**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **U.S. COMMODITY FUTURES TRADING COMMISSION,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **CASE NO. 12-cv-06763** |
| | : | |
| **DONALD A. NEWELL AND QUIDDITY, LLC,** | : | |
| | : | |
| **Defendants.** | : | |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO EXCLUDE
THE TESTIMONY AND OPINIONS OF JEFFERY D. HARRIS**

NOW COME Defendants Donald A. Newell ("Newell") and Quiddity, LLC ("Quiddity"), by and through their undersigned attorneys, and for their Memorandum In Support of Defendants' Motion to Exclude the Testimony of Jeffery H. Harris, state as follows:

**INTRODUCTION**

The CFTC has alleged that the Defendants engaged in a fraudulent scheme whereby they ex-post allocated profitable trades to their proprietary account. Among other evidentiary hurdles, the manually completed order tickets for the "trades" listed in ¶ 34 of the Complaint all contain both the proprietary account and a suspense account number. The CFTC has no testimony to establish when the proprietary account number was placed on the written order tickets. In an attempt to bridge its huge evidentiary gap, the CFTC retained a former chief economist for the CFTC, Jeffery H. Harris, Ph.D. ("Harris") to provide "expert" testimony; however his data and conclusions are not reliable, nor will his testimony help understand any of the evidence or assist the trier of

fact to determine any of the facts in this action. Furthermore, Harris is not qualified to testimony regarding the subject matter of this action. For these reasons, Harris' testimony must be excluded.

## SUMMARY OF THE ARGUMENT

Harris' opinions are based upon a flawed and misrepresentative statistical analysis of a limited number of transactions cherry picked for his review by the CFTC. His testimony, therefore, must be excluded for at least the following reasons:

a. The methodology of his analysis is based upon a tainted pool of data points;
b. The analysis is based upon definitions and data manipulations that are not generally utilized or accepted;
c. The methodology or data underlying his analysis has not been tested by him;
d. He never used the methodology in his daily activities;
e. The methodology of his analysis has not been subjected to peer review or publication;
f. The structure and basis of his analysis has not been accepted in the industry or any relevant community and has been criticized by the Seventh Circuit; and
g. Harris has no actual background and experience in the relevant areas of options or futures trading -- his credentials have no connection to his analysis.

Harris produced an Initial Report and Supplemental Report. Copies of his reports are submitted as Exhibits A and B, respectively, in the Appendix filed concurrently with this Memorandum. A copy of Harris' deposition testimony is submitted as Exhibit C to the Appendix.

## SUMMARY OF HARRIS' REPORTS

According to Harris, the CFTC asked him whether using "data in the record" whether other "variables" could account for the differences in profitability in the respective Proprietary and Customer accounts. (Ex. C, p. 396). Harris choose five criteria

to test: 1) trade size; 2) executing broker; 3) time a position is held; 4) the day of the week that trades are executed; and 5) the time of day the trades were executed. *See* Ex. A, p. 7 ¶ 12. Notably absent from Harris' analysis is any consideration the respective accounts' investment objectives, the stated risk tolerances, the implication of margin and, most incredibly, any consideration of how the subject transactions impacted the pre-existing options positions in the Customer Accounts. Ex. C, pp. 143-61. Harris admitted that the five criteria he used for his analysis could *not* account for the differences in profitability in the respective accounts:

> Q. If you take any two commodity trading accounts and you apply your five criteria, *could you determine from your analysis whether one account was dealing in ex post allocations and the other one wasn't?*
> MR. GREEN: Objection. Vague.
> THE WITNESS: *I doubt it.*

Ex. C, pp. 156-7.

Harris did no independent selection of which transactions to test, instead relying on "suspicious" transactions selected solely by the CFTC. Worse, Harris adopted a unique and fundamentally flawed definition of the term "trade," thus generating an analysis based on a completely untested methodology using five criteria that have never been self-tested, peer-tested, nor subject to any peer review whatsoever. In short, Harris' analysis is precisely the type of junk science criticized by the Seventh Circuit in Elliott v. Commodity Futures Trading Commission, 202 F.3d 926 (7th Cir. 2000) *cert. denied,* 531 U.S. 1010 (2000). Therefore, pursuant to this Court's gatekeeping responsibility imposed by Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 597, 113 S.Ct. 2786 (1993) and its progeny, Harris' testimony must be excluded.

## I. FACTUAL BACKGROUND

### A. The Nature of Quiddity's Business

Quiddity, through Newell, operated two commodity pools, the QED II Fund, L.P. (the "Pool") and also acted as a commodity trading advisor ("CTA"), exercising trading authority over between four and eight customer trading accounts ("Managed Accounts") (collectively, the "Customer Accounts"), which were primarily carried at MF Global, Inc. ("MFG"), a registered commodity futures commissions merchants ("FCM"). Having made the disclosures required by 17 C.F.R. 4.34, Quiddity also maintained a proprietary trading account (the "Proprietary Account") at MFG.

With the financial meltdown of 2008, Newell an experienced day-trader, perceived the opportunity to profit from the increased market volatility and he increased his day-trading for the Proprietary Account in mid-October, 2008. The overwhelming number of trades in the Proprietary Account consisted of futures day-trades, while the trading for the Customer Accounts overwhelmingly consisted of a long-term (three to six month), premium selling options strategy. A large portion of the Proprietary Account trades occurred in the overnight markets, whereas trades for the Customer Accounts were initiated primarily during the day when the open outcry options markets were accessible.

Quiddity's strategy was not a get-rich-quick scheme but, instead, was a risk controlled program for "institutions, pension funds, high net worth individuals, family offices and investment advisors." *See* Quiddity Disclosure, attached as Exhibit D to the Appendix. Quiddity used a computer program named QUIPS to identify the initial options positions to be initiated for the Customer Accounts. As Defendants' marketing material stated: "We don't take directional bets." The marketing materials further stated

that Quiddity did *not* engage in option day trading for the Customer Accounts. Id.  The records reviewed by Harris disclosed that commodity futures hedge trades accounted for less than 5% of the total positions initiated for the Quiddity strategy.

In addition to the different sizes of the various Managed Accounts, each account authorized different margin levels, as well as limiting which contracts could be traded in certain accounts.  Quiddity maintained formulas for properly allocating the number of options or futures contracts assignable to each Customer Account based on these considerations. The Defendants' ability to manage risk accounted for its unbroken record of generating returns for the customer accounts (*see* Ex. D):

**Annual Return To Investors Net Of All Fees And Expenses:**

| 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 |
|------|------|------|------|------|------|------|
| 14.96% | 13.40% | 14.14% | 5.71% | 14.17% | 0.58% | 15.41% |

Newell testified that futures trades were used solely as a hedging strategy to offset a portion of the risk realized from increased volatility for the Customer Accounts. Since the customer strategy was optioned-based, any futures positions were intended as either a "placeholder hedge until an appropriate, affordable option hedge could be found.  If an appropriately priced options contract was executed, then the placeholder futures contracts would be liquidated resulting in a day-trade; if not the placeholder futures positions would be incorporated into the overall open position. The open options positions totaled in the tens of thousands at various strike prices for various contract months while the incorporated futures positions were 4-5% of the total positions and represented an even smaller total of the notional values of the accounts.

