IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| U.S. COMMODITY FUTURES TRADING COMMISSION, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CASE NO. 12-cv-06763 |
| | : | |
| DONALD A. NEWELL AND QUIDDITY, LLC, | : | |
| | : | |
| Defendants. | : | |

APPENDIX TO THE MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO
EXCLUDE THE TESTIMONY AND OPINIONS OF JEFFERY D. HARRIS

## TABLE OF CONTENTS

**EXHIBIT A**   Expert Report Of Jeffrey H. Harris, Ph.D.

**EXHIBIT B**   Supplemental Expert Report Of Jeffrey H. Harris, Ph.D.

**EXHIBIT C**   Harris Deposition Transcript, with Exhibits

**EXHIBIT D**   Quiddity August 2008 Due Diligence Questionnaire

Nicholas P. Iavarone
The Iavarone Firm
33 N. LaSalle Street
Suite 1400
Chicago, Illinois 60602
(312) 637-9466
ARDC #: 1299220

Alan F. Block
Block & Landsman
33 N. LaSalle Street
Suite 1400
Chicago, Illinois 60602
(312) 251-1144
ARDC #: 6200912

# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS

| U.S. Commodity Futures Trading Commission, v. Donald A. Newell and Quiddity, LLC, | Civil Action |
|---|---|

**EXPERT REPORT OF JEFFREY H. HARRIS, Ph.D.**

August 29, 2013

## EXPERT REPORT OF JEFFREY H. HARRIS, Ph.D.

### I.    Qualifications

1.    I, Jeffrey H. Harris, am Dean's Chair in Finance at the Whitman School of Management at Syracuse University. Prior to joining the faculty at Syracuse, I taught at Southern Methodist University, the University of Delaware (tenured), the University of Notre Dame and the Ohio State University. I have also served as Chief Economist at the U.S. Commodity Futures Trading Commission (CFTC) in Washington, DC. As the CFTC Chief Economist, I directed the economic analysis to support the Division of Enforcement in a wide variety of cases. I was in charge of directing economic research studies and providing economic guidance to the Commission.

2.    In my capacity as Chief Economist at the CFTC, I recruited, hired and directed a team of economists who interfaced with market surveillance and Enforcement staff regarding economic issues. I also interfaced with the Division of Market Oversight, offering expert economic perspective on issues regarding regulatory jurisdiction and product oversight. Among other projects, I directed and presented to the Commission economic analyses of natural gas markets, which were subsequently written into law, designating CFTC jurisdiction over "significant price discovery contracts"[1] and gave economic input into various contracts considered for CFTC jurisdiction, including one-day forward electricity contracts, hurricane contracts and various event-outcome contracts, among others. Additionally, I coordinated efforts with

---

[1] See Jeffrey H. Harris, "Price Discovery in Natural Gas Markets" testimony before the United States Commodity Futures Trading Commission Hearing to Examine Trading on Regulated Exchanges and Exempt Commercial Markets, September 18, 2007.

Enforcement attorneys regarding the potential for market abuses and directed staff to apply economic analysis to support Enforcement cases efficiently and effectively. Through this work and my own research, I have become intimately familiar with the interface between the Commodity Exchange Act (and related regulations) and financial market economics.

3.     My primary teaching responsibilities have spanned the areas of investments, derivative securities (options and futures), financial markets and institutions, and corporate finance. I received my doctorate in Business Administration (Finance) from the Ohio State University in 1995 and a Masters of Business Administration from the University of Iowa in 1987.

4.     Earlier in my career I served a one-year term as Visiting Academic Fellow at the NASDAQ Stock Market and a one-year term as a Visiting Academic Scholar in the Office of Economic Analysis at the United States Securities and Exchange Commission (SEC) in Washington, DC. My academic work has been in the field of market microstructure, studying how trading behavior, market regulations and market structure interact. I have published numerous articles in refereed finance journals, including the *Journal of Finance*, the *Journal of Financial Economics*, the *Journal of Futures Markets*, the *Journal of Investment Management*, and the *Review of Financial Studies*. In addition, I have served as a referee for a wide range of academic journals including *The Accounting Review, Journal of Banking and Finance, Journal of Business, Journal of Finance, Journal of Financial and Quantitative Analysis, Journal of Financial Markets,* and *Review of Financial Studies,* among others.

5.     I have testified on four separate occasions to various Committees and Subcommittees of the United States Congress, including "The Role of Speculative Investments in Energy Markets" before the United States Senate Subcommittee on Energy and Natural Resources on September 16, 2008; "Financial Speculation in Commodity Markets: Are Institutional Investors and Hedge Funds Contributing to Food and Energy Price Inflation?" before the United States Senate Committee on Homeland Security and Governmental Affairs on May 20, 2008; "The Influence of Speculative Traders in Commodity Markets" before the United States House of Representatives Agriculture Committee on May 15, 2008; and "The Influence of Non-commercial Institutional Investors on Oil Prices" before the United States Senate Committee on Energy and Natural Resources on April 3, 2008.

6.     Additionally, I have testified on three separate occasions at the CFTC, including "Price Discovery in Natural Gas Markets" at the Hearing to Examine Trading on Regulated Exchanges and Exempt Commercial Markets, September 18, 2007; "Price Convergence in Agricultural Markets" before the Agricultural Markets Roundtable, April 22, 2008; and "On Position Limits" at the Open Meeting Regarding Proposed Position Limits Rule, January 14, 2010.  Exhibit B contains my curriculum vitae.

## II.     Assignment and Summary of Opinions

### a.  Assignment and Compensation

7.     I have been retained by the U.S. Commodity Futures Trading Commission (CFTC) in the matter of CFTC v. Donald A. Newell and Quiddity, LLC to prepare this expert report to independently assess whether the Defendants fraudulently allocated commodity futures contracts trades and options on commodity futures contracts trades

4

(collectively, "commodity interest trades") to benefit a corporate proprietary account at the expense of customer trading accounts managed by the Defendants.

8.　　For the time spent working on this matter I am being compensated at the rate of $350 per hour. My compensation is in no way contingent upon the professional conclusions that I reach or the final results of this litigation.

### b. Summary of Opinions

9.　　The summary of my opinions is as follows: First, I find, on an objective statistical basis, that the difference in profitability between the reported client and proprietary trades is highly unusual, under various assumptions about random outcomes or trading skill. Second, I find that there is no evidence that the difference in profitability between client and proprietary trades during the sample period is driven by trade size, executing broker, the day of the week trades were executed or the time of day that trades were executed. In fact, most statistically significant differences between the size of client and proprietary trades run in the opposite direction, suggesting that client trades should be more profitable than proprietary trades. Third, I find there is limited evidence that client trades are held for a shorter period than are proprietary trades. However, within the data I analyzed, there is no significant correlation between trade profitability and holding period, either among client trades or among all trades, suggesting that the profitability difference between client and proprietary accounts is not related to the time positions are held.

10.　　In sum, I conclude that the profitability differences between client and proprietary trades cannot be explained by characteristics of trade size, executing broker, the time a position is held, the day of week that trades are executed or by the time of day

that trades are executed. The profitability differences are almost surely the result of *ex post* assignment to different trading accounts.

11.    For this expert opinion I have relied on the information contained in the documents listed in Exhibit A below.  These documents include .pdf files of trade tickets from office orders, spreadsheet records of trades executed via Mizuho, MF Global and XFA, and electronic statements of various accounts generated by the Defendants. Accordingly, if additional materials or any new facts are brought to my attention, I reserve the right to modify or update my opinions.

### c. Organization of Report

12. The remainder of my report is organized into the following sections. In Section III, I briefly discuss regulations applicable to the trading in question along with some perspective on the profitability of trades made by the Defendants. In Section IV, I review the characteristics of the trading records, including the time positions are held, the time of day and day of week that trades are executed, and the lot sizes of executed trades for further perspective on any differences between trades made for client accounts and those made for the proprietary account. In Section V, I state my conclusions.

## III. Applicable Regulation and Defendants' Trading Records

13. The CFTC regulates trading by agents who represent clients. In particular, brokers are required to identify and keep separate trades for their clients and trades for their own proprietary account.

14. To the best of my knowledge, the Defendants did not consistently keep separate trades executed on behalf of clients from those executed for the Defendants' proprietary account.

15. Given the fact that trades were not identified as customer or proprietary trades at the time of execution, the analysis that I apply in this report relies greatly on the *ex post* assignment of trades to different accounts as reported by the Defendants. In this light, the CFTC alleges that the *ex post* allocation of trades was done in a manner to the detriment of the customer account and to the benefit of the proprietary account. Observed objectively, I apply some basic statistical tests to the trading data to assess whether this allegation has merit.