The options positions in the Customer Accounts had been initiated months earlier with the intention to hold the positions until expiration and retain the maximum amount

of net collected premium. *See* Ex. D. After the Lehman Brothers bankruptcy in September of 2008, market volatility increased dramatically, requiring active management of the previously established positions to prevent large losses due to the increase volatility. When the market whipsawed during the day, changing direction with historic speed and volatility, placeholder futures trades often had to be liquidated, since, rather than hedging the overall position, the placeholder positions actually increased the risk as the market reversed itself. To the uninformed, this activity can give the appearance of day trading. Nonetheless, Defendants' ability to effectively use options and placeholder futures contracts to hedge risk is reflected in the fact that none of the Customer Accounts lost money during the 2008-09 financial crisis.

During the relevant time-period, Quiddity executed trades for the Customer Accounts and the Proprietary Account at MFG as well as at Mizuho Securities USA Inc. ("Mizuho"), Xchange Financial Access LLC ("XFA"), and Devonshire with the vast majority of trades being executed through Mizuho and MFG. At the end of each day, Mizuho, XFA, and Devonshire would "give-up" the trades to MFG. The trades executed through MFG were entered via an electronic system called "PATS" thru a terminal located in Quiddity's office. The trades executed through the other FCMs were accomplished via telephone from either Quiddity's office or Newell's home to the FCM's order desk where a paper order ticket was generated by the FCM's order desk personnel. Trades entered for the Customer Accounts were entered as "bunched orders" using what is known as a "suspense account"[1] and were subsequently allocated to the appropriate

---

[1] A "suspense account" is a fictitious, temporary, account identifier used by an FCM to execute bunched orders that takes the order from the front-end order entry point through the middle and back office systems prior to allocation to specific accounts and, in the case of an execution-only FCM, to ultimate "give-up" to the FCM holding the actual accounts.

Customer Accounts via a summary spreadsheet sent by Quiddity to the executing broker prior to the end of the trading day. *See* 17 C.F.R. §1.35 (a-1)(5)(iii).

Newell testified that he did not place bunched orders for the Proprietary Account. Instead, for the FCMs though which the Defendants placed telephone orders for the Proprietary Account, Defendants provided the order desk with information identifying the order as being placed for the Proprietary Account when the order was placed or, in instances where the order desk personnel were too busy or refused to take the account identifier information when the order was placed, at the time the "fill" (*i.e.* report that the order had been executed) was reported to Quiddity.

The MFG orders were placed electronically through a PATS terminal in Quiddity's office. From October 15, 2008 until approximately December 4, 2008, the only account listed on the drop down menu on the PATS terminal in Quiddity's office was the MFG suspense account for the Customer Accounts. MFG had authorized the Proprietary Account as one of the accounts that could use the suspense account number for trading. Upon placing a trade for the Proprietary account, Quiddity personnel would call MFG's back office, informing MFG that the trade was for the proprietary account. In November, 2008 -- in an action wholly inconsistent with someone engaged in a fraudulent scheme dependent on the use of a suspense account to allocate trades post-execution -- Newell requested that MFG add the Proprietary Account number the drop down menu on Quiddity PATS terminal. MFG provided that authorization on or about December 6, 2008.

## B.    The CFTC's Proof Problem

For the trading activity listed in ¶ 34 of the Complaint placed via telephone, the proprietary account number *appears on all the written order tickets*. However, a fraudulent allocation scheme is entirely dependent on proving *when* the order takers where provided with the proprietary account number.  Six different scenarios exists for when an account number could be provided for a particular order:

1. When the order is given;
2. When a price or quantity change is made to an unexecuted order;
3. Contemporaneous with the report of the fill for the order;
4. After the fill has been reported, and the price is the same as that for the order;
5. After the fill, and the price has moved so that there is an open loss for the trade; and
6. After the fill, and the price has moved so that there is an open profit for the trade or the position has been closed out for a profit.

Only the last possibility, allocating a trade after there is an open or realized profit, supports a fraudulent allocation scheme. Therefore, proving *when* the proprietary account was placed on the order tickets is crucial to the CFTC's case. The CFTC has no direct testimony stating when the Proprietary Account numbers were placed on the order tickets. Similarly, the CFTC has no testimony from anyone in MFG's back office during the period October 15, 2008 through December 6, 2008 (before the Proprietary Account was included in the dropdown menu of the PATS terminal) contradicting Defendants' testimony that they called MFG to inform it when they were placed an order for the Proprietary Account on the PATS terminal. As such, the CFTC tried to fill its evidentiary void with Harris' reports.

### C.    The Harris Opinions

Harris offers two opinions. *First*, Harris opines that compared to a 50% flip-of-a-coin probability of success (Ex. C, p. 192), the chances of 55 of 66 Proprietary Account "trades" being profitable is "virtually zero" while the probability of only 25 of 64 Customer Account "trades" being profitable is only 5.2%. Ex. A, at ¶18. *Second*, Harris opines that the differences in profitability between the "trades" in the Customer Account and the Proprietary Account "cannot be explained by characteristics of trade size, executing broker, the time a position is held, the day of week that trades are executed or by the time of day" and, therefore, "The profitability differences are almost surely the result of *ex post* assignment to different trading accounts." Id. at ¶ 62.

## ARGUMENT

## THE <u>DAUBERT</u> STANDARD

In <u>Lewis v. Citgo Petroleum Corp.</u>, 561 F.3d 698,705 (7th Cir. 2009) *cert. denied*, 558 U.S. 1092 (2009), the Seventh Circuit affirmed the "<u>Daubert</u>" standard for admissibility of expert testimony:

> The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and the Supreme Court's opinion in <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). <u>Naeem v. McKesson Drug Co.</u>, 444 F.3d 593, 607 (7th Cir.2006). Expert testimony is admissible when the testimony is reliable and would assist the trier of fact to understand the evidence or determine a fact at issue in a case. *See* Fed. R. Evid. 702; <u>Daubert</u>, 509 U.S. at 589-91, 113 S. Ct. 2786. The proponent of the expert bears the burden of demonstrating that the expert's testimony would satisfy the Daubert standard. Fed. R. Evid. 702 advisory committee's note (2000 Amends.) ("[T]he admissibility of all expert testimony is governed by the principles of Rule 104(a). Under that Rule, the proponent has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence.")

In <u>Kumho Tire Co., Ltd. v. Carmichael</u>, 526 U.S. 137, 149, 119 S. Ct. 1167 (1999), this

Court's Daubert "gatekeeping" function was extended to all expert opinions.

Rule 702 ascribes to this Court "the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." Daubert, 509 U.S. at 597, Under Daubert, a trial court faced with the proffer of expert testimony:

> [M]ust determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.

509 U.S. at 592-93. The Supreme Court identified four factors among those to be considered in assessing the reliability of such expert testimony: 1) whether a theory or technique can be and has been tested; 2) whether a theory has been subjected to peer review and publication; 3) whether a "particular scientific technique" has a known or potential rate of error; 4) and whether the theory or technique enjoys general acceptance within the "relevant scientific community." Id., at 593-94.