16. First, I simply assess the profitability of various trades that are assigned *ex post* to the proprietary and customer accounts. During the period under question (October 15, 2008 through March 18, 2009), I examined data for 2224 trades executed in the eMini S&P 500 and S&P futures contracts (1262 trades), the Japanese Yen futures contract (607 trades), the Euro futures contract (355 trades) and related options on these futures. Of these trades, 1627 have been assigned as client trades and 597 assigned as proprietary trades. While the bulk of trading took place in the eMini S&P 500 futures contracts, the Defendants actively traded in each of these markets.

17. My statistical analysis examines 130 trades executed during the sample period which were identified by the CFTC as suspicious.[2] Among these trades, 55 of 66 trades assigned to the proprietary account were profitable for the Defendants. Conversely, just 25 of 64 trades assigned to the client account were profitable for clients. I assess the objective probability of this dichotomous outcome with a number of statistical tests.[3]

18. One way to objectively assign probabilities to these outcomes is to simply assume that a random trade would be profitable 50 percent of the time. Viewed in this light, the probability of making profitable trades 55 out of 66 times in the proprietary account is virtually zero. Under the same assumption, the probability of having as few as 25 profitable trades (of 64) in the proprietary account is just 5.2 percent. In either case, it appears highly unlikely that the outcomes between the two types of accounts would be so different.

---

[2] Trades through XFA have no timestamps so are excluded in this analysis. In addition, I could not locate trade tickets for a few of the trades, so these were also excluded. Lastly, trade number 49 for the proprietary account was not profitable, so was also excluded.

[3] Since some trade characteristics are missing in the data, some statistical tests are performed on subsets of the full data as necessary.

19. Of course, the Defendants are finance professionals, likely with some skill in trading these assets. Viewed in this light, the probability of making profitable trades is likely larger than 50 percent. As a second alternative, I use the Defendants' record of profitability to assess an alternative view of the differences between outcomes in the proprietary and client trading accounts. For the second alternative, I consider that, in total, 80 Defendant trades were profitable (25 for clients and 55 for the proprietary account) out of a total of 130 trades (64 for clients and 66 for the proprietary account). Thus, the Defendant trades are profitable 61.5 percent of the time, (larger than 50 percent, presumably reflecting some degree of skill).

20. Based on the 61.5 percent probability in my second alternative, the probability of making profitable trades 55 out of 66 times in the proprietary account remains virtually zero. Under the same assumption, the probability of having as few as 25 profitable trades (of 64) in the proprietary account is also virtually zero. Under this second alternative, the assumption that the Defendants have skill does not increase the probability that proprietary trades are always profitable, and in fact, this assumption reduces the probability of finding so few profitable client trades.

21. A third alternative, tilted toward assessing the skill applied to trades in the client account, is to consider the probability of making profitable trades based on client trades alone. Under this assumption, the probability of making profitable trades would be just 39.1 percent (25 out of 64 trades). For this third alternative, and as might be expected, the probability of having as few as 25 profitable trades (of 64) in the proprietary account rises to 84.0 percent. However, the probability of making profitable trades 55 out of 66 times in the proprietary account remains virtually zero. This third

alternative also fails to explain the dichotomous results between profitability in the client and proprietary accounts.

22. I have assessed the differential results between profitable trades in the client and proprietary accounts under three assumptions--using random probabilities, assuming a degree of skill, and using probabilities from client trades alone. In each of these three cases, it remains virtually impossible, on an independent statistical basis, to support the contention that client trades and proprietary trades were not assigned on an *ex post* basis, with fewer profitable trades assigned to client accounts.

**IV.    Trade Characteristics and Differences between Proprietary and Client Trades**

23. The analysis above implies that there is virtually zero probability of having such dichotomous rates of profitability between client and proprietary trades. Of course, the possibility remains that the types of trades made for clients differ in some dimension from the types of trades made for the proprietary account. In this section, I apply independent statistical tests to the data to assess whether trade sizes, holding periods, executing brokers, contract types, time of day, or day of the week differs across client and proprietary trades.

24. Statistical tests comparing trade characteristics across client and proprietary accounts can be done with a parametric approach (assuming the data is normally distributed) or a non-parametric approach (making no such assumption). In an effort to be comprehensive, I present results from both parametric and non-parametric tests below.

**A. Trade size analysis**

25. The first characteristic I examine is the trade size. Economic theory and empirical evidence have shown that transaction costs (and, by extension, profitability)

10

can depend on the sizes of trades executed.[4]  Generally, larger trades are more expensive and therefore are likely to be less profitable. Given the disparity between the profitability of client and proprietary trades examined above, a natural question is whether these trades differ by size.

26. Based on the trade information I assessed, I am able to identify trade sizes for 58 client trades and 49 proprietary trades.  The average trade size for client trades was 76.9 contracts while the average trade size for proprietary trades was 64.0 contracts. Based on a statistical test for differences, however, we can be only 60 percent confident that these trade sizes differ (far from the standard 95 percent confidence level typically applied to assess important statistical differences).

27. The median trade size for client trades is 35 contracts while the median trade size for proprietary trades is 25 contracts. Based on a non-parametric test of these differences, we can only be 62 percent confident that these medians are different. Both parametric and non-parametric tests fail to show that the trade sizes across accounts differ in any statistical sense.

28.  As an alternative, I consider tests for the subset of 70 total trades (24 client trades and 46 proprietary trades) that were completely filled during the sample period. For example, if 20 contracts were purchased and 18 contracts were sold during the sample period, I consider only the trade sizes of the 18 contracts which were both bought and sold during the period and ignore the remaining contracts. I refer to these 18 contracts and "round turn" trades.

29. The average trade size for round turn client trades was 41.3 contracts while the average trade size for round turn proprietary trades was 65.8 contracts, a larger

---

[4] See Pedersen and Fialkowski (1994) and Frino, Bjursell, Wang and Lepone (2008).

difference than for all trades. Based on a statistical test for differences, we can be 94 percent confident that these round turn trade sizes differ (marginally statistically different, from a statistical standpoint). This evidence suggests that round turn proprietary trades are somewhat larger than round turn client trades, suggesting that proprietary trades might be more expensive, and therefore less profitable. If so, this result that runs contrary to the finding that the Defendants' proprietary trades are more likely to be profitable (as compared to client trades).

30. The median trade size for round turn client trades is 25 contracts while the median trade size for round turn proprietary trades is 32.5 contracts. Based on a non-parametric test of these differences, we can only be 59 percent confident that these medians are different. These non-parametric tests fail to show that the trade sizes for round turn trades differ across accounts in any statistical sense.

31. While trade size statistics generally fail to distinguish between client and proprietary trades, I also compare trade sizes conditional on which contract is traded for each account. Table 1 presents point estimates of trade sizes across contracts and shows that trade sizes do appear to differ across markets. In the Euro market, the average client trade was 80 contracts while the average proprietary trade was 39.1 contracts. In the Yen market, the average client trade was 35.8 contracts and proprietary trade was 52.8 contracts. More similar, client and proprietary trades in the S&P market were 90.2 and 88.3, respectively.

32. Based on parametric t-tests, we can only be 67 percent confident that the Euro client trades are larger than proprietary trades. As might be expected, we can only be 7 percent confident that client and proprietary trade sizes differ in the S&P market. While

larger trades may be more expensive to execute (and therefore less profitable), I find no evidence that client trades are significantly larger than proprietary trades.

33. This marginal evidence is supported by the fact that non-parametric tests show we can only be 87 percent confident that the Euro client trades are larger than proprietary trades (again, below the standard 95 percent confidence typically required for statistically significant differences). Likewise, we can only be 34 and 38 percent confident that median Yen and S&P client trades are larger than proprietary trades, respectively.

34. I further examine trade sizes by broker and by day of the week. While there is limited theory to guide an examination of profitability by broker, some empirical evidence suggests transaction costs (and therefore profitability) may differ across the trading week.[5] Generally, transaction costs are higher on Mondays than other days of the week. These higher transaction costs may theoretically make trades executed on Mondays less profitable. I therefore explore whether the difference in profitability between client and proprietary trades documented above might stem from a disproportionate share of client trades executed on Mondays.

35. Table 2 displays the number of trades on each day of the week, categorized by client and proprietary account. As shown, 13 client trades and 11 proprietary trades are executed on Mondays, suggesting there is not a significant difference in the fraction of total trades executed on Mondays. Among trades executed on Mondays, the average trade size for client trades was 64.2 contracts while the average trade size for proprietary trades was 37.7 contracts. Based on a statistical test for differences, however, we can be only 80 percent confident that these trade sizes differ (below the standard 95 percent confidence level typically applied to assess statistical differences).