"The trial court, exercising its gatekeeping function, must examine the expert's qualifications, the methodologies he used, and the relevance of the final results to the questions before the jury." Adams v. Ameritech Srvs., Inc., 231 F.3d 414, 423 (7th Cir. 2001). While Daubert "does not preclude testimony merely because it may be based upon an assumption, the supporting assumption must be sufficiently grounded in sound methodology, and reasoning" for any conclusions "it supports to clear the reliability hurdle." In re TMI Litigation, 193 F.3d 613, 677 (3rd Cir. 1997). As stated in Rosen v, Ciba-Geigy Corp., 78 F.3d 316, 318 (7th Cir. 1996) *cert. denied,* 519 U.S. 819 (1996), under Daubert "a district judge asked to admit scientific evidence must determine whether the evidence is genuinely scientific, as distinct from being unscientific

speculation offered by a genuine scientist." Under the <u>Daubert</u> standard, Harris'

testimony and conclusions must be excluded.

**I.      THE SELECTION METHODOLOGY AND DATA USED BY HARRIS
        IS TAINTED AND PATENTLY UNRELIABLE**

For an analysis to be admissible, the data used for that analysis must be reliable.

<u>Chavez v. Illinois State Police</u>, 251 F.3d 612, 641 (7th Cir. 2001). As Harris admitted,

"with bad data you have a questionable report".  Ex. C, p. 320.  Here, the data used by

Harris to form his opinions is tainted by selection bias and, thus, is patently unreliable.

As stated in the <u>Reference Manual On Scientific Evidence</u>, Federal Judicial

Center, 3rd Ed., "Inferences from the part to the whole are justified when the sample is

*representative*." <u>Id</u>. at p. 217 (emphasis supplied). Consistent with such standard, in his

usual capacity, Harris selects the data for a study to avoid selection bias. Ex. C, pp. 54,

59-61. If data is selected non-randomly, one cannot, as Harris concedes, make use of any

statistical theory based on random variables or normal distributions in assessing that data.

<u>Id</u>. at p. 62.  The pre-screening of data is, as Harris admits, a concern since the selection

criteria can affect the outcome of the analysis. <u>Id</u>., p. 61. According to Harris, if one is

not selecting the data oneself, it is important to understand the data-generating process in

order to know from where the sample is coming. <u>Id</u>. at p.63.  In this case, however, Harris

accepted the data without doing anything to determine whether the "process utilized by

the CFTC to choose these transactions was tainted by any bias." <u>Id</u>. at p. 128-29. Other

than noticing that the "trades" were generally opened and closed the same day, all Harris

knew was that the "trades" were somehow "suspicious" because the CFTC believed that

the "trades" were allocated disproportionately to the respective accounts. <u>Id</u>., p. 119. He

made no attempt, *whatsoever*, to attempt to determine whether the CFTC's selection

process could have tainted the outcome of his analysis. This failure, alone is basis to exclude his testimony. <u>Cummins v Lyle Indus.</u>, 780 F. Supp.2d 719 (E.D. Wisc. 2008).

In <u>Cummins</u> the defendant's expert predicated his report entirely on information provided to him by defendant's counsel. As occurred, with Harris, that expert failed to verify or test any of that information:

> Wilson [the expert] did not independently verify the source and accuracy of the data. Wilson did cross-check the information against other documents, but the bottom line is that Wilson never talked to anyone at St. Jude to verify the accuracy of the information in any of the documents he reviewed. Wilson's information was received solely from St. Jude's counsel.

780 F. Supp.2d at 726 (expert excluded; "was not intended to abolish the hearsay rule and to allow a witness, under the guise of giving expert testimony, to in effect become the mouthpiece of the witnesses on whose statements or opinions the expert purports to base his opinion.") (internal cite omitted).

Harris failed to undertake any effort to verify whether the "trades" were actually profitable or unprofitable as represented by the CFTC. <u>Id.</u>, p. 133. Harris never made any attempt to determine if the profitable trades were actually unprofitable after commissions and fees. <u>Id.</u>, p. 132.[2] This omission is curious because Harris purposely omitted what he assumed to <u>be</u> unprofitable Proprietary Account trades from his analysis. Hence, even accepting his flawed selection process, Harris did not consistently apply that process. In short, Harris failed to apply *any* scientific rigor to determine whether he was dealing with consistent or reliable data. Instead, Harris merely accepted the "CFTC's efforts, assumed them to be good faith, and that "they were giving me all of the trades that fit the

---

[2] For example, Trade 5 in ¶ 34 of the Complaint is actually a losing trade after the commissions are subtracted. Trade No. 24 also is a losing trade, but, again, Harris failed to undertake any independent investigation of the data he was to analyze and, thereby, was inconsistent in his application of the data.

parameters that they told me." Id., p. 121. "Other than trusting the government, I trusted they gave me the data that they wanted me to analyze." Id., p. 122.

Merely trusting the person who retains one as an expert does not satisfy the requirements of reliability under Daubert. *See* Cummins, 780 F. Supp.2d at 726; and In re TMI Litig., 193 F.3d 613, 697 (3d Cir. 1999) (excluding testimony of expert who failed to verify data provided by client's counsel). Additionally, the methodology of choosing the data samples is fatal to Harris' reports. In Allgood v. General Motors Corp., 2006 U.S. Dist. LEXIS 70764 (S.D. Ind. 2006) the court faced a similar issue when the plaintiff's statistical study was subjected to the rigors of Daubert. In Allgood the expert's study utilized data points "cherry picked" by the expert to establish the likelihood of developing cancer from some alleged environmental poisoning. Id., at *28. "Questions as to [the expert's] choice in data sampling go to the heart of his methodology." Id., at *33. Though numerous other data sample were available, the expert's selections were not considered a representative sample and "was not sufficiently reliable to satisfy the demands of Daubert and Rule 702 due to selection bias and therefore cannot be admitted." Id., at *35. *See also,* Menasha Corp. v. News America Marketing In-Store Inc., 238 F. Supp.2d 1024, 1030 (N.D. Ill. 2003) (journalist survey excluded in part because he failed to gather responses from a representative sample accurately representing the target population), *aff'd*, 354 F.3d 661 (7th Cir. 2004); and United States v. Mikos, 2003 U.S. Dist. LEXIS 22069 *12 (N.D. Ill. 2003) (finding that FBI database of bullet samples could not be the basis for expert testimony; database could not satisfy Daubert where there was no evidence "that the samples were gathered in any approved

scientific manner so as to be considered as representative of the bullet population as a whole"). The sum of these cases confirms:

> (1) that sample choice, the selection of data points on which to determine risk in this case, is an issue of methodology, and (2) that to represent adequately the risk or other prediction at issue, the samples must be chosen using some method that assures the samples are appropriately representative of the larger entity or population being measured.

Allgood, at * 34-5.

During the period of October, 2008 through March, 2009, there were thousands of transactions in the Proprietary and Customer Accounts. Instead of choosing a representative sample, Harris simply accepted 130 "trades" *selected* by the CFTC as "suspicious." By doing so, Harris simply accepted as true what are essentially factual assertions of the CFTC regarding the agency's "suspicions." Based on that erroneous assumption alone, Harris should be excluded. Clark v. Takata Corp., 192 F.3d 750, 757 (7th Cir. 1999) (excluding expert's opinion; "an expert does not assist the trier of fact in determining whether a product failed if he starts his analysis based upon the assumption that the product failed (the very question that he was called upon to resolve)"). In Champagne Metals v. Ken-Mac Metals, Inc., 458 F.3d 1073 (10th Cir. 2006), the plaintiff's expert economist merely accepted the facts as related by the party retaining him. The District Court "noted that many of Dr. Murry's opinions were based solely on facts provided by Champagne" and ruled that "[n]o reasonable economist would simply accept the self-serving statement of an interested party as fact." 458 F.3d 1080 at n.4. The Tenth Circuit agreed, holding that the District Court properly excluded the testimony since the "opinions lacked foundation because they were based on 'the self-serving statement[s] of an interested party.'" Id.