36. In the interest of a complete analysis of potential day of the week effects, I also test (both parametrically and non-parametrically) for differences in mean and median trade sizes across other days of the week. As shown in Table 2, average trade sizes in the customer accounts are 86.9, 80.4, 92.5 and 69.3 contracts for Tuesday through Friday, respectively. While proprietary account trade sizes differ in magnitude (43.2, 126.6, 42.4, and 51.7 contracts, respectively), none of these differences are statistically significant beyond the 80 percent confidence level. There is no evidence that the average client and proprietary trades differ in the day of week that they are executed.

37. As shown in Table 2, median trade sizes in the customer accounts are 35, 50, 25 and 50 contracts for Tuesday through Friday, respectively. While proprietary account trade sizes sometimes differ in magnitude (at 50, 90, 25, and 45 contracts, respectively), non-parametric tests show that none of these differences are statistically significant beyond the 56 percent confidence level. In sum, I find no evidence that day of the week effects have significant influence over the differences in profitability found between client and proprietary accounts.

38. For completeness, I also examine trade sizes across executing broker. While no theory guides a look at specific executing brokers, if client trades are disproportionately executed via different brokers (relative to proprietary trades), we might expect differences in the profitability as well. In this analysis, I examine the trade size of 38 client trades and 7 proprietary trades executed through MF Global and 9 client trades and 40 proprietary trades executed through Mizuho. Mizuho executed a greater fraction of proprietary trades while MF Global executed a greater fraction of client trades during the sample period.

---

[5] See Keim and Stambaugh (1984) and Sias and Starks (1995).

39. An examination of MF Global trades shows that the average client trade size was 78.9 contracts while the average trade size for proprietary trades was 137.9 contracts. Based on a statistical test for differences in means, however, we can be only 87 percent confident that these trade sizes differ (insignificant at the standard 95 percent confidence level). Median MF Global trade sizes are 45 and 65 contracts for client and proprietary trades, respectively. Non-parametric statistical tests show that these medians are not significantly different either.

40. Examining Mizuho trades, I find that the average client trade size was just 22.2 contracts while the average proprietary trade size was 53.1 contracts. This mean difference is statistically significant at the 99 percent confidence level. However, a larger proprietary trade size suggests that the profitability of proprietary trades should be lower, not higher. The median Mizuho trade size is the same (25 contracts) for both client and proprietary trades. Non-parametric statistical tests confirm that these medians are not statistically different.

41. Overall, I find only marginal differences between the size of trades assigned to client and proprietary accounts. Client trades executed through the various brokers are, on average, unprofitable across each broker. The profitability of trades appears to be unrelated to the executing broker.

**B. Holding period analysis**

42. The analysis above implies that there is little evidence linking trade sizes with profitability across client and proprietary trades. Where statistical significance was found, this significance worked against finding greater profitability within the proprietary account. However, the possibility remains that the characteristics of trades made for

clients differs from those made for the proprietary account on other dimensions. In this section, I examine a second general trade characteristic--the holding period for each trade. I apply similar statistical tests to the data to assess whether the holding period generally, and holding period conditional on executing broker, contract type, time of day, or day of the week differs across client and proprietary trades.

43. While little economic theory guides the examination of holding periods, there remains some uncertainty as to whether this dimension may contribute to the disparity in profitability of trades in the client and proprietary accounts. In the interest of exploiting more information in the data I have been provided, I test some of these possibilities below.

44. Based on the trading data I analyzed, I am able to identify the holding period for 58 client trades and 49 proprietary trades. The average client trade was held for 345.5 minutes, just under 6 hours, while the average proprietary trade was held for 524.5 minutes, or just under 9 hours. Given that the typical trading day lasts 6.5 hours, the average proprietary trade was held for at least one overnight period. Based on a statistical test for differences, we are 95 percent confident that the proprietary trades are held longer than client trades.

45. The median client position is held for 217 minutes, while the median proprietary position is held for 385 minutes. Based on a non-parametric test of these differences, we are also 97 percent confident that these medians are different. Both parametric and non-parametric tests show that the holding periods across accounts are statistically different, with client trades held for a shorter duration than proprietary trades.

46. I further examine whether the difference in holding periods between client and proprietary trades is related to the profitability differences between the two groups. I find that the correlation between holding period and profits is an insignificant 12% among client trades and an insignificant 14% among all trades. The lack of correlation suggests that the profitability difference between client and proprietary accounts is not related to the time positions are held.

47. I further compare holding periods conditional on which contract is traded for each account. Table 3 presents point estimates of the mean and median holding periods across contracts and shows that the general differences between holding periods are found only in the Yen and S&P markets. In the Euro market, the average client trade was held for 505.5 minutes while the average proprietary trade was held for just 342.3 minutes. In the Yen market, the average client trade was held for 389 minutes and proprietary trade was held for 596.8 minutes. Similarly, S&P client trades were held for a shorter period (306.4 minutes) than proprietary trades (530.8 minutes).

48. Formal statistical tests show no significant differences between the length of time client positions are held and the length of time proprietary trades are held in either the Euro or Yen markets. For parametric t-tests, our degree of confidence is 52 and 76 percent in these two markets, while the corresponding degrees of confidence for non-parametric median tests are 18 and 91 percent. In these markets there is no statistical evidence that the length of time that positions are held contributes to the difference in profitability between client and proprietary trades.

49. For the S&P market we can be 87 percent confident that the mean S&P proprietary trade is held longer than the mean client trade (306.3 vs. 530.8 minutes).

17

Similarly, non-parametric tests suggest only an 81 percent level of confidence that the median times held differ (median client trades are held for 254 minutes vs. 341 minutes for proprietary trades). Tests for differences in medians in the Euro and Yen markets also fail to find differences between the time held for client and proprietary trades.

50. I further examine holding periods by broker and by day of the week. Keeping in mind that there is limited theory to link holding periods to profitability, I extend my analysis to the broker and day of week to better characterize any possible dimensions that might support the dichotomous results in profitability. The relatively weak evidence that proprietary trades are held longer in the Yen or S&P markets merits further investigation along these dimensions.

51. Table 4 displays the number of trades on each day of the week, categorized by client and proprietary account. As shown, 12 client trades and 11 proprietary trades are closed out on Mondays. Among these trades, however, the average client trade was held for 244.5 minutes while the average proprietary trade was held for 459.6 minutes. Based on a statistical t-test for differences, however, we can be only 55 percent confident that these holding periods differ (far below the standard 95 percent confidence level typically applied to assess statistical differences). Tests for differences between medians, however, suggest that client trades closed on Mondays are held for significantly shorter duration (244.5 minutes vs. 459.5 minutes) with 97 percent confidence.

52. I also test (both parametrically and non-parametrically) for differences in mean and median holding periods across other days of the week. As shown in Table 4, average holding periods in the client accounts are 402.8, 470.7, and 372.8 minutes for Tuesday through Thursday, respectively. While the average proprietary account holding

18

periods differ in magnitude (302.7, 489.3, and 519.2 minutes, respectively), none of these differences are statistically significant beyond the 92 percent confidence level (a marginal difference for positions closed on Tuesdays).

53. As shown in Table 4, median holding times in the customer accounts are 206, 254, and 288.5 minutes for Tuesday through Thursday, respectively. While proprietary account holding periods sometimes differ in magnitude (at 270, 292, and 439 minutes, respectively), non-parametric tests show that none of these differences are statistically significant beyond the 68 percent confidence level.

54. For positions closed on Friday, however, the average client trade is held just 256.8 minutes compared to 1074 minutes for proprietary trades. The median client trade is held for 256.8 minutes compared to 788 minutes for the median proprietary trade closed on Fridays. Both mean and median differences are significant at the 99 and 98 percent levels, respectively. In sum, I find some evidence that client trades are held for a shorter period of time than proprietary trades, primarily for trades executed to close positions on Fridays.

55. As with trade size above, I also examine holding periods across executing broker. MF Global trades shows that the average client trade was held for 184.2 minutes while the average proprietary trade was held for 217.6 minutes. Based on a statistical test for differences in means, however, we can be only 18 percent confident that these holding times differ (far from the standard 95 percent confidence level). Median MF Global trades are held for 179 and 270 minutes for client and proprietary trades, respectively. Non-parametric statistical tests show that these medians are not significantly different, however (at only the 46 percent level of confidence).

56. Examining Mizuho trades, I find that the average client trade was held just 347.6 minutes while the average proprietary trade was held for 549 minutes. This mean difference is not statistically different, however, with only a 77 percent level of confidence. Similarly, we can only be 72 percent confident that the median Mizuho trades differ by account (medians are 169 and 470 minutes, but with a small number of observations and large variances, these are not statistically different).

57. The analysis of holding times suggests that the reported client and proprietary trades may differ along at least this one dimension for the 12 client trades which are closed on Fridays (relative to 7 proprietary trades). However, we do not know whether these differences are causal in any sense. Differences may stem from either client trades being held for a shorter time horizon than proprietary trades or from unprofitable trades being sold earlier and assigned *ex post* to client accounts.