The reason for excluding an opinion based on data selected by a party is evident

when one considers that the first part of Harris' analysis is a probability analysis of how likely it is to have "X" number of profitable trades out of a universe of "Y" trades. When the party retaining the expert selects the universe to be analyzed it is a simple matter to dictate the results of the analysis. Here, the CFTC selected "trades" for Harris to analyze, 66 of which were for the Proprietary Account (with 55 being profitable) and 64 for the Customer Accounts (with 25 being profitable). Ex. A, ¶ 17. Then using a flip-of-the-coin probability of a "trade" being successful, Harris opines that the chance of having an 83.3% (55 out of 66) success ratio for the Proprietary Account "trades" is "virtually zero" and the likelihood of the corresponding 23.5% (25 of 64) success ratio for the Customer Account "trades" is only 5.2%. Harris did not calculate how many actual "trades" were made for each account, nor did he inquire the overall number of profitable "trades" for the respective accounts. There are simply no facts to support that the hand-picked trades were representative of either account. Without any independent scrutiny, it is the selection process that dictates the result. Here, as in <u>Champagne Metals</u>, Harris simply accepted the self-serving information provided him, without testing the data for selection bias, which is nothing more than a self-serving supposition. As Harris admitted, all the tests were done "on the samples that I was given" and so the results depended entirely on what was selected. Ex. C, p.246.

This Court must determine if it was appropriate for Harris to rely "upon the sources of information which he employed." <u>Bielskis v. Louisville Ladder Company, Inc.</u>, 663 F.3d 887, 896 (7th Cir. 2011) (internal cite omitted). An expert must be "as careful" in his expert analysis "as he would be in his regular professional work outside his paid litigation consulting." <u>Sheehan v. Daily Racing Form, Inc.</u>, 104 F.3d 940, 942

(7th Cir. 1997) *cert den*. 521 U.S. 1104 (1997); Kumho, 526 U.S. at 152. Neither Harris

nor anyone else in the academic world would "accept from his students" papers without

properly testing the data for selection bias, *see, e.g.,* Rosen, 78 F.3d at 319, and neither

should this Court.

## II. HARRIS USED A UNIQUE DEFINITION OF THE TERM "TRADE" WHICH PURPOSEFULLY OBSCURED THE DIFFERENCES IN TRADING BETWEEN THE ACCOUNTS

An analysis of trading profitability between accounts must, of course, begin with

a definition of what, precisely, is a trade. The Chicago Mercantile Exchange ("CME")

defines a "trade" as "any purchase or sale of any commodity futures or options contract

made on the Exchange.[3] Harris agreed with the CME's definition of the term "trade":

"Generally speaking, I would say a trade is a buy or a sell, a single transaction." Ex. C, p.

114. The CFTC does not define the term "trade" but does defines the term "round turn"

as "A completed transaction involving both a purchase and a liquidating sale, or a sale

followed by a covering purchase." *See*, CFTC Glossary, available at:

(www.cftc.gov/consumerprotection/educationcenter/cftcglossary).

Harris testified that his definition of the term "round-turn" comports with that in

the CFTC Glossary. Ex. C, p. 183. However, for the purposes of this matter, Harris

adopted the a definition of a "trade" as consisting of all the trading activity in a given

account for a given commodity that initiated and closed out positions for a given "day."

---

[3] The CME defines an order as "a request by a trader to buy or sell a given futures instrument with specified conditions such as price, quantity, type of order." CME Group Glossary (see, www.cmegroup.com/education/). The CFTC Glossary states a "limit order" is an order in which the customer "specifies a minimum sale price or maximum purchase price, as contrasted with a market order which implies that the order should be filled as soon as possible at the market price." An order can be executed at different prices or "fills" as the price fluctuates for a market order being worked or fluctuates favorably for a limit order being work.

Ex. C, p. 114. A "day" for the purpose of this definition of the term "trade" runs from 5 p.m. one day until 5 p.m. the next day.  Id. at p. 410-11.[4]

Harris testified that he never previously used this definition of "trade" (Ex. C, p. 179), and is unaware of any regulation or exchange rule that uses this definition of the term "trade." Id. at p. 227. Harris is also unaware of any treatise or textbook study that used this unique definition of the term "trade." Id. at p. 181. Nor, is Harris aware of any study aggregating multiple round-turn done throughout a day into a single "trade" as the CFTC's definition of "trade" does in this case. Id. at p. 185-6.

Aside from being different from accepted industry standards, the CFTC's unique definition of "trade" contains a number of inherent flaws.  One problem with the CFTC's definition of a "trade" is that it purposely eliminates and obscures the very data points that Harris was supposedly testing for. For example, under the CFTC's definition, ten 5-lot round turn trades executed during the day in the Proprietary Account is considered a single 50-lot trade. All of the individual characteristics of the ten 5-lot trades are lost through this aggregation. The CFTC's definition also eliminates time gaps between transactions, changes in strategies and the holding period for that specific round turn trade.  For example, if the first three (of the ten) round turns were opened as long positions, and then four hours after the last long position was covered, the Proprietary

---

[4] The normal trading day for the S&P IMM and E-mini contracts is 3:30 p.m. central time until 3:15:pm central time the following day. The market closes at 4:30 p.m. central time for one half hour, reopening at 5:00 p.m. The Japanese Yen futures contract generally trades from 5:00 p.m. central time until 4:00 p.m. the next day. The "open out-cry hours" on the CME for the S&P IMM and S&P E-mini is 8:30 a.m. to 3:15 p.m. central time while the open outcry trading hours for Yen futures is 7:20 a.m. to 2 p.m. central time. Trading outside of CME "open outcry" hours is considered "extended" or "after hours" trading and, at Mizuho, was placed through its "24 hour desk."  Therefore, while the Japanese Yen trades for a "day" as defined by Harris and the CFTC would fall within the CME's definition of a single trading day, the CFTC and Harris definition of "day" would actually consist of portions of two different trading days as defined by the CFTC.

Account opened with a 5-lot short position in the same contract, the CFTC's definition would obscure the fact that the fourth round-turn transaction was different, both strategically and by the timing, from the prior three round-turns.[5]

Moreover, what may be interpreted as classic in-and-out trading by a scalper becomes equivalent to a position of a single 50-lot position taken and held for a much longer period of time during the trading day. Therefore, while the ten 5-lot trades vary considerably in market exposure, number and size compared to a true single 50-lot trade, Harris would find no size difference between the two "trades." Similarly, if the ten 5-lot trading began at 7:00 a.m. and the last trade was closed out at 3:00 p.m. and even though each of the ten round turn trades lasted only 2 minutes, Harris would treat the ten round turn trades as if it had a single eight-hour holding period. That was the only way he could conclude that "the average proprietary trade was held for 524.5 minutes, or just under 9 hours." Ex. A, ¶ 44. Only by these types of manipulations could Harris conclude that any difference in profitability between the two accounts could not be explained by either "trade" size or "trade" holding period.