**C. Time of day analysis**

58. Given the limited evidence that trade sizes differ between client and proprietary accounts and the few differences uncovered for the time that positions are held between accounts, I further look to potential differences in the execution times for these.[6] Table 5 shows the average and median sizes for client and proprietary trades, grouped by time of day that the position was closed.[7] As shown, statistical differences between client and proprietary trades cannot be determined in trades reported before 12 noon since there was no variation in trade sizes for the 4 client trades in this category.

---

[6] Ekman (1992), McInish and Wood (1992) and Chan, Christie and Schultz (1995) show transaction costs differ across the trading day, and therefore profitability of trades executed at different times may also differ.
[7] I use the time of the closing trade assuming that exogenous reasons for closing a client position (e.g. for rebalancing purposes, hedging, etc.) gives the Defendants less control over this trade characteristic.

59. Table 5 reports only a few statistically significant results. For instance, the 10 proprietary trades reported to be executed between 12 and 3 p.m. are significantly larger (with 99 percent confidence) than are the 5 client trades executed during the same interval. Likewise, the 3 proprietary trades reported to be executed between 6 and 9 p.m. are also significantly larger than the 21 client trades executed during that interval (with 95 percent confidence). As noted above, however, larger trades are likely to be more expensive, and therefore less profitable than smaller trades. In this light, this evidence suggests that these comparable client trades should be more profitable than the proprietary trades, a result contrary to those documented above.

60. Given the small number of observations examined above, I also test whether the median trade sizes differ across groups within the various time bins. While the median trade size varies from 25 to 75 contracts in various time intervals, I find only one marginal statistical difference in this data. For trades reported after 9 p.m. the median client trade is 40 contracts while the median proprietary trade is for just 25 contracts. This difference is marginally statistically different at the 10 percent level (or 90 percent confidence level). Note that during this interval, however, the differences in means are not significant.

61. I further examine whether the time of day at which client and proprietary trades are executed is related to the profitability differences between the two groups. I find that the correlation between the time of day executed and profits is -24%, indicating that trades executed later in the day are less profitable. This result likely stems from the fact that (mostly unprofitable) client trades are more likely executed later in the day. Indeed, within client trades alone, the correlation between the time of day traded and

21

profits is an insignificant 3% and within proprietary trades, the correlation is an insignificant -7%. The lack of correlations here also suggests that the profitability difference between client and proprietary accounts is not related to the time of day that trades are executed.

## V.    Conclusions

62. For the foregoing reasons, I conclude that the profitability differences between client and proprietary trades cannot be explained by characteristics of trade size, executing broker, the time a position is held, the day of week that trades are executed or by the time of day that trades are executed. The profitability differences are almost surely the result of *ex post* assignment to different trading accounts.


Jeffrey H. Harris

Dated:  August 29, 2013

**Table 1 Trade Size by Contract Type**

Average and median trade sizes for 49 trades assigned to the proprietary account and 58 trades assigned to the client account from October 15, 2008 through March 18, 2009 in the eMini S&P 500 and S&P futures contracts, the Japanese Yen futures contract, and the Euro futures contract. ***, **, and * denote differences between client and proprietary trades at the 99, 95 and 90 percent confidence levels, respectively.

| Contract | | # trades | Average Trade Size | Median Trade Size |
|---|---|---|---|---|
| Euro | Client | 6 | 80.0 | 35 |
| | Proprietary | 9 | 39.1 | 25 |
| Yen | Client | 13 | 35.8 | 30 |
| | Proprietary | 21 | 52.8 | 25 |
| S&P | Client | 39 | 90.2 | 50 |
| | Proprietary | 19 | 88.3 | 60 |

**Table 2 Trade Size by Day of Week**

Average and median trade sizes, by day of the week, for 57 trades assigned to the client account and 44 trades assigned to the proprietary account from October 15, 2008 through March 18, 2009 in the eMini S&P 500 and S&P futures contracts, the Japanese Yen futures contract, and the Euro futures contract. ***, **, and * denote differences between client and proprietary trades at the 99, 95 and 90 percent confidence levels, respectively.

| Day | | # trades | Average Trade Size | Median Trade Size |
|---|---|---|---|---|
| Monday | Client | 13 | 64.2 | 35 |
| | Proprietary | 11 | 37.7 | 25 |
| Tuesday | Client | 8 | 86.9 | 35 |
| | Proprietary | 11 | 43.2 | 50 |
| Wednesday | Client | 12 | 80.4 | 50 |
| | Proprietary | 14 | 126.6 | 90 |
| Thursday | Client | 12 | 92.5 | 25 |
| | Proprietary | 5 | 42.4 | 25 |
| Friday | Client | 12 | 69.3 | 50 |
| | Proprietary | 3 | 51.7 | 45 |

**Table 3 Holding Time by Contract Type**

Average and median minutes held for 49 trades assigned to the proprietary account and 58 trades assigned to the client account from October 15, 2008 through March 18, 2009 in the eMini S&P 500 and S&P futures contracts, the Japanese Yen futures contract, and the Euro futures contract. ***, **, and * denote differences between client and proprietary trades at the 99, 95 and 90 percent confidence levels, respectively.

| Contract | | # trades | Average Minutes Held | Median Minutes Held |
|---|---|---|---|---|
| Euro | Client | 6 | 505.5 | 221.5 |
| | Proprietary | 9 | 342.3 | 227.0 |
| Yen | Client | 13 | 389.0 | 186.0 |
| | Proprietary | 21 | 596.8 | 498.0* |
| S&P | Client | 39 | 306.4 | 254.0 |
| | Proprietary | 19 | 530.8 | 341.0 |

**Table 4 Holding Time by Day of Week**
Average and median minutes held, by day of the week, for 48 trades assigned to the
proprietary account and 57 trades assigned to the client account from October 15, 2008
through March 18, 2009 in the eMini S&P 500 and S&P futures contracts, the Japanese
Yen futures contract, and the Euro futures contract. ***, **, and * denote differences
between client and proprietary trades at the 99, 95 and 90 percent confidence levels,
respectively.

| Day | | # trades | Average Minutes Held | Median Minutes Held |
|---|---|---|---|---|
| Monday | Client | 12 | 244.5 | 166.0 |
| | Proprietary | 11 | 459.6 | 393.0** |
| Tuesday | Client | 9 | 402.8 | 206.0 |
| | Proprietary | 11 | 302.7* | 270.0 |
| Wednesday | Client | 11 | 470.7 | 254.0 |
| | Proprietary | 9 | 489.3 | 292.0 |
| Thursday | Client | 13 | 372.8 | 208.5 |
| | Proprietary | 10 | 519.2 | 430.0 |
| Friday | Client | 12 | 256.8 | 262.0 |
| | Proprietary | 7 | 1074.0*** | 788.0** |

**Table 5 Trade Size by Time of Day Reported**

Average and median trade size, by time of day that the position was closed, for 58 trades assigned to the proprietary account and 49 trades assigned to the client account from October 15, 2008 through March 18, 2009 in the eMini S&P 500 and S&P futures contracts, the Japanese Yen futures contract, and the Euro futures contract. ***, **, and * denote differences between client and proprietary trades at the 99, 95 and 90 percent confidence levels, respectively.

| Time of Day Reported | | # trades | Average Trade Size | Median Trade Size |
|---|---|---|---|---|
| Before 12 noon | Client | 4 | 25.0 | 25.0 |
| | Proprietary | 25 | 43.1 | 25.0 |
| 12 p.m. to 3 p.m. | Client | 5 | 34.0 | 35.0 |
| | Proprietary | 10 | 88.5*** | 72.5 |
| 3 p.m. to 6 p.m. | Client | 15 | 72.0 | 25.0 |
| | Proprietary | 2 | 42.5 | 42.5 |
| 6 p.m. to 9 p.m. | Client | 21 | 69.5 | 40.0 |
| | Proprietary | 3 | 134.3** | 25.0 |
| After 9 p.m. | Client | 13 | 127.1 | 75.0 |
| | Proprietary | 9 | 76.3 | 40.0* |

**Exhibit A--Facts and Data Considered in Forming Opinion**

## I. Publications

Chan, K.C., William G. Christie and Paul H. Schultz, 1995, Market structure and the intraday pattern of bid-ask spreads for Nasdaq securities, *Journal of Business* 68, 35-60.

Ekman, Peter D., 1992, Intraday patterns in the S&P 500 index futures market, *Journal of Futures Markets* 12, 365-381.

Frino, Alex, Johan Bjursell, George H. K. Wang and Andrew Lepone, 2008, Large trades and intraday futures price behavior, *Journal of Futures Markets* 28, 1147-1181.