III.    HARRIS IMPROPERLY DISREGARDED DATA THEREBY
        MANIPULATING THE RESULTS OF HIS ANALYSIS

Having an adequate sample size is paramount to the value of any statistical analysis Chavez, 251 F.3d at 643. Here, the entire *starting* sample size is 130. Hence,

---

[5] A prime example of the CFTC's unique definition of 'trade' is found in Trade #1 in paragraph 34 of the Complaint. The Complaint lists it as a single 300 lot transaction, which Harris treats the "trade" to have been in place for more than 5 hours. In reality, the 'trade' was actually a series of four 25 lot round turns, plus four 50 lot round turns, including two reversals (where the opening position was long when the prior purchase closed out a short position, and vice versa). Total actual market time for the 8 round-turns was about 60 minutes, with certain round turns lasting less than 2 minutes. Hence, 8 distinct transactions of 25 or 50 lots, with total market time of 69 minutes is converted to a single 300 lot "trade" in place for 5 hours. See, Ex. C, pp. 271-88. The Complaint and Harris' conclusions are entirely dependent on this type of distortion.

compared to the thousands of transactions in the Proprietary Account, Harris used relatively few of the transactions for his analysis. According to Harris 2,224 executions are compressed into his 130 "trades." Moreover, Harris admits that he manipulated the data.

For example, Trade 49 was listed as profitable in ¶ 34 of the Complaint. Harris excluded it because in actuality, it was not profitable. Ex. A, fn. 2. Harris admitted that he disregarded numerous "suspicious" "trades" for the criteria based portions of his analysis because the data (such as timestamps) were illegible or missing and he did nothing to research the missing data. Ex. C, pp. 228-29. Inexplicably, he also excluded the 10 losing "suspicious" trades in the Proprietary Account. Ex. C, p. 233. Removing this data (more than 10% of the total) altered "the significance of his data." *See e.g.* U.S. v. Barlow, 310 F.3d 1007, 1012 (7th Cir. 2002) *cert den*. 538 U.S. 1066 (2003).

As noted above, Harris selectively disregarded components of the universe of 130 "trades". Specifically, his entire analysis (excluding his 'coin toss' portion) excluded 10 losing trades for the Proprietary Account that the CFTC deemed "suspicious". See, e.g., Ex. A, Tables attached at pp. 23-27. As the Court will note, each of his 'tests' uses a reduced number of "trades". Id. So, after starting with a deficient universe of 130 "trades", Harris further filters, reduces and manipulates the data so that increasingly smaller pools of transactions are used to allegedly 'represent' what happened in the various accounts. In an economist's language, the reduced number of the tested "trades" increases the standard error and lowers the confidence interval. *See e.g.*, Ex. C, pp.69-70, 130. In other words, the shrinking size of his testing pools makes the results of his tests less reliable.

Additionally, Harris disregarded any open positions. Ex. C. pp. 290-94. If the Customer Accounts purchased a total of 100 futures contracts at 9:00 a.m. and closed out only 50 of those contracts at 2:00 p.m., Harris' analysis ignores the second 50 contracts; it would appear as a 50 contract "trade" that lasted five hours, not a 100-lot trade with a 50 lot being carried (at least) until the next day. Therefore, the true characteristics of this transaction are ignored for purposes of determining size, holding period and profitability. It is as if the second 50-lot never occurred. Because the vast majority of the Proprietary Account trades were closed out the same day, this selective disregarding of open positions obscured the real statistics far more often for the Customer Accounts. This manipulation clearly impacted the comparison of the two account trades considered in his analysis. Ex. C, pp. 296-300.

Worse, notwithstanding that he had all the trading records (Ex. C, p. 98), Harris completely ignored the underlying options positions which made up the bulk of the positions in the Customer Accounts. See, Ex. C at 99:

> Q.    I want to be clear on this. Are you saying that your testing was just to look to look at the trades that were open and closed within the same day without regard to what else was in the account?
>
> A.    That's basically it, yes.

This startling admission begs the question of how he could opine on a purported *ex post* allocation scheme without considering whether the subject transactions fit the customers' strategies or investment objectives, their risk profiles, the impact on any margin usage, or if the subject transactions may have been duplicative or in contradiction to pre-existing positions in the accounts? It is as if the CFTC purposely put blinders on Harris so he could not and would not see how the subject transactions fit into the bigger picture. This

Court should not countenance such blatant manipulation of the data.

IV. **HARRIS FAILED TO TAKE INTO ACCOUNT A MAJOR FACTOR THATCOULD EXPLAIN THE DIFFERENCE IN PROFITABILITY BETWEEN THECUSTOMER AND PROPRIETARY ACCOUNTS**

Harris ignored the crucial and fundamental difference in the investment strategies between the Customer and Proprietary Account. Thus, even if the data relied upon by Harris was reliable, his methodology is fatally flawed. In short, Harris treats the Customer and Proprietary Accounts as equivalents, ignoring the different risk tolerances and the objectives of each account. The Customer Accounts maintained large open options positions as well as various open futures positions, while the Proprietary Account was a day trading account of primarily futures trading that only occasionally held a futures or options positions overnight. That difference is not subject to dispute.

Harris, by focusing solely on the futures day trades in the Customer Accounts, compares a minor component of the Customer Accounts (*i.e.* trades that for some reason resulted, at least in part, in a round turn day trade) to what is almost exclusively a day trading Proprietary Account. In other words, he equates a controlled risk options account with a speculative futures account -- clearly an 'apples to artichokes' comparison. Assuming, *arguendo*, that the small volume of day trades in the Customer Accounts can be divorced from the overall trading in the Customer Accounts in a manner that permits an actual comparison of trading between a small segment of the activity in the Customer Accounts with the entirety of the Proprietary Account trading, there is a larger issue: *the assumption that profitable trading is always synonymous with successful trading.*

The CFTC defines a "speculator" as "a trader who *does not hedge* but who trades with the objective of achieving profits through the successful anticipation of price

21

movements." CFTC Glossary (emphasis supplied). For a speculator, profitability is the measurement of a successful trade – it either makes or loses money. Here, the parties agree that the Proprietary Account was a speculative account. In contrast, a hedger enters a trade "to minimize the risk of financial loss from an adverse price change." Id.[6]

Harris acknowledged that hedges generally lose money (Ex. C, p. 255-56) and that "if the hedge is making lots of money, that is generally reflective that the underlying position is losing lots of money." Id., p. 256. Therefore, the ultimate profitability of the hedge cannot be a proper measurement of the success of a hedging transaction. A losing hedge means that the net of the overall position is generating greater profits from the market movement that is causing the hedge to lose money and, conversely, for every dollar of profit earned by the hedge the net overall position is losing a greater amount of money. Therefore, just as having 55 profitable "trades" out of 66 "trades" is good news for the speculator, having only 25 profitable "trades" out of 64 "trades" is good news to the hedger and not a "bad" thing as Harris implies in his report.

Importantly, Harris testified that if one account was using futures as hedges and another account was not, one could expect to see a number of differences between the accounts, *including profitability differences*. Ex. C, p. 258. Harris further admitted that an analysis of the accounts to determine the general trading strategy being employed could have been made but that he did not conduct such an analysis. Ex. C, p. 105-06. Curiously, Harris admitted that there could be "exogenous reasons for closing a client position, e.g., for rebalancing purposes, hedging, etc. . ." Ex. C p. 249; Ex. A, p. 20, fn.