Keim, Donald B. and Robert F. Stambaugh, 1984, A further investigation of the weekend effect in stock returns, *Journal of Finance* 39, 819-835.

McInish, Thomas H. and Robert A. Wood, 1992, An analysis of intraday patterns in bid/ask spreads for NYSE stocks, *Journal of Finance* 47, 753-64.

Pedersen, Mitchell A. and David Fialkowski, 1994, Posted versus effective spreads: Good prices or bad quotes?, *Journal of Financial Economics* 35, 269-292.

Sias, Richard and Laura Starks, 1995, The day of the week anomaly: The role of institutional investors, *Financial Analysts Journal* 51, 58-67.

## II. Sources Used to Construct the Datasets

- CFTC complaint as filed PDF

- Defendants' Answer and Affirmative Defense to Complaint PDF

- Plaintiff's Answers and Objections to Defendants' First Set of Interrogatories PDF

- Plaintiff's Responses and Objections to Defendants' Second Set of Interrogatories to Plaintiff (Revised) PDF

- Devon trade ticket files, various PDF

- Mizuho trade ticket files, various PDF

28

- MF Global electronic trading records (60629001 - Suspense Account.txt)

- MF Global electronic trading records (29060006 - Proprietary Account.txt)

- Master Allocation spreadsheet files (XLS)

Exhibit B—Curriculum Vitae of Jeffrey H. Harris

# JEFFREY H. HARRIS

624 Whitman
Syracuse University
Syracuse, NY 13244
(315) 443-4843
jhharr03@syr.edu

## Education
Ph.D., Business Administration, Finance.  The Ohio State University, 1995

M.B.A., Finance.  The University of Iowa, 1987

B.A., Physics.  Economics Minor.  The University of Iowa, 1986
                                Attended Luther College, 1982-84

## Employment History
Syracuse University, Dean's Chair in Finance, 2011-Present

University of Delaware, Professor, 2006-11
                Associate Professor, 2003-06
                Assistant Professor, 2001-03

Southern Methodist University, James M. Collins Chair (Visiting), 2010-11

U.S. Commodity Futures Trading Commission, Chief Economist, 2007-10
                                Visiting Academic/Consultant, 2006-07

University of Notre Dame, Assistant Professor, 1995-2001

Nasdaq Department of Economic Research, Visiting Academic Fellow, 2000-01

U.S. Securities and Exchange Commission, Visiting Academic Scholar, 1999-2000

The Ohio State University, Visiting Assistant Professor, 1995-97

## Professional Activities
Testimony before Congress
        "The Role of Speculative Investments in Energy Markets" before the United States
        Senate Subcommittee on Energy and Natural Resources, September 16, 2008.

"Financial Speculation in Commodity Markets: Are Institutional Investors and Hedge Funds Contributing to Food and Energy Price Inflation?" before the United States Senate Committee on Homeland Security and Governmental Affairs, May 20, 2008.

"The Influence of Speculative Traders in Commodity Markets" before the United States House of Representatives Agriculture Committee, May 15, 2008.

"The Influence of Non-commercial Institutional Investors on Oil Prices" before the United States Senate Committee on Energy and Natural Resources, April 3, 2008.

Testimony before the Commission
"Price Discovery in Natural Gas Markets" before the United States Commodity Futures Trading Commission Hearing to Examine Trading on Regulated Exchanges and Exempt Commercial Markets, September 18, 2007.

"Price Convergence in Agricultural Markets" before the United States Commodity Futures Trading Commission Agricultural Markets Roundtable, April 22, 2008.

"On Position Limits" before the United States Commodity Futures Trading Commission Open Meeting Regarding Proposed Position Limits Rule, January 14, 2010.

Expert Reports
In re: United States Securities and Exchange Commission v. Moises Saba Masri and Albert Meyer Sutton
In re: Sycamore Networks, Inc. Initial Public Offering Securities Litigation
In re: United States v. Sergey Aleynikov
In re: United States v. George Holley
In re: Qimonda Richmond, LLC, et al. Debtors, Chapter 11

## Publications

"Herding and Speculation in the Crude Oil Market" with Celso Brunetti and Bahattin Büyükşahin, *The Energy Journal*, forthcoming.

"Informed Trading and Market Structure" with Charlie X. Cai, Robert S. Hudson and Kevin Keasey, *European Financial Management*, forthcoming.

"Who Drove and Burst the Tech Bubble" with John M. Griffin, Tao Shu and Selim Topaloglu, 2011, *Journal of Finance* 66, 1251-1290.

"Clearing House, Margin Requirements, and Systemic Risk" with Jorge A. Cruz Lopez and Christophe Pérignon, 2011, *Review of Futures Markets* 19, 39-54.

"The Role of Speculators during Periods of Financial Distress" with Naomi Boyd and Arkadiusz Nowak, 2011, *Journal of Alternative Investments* 14, 10-25.

"Effects of Central Bank Intervention on the Interbank Market during the Subprime Crisis" with Celso Brunetti and Mario di Filippo, 2011, *Review of Financial Studies* 24, 2053-2083.

"The Role of Speculators in the Crude Oil Futures Markets" with Bahattin Büyükşahin, 2011, *The Energy Journal* 32, 167-202.

"Why to Maturing Futures and Cash Prices Diverge for Agricultural Commodities?" with Nicole Aulerich and Raymond P.H. Fishe, 2011, *Journal of Futures Markets* 31, 503-533.

"Why are IPO Investors Net Buyers through Lead Underwriters?" with John M. Griffin and Selim Topaloglu, 2007, *Journal of Financial Economics* 85, 518-551.

"How New Entry in Options Markets affected Market Making and Trading Costs" with Patrick DeFontnouvelle and Raymond P.H. Fishe, 2005, *Journal of Investment Management* 3, 24-40.

"The Development of Secondary Market Liquidity for NYSE-Listed IPOs" with Shane A. Corwin and Marc L. Lipson, 2004, *Journal of Finance* 59, 2339-2374, Awarded Outstanding Paper in Financial Institutions at the 2002 Southern Finance Association Meeting.

"The Dynamics of Institutional and Individual Trading" with John M. Griffin and Selim Topaloglu, 2003, *Journal of Finance* 58, 2285-2320. Nominated for the Smith-Breeden Prize.

"The Behavior of Bid-Ask Spreads and Volume in Options Markets During the Competition for Listings in 1999" with Patrick DeFontnouvelle and Raymond P.H. Fishe, 2003, *Journal of Finance* 58, 2437-2463. Nominated for the Smith-Breeden Prize.

"Nasdaq Trading Halts: The Impact of Market Mechanisms on Prices, Trading Activity and Execution Costs" with William G. Christie and Shane A. Corwin, 2002, *Journal of Finance* 57, 1443-1478.

"The Initial Listing Decisions of Firms that Go Public" with Shane A. Corwin, 2001, *Financial Management* 30, 35-55.

"The Effect of Nasdaq Market Reform on Trading Costs and Depths" with Michael J. Barclay, William G. Christie, Eugene Kandel, and Paul H. Schultz, 1999, *Journal of Finance* 54, 1-34. Nominated for the Smith-Breeden Prize.

"The Trading Profits of SOES Bandits" with Paul H. Schultz, 1998, *Journal of Financial Economics* 50, 39-62.

"The Importance of Firm Quotes and Rapid Executions: Evidence from the January 1994 SOES Rules Change" with Paul H. Schultz, 1997, *Journal of Financial Economics* 45, 135-166.

"Why Did NASDAQ Market Makers Stop Avoiding Odd-Eighth Quotes?" with Paul H. Schultz and William G. Christie, 1994, *Journal of Finance* 49, 1841-1860.

## Book Chapters/Articles in Books
"The Changing Structure of Energy Futures Markets" with Bahattin Büyükşahin, James A. Overdahl and Michel A. Robe, 2009, in *Finance et Valeurs*, A. Corhay, G. Hubner and A. Miller, editors, ULg Press, Belgium.

"Equity Market Derivatives" with L. Mick Swartz, 2009, in *Financial Derivatives* (Robert W. Kolb Series in Finance), Bob Kolb and Jim Overdahl, editors, John Wiley and Sons, Inc.

"Tick Size, Market Structure and Trading Costs" with William G. Christie and Eugene Kandel, 2008, in *Stock Market Liquidity: Implications for Market Microstructure and Asset Pricing*, Francois-Serge L'habitant and Greg N. Gregoriou, editors, John Wiley and Sons, Inc., 173-197.

## Working Papers
"CoMargin: A System to Enhance Financial Stability" with Jorge A. Cruz Lopez, Christophe Hurlin and Christophe Perignon.

"Speculation, Prices and Market Volatility" with Celso Brunetti and Bahattin Büyükşahin.

"The Impact of Herding on Futures Market Prices" with Naomi Boyd, Bahattin Büyükşahin and Michael S. Haigh.