---

[6] Harris admits that hedgers do not offset risk dollar for dollar but rather offset a portion of the risk of an adverse price movement of the underlying asset. Ex. C, pp. 253-54.

7. That "the hedge doesn't need to be made any more . . . ." Id. Harris also admits that an opening transaction may be "to initiate a hedge". Ex. C, pp. 250-51. Yet, Harris never attempted to determine whether hedging was occurring in one account versus speculation going on in the other account. Id. at p. 262.

Though the failure of an expert to test for a variable or set of variables generally goes to the weight and not the admissibility of an opinion, any analysis *must* account for major factors. *See e.*g., EEOC v. Sears, Roebuck &Co., 839 F.2d 302, 326 (7th Cir. 1988) (questioning statistical report in a discrimination suit wherein "the six characteristics chosen by the EEOC's expert Siskin were 'simplified' and inadequate to account for applicant differences in interest and qualifications."). Here, Harris failed to account for a possible major variable between the accounts, *i.e.* that the "trades" he analyzed in the Customer Accounts were the result of non-directional hedging activity while those in the Proprietary Account were directional, speculative "trades." Statistical evidence that fails to take into account factors that might offer a contrary explanation to the hypothesis being tested, is insufficient to create an inference of causation (Radue v. Kimberly Clark Corp., 219 F.3d 612, 616 (7th Cir. 2000)) and attests to a failed methodology.

## V.   HARRIS' USE OF A FLIP OF THE COIN PROBABILITY STANDARD FAILS THE DAUBERT "FIT TEST"

As stated in Daubert,

Rule 702 further requires that the evidence or testimony "assist the trier of fact to understand the evidence or to determine a fact in issue." This condition goes primarily to relevance. "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." 3 Weinstein & Berger ¶ 702[02], p. 702-18. *See also* United States v. Downing, 753 F.2d 1224, 1242 (CA3 1985) ("An additional consideration under Rule 702—and another aspect of relevancy —is whether expert testimony proffered in the case is sufficiently tied to the facts of the case

that it will aid the jury in resolving a factual dispute"). The consideration has been aptly described by Judge Becker as one of "fit."  *Ibid.*

509 U.S. at 591. Here, Harris' probability analysis discussed in ¶ 18 of his initial Report fails this "fit" test.

Harris, using the CFTC's novel definition of a "trade," computed the probability of the Proprietary Account realizing 55 profitable "trades out of a total of 64  "trades" as "virtually zero" and the probability of the Customer Accounts only realizing 24 profitable trades out of a total of 60 such trades as 5.2%. Ex. A, at ¶ 18.  However, as previously discussed, the 130 "trades" that Harris used for his probability analysis were not chosen randomly. While the flip of the coin requires only one action (flipping) to experience a result of heads or tails, a commodity futures or options "trade" requires numerous decisions including when to enter the market, how much to risk, and when to exit the market. Harris testified that trades are not entered randomly (Ex. A, at p. 191), but never explains how the use of randomness as a standard to analyze such a non-random data is at all helpful in determining the issues in this case. Harris cites no accepted theory or any study that supports this type of randomness probability methodology[7].

The fallacy of Harris' methodology is exposed by the trading results for the Proprietary Account for the six-months following the relevant period in the Complaint during – for which there are no allegations of any improper post-execution allocations. From April 1, 2009 through September 30, 2009 the Proprietary Account engaged in 261 round-turn trades with the following results:

---

[7] Harris' flip of the coin methodology (the chance of having 55 of 66 trades being profitable) would also mean that a doctor's "chances" of making 55 out of 66 correct diagnoses is "virtually zero" or that there is a "virtually zero" chance a person's car will start 55 out 66 times the key is turned. Randomness is useless in measuring a non-random activity.

|  | Percent Of Profitable Round Turns | Percent of Profitable Contracts |
|---|---|---|
| Apr-09 | 84.00% | 84.50% |
| May-09 | 79.01% | 84.10% |
| Jun-09 | 72.20% | 88.20% |
| Jul-09 | 86.22% | 87.70% |
| Aug-09 | 83.30% | 92.40% |
| Sep-09 | 78.70% | 85.20% |

Expert Report of Jack Parkes, Jr. at p. 24. (Excerpts attached as Ex. E to the Appendix). Therefore, the Proprietary Account actually replicated over a considerable period of time the type of profitability ratios that Harris random probability analysis stated had a "virtually zero" chance of occurrence.

## VI. HARRIS' OPINION THAT THE FIVE TESTED CHARACTERISTICS CAN BE USED TO DISPROVE AN EX-POST ALLOCATION SCHEME IS A CLASSIC INSTANCE OF *IPSE DIXIT*

While statistical evidence can establish a possible correlation between factors and a result, such evidence cannot prove causation <u>Radue v. Kimberly Clark Corp.</u>, 219 F.3d 612, 616 (7th Cir. 2000). At best, a statistical model can establish a possible correlation between selected factors and a result. Determining the factors to include in a statistical analysis, *i.e.* "what to look for," is the first, hardest, and often the only task." <u>Mister v. Illinois Cent. Gulf Ry, Co.</u>, 832 F.2d 1427, 1431 (7th Cir. 1987). As stated in <u>Furr v. Seagate Technology, Inc.</u>, 82 F.3d 980, 986 (10th Cir. 1996) *cert. denied*, 519 U.S. 1056 (1997), statistical evidence may be so flawed as to render the evidence of no value to a jury.

Harris admits that he never conducted any empirical testing to determine whether the five tested criteria could determine whether an account was subject to ex post allocation. (Ex. C, p. 157) Nor, could Harris point to any treatise of study that did so

even attempted to do so. Id., at p.162. The reason for using the five tested criteria is one borne not from scientific method but rather from necessity. *Harris came up with these five criteria because (he felt) that was all the data he had*. Ex. C., p. 143. Since these were criteria borne of necessity, when asked whether, using the five tested criteria, "could you determine from your analysis whether one account was dealing in ex post allocations and the other one wasn't", Harris testified, "I doubt it. " Id., p. 156-7.

Given that Harris made up his test for this case, there are no studies or treatises that have evaluated his methodology nor is there any peer acceptance. Harris, himself, has never used this hypothesis outside of the world of litigation or even outside this case, which, in itself, weighs heavily against reliability. Without the benefit of any type of testing, it is impossible to determine the possible error rate for Harris' hypothesis. Allison v. McGahn Medical Corp., 184 F.3d 1300, 1321 (11th Cir. 1999). As noted in Allison, "untested theories" that are not generally accepted, "obviously have a high potential rate of error." Id. The failure to self-test his novel hypothesis or subject the hypothesis to peer review and testing, is, in itself, fatal. *See* Chapman v. Maytag Corp., 297 F.3d 682, 688 (7th Cir. 2002):

> In our opinion, the absence of any testing indicates that [the expert's] proffered opinions cannot fairly be characterized as scientific knowledge. Personal observation is not a substitute for scientific methodology and is insufficient to satisfy *Daubert's* most significant guidepost . . . Further, [the expert's] testimony failed to satisfy any of the other *Daubert* guideposts for reliability. [The expert] presented no proof that his theory is generally accepted in the scientific community.