"Funding Constraints and Liquidity Contagion in U.S. Equity and Treasury Markets" with Christof W. Stahel.

"Do Institutional Traders Predict Bull and Bear Markets?" with Celso Brunetti and Bahattin Büyükşahin.

"Fundamentals, Trader Activity and Derivative Pricing" with Bahattin Büyükşahin, Michael S. Haigh, James A. Overdahl and Michel A. Robe.

"Trading Networks" with Lada Adamic, Celso Brunetti and Andrei Kirilenko.

"Off but Not Gone: A Study of Nasdaq Delistings" (formerly titled "From Pink Slips to Pink Sheets: Market Quality around Nasdaq Delisting") with Venkatesh Panchapagesan and Ingrid M. Werner.

"Stepping Ahead of the Book" with Amy K. Edwards.

"Liquidity Risk, Investor Flux and Post-Earnings Announcement Drift" with Kirsten L. Anderson and Eric So.

"The Sound of Silence" with Mohsen Saad.

**Work-In-Progress**
"Price Discovery in Crude Oil Futures Markets" with Bahattin Büyükşahin.

"The Long and Short of Dealer Profits" with Jay F. Coughenour.

**Teaching Experience**
Seminar, Empirical Finance (PhD), 2012
Financial Management (MSF), 2013
Investment Analysis (MBA), 2001-04, 2006.
Portfolio Theory (MBA), 2010, 2012.
Derivative Investments (MBA), 1996-97, 2005, 2010, 2012-13.
Management of Financial Institutions (MBA), 1995-97.
Investments, 2001-06, 2010.
Options, Futures and Other Derivatives, 1994-97, 2005, 2012-13.
Speculative Markets, 2010.
Financial Institutions Management, 1997.
Introductory Managerial Finance, 1997-99.

**Presentations**
"Financial Trading, Energy Markets and Dodd-Frank"
Keynote Address to the 2012 Oklahoma State MSQFE Alumni Weekend.

"Gasoline Prices and the Changing U.S. Oil Market"
Presented to the Congressional Research Service.

"Funding Constraints and Liquidity Contagion in U.S. Equity and Treasury Markets"
Presented at Syracuse University.

"Energy Markets and Dodd-Frank: Where are we now?"
Presented at the 2012 Fulbright Jaworski/Cornerstone Research conference on Dodd-Frank's Impact on the Energy Markets and at Resources for the Future.

"Do Institutional Traders Predict Bull and Bear Markets?"
Presented at the New York Accounting and Finance Forum and Syracuse University.

"Speculation, Prices and Market Volatility"
Presented at the University of Mississippi and the University of Delaware Economics
Seminar.

"The Evolving Landscape for Derivative Regulation"
Presented at Fulbright Jaworski Oil and Gas Compliance Seminar, HEC Paris,
NasdaqOMX, the Universita Politecnica delle Marche, Ancona, Italy, the Vanderbilt
University Conference on Regulatory Change in the Global Financial System, Cornerstone
Research and the Platts Oil Trading and Risk Management Forum.

"Effects of Central Bank Intervention on the Interbank Market during the Sub-Prime
Crisis"
Presented at the Universita Politecnica delle Marche, Ancona, Italy.

"Trading Networks"
Presented at Rutgers University, Southern Methodist University, Syracuse University,
Temple University, the University of Central Florida, the University of Missouri-
Columbia, the University of Tennessee and Villanova University.

"Improving Market Transparency"
Presented at the 2009 CFTC Symposium for International Market Authorities.

"Abusive Conduct from an Economist's Perspective"
Presented at the 2009 CFTC Division of Enforcement International Regulators
Conference.

"The Role of Speculators in the Crude Oil Futures Markets"
Presented at the NYSE/Euronext Amsterdam & Tinbergen Institute Workshop on
Liquidity and Volatility in Today's Markets and the 2009 International Association of
Energy Economists International Conference.

"Index Trading and Speculation in Commodity Futures Markets"
Presented at the CFTC Agricultural Forum, the American Agricultural Economics
Association Meeting, the Mid-Atlantic Farm Credit Board of Directors annual meeting,
the Council on Food, Agriculture and Resource Economics, Keynote Address to the
Washington Area Finance Association, the U.S.-India Financial and Economic Forum,
the U.S. Department of State Bureau of Economic and Business Affairs, the 2008 CFTC
Symposium for International Market Authorities, the USDA/World Bank Food Panel, the
2008 IOSCO Conference on Speculation and Volatility in Commodity Markets, the
Canadian Securities Administration, the Energy Information Administration (Department
of Energy), the 2009 NCCC-134 Meeting on Applied Commodity Price Analysis,
Forecasting and Market Risk Management, the Kansas City Federal Reserve Panel on
Agricultural Finance, the 2009 EIA Energy Conference, the American Petroleum
Institute, the 2009 FIA Legal and Compliance Conference, HEC Paris, the 2009
Canadian Economics Association meeting, Terrapinn 2011 World Commodities Week
and the 2011 InVivo Paris Conference on Speculation in Agriculture Markets.

"Increasing Internationalization of the Financial Markets"
Presented at the Chatham House, London.

"Index Funds and Data Dissemination in Crude Oil Markets"
Presented at the 2008 International Energy Agency Expert Roundtable on Oil Price
Formation and to the U. S. CFTC Energy Markets Advisory Committee.

"The Impact of Herding on Futures Market Prices"
Presented at the 2007 CFTC Symposium for International Market Authorities.

"Price Discovery in U.S. Natural Gas Futures Markets"
Presented to the U.S. CFTC.

"Market Growth, Trader Participation and Pricing in Energy Futures Markets"
Presented at the Arizona State University, the 2007 MIT Center for Energy and
Environmental Policy Research Conference and Johns Hopkins University.

"Liquidity Risk, Investor Flux and Post-Earnings Announcement Drift"
Presented at the University of Toronto and the University of Arizona.

"The Sound of Silence"
Presented at the U.S. CFTC and University of Delaware Brown Bag seminar series.

"Off but Not Gone: A Study of Nasdaq Delistings" (formerly titled "From Pink Slips to
Pink Sheets: Market Quality around Nasdaq Delisting")
Presented at the University of Delaware, George Mason University and George
Washington University.

"Why are IPO Investors Net Buyers through Lead Underwriters?"
Presented at American University, Case Western Reserve University, Drexel University,
the University of Missouri—Columbia, Morgan State University and Temple University.

"Investor Behavior Surrounding Earnings Announcements"
Presented at the University of Delaware Brown Bag seminar series.

"Trading Behavior around the Rise and Fall of Nasdaq"
Presented at the University of Maryland and the University of Connecticut.

"The Effect of Decimals on Nasdaq Retail Trading"
Presented at the University of Delaware and 2002 Eastern Finance Association Meeting.

"The Development of Secondary Market Liquidity for NYSE-Listed IPOs"
Presented at Nasdaq, 2001 Financial Management Association Annual Meeting, 2002
Southern Finance Association Meeting, the University of Miami and the University of
Delaware.

36

"Competition for Market Making in NYSE IPOs"
Presented at Nasdaq.

"Nasdaq Trading Halts: The Impact of Market Mechanisms on Prices, Trading Activity
and Execution"
Presented at the 2000 Western Finance Association Annual Meeting, 2000 NBER
Microstructure Conference, 2000 Financial Management Association Annual Meeting,
Penn State University, the Nasdaq Stock Market, George Washington University and
American University.

"The Initial Listing Decisions of Firms that Go Public"
Presented at the 1998 Financial Management Association Annual Meeting, the Nasdaq
Stock Market, Syracuse University and Arizona State University.

"The Trading Profits of SOES Bandits"
Presented at the University of Georgia and the 1997 Financial Management Association
Annual Meeting.

"The Importance of Firm Quotes and Rapid Executions: Evidence from the January 1994
SOES Rules Change"
Presented at The Ohio State University, University of Notre Dame and the 1997
American Finance Association Annual Meeting.

"Cost Components of the Bid-Ask Spread: An Intraday Analysis"
Presented at the 1994 Financial Management Association Annual Meeting, University of
Arizona, University of Houston, University of Iowa, University of Miami, Michigan
State University and University of Notre Dame.

## Professional Activities

Panelist,
  "Dodd-Frank and Commodity Markets" panel at the Terrapinn World
    Commodities Week, London 2011.
  "Speculation and Regulation in Energy Markets" panel at the Standard Chartered
    Bank Earth's Resources Conference, Hong Kong 2011.
  "The Regulatory World of Market Manipulation" panel at the American Bar
    Association Antitrust and Consumer Law Issues in the Energy Industry
    Conference, 2011.
  "Commodity Super-cycles" panel at Standard Chartered Bank New York
    Symposium, 2011.
  "World Oil Markets" panel moderator at the IEA/IEF/OPEC London Symposium
    on World Oil Markets, 2010.
  "Assessing Dodd-Frank" panel on current financial regulation, National
    Association of Business Economists, 2010.
  "What's Next?" panel on post-crisis regulation, Georgetown University, 2010.