See, also, Cummins v. Lyle Indus., 93 F.3d 362, 369 (7th Cir.1996) (excluding conclusions of credentialed expert because there was no testing to substantiate his opinions). As the Seventh Circuit stated in Kirstien v. Parks Corp., 159 F.3d 1065 (7th

Cir. 1998) *cert. denied,* 526 U.S. 1065 (1999), a products liability case:

> Furthermore, we see no abuse of discretion in the exclusion of the expert. It is true that Dr. Nelson has impressive credentials. He is a safety engineer. His educational background is in industrial and product safety. He has a Ph.D. from Texas A&M University. He was vice president of the Texas Safety Association and is a member of the National Fire Protection Association. But the fact is that he did no testing on these products, either alone or in combination. Neither did he provide studies which employed such testing. In short, Dr. Nelson offered only speculation. And we have sanctioned the exclusion of speculation offered by persons with credentials as impressive as those of Dr. Nelson. In Rosen, for instance, the expert whose exclusion we upheld was a "distinguished cardiologist and department head at the University of Chicago." 78 F.3d at 318.

Id. at 1067-68.

For three of the five characteristics tested in his Initial Report ("executing broker," "time a position is held," and "time of day executed") Harris does not cite to any study, peer review paper or other recognized treatise that suggests that *any* of these characteristics can identify an *ex post* allocation scheme or even explain the difference in profitability between any two futures accounts.  *See* Ex. C, p. 303-5 (no studies assessing profitability based on executing broker); Ex. C., p. 308 (conceding no studies which assessed the effect of holding periods on profitability; and Ex. C, p. 327-29 (no studies indicating any correlation between the "time of day executed" and determination of an ex post allocation, or any material impact on profitability).

Harris does cite to certain studies, some of which tangentially touch upon a variation of some of the characteristics as time "trade size," but those studies did not analyze the futures markets and were focused on the effects of large "block trading on the transaction costs over transaction size." Ex. C., p. 262-64.  By "transaction costs' Harris is not referring commissions or fees; it is the "price impact" of "iceberg orders" on the market efficiencies. Id., at 265.  These studies do not opine on profitability of any

account or trading strategies, nor do they even mention ex post allocation. Moreover, to the extent that such studies have *any* relevance to a small CTA/CPO like Defendants, it is even more remote considering that Defendants primarily utilized limit orders (Ex. C, p. 271), so as not to be subject to the studies' suggested market inefficiencies.

Moreover, Harris' "day of week" testing has even less support in any study or treatise. Harris admits "that's one of the shortcomings of this type of analysis. There's not a lot of theory that connects these two together." Ex. C. pp. 326-27. Indeed, the two studies cited in Ex. A discuss the "weekend effect" of large trades in the equity markets. Neither study analyzed any issue raised in this action. Ex. C, pp. 350-52. In sum, the cited studies have no relevance in this action.

Harris further admits that the cited studies did *not* test for the characteristic mentioned in his report as a determinative factor of trade profitability. The studies cited by Harris concern tangential matters regarding securities transactions entered by large institutions and not proposed that what was being studied could determine either why one account was more profitable than another or that any results for an account were caused by ex post allocations. Such studies, therefore, are patently insufficient to support Harris' novel methodology. General Electric Co. v. Joiner, 522 U.S. 136, 118 S. Ct. 512 (1997). *See also* Daubert, *supra*, and Chapman, *supra*. Harris' selection of his five criteria are no more based upon any science or statistically reliable standards than if he tested for the color of Newell's shoes at the time of order entry.

Nor, did Harris perform a statistical regression analysis, which "if done right" then "permits an inference of causation." In re Oil Spill by the Amoco Cadiz, 954 F.2d 1279, 1322 (7th Cir.1992) (*per curium*). While the failure to perform a regression

analysis is not, in itself, sufficient as a matter of law to disqualify an expert opinion under Daubert the failure to do so is "odd." Adams v. Ameritech, at 425, especially when unexplained. *See* Zenith Elecs. Corp. v. WH-TV Broad. Corp., 395 F.3d 416 (7th Cir.) *cert. denied* 545 U.S. 1040 (2005). Here, since there are only five factors upon which to perform such an analysis, Harris could not have been concerned there were so many factors that their sheer number might have reduce the likelihood of any one factor being statistically significant. Id. The reason Harris failed to perform a regression analysis is that such a regression analysis properly performed on a sufficient number of data points would completely undermine his conclusions.

## VI.   HARRIS IS NOT QUALIFIED TO GIVE THE OPINIONS

An expert for one purpose is not an expert for all purposes. "Even where a witness has special knowledge or experience, qualification to testify as an expert also requires that the area of the witness's competence matches the subject matter of the witness's testimony." 29 Charles A. Wright, et al., Federal Practice & Procedure § 6265 at p. 255 & nn. 34 & 35 (1977). Not all opinions that happen to be held by an expert are "expert opinions." United States v. Benson, 941 F.2d 598, 604 (7th Cir. 1991) *reh. denied* 957 F.3d 301 (1992). Opinions falling outside the expert's area of expertise are inadmissible. Watkins v. Schriver, 52 F.3d 769, 771 (8th Cir. 1995) *reh. denied* 1995 U.S. App. LEXIS 12716 (1995) (affirming exclusion of neurologist's testimony "that the [plaintiff's neck] injury was more consistent with being thrown into a wall than with a stumble into the corner"); and Mid-State Fertilizer Co. v. Exchange Nat'l Bank, 877 F.2d 1333, 1339-40 (7th Cir. 1989) (rejecting economist's opinion that defendant's conduct "was contrary to good faith and fair dealing").

Harris may be qualified as an expert economist and he may also qualify as someone who has a general understanding of the workings of the commodity futures and commodity options markets. He is not a statistician; he has no degree in statistics and has never taught statistics. Ex. C, at p. 102. He has no real industry experience and is therefore is not competent to analyze the factors that could account for the profitability differences between two commodity futures and commodity options trading accounts. "Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony." Carroll v. Otis Elevator Co., 896 F.2d 210, 212 (7th Cir. 1990).

Harris has never personally traded commodity futures or commodity options (Ex. C, p. 44). He has never entered orders for commodity futures or options transactions. (Id. p. 45). Never has never been employed by private futures/option firm and has never worked on floor or trading desk. (Id., p. 41). He has never been employed a commodity trading advisor or commodity pool operator and has never been registered in any capacity. (Id., p. 71). In fact, Harris had never even reviewed a commodity account statement prior to his engagement for this case. (Id., p. 89). Harris looked at a total of only 18-20 trade tickets in this action. Shockingly, he does not even know who has the responsibility for filling out the trade ticket. Ex. C, p. 169.