"Sovereign CDS Markets" discussion panel at Georgetown University, 2010.

Referee,
> *The Accounting Review, Eastern Economic Journal, Financial Management, Financial Review, International Review of Financial Analysis, Journal of Accounting and Public Policy, Journal of Banking and Finance, Journal of Business, Journal of Corporate Finance, The Journal of Economics and Business, Journal of Finance, Journal of Financial Economics, Journal of Financial and Quantitative Analysis, Journal of Financial Markets, Journal of Money, Credit and Banking, The Quarterly Review of Economics and Finance* and *Review of Financial Studies.*

Director,
> Eris Exchange, 2011-Present
> Southern Finance Association 2010-Present

Track Chair,
> Markets and Microstructure, Financial Management Association 2002
> Markets and Microstructure, Midwest Financial Management Association 2003

Program Committee,
> European Finance Association 2006-11
> Financial Management Association 2002-10
> Southern Finance Association 2008
> Western Finance Association 2003-11, 2013

Session Chair,
> Financial Management Association 2002, 2004-05
> Southern Finance Association 2000, 2002, 2008
> Eastern Finance Association 2002

Discussant,
> Allied Social Sciences Association 2007
> Financial Management Association 1996-97, 1999-2002, 2004-06
> Ohio State Conference on Dealer Markets 1996
> Notre Dame/Nasdaq Dealer Market Conferences 1999-2000
> Southern Finance Association 2000, 2002, 2008
> Western Finance Association 2001, 2004
> Washington Area Finance Association 2000, 2002, 2004

Member,
> American Finance Association
> Financial Management Association
> Southern Finance Association
> Western Finance Association

Advisor,
        Lerner Finance Club (MBA) 2005-07
        Whitman Financial Management Association 2011-Present

## Other Work Experience

Copy Editor, *Journal of Finance*, 1992-93
MBA Advisor/Graduate Admissions Coordinator, University of Iowa College of
Business Administration, 1988-1991
Executive Trainee/Distributor, MAY Corporation Venture Stores Division, 1988

## Honors and Awards

Lerner College Outstanding Scholar Award, University of Delaware, 2008
Research Grants,
        Institute for Financial Markets, 2010
        Lerner College of Business and Economics, 2004, 2007
        University of Delaware General University Research Grant, 2006
        University of Delaware Department of Finance, 2005
        University of Notre Dame Mendoza College of Business, 1996, 1998-99

Nominated for University of Delaware Lerner College Teaching Award, 2004, 2006
Nominated for University of Delaware Lerner College Advising Award, 2004
Cited as "Prominent Faculty" in 2008-10, 2012 Business Week Rankings of
        Undergraduate Business Schools
Member, Beta Gamma Sigma

# EXHIBIT B

# EXHIBIT B

# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| U.S. Commodity Futures Trading Commission, v. Donald A. Newell and Quiddity, LLC, | Civil Action 12-CV-6763 |

**SUPPLEMENTAL EXPERT REPORT OF JEFFREY H. HARRIS, Ph.D.**

**(Incorporates by Reference Previous Expert Report)**

December 9, 2013

## SUPPLEMENTAL EXPERT REPORT OF JEFFREY H. HARRIS, Ph.D.

### I.    Overview

1.    In this report, I clarify and discuss the use of the term "trades," offer my opinions on statements made in Defendants' Expert Reports (see list in Appendix A), and present some further analysis of the trades which the Defendants assigned to both proprietary and customer trading accounts.

### II.    Summary of Opinion

2.    First, upon reviewing the Defendants' expert reports, I maintain that there exists little evidence of material differences (other than profitability) between trades assigned to client and proprietary trading accounts. Second, I find that the Defendants' criticism of the Commodity Futures Trading Commission (CFTC) definition of "trades" as all trading activity over a particular day is not problematic, and in fact, is less susceptible to data errors that may result from any *ex post* assignment of trades to customer or proprietary accounts. Third, having further analyzed days in which trades in the same contract are assigned to either the customer or proprietary account, I continue to find that profitability of trades differs across accounts.

### III.    Clarification of the Term "Trades"

3.    My Expert Report adopted the the same terminology for the term "trade" as employed by the CFTC in the complaint. I adopted this definition for an important reason: Given no evidence that individual executions were assigned *a priori* to the client

2

or proprietary accounts, an analysis of the profitability or trade characteristics of trades defined as "the initiation and liquidation of a position" would be inherently flawed since an objective observer would have no factual basis for determining whether the position was initiated in the client or proprietary account. In fact, an *ex post* allocation of executions to different accounts would necessarily rely on a definition of "initiations and liquidations" tainted by the alleged behavior that was the subject of the original complaint.

4.      Indeed, on a number of days (at least fifteen) during the complaint period, Defendants allocated positions in the same underlying contract to both customer and proprietary accounts positions. If allocations were done on an *ex post* basis, it would be impossible for an independent observer to know when any initiated position might have been liquidated. Without the facts to support the contention that these executions were assigned to an account at initiation, any type of analysis using this "bad" data would be flawed. If the account designation for initiated positions are not accurate, any subsequent analysis based on the erroneous account designation would be inaccurate as well.

5. Whether trades are defined as "initiation and liquidation" or by trading day, on the various days during the period under question the trades assigned to customer accounts fared significantly worse than those assigned to the proprietary account. In fact, on eight of these days, trades assigned to the customer accounts suffered aggregate daily losses while trades assigned to the proprietary account enjoyed aggregate daily profits.

6. The CFTC's definition of "trades" attempts to overcome this inherent flaw in the Defendants' definition by examining executions over an entire trading day, since the overnight period affords the opportunity for *ex post* assignment. By examining the full

set of executions each day as a "trade," my original analysis focused on the statistical differences between observable characteristics of the executions assigned to each account each day rather than on the potentially faulty premise that executions were appropriately assigned beforehand to the customer or proprietary accounts. In this light, any attempt to apply an "initiation and liquidation" approach introduces potentially flawed data into the analysis of profitability.

7. In short, any critique of the CFTC's definition of a "trade" in this case lacks merit. To avoid the bias inherent in analyzing trades defined as "the initiation and liquidation of a position" my analysis focuses on substantiated facts in the data and not on data potentially tainted by the precise bad behavior alleged in the CFTC's complaint.

## IV. Discussion of the Defendants' Trading Strategies

8. Defendants' expert reports posit a number of differences that should be evident if the trading strategies applied to customer and proprietary accounts differ. Indeed, my original Expert Report utilized as many facts within the trade data—including trade size, executing broker, length of time a trade is held, day of the week that trades are executed and time of day that trades are executed—that could be exploited in an attempt to discern any differences between accounts. I found little to no differences along these dimensions.

9. Subsequently (see p. 5, Final Expert Report of John Burnside) the Defendants' expert asserts that the overwhelming number of customer trades placed by the Defendants during the period covered by the CFTC complaint are in options contracts and are not futures day trades. This does not diminish the fact that the futures day trades assigned to

the customer account closely resemble the futures day trades assigned to the proprietary account (sometimes on the same day and in the same underlying asset).

10. Defendants' expert reports mention on many occasions that delta hedging strategies underlie trades assigned to the customer account. I find these statements to be unconvincing. First of all, one of the Defendants' experts asserts that the Defendants' customer trades are generated by a computer executing "a probability dependent approach to option volatility arbitrage" but also represent "hedge transactions ... motivated by the desire to reduce risk ... and not motivated by the quest for profits" (see p. 6, Final Expert Report of John Burnside). These two motivations are contradictory. Arbitrage trades (including statistical based option volatility arbitrage), by definition, are meant to generate profits.

11. Notwithstanding the contradictory nature of these statements, I have no reason to believe that this strategy was actually implemented in trades assigned to customer accounts. Volatility arbitrage as a strategy

> "generally implemented through a delta neutral portfolio consisting of an option and its underlying asset. A long position in an option combined with a short position in the underlying asset is equivalent to a long volatility position. This strategy will be profitable if the realized volatility on the underlying asset eventually proves to be higher than the implied volatility on the option when the trade was initiated. Conversely, a short position in an option combined with a long position in the underlying asset is equivalent to a short volatility position, which will be profitable if the realized volatility on the underlying asset is ultimately lower than the option's implied volatility." (see Investopedia.com at http://www/investopedia.com/terms/v/volatility-arbitrage.asp accessed on December 6, 2013)

Despite the assertion that this strategy underlies trades assigned to customer accounts, the Defendants' expert reports provide only a few anecdotal details as to the combined option and underlying assets that might comprise this strategy. Only a few

option or portfolio deltas have been provided in defense of this strategy, a fact I find surprising, given the assertions that this strategy prevailed during the entire period under question. Moreover, the Defendants provide only scant evidence about market volatility that these strategies were purported to mitigate.