Harris' lack of any meaningful experience in the futures industry is demonstrated by his inability to read the trading records in this case. Specifically, one of the "characteristics" he tested measured the length of time that a "trade" was in place in each of the subject accounts. However, due to his lack of familiarity with these types of

records he failed to properly match time records. Whereas transactions at Mizuho were time stamped in Central Standard Time, the transactions at MFG were recorded electronically in Greenwich Mean Time – 7 hours difference. Harris never made the conversion. As a result, when his Initial Report concludes (Ex. A., p. 21, ¶ 60), "the 3 proprietary trades reported to be executed between 6 and 9 p.m. are also significantly larger than the 21 client trades executed during that interval (with 95 percent confidence)", it based upon erroneous data and his unfamiliarity and inability to read the trading records. See, also, Ex. C, pp. 420-24.[8]

Harris has never conducted any testing of an actual options trading strategy. (Id., p. 131-32). Harris has never worked on a matter involving "bunched" orders (id., p. 30), has never previously had any involvement in a matter involving ex-post allocations. Id., p. 24. Harris has never evaluated trading strategies for any options or futures account Id., p. 36. He has never previously attempted to evaluate the factors that might contribute to the success or lack of success of a commodity futures or options trading strategy. Harris never conducted any study on the success rate of professional commodity futures or options traders. Nor has Harris ever conducted a study regarding factors that may contribute to the relative success or failure of different trading systems, especially differences between speculative and hedging strategies. See e.g. E x. C, pp.260-62.

---

[8] The reference to "95 percent confidence" is ironic. Had Harris a modicum of understanding of the Quiddity trading strategies or even the process of entering trades he would have realized numerous uncontroverted facts: First, the optimal time to manage options positions in the Customer Accounts was during the day when the options markets were most liquid. Second, as a result of the illiquidity very few of the Customer transactions were done at night; whereas, dozens of futures transactions were entered for the Proprietary account at night (exactly opposite of Harris' conclusions). Finally, the MFG transactions were only entered through the PATS terminal in Quiddity's office. Hence, as the record clearly establishes, when Donald Newell was trading from his home at night he could not have entered orders through the PATS terminal or MFG.

Overall, he did not need any specialized knowledge to interpret and apply any studies or generally accepted theory since no study or theory exists that espoused that the five tested characteristics, alone or in combination, are responsible for profitability difference between commodity trading accounts. Ex. C, at p. 162. He simply did not use any specialized knowledge or anything garnered from his experience or knowledge as an economist to select or analyze the 130 "suspicious trades." provided to him by the CFTC. Worse, he failed to test the accuracy or efficacy of the CFTC's selection criteria. He did not apply the principles of any study on profitability nor any accepted methodology that required skill as either a statistician or economist. Conclusions such as if you flip a coin 60 times, it is virtually impossible for the coin to come up heads 55 times, is an opinion within the knowledge of most anyone who has completed high school. "An expert . . . must testify to something more than what is 'obvious to the layperson' in order to be of any particular assistance to the jury." Ancho v. Pentek Corp., 157 F.3d 512, 519 (7th Cir. 1998). In sum, Harris did not possess nor applied any specialized knowledge for his analysis. His testimony simply will not assist a jury.

VII. **THE SEVENTH CIRCUIT HAS CRITICIZED THE CFTC FOR ATTEMPTING TO USE SUCH PSEUDO-STATISTICS IN AN ATTEMPT TO FULFILL THE BURDEN OF PROOF**

In Elliott, *supra*, the Seventh Circuit was confronted with a similar attempt by the CFTC to foist what the CFTC characterized as "expert" opinion of a CFTC employee on the trier of fact. Unlike the case at bar, in Elliott, the facts were undisputed. 202 F.3d at 927-28. The issue was whether the plaintiff and others had participated in pre-arranged, non- competitive wash sales. Id. at 929.

In Elliott, the CFTC expert based his opinion on seven significant characteristics, to wit: trade size, absence of profits or loss, lack of participation by other traders, trade configurations, two audit trail irregularities, and trader motivation. Id. at 929-30.  Like here, the "expert" in Elliott, relied on "limited information" (id. at 930), such as not interviewing any traders, just as Harris refrained from reviewing available account records and testimony in this case. More importantly, just as Harris conducted no historical investigation of the trading and profitability in the Customer and Proprietary accounts either prior to or subsequent to the period alleged in the Complaint, the CFTC's expert in Elliott conducted no historical analysis. The Seventh Circuit noted:

> . . . he had not conducted any historical analysis to determine whether lack of profit was an unusual occurrence during delivery months (despite, in his second significant characteristic, concluding that the lack of profit was unusual enough to warrant an inference of liability), *see id*. at 175.

Id.  Therefore, just as Harris refused to test both his hypothesis regarding the tested characteristics and his probability of success analysis on some other period of time, the CFTC in Elliott also made declarations without historical proof. Also, just as Harris admitted that the CFTC's selection criteria could have biased his analysis, the CFTC expert in Elliott likewise made admissions that could "undermine" his "reliance" on certain of his "significant characteristics." Id.  Similarly, just as Harris limited his analysis to merely the 130 "suspicious" trades selected by the CFTC, the CFTC's expert in Elliott likewise utilized a very limited data sample. Id.  The Seventh Circuit concluded: "These and other Rooney concessions amounted to an admission that his conclusion was not based on a rigorous statistical analysis." Id., at 931.

Unlike the case at bar, the defendants in Elliott did not properly challenge the decision to admit the testimony of the CFTC expert. But the Seventh Circuit noted that

had such a challenge been made, "we might have been inclined to agree with them." <u>Id</u>. at 933. Then, the Seventh Circuit, after setting forth the <u>Daubert</u> "gateway" requirement, explained why:

> The petitioners' effective cross-examination of Rooney exposed his opinion--and therefore his ultimate conclusion—as unreliable. The Division, through Rooney, presented what was essentially a "numbers" case: *the circumstances surrounding the charged trades, it alleged, were statistically improbable*. But it provided no reliable statistics to support this charge (and, indeed, could not even produce for the petitioners some of the raw numbers upon which it allegedly relied). It conducted no analysis of the liquidity of the market or of the usual number of traders swapping spreads during wheat delivery cycles; no analysis of the likelihood that delivery cycle freshening trades would result in no profit for the traders; and no analysis of the likelihood of making mistakes on trading cards or other audit trail irregularities--that is, *it failed to justify Rooney's assertion that the "significant characteristics" were at all significant. It was a numbers case without meaningful numbers*, and, had the respondents objected to the admission of Rooney's opinion testimony, we think that <u>Kumho</u> might well have compelled the ALJ to sustain the objection.

<u>Id</u>., at 933-34. Ultimately, the Seventh Circuit concluded that the Commission had not considered the expert opinion and, as such, affirmed the Commission's finding of a violation. Judge Easterbrook dissented, arguing that the Commission's decision should be reversed. However, on the issue of the CFTC expert, there was no disagreement. As Judge Easterbrook stated: "My colleagues conclude that Rooney's testimony is junk science of no probative value, and I agree." <u>Id</u>. at 939. This Court should reach a similar conclusion and exclude the testimony of Harris as unreliable and of no probative value.

## CONCLUSION

WHEREFORE, for the reasons set forth herein, this Court should exclude the testimony of Jeffrey Harris and grant Defendants all further relief this Court deems just and fair.

34

Dated:  April 2, 2014                Respectfully submitted,

DONALD A. NEWELL AND
QUIDDITY, LLC


By: /s/ Nicholas P. Iavarone

Nicholas P. Iavarone
The Iavarone Firm
33 N. LaSalle Street
Suite 1400
Chicago, Illinois  60602
(312) 637-9466
ARDC #:  1299220

Alan F. Block
Block & Landsman
33 N. LaSalle Street
Suite 1400
Chicago, Illinois  60602
(312) 251-1144
ARDC #:  6200912