12. Defendants' experts also claim that different risk tolerances could possibly lead to "material differences" between the profitability of trades assigned to the customer accounts and trades assigned to the proprietary account (see Section V.B. pp. 7-8, Final Expert Report of John Burnside). However, different risk tolerances are also likely to be reflected in material differences in the variables I analyzed in my first expert report. For instance, lower risk tolerances should also result in smaller trade sizes and/or shorter holding periods. The fact that no material differences are found between trade sizes or holding periods in my earlier analysis suggests that different risk tolerances also do not underlie the profitability differences found between the trades assigned to the customer and proprietary accounts.

13. Defendants' experts also claim that proprietary trading systems are "at least partially, if not wholly, in the heads of the traders who employ them" and it is "virtually impossible to ascertain ... the system used by ... Mr. Newell" (p. 8, Final Expert Report of John Burnside). I find this argument to be unconvincing in light of my prior analysis. Just because an independent observer might not be able to correctly ascertain a particular proprietary trading strategy does not mean that a comparison of trade characteristics between trades assigned to customer accounts and trades assigned to proprietary accounts is not informative. The fact remains that the computer assisted trading strategy which the Defendants allegedly used for customer accounts generates trades indistinguishable from

6

proprietary trades across the five variables that I analyzed in my first report, but significantly different in profitability. These expert claims do not temper my concerns that these trades were executed and then allocated after the fact to different accounts based on profitability.

14. In the few instances when the Defendants' trades are discussed in any detail by the experts (see Section XI in Preliminary Expert Report of John Burnside) I find the explanations of customer trading strategies to be incomplete or even contradictory. In one instance, during the discussion of February 24, 2009 trades, the Defendants' expert himself notes that the espoused "delta neutral strategy" was not followed. A delta neutral strategy will have a delta close to zero. At the top of the last page of this report, he documents a net (portfolio) delta of -32.5, a bearish position, and notes that the lack of a long futures (which would move the portfolio delta closer to zero) "seems a bit out of place." These findings undermine assertions that strategies executed for customer accounts were part of delta neutral strategies.

15. In another instance, the Defendants' expert Burnside discusses the trades executed on October 16, 2008 with details about the gamma of the portfolio in the customer account (see Section XI in Preliminary Expert Report of John Burnside). He documents that the customer account had a significant gamma. Optimally, a delta neutral strategy will have a low gamma so as to minimize the number of times a portfolio must be rebalanced. The fact that this gamma was significant also undermines claims that a delta neutral strategy was applied to customer accounts.

16. Expert Burnside's discussion of the trades on October 16, 2008 also contains inconsistencies (see Section XI in Preliminary Expert Report of John Burnside). Burnside

7

acknowledges "I cannot … even begin to explain the logic … of each action." Nevertheless he concludes allocations to customer accounts were "done with the purpose of either hedging an existing … position or … an anticipated or executed option order." Since even the Defendants' expert himself fails to understand the logic of each action, I am not convinced of anything that he might opine on related to the purposes of these trades. At the end of the day, as Burnside notes, in the customer account "open positions made $1,230,339" but day trades allocated to "the customer accounts lost $720,200." Meantime, day trades assigned to the proprietary account were profitable.

17. To the best of my knowledge, the Defendants did not consistently keep separate trades executed on behalf of clients from those executed for the Defendants' proprietary account. My previous report examined five possible trade characteristics that might generate the profitability differences noted in the CFTC complaint. Having reviewed the Defendants' expert reports, I find Defendants' *ex post* explanations based on differences in trading strategies (like those cited above) often contradict trading records, lend support to the CFTC's complaint or simply are asserted with little empirical support.

18. For instance, the Defendants' expert's report makes statements about trading strategies that are contradicted by the trading records. When discussing Trade 4, Burnside notes "Quiddity's express strategy is to establish long term positions and not to engage in short-term options trading" (Preliminary Expert Report of John Burnside). However, the trading records of Customer Trades 1 (on October 15, 2008) and 8 (on October 23, 2008) both involve short-term options trades assigned to the customer account.

8

19. The Defendants' expert's report makes other claims which are directly contradicted by trading data. For instance, Burnside notes, when discussing Trade 17, "the 10-lot trades, are too few in quantity to be properly allocated to the customer accounts" and when discussing Trade 29, that "(a 10-lot) is ... too small to be allocated among customer accounts" (Preliminary Expert Report of John Burnside). Notwithstanding that these statements leave an impression that the allocation process took place after execution, they are clearly violated by the fact that hundreds of other executions of lesser quantity (including 1-, 2-, and 3-lot executions) have been allocated to customer accounts in other trades cited in the complaint.

20. The Defendants' expert's report also concedes that some trade tickets clearly lacked proper account numbers. For instance, when discussing Trade 8, Burnside notes "the order tickets bear 'Q0000,' the suspense account number with nothing to indicate the trades were for the proprietary account" (Preliminary Report of John Burnside). Notably, these order tickets also do not indicate the trades were for the customer account where they were put in an "erroneous allocation" and subsequently moved to the proprietary account.

## V. Further Analysis of Profitability Differences between Customer and Proprietary Trading Accounts

21. Defendants' expert reports raise questions about the CFTC selectively choosing data for the complaint. In an effort to account for differences that cannot be directly measured (like trading strategies and the like), I subsequently analyzed trades (using the CFTC definition for reasons cited above) for customer and proprietary

accounts executed on exactly the same days. In this analysis, I found 15 days where trades were executed in the same contract for both accounts.

22. Within these 15 days, the profitability of trades differed substantially whether the trade was assigned to the customer or proprietary account. In fact, I identified eight days where the trades assigned to the customer account experienced aggregate daily losses while those assigned to the proprietary account experienced profits. Additionally, the profits of trades assigned to the proprietary account far exceeded any profits attained by trades assigned to the customer account.

23. This concurrent-day analysis adds further evidence to the CFTC's complaint. We see a pattern similar to that described in my original expert report—customer trades are more likely to experience losses than proprietary trades, even when trades are assigned to both accounts on the same day in the same contract.

## VI. Conclusions

24. For the foregoing reasons, I conclude that the profitability differences between client and proprietary trades cannot be explained by characteristics of trade size, executing broker, the time a position is held, the day of week that trades are executed or by the time of day that trades are executed. The profitability differences are almost surely the result of *ex post* assignment to different trading accounts.

Jeffrey H. Harris
Dated: December 9, 2013

**Exhibit A--Facts and Data Considered in Forming Opinion**

I.  **Publications**

Chan, K.C., William G. Christie and Paul H. Schultz, 1995, Market structure and
the intraday pattern of bid-ask spreads for Nasdaq securities, *Journal of
Business* 68, 35-60.

Ekman, Peter D., 1992, Intraday patterns in the S&P 500 index futures market,
*Journal of Futures Markets* 12, 365-381.

Frino, Alex, Johan Bjursell, George H. K. Wang and Andrew Lepone, 2008,
Large trades and intraday futures price behavior, *Journal of Futures
Markets* 28, 1147-1181.

Keim, Donald B. and Robert F. Stambaugh, 1984, A further investigation of the
weekend effect in stock returns, *Journal of Finance* 39, 819-835.

McInish, Thomas H. and Robert A. Wood, 1992, An analysis of intraday patterns
in bid/ask spreads for NYSE stocks, *Journal of Finance* 47, 753-64.

Pedersen, Mitchell A. and David Fialkowski, 1994, Posted versus effective
spreads: Good prices or bad quotes?, *Journal of Financial Economics* 35,
269-292.

Sias, Richard and Laura Starks, 1995, The day of the week anomaly: The role of
institutional investors, *Financial Analysts Journal* 51, 58-67.

II.  **Sources Used to Construct the Datasets**

- CFTC complaint as filed PDF

- Defendants' Answer and Affirmative Defense to Complaint PDF

- Plaintiff's Answers and Objections to Defendants' First Set of Interrogatories
  PDF

- Plaintiff's Responses and Objections to Defendants' Second Set of
  Interrogatories to Plaintiff (Revised) PDF

- Devon trade ticket files, various PDF

- Mizuho trade ticket files, various PDF

- MF Global electronic trading records (60629001 - Suspense Account.txt)

- MF Global electronic trading records (29060006 - Proprietary Account.txt)

- Master Allocation spreadsheet files (XLS)

- Expert Report of John Burnside

- Final Expert Report of John Burnside

- Expert Report of John E. Parkes, Jr.

- Expert Report of Margaret Wiermanski

- Expert Report of Jeffrey H. Harris