Case: 1:12-cv-06763 Document #: 94-3 Filed: 04/02/14 Page 1 of 329 PageID #:1123

1    that at the time to make sure that it was accurate.

2    BY MR. GREEN:

3         Q.    Mr. Block discussed with you Exhibit 12,

4    which was portion of trading records for what's

5    Client Trade 1 in the CFTC's Complaint?

6              MR. BLOCK:   Customer trading.   I'm sorry.

7    Proprietary Trade 1.

8              MR. GREEN:   Proprietary Trade 1.   Thank

9    you.

10   BY MR. GREEN:

11        Q.    And he was discussing with you what

12   exposure there was to the market at every time and

13   when trades, when positions were put on and offset.

14   If a trader who's trading for multiple accounts, if

15   you know, based on your experience, if a trader who

16   is trading for multiple accounts is one single

17   trader, but he's putting on multiple positions from

18   multiple accounts, if he buys mini S&P for one

19   account and sells them for another account, would

20   that be a round turn trade?

21        A.    No.

22        Q.    So, is there, what assumption, if any,

1    would you have to make to determine that a buy and a

2    sell actually represent a round turn trade as

3    opposed to two separate positions?

4            MR. BLOCK:  Object to form and foundation.

5            THE WITNESS:  I think a round turn trade,

6    like we discussed earlier, was a buy and a sell for

7    the same account in sequence.

8    BY MR. GREEN:

9        Q.   And, if there are a series of buys and

10   sells that are executed in a suspense account not

11   associated with any specific account, do you know

12   whether or not these are round turn trades or a

13   series of unrelated trades?

14           MR. BLOCK:  Objection as to form and

15   foundation.

16           THE WITNESS:  Right.  So, if we have a

17   suspense account that doesn't identify accounts, it

18   would be very hard to determine which, if any, legs

19   would offset each other.

20   BY MR. GREEN:

21       Q.   And would there be a point in time when

22   that could be determined?

1          MR. BLOCK:  Same objection.

2          THE WITNESS:  Well, I guess it depends,

3    once we identify the actual account that, I mean, if

4    I had an account identifier for both legs of the

5    trade, that's when it could be identified.

6    BY MR. GREEN:

7       Q.   And when --

8          MR. GREEN:  I think that will be it, if

9    you have any follow up.

10         EXAMINATION BY COUNSEL FOR THE DEFENDANTS

11   BY MR. BLOCK:

12      Q.   A suspense account is an account, is it

13   not?

14      A.   Yes.

15      Q.   So, trades made within a suspense account

16   could have an open and a close; correct?  Opening

17   positions, transaction, you cover that transaction?

18         MR. GREEN:  Objection.  Calls for

19   speculation.

20         THE WITNESS:  Yeah, I guess, if it's,

21   like, in -- so are you saying by your description a

22   long and a short position could never be held

1    together in a suspense account?

2    BY MR. BLOCK:

3        Q.   No, that's not -- let me start again.

4    Counsel was asking you questions about suspense

5    account and how that might be an inability to decide

6    where the trades ultimately end up because it's in a

7    suspense account.  Do you recall him asking a

8    question about that?

9        A.   Yes.

10       Q.   He was asking about an issue of

11   allocation, was he not, as opposed to execution of

12   the actual trade?

13       A.   He was asking me whether I could determine

14   whether there was a round turn transaction given two

15   transactions.

16       Q.   You looked at records here, and a suspense

17   account was Account 60001.  Were there trades in the

18   suspense account?

19       A.   Yes.

20       Q.   Okay.  There were opening transactions and

21   closing transactions; correct?

22           MR. GREEN:  Objection.  Calls for

1    speculation.  Lack of foundation.

2              THE WITNESS:  None of them were labeled

3    open and closed.  They were listed long and short in

4    the account.

5    BY MR. BLOCK:

6         Q.   Buys and sells, long and short.  Call it

7    whatever you want.  That was all within that

8    account, and you could track what occurred in that

9    account, could you not?

10        A.   Based on what we went through earlier,

11   yes.

12        Q.   So, when counsel was asking about where

13   you could decide where the trades ultimately ended

14   up, that's an issue of allocation as opposed to

15   execution, isn't it?

16        A.   The subtlety there is a little different;

17   right?

18        Q.   Sir, I'm disagreeing.  It's not a matter

19   of subtlety.  I'm asking you with regards to a

20   suspense account -- by the way, do you know what a

21   suspense account is?

22        A.   Yes.

1        Q.    What is it?

2        A.    An account that's pooled, well, it's an

3   account that, as it's described, suspense.  It's not

4   owned or allocated to any particular individual at

5   the time.

6        Q.    It's an interim account, isn't it?

7        A.    Right.  Like purgatory or some other

8   analogy.

9        Q.    It holds the trades, and once the trades

10  are made they are allocated to individual accounts.

11  Did you see any transaction here where there's a

12  trade made in the suspense account that wasn't

13  opened and closed or long and short, however you

14  want to term it, initiated and closed out?

15       A.    Well, the example we went through, no,

16  they were all, there were purchases and sales.

17       Q.    So, the fact that it's a suspense account

18  doesn't change whether you can identify the round

19  turn that occurred in that account?

20            MR. GREEN:  Objection.  Leading.

21            THE WITNESS:  If there's a rounds turn

22  that occurs, yeah, I guess, I mean, by that account

Case: 1:12-cv-06763 Document #: 94-3 Filed: 04/02/14 Page 7 of 329 PageID #:1129

1   definition it's a round turn.

2   BY MR. BLOCK:

3       Q.   He was also asking you about the

4   definition of day here as used by the CFTC in your

5   analysis.

6           MR. GREEN:  It wasn't, I'll object to your

7   determination that it was as used by the CFTC.  He

8   was asked about how he used the term in his

9   analysis.  Those are separate things.  I was asking

10  about how he used it.

11          MR. BLOCK:  Wow.  I think we might be here

12  a little bit longer.

13  BY MR. BLOCK:

14      Q.   Did you use a different term for day than

15  what the CFTC was using as far as their definition

16  of what a trade or a lot size was?

17      A.   I don't believe so.  I think we used the

18  same, but we had a discussion about what time or

19  when the day began and ended.

20      Q.   Who had a discussion?

21      A.   Mike Schafer and I, and then that was

22  related to, I think, some of the issues we saw

 1    earlier where there was two different time or date

 2    stamps on them.

 3         Q.   So, what did you understand was the CFTC's

 4    definition of day?

 5         A.   So, that's what we needed a clarification

 6    on back when we were looking at the data entry.  So,

 7    it was sometime, I don't know the details, remember

 8    the details, but sometime after the close of trading

 9    into the next day.

10         Q.   So, the CFTC's definition of day was not

11    necessarily a calendar day?

12         A.   Right, not as far as I understand.

13         Q.   What are the limits?  What are the

14    parameters of the CFTC's definition of day in this

15    case?

16         A.   I don't recall exactly.  It has something

17    to do with after the close of the market in the

18    evening into the next day.

19         Q.   How far into the next day?

20         A.   Until the same point in time the next day,

21    so it was a 24-hour period going from the evening of

22    one day to the evening of the next day.

1     Q.   So, in other words, the whole discussion

2   we had about having an open position at the end of

3   the day wasn't the end of the calendar day.  It was

4   the end of some undefined 24-hour period?

5     A.   That's right.

6     Q.   And what did you do your analysis based

7   on, the calendar day?

8     A.   No, based on that definition of what you

9   just described.

10    Q.   I just want to make sure you're going to

11  stick by that, sir, because we're, I think I'm going

12  to have to pull out a whole bunch more trades, and,

13  before I do, so I want to make sure that was what

14  you ran your analysis on.

15    A.   I'm quite sure that's the analysis we ran

16  on.

17    Q.   So, what was the cut-off time of the

18  trade?  And now I'm sorry.  I think we're going to

19  be -- tell me the cut-off times of the trade.

20    A.   Not exactly sure about that.

21    Q.   Well, you ran the analysis, sir.  You have

22  something in your notes.

1          MR. BLOCK:  Mike, can you retrieve those

2    documents from the shredder?

3          MR. SOLINSKY:  I put them all in the

4    shredder.  I asked you before if it was okay.

5          MR. BLOCK:  I didn't think I was going to

6    encounter this.  Laugh all you want.

7          MR. GREEN:  Could we go off the record for

8    a minute.

9          (Discussion held off the record.)

10          (Whereupon, a short recess was taken from

11    8:02 to 8:13 p.m.)

12    BY MR. BLOCK:

13      Q.   Dr. Harris, you've had some time now to

14    review your computer records.  Have you determined

15    what the time frame is that you were, I guess,

16    instructed to use or which you used to determine all

17    the criteria of your test with regards to what time

18    period?  Let me strike that.  You're changing your

19    testimony, are you not, as far as how you define day

20    in the course of your study?  Is that correct?

21      A.   Yes.  Let me apologize for that.  I

22    didn't, I've been using the dates that we have as a

1    single date recently, so I neglected to realize or

2    recall the conversation that we had about how the

3    original data was sent to me and the questions we

4    had around that time stamp.

5        Q.   And this is conversation you had with

6    counsel or you had with Mike Schafer?

7        A.   Both.  We started the discussion with Mike

8    Schafer about the fact that there was multiple days.

9    We inquired and we went back and asked the CFTC at

10   the time how their definition, so I think our

11   definition equates to theirs.  I don't have notes on

12   that, but the data that I see, at least what I've

13   looked up here, it looks like we, there's an

14   inflection between, right, at 5 o'clock in the

15   evening, at least in the data for the proprietary

16   account.

17       Q.   So, what does that mean?

18       A.   So, that means a definition of the day

19   would start at 5 p.m. and go to 5 p.m. the next day.

20       Q.   Is it your testimony that that is the

21   parameters that you used for all your analysis?

22       A.   Yes.

1      Q.   Can you tell me where it says that in your

2   protocols?

3      A.   It doesn't say that in the protocols.

4      Q.   Can you tell me where it gives that

5   definition of a day in your notes?

6      A.   Yeah, it's not in my notes either.

7      Q.   Do you have any type of e-mail

8   correspondence with either Mr. Schafer or with

9   counsel that references that definition of trading

10  day as -- is it five to five every day?

11     A.   5 p.m.

12     Q.   And what is your understanding why 5 p.m.

13  is chosen as the cutoff?

14     A.   My understanding would be that the

15  discussion was that 5 p.m. was a chance to allocate,

16  and anything done after that would have to be

17  allocated on the next day's report.  So, it had

18  something to do with the logistics of how the trades

19  were reported to each individual account.

20     Q.   And is that the same, did you use the 5 to

21  5 p.m. time frame for all the different criteria

22  that you tested?

Case: 1:12-cv-06763 Document #: 94-3 Filed: 04/02/14 Page 13 of 329 PageID #:1135

1      A.    Yes.

2      Q.    Did you use the five to five criteria for

3   determining, to determine how many round turns had

4   been used in any given time frame?

5            MR. GREEN:   Objection.

6            THE WITNESS:   No.   I didn't determine the

7   round turns.   I just, again, we took that 24-hour

8   period and took one trade.

9   BY MR. BLOCK:

10     Q.    So, you didn't determine the round turns.

11   What did you do with the open contracts then at the

12   end of 5 o'clock?

13     A.    Right.   Those were still handled the same

14   way as I described before.   Those would be

15   considered unfilled open positions at 5 o'clock

16   rather than, say, midnight.

17     Q.    And, when you are doing your analysis --

18   well, let's go back.   Counsel is asking you

19   questions about the transition from general, from

20   Greenwich Mean Time to Central Standard Time.   Did

21   your analysis make that change, well, did you find

22   anywhere in your records where your analysis changed

Page 413

1    it from Greenwich Mean Time to Central Standard

2    Time?

3         A.   Give me a minute.  I'll look at a couple

4    of them.  Yeah, I think considering what we, the

5    data that I can see here looks like we did do the

6    conversion.

7         Q.   Where did you do the conversion?  Where is

8    it reflected in any of your records?

9         A.   It was just in the raw data that we input

10   into the --

11        Q.   Show me in your raw data where it was

12   converted.

13        A.   Well, so, here's MFG Mizuho trade, and

14   these are the two time stamps.

15        Q.   There's only going to be one time stamp.

16        A.   One is for open, one for closed.  If one

17   of them is not adjusted, they wouldn't be anywhere

18   close to being --

19        Q.   What trade number is that?

20        A.   That's Proprietary Trade Number 31.

21        Q.   So, your testimony now is that you

22   actually did a conversion from Greenwich Mean Time

1    to Central Standard Time?

2          A.    I believe so, yes.

3          Q.    Okay.  Show me the trading records for the

4    17 trades done through MFG for the 6 to 9 p.m. slot

5    then.  Sorry.  What was that last trade number that

6    he was --

7                MR. GREEN:  It was Proprietary Trade 31, I

8    think.

9                MR. BLOCK:  Well, that doesn't, you still

10   got 31 on your screen here because, according to

11   your trades for analysis document, that was all done

12   at MF Global.  There was no Mizuho component.

13               THE WITNESS:  I have Mizuho listed as a

14   second broker, so what are we --

15   BY MR. BLOCK:

16         Q.    Here's the problem I have with that, sir.

17   I printed out your trades for analysis clients trade

18   spreadsheet.

19               MR. GREEN:  Proprietary Trade 31, Exhibit

20   5, and it says Mizuho.

21               MR. BLOCK:  So, proprietary trade?

22               MR. GREEN:  Yes.

1          MR. BLOCK:  I'm sorry.  I've got the wrong

2     list.  I'll get another list.

3          THE WITNESS:  So, what were the trades we

4     were looking at earlier?

5     BY MR. BLOCK:

6          Q.   Your report states that 21 trades closed

7     between the hours of 6 and 9 p.m.

8          A.   Okay.  Right, and I started with 38:21:41.

9     So, is there a question?  I'm sorry.  We have the 21

10    up.

11         Q.   Now, I want you to find me the electronic

12    trading records for Mizuho for those trades.

13         MR. GREEN:  For MF Global.

14         MR. BLOCK:  I'm sorry.  Thank you.  MF

15    Global.

16         MR. GREEN:  Can we go off the record for

17    just a second?

18         MR. BLOCK:  Sure.

19         (Discussion held off the record.)

20         THE WITNESS:  Okay.  So, this is MF

21    Global.

22         MR. SOLINSKY:  Can we have the record

1    reflect what people are looking at?  If he shows you

2    something.

3    BY MR. BLOCK:

4         Q.   It's the electronic trade blotter from MF

5    Global, is it not?

6         A.   Yes.

7         Q.   And what time does it show on those

8    records for, are you looking at the specific trades

9    that you identified as the 21 trades that were

10   closed between 6 and 9 p.m.?  By the way, if they

11   were closed between 6 and 9 p.m., they'd have to be

12   opened between five and six, wouldn't they?

13        MR. GREEN:  Objection.  Calls for

14   assumptions.

15   BY MR. BLOCK:

16        Q.   The trading day as now defined, it closed

17   at 5 p.m.

18        A.   So, I see what you're saying, right.

19   Here's Trade Number 38 that we have opened and time

20   stamped on the 20th of November at 10:45.

21        Q.   A.m. or p.m.?

22        A.   A.m.  Closing at 6 p.m. on the 28th.

1     Q.   So, that wouldn't be, that wouldn't close

2  according to your definition; am I correct?  You're

3  shaking your head.

4     A.   Well, no, it's, 'cause it's listed as not

5  a round turn.

6     Q.   So, that shouldn't have been counted at

7  all?

8     A.   Well, there's a portion of it, I guess,

9  that wasn't closed out at five.  All right.  So,

10  that particular trade, right, so there was a 50 lot

11  sold.

12     Q.   What number is this again?

13     A.   Number 38 of the client accounts.

14     Q.   And what time was it sold at?

15     A.   So, 50, looks like the first execution was

16  50 at 8:10 or 10:45, 50 bought back at 11:54 and

17  another record of execution through MFG of 15 bought

18  at 6 p.m.

19     Q.   Okay.  The 10:45 and the 11:54, a.m. or

20  p.m.?

21     A.   A.m.

22     Q.   So, then that wouldn't qualify as one of

Case: 1:12-cv-06763 Document #: 94-3 Filed: 04/02/14 Page 19 of 329 PageID #:1141

1    the 21 you cited?

2              MR. GREEN:  Objection.  Leading.

3              MR. BLOCK:  I'm sorry?

4              MR. GREEN:  I said objection.  Leading.

5    BY MR. BLOCK:

6         Q.   Well, do you disagree?

7         A.   So, of the 21 I cited to do what?  I'm

8    sorry.

9         Q.   That supposedly closed between 6 and

10   9 p.m.

11        A.   Right.  So, it didn't close.  That was

12   just the last time stamp we had for that trade.

13        Q.   Can you pull up another trade that was

14   supposedly part of the 21?

15        A.   So, the next one is Prop Trade Number 21.

16        Q.   I know.  Part of your 21.  I want to find

17   out if there's any additional errors in your report.

18   The 21 trades that supposedly closed between six and

19   nine, 38 is on your list, and that doesn't fit the

20   parameters?

21        A.   Right.  So, I was just saying Client Trade

22   21.

1    Q.   Is that the next one?

2    A.   Number 21.  Sorry.

3         MR. GREEN:  Are you asking about through

4    MF Global or any trade?

5    BY MR. BLOCK:

6    Q.   Any trade that he analyzed and is

7    including in the 21 trades he said closed between 6

8    and 9 p.m.  By the way, I want to ask you this, sir.

9    Your analysis was based upon the close time;

10   correct, not the open time?

11   A.   Right.

12   Q.   Is Client Trade 21 on November 5, 2008?

13   A.   November 4, 2008.

14   Q.   When was the first trade?

15   A.   18:18.

16   Q.   And what day?

17   A.   On the 4th of November.

18   Q.   So, that's Mizuho; right?  So, that's

19   6:18?

20   A.   Yes.

21   Q.   When's the next trade?

22   A.   Well, there was one at 17:16.  Sorry.  So,

1    5:16 p.m. there was a buy, and the one at 6:18 p.m.

2    was a sell.

3          Q.    Are they on the same day?

4          A.    They are listed both on November 4, yes.

5          Q.    Okay.  Is there a reason why on your

6    trades for analysis it lists it at November 5?  Is

7    this a euro trade?

8          A.    Yes.

9          Q.    Is there another trade ticket associated

10   with this?

11         A.    Yeah.  It looks like the third one, too.

12         Q.    Okay.  When was that?

13         A.    Well, so, the 6:18 was the third one.

14   There was one at 5:16 p.m., one at 6:14 p.m. and a

15   third one at 6:18 p.m.

16         Q.    And this is all on the 4th?

17         A.    Yes.

18         Q.    And what was the 6:14?

19         A.    6:14 was a buy for 35.

20         Q.    So, you had a buy, a buy and then a sell.

21   Is that the correct order?

22         A.    Yes.

```
 1        Q.    So, you had a buy at 5:16 and a buy at

 2   6:14, and you had a sell at 6:18?

 3        A.    Yes.

 4        Q.    So, how are you determining which of those

 5   buys completes the round turn?

 6        A.    Well, the sell completed one of the buy

 7   round turns.

 8        Q.    I understand that.  Which buy?

 9        A.    I don't know.

10        Q.    Well, how did you design the test?

11        A.    Well, the test was just to do the closing

12   position.  That's all.  So, when I had 6:18, that's

13   what I used.

14        Q.    But you now have an open position from

15   this series of transactions?

16        A.    Right.  And I just used the last time in

17   the record.

18        Q.    Well, you APS'd these, too, didn't you,

19   for your profitability determination?

20        A.    Did I what?

21        Q.    You used an average price, did you not?

22        A.    I didn't do an analysis of the
```

Case: 1:12-cv-06763 Document #: 94-3 Filed: 04/02/14 Page 23 of 329 PageID #:1145

1    profitability that way.

2         Q.   Okay.  Well, let's look --

3         A.   There is an average price, I think, in the

4    record here.

5         Q.   Okay.  You have a sell -- I'm sorry.  You

6    have a buy at 13, 1.300.  You have a buy at a

7    different price.  Then you have a sell.

8         A.   Right.

9         Q.   Okay.  Which buy is offset by the sell?

10        A.   I didn't do that analysis.

11        Q.   Well, you realize that changes, that

12   determines on whether it falls within your

13   parameters or not of 6 to 9 p.m.?

14        A.   No, because the closing position, no

15   matter what, is closed, still closed at 6:18.

16        Q.   But it might not have started before

17   6 o'clock, which means that --

18        A.   No, I understand.  No, but that's the

19   point.  I think that's why we used the closing.  We

20   knew when the last closing price was.  When I threw

21   it into the bin, that's the last price, the last

22   time I used.

1      Q.    What's the next trade on your list?

2      A.    Client Trade 41.

3      Q.    That's an E mini trade?

4      A.    Yes.

5      Q.    December 10?

6      A.    Yes.

7      Q.    And this is all through MF Global?

8      A.    Yes.

9      Q.    And, according to Greenwich Mountain Time,

10   it's 18:14:29; correct?

11     A.    Yes.

12           MR. SOLINSKY:  I think it's mean time.

13           MR. BLOCK:   Thank you.

14   BY MR. BLOCK:

15     Q.    So, that would equate to 1:14 in the

16   afternoon?

17     A.    That would, right, if that's Greenwich

18   Mean Time, right.

19     Q.    And it was sold at 18:31:33 Greenwich Mean

20   Time, so that would be 1:31 in the afternoon?

21           MR. GREEN:  Objection.  Making assumptions

22   regarding what's in the data, time zone.  If you

Case: 1:12-cv-06763 Document #: 94-3 Filed: 04/02/14 Page 25 of 329 PageID #:1147

1    want to --

2              (Discussion held off the record.)

3              THE WITNESS:  Right.  So, the time I used,

4    it appears to be the time 6:18 p.m.  So, to throw it

5    in, to assign it into a bin of when the trade

6    closed.

7    BY MR. BLOCK:

8         Q.   And that's incorrect?  You can't nod your

9    head.  You have to answer audibly.

10        A.   Yeah, I'm not, I'm not positive of that.

11        Q.   Are there other --

12        A.   I believe it may be incorrect, yes.

13        Q.   Are there other aspects, as you sit here

14   now, are there other aspects of either your report

15   or your testimony that you're not positive of?

16        A.   No.  I've been trying to be up front and

17   tried to recall to the best of my ability.

18        Q.   That's appreciated.  Let's have a

19   discussion on the record.

20             MR. BLOCK:  The court reporter has to

21   leave.  It's about almost 8:40.  I'm, frankly, going

22   to file a Motion to Compel to bring him to Chicago

Page 425

```
 1    to finish this because I do estimate I'll probably

 2    need, first of all, I need time to prepare, but I

 3    estimate that I'm going to have possibly multiple

 4    hours more to go with him.

 5              MR. GREEN:  Well --

 6              MR. BLOCK:  So, you can put whatever you

 7    want on the record.  We have to conclude for the

 8    day, but I'm not releasing the witness.

 9              MR. GREEN:  I understand we have to

10    conclude for the day, and we can also try to have a

11    discussion early next week about whether you need to

12    do a Motion to Compel or whether we'll make him

13    available.  I understand today was the day by which

14    it had to be completed, but, obviously, we'll be

15    able to discuss it.

16              What we'll say on the record now is we can

17    talk next week about how we want to handle it then.

18              MR. BLOCK:  Okay.  Thank you for your time

19    today, Doctor.  Thank you.

20              THE REPORTER:  Read and sign?

21              MR. GREEN:  Yes.

22              (Whereupon, signature not having been
```

1    waived, the taking of the deposition concluded at

2    8:41 p.m.)

3                          *      *      *

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

1                    ACKNOWLEDGMENT OF DEPONENT

2

3    I, Jeffrey H. Harris, Ph.D., do hereby acknowledge I

4    have read and examined the foregoing pages of

5    testimony, and the same is a true, correct and

6    complete transcription of the testimony given by me,

7    and any changes and/or corrections, if any, appear

8    in the attached errata sheet signed by me.

9

10

11

12   _____          _____
     Signature                       Date

13

14

15

16

17

18

19

20

21

22

Page 428

1        CERTIFICATE OF NOTARY PUBLIC

2            I, Kathleen M. Vaglica, the officer before

3    whom the foregoing deposition was taken, do hereby

4    certify that the witness whose testimony appears in

5    the foregoing deposition was duly sworn by me; that

6    the testimony of said witness was taken by me in

7    stenotype and thereafter reduced to typewriting

8    under my direction; that said deposition is a true

9    record of the testimony given by said witness; that

10   I am neither counsel for, related to, nor employed

11   by any of the parties to the action in which this

12   deposition was taken; and, further, that I am not a

13   relative or employee of any attorney or counsel

14   employed by the parties hereto, nor financially or

15   otherwise interested in the outcome of the action.

16

17

18                          Notary Public in and for

19                          District of Columbia

20

21   My Commission Expires:

22   February 14, 2016

CERTIFICATE OF NOTARY PUBLIC

I, Kathleen M. Vaglica, the officer before whom the foregoing deposition was taken, do hereby certify

that the witness whose testimony appears in the foregoing deposition was duly sworn by me; that the

testimony of said witness was taken by me in stenotype and thereafter reduced to typewriting under my

direction; that said deposition is a true record of the testimony given by said witness; that I am neither

counsel for, related to, nor employed by any of the parties to the action in which this deposition was

taken; and, further, that I am not a relative or employee of any attorney or counsel employed by the

parties hereto, nor financially or otherwise interested in the outcome of the action.

Notary Public in and for the

District of Columbia

My Commission Expires:

February 14, 2016

**INDEX**

**A**

**ability** 142:16
143:4 193:22
357:15 358:1
424:17
**able** 34:3,5 55:11
60:13 65:12 97:15
115:22 124:1
143:15 144:15
149:22 177:1
193:4,7 197:5
288:20 295:18
347:3,8 348:13
425:15
**abnormal** 33:22
**abnormally** 35:14
36:12
**absence** 213:13
**abuses** 25:3
**academic** 67:1 89:3
131:21 181:13
**accept** 76:7 197:12
248:1
**accepted** 17:11,11
17:21
**access** 85:1,12 98:7
98:9,11 127:10
148:15 161:14
215:21 225:1
**accommodate** 8:5,8
8:12 395:7
**account** 11:3 30:19
30:22 31:3,5,18
32:18 43:13,16,17
43:20 44:1,6,6,9
74:17 77:3,4 84:8
84:16 85:15 86:16
88:1,4,9,13,14,15
89:7,10 90:9 95:3
95:17 96:10,20
97:1,7 98:4,9,12
98:13,14,20 99:20
100:1,1,3,8,10,14
101:7,12,22
106:12 111:12
113:18 115:14

116:15 117:7,10
119:18 121:2,3,8
126:10,14,18
127:13 129:9
130:12,13,14
131:2,3 139:2,12
142:2,9 148:13
150:13,15,17
151:14,21 152:3
152:13 153:22
154:14 155:1,3
156:8,8,21 157:7
160:12,19 163:10
163:10 164:6,19
165:13,16 166:11
166:14,18,19,22
167:11,11 168:7,8
168:10,12,20,22
170:11,11,14,18
171:11,13,19
172:20 173:14
186:8 189:18
192:2 193:8
194:20 195:3,21
195:22 197:16
198:2 205:22
213:14,22 214:2
215:3,17 216:16
216:18 217:10
218:2,12 219:1,15
219:20 220:10,13
221:6,7,16 223:3
224:2 230:17
232:12,17,18
233:2,3,7,7,11,12
233:16,21,22
238:1 240:6,7,10
240:11 241:14
243:8,9 245:6,20
247:3,11,18 248:3
251:4 255:14,15
256:1,2 258:9,10
259:4,4 260:12
262:7,8 272:12
273:12,13 274:3
274:22 275:10,12
275:16,19 276:4,8

278:18 279:22
280:9 281:14
282:5 284:4 285:1
285:17 286:14
294:9 297:4
303:21 304:11
306:9 314:2,12,13
325:1 327:10
333:1,11 335:11
340:12 348:4
355:16,21,22
356:3,6,10,11,20
357:15,17,18
358:14 373:14,15
374:1,5,17 377:18
380:11 382:16
386:9 393:13,15
393:20 394:6,19
400:19,19 401:17
401:10,11,17
402:3,4,12,12,15
403:1,5,7,17,17
403:18 404:4,8,9
404:20,21 405:2,3
405:6,12,17,19,22
410:16 411:19
**accounted** 153:13
293:21 294:1
**accounting** 153:5
340:1
**accounts** 31:8,13
31:15 32:13 42:21
74:12,14,18 81:3
81:21 82:4,11
83:4 84:9,12
87:21 90:2 95:9
96:14,15,18,21
97:4,16 98:21
99:5 105:4,15,20
116:17,22 117:1,4
117:9 118:1,2
119:13 122:6
123:8 124:7 125:8
125:22 129:4
130:13,16,16
131:1 138:4,14,21
139:5 143:5

144:12 146:21
147:3,8 149:2
150:8 152:18
153:2,6,19 154:14
155:5,7,10 156:20
157:9 158:6 159:8
159:14 160:15
162:11 163:18,20
166:8,17 167:13
167:17 175:9
186:9,11,15 187:9
187:13 193:4
195:3 196:17
197:4,11 198:4
208:1 213:11
219:15 220:2,12
220:18,20 221:1
221:17 222:2
225:16 226:7,11
226:12 233:15
235:15 236:4
237:10 240:17
243:4 247:2,10,17
248:1,16,21 252:2
258:12,16 275:2
301:6,7 305:3,8
305:14 308:15
309:2 324:11
326:4,13,19
340:10 355:19
356:15 357:3
359:17,22 377:15
377:18,20 381:2
385:18 388:4
389:5,9,11 390:18
391:1,22 392:4,16
393:1,9 394:1,10
394:11,17 397:2,3
397:5 398:1
400:14,16,18
401:17 405:10
417:13
**accumulating**
209:9 212:16
**accumulation**
90:20 271:11
**accuracy** 223:2

320:9 348:20
**accurate** 103:22
159:8 190:2 203:1
205:14 206:15
213:1 234:10
237:8 274:9
275:18 338:18
347:20 400:1
**accurately** 243:17
**acknowledge** 427:3
**acknowledgment**
427:1
**acronym** 181:1
**act** 25:15,18,19
91:16 165:3,4
**action** 24:12 307:14
428:11,15
**actions** 24:10
**active** 157:10 316:7
**activity** 90:7 96:6
116:21 117:1,3
118:1 147:11
207:20 208:5,16
210:7
**actual** 33:3 34:14
46:7 84:5 98:15
107:9 131:12
185:4 256:13
272:9 278:19
287:13 339:13
357:14 359:22
402:3 403:12
**add** 126:5 191:8
222:13 280:2
**added** 126:17
190:21 210:3
216:22,22 222:21
280:3 282:13
**adding** 153:15
190:19 223:17
282:1 287:13
369:1
**addition** 49:15
229:5
**additional** 50:17
52:17 125:21
129:8,17 418:17

additionally 25:1
additions 127:1
addressed 399:22
adjust 257:10
adjusted 413:17
adjustment 257:12
  257:14
admittedly 197:8
  315:2
adopt 115:3 149:10
adopted 114:5,8
  181:9 213:8
adopts 181:5
  227:15,19
adult 46:9,15
advance 218:10
  304:7
adverse 258:5
  263:6 328:7
advice 32:7 40:12
  40:13
advisor 31:21 32:6
  43:9
affect 156:17
  194:16,18 195:17
  252:11,14,18
  256:21 366:16
  368:22 370:17
  373:11
affirmative 216:10
  392:21
affirmatively
  214:13
afield 373:12
afternoon 104:19
  155:18 322:10
  423:16,20
ag 37:11
agents 164:22
aggregate 21:5,5
  33:6,10,11 108:21
  110:4 209:22
  267:13 289:4
  351:7
aggregated 211:18
aggregating 210:6
  212:16 217:19,21

ago 9:10 16:12 18:6
  40:11 42:13
  368:21
agree 7:22 20:8
  61:13 63:22 78:11
  79:20 96:8 97:14
  131:10 134:15
  135:16,19 136:7
  172:2 205:16
  253:20,21 330:20
  331:15 345:7
  346:10 366:5
  380:7
agreed 11:21 74:2
  74:7 76:7 77:18
  77:20,21 78:11,13
  78:20
agreement 78:2,14
  78:15
ahead 20:19 29:9
  97:13 240:5 338:7
aimed 81:13
air 8:3 210:2
al 6:12
alan 3:14 6:17
  395:2
allegation 74:11,15
  186:17
allegations 30:10
  35:13 74:5,8,10
  76:6 77:2 79:10
  80:10 103:10
  186:22 187:4
  199:20
alleged 30:6 221:3
  222:4
alleging 103:7
allocate 226:17
  390:17 411:15
allocated 45:18
  54:17 74:17
  119:12 172:13
  215:22 389:4,8,11
  391:1,17,19,21
  392:3 393:1,8,12
  393:19 394:1,11
  394:16,17,19,22

397:9 405:4,10
  411:17
allocating 394:5,6
  394:7,8,9
allocation 120:20
  157:8,14,19,21
  158:3,9,19 159:7
  160:1 161:20
  162:5 171:4 172:4
  172:22 173:14
  174:3,6,10,17
  186:17 187:4
  198:6,17 199:20
  216:3 220:19
  221:1 222:1
  225:15 227:4
  252:3 388:22
  403:11 404:14
allocations 24:19
  31:15 32:18 74:12
  74:13 156:22
  159:13 194:9
  248:19 392:22
allotted 392:15
allow 10:12 296:10
allowed 169:16,20
  170:1
allowing 16:14
alotments 323:2
  392:6
alternative 193:2
  248:13
american 16:19,22
  17:3,4,8,21 18:2,3
  18:7,8 38:2,8
  39:11,13 41:12
  45:16 322:18
amount 47:16
  54:16 84:2 105:13
  120:12 123:14,16
  127:6 131:1
  132:17,19,20
  256:15 286:22
  288:13 357:7
  393:7
analogy 255:13
  405:8

analyses 23:18
  52:22 201:19
analysis 12:1,12,20
  13:8 18:19 20:11
  20:13 21:2 23:2,6
  24:11 25:4 31:18
  32:12,15 33:2
  36:6 52:5 54:6,7
  54:20 55:18 56:5
  56:15,18 61:15
  63:5,8 66:15 67:4
  68:6 69:14 70:5
  78:16 98:3 100:17
  100:21 101:8
  102:17 106:15
  120:4 123:14
  125:13 126:2,5,12
  127:20 130:1
  132:3 133:18
  145:16 146:18
  150:5 152:19
  156:21 159:5
  161:17 166:6
  179:16 199:3,6
  201:9 205:13,18
  211:9 215:12
  229:5 231:12,15
  232:10,15 238:5
  245:12 246:18
  247:22 261:8
  262:5,13 265:3
  272:15 288:16
  290:20 291:5
  292:4 294:8,11,14
  300:9 305:19
  313:9 318:7 322:3
  324:16 327:1,8
  337:16 344:7
  346:17 347:15
  360:3 396:18
  397:13,16 406:5,9
  408:6,14,15,21
  410:21 412:17,21
  412:22 414:11,17
  419:9 420:6
  421:22 422:10
analyze 23:8 89:12

100:5 101:4,5
  111:14,16,16,17
  112:1 116:1
  122:12,14 133:13
  151:13 156:6
  193:17 197:22
  237:2 321:12
  327:19 398:18
analyzed 100:6
  115:6 168:5
  223:10 234:2
  305:6 308:18
  360:15 372:22
  419:6
analyzing 98:2
  111:19 264:20
  289:11
answer 7:20 10:14
  10:17 20:22 28:12
  28:15 29:7 31:19
  34:15 59:7 63:2
  66:5 79:5 82:7,15
  114:12 123:1
  158:14 162:2
  163:12 167:6
  220:4 247:13
  256:8 342:12
  368:5 386:6 424:9
answered 244:6
  245:1 261:11
answering 67:6
answers 4:15 5:10
  68:1 112:21 113:8
  150:6 167:8
  383:12 384:3,5
anticipate 330:3
anticipated 358:18
  365:10
anybody 54:8
  104:7 146:13
anymore 261:6
anyplace 181:20
apologize 409:21
apparent 399:15
apparently 45:18
  297:1
appear 50:12

259:13 427:7
**appeared** 122:21
349:19
**appears** 19:21
21:22 49:4 105:19
189:8 229:21
279:11 297:8
321:11 345:9
424:4 428:4
**apples** 235:3,3
**application** 55:19
67:2 162:16
**applications** 33:2
45:19
**applied** 127:18
128:1 131:9
163:17 179:8,11
183:21 313:1,8
378:4,10 386:12
388:3
**apply** 25:4 26:1
40:2 68:14 139:3
156:20 166:6
255:14 312:2
353:9
**applying** 138:20
245:17 371:1
**appreciated** 424:18
**approach** 23:3
322:20 369:17
372:4
**appropriate** 25:20
165:3 171:4 197:4
203:22
**approximate** 387:5
387:7
**approximately**
13:21 287:12
387:7
**april** 189:7
**apsd** 421:18
**arbitrage** 362:12
362:14,17,21
363:21 364:5,10
364:12,12,13,21
365:9 366:6,12,12
366:22 367:5

**368**:2,4,5 369:18
370:3,3,7,10,11
370:14,18,20
371:1,6 372:5,15
372:16
**area** 22:9 42:1 83:1
**areas** 211:2
**arent** 52:10 126:10
161:12 198:5
206:15 216:5
259:10 329:6
332:6 341:5 367:8
370:6 371:16
**argument** 342:11
**argumentative**
104:2 212:10,19
235:19 236:7
243:11 296:19
306:10 314:16
317:7
**arithmetically**
387:3
**arrangement** 154:3
**arrive** 366:8
**arrived** 24:4
**article** 305:5
352:10,13
**articles** 350:3
**articulated** 7:13
**artifact** 235:11
**ascertain** 104:6,7
**asian** 316:3
**aside** 49:22 67:1
344:8
**asked** 8:13 11:20
55:5 81:7 111:14
114:10 117:19,19
120:14 130:11
160:7 244:6
261:11 327:19
396:18,21 406:8
409:4 410:9
**asking** 7:16 34:13
55:11 57:2 64:5
68:8 78:19 100:6
100:7,21 110:6
126:16 150:3

**154**:19 156:3,5,13
162:4,14,15
175:14 177:6
204:14 213:3,4
227:22 229:10
243:17 245:15
270:22 271:1
291:6 293:12
357:22 368:2
371:21 398:8
403:4,7,10,13
404:12,19 406:3,9
412:18 419:3
**asks** 30:18 384:12
385:1 386:1
**aspect** 67:1 107:10
**aspects** 424:13,14
**assembling** 55:8
**assertion** 59:11
**assess** 83:10 84:7
105:6 108:8 175:7
193:2 374:6,12
**assessed** 260:3
308:13
**assessing** 15:12
62:14 104:4
111:17 197:13
**assessment** 23:12
41:21 57:18 59:6
84:11,20 112:7
138:10 140:20
153:15,18 154:9
197:2 201:10
245:4 246:1,17
292:20 293:21
294:8 300:8
306:13
**asset** 257:7
**assets** 143:4 192:19
260:19 261:2,4
354:7 356:19,22
363:17
**assign** 192:18 221:6
221:16,17 424:5
**assigned** 34:18
75:21 142:7
160:14 166:14,21

**168**:5,7,13 175:8
213:10 214:1
218:12 219:19
220:11,12 233:1
233:16,20 304:13
355:16
**assigning** 22:20
34:12 194:20
206:16
**assignment** 75:11
77:3 84:5,7 90:21
100:10 102:6
157:10 161:22
162:13,15 166:7
166:16,17 167:1
168:1 192:19
207:22 243:22
**assignments** 13:3
167:2 175:11
**assistance** 14:1
16:5
**assistant** 14:16
16:6 54:10,14
398:12
**assisted** 15:12
385:3,11
**associated** 71:8
401:11 420:9
**assume** 30:21 78:10
153:20,22 172:14
172:21 188:21
213:20 216:17
244:13 272:13
334:8 374:6
377:15,21 378:3
378:21 379:11
380:22 381:3,8
382:2 390:14
**assumed** 231:7
**assuming** 51:15
88:17 138:18
159:6 167:22
214:4 215:2,4
216:5 245:21
246:16 249:10
392:14
**assumption** 138:7

**138**:12,13,16,17
139:4,6 158:9,17
175:9 191:15
192:22 216:10
259:14 270:22
286:7 294:5 363:7
376:22 400:22
**assumptions** 64:13
137:22 138:9,21
284:3 287:4,6,17
375:22 379:16
390:20 416:14
423:21
**attach** 282:21
**attached** 17:6
127:11 319:6
322:11 427:8
**attachment** 109:22
**attack** 81:4
**attained** 194:17
**attempt** 7:19
**attempted** 131:19
**attorney** 428:13
**attorneys** 25:2
26:14,20 232:2
**au** 38:3
**audible** 7:8
**audibly** 424:9
**audited** 348:4
**august** 9:7 17:5,19
22:1,6 92:21
**authored** 110:7
**authorization**
270:1
**authors** 51:14
**automatically**
203:9
**availability** 142:15
296:7 381:1
**available** 47:22
83:10 105:2
119:15 141:22
142:5 144:20,22
148:19 150:4
189:11 231:11,18
269:9 296:8
334:13 425:13

**average** 13:7 26:4
135:15 191:20
255:2,4 295:11
297:10 302:13,15
309:16 310:16
311:18 312:6
313:9,11 421:21
422:3
**averages** 302:21
**avoid** 269:12
**aware** 128:21
143:10 157:5
162:7 168:19
186:21 187:8
227:18 249:3
304:9 356:2
398:12

**B**

**b** 4:7 19:6 38:10,11
137:15 163:10
229:8 306:9
373:14,18 377:18
377:19 378:13
379:11 381:1,7,19
381:21 382:11,12
382:18
**b6** 305:15
**back** 9:7 27:22 28:1
37:3 41:17,20
71:21 73:12 79:16
100:8 102:5
108:20 132:6
158:14,15 160:8
172:18 173:8
182:9 185:12,13
191:11,14 201:13
227:22 231:4,16
233:17,18 237:14
237:15 244:21
251:21 260:6,8
262:11 273:8,22
274:10 278:13
279:1 283:8
284:12 285:12,21
286:1 288:19
299:13 314:4

321:19 328:13
329:2 330:11
332:5 335:15
336:8 339:12
350:2 358:6
375:10 389:20
393:5 396:10,12
407:6 410:9
412:18 417:16
**background** 44:1
76:6 81:16 101:20
**backwards** 345:20
**bad** 156:5 171:15
320:11 342:8,8
364:4 395:20
**balance** 322:19
323:13
**bandits** 179:21
180:22 309:5
**banging** 26:22
35:18
**base** 169:1 270:11
**based** 62:12 64:1
67:14 78:15
118:15 127:7
141:7,8,20 145:16
158:4,8 160:16
165:14 169:2
205:5 206:4
226:14 261:9
267:13 287:11
298:17 305:8,12
306:8 309:8
310:11,14 322:3
326:8,13 329:22
330:21 341:11
342:8 353:13
363:20 376:1
399:12 400:15
404:10 408:6,8
419:9
**bases** 194:9
**basic** 76:2
**basically** 37:20
42:17 81:1 91:16
99:21 109:5 111:9
117:20 123:16

126:22 134:4
201:12 262:16
263:6 271:11
367:13 386:13
**basis** 13:7 26:8
27:2 74:19 80:13
88:22 89:3 90:4
105:8,12 137:20
156:7 163:3
165:13 174:2,18
192:4 195:17
215:16 216:14
242:16,17 287:8
301:5 309:19
310:18 311:14,15
311:19 369:21
387:10
**bates** 90:11
**began** 406:19
**beginning** 9:2
74:16 84:19
111:15 116:2,4,8
118:19 170:6
272:21 276:6
281:3,9 306:22
314:1 324:19
325:8
**begins** 239:13
**behalf** 32:10 45:5
165:11 188:16
396:11
**behavior** 25:21
32:16 33:5,10
165:4 221:3 222:4
350:19 358:6
**behavioral** 194:19
**behaviors** 41:19
**belief** 114:21 375:3
375:7
**believe** 14:10 16:10
16:13 29:3,20
41:20 44:10 76:18
77:13 79:3 80:7
82:7 85:18 86:21
88:2,11 89:21
90:22 93:1 97:3
98:11 109:22

110:1 113:18
136:3,17 176:16
184:2 212:12
233:21 234:9
244:6 245:3
247:12 267:14
288:12 289:3
290:4,22 319:16
323:8 337:10
343:5 368:20
375:18 382:6
398:1,11 406:17
414:2 424:12
**belong** 215:22
**belonged** 221:18
**benchmark** 65:1,4
306:4 318:6,14
**beneficial** 94:1
**benefit** 35:22 65:3
219:8 361:19
**best** 29:20 53:13
69:2 165:9 341:1
424:17
**bet** 361:16 363:7
377:11
**bets** 358:10 362:15
362:17 376:19
**better** 57:6 69:15
273:10 279:12
280:15 327:6
328:19
**betting** 353:16,20
**beyond** 58:20 98:2
290:17
**bias** 60:22 61:20,22
61:22 62:5,6,10
62:15,16,16,17,19
62:20 63:9,9,14
63:17 128:12,14
128:17,20 129:11
129:19 341:16
**biased** 64:1 129:6
**biases** 193:14,16,18
**bid** 263:18,19
**big** 93:16 116:8
120:7 155:16
263:8 269:8 291:4

331:12,20 360:6
**bigger** 12:6 57:16
131:4 263:3
297:11 298:3
301:18,21 303:5
328:10
**bin** 112:5 125:17
130:19 323:16
341:8 422:21
424:5
**binomial** 37:17
**bins** 112:9 116:18
130:16 341:14,16
**bit** 17:14 75:4,6
81:5 179:14 185:7
206:14 247:5
259:17 266:20
270:19 273:10
280:15 316:20
330:14 373:12
406:12
**black** 37:19
**blackjack** 376:16
**block** 3:14,15 4:4
6:8,18 20:19,21
21:14 28:2,11
29:8 33:14 35:10
48:21 50:5 59:18
59:20 61:17 63:1
64:6 65:21 67:7
68:4 69:18 70:3
71:14,19 75:5,18
76:4 77:7 80:5
92:1,5,7 95:15
96:2,13 97:5,10
98:5 101:14
103:17 104:11
109:15 113:3
114:18 118:12,21
120:16 121:5
124:14 125:20
126:8,19 130:2,10
131:16 133:6,9
135:9 136:14
137:7,11 142:20
144:13 145:13
146:5 147:14

148:9 149:5
151:10 152:10
154:18 156:1,18
157:4 158:7,12,16
159:3 160:6 161:3
161:16 162:1,14
163:4,16 164:4
167:7,20 168:11
168:16 169:21
170:7 171:9 172:7
173:4,19 174:12
175:13 178:5
182:4,22 183:3
184:11,17 185:2
185:18 186:2
187:1,10 188:4,12
191:3,10 193:15
194:5,13 196:6,14
197:6,20 198:15
199:2,15,17,18
200:4,6,13 202:12
204:18 205:4
206:3,12 207:7
208:20 209:17
210:5 211:13
212:1,14 213:2,17
214:12 215:10
216:12 217:6,18
218:6,20 219:21
220:8 221:12,22
224:20 225:13
226:3,16 227:11,13
228:7,16 233:19
234:17 235:5,20
236:12 237:5,14
237:19 238:15
239:11 240:3,16
241:21 243:13
244:1,11 245:9,16
246:10,15,22
247:14 248:10
249:4 250:11,19
251:9,15 252:9,16
253:14 254:12,14
254:22 255:10,21
256:7 257:1,20
258:8,17 259:9

260:5,9 261:12,21
263:1,8 264:17
265:4 267:6,13
269:4 270:10,21
272:1,5 274:7
275:3,13 276:11
276:12 277:11,20
278:4 279:14,21
280:11,20 281:10
284:14 286:12,18
287:5,19 289:10
290:6 291:8,17
293:10,15,18
295:6 296:22
297:6 298:5,16
299:12 300:7
301:4,14 302:8
303:7 304:6
306:16 308:3
312:9 313:6,17
314:20 317:10,21
319:2,12 320:7,14
320:16 321:5
322:7 324:2,5
326:20 329:21
330:15 331:9,14
331:19 332:20
333:22 335:9
336:13 337:8
339:1,19 340:5,19
341:9,19 342:6,14
343:2,8,12,14,15
344:1,5,15,18
345:11 346:8,14
347:2 349:5,11
352:5 354:1,14,22
357:21 358:20
359:14 361:5
362:7 363:14
364:3,14 365:7,20
366:20 367:9,19
368:15 371:9
374:3,14 375:5
376:3,14 377:3
378:20 379:19
380:19 383:14,16
388:19 391:2,9

392:5,19 395:9,13
395:20 396:2,13
398:7 399:5,17
400:3,6 401:4,14
402:1,11 403:2
404:5 406:2,11,13
409:1,5,12 412:9
414:9,15,21 415:1
415:5,14,18 416:3
416:15 418:3,5
419:5 423:13,14
424:7,20 425:6,18
**blotter** 416:4
**board** 36:20 40:4
40:19
**boaz** 3:5 73:18,21
396:11
**book** 73:10,12
225:2
**books** 175:1
**boot** 335:3
**bottom** 24:22 213:7
262:14 306:19
**bought** 127:7 132:7
176:9 182:8,9
210:18,19 223:15
271:16 273:14
278:13 285:12,21
285:22 286:1
289:20 291:21
292:11 297:16
378:22 393:11
417:16,17
**brand** 40:10
**break** 8:2 59:15,18
71:15 133:7 137:8
139:9 188:9
199:15 272:2
322:1 334:17
362:9
**brief** 118:16
**briefing** 15:9 74:4
74:5
**briefly** 307:22
**bring** 424:22
**broad** 154:4
**broader** 240:19

**broken** 241:11
264:15,16 268:1
**broker** 28:20 29:1
30:21 31:1 86:15
110:22 139:19
141:2 144:2
172:15,16,18
173:6,11 174:22
176:22 250:6
303:8 304:14,16
304:22 305:8,13
305:17,19 306:3,8
306:9 324:20
325:2 373:8
377:22 378:2
381:9 414:14
**brokerage** 29:14
30:18,22 31:1
41:3 86:18,19,21
88:5,6,10,16,19
89:6,8,13,14,19
90:1 91:3 108:20
170:12 319:3
339:3
**brokers** 29:21
303:13,15 304:3,3
304:5,11 305:2,21
306:14,14
**brown** 1:8
**bs** 31:3,5
**budget** 12:6 123:21
**build** 37:16 356:21
356:21 357:1
**building** 37:6
**bulk** 107:7
**bunch** 27:21 28:21
29:1 155:13
168:12,13,20
350:21 394:11
408:12
**bunched** 27:14,17
28:6,16 29:13,17
30:6,7,11,15
394:10
**burnside** 5:2
354:12 355:4
371:11,15 372:10

384:18 385:7
389:7,15 394:21
**burnsides** 369:16
385:9 386:3
**business** 16:15
91:11,14
**buy** 83:22 107:1
114:16 127:4
184:6 185:5,7,11
185:13 222:7,7,17
222:18 223:13,13
223:13,18,18,18
223:19,19,22,22
224:1,12,12,12
269:11 273:9,20
275:8 278:9 279:1
279:2,10,16 280:3
280:4 281:16
282:1,11,11,12,16
285:18,22 286:1
291:2 367:13
377:16 401:1,6
420:1,19,20,20
421:1,1,6,8 422:6
422:6,9
**buying** 29:12 176:6
176:7 207:3 231:4
263:4 265:16
268:8 361:14,15
390:15
**buys** 291:20 377:18
377:19 379:11,17
400:18 401:9
404:6 421:5

---

**C**

**c** 1:5,13 2:16 3:1,10
6:1 17:7,9,12
19:21 27:6 39:1
**calculate** 189:17
356:12 379:4
**calculated** 132:21
193:5 308:5
313:18,19 325:5
356:10,14 357:4
**calculating** 356:16
357:13

**calculation** 288:14
300:8 357:12
**calculations** 133:11
189:22 288:2
292:1 356:18
**calendar** 318:21
319:4 326:9
397:14,19 398:2
407:11 408:3,7
**call** 36:7 46:2 50:15
77:10,11,14 79:17
97:21 107:18
136:11 172:17
176:10,22 179:16
204:4 221:15
230:5 261:17
266:21 277:18
279:20 294:13
310:17 353:20,21
365:9 367:13
388:12,15 404:6
**called** 6:4 70:7
179:20 180:21
250:4
**calling** 28:7,18 29:4
169:11
**calls** 31:1 77:10
136:21 142:18
147:4 151:3
156:10 163:22
168:14 169:17
170:2 171:6,7
172:5,15,18 173:1
173:6,8,16 174:7
185:14 193:9
196:21 197:18
198:8 204:16,17
205:19 206:8,22
217:2,15 221:8,19
226:19 238:6
239:21 245:7
246:8 248:4,22
250:8,15 251:6,16
252:4,12 253:11
254:20 255:5
256:5,17 257:16
258:13 259:6,22

264:21 270:3
274:5 275:1,12
277:6,15 279:17
286:6 290:2 293:6
298:11 300:19
301:8 302:2 317:6
329:19 337:6
357:19 361:1
362:3 363:10
365:2,13 366:9
367:2 371:3
373:19 374:22
376:21 378:15
379:15 383:4
388:13 390:19
391:6 402:18
403:22 416:13
**cancel** 282:19
284:18 285:22
**canceled** 83:16
282:16,17,22
284:7 285:4,5
**canceling** 282:11
**cancellation** 205:7
205:8
**cancellations**
205:11
**cant** 7:8,9,11 38:19
46:22 56:8 58:13
131:15 160:5
163:13 198:16
213:4 214:15
256:8 303:3,6
326:13 363:6
369:9 424:8
**capacity** 22:11 41:8
**capital** 287:7
**carried** 98:1,15,22
99:6 289:22 292:2
292:13 298:8
299:14 307:3
**carry** 46:20 376:4
**case** 6:12,12,18
12:14,17 27:11
36:3 50:14,14,18
50:22 54:11 56:20
60:16,17 64:17

67:18 70:9 74:5,6
74:7,9 76:6 81:16
84:6 89:12,18
90:2 91:6 95:4,7
114:11 118:20
122:19 132:14
143:10 156:6
179:7 184:18
186:12 188:16
245:18 256:13
259:1,5 260:11
265:8 270:14
301:17 310:3
312:3 318:19
339:11 346:5
357:3 359:13
374:4 375:12
378:4 397:22
407:15
**cases** 12:15,16,19
13:7 21:2 23:21
24:18 25:4 26:17
26:20,21 30:9
34:8 35:4,6,9 36:4
36:6 54:19 67:19
89:11 123:2 128:1
220:7 319:20
360:9 372:14
**categories** 127:14
153:11 205:11
321:21 322:1
**category** 85:11
323:21
**causality** 20:13
**cause** 17:18 60:18
61:1 68:16 106:15
108:2 136:12
154:2 174:15
232:9 258:1 263:6
265:14,15 274:15
277:5 279:15
341:17 342:2
367:6 382:8,19
417:4
**cbot** 41:13
**central** 32:20 337:4
337:18 338:18

340:7 398:22
399:4 412:20
413:1 414:1
**cents** 131:22
**certain** 26:21 32:22
74:16 108:3
129:15,16 137:2
167:17 220:10,10
220:12,12 232:16
240:9 269:22
328:22
**certainly** 58:11
59:18 63:4,6
152:1 161:1
331:6 378:17
395:7
**certainties** 148:11
**certainty** 148:8
**certificate** 428:1
**certifies** 46:9
**certify** 428:4
**cftc** 6:12 11:12 16:4
16:9 19:22 20:5
22:12,20 24:8
26:16 29:16 30:3
32:14 34:9 73:14
73:16 78:3 86:20
88:22 103:7 106:7
110:5,10 114:5,8
114:10,20 119:11
120:8,14,18
123:13 128:19
129:20 132:15
133:1,2,13 136:16
164:21 174:14
175:10 177:11,12
177:15 180:9
181:6,9,14 182:16
182:20 183:7,22
197:9,21 207:12
208:9 227:14
232:2 245:5 246:4
246:18 277:18
286:10 301:21
313:1 318:22
346:5 349:16
358:5 378:11

385:15 396:11,18
396:19 397:4,8
406:4,7,15 410:9
**cftcs** 81:20 115:8
121:17 134:14
177:4 178:1,14
179:5 184:18
185:6 208:7
288:10 314:11
318:18 375:12
380:3 400:5 407:3
407:10,14
**chair** 18:9
**chance** 411:15
**chances** 192:8,11
**change** 17:7 125:19
126:1,6,7,18
134:4,5 245:18
278:3 297:8
312:20 340:1
378:21 386:19
405:18 412:21
**changed** 12:13
173:18,20 202:22
390:4 412:22
**changes** 17:8 51:18
51:21 307:12
366:7 390:7
422:11 427:7
**changing** 207:5
364:19 409:18
**characteristic**
194:19 241:8
249:13
**characteristics**
82:20 83:13 84:2
94:21 98:4 99:14
104:9 112:3,8
118:16 130:15
153:2 157:16
163:6 164:14
215:13 232:11,16
233:14 235:13
238:4,10 256:21
267:9 298:22
299:5 300:6
304:13 326:3

327:3 333:7 353:9
359:4 364:19
**characterization**
20:2,9 118:15
235:2 364:1
**characterize**
157:16
**characterized**
184:22 185:3
**charge** 11:22 22:20
183:9
**chart** 113:14 114:3
**cheaper** 268:2,5,6
**check** 120:22 121:6
121:7 143:3
190:17 259:18
325:19 327:21
348:21
**checked** 254:4
348:1
**checking** 326:1
**checks** 399:12,15
**chicago** 3:18
337:11 424:22
**chief** 22:11,18 23:5
**choices** 19:9
**choose** 128:19
236:22
**choosing** 129:20
**chose** 18:3,3 60:19
**chosen** 117:14
118:15 411:13
**chronologically**
236:20
**circumspect** 23:20
**circumstances**
103:9 206:13,19
**cite** 26:13 177:9
180:20 266:2,16
308:12 327:8
350:3
**cited** 389:5 418:1,7
**citing** 208:7
**civil** 8:18 24:12
**claims** 27:10 388:2
**clarification**
396:16 407:5

**clarify** 7:19 34:11
71:21 80:21 90:14
224:21 225:1
368:1
**class** 19:14,15,17
19:19 37:4 38:2,3
38:4,10,21,22
39:5,7,16,18,20
40:1,1 46:2,19
47:2,19 72:2,7,10
72:11,17,22 131:7
330:12 356:12
**classes** 18:13 19:3,7
19:11,11 36:15
37:21 38:1,8,14
38:16 39:15 40:2
46:18 73:9
**classification**
341:13
**classified** 182:14
243:17
**classify** 364:9
**classmates** 47:4
**classroom** 51:15
**clear** 10:12 99:17
118:20 119:6
121:7 144:18,21
150:6 163:1 185:5
213:12 224:16
292:6 293:2 328:3
330:4 360:16
**clearer** 69:16
244:13
**clearly** 64:10,12
94:5 115:1 258:22
313:15 319:7
346:20 379:18
388:16 389:1
391:18 392:3
397:18
**client** 12:8 27:11
30:18,22 31:3,5,5
77:3 86:15 88:16
137:21 138:14
139:2,17 140:5
169:7 193:4
213:10 215:17

216:15 238:12,13
247:2 248:15
249:11 250:3
251:16 252:2
259:4 260:12
273:2,18 274:18
279:11 281:15
288:21 293:5,9,13
295:19 296:5,9
297:9,10,18 298:2
299:7 301:17,22
302:10,13,18
303:13 304:11
307:9 311:4,12
314:12 326:4,19
332:3,18 333:11
334:7,8,10 336:16
339:21 340:10,12
340:21 341:16
343:17,22 344:1
344:10 345:5
348:4 385:12
390:18 393:9
397:3 400:5
417:13 418:21
419:12 423:2
**clients** 12:7 28:21
91:3,6 164:22
165:11 301:16
414:17
**clock** 337:2,15
**clocks** 337:3
**close** 26:22 35:19
142:16,17 148:13
181:18 217:8,8
249:21 250:4
251:1 288:18
307:15 309:22
318:11 340:22
341:2 395:3
402:16 407:8,17
413:18 417:1
418:11 419:9
**closed** 75:16 97:22
99:1,19 100:15
101:9 114:7 118:4
118:9 169:14

210:16,20,21
230:9 289:14,16
293:12 294:6,12
296:17 297:16
298:3,10,14
299:17 300:17
312:8 319:9
320:18 334:10
339:21 340:13
341:2 347:12
351:11 377:17
397:20 398:5
404:3 405:13,14
413:16 415:6
416:10,11,16
417:9 418:9,18
419:7 422:15,15
424:6
**closer** 239:4,4
**closes** 327:15
346:20
**closing** 26:22
172:10 179:17
202:7 212:4
249:10,11 250:3
292:8,10 294:9
313:14 316:9
319:16,17 334:19
345:21 365:21
398:3 403:21
416:22 421:11
422:14,19,20
**closings** 221:15
**cme** 41:13
**code** 5:1,6 9:20,20
10:2,22 35:1
290:10 321:2,11
323:1 324:3,10,14
324:15 325:6
334:16 335:11
337:17,21 338:3
**cohn** 18:9,9
**coin** 192:7
**collect** 55:9 60:19
61:5 63:13 108:21
254:5
**college** 14:5

**colloquially** 181:17
**columbia** 2:20
428:19
**column** 110:18
344:20
**com** 182:20
**combination** 94:17
367:15 375:8
**combinations**
223:1
**come** 18:18 58:9
84:9 98:20 103:9
103:12 105:18
109:7 112:3 124:6
155:15 190:13
205:8 249:18
262:11 270:6
288:22 322:12
334:2 339:20
351:20 353:4
**comes** 29:11,12
68:7 70:1 190:4
190:12,14 191:5
203:9 267:22
271:11 272:10
**comfort** 92:16
**comfortable** 76:10
87:16 88:17
357:22 365:16
373:9
**coming** 63:21
103:14 283:12
**comments** 107:16
**commission** 1:5
2:14 3:7 207:19
428:21
**commissions**
127:15,16 128:1
132:10 265:11
329:8
**committed** 13:12
**committee** 14:6
**commodities** 32:7,9
43:6 44:19 47:12
89:20 91:15 156:9
180:2 181:5,10,22
183:19 186:4,6

255:11,15 305:3,7
306:9 308:14
327:10 331:13
352:16,18
**commodity** 1:4
2:14 3:7 25:15,17
25:19 26:3 31:21
32:1,6,8 45:2 89:6
89:10,13 155:10
156:19 162:11
165:2,4,5 174:5
207:18 310:11
**communication**
53:8
**community** 108:20
**companies** 39:21
**company** 255:9
**comparable** 243:3
**compare** 65:12
151:20 220:1
235:16 333:5
397:4
**compared** 100:14
135:3 146:20
150:17 297:3
302:22 314:13
317:13
**comparing** 65:1
128:7 233:5 235:3
235:7 323:17
333:9,14,17
337:18 339:2
**comparison** 37:8
84:8 126:21 128:9
248:8 294:17
302:21 340:9,18
341:15
**compatible** 107:3
**compel** 424:22
425:12
**compensated** 11:14
14:9
**compile** 85:10
**compiled** 189:5,20
**complaint** 79:2,3,6
79:11 106:9
111:10 134:14

176:4 178:3,16
183:22 186:19
221:4 222:5
227:16,19,20
389:6 400:5
**complete** 48:16
50:8 122:8 289:2
427:6
**completed** 13:3
74:20 75:1,10
76:22 113:5
183:15 184:14
189:6,10 298:19
299:7 308:8 345:3
421:6 425:14
**completely** 107:15
295:5,9 297:15
311:5
**completes** 421:5
**completing** 93:9
**completion** 75:11
**completions** 326:8
**complicated** 292:22
365:5
**complimentary**
370:6
**component** 61:11
146:3 265:13
351:10 353:11
414:12
**components** 131:10
**compound** 76:17
187:7 209:14
**comprehensive**
147:7
**computed** 202:13
**computer** 11:2
15:10 249:19
347:4 372:3 385:3
385:11,11 394:2
409:14
**conceded** 330:16
**concept** 240:19
244:8,20 370:2,2
**concepts** 368:14
**conceptual** 23:6
242:16

**conceptualization**
27:4
**concern** 58:8 61:2
61:6 62:9 63:6
106:18 199:8
209:11,15 211:15
211:17 212:6,21
225:10,19,22
265:1 267:4
**concerned** 128:18
211:14 264:6
265:9
**concerns** 137:5
187:3 263:19
329:13
**concession** 262:18
**conclude** 266:17
325:16 425:7,10
**concluded** 294:21
311:1 426:1
**concluding** 325:17
**conclusion** 58:10
158:8 159:22
168:15 170:3
171:7 173:2 174:8
204:17 251:21
266:11 312:10
327:22 339:21
359:11 373:17
**conclusions** 23:16
64:1 154:17,19
160:3,5 173:16
298:7 312:14
342:7
**conditions** 193:18
195:9 364:19
**conduct** 54:7 59:21
**conducted** 157:6
**conduit** 91:16
**conference** 50:15
**confidence** 58:22
59:9 70:1 129:16
140:12,15 239:15
239:19 241:3
243:6,18,20 244:7
244:15,18
**confident** 59:11

69:22 130:4
140:16 244:4
303:3
**confirm** 197:7
214:17
**confirmations**
373:9
**confusion** 176:1
295:17
**congress** 19:22
20:5 26:10,16
**conjunction** 107:5
**connect** 56:9
142:14 143:6
**connection** 33:17
48:6 147:2 225:14
360:16 369:7
**connects** 327:2
**consider** 51:16
63:10 64:19
136:18 141:16
142:1 145:3
290:14 292:16
299:19
**consideration**
152:18 160:20
193:21 212:7
**considerations**
329:12
**considered** 46:8
174:16 186:1,5
277:12,13 291:22
311:12 316:5
322:17 325:3
412:15
**considering** 23:1
65:20 174:22
311:21 413:4
**consisted** 179:3
**consistent** 94:10
150:21 207:11
213:5 245:22
246:14 360:1
**consistently** 165:10
178:11
**constraints** 12:6
**construct** 4:19 48:3

49:12,19 146:3
200:8,20
**consulting** 18:18
30:4
**consummated**
77:22
**contact** 73:15,19
77:13
**contacted** 73:21
**contain** 52:2
**contained** 84:16
124:18
**contents** 4:1
**context** 26:6 36:2
183:22 202:17
267:16
**continent** 322:18
**continual** 257:12
**continue** 37:13
119:2 211:4
**continuing** 25:12
**contract** 13:10 16:4
16:6,7,9,12,19,21
17:4 77:19,22
78:2,5,10 151:14
178:21 182:11
202:15 204:6
206:5 208:17
209:11 210:7
217:20,22 219:5
220:11 230:3
240:6,7,12 269:9
287:8 289:16,17
332:8 363:18
368:8 369:1,4
373:16 380:6
**contracts** 37:10
45:2 83:20,22
151:18 164:7
175:20 176:7
178:20 189:6,10
224:4 237:1,9
240:11,13,14
242:18,21 243:3
261:14 269:9,14
273:2 274:19
278:10 279:2,10

282:2 285:8
297:15 299:14
300:16 307:3
316:11,12 331:16
368:11 377:16,20
377:21 378:13,22
379:12 381:3
391:11 412:11
**contractually**
16:14
**contradictory**
369:21 370:1
372:12
**contradicts** 394:20
394:21
**contribute** 315:7
**contributed** 45:8
395:14
**contribution** 15:5
45:10 107:9
**control** 64:15,20,22
65:16 122:15
123:12 159:19
194:4,7 195:6,8
195:15 196:18
199:11 220:21
249:13 380:13
**controlled** 236:9
**controls** 220:16
236:2,9
**conversation** 50:16
77:8 410:2,5
**conversations** 77:8
**conversion** 337:17
413:6,7,22
**convert** 398:22
**converted** 399:4
413:12
**conveyed** 77:15
80:13
**conveying** 79:13
**coordinated** 25:1
**copies** 11:2 15:15
21:9 106:6 111:2
111:4 383:15
**copy** 10:6 11:2
15:18,19 17:6

21:22 27:8 49:4
79:2,3,5 92:6
180:14 343:13
**core** 38:22
**correct** 18:4 20:1
36:16 51:7 55:2,6
56:12 62:21 70:11
70:15,16 72:3
75:12,21 78:3,7
79:18 80:6 81:16
81:22 82:4,11
87:2,18 95:11
97:1 101:18
103:10 110:16,19
110:22 112:13,14
112:17 115:15
118:14 121:3
123:6,9 130:5
135:4 141:14
144:7 145:17
148:14 154:15
161:6 178:6 181:1
187:21 188:17,21
189:7 190:6,10
191:8,16 192:21
195:22 196:8
197:17 208:17
209:22 211:9
212:17 218:8,17
218:21 221:7,18
227:9 229:18
232:18,21 233:3
234:7,18,21 235:2
236:5,16 237:2
246:16 251:5,12
253:7,17 254:7
255:1 277:5,22
283:10 285:9
294:6 297:12,19
300:1 303:9 317:4
317:14,22 318:12
320:2,9 321:21
325:20 326:14
334:11 336:10
339:4 340:14
342:22 348:22
350:11 351:22

359:18 362:2
366:8 374:9
375:20 376:17
378:5,8 379:2,14
389:16 391:5
392:20 402:16
403:21 409:20
417:2 419:10
420:21 423:10
427:5
**correction** 239:13
341:3
**corrections** 427:7
**correctly** 190:19
191:9 192:4 208:2
234:11 248:16
303:17
**correlated** 151:21
260:20 261:4,5
**correlating** 309:3
**correlation** 261:16
325:13
**correlations** 260:22
260:22 261:2
354:8
**correspondence**
143:15 411:8
**cost** 82:21 257:15
262:22 265:2
267:9 269:2,5,7
269:11,12,19,20
328:11 329:9
352:3
**costly** 259:14
**costs** 82:16,19
132:3,10 141:10
162:21 263:1
265:5,10 266:21
305:22 327:12
328:3,4,7 329:5
351:16,17 387:17
**couldnt** 108:8
121:12 142:13,15
143:6 144:17,19
146:10 153:21
159:21 170:5
202:4 214:10

220:21 225:4
228:20,21 374:6,6
390:13
**counsel** 3:4,13 6:4
6:7 8:11 9:10
10:1,9,11 21:10
50:16 180:15
188:9 395:4 396:8
402:10 403:4
404:12 410:6
411:9 412:18
428:10,13
**count** 286:19 307:4
327:4
**counted** 176:20
290:13 299:22
342:21 398:5
417:6
**counterparty**
328:22
**counterpoint** 329:4
**countervailing**
331:3
**couple** 13:2 17:11
24:15 42:15 50:15
76:21 92:11
140:13 220:6
222:16 351:4
413:3
**course** 19:6 25:21
31:8 32:19 42:6
61:10 69:12,13
73:5 77:9 100:10
115:21 135:12,13
153:7 189:11
208:17 265:16
271:12 272:14
286:4 295:9 299:7
310:1 360:2
385:12 397:20
409:20
**courses** 39:22
**court** 1:1 6:14 7:13
395:18 424:20
**courtesy** 10:15
308:1
**cover** 37:20 292:8

365:19 402:17
**covered** 38:15
134:14 289:20
324:17 360:7
379:1 384:11
**covering** 183:17
365:21
**covers** 377:19,21
379:12,21
**cpo** 31:22 33:21
36:8 71:12 267:17
268:18
**cpos** 32:17 33:13
**create** 110:3 111:3
123:12 128:12,14
201:3 367:12
**created** 10:13
86:18,20 217:9
**creates** 351:12
**criminal** 8:20
**crisis** 135:1 136:9
136:12 137:4
**criteria** 61:14 68:5
122:4,17 138:5
139:3 141:1,5,14
141:16 143:22
144:7 145:4 150:1
150:3,8,10 152:16
152:16,20,22
153:3,4,11 154:4
154:11,12,21
155:3,8,20 156:5
156:15,20 157:6
157:13 158:4,5
159:14 160:11,16
160:18 161:2,18
162:5,9,16 163:9
163:17,21 193:20
194:6,15 196:13
198:7,12,16,20
201:2 234:3 262:4
380:9 382:15
409:17 411:21
412:2
**criticism** 207:18
369:16
**criticized** 315:11

cross 229:7
crude 42:12
cta 31:19,20 32:13
33:3,18,21 36:8
71:10 267:17
268:18
ctas 32:16 33:13,19
currencies 136:5
currency 37:14
136:5 330:4
current 12:22
16:21
currently 12:18
14:4 19:3
customary 110:15
customer 4:14
74:17 84:9 86:16
96:14,15,18 97:16
98:21 99:5 101:7
105:4,15 109:11
117:9 119:18
121:2,2,7 124:7
125:8,22 130:13
131:1,3 143:5
154:13 166:5,17
166:18,19,21
167:11 168:7,9,22
175:8 186:9,11
195:2 198:4 208:1
220:11 226:1,11
232:18 233:3,7,22
235:15 240:7,11
241:13 243:8
246:6 247:10,16
250:4 297:2 301:6
313:9 355:16,18
359:17,22 372:3
385:17 388:3
389:5,8,11,14,14
391:22 392:4,16
393:1,13 394:1,6
394:10,11,17,19
400:6
customers 221:6
248:1 372:14
cut 81:14 122:22
185:5

cutoff 408:17,19
411:13
cycle 387:18

**D**

d 1:12,13 2:11,16
3:10 4:3,10,12 6:1
6:3 14:6 21:12
48:18 188:19
189:2 427:3
daily 90:1,3,4,5,7,9
95:18 100:9
104:22 147:17
148:19 167:15
356:4
data 9:21 14:22
15:1,2,4,9,9,10,11
20:11 23:6,8,8,9
52:5,9 53:15
54:11,13,16,18,21
54:22 55:2,6,8,9
55:12,16,19 56:14
56:17 59:12 60:9
60:10,13,15,17,19
60:22 61:1,5,7,11
62:14,18 63:11,12
63:13,15 64:5,12
67:11 68:8 74:6
76:9,9,10,13,16
78:12,14,14,16,18
78:21,22 83:10,11
84:14,17 85:7,8
85:11,14 87:8
90:20 91:1 98:8
98:12 101:17
103:14 107:3,17
107:19,20 108:6
108:11 109:3,4
111:18 112:6
115:21 117:6
119:14,15 120:6
122:11,16 123:18
124:1,5 125:18
128:16 141:9,21
141:22 142:4
146:2,6 148:20
149:18 161:14

175:19 199:10
201:8,13,17
205:14,17 206:11
207:21 208:22,22
209:16,20 210:8
211:3,8,12,16
212:21,22 222:14
223:8 224:1
234:10,15 235:1
247:4 248:7 261:9
290:5,8 296:7,8
300:12 320:8,11
322:21 324:17
325:9 338:9,13,15
338:17 339:22
340:4 342:8
347:19,21,22
348:1,6,12,16,19
348:19 349:3,8,13
349:16,17 357:11
360:15 393:17
396:21 397:17
398:19 399:13,16
407:6 410:3,12,15
413:5,9,11 423:22
datagenerating
63:19
dataset 10:6 115:22
122:8 146:4 147:7
datasets 4:20 10:3
48:3 49:12,19
53:15 70:12 123:3
200:8,20,21
date 9:8 16:9
230:13,15 289:7
289:11 319:5,17
319:17 325:1
346:4 397:21
398:2 407:1 410:1
427:12
dated 22:6 384:6
dates 72:21 116:2,4
116:9 409:22
day 13:11,13 32:20
60:8,9,12 82:19
90:8 96:5 97:20
97:22,22 98:2

99:1,19 100:3,16
101:9 105:10
118:1,4 135:13
139:20,21 141:3,4
141:11 147:20,21
148:1,13,16 153:8
153:8 155:19,20
159:17 160:11,12
162:19,20 166:12
167:9,12,15
168:10 179:4,15
180:1 182:11
185:16 202:15
207:20 208:6,17
209:11 210:7
212:16 217:8,22
218:17 219:5,19
220:2 221:14
230:21 231:6,17
234:3 271:12
288:13 289:4,5,22
290:13,20 291:3
292:3,12,13 295:9
295:14,16 296:4
296:14,18 297:3
298:3,4,8,8,10,19
299:15,20 300:17
302:11 307:1,1,3
307:8 308:6,8,21
309:16,19,20
310:3,8,9,21
312:1,6,19 313:1
313:7,15,22 314:2
314:11,14 315:19
315:21 317:13,17
317:18,18,19,20
318:7,16,19,22
319:4,15,21 320:1
321:14 322:18
323:20 324:12
325:4,20,22 326:7
326:9,14 327:8,9
327:11,12 329:1
341:11 342:18,22
344:22 346:19,20
347:17 350:2
352:18 360:12

378:2,3 380:5,6,9
380:10 395:13
397:12,14 398:1,5
399:20 406:4,14
406:19 407:4,9,10
407:11,14,18,19
407:20,22,22
408:3,3,7 409:19
410:18,19 411:5
411:10,10 416:16
419:16 420:3
425:8,10,13
days 9:10 31:1
76:22,22 141:11
159:18 220:9,12
330:11 360:15
397:19 410:8
411:17
dead 210:2
deal 83:16 242:19
dealing 22:15 30:9
47:5 87:17 104:14
122:8 156:22
186:3 211:7 340:6
340:7 351:21
deals 306:2
dealt 123:2 350:10
350:13
dearth 355:20
death 42:15
debunking 198:20
december 49:5
384:6 423:5
decide 17:22 56:4
68:5 108:6 240:8
280:22 390:13
403:5 404:13
decided 237:21
323:10
decides 154:2
deciding 46:7 53:21
decipher 105:3
296:15 357:17
390:11
deciphering 88:18
101:21 108:5
decision 57:14

245:2 359:6
363:20
decisions 45:21
  46:22 373:11
decline 381:13
declines 382:4
decrement 284:5
dedicated 43:11
deducted 132:11
deductions 265:12
deemed 175:2
  196:17
defendant 79:13
  88:2 143:10
  166:13
defendants 1:9
  3:13 4:16 5:10
  6:5,7,18 74:18
  79:10 80:2,9 82:3
  84:19 87:21
  112:22 147:13
  165:10,12 166:9
  188:17 193:1,6
  196:20 207:17
  249:12 310:13
  355:13,14 383:12
  384:5,15,20
  385:10,16 402:10
define 36:1 127:3
  176:12 177:12
  289:5 315:4,11
  318:19 353:1,6
  372:15 409:19
defined 36:2
  115:19 176:2
  177:14 215:13
  236:18 301:13
  316:16,19 324:12
  416:16
defines 25:19
  177:11
defining 301:21
  318:1
definition 114:2,4,8
  114:20,21 178:2
  178:14 179:5,8,11
  180:4,8 181:5,9

181:14 182:17
183:11,21 184:18
185:6 207:8,12,19
208:4,7,10 213:8
221:2 222:3
225:17 227:15,19
236:1 276:8
286:10 288:10
298:18 300:10,16
300:17 301:1,20
313:1,8 314:11,13
315:17 317:3,11
317:13,18 318:7
318:11,18 334:12
342:17 352:22
354:3 361:6,12
366:12 371:1
375:12,17 378:4
378:10 380:4
387:4,8 397:11,14
397:15 406:1,4,15
407:4,10,14 408:8
410:10,11,18
411:5,9 417:2
definitional 262:2
definitions 125:13
  297:7 346:4,13,16
  347:14
degree 129:16
  239:14
degrees 140:13
delaware 72:12,14
  72:19 73:2
delivered 23:11
  230:10
delta 84:20,22
  256:20 355:15,18
  356:10,18 357:2
  357:14 384:15,20
  386:15,15,17,19
  386:20 387:1,2,4
  387:5,9,12,16,19
  387:21 388:3,7,9
  388:11,17
deltas 85:1,5
  355:21,22 356:12
  357:4 387:5

demand 29:12
  262:17,17,19
  263:2 327:14,17
  328:11 351:12
demonstrate 199:4
densities 104:8
department 30:5
depend 64:7 204:12
  245:14
dependent 68:15
  68:21 69:13
  125:16 349:7
  369:17 372:4
depending 67:21
  68:14 125:17
  203:7 211:21
  246:17 255:7
  321:13 328:16
  376:8
depends 55:17 56:6
  57:12 60:7 61:9
  64:4 66:18 68:22
  383:6 402:2
deponent 427:1
deposed 7:1 8:14
deposition 1:12
  2:11 6:10 7:6 9:1
  9:3,11,17 11:4,8
  13:19,20 92:9
  354:19 426:1
  428:3,5,8,12
derivative 38:21
derivatives 19:15
  39:2,7 72:3 73:1
  366:3
describe 93:15
  134:22
described 25:9
  116:10 301:13
  316:14 385:6
  405:3 408:9
  412:14
describes 202:3
describing 385:14
description 4:20
  200:8,22 201:11
  201:22 202:2

402:21
descriptions 360:1
descriptive 91:10
  325:9
design 23:7 54:6
  55:15 67:13
  421:10
designate 344:21
designated 230:18
designation 170:18
  213:14 215:3
  216:18 220:18,19
designed 372:8
designing 60:4,5
  61:4 64:14
desire 369:19
desk 29:14 41:5
  86:8,9 204:4
  249:18
desks 329:6
details 35:6 57:1
  77:15 407:7,8
determination 54:1
  55:5 75:19 78:6,9
  219:9 260:21
  287:11 406:7
  421:19
determine 28:14
  55:15 58:15 76:15
  105:14,21 121:12
  127:19 131:18
  143:15 155:3
  156:21 157:6
  161:18 162:9
  163:9 194:8 198:7
  198:16 215:16
  218:2 220:16
  247:16 260:11,16
  261:8 262:6
  275:15 306:20
  316:14 322:14
  344:21 355:17
  390:16 397:8
  401:1,18 403:13
  409:16 412:3,6,10
determined 11:19
  111:22 115:5

325:12 401:22
  409:14
determines 422:12
determining 65:8
  112:8 216:14
  219:1 288:15
  412:3 421:4
deterministic 59:7
detriment 173:21
developed 131:5
developing 42:18
  131:11
deviation 333:4,8
devised 131:9
dialogue 10:11
dichotomous
  248:14 252:1
  259:3
dichotomy 252:19
didnt 17:18 23:20
  27:2 47:1 48:9
  52:10 60:9,21
  80:12,18 84:22
  93:22 95:18 98:2
  98:7 99:8 100:5
  100:11,17,22
  101:2,4,5,11,12
  108:4 111:3 115:7
  116:1,5,8 119:22
  120:4,18,22 125:3
  125:4,5,6 127:10
  127:17 129:1
  130:17,18 144:3
  145:6 146:1,12,13
  147:10,21 149:20
  150:12 151:5,7
  154:9 155:6
  166:10 167:14
  171:21 179:16
  180:20 186:14
  187:17 189:14
  195:15 216:3
  224:9,22 231:14
  231:16 236:8,14
  236:22 238:20,21
  238:22 247:10
  264:19 265:3

290:14 293:17
294:21 295:2
298:20 299:19
301:10 304:12
315:13,13 316:13
316:19,22 319:18
327:20 328:1
337:5,20 348:15
356:7 357:6 360:9
360:15,16 388:15
397:7 409:5,22
412:6,10 418:11
421:18,22 422:10
**differ** 153:2 303:3
397:3
**differed** 99:15
312:14 326:4
**difference** 32:2
37:10 55:22 65:11
69:7 81:11 114:19
127:8 130:14
137:20 139:16
140:7 144:11
155:4,9 156:13
157:17 159:20,22
162:10 163:9
164:9 170:13
185:10 194:8
197:14 218:11
232:15 233:10
238:18 248:20
269:1 276:5 295:7
295:10 305:7
315:5 316:21
336:20 339:13
340:8 382:16
392:9
**differences** 70:10
82:10 140:21
141:9 163:19
193:3 238:22
258:16,18 266:10
303:16 315:6,13
315:15 321:12
326:18 334:2
372:22 380:11
**different** 15:8,9

25:6 27:20 28:4,7
29:10 52:22 53:17
56:2,3 57:19
67:13 68:1 73:11
74:12,14 77:3
81:2,3 82:4,16,17
82:18,18,20 83:18
91:19 94:20 104:8
105:16 109:6
110:17 112:3,4
113:14 114:13
131:8 137:5 138:9
140:9,13 141:10
141:11,11,12,14
148:8 149:19
150:14 152:17,18
153:6,19 159:7,17
159:18,18 160:15
161:5 163:18
166:8 175:20
178:1,7 182:13
184:19 185:1,3,19
186:1 190:5 195:1
199:9 200:20
201:1,2,15 206:6
206:18,20 207:4
212:4 220:6 221:1
222:2 224:5
225:16,18 236:13
238:3,9,11,14
240:2,4,12 242:12
243:7 258:12
261:12 268:7
273:7 279:11
282:4 283:3
284:11 285:13
286:2 303:14
305:2,14,21 309:2
314:18 315:7
316:6,8 317:3,4
317:12 322:2,4,13
322:15 324:11,11
328:13 335:12
338:22 341:4
342:3 348:7 351:4
354:2,4 357:16
361:9 362:13,21

363:22 364:6,7,11
366:7 371:15
372:20 373:18
374:19 375:19
382:22 390:18
391:1 393:20
397:1,2 398:2
404:16 406:14
407:1 411:21
422:7
**differential** 65:19
65:22 66:1 83:3
84:11 154:22
158:6 159:12
162:21 250:17
263:15 294:12
332:15
**differentials** 153:6
**differentiate**
155:21
**differently** 315:12
316:17
**differs** 201:1
**difficult** 304:4
358:7 359:3
**difficulties** 218:22
**diligence** 5:3 92:3
92:20 93:5
**dimension** 237:17
326:4 382:21
383:1
**diminish** 369:4
**diminishes** 331:4
**direct** 36:21 43:2,4
87:16
**directed** 22:12 25:3
43:12
**direction** 94:22
271:13 353:14,16
428:8
**directional** 94:22
258:11 353:15
358:10 361:15
378:18
**directly** 155:6
157:18
**directors** 36:20

**disagree** 418:6
**disagreeing** 404:18
**discern** 144:11
165:15 361:20
**discerned** 360:5
**disclose** 51:19,22
352:19
**disclosed** 31:8
**disclosure** 305:17
**disclosures** 189:13
**discount** 12:2,3
**discovery** 9:18
**discrepancy** 103:7
138:3 139:5
396:20
**discretion** 222:9
250:22
**discuss** 38:20
107:18,21 295:1,4
425:15
**discussed** 9:22
46:10 53:17 76:15
83:5,7,8 120:14
125:11 186:18
359:16 389:18
400:3 401:6
**discusses** 308:18
**discussing** 164:15
310:2 392:11
400:11
**discussion** 76:8
79:8 80:9 111:15
111:21 115:20
116:1,6 200:10
202:11 228:13
254:13 307:20
321:4 332:5 335:6
354:18 371:8
376:1 380:16
385:6 399:19
406:18,20 408:1
409:9 410:7
411:15 415:19
424:2,19 425:11
**discussions** 79:9
**dispersion** 303:1,5
**disposal** 159:15

**dispose** 307:15
**disproportionate**
27:1 54:15 95:21
96:3 115:13
116:14 120:12
149:19 256:15
302:18 326:6
**disproportionately**
119:12 298:2
303:14
**disprove** 66:13,16
66:21 67:3,10,15
68:2 158:18 160:5
161:19 162:5
**disrespect** 131:21
**distinguish** 96:16
154:12 156:7
303:6 326:13
334:5
**distinguishes**
117:20
**distinguishing**
96:17
**distributed** 304:14
**distribution** 241:7
241:9 242:14
244:10 332:17
333:6,20 334:4
**distributions** 62:13
303:2
**district** 1:1,2 2:20
6:14,14 428:19
**divest** 46:4
**divide** 58:4 191:9
**dividing** 190:19
**division** 1:3 3:8
6:15 22:22
**doctor** 242:8
425:19
**document** 4:13,22
21:18 48:14,22
50:4,6 90:11,15
92:10,14,22 93:3
102:22 109:18
110:3,8 113:10
167:1,3 200:16,16
266:9 271:21

279:6,7 321:7
359:15,16 383:21
384:19 414:11
**documentation**
11:9 215:20
**documented**
291:20
**documents** 9:16
11:2,2 39:17
49:16,18 106:11
107:12,14 166:20
360:2 384:13
409:2
**doesnt** 128:12
163:2 211:17,17
218:1,9 225:10
228:3,22 249:20
257:15 271:13
287:6 294:8 304:4
312:2 320:19
324:21 368:16
369:3 372:16,16
380:10 382:13
388:10 401:17
405:18 411:3
414:9 418:19
**doing** 13:16 14:21
14:22 33:16 41:16
41:22 57:17 66:15
93:17,18 103:14
103:19,21 123:21
155:13,17,18
238:12 298:21
306:3,13 328:16
333:15 364:17
367:4 370:11
397:16 412:17
**dollar** 47:16 96:8
**dollars** 131:22
**donald** 1:8 3:22
6:12 143:9
**dons** 244:12
**dont** 7:17 8:6 16:1
17:12 36:10 38:3
39:19 42:22 44:3
44:10,13,16,16
54:8,9 65:15,17

66:21 67:9,13
70:5 73:22 76:19
76:20 77:19,21
78:1 79:1,7 83:7,8
84:18 88:6 89:9
90:6 92:5 97:11
99:2 100:12 102:1
102:1,10 110:9
118:19 122:4
130:21 136:3,3
146:16 148:21
151:6 152:2 154:5
156:12 163:14
170:19,22 171:1
181:16 184:2
186:13 205:12
210:12 212:15,21
212:22 214:9,20
216:11,19 217:4
222:12 223:21
224:11,13 225:1
228:11,19 230:11
232:8 234:15
239:3 242:19
248:9 252:7,18
254:3,6 255:13
261:5 262:1
267:21 268:9,16
269:22 293:8
295:15 300:4
302:7 307:4
320:12 323:8
334:21 341:3
342:12 353:15
358:2,16 360:11
369:6 370:11
375:10 385:7
396:14 399:8
406:17 407:7,16
410:11 421:9
**dots** 56:9
**double** 68:2
**doubt** 157:3
**downside** 353:13
**dozen** 34:10
**dr** 6:11,17 7:1
161:22 163:12

335:10 380:21
409:13
**draw** 298:6 312:14
373:17
**drawing** 44:8
**drawn** 23:16 57:18
64:1 68:11,12
241:9 332:16
**drilling** 242:18
**drive** 9:22
**driven** 139:18
140:1,2
**driving** 7:11
**drop** 363:3
**drops** 382:8 383:7
**dubofsky** 73:12
**due** 5:3 92:2,20
93:5 192:15
**duly** 428:5
**duration** 120:9
121:15 122:1
163:1 314:8
316:18 320:5
325:6,7
**durations** 399:9
**duties** 22:19
**dynamic** 257:2
**dynamically**
257:10

_____
**E**
**e** 3:1,1 4:7,18 6:1,1
178:21 188:3
249:11 273:2
274:18 377:16,18
377:20 378:22
379:11,21 381:2
423:3
**earlier** 6:17 10:7
16:13 29:3 36:14
57:21 82:7 122:22
123:1 128:15
149:7 160:7 234:9
277:14 291:7
299:13 308:21
309:13,22,22
313:8 316:1 334:9

352:4 358:8
382:19 390:7
397:13 401:6
404:10 407:1
415:4
**early** 425:11
**easier** 217:11,17
218:1,9
**easily** 83:21 356:20
393:13
**eastern** 1:3 6:15
**easy** 334:18
**eaten** 132:9
**economic** 22:14
23:2 25:4 27:2
37:16 194:16
262:13,14 308:11
**economically** 67:20
**economics** 25:16,18
**economist** 22:11,18
23:5
**economists** 22:13
22:19,21 24:5,6,7
24:17
**edge** 93:20,20
**editions** 73:8,11
**effect** 33:7 305:2,13
308:13 329:12,16
351:1,3,13 352:12
**effective** 56:18
266:22
**effectively** 25:5
54:17 307:6 310:5
**effectiveness**
259:18 260:2
**effects** 351:5
**efficiently** 25:5
**effort** 16:22 120:7
145:10 171:10,15
315:6
**efforts** 15:6 25:2
101:17 121:17
171:17
**eight** 12:14 13:4
175:6 185:5,6,8
185:11,12 186:7
228:1 229:3

285:21 381:5
**either** 23:6,13
29:12 35:21 52:6
53:11 63:9 66:12
67:22 74:17 93:18
94:9 95:2 101:1,6
110:9 118:4 121:1
126:17 136:15
140:14 142:2
147:12 160:19
167:15 169:10
173:7 187:12
195:2 211:3
220:18 221:7,11
226:10 230:21
241:16 261:1
266:11 294:3
307:14 340:13
342:21 348:3
352:7 353:12
361:12 411:6,8
424:14
**elapsed** 351:15
**elastic** 327:14,17
328:11 351:12
**elect** 269:12
**electronic** 15:16
42:16,18 51:4,10
53:8 87:20 101:22
106:16 124:16
149:1,4,6,12,14
149:14 272:10
304:8 315:22
335:18 336:5
338:5 373:9 398:9
415:11 416:4
**electronically**
50:21 203:9
**eliminate** 93:16
146:7 210:8
211:17 212:6
360:6
**eliminated** 211:5
245:22
**eliminating** 212:5
234:20
**email** 411:7

emails 53:4 91:2
215:19
emanating 27:20
29:10
empirical 23:7 54:9
155:2 157:5
262:20,21
employed 13:22
17:1,16 36:18
41:1,3 91:20
355:18 428:10,14
employee 428:13
employment 36:21
encompassed 150:9
encounter 409:6
encountered 26:9
54:19 181:12
encourage 46:3,21
endeavors 181:13
ended 35:21 116:7
167:17,19 171:12
293:3 319:21
320:1 404:13
406:19
endowed 18:9
endowment 18:14
45:17
endowments 18:19
ends 196:4 382:12
enforcement 3:8
22:14,16,22 23:1
23:19 24:10 25:2
25:4,8 26:14,17
26:19 30:5 34:8
35:2
entail 18:11
entailed 150:18
176:6
entails 33:1 82:21
enter 282:22 283:1
284:18,18 381:3
entered 45:1
101:13 104:10
107:15 143:22
145:15 147:8
168:9,9 191:16,19
274:4 279:10

284:8 336:2,3
347:20,21 348:6
348:12 349:8,13
398:16
entering 117:6
146:11 161:8
264:4 351:22
enters 30:21
entire 58:2 240:14
241:3 242:3,4
244:3 246:11
305:19 332:21
entities 33:12
entitled 92:20
entity 33:21 45:3
309:8
entry 14:22 15:1,2
15:4 29:17 54:16
54:21 87:8 101:17
124:5 205:14,17
288:6 319:17
320:8 398:19
407:6
environment 61:21
131:22 359:5
equal 277:13
equally 196:13
equals 58:1
equate 239:13
253:19 423:15
equates 410:11
equities 180:2,3
350:20 352:9
equity 38:19 89:15
109:8 135:17
137:5 180:12
181:3 263:12
308:22 309:21
310:10
equivalent 38:2
231:4 332:9
eris 36:21 37:2,2
40:5,17
errata 427:8
erroneous 64:13
205:22 210:4
erroneously 210:3

error 209:20
211:12,16 212:17
errors 207:21
208:22,22 209:16
210:9 211:8
418:17
especially 263:11
esquire 3:5,6,14
essentially 352:9
establish 382:3
established 147:16
208:9
estimate 18:16
174:10 315:2
425:1,3
estimated 314:7
estimates 303:4
estimation 27:17
28:6 128:7 286:21
297:12 300:14
329:14 370:7
et 6:12
euro 240:10,11,13
240:14,21 241:13
241:14,19 242:4
327:15 420:7
european 316:4
euros 240:8 242:3
251:18 331:16
evaluate 23:15
evaluated 191:20
evaluations 24:15
39:21
evening 398:4
407:18,21,22
410:15
event 319:6
events 205:1
395:14
eventually 84:18,19
85:3
everybody 396:1
evidence 66:13
124:12 139:16
140:2,5,7,7,10,12
144:3 158:2
166:10 211:11,15

213:9 214:1,7,10
214:14,16 215:8
262:20,21 302:5
evolution 42:8,15
evolving 42:7,10
ex 24:19 74:11,11
74:13,19,21 75:9
75:17,21 156:22
157:7,8,10,14,18
157:21 158:3,9,18
159:6 160:1
161:19 162:5
166:7 167:22
171:4 172:4,12,22
173:14 174:3,6,10
174:17 175:8,10
186:17 187:4
194:9 198:6,17,22
199:20 207:22
215:22 216:2
217:12 220:18,22
221:7,16 222:1
225:15 226:14,17
248:19 252:3
366:19
exact 64:17 228:12
243:6 364:15
exactly 9:8 16:2
28:14 78:1 131:15
168:19 201:12
203:16 210:13
224:9 239:5
243:15 281:20
304:2 318:9
387:15 407:16
408:20
examination 4:3
6:4,7 303:8
304:21 308:11
396:8 402:10
examine 100:22
158:4
examined 6:6 97:19
175:19 306:6
360:9 427:4
examining 33:3
example 35:16

60:13 176:17
204:4 209:5 211:5
219:14 240:8
242:10 251:16
292:11 299:13
314:4,10 320:17
376:15 405:15
examples 250:1,7
391:11 393:16
exceeded 311:22
exception 179:1
excerpts 183:6
excessive 26:11
93:16
exchange 25:15,18
25:19 27:21 28:22
30:2 36:21 37:1
40:5,10,18 41:10
41:12,12,13,21
86:8 108:18,20
109:8 165:3,4
227:18 270:20
273:22 310:1,6
exchanges 41:15
42:5 231:7 270:20
excising 211:8
exclude 228:15
232:7,9 237:21
245:1 294:18
320:4
excluded 228:17
229:5 232:6
245:11 290:20
344:3 346:3,10,18
347:15
excluding 233:9
294:15 320:1
exclusion 244:22
excuse 9:17 168:13
227:19 229:8
295:17 304:22
314:12
execute 29:22
82:17
executed 82:21
86:11,14 139:20
139:21 141:3,4

165:11,12,17
175:19 176:21
177:10 203:8,9
204:10 276:16
280:14 284:6
303:14 325:4
332:1,3 334:7
340:21 389:12
390:3 393:22
401:10
executing 30:1
82:22 139:19
141:2 303:13
372:3 373:8
execution 29:21
31:15 105:7,10
141:10 166:6
169:1 181:2
202:16 203:21
204:10,21 209:4
221:1 222:16
227:4 267:22
282:13 290:15
305:18 306:2
389:1,14 392:10
397:9 398:17
403:11 404:15
417:15,17
executions 86:14
114:6 176:2,5,11
176:15 177:3,10
177:16 213:10
222:2 223:22
224:5 225:15
227:5,6 274:1,21
279:12 281:19
282:4 284:11
285:13 286:2
289:3 301:3 389:3
389:4,10 391:3,12
391:16,18 392:8
392:14 393:19
398:10
exhaust 153:4
exhaustive 85:13
exhibit 21:8,11
24:22 48:2,12,17

49:9,11,15 50:1,3
85:20 90:13 92:2
92:9,20 94:11
95:3 102:8 103:2
109:11,17 110:11
110:12,13,14
112:11,13,20,21
113:7,13 114:2,3
137:12 143:14
183:1 188:2,19
189:2 200:7,14
201:3 207:13
227:22 228:4,5,8
229:7,8,13 248:11
271:20,21 272:7
276:9,14 279:5
280:12 284:16
286:5 314:4 321:2
324:3,7 336:9
339:12 343:6,11
344:16 345:4
346:17,22 354:11
355:1 375:10
383:11,18 391:10
400:3 414:19
exhibits 5:12
109:10 115:4
117:11 124:8
125:2
exist 119:22 218:15
250:13
existence 161:19
existing 85:2
150:16
exists 209:20 219:2
219:6 328:15
exogenous 249:10
249:14,16 250:1
250:12,18
expand 146:17
368:6
expect 164:8 202:7
254:18 255:22
258:11,15 298:1
303:16 333:6
363:5
expecting 363:3

expensive 155:14
259:12 265:19
266:8,13,18
267:19 268:15,19
269:16 351:5
experience 36:5
44:2 136:15,16
168:18 172:8
191:18 205:5
206:4 270:12
329:22 330:9,22
400:15
expert 4:10,11,18
5:2 9:6,8 12:1,12
12:19 13:8 18:18
18:19 21:11,22
24:15 48:17 49:5
104:17 157:15
162:19 187:20
188:2 354:11
355:3,13,14 373:1
384:18 385:7,9
386:3 388:5 389:7
expertise 18:15
23:14
experts 23:11,17
104:18 308:2
expiration 230:13
230:15,18 231:16
expire 231:1,9
expired 179:4
202:6 230:20
expires 231:3
428:21
explain 25:6 32:5
59:2 62:5 68:18
81:11 155:8
157:17 159:19,21
196:11 248:14,19
explained 84:13
198:21
explaining 103:6
explanation 80:2
80:16,18,21 81:8
82:3,5 124:4
158:5
explanations 201:1

248:18 251:22
259:2
expose 23:21
366:18
exposed 353:12
exposes 307:11
369:2
exposing 94:15
364:18 378:18
exposure 91:17
152:8 287:1,2,7
287:13 307:10
314:5 375:18
376:4,5,11 377:7
400:12
expressing 395:11
extend 10:15 308:1
extension 16:12
extent 318:22
327:13 338:1
350:15 360:4
extra 18:14 49:15
293:19 294:4
395:16
extrapolate 64:11
extremely 135:17
136:19 358:6

### F

f 1:6 3:14 27:6
face 77:14,14,16,16
77:17,17 81:15,16
133:2 175:4
269:15 305:22
358:4
facetoface 77:12
79:18,21 80:1
fact 47:8 94:17
109:3 125:7
133:15 145:14
166:4 168:4 171:2
173:18 174:4,11
189:9 197:12
199:3 207:21
215:5,7 220:22
225:6 254:18
296:13 298:6

320:11 332:14
335:11 336:8,14
338:6 340:20,22
342:2 344:19
374:4 388:1 389:2
391:15 398:2,9,12
399:9 405:17
410:8
factor 69:6 80:15
112:9 195:15
379:7 389:13
factors 57:14
199:11 219:13
317:5
facts 76:2 286:7
287:17
factual 215:16
216:14
faculty 72:15,18
fail 267:13
fails 248:14
fair 8:8 67:9 175:4
342:4 364:1
fairly 23:19,20
356:20
faith 121:17 132:22
fall 17:13,22 19:5
45:12 47:20
323:16 362:18
369:6
falls 422:12
familiar 25:14 27:6
29:16 30:17 31:3
31:6 42:1,3,6 89:5
89:8 108:13
134:18 135:19
315:17 324:6
335:17 350:8
383:21
familiarity 135:22
family 17:19
far 15:6 20:7 24:10
25:7 32:17 34:13
44:2,5,8 47:17
52:22 58:16 73:15
76:5 79:9 80:8,20
91:18 96:8 101:17

102:12 118:16
124:22 125:10
142:6 152:15
164:15,15 189:22
190:5 201:21
203:5 217:10
230:9 238:4
263:19 271:1
304:8 318:11
329:8 332:5
336:11 341:3
348:19 349:6
373:12 385:16
390:10 406:15
407:12,19 409:19
**farfetched** 146:15
**fashion** 69:1
**fast** 103:15
**faster** 373:10
**fault** 100:20
**favor** 362:1 381:5
**feasible** 122:21
123:11 148:22
149:21 151:9
**february** 345:18,22
428:22
**fee** 265:15 329:5,8
**feedback** 40:9
373:10
**feel** 42:3 147:10
316:22 365:16
395:20
**fees** 127:11,14,16
127:22 132:10
259:15 265:11,17
265:20
**fell** 322:16
**felt** 76:10 87:15
112:5
**fewer** 195:21
**fialkowski** 266:4
**fields** 91:1 107:3
348:2
**fifty** 12:10
**figure** 54:12 99:13
103:4,15 145:11
146:16 153:21

193:5 195:19
205:10 233:10
292:21 298:22
356:5 358:3 386:8
**figurehead** 46:19
**file** 15:10,12 53:10
201:7,9 223:10
324:18 325:8
334:15,16 348:3
424:22
**filed** 184:1
**files** 10:5 15:11,17
86:5 106:17
149:11
**fill** 43:19 83:17
172:3 204:14,21
204:21 216:7
264:11 267:13
269:10 270:7
274:4 277:1
278:20 281:1
283:4 284:19
304:4
**filled** 28:19 172:17
172:19 173:9,12
176:18 204:13
206:17 211:22
215:1,9 224:5
225:8,9,18 264:18
264:19 269:14,17
270:8 273:4,22
274:20 276:22
277:2 278:11
279:2,11 280:4
281:17,18 282:2
283:20 284:9,18
285:3,6,19 288:7
295:5,9 311:5
341:16 391:12
393:8,18
**filling** 169:9
**fills** 205:11 224:13
225:5,19 273:7,7
277:10 390:22
391:3
**final** 5:2 274:4
354:11 355:3

384:18 385:7,9
386:3
**finance** 14:8 18:10
19:6,13,14,15,18
26:4 38:11 137:4
**financial** 25:16
135:1 136:8,12
137:4 174:21
182:3 257:18
261:2
**financially** 428:14
**find** 23:3 32:20
87:7 117:3 137:19
139:15 140:1,4
159:4,15 198:11
207:17 238:21,22
239:2 294:22
304:5 315:4,13
342:3 366:17
372:11 394:2
412:21 415:11
418:16
**findings** 159:2
**fine** 10:21 66:6
199:16
**finish** 66:4 425:1
**firm** 20:17 33:18
41:1,3 86:21
103:14 110:22
**firms** 21:4 60:18
85:17 86:19,19
88:10 90:2 91:3
170:12
**first** 41:19 52:12
55:1 73:20 76:21
77:13 79:12 83:2
83:11 85:6 87:6
111:8 115:7
137:17,19 138:13
139:6 146:12
175:14 200:19
201:6 202:14
204:7,8,9,10
236:18 275:8
277:18 281:4
283:5 286:22
288:6,6 306:22

309:18 314:1
321:20 323:2
335:13 345:12
347:9 371:18
372:7 373:1
396:17 417:15
419:14 425:2
**fit** 69:2 121:18
122:17 123:15
151:2 242:21
243:2 360:10
418:19
**five** 12:15,18 13:13
73:3 137:13 141:1
141:14 149:22
152:20 153:10
154:11,12 155:3,8
156:5,20 157:6,13
160:16 161:18
162:8,16 163:8
173:10 176:6,7,9
194:6 198:7,12,16
198:21 200:20
221:13 222:7,8,8
222:17,18,18,19
274:1,1 286:2
288:9 314:7
322:13,14 332:3
332:17,18 333:5
333:14,18,19
339:7 355:8,10
374:19 379:7
382:4 383:2,8,9
411:10,10 412:2,2
416:12 417:9
**fivelot** 176:10
**fiveminute** 71:14
272:2
**fixed** 265:15
**flat** 273:13 274:11
274:12 277:5
287:21 292:15
**flawed** 64:2 215:15
339:22 341:5,11
341:14
**flaws** 205:17
**flexible** 185:7

**flier** 102:13,16,19
102:21
**fliertype** 102:10
**flipped** 192:11
**flipping** 192:7
**floating** 299:21
**floor** 41:7 42:4,16
42:19 86:8 203:11
310:11,14 315:21
**floors** 41:10
**flow** 350:16 357:16
**focus** 130:17
352:15,17
**focusing** 350:22
**follow** 99:8 178:19
201:18 277:8,9
286:9 380:21
381:9 402:9
**followed** 183:17
292:9
**following** 275:5
284:21 327:16
351:6 376:2 382:5
**follows** 6:6 137:19
**footnote** 178:15,18
184:4 228:1,9,18
228:19,21 229:3
232:5 249:7,9
**forces** 196:8 267:12
**foregoing** 427:4
428:3,5
**foreign** 135:21
270:20 310:1,6
316:1
**forget** 10:7 153:10
177:12
**forgot** 70:19
**form** 28:10 29:6
33:8 53:8 69:4
74:6 76:9 90:17
106:19 111:18
164:17 191:6
241:17 364:2
399:5,17 401:4,14
**formal** 78:2
**format** 91:1 106:17
106:17,20 109:6

109:16 110:17
149:14 272:15
**formats** 15:1
**formed** 52:3 157:20
**former** 183:8
**forms** 43:19 106:16
**formulate** 55:14
**formulating** 52:22
**forth** 201:19
**forward** 37:8,10
369:12
**forwards** 37:10
**found** 140:18
232:10 349:19
**foundation** 336:12
401:4,15 404:1
**four** 12:15,16 13:14
24:3 73:3 149:19
176:18,20 177:2,3
285:12 286:19
308:10 314:7
323:17 339:2
341:1,1 384:8
**fourandahalf** 288:8
**frame** 77:1,2
111:12 119:17
122:2 123:6 126:1
134:16,20 135:8
169:20 189:6,11
237:10 240:9
308:6 323:14,15
332:8,22 338:7
341:2 380:5
409:15 411:21
412:4
**frames** 322:4
332:14
**frankly** 424:21
**frequent** 26:8
**fresh** 8:3
**friday** 1:14 2:8
231:10 351:14
**fridays** 326:19
351:10
**frino** 266:5
**front** 14:21 26:10
76:3 93:7 102:22

123:19,22 172:11
397:18 424:16
**fulfilled** 204:10
**fulfills** 250:6
**full** 6:20 18:12 62:7
100:17 120:4
225:1 288:12
294:21 298:1
300:4 343:17
**fully** 325:3
**function** 356:19
385:2
**functional** 231:4
387:8
**functionality** 357:2
**fund** 19:7 38:14,18
38:19 45:9,11
46:4 381:1
**fundamental** 37:16
38:22
**fundamentals**
194:16
**funds** 21:6 32:9
38:12 39:15 43:11
46:12 93:4 94:4
95:6
**funneled** 28:8
**further** 381:3
428:12
**future** 45:2 261:14
261:15,15 307:12
331:16
**futures** 1:4 2:14 3:7
19:16 36:15,18
37:5,7,9,11,11,15
38:15,20 39:2,6
43:7 44:21 47:10
47:11,14 89:20
91:15 94:16,19,19
95:9 96:7,10,22
97:4 156:9 181:10
186:4,6 207:18
221:14 255:12,14
258:9,10 263:11
263:14 308:14,22
309:21 327:10
330:7 337:11

350:14 352:16,18
366:22 367:5,7,16
368:7,8,9,17
369:1,7,10,13

---
### G
**g** 6:1 249:11
**gain** 75:17,20
**gains** 138:11
**game** 148:4,7
**gamma** 366:15
386:2,4,7,9,17,19
386:21 387:1,13
387:19,21 388:2,5
388:8,10,12,16,18
**gary** 18:8
**gather** 54:11 55:1
103:8 357:11
**general** 25:10 27:3
34:10,16 54:5
89:9 91:13 102:14
105:12 127:18
130:15 136:16
154:4 195:8
352:17,22 359:7
362:16 363:21
412:19
**generalization**
253:22
**generally** 16:6
33:19 35:7 57:5
61:19 66:15 67:17
80:17 89:14 96:6
105:18 114:15
134:18 135:6
136:5,17 137:6
138:18 174:19,20
238:13,13 247:4
256:3 260:18
265:18 350:19
353:9 356:15
376:10
**generate** 78:15
**generated** 48:1
87:21 90:1 372:3
385:16
**geraldine** 1:8

**gestures** 7:10
**getting** 40:13 86:2
91:16 111:18
120:5 145:20
149:18 192:8,12
195:21 223:1
249:15 307:6
**give** 7:9 8:22 12:11
15:15 35:6,16
39:18 45:22 53:1
60:18 85:10 90:10
120:10 133:6
169:16 197:21
198:3 200:1
213:19 286:21
300:14 312:7,11
312:16 328:18
350:4 352:22
367:20 376:15
377:13 380:20
385:15 413:3
**given** 8:14,17 10:12
10:19 14:22 19:22
30:13 48:8 52:9
85:11,12 86:13
104:20 105:5,13
106:2,6 108:11
122:16 133:13
136:8 139:8 145:9
161:14 166:4
171:3 173:7,10
197:15 202:14,15
208:16 213:9
215:19,20 216:6
239:18,19 245:19
246:5,21 247:20
260:11 287:1
298:19 320:17
324:14 329:14,16
359:21 360:1
372:10 375:19
376:20 377:7
386:9,9 393:7
395:4 399:8
403:14 412:4
427:6 428:9
**gives** 59:9 222:8

249:12 265:16
374:1 411:4
**giving** 32:7 33:4
40:8,9 121:18
129:6 341:4
389:13 396:13
**glad** 178:10
**global** 86:22 106:22
134:10 149:13
272:10 336:3
337:12 339:9
340:8 414:12
415:13,15,21
416:5 419:4 423:7
**glossary** 183:7
**go** 7:4 17:17 18:1
20:19 21:15 29:9
31:2 47:17 51:13
57:1 71:20,21
85:16,19 92:12
94:18 96:9 97:13
132:6 139:15
140:3 145:10
166:3 176:3 184:5
185:12 191:14
201:13 215:11
223:3 226:11
227:22 228:10
231:16 239:7
259:15 261:17,18
261:19 262:11
272:17 276:13
283:8 284:9
296:14 297:15
330:11 344:9
353:4,17 359:6,9
359:10 363:1,5
374:13 376:15
388:1 396:4,10
409:7 410:19
412:18 415:16
425:4
**goes** 62:17 86:7
147:22 172:9
175:20 177:1
250:6 342:20
354:8,8 362:1

369:5
**going** 6:20 7:6,6,7
7:16 8:13 10:13
24:21 39:22 41:22
42:2 46:3 52:15
55:9,10,16 57:6
59:14 72:8 78:7
78:18 84:16 85:7
90:10,14 92:16
102:5 109:9 112:1
113:22 117:5
133:4 137:3,12
138:19 145:12
148:22 156:17
178:18 190:21
195:16 198:6
199:13,17 210:7
218:15 226:10
234:11 236:3
244:21 256:10
262:6,7 264:6
271:14,19 272:8
283:4 286:10,16
288:18 293:1
296:12 299:13
300:22 306:8
307:13 314:4
323:10 325:19
332:5 334:6 339:6
340:11,14 343:9
350:2 351:11
353:7,17 359:9,10
360:7,14 361:4
362:15,18 363:8
363:13 365:17,22
367:6 368:9
372:19 375:10
377:15 378:11
393:5 396:16
407:21 408:10,11
408:18 409:5
413:15 424:21
425:3
**goldman** 18:9
**good** 40:17 83:16
104:15 108:6,8
121:17 137:7

156:4 172:19
196:18 315:9,9
348:20 388:9
**gotta** 242:8
**gotten** 394:17
**government** 12:4,5
122:10
**governments** 124:2
**grab** 375:11
**grade** 356:17
**graduate** 73:4
**granger** 20:13
**granted** 395:16
**granular** 322:20
**grasp** 80:18
**great** 172:16
**greater** 131:1
220:11 239:14
241:15 262:18
**greatly** 166:7,9
168:4
**green** 3:5 4:5 20:18
20:20 28:10 29:6
33:8 35:5 59:14
61:16 62:22 64:3
65:14 67:5,16
69:17 71:16 73:18
75:2,13,22 76:17
80:4 95:12,20
96:12 97:2,9,17
101:10 103:11
104:1 114:14
118:10,18 120:13
121:4 124:10
125:14 126:3,15
129:21 130:6
131:13 133:4,8
135:5 136:10,21
142:18 144:8
145:8,18 147:4
148:5 149:3 151:3
152:6 154:16
155:11 156:10
157:2,22 158:10
158:20 160:2,22
161:13,21 162:12
163:11,22 167:5

167:18 168:2,14
169:17 170:2
171:6 172:5 173:1
173:15 174:7
175:12 178:4
182:1,18 184:10
184:16,21 185:14
185:21 186:20
187:6 188:8 191:2
191:6 193:9 194:2
194:11 196:1,9,21
197:18 198:8,18
199:13 200:3
204:16 205:3,19
206:8,22 208:18
209:13 210:1
211:10,19 212:9
212:18 213:15
214:8 215:6 216:8
217:2,15 218:4,18
219:11 220:3
221:8,19 224:15
225:12,21 226:13
226:19 227:10
228:10 234:16
235:4,19 236:6
237:4,11 238:6
239:6,21 240:15
241:17 243:10,19
244:5 245:7,13
246:8,12,19
247:12 248:4,22
250:8,15 251:6,13
252:4,12 253:11
254:20 255:5,16
256:5,17 257:16
258:3,13 259:6,22
261:11 264:9,21
267:5 268:21
270:3,16 273:6
274:5 275:1,11
276:7 277:6,15
278:1 279:6,17
280:7,18 284:3
286:6,15 287:3,16
290:2 291:6,12
293:6,14 294:22

296:19 297:5,21
298:11 299:10
300:2,19 301:8
302:2,7,19 303:22
306:10 307:22
312:4 313:3,12
314:15 317:6,15
318:20 320:3,13
326:15 329:19
330:8 331:1,11,17
332:10 333:16
336:12 337:6
338:20 339:17
340:2,15 341:6,12
342:1,10 343:1,4
343:11,13,22
345:8 346:6,11
349:1,9 352:1
353:18 357:19
358:13 359:1
361:1 362:3
363:10 364:2,8
365:2,13 366:9
367:2,18 368:12
371:3 373:19
374:10,22 375:21
376:12,21 378:15
379:15 383:4
388:13 390:19
391:6 392:1,17
394:13 395:2
396:9,11 399:11
400:2,8,10 401:8
401:20 402:6,8,18
403:22 405:20
406:6 409:7 412:5
414:7,19,22
415:13,16 416:13
418:2,4 419:3
423:21 425:5,9,21
**greenwich** 337:13
337:15,19 338:9
398:11,13,21
399:3,8,13 412:20
413:1,22 423:9,17
423:19
**gross** 132:8,19,20

**ground** 7:5
**group** 23:3 24:16
33:19 64:15,20,22
65:2,16 99:16
128:7 163:6
198:13 243:22
**groups** 21:4 65:6,9
65:11,19 140:22
312:15 333:21
**growth** 40:11
**guarantee** 364:11
370:8
**guess** 10:1 12:16
16:1,5 24:3 25:9
26:2 27:4 33:12
39:7 46:10 50:15
50:16 56:6 61:19
64:19 68:7 73:18
78:17 81:5,5 95:7
95:21 96:1 98:17
103:3,6 106:9
116:5 119:10
123:22 124:2
128:6 129:12,13
147:9 148:21
149:17,20 152:7
153:8 164:2
180:20 197:2
203:8 207:4,4
221:21 232:9
237:17 243:20
245:14 252:7
265:1 273:5
274:15,17 279:19
280:15 281:12,15
282:21 284:8,10
285:14 290:12
292:20 302:7
311:6,11 315:3
316:10 318:22
324:20 325:10
328:6,20 340:22
349:21 350:1
360:4 362:16
365:15 366:11
376:13 382:20
396:19 397:17

402:2,20 405:22
409:15 417:8
guessing 148:4,7
guidance 40:8
guide 304:21
guides 303:12
308:11
guy 43:10
guys 107:20

**H**

h 1:12 2:11 4:3,7,10
4:12 6:3,11,22
21:12 48:18 427:3
hadnt 19:18 210:21
half 34:18 278:16
280:14 281:15
282:3 285:20
hand 56:7 197:8,21
203:10 235:22
237:2 249:6
347:21
handle 85:6 203:1
292:6 305:21
425:17
handled 144:3
201:12 227:12
412:13
handouts 39:17
hands 35:2 36:5
handwriting 15:13
108:5
handwritten 4:13
50:3
happen 7:6 207:6
220:7 230:19
245:4 246:4
happened 81:3
88:3 90:7 108:22
126:14 136:1
147:20,21 167:12
222:13 230:8
237:22 293:19
313:22 323:6
360:11 381:16
happening 32:21
135:20 199:11

happens 55:15
173:5 174:11
185:11 206:11
230:12 273:17
274:13 276:4
278:5,22 280:1,12
281:14 282:8
285:11 289:19
290:1 292:2
hard 11:1 15:15,18
15:19 62:12 148:1
327:6 353:3
359:13 361:20
395:19 401:18
harder 353:6
harris 1:12 2:11
4:3,10,12 6:3,11
6:16,17,22 7:1
21:11,12 37:1
48:17,18 50:3
92:2 109:11
112:21 163:12
183:1 188:2 200:7
228:5 271:21
321:2 324:3
335:10 343:6
344:16 346:22
354:11 380:21
383:11 384:13,17
385:4 409:13
427:3
harriss 161:22
385:1
havent 9:11 157:20
160:20 161:2
hazard 255:8
head 7:9 27:7 223:6
256:8 417:3 424:9
headed 22:17
heads 192:8,12
hear 27:14
heard 335:17
385:20,22
hearing 8:17
hedge 21:5 93:18
94:20 249:19
251:11 253:5,9,15

255:18,18,22
256:2,11,14,20,22
257:8,9 258:1,10
259:11,13,19
260:3 261:6 354:2
354:5,6 360:19
361:19,22 362:2
365:1 366:1,19,22
369:10,13,18
370:4,9,12 372:17
hedged 360:7,12,13
361:17,18
hedges 253:19
254:15,15,19
255:11 260:13
hedging 84:20,22
249:12,17,22
252:17,20,21
253:2 255:14
256:20 257:3
258:4 259:2,15
260:16,18 261:10
262:2,6 355:15,18
360:17,17 366:6
370:2 372:8
384:16,21
held 2:11 35:22
96:19 97:7,16
100:2,13,19 140:5
141:3 152:21
153:4 160:12
200:10 202:5,11
203:10 228:13
230:18 241:8
254:13 273:11
274:3 275:10,15
276:2 290:17
307:20 308:6
309:4,17 311:18
313:10,20 316:15
316:19 320:6
321:4 335:6
354:18 358:15
371:8 378:7
380:10,16 382:18
383:1,9 402:22
409:9 415:19

424:2
help 14:1 80:21
198:19 242:8
244:12 367:6
helped 129:10
helpful 342:16
helps 253:21
heres 80:14,15
198:1 413:13
414:16 416:19
hereto 428:14
hes 14:4 16:5 102:2
158:21 177:1
189:5 190:8 279:7
279:22 357:22
372:13 379:13,22
400:17
hey 172:18 251:17
high 136:13,19
137:6 363:3 369:5
higher 135:7,10,14
141:10 268:9
296:16 298:9
highlight 137:4
highlighted 136:13
273:5
highly 13:9 137:21
138:2
highway 7:11
hired 14:2 22:12
historic 136:8
historical 135:3
154:7,9
historically 154:8
hit 238:8
hold 70:19,22
164:12 249:6
253:4 376:9
holderman 1:7
holding 159:17
202:9,13 306:18
306:20,21 308:4
308:12,13,20
309:9,11 320:20
325:14,18 343:3
373:5 382:20
holdings 342:22

holds 405:9
home 284:12 396:1
honest 395:10
hopefully 10:15
hour 11:18 12:9
14:12 59:15 133:5
185:13 199:14
289:21 291:3
299:17 360:13
hours 13:14,21
16:2 202:14 288:8
288:9 309:16
310:1,5 311:22
312:2,19 314:7
315:21 317:17
318:1,4,15 322:7
329:6 338:7,13
395:3 398:4
399:22 415:7
425:4
house 30:18,22
31:2
houses 339:4
hull 39:1 51:14,14
73:10
hundred 12:10
76:21
hundreds 389:2
391:16
hypotheses 54:13
hypothesis 66:2,7,8
66:11,16,20 67:3
67:15,18 68:3
150:15 151:7,7
160:9 233:13
235:12
hypothetical 163:2
197:21 213:19
245:10 373:17
377:13 380:15,20
hypothetically
221:10 252:6
373:7 386:22

**I**

iceberg 266:22
id 184:22 207:13

272:13,17 324:20
335:4 355:8 394:2
**idea** 55:10 69:6
77:4,5 199:22
232:7,8,9 243:2
263:2 349:3
**ideas** 82:8
**identifiable** 65:10
**identification** 21:8
21:13 48:13,19
50:2,4 92:4,9
109:13,18 113:2
169:16 183:2,5
188:3 200:9,15
228:6 271:22
272:7 321:3 324:4
343:7 344:17
347:1 354:13
383:13,19
**identified** 22:9 52:6
111:11 114:1
115:3 124:8
125:10,11 132:15
143:9 166:4
168:22 171:11
175:10 240:21
242:21 245:5
271:4 311:3
346:16 396:20
402:5 416:9
**identifier** 146:16
169:7 170:12
173:7,9 215:3
216:18,22 217:11
218:2,13 219:1
402:4
**identifiers** 91:1
**identify** 21:20 34:5
49:2 97:15 109:21
129:19 144:15
200:18 223:4
226:4 271:9
288:21 295:18
296:10 308:17
321:9 324:9,10
334:6 384:1,12
401:17 402:3

405:18
**identifying** 33:17
112:20 211:3
394:12,15
**ignore** 128:8,10
282:19 287:20
**ii** 48:2
**il** 3:18
**ill** 7:5,19 8:5,7
10:15,16 20:6
27:8 35:5 62:1
66:4 92:10 97:12
149:10 170:15
172:16 184:4
188:6 271:2 350:4
367:20 380:20
394:1 396:2,15
406:6 413:3 415:2
425:1
**illegible** 211:4
**illinois** 1:2 6:15
**illogical** 108:1
**im** 6:17,20 7:6,16
8:13 10:13 13:9
13:16 14:15 16:2
17:10 18:12 24:21
26:14 30:20 31:6
34:12,13 37:3
51:14 52:12 60:3
63:3 64:11,13,16
64:16 66:4 78:17
78:18 85:7 88:14
88:17 89:8 90:3
90:10,14 92:5,8
92:16 99:2 100:6
100:7,20 102:20
103:1 105:8,11
109:9 110:6,13
131:21,22 137:12
148:10,15 149:4
150:3,6,15 154:19
156:2,3,5 159:4
162:7,14,15
164:11,13 168:3
168:19 169:10,19
170:5 171:1 177:6
178:10,18 187:8

189:12 191:14
199:16 201:20
203:16 204:1,14
208:7,13 215:7
216:9,10 223:22
227:22 239:12
243:11,15,15,16
244:22 245:21
249:2 259:8 260:6
263:22 265:9,22
266:7 267:15
268:8,10,13
270:22 271:1,19
272:8 275:21
282:14 283:6
290:7 293:12
296:11 306:11,18
308:10 309:12
314:17,18,22
316:17 317:8,22
318:13,17,21
319:7 320:14
321:18 326:11
328:3 332:16
333:17 334:6
340:4 343:9,14
346:9 353:7 356:2
361:13,13,15,16
365:21 367:17
370:10,11 371:21
372:19 377:14
378:11 389:20
390:9,14 392:20
392:21 394:19
395:9,11 399:1
400:6 404:18,19
408:11,15,18
415:1,9,14 418:3
418:7 422:5
424:10,10,21
425:3,8
**immediate** 106:18
**impact** 58:1 61:7
125:11 127:2
133:17,19 142:2
142:16 156:14,16
160:19 162:21

196:4 205:17
206:2 238:5
259:20 264:1
265:9,21,22 267:1
267:2 300:14
301:21 328:10
330:3,6 350:18
351:17 352:3,19
**impacted** 125:13
299:1,2 368:9
**impacts** 263:6
267:12 302:17
327:9
**impetus** 250:5
**implement** 131:9
**implied** 363:19,20
**important** 65:22
66:1 144:6 205:14
213:9 320:9
368:10,14
**imposition** 259:14
**impossible** 104:5,6
104:16,20 105:6
**impression** 388:22
**improprieties** 30:5
30:6,11 32:18
33:17
**inability** 403:5
**inaccurate** 190:1
371:21
**inappropriate**
371:7
**incentive** 351:7
**include** 180:4,9,12
196:7 231:14
294:19 295:13
314:6
**included** 52:6,11
52:13,15 119:18
121:10 124:13
126:11 127:14
239:17 269:3
292:4 295:13
300:4 341:21
344:13,14 398:10
**includes** 342:18
**including** 143:14

196:8 241:2
294:15 296:3
389:3 419:7
**income** 13:12 16:15
18:17
**inconclusive**
326:12
**inconsistent** 94:10
310:22
**incorporate** 153:18
**incorrect** 424:8,12
**increase** 239:19
366:1
**incremental** 152:12
239:19
**increments** 176:9
176:10 177:2
263:13 281:19
322:6,9,13
**incurred** 381:21
**independent**
122:15 173:10
**index** 134:19
**indicate** 95:18
215:21 374:19
388:21
**indicated** 145:15
187:20
**indicates** 178:19
189:1 305:12
327:9
**indication** 93:12
94:13 374:1 388:9
**indications** 140:21
**indicator** 171:3
358:11
**indirectly** 194:18
**indistinguishable**
301:12
**individual** 20:17
21:4 28:5,17
31:13 32:16 33:10
33:16,20 36:3
107:12 108:22
127:18 132:4
136:4 140:20,20
142:7,7,13 143:7

144:4,4 146:2
150:13 152:13
163:5 194:20
213:9 242:18
267:16 268:18
269:6,7 301:3,11
304:14 309:8
316:11 322:6
351:21 353:4
360:12 374:2
405:4,10 411:19
**individually** 141:13
143:10
**individuals** 28:7
29:13 32:16
**industry** 36:19
70:20 102:2
136:17 168:18
174:15 179:13
181:22 183:19
191:18 204:19
205:6 206:5
314:13 315:18
317:3,14 318:10
319:13,16 330:1
370:21
**infer** 302:4 328:21
358:16,17,17
**inference** 125:19
140:17
**inferences** 64:10
126:7 197:5
323:16,22
**inferior** 329:2
**inflection** 410:14
**influence** 35:14
46:16 47:1 57:14
61:15 62:20
126:12 156:4
175:2 247:21
**influences** 20:7
**inform** 305:20
**information** 11:1
26:4 44:2 48:5
74:1 85:1 88:18
89:13 90:5 95:4
102:15 103:8

104:21 105:5,13
106:2,11,16
107:15 108:21
110:5 112:5
115:22 141:21
143:13 144:10,15
144:20,21 145:11
145:16 147:10
148:12 150:5
152:22 153:15
171:16 214:18
216:6 217:10
231:11,18 237:7
247:22 260:11
272:10 275:14
289:2 304:7
306:15 324:14
328:21 341:11
342:8 350:16
351:7 355:20
385:13,16
**informative** 151:9
**informed** 328:17
328:18,22 353:21
**inherently** 64:2
215:14
**initial** 17:6 19:21
48:6 51:18 79:8
93:9 113:20 124:5
207:10 216:4
222:20 272:19
336:15 372:5,9
**initially** 336:15
**initiate** 251:3,11,11
381:12
**initiated** 12:16
100:15 101:8
144:1 165:20
215:17 216:15
223:13,14 250:13
250:14 306:22
372:6 405:14
**initiates** 377:16
**initiating** 271:18
**initiation** 170:1
215:13 219:3,4
221:2,5 224:7,7

226:6,18,21
235:18 250:17
277:4 281:4 292:7
292:10 314:1
324:13
**initiations** 222:3
225:17
**input** 34:22 348:20
348:21 413:9
**inputs** 359:6
**inquire** 117:13
174:16
**inquired** 410:9
**inquiries** 44:4
**inquiry** 79:9
**insignificant** 388:7
**instance** 7:10 10:9
11:9 42:11 45:20
55:21 56:9 68:9
69:2 70:8 83:20
109:8 135:20
146:1 164:6
201:21 210:10
225:5 271:16
323:17 325:6
339:13 348:8,18
349:18 373:3
391:10
**instituted** 380:4
**institutional**
267:14
**instruct** 35:5
**instructed** 29:22
270:9 409:16
**instructions** 53:2
396:12
**instrument** 362:22
**instruments** 236:11
**insulted** 395:9
**insurance** 253:20
254:2 255:9,13
**intended** 154:12
254:15 260:13
261:9 370:4,5
**intends** 390:10
**intent** 105:6 390:11
**interact** 46:18

**interest** 103:4
**interested** 428:15
**interesting** 60:18
66:20 151:9
274:15
**interface** 25:14,17
25:22 26:2 41:18
**interfaced** 22:13
**interfaces** 40:12
**interfacing** 22:21
**interim** 211:22
348:11 405:6
**intermediary** 29:15
**intermediate** 10:3
10:6
**international** 47:8
**interplay** 81:1
**interpret** 96:1
272:18
**interpretation** 76:2
116:13
**interpreted** 226:15
**interrogatories**
4:16 5:11 9:5
110:1 113:1,9
383:13 384:6
**interrogatory**
386:1
**interval** 59:9 122:1
322:17 332:4
**intervals** 322:15
**intervening** 219:13
**intimately** 25:14
29:18 42:1,3
**intrinsic** 231:1
**introduced** 6:17
**introduction** 39:7
**introductory** 19:6
19:17 38:10,11
**invest** 38:20
**invested** 96:9
**investigation** 106:3
106:7 115:17
**investing** 19:8 32:7
305:17,20
**investment** 19:7
38:12,14 39:14

41:1 43:9 44:2,14
45:9,11,21 46:4
95:5 253:16
257:22 267:19
307:18 363:22
**investmentrelated**
71:1
**investments** 43:3,4
43:6 44:6 45:13
47:17 93:6
**investor** 94:1 95:5
**investors** 93:5,14
93:14 94:4
**involve** 30:10 40:7
54:18
**involved** 24:9,14
30:18 31:4 34:9
36:6 46:2 47:16
55:17 76:14,16
85:17 87:5 88:10
114:11 123:2
**involvement** 34:12
34:14,21 40:22
42:20 53:20
**involves** 28:7 40:8
177:16 244:3
364:22
**involving** 13:8
183:16
**ipo** 109:4 179:22
**ipos** 64:18
**irrelevant** 170:3
199:6,7
**isnt** 95:11 130:4
144:7 148:4 212:4
212:17 218:21
227:8 231:3
234:18 235:2
240:13 241:3
251:12 254:7
255:1 256:2,9
264:20 268:5
276:18 290:11
296:18 310:22
317:14 333:14
338:13 339:15,22
340:11 341:22

348:22 349:7
362:2 366:1
368:10 378:14
379:7 388:8 391:5
392:7 394:11
404:15 405:6
**isolated** 223:7
**isolating** 193:22
**isolation** 209:9,21
**israel** 3:5
**issue** 20:16 24:14
24:19 27:1 55:17
57:12 128:14,17
136:19 145:5
146:21 214:15
317:11 327:17
357:3 403:10
404:14
**issued** 88:9
**issues** 15:8 20:4,6,7
22:14 26:15 40:9
40:11,12 171:5
255:9 296:6
406:22
**itemized** 291:11
**itemizing** 201:12
**items** 49:14
**ive** 12:4,15,15
17:13 19:18 41:11
46:17,21 65:18
73:6 90:13 168:5
206:10 218:7
356:17,18 409:22
410:12 415:1
424:16

### J

**james** 1:6
**january** 1:14 2:8
6:10 319:9 384:7
**japanese** 135:21,22
204:5 221:14
**jeffrey** 1:12 2:11
4:3,10,12 6:3,11
6:22 21:12 48:18
427:3
**jfe** 179:21 180:18

**job** 1:21 13:17
17:15,20,21
**john** 4:18 5:2 39:1
188:3,13 354:12
355:3 384:18
385:7
**join** 18:15
**jr** 4:18 188:3
**judge** 1:6
**judged** 326:7
**judgment** 173:17
174:2
**jumping** 240:4

### K

**kathleen** 1:22 2:19
428:2
**keep** 67:6 165:11
199:17 201:16
342:15
**keeping** 17:19
284:12
**keim** 350:4
**kept** 42:8 290:4,7,8
290:22 398:20
399:13
**key** 353:11
**kill** 83:17 270:7
**kind** 85:6 90:14
107:20 123:12
148:3 151:16
236:2 253:20
297:22 299:21
302:4 357:1 371:6
**kinds** 255:9
**knew** 117:2 125:12
201:7 225:8
358:14 398:14
422:20
**know** 6:16 8:11
9:14 13:18 14:5
14:11 15:21 16:1
16:8 17:12 21:15
26:5 31:7,9 32:2
33:3 34:8 41:22
48:15 50:8 59:15
59:19 65:15,17

76:19 80:14 81:7
88:6 90:6 92:12
100:12 101:20
102:1,1,10 110:7
113:4 115:7
127:17 134:6
142:6,21 146:13
147:21 149:20
150:11 151:6
153:1 154:5
155:14 165:1
169:6,11 181:16
181:16 182:16
186:3 188:5,9
210:13 212:21
214:9 216:3,11,19
218:9 219:18,18
222:12 223:21
224:3,9,11,13
227:14 228:19
230:8,12 232:8
241:22 242:2
243:6 244:19
247:1 252:7,18
261:17 262:1
264:15 267:12,21
282:22 286:13
293:8 296:11
300:4 301:5
304:12 306:7
315:11 319:3,14
327:20 334:21
335:15 336:11,20
337:1,9 352:21
353:16 357:6
358:16 359:3,13
360:11 363:1
366:14,15 367:10
369:5 377:14
380:22 385:7
386:6 387:6
395:17,21 396:15
398:20 400:15
401:11 404:20
407:7 418:16
421:9
**knowledge** 40:2

136:4 165:10
187:3 330:22
336:2
**knows** 328:9

### L

**labeled** 272:12
404:2
**lack** 142:15 325:13
404:1
**landsman** 3:15
**language** 176:21
**large** 23:21 27:19
28:21 35:19 36:1
96:19 106:15
159:16 164:7
262:22 267:13
292:21 393:2
**largely** 58:17
**larger** 20:6 117:15
123:3 238:22
241:10 242:6
253:9 256:15
265:18 266:8,12
266:17 267:18
268:15,19 297:9
297:18 301:6
302:12,14 332:2
381:22 391:4
**largest** 287:8,10
**las** 376:16
**lasalle** 3:16
**lasts** 309:16 312:19
**latest** 202:19,20
**laugh** 409:6
**law** 26:5 31:6
**lawyer** 289:9
**laymans** 69:10
**lead** 158:5 304:13
**leader** 23:3
**leading** 20:20 61:16
62:22 64:3 65:14
67:16 69:17 75:2
75:13,22 80:4
95:12,20 96:12
97:2,17 101:10
103:11 121:4

126:3,15 129:21
130:6 131:13
135:5 136:10
144:8 145:8,18
149:3 154:16
157:22 158:10,20
160:2,22 161:13
167:5,18 168:2
175:12 178:4
182:1 184:10,21
185:21 186:20
191:2 194:2 196:1
196:9,21 197:18
198:18 205:19
208:18 209:13
210:1 211:10,19
212:9,18 213:15
214:8 215:6 216:8
218:4,18 219:11
224:15 225:12,21
226:13 227:10
234:16 235:4
236:6 237:11
239:6 240:15
241:17 243:10
255:16 267:5
268:21 277:7
278:1 296:20
297:5,21 300:2
302:19 303:22
312:4 313:3,12
314:15 317:15
318:20 320:3,13
320:14 326:15
329:19 330:8
331:1,11 332:10
333:16 338:20
339:17 340:2,15
341:6,12 342:1,12
343:1 346:11
349:1 352:1
353:18 358:13
359:1 367:2
374:10 376:12
394:13 405:20
418:2,4
**leads** 162:22 342:9

383:8
**learn** 124:6
**learned** 181:8
  308:17
**leave** 17:14,17,20
  388:22 424:21
**leaves** 354:19
**led** 195:21
**leeway** 395:5
**left** 345:14
**lefthand** 276:19
**legal** 168:14 170:2
  171:7 172:6 173:1
  173:16 174:7,18
  204:16
**legible** 15:14
  201:22
**legs** 8:3 277:18
  364:22 401:18
  402:4
**length** 121:22
  309:9 316:14
  318:1 343:3
**lengths** 364:7
**lesser** 131:1 270:2
  389:3 391:16
**level** 18:13 29:19
  34:10 54:5 57:9
  58:22 70:1 73:4
  92:16 105:19
  136:8 140:11,15
  140:16,18 153:22
  196:19 241:4,12
  243:18,21 362:16
  374:20
**levels** 73:6 136:2
  148:8 153:19
  306:8
**licensed** 71:3
**licenses** 70:19
**lies** 58:16 185:10
**life** 45:13,19 131:20
  131:20
**light** 191:22
**limbo** 17:14
**limit** 37:18 83:15
  94:3 264:4,13

267:3,8 268:18
269:2,12,13,19,20
269:21 270:8,15
271:5,7 273:3,19
274:2,19,21
276:21,22 278:9
278:13 279:1,10
279:12 280:15
281:1,20 282:21
283:3,17,18
284:11,19 351:22
390:15
**limited** 13:9 16:14
  68:14 123:8 140:4
  140:7,12,19
  172:21 176:19
  237:21 273:9
  304:20 310:13
  325:18 351:7
**limiting** 389:13
**limits** 395:8 407:13
**line** 69:2 91:11,13
  283:9,12 391:15
**linear** 69:1 356:19
  357:2
**lines** 80:17 283:7
  283:20
**link** 261:13
**linking** 325:18
**liquid** 263:15
  330:13,18,21
  331:7,10
**liquidating** 183:16
**liquidation** 215:14
  219:3,4 221:3,5
  226:18,22
**liquidations** 222:3
  225:17
**liquidity** 270:19
  329:17 331:4,5,6
**list** 76:19,20 85:13
  86:3 141:1 153:4
  180:18 189:5,10
  324:21,22 343:17
  343:17 345:5
  397:21 415:2,2
  418:19 423:1

**listed** 16:5,7 49:14
  107:1 117:14
  122:9 133:15
  146:13 176:3
  178:15 319:4
  338:2 349:20
  404:3 414:13
  417:4 420:4
**listing** 64:19
**lists** 111:4,7 112:6
  112:10 119:19
  121:10,15 124:13
  124:19 177:21
  200:21 343:19
  345:8 420:6
**literal** 174:13
**literally** 106:13
**literature** 262:22
  266:20
**litigation** 23:15
**little** 16:11 17:14
  27:9 34:21 75:4,6
  81:5 85:5 104:19
  155:14 179:14
  185:7 240:1
  244:12 259:17
  273:9 280:15
  285:14 308:11
  330:14 373:12
  378:21 404:16
  406:12
**live** 356:11
**llc** 1:8
**load** 55:18 123:17
**local** 337:3 338:11
**locate** 34:1 228:20
  228:21,22 229:1,6
**lock** 370:8
**locked** 370:14
**logical** 275:6
**logistics** 411:18
**london** 41:12
**long** 38:4 71:22
  72:13 178:21
  273:15,16 275:10
  275:15 278:15
  279:22 280:1,6,10

280:17 281:5,5
282:5,6,7 283:9
284:2 286:10,16
286:17 293:1
307:18 310:3
312:7,16 334:20
358:15 359:8
361:4 363:4 376:8
381:12 395:12,13
402:22 404:3,6
405:13
**longer** 97:15 100:2
  100:13 101:5
  235:3 335:1
  382:20 383:9
  406:12
**longterm** 94:14
**look** 11:1 21:7 23:8
  48:14 50:1 66:13
  67:20 78:11,13,14
  78:18,21 81:8
  85:19 87:4 99:18
  100:22 101:2
  112:20 113:13
  119:21 120:3,6
  125:5 137:12
  138:17 139:1
  142:9 154:6
  164:11 183:10
  188:19 191:11
  194:21 195:2,5,10
  207:13,16 223:9
  225:3 232:11
  235:13 237:17
  240:20 259:19
  272:1 276:19
  287:21 288:19
  291:8 295:3,18
  301:10,15 303:11
  303:11,13 304:19
  305:18 310:8
  311:9,17 315:1
  325:11 326:17
  345:4,8,21 356:3
  357:15 358:5
  359:20 360:21
  371:10 372:19

386:13 389:22
413:3 422:2
**looked** 9:19 11:1
  32:15,17,19 33:13
  76:22 85:8 86:10
  87:1,6,12 88:14
  94:7,16 98:14
  101:12 102:5
  132:17 138:13
  150:17 169:3,5
  187:13 234:4
  247:19 248:7
  271:6 301:12
  322:15 323:9
  335:13 350:19
  351:12,13,16
  403:16 410:13
**looking** 20:15,16
  33:4,6,9,15,18
  35:4 40:12 42:14
  58:19 60:14 66:3
  68:20 76:10 83:9
  85:7 87:8,15 95:3
  98:3 103:19,20
  105:8,10 114:3
  117:6 119:3
  126:22 128:4
  129:3 130:12
  131:8 132:4 139:4
  140:9 144:14
  170:8 177:19
  189:15 194:15
  196:2 206:1
  209:21 213:12,20
  217:13 218:16
  219:10,14,15
  223:11,12 225:4
  229:2 234:7
  241:12 248:12
  264:5 271:8
  273:21 275:9,22
  277:1 281:9 288:5
  288:18 300:12
  301:2,3 303:19
  304:1 306:18
  308:10 309:7,12
  313:21 316:18

320:6 322:6,7,9
326:11 327:11
332:16 336:8,15
339:12 346:19
358:4 390:9
397:17,21,22
399:9,19 407:6
415:4 416:1,8
**looks** 188:10
229:16 230:4,7
242:14 273:1,13
273:19 274:19
278:7,12,16 279:3
280:2 285:20
288:8 295:11,15
296:21 297:10
326:18 336:16
345:19 347:10,13
410:13 413:5
417:15 420:11
**lose** 95:1 254:19
255:19 296:12,12
361:22 380:21
381:16
**losers** 132:16
**losing** 139:7 175:1
237:22 256:4,15
323:14
**loss** 75:17,20
132:12,13 178:22
322:21 381:22
382:7
**losses** 138:11,20
223:3 259:16
**lost** 204:3 379:2,5
379:10 381:19
383:15
**lot** 23:21 26:21
46:20 98:3 129:13
137:4 155:17
163:2 178:19
179:17 202:10
254:18 261:2
263:11,16,16
288:11 289:22
290:1 291:19
292:1,16 300:13

303:20 307:10
327:1 330:6
342:22 348:8
358:9 373:11
374:5,8,17,21
375:12,13 376:4,5
376:7,10,11 378:5
381:2,12 382:3
389:4,10,17,18
390:22 391:20
393:18,21 394:5
395:5 406:16
417:10
**lots** 135:2,3 179:3
255:19,19 256:2,4
334:2 373:16
374:13 375:19
389:8 390:15,16
390:17 392:22
393:2 394:5,7,18
**love** 394:2
**low** 13:15 138:4
363:4,7,9 387:12
**lower** 12:7 127:4
265:17 267:20
268:11 283:5
373:3 382:18
387:18,21,21
**lowered** 273:20
**lunch** 137:9

---

**M**

**m** 1:22 2:9,19 19:6
38:10,11 71:18
108:2,2 137:10
200:12 272:4
319:8,10,11,13
332:2 334:7,10
335:8 339:22
340:21,22 347:11
354:21 377:17,17
377:19,20,21
379:1,1,12,22
380:18 396:7,13
409:11 410:19,19
411:11,12,15,21
414:4 415:7

416:10,11,17,21
416:21,22,22
417:18,19,20,21
418:10 419:8
420:1,1,14,14,15
422:13 424:4
426:2 428:2
**macro** 20:6 105:8
105:19 356:7
**magistrate** 1:7
**main** 73:19
**maintaining** 74:16
**major** 26:9 328:19
**majority** 116:21
319:20
**making** 19:9 59:12
64:8,11,13 170:5
192:1,5 216:9,10
256:2,14 284:3
286:7 287:3,6,16
322:21 323:22
359:6 370:11
375:9,21 382:12
390:20 392:21
397:12 423:21
**managed** 38:18
**management** 19:7
38:12,14,18 39:14
45:11 46:7 330:12
**managerial** 19:14
**mandate** 305:17
**manifest** 163:20
**manifests** 134:6
**manipulation**
26:20 27:5 35:9
35:11
**manner** 204:1
**march** 134:15
175:18 187:5
189:18 199:21
**margin** 130:20
142:2,4,10,11
143:1,5,7,7
**margins** 142:7
**mark** 92:1 182:22
200:6 324:2
344:15

**marked** 5:12 21:8
21:12 48:13,18
50:2,4 90:11,13
92:3,8,19 102:8
109:9,12,17 113:1
183:2,4 188:1,3
200:9,14 225:7,7
228:4,6 271:19,22
272:6 320:22
321:3,6 324:4,6
343:7 344:17
347:1 354:12
355:1 383:13,18
**market** 20:7 22:13
25:3,16,18 26:1
26:20 27:5 29:15
33:7,11,22 35:9
35:11,15 37:18
38:19 41:17,83:16
83:19 93:18
133:22 134:5
152:8 155:16
156:4,14,16
173:12,21 180:12
185:12 193:18
195:9 196:7
236:10 251:17
264:2,7 265:21
266:1 267:3,12,12
269:5,10,16,18
270:19 287:2,13
307:9,10,12 310:4
327:15 328:12
329:12,16 330:3,7
330:10,14,17,20
330:22 331:7,20
337:11 350:17,18
351:11 352:3,9,12
353:17 357:8
358:18 359:4,10
360:6,18,20 362:1
364:19 365:9
366:8 375:3,20
381:3,5,13 382:3
400:12 407:17
**marketing** 91:5,7,8
91:21 95:14 102:7

103:5 105:1 154:3
360:5
**marketplace** 94:15
175:3 262:17
263:3 267:1
**markets** 20:11 21:3
26:3 37:8,8,11,12
37:14 38:21 89:15
91:17 109:8
134:10 135:17,21
136:5 137:2,5,6
145:4 165:5
174:21 175:4
181:5,10 182:3
186:4 257:18,19
263:11,12,14,15
270:12 308:22
309:21,22 310:1
310:10 315:22
316:1,8 329:14,17
330:10 350:11,14
350:20 351:18
352:13 353:2
359:9 360:14
366:4
**marketwide** 145:11
328:15
**marking** 216:1
**master** 347:4
**matched** 243:3
**material** 91:22
195:16 330:6
341:20 372:22
383:2
**materials** 91:6,7,8
95:14 102:7 103:5
105:1 247:2
300:13 384:13
**math** 112:13
190:17 191:4
**mathematical**
130:8
**matter** 8:18,20
11:12 14:1,17
15:22 16:9 51:5,7
51:11 52:3 53:16
54:18 60:12 70:13

73:13,17,21
102:17 114:21
123:20 151:16
152:5 209:8
219:17 271:13
314:19,21 315:2
316:17 327:13,16
327:18 328:1
339:14 404:18
422:15
mattered 248:9
294:15
matters 12:12
66:22 152:3 315:1
327:4
mean 25:17 28:3
30:20 42:10,11
56:19,21 57:17
58:6 59:2 63:3,10
66:10,19 68:1,18
74:13 82:5 83:14
83:19 90:17 94:12
96:6 129:1 138:1
142:11 152:7
153:7 155:12
166:9 174:6
175:22 176:5,12
197:2 201:20
202:15 203:20
204:13 205:21
207:2 209:19
210:2 216:1
219:22 223:8
231:20 236:10
244:10 246:20
249:14 253:1
255:17 257:5
258:22 261:1,18
261:19 290:7
292:9 303:5 316:2
317:18 328:6
333:4,7,17,18
337:13,19 338:9
352:2 361:3 362:5
365:4 366:3 373:7
389:6 392:7 394:4
398:11,13,21

399:3,8,13 402:3
405:22 410:17
412:20 413:1,22
423:12,18,19
meaning 181:22
182:3,5 184:19
meaningful 323:20
means 13:2 29:11
31:20,22 55:22
70:9 134:11
140:12,19 154:5
174:4 175:14
322:3 360:7 364:5
386:5 410:18
422:17
meant 22:22 28:15
93:17 120:15
139:19 154:8
253:15 312:16
measurable 329:16
measured 135:14
measurement
315:10
measurements
135:4 153:12
mechanics 313:19
313:21
mechanism 65:7
median 56:21,21
57:17 244:10,16
244:19 333:18,19
medians 55:22 70:9
meeting 77:12
79:12,18,21 80:1
81:15
meetings 40:20,21
member 34:13
136:15 183:9
members 24:2
40:13
memory 52:15
men 64:9,10
mens 64:9
mention 10:7 184:2
332:1 355:14
mentioned 10:22
11:6 35:18 36:14

40:4 57:21 83:12
161:8 256:11
336:14 358:8
merit 150:11
messages 274:16
met 9:9 77:14,17
metals 37:12 41:13
methods 64:2
metric 96:3
mf 86:22 106:22
149:13 272:10
336:3 337:12
339:8 340:8
414:12 415:13,14
415:20 416:4
419:4 423:7
mfg 106:21 335:11
336:3 338:6
413:13 414:4
417:17
michael 3:6
micro 20:12 41:17
mid 41:17
middle 137:14
283:9
midnight 322:8
412:16
mike 14:2,4,5 15:21
69:18 87:7 107:6
107:8 183:8,10
335:4 398:19
406:21 409:1
410:6,7
millions 77:5
millisecond 206:15
mind 82:6 83:2,9
199:1 359:12
mine 54:3
mini 273:2 274:18
330:17 377:16,18
377:20 378:22
379:7,11 381:2
400:18 423:3
minimize 267:1
387:13,17,18
minimizing 154:4
minimum 56:17

291:20
minis 379:21
minus 58:5 281:9
281:10,12 314:3
minute 203:17
228:11 278:16
285:14,15,20
339:15 409:8
413:3
minutes 35:20
92:11 133:7
173:10 182:10,12
185:12 199:14
202:13 210:15
275:19 276:2,3
281:12,15 282:3,3
284:21 285:20
288:2 314:6 325:7
334:21 335:3
339:14 378:8
382:4 383:3,8
mischaracterized
218:7
mischaracterizes
118:10 158:21
161:21 218:5
220:3 332:11
346:6,12 392:17
mischaracterizing
120:13 154:17
160:3 162:13
167:6 394:14
missing 146:2,6
201:17 211:4
348:17
misstate 118:13
mitigating 80:15
mizuho 5:7,8,9
86:12,13,15,22
90:12,12 303:20
335:12 337:4,10
338:7,17,21 339:6
339:8 340:7,13
341:2 343:6,18
344:16 346:22
413:13 414:12,13
414:20 415:12

419:18
mmhmm 16:16
59:1 72:4 81:17
137:16 192:16
295:22 345:6
model 37:17,19,19
54:7 386:12
modeling 63:7
models 37:7 386:14
387:6
moment 10:12,19
21:15 48:14 50:7
113:4 115:3 188:5
262:6 334:15
368:20 377:7
383:17
momentarily 163:6
monday 155:13
351:5,9,14
money 19:8 45:14
45:15,16,18 93:14
95:1 96:9 254:16
254:19 255:19,20
256:2,4,14,16
257:15 309:7
370:4,11 378:18
379:2,18
monitoring 310:21
month 88:3 98:16
98:16 231:10
monthly 88:1,4,9
88:19 94:8 95:17
104:22 117:6
124:16,18 147:15
148:17 167:16
356:4
months 12:13,14
13:4,13 99:6
100:4 360:15
moral 255:8
morning 68:18
155:14 289:21
291:2 292:12,12
292:14,14,15
319:9 320:19
324:18 351:6,9
morph 322:21

motion 424:22
425:12
motivated 369:19
369:20
motivations 369:21
369:22
mountain 423:9
move 17:3 30:19
36:12 70:18 213:6
256:22 257:9
269:18 334:6
moved 9:21 206:17
258:6 381:5
movement 31:4
134:19 263:7
358:10,18 375:3
movements 33:22
93:17 258:5
351:18 353:13
360:20 378:19
moves 156:16
269:16 360:6
365:10
moving 36:12
155:16 206:14
257:11 330:14
msg 303:20
multiple 77:10
145:22 202:18
209:6 219:16
222:7 224:18
253:2 363:17
364:5,22 391:12
393:19 400:14,16
400:17,18 410:8
425:3
multiplication
379:9

**N**

n 2:15 3:1,9,16 6:1
58:5,5,7
naked 361:13
name 6:21 33:4
51:14 146:13
names 201:7,9
narrow 243:2

narrower 323:15
narrowing 323:14
nasdaq 64:19 181:3
naturally 283:4
nature 20:8 35:3
56:6 60:7 66:18
91:10 116:13
118:16 120:20
121:1,9 122:9
124:8 125:9,22
135:13 230:1
259:17 265:12
327:18
nearly 54:22
necessarily 32:17
52:11 56:19 85:9
110:6 138:22
150:12,16 152:2
172:12 221:2
225:16 227:4
264:13 266:12
311:10 351:20
407:11
necessary 92:11
136:4 365:1 370:9
need 8:2,4,10 17:9
40:15 55:5 56:18
57:11 58:20 59:15
59:18 69:10,12
93:5 199:15
249:20 275:14
290:9 306:14
342:12 370:12
375:11 377:14
386:8,11 396:4
399:10 425:2,2,11
needed 23:2 53:1
54:16 201:16
308:2 407:5
needs 31:9 291:8
negates 128:11
negative 68:3 261:4
354:7 388:17
negatively 260:19
neglected 410:1
neither 67:10
350:13 428:10

nervous 365:19
net 127:6 131:2
132:17 133:16
167:2,3 373:21
network 32:15 33:2
neutral 386:20
387:1,1,2,4,12,16
388:3,7,9,11,17
neutrality 387:9
never 19:18 24:13
31:16 71:3 89:21
299:11 402:22
new 40:10 41:11,20
64:18 109:7 126:5
150:17 284:19
newell 1:8 3:22
6:12 143:9 199:4
267:17 319:11
354:19
newells 330:6
nfa 106:3
nice 85:3
night 320:18
nimex 42:11
nine 137:14,17
240:12,21 241:4,6
241:13,16,18
242:1,4 244:14,14
281:19 292:14,15
395:6 418:19
nineties 41:17
73:12
nod 7:8 256:8
424:8
nongovernment
12:8
nonprofitable
133:12,20 233:9
235:7,17 246:1
nonspecific 80:12
nonsuspicious
163:18
noon 322:8,8 323:4
nope 45:4
normal 18:13 62:13
135:7 310:7,9
375:17

normally 12:10
54:8,9,11 59:22
61:4 66:19 68:22
270:8,17
north 322:18
northern 1:2 6:14
nos 109:11
notary 2:20 6:6
428:1,18
notate 146:8
note 66:1 183:10
noted 290:16 390:5
390:8
notes 50:12,13,15
50:17,20 51:1,4,6
51:10 201:11
408:22 410:11
411:5,6
notice 2:19 6:11
99:22 124:17
127:12 130:14,19
130:22 269:21
270:13 271:2
noticed 100:7 119:3
201:14 222:14
notify 46:12
notwithstanding
388:21
november 179:2
230:16 416:20
419:12,13,17
420:4,6
nuances 270:6
null 66:8,11,16
67:3,15,18,22
160:9
nullity 264:20
number 4:8 6:13
21:8 23:21 27:19
27:20 28:3,7,21
29:10,13 33:4
48:13 49:10,15
50:1 56:16,17
57:7,16 58:5,7
59:10 68:17 85:20
90:12 94:11 95:22
96:4 106:15

109:10 110:11,12
110:14 112:20
113:7 114:3
115:13 116:14
123:8 125:16
137:13 140:8
151:17 164:7,8
170:11 171:19,19
172:2 178:20
183:4 190:9,10,12
190:13 192:20
197:3,4 200:1,15
201:15 207:13
213:22 228:9
229:12,13,13,17
232:6 239:1,2,8
243:6 258:15
271:12 272:7,12
279:2 291:20,21
292:22 314:18
323:9 324:7 325:7
332:13 345:5
348:7 355:2
362:13 384:10
387:13 413:19,20
414:5 416:19
417:12,13 418:15
419:2
numbered 229:11
numbers 27:12
245:18 246:5
357:14
numeral 22:10 48:2
numerous 20:1
28:17 29:2 391:10
nut 106:14

**O**

o 6:1
object 401:4 406:6
objection 10:10
20:18,20 28:10
29:6 33:8 61:16
62:22 64:3 65:14
67:5,16 69:17,19
75:2,13,22 76:17
80:4 95:12,20

| | | | | |
|---|---|---|---|---|
| 96:12 97:2,9,17 | 254:20 255:5,16 | 256:5 365:13 | 40:20 107:22 | 50:10 62:2 71:7 |
| 101:10 103:11 | 256:17 257:16 | 383:12 384:5 | **occasions** 20:1 | 75:8 92:18 97:13 |
| 104:1 114:14 | 258:3,13 259:6,22 | **objective** 67:19 | 68:18 203:18 | 109:14 110:11 |
| 118:10,18 120:13 | 264:9,21 267:5 | 84:10 94:3,10 | 355:15 | 113:6 119:9 133:8 |
| 121:4 124:10 | 268:21 270:3,16 | 99:12 121:16 | **occur** 242:7 | 159:11 161:8 |
| 125:14 126:3,15 | 274:5 275:1,11 | 137:19 198:11,11 | **occurred** 80:3 | 170:16 173:9 |
| 129:21 130:6 | 276:7 277:6,15 | 215:15 216:13,21 | 81:21 82:3 168:1 | 179:19 188:1 |
| 131:13 135:5 | 278:1 279:6,17 | 217:11 218:1,22 | 187:9 189:18 | 191:13 193:20 |
| 136:10,21 142:18 | 280:7,18 284:3 | 219:8,18 255:17 | 237:9 273:7 286:4 | 198:1 224:3 |
| 144:8 145:8,18 | 286:6,15 287:3,16 | 360:18 364:6 | 286:13 319:15 | 236:22 239:12 |
| 147:4 148:5,6 | 290:2 293:6 | **objectively** 67:20 | 333:10 345:22 | 244:21 247:15 |
| 149:3 151:3 152:6 | 296:19 297:5 | 84:13 | 404:8 405:19 | 249:5 271:13 |
| 154:16 155:11 | 298:11 299:10 | **objectives** 44:14,15 | **occurring** 136:9 | 272:2 276:20,20 |
| 156:10 157:2,22 | 300:2,19 301:8 | 387:17 | 159:7 216:2 | 283:16 286:20 |
| 158:10,20 160:2 | 302:2,19 303:22 | **obligated** 78:18 | 236:16 | 320:8 321:18 |
| 160:22 161:13,21 | 306:10 312:4 | **obligation** 29:22 | **occurs** 405:22 | 324:1 328:2 334:1 |
| 162:12 163:11,22 | 313:3,12 314:15 | **observation** 58:18 | **oce** 23:4 24:1 | 338:4,11 344:8,12 |
| 167:5,18 168:2,14 | 317:6,15 318:20 | 139:1 244:9 300:5 | **oclock** 320:18,19 | 345:4 355:12 |
| 169:17 170:2 | 320:3,13 326:15 | 398:6 | 410:14 412:12,15 | 368:16 371:12 |
| 171:6 172:5 173:1 | 329:19 330:8 | **observations** 56:8 | 422:17 | 383:20 384:9 |
| 173:15,15 174:7 | 331:1,11,17 | 56:16 57:5,8,17 | **october** 175:18 | 399:2 403:20 |
| 175:12 178:4 | 332:10 333:16 | 57:20,22 58:5,8 | 179:1 230:14 | 409:4 414:3 415:8 |
| 182:1,18 184:10 | 336:12 337:6 | 58:14,16 59:5,6 | 311:9 317:19 | 415:20 417:19 |
| 184:16,21 185:14 | 338:20 339:17 | 69:12,14,15,21 | 343:21 347:10,13 | 420:5,12 422:2,5 |
| 185:21 186:20 | 340:2,15 341:6,12 | 77:5 108:7 112:4 | **offered** 12:7 60:18 | 422:9 425:18 |
| 187:6 191:2,6 | 342:1,10 343:1,4 | 125:16 126:6 | 82:14 | **omissions** 124:1 |
| 193:9 194:2,11 | 346:6,11 349:1,9 | 129:8 130:1,3 | **offering** 12:19 | **omitted** 125:18 |
| 196:1,9,21 197:18 | 352:1 353:18 | 201:15 239:1,3,8 | 24:10,11 | **once** 335:5 349:6 |
| 198:8,18 204:16 | 357:19 358:13 | 241:6 242:15 | **offhand** 170:13 | 402:3 405:9 |
| 205:3,19 206:8,22 | 359:1 361:1,2 | 296:12 303:2 | 230:11 250:10 | **oneday** 299:8 |
| 208:18 209:13 | 362:3 363:10 | 322:16 323:10,14 | 296:11 382:22 | **onepage** 90:15 |
| 210:1 211:10,19 | 364:2,8 365:2 | 323:16 332:18 | **office** 22:17 23:5,14 | **ones** 99:3 124:8 |
| 212:9,18 213:15 | 366:9 367:2,18 | 348:18 | 25:8 86:6,6,9 | 207:4 221:16 |
| 214:8 215:6 216:8 | 368:12 371:3 | **observer** 215:15 | 203:12,14 | 234:7 236:14 |
| 217:2,15 218:4,18 | 373:19 374:10,22 | 216:13,21 217:12 | **officer** 428:2 | 295:8,8 298:3 |
| 219:11 220:3 | 375:21 376:12,21 | 218:1,22 219:9,18 | **offices** 2:12 | **oops** 31:2 |
| 221:8,19 224:15 | 378:15 379:15 | **observing** 130:22 | **officially** 18:6 | **open** 17:19 43:15 |
| 225:12,21 226:13 | 383:4 388:13 | **obvious** 209:7 | **offset** 129:10,19 | 43:20 97:22 99:1 |
| 226:19 227:10 | 390:19 391:6 | **obviously** 18:3 | 178:22 400:13 | 99:19 118:2,3,8 |
| 234:16 235:4,19 | 392:1,17 394:13 | 40:19 46:19 58:18 | 401:19 422:9 | 143:4 181:18 |
| 236:6 237:4,11 | 399:5,17 401:14 | 94:18 144:5 | **offsetting** 216:20 | 210:14 214:15 |
| 238:6 239:6,21 | 402:1,18 403:22 | 182:12 207:3 | **oh** 85:19 140:3 | 217:8,8 222:6 |
| 240:15 241:17 | 405:20 412:5 | 315:10,11 316:6 | 318:9 | 250:21 287:9,10 |
| 243:10,19 244:5 | 416:13 418:2,4 | 381:21 425:14 | **ohio** 72:12 73:12 | 287:13 289:14,19 |
| 245:7,13 246:8,19 | 423:21 | **occasion** 30:4 | 330:11 | 290:1,17,19 291:4 |
| 248:4,22 251:6,13 | **objections** 4:16 | 203:19 | **oil** 20:10 21:2 42:12 | 292:13 293:9,11 |
| 252:4,12 253:11 | 5:10 112:22 113:7 | **occasionally** 23:10 | **okay** 21:17 48:20 | 293:19 294:5 |

295:13,15 296:4
296:13 297:2,14
298:8 299:14
307:2,11,13 308:7
309:22 310:1,4,5
310:20 311:13
312:8 313:14
315:21 318:11
320:2 329:7
342:16 378:14
398:5 402:16
404:3 408:2
412:11,15 413:16
419:10 421:14
**opened** 43:13,17
75:16 114:6 119:4
128:5 165:21
172:11 202:8
222:15,20 289:15
345:17 347:9
397:19 405:13
416:12,19
**opening** 142:22
172:10 179:17
212:4 216:17
217:1 221:14
277:4,22 279:16
299:16 316:3,4,5
316:9 398:3
402:16 403:20
**opens** 210:11
**operates** 32:9
**operation** 361:14
**operations** 42:4
106:4,8
**operator** 32:1,8
**opine** 396:21
**opinion** 12:20
23:17 47:4 105:3
105:12 157:15,20
158:1,21 172:6,22
173:3 184:12,18
207:17
**opinions** 13:8 47:2
52:3 104:18
137:15,18
**opportunities**

84:21
**opportunity** 21:16
48:15 50:8 188:6
196:15 237:6,16
**opposed** 29:2
155:17 224:6
261:10 300:16
313:10 315:19
401:3 403:11
404:14
**opposite** 222:17
368:20
**optimal** 388:6
**optimally** 387:12
**option** 17:19 37:7
37:17,18 96:19
99:5 131:20
230:12,20 231:1,7
231:8 261:14,14
261:15 363:1
367:10,12 368:14
369:6,17 372:4
386:12 387:6
**options** 19:16 36:15
37:4,9,15 38:15
38:20 39:2,6
44:17,21 45:5
47:7,14 72:2 73:1
91:16 94:16,19
95:8,11,22 96:7,9
96:21,22 97:4,6
97:15 98:22 100:2
131:6,7,11,12
132:3 137:5 179:2
179:3 230:18,19
363:1,17 366:15
366:15,21 367:6
368:11,17 369:1,2
369:3,4,10,13
372:6,9
**optionsbased** 95:19
**oral** 6:10
**order** 27:14,17,18
28:6,8,16,18 29:4
29:14,17,20 57:11
58:9 63:16 69:11
76:15,21 83:18,19

84:3 85:9 86:6,7
144:14,16 161:18
164:16 166:1
169:12 171:18
172:3,15,16,21,21
173:6 176:17,19
181:2 187:11
193:21 203:4,5,10
203:14 204:5,9
210:16 211:16,18
224:4,14,18 225:1
225:5,6,18 226:1
226:1 250:13
251:11 262:4
264:5,7,13,15
267:3,8,10,22
269:10,13,13,19
269:20,21,22
270:6,7,8 272:19
272:19 273:1,2,3
273:4,6,9,18,19
273:20 274:2,15
274:18 275:6
276:15,21,22
278:7,8,20 279:1
279:2,10 280:2,4
280:13,21 281:1
281:16 282:1,11
282:11,12,16,21
283:2,13 284:8,17
284:18,18,19
285:2,4,4,5,7,18
285:22 286:1
298:22 324:15
330:13 336:16
338:5 376:2 381:6
381:7 389:15,19
389:21 390:1,3,4
390:9,16 391:4,11
393:3,8,22 394:6
394:10 420:21
**orders** 27:20 28:19
28:22 29:2,22
30:1,6,7,11,15
82:17,21,22 83:13
83:15,16,17,17
86:6,14 203:12

205:7,8 206:16
207:3 211:21
223:19 224:14,18
265:2 266:22
267:1,14 268:1,18
269:2 270:7,15,19
271:4,5,7 283:3
283:14 304:4
305:21 350:21
351:22
**organized** 228:11
**original** 9:6,18
111:10 221:4
222:5 224:3
274:15 365:17
410:3
**originally** 45:16
116:20 235:12
322:5
**originator** 88:13
**outcome** 61:15
62:20 138:15
139:8 152:4
194:10 428:15
**outcomes** 65:8
84:12 138:1
154:22 193:3
358:4 362:6
**outlined** 81:4
**outofsample**
193:13
**output** 386:11,13
**outright** 17:18
**outside** 13:12,16
16:15 19:1 23:11
54:10 108:10
249:18
**outstanding** 282:18
283:3 284:7
**overall** 68:11 101:8
105:14 260:3
397:5
**overcome** 58:12
212:17
**overlap** 38:13
247:6,8,19 248:7
303:2

**overnight** 290:5,15
309:18 310:17
311:19,21 313:10
342:21 347:18
**overseeing** 45:10
46:15
**overview** 25:10
45:22
**owned** 405:4

---

**P**

**p** 3:1,1 6:1 108:2
134:19 137:10
200:12 230:3,5
270:17 272:4
273:3 319:8,10
330:2,17,17 331:8
332:2 334:7,10
335:8 339:22
340:21,22 347:11
354:21 377:16,18
378:22 379:11
380:18 381:2
396:7 400:18
409:11 410:19,19
411:11,12,15,21
414:4 415:7
416:10,11,17,21
416:22 417:18,20
418:10 419:8
420:1,1,14,14,15
422:13 424:4
426:2
**page** 4:3,8 22:2,8
24:22 25:1,12
48:1 49:6,9
113:13 137:13,14
164:11 175:5,6
178:15 183:11
186:7 191:11,14
192:17 200:19,21
201:6,21 207:16
213:7,8 215:11
228:1 229:3
248:11,13 249:6
251:22 262:12,14
283:7,9 288:20

295:3 303:11
304:19 306:17,18
306:19 309:12
321:20 323:2
325:16 327:7
331:22 345:12,21
355:8,10 371:10
371:15 384:8
pages 1:9 5:5 50:7
50:11 183:1,5
228:12 427:4
paid 16:8
paired 226:21
panels 19:22 20:5
26:16
paper 17:11 66:20
106:17 163:8
179:21 180:18
308:21
papers 17:11 30:14
42:15 162:17
163:15 306:12
paragraph 22:10
85:19,21 137:14
137:17 141:1
164:11,12,21
165:9 166:3 175:6
177:8 191:11,15
192:1 202:9 213:6
262:12 266:15
271:8 288:20
295:3,11,14
297:17 299:6
301:15 302:13
303:12 304:19
308:10 311:1,2,3
311:7 312:15
325:11,16 326:16
331:22 369:15
371:14,22 372:7
372:19 385:4
387:11 388:20
paragraphs 200:22
311:1 371:15
372:2 384:16
parameter 123:15
242:22 244:18

parameters 94:21
121:18,21,22
125:10 129:18
161:12 243:7
304:15 385:2
407:14 410:21
418:20 422:13
parkes 4:18 187:20
188:3,14 189:2,16
193:5 200:3
part 10:1,4 20:10
22:18,19 38:21
45:17 63:4 90:19
101:7 102:11
108:5 150:5
165:18 227:8,12
277:1 290:11
311:2 314:1
328:11 393:2
418:14,16
partial 204:14
205:7,11 224:13
273:7 390:22
partially 204:13
270:8 314:22
participants 26:1
particular 12:17
20:16 26:7,12
46:5 54:11 56:20
60:17 62:13 70:13
73:15 90:20 105:7
105:11 110:7
123:15 138:12
165:6 181:14
207:20 208:6
209:4 210:17
224:2 237:17
240:22 245:17
265:8 267:7 274:8
275:16 289:15,16
303:21 304:16,16
309:8,9 310:3
366:13 405:4
417:10
particularly 31:11
parties 30:10
428:11,14

partly 120:5
parts 212:7 213:5
331:3
party 144:5
pass 46:12 396:2
passage 366:14
passed 281:7 288:7
path 113:22
patience 395:7
pats 335:15,16
336:3,6,9,17,21
337:12 398:8,21
pattern 125:1
358:21 383:7
patterns 82:18
119:17 154:6
298:7,14
pause 10:14
pay 254:2,6 262:18
265:15 268:9
365:17
paying 11:16
payoff 131:8
367:15
pays 16:3
pdf 15:17,20 86:5
106:17 149:11
164:16
peak 24:4
pederson 266:2
peer 162:17 163:8
179:12 305:5
pending 6:13 8:6
342:11,13
penultimate 40:1
people 23:19,22
32:10 40:13,17
42:14 163:15
169:14 181:17
279:19 328:13,17
351:8,12 353:20
353:21 371:6
416:1
perceived 47:3
percent 13:11
16:14 19:2 123:18
140:12,14,15,16

140:16,18 191:5
192:13 193:5
199:4 241:4 243:5
243:15,16 244:4,7
244:15,17 297:11
297:18 301:18
303:4 381:22
percentage 18:17
18:21 186:10
296:16 298:9
percentages 138:14
190:14
perform 31:17
122:14 155:2
performed 32:12
period 32:22 35:20
76:14 100:16
115:15,16,19
116:7,18 117:10
118:2,3,5,9 119:4
125:1,8 134:13
135:1,16 136:1
139:18 140:6
143:17 175:17
186:12,15,18
187:2 190:15
193:12 195:4,6,7
195:11 196:17
197:11 199:5,5,12
236:4,15 290:15
297:16 306:18,20
306:21 307:7
308:20 309:18
310:17 311:6,7,8
311:8,19,21
313:10 316:6
320:20 330:18,21
331:4 342:21
351:11 360:8
361:18 397:6
398:4 407:21
408:4 409:18
412:8
periodic 135:11
periodically 206:11
388:12
periods 136:19

159:17 186:17
187:14 190:5
195:1 308:4,12,13
309:11 310:20
325:18 373:5
peripheral 32:21
permanent 307:17
permanently 18:1
permutations
222:22
person 10:8,11,18
45:2 71:8 146:11
161:8 328:9 383:8
personal 34:14
42:20 89:9
personally 24:9,13
24:14 133:10
perspective 310:7
312:7,16
pertains 44:7
pettit 183:8
ph 1:12 2:11 4:3,10
4:12 6:3 14:6
21:12 48:18 427:3
phase 87:17
phone 53:3,12 77:9
77:10,11,14 79:17
107:11 169:12
173:11
phrases 371:13
physical 202:19
physically 42:19
55:13 337:20
pick 62:6 152:11
169:12 340:13
picked 120:8 197:8
235:22 237:2
241:22
picks 197:22
picture 101:12
piece 149:20
pieces 106:16 268:2
268:3 276:16
301:3 302:5
piles 197:14
pin 148:2
pit 42:12

pitching 46:2
place 111:11 120:6
142:16,17 150:20
150:22 172:14,16
204:5 255:22
342:3 358:22
370:19 389:1
placed 92:19
144:16 171:12,19
172:3 216:19
218:2 219:1 233:1
233:2 248:2 258:1
272:6 370:15
383:17 391:11
393:19
placement 264:7
372:10
places 173:6 322:19
placing 268:18
plaintiff 1:6 3:4
4:17 113:1 384:6
396:8
plaintiffs 4:15 5:10
112:21 113:8
383:11 384:3,4
planning 46:11
platform 335:19
platforms 42:18
play 84:4 268:1
351:20
please 21:20 27:22
32:5 45:22 49:3
59:2 90:10 112:20
118:14 158:13
175:21 183:14
188:19 249:7
260:7 306:17
321:10 324:9
335:2 344:15
346:21 384:2,8
plenty 154:20
plethora 161:11
plot 69:1
plus 280:10 281:10
381:6,7
point 7:17 13:15
26:2 59:16 64:17

90:8 103:2 104:7
118:22 124:21
133:7 159:5,5,9
159:11,12 162:18
168:5 169:13
222:13 235:18
239:4 241:11
267:17 283:10
290:17 293:11
294:6 303:4 305:1
305:6,10 316:10
328:19 333:12
340:17 366:5
371:18 376:6
379:20,20 380:1
382:12 389:9
401:21 407:20
422:19
pointed 220:6
pointers 33:12
points 56:18 125:18
199:9 234:10,15
328:14,22 379:4
379:10 381:5,7,8
381:17,19
policy 253:20 254:3
pool 32:1,8,9 45:9
45:18 46:7 234:14
235:2,22 237:21
238:12
pooled 405:2
poor 306:3
poorly 70:17
population 56:11
58:2 62:7 68:10
68:12 117:15
239:5,14 240:14
240:18 241:3,10
241:15 242:3,4,7
242:9,11 244:3,13
244:16 245:19
332:6,9,19,21
333:21
populations 57:19
68:9
portfolio 19:9,16
19:19 47:18 94:17

104:9 260:3
307:18 330:12
369:2 387:14,16
portion 43:10
128:8 267:10
298:1 302:11
308:7 327:3 338:4
400:4 417:8
portions 274:21
300:3
pose 225:10
posed 7:20 114:11
position 18:7,8
35:20,22 36:1
46:5 71:1 75:15
75:16 81:20 88:22
94:14 97:22 105:2
114:6 118:17,17
141:2 142:22
147:12 148:16
152:9 165:21
172:10,11 179:17
179:18 180:6
181:18 182:11
202:7 210:11,12
210:13,14,17,20
210:21 215:14,16
215:18 216:4,15
222:6,13,15,20,21
226:5 249:11,21
250:3,14,22 251:1
251:2,3 253:4,6,6
253:10,16 256:1,4
256:13,15 257:10
257:22 258:6
259:21 260:18,19
261:3 264:12
271:17,18 273:11
274:3,22 275:15
277:22 278:3,15
278:22 281:5
282:9 287:9,10
288:6 289:15,16
289:20,22 290:1
290:17,19 291:4
292:13 293:1,2,9
293:11,20 299:16

306:22 307:10,11
307:13 308:6
313:20 316:15
347:9 353:5,5,8
353:10,13 354:2,5
354:6,6 357:9
361:16,17 362:1
363:2,4,6,12
364:7,21,22 365:1
365:9,9,11,17
366:17,21 367:5
368:8 370:10,10
370:12,14 373:10
373:22 375:4
377:17 378:14
379:13,22 381:12
382:3 386:20
387:1,3 397:19
402:22 408:2
421:12,14 422:14
positioners 353:21
positioning 128:5
positions 27:1
32:19 36:12 85:2
93:19 95:22 96:5
96:10,19 97:7,15
98:15,22 99:5
100:2,13,18 101:6
118:3,8 128:5
130:15 146:20
147:2 148:12
150:7,21 178:21
185:9 223:18
253:2 257:9
287:14 292:22
295:14,15 296:4
297:2,8,14 298:8
311:13 312:8
313:14 316:18
356:15 358:9,15
358:15 363:17,22
364:5 365:22
369:10,13 372:6,9
385:17 400:13,17
401:3 402:17
412:15
positive 388:17

424:10,15
positively 261:5
possible 26:15
148:21 332:17
358:7 381:11
399:2,3,4,7
possibly 225:3
247:21 359:16
425:3
post 24:19 31:14
74:11,11,13,19,21
75:9,17,21 156:22
157:7,8,10,14,18
157:21 158:3,9,19
159:7 160:1
161:19 162:5
166:7 167:22
171:4 172:4,12,22
173:14 174:3,6,10
174:17 175:8,10
186:17 187:4
194:9 198:6,17,22
199:20 207:22
215:22 216:2
217:13 220:19,22
221:7,16 222:1
225:15 226:14,17
248:19 252:3
366:19 397:9
posted 168:20
potential 25:3
31:14 33:17 139:8
143:21 157:7
211:8 212:17
248:18 258:2
259:16 269:19,20
322:4
potentially 126:12
128:14 129:10
152:17
power 57:7 69:13
130:7 234:12
239:9
powerful 240:2
practical 67:2
134:7,8,9 242:17
precisely 16:1

174:18
predicate 47:22
predicated 388:8
predicting 359:8,10
preexisting 101:6
150:7 253:16
preliminary 5:10
383:12 384:4,4
premium 254:6
prepackaged 56:3
preparation 11:4,8
13:19 48:9 355:5
prepare 9:1 425:2
prepared 9:13,15
preparing 48:6
355:6
preponderance
270:14 271:3
prescreened 61:11
prescreening 60:22
61:1,7 63:12
presence 213:13
present 3:21
105:17 120:18
128:17
presentation 40:3
46:5
presentationorie...
39:20
presented 81:1,20
117:11 124:12
presumably 167:9
196:12 264:12
280:8 373:21
386:11 389:11
391:1
presume 96:16
155:12 166:13
171:8 182:19
190:18 191:7
197:2 203:17
270:18 278:2
293:16
presumed 190:2
241:9 332:16
presuming 274:9
275:5,18 287:15

287:21
presumption
202:21 242:5
pretty 42:6 68:9
99:12 120:6 138:4
357:10 365:5
previous 332:11
previously 189:3
price 35:21 37:9
83:21 84:1 127:4
132:18,18 172:20
191:20 204:6
206:17,18 207:5
230:3,5,22 231:17
262:18 263:4,5,6
263:22 265:9
267:1,2 268:4,9
268:10,10,11
269:11,15,22
270:2 273:3,10
274:2,19,21 278:9
278:14 279:12,13
280:15 281:20
283:5,17,18
284:11,19 307:12
328:10,19 329:3
351:18 357:8
379:1,12 381:12
383:6 421:21
422:3,7,20,21
priced 230:4
prices 27:3 35:14
36:13 141:11
156:16 162:21
194:17 206:6,7,14
206:21 261:17,17
261:18 283:3
329:2 364:11
367:7 369:7
pricing 37:7,11,16
37:17,18 368:14
386:12,14 387:6
primarily 14:21
95:11,19
primary 95:5 199:8
print 348:11,15
printed 414:17

printout 149:14
336:9
printouts 272:9
prior 13:14 19:19
72:8 78:22 89:11
93:8 101:16 109:2
113:10 114:21
131:18 148:13
171:4 172:3 179:7
186:11 215:22
349:13 393:5
priori 213:10 214:2
217:12 220:18
221:7,17
private 30:10 41:1
privy 143:1
pro 175:3
probabilities 59:8
probability 81:3
104:8 138:3,11,15
192:1,4 334:4
369:17 372:4
probably 13:13
19:1 34:10,18,20
34:20,22 47:2
87:12,14 104:6,13
104:15 139:19
161:11 176:1
204:9 230:15
246:13 255:3
258:16 290:10
312:21 330:3
343:20 365:18
371:5 387:8 425:1
problem 57:22 68:3
81:4 193:11,12
210:4 219:6 328:8
414:16
problematic 207:20
problems 107:17
107:19,20 111:18
145:19 147:7
174:21 202:3
211:1,3 261:1
306:13 348:5
358:3 374:12
procedures 7:5

9:12 25:11
proceed 77:21
proceedings 6:20
process 10:4 15:2
25:10 55:14 62:17
63:20 90:20 117:5
128:13,16,19
389:1
processed 45:22
272:20
processes 23:7
40:14
produce 348:13
produced 50:19
51:10 166:13
343:18 348:7
producing 24:17
258:7
product 24:16,16
34:19 220:1
304:17 309:9
production 52:18
products 247:3,11
247:17 248:2
310:2,12
professional 13:17
professionals
136:18 267:17
370:22
professor 14:5,7
18:12,13 26:4
46:8
proficiency 187:12
profiler 151:2
profiles 152:17
profit 84:12 132:8
178:22 258:2
273:21 306:7
361:4 364:11
379:13,20 380:1
382:13
profitabilities
380:11
profitability
120:12 122:3
125:17 132:7
133:12 137:20

138:18 139:1,16
152:3 154:13
155:4,7,9 156:7
156:15,17 157:17
158:6 160:19
162:10,22 163:10
163:19 164:10
175:7 186:8 190:5
191:5 193:2
198:13,21 199:4
215:12 223:2
227:12 233:11
248:15,20 252:2
252:11,15 258:21
259:3,20 294:2
298:17,20 299:2,4
299:5,9 303:16
304:21 305:3,7,13
308:14 309:1,3
315:8 325:13,19
327:5,10 352:20
352:21 370:18
382:16 397:5
421:19 422:1
profitable 115:13
116:14 121:14
122:5 126:17
127:1,3,8 132:11
132:16 133:11,16
133:17,19 139:7
155:22 156:3
159:13 160:14
186:10 190:9,22
192:1,20 193:7
194:1 196:5
197:16 198:2,5
232:6,10,11
233:14 234:4,4,7
235:6,7,13,16,17
238:11,17,17
245:6,21 246:6
266:19 268:16,20
349:20,21
profiting 364:6
profits 83:3 138:20
179:21 180:22
194:18 220:10,12

222:19 223:3
258:7 263:6 326:6
369:20 370:9
381:4 396:20
397:1,2
**program** 14:22
55:20 95:19 325:5
**programming** 10:4
15:3
**programs** 93:12
107:13,16
**progression** 55:18
**project** 33:16 74:3
76:7 77:18 78:7
79:20 101:18
107:10 131:17,19
304:10 375:2
**projects** 109:2
123:2
**prop** 186:8 189:18
195:3 302:14,15
302:17 324:22
418:15
**properly** 46:10
254:10 348:22
395:1
**proportion** 126:22
397:1
**proportional**
351:15
**proprietary** 4:14
77:4 84:8 86:16
96:18,20 97:1,7
100:1,3,9,14
101:7 109:12
110:15,18,21
113:18 117:10
126:10,14,18
130:14 131:2
137:21 138:14
139:17 140:6
154:14 165:12
166:5,18,19,21
167:11 168:7,22
170:10,11 171:11
171:13,18 175:8
192:2 193:3,7

197:16 198:1
208:1 213:11,14
213:22 214:2
215:17 216:15,18
220:13 226:2,11
229:8,17 232:12
232:13,17 233:2,6
233:14,16,21
234:6 238:1,11,13
240:6,9 241:14
243:9 245:6,20
247:3,11,18 248:3
248:15 252:2
259:4 272:12
288:22 295:19
296:5,9,17 297:4
297:11,17 301:7
301:16 302:1
303:15 309:17
310:16,19 311:5
311:11,18 313:11
314:12 326:3,19
332:1 340:10
341:17 348:4
393:14 397:2
400:7,8 410:15
413:20 414:7,19
414:21
**protect** 63:8,17
253:5,15 256:1
257:21 365:11
366:7
**protecting** 259:21
**protocol** 201:18,20
288:15 290:11
291:7
**protocols** 30:1
411:2,3
**prove** 66:12,17,21
67:3,10,14 68:2
160:8
**provide** 23:5 34:22
40:13 180:15
250:7
**provided** 9:20
15:20 74:2,4 88:2
91:6 102:20

104:21
**providence** 14:5
**provides** 18:14
351:7
**providing** 123:14
**public** 2:20 35:6
305:18,20 428:1
428:18
**publication** 30:15
**publications**
180:21
**pull** 343:16 346:21
347:3 408:12
418:13
**pulled** 39:1
**purchase** 132:18
183:16,17 273:10
364:10
**purchased** 46:16
223:15
**purchases** 132:18
224:17 405:16
**purchasing** 19:9
**purest** 65:16
**purgatory** 405:7
**purpose** 41:14
64:21 93:2 201:5
**purposes** 17:20
21:9 41:16 48:14
50:2 84:22 92:9
109:18 183:5
200:15 205:13
216:5 249:12,16
251:3 264:5 272:7
291:5 292:1 318:7
318:19 360:20
383:19 397:12
**pursuant** 2:19 6:11
319:4 322:22
**push** 35:21 83:21
83:22 263:20
269:10 316:22
**pushing** 263:4,5
**put** 49:22 53:18
88:12 95:22 103:5
106:19,20 110:1
160:9 165:16

172:20 202:22
203:4 204:9 209:4
218:10 230:3
251:4 256:20
259:13 261:3,18
264:12 267:3
269:22 278:7
280:16 282:10,12
295:2 300:5
307:22 319:16
324:21 330:12
338:8 341:21
349:18 360:19
364:21 365:8
367:14 370:18
373:15 374:5,8,17
377:10 399:8
400:13 409:3
425:6
**puts** 108:18
**putting** 93:7 107:16
158:21 214:22
341:7 400:17

———————————
**Q**

**qualifications**
22:10
**qualify** 93:6 417:22
**quality** 305:18
306:2 349:7,12
399:12,15
**quantity** 270:2
389:3 391:16
**quarter** 34:20
**quarterly** 40:19
**quest** 369:20
**question** 7:20,22
8:6 10:16,17,18
14:16 20:22 21:1
28:15 31:14 33:22
34:16 46:18 56:7
56:13 58:19 61:18
70:17 76:12 82:2
97:11 99:15
100:20 105:16,17
106:18 110:11
112:2 114:12

116:6 120:17
122:2 142:12
147:18,19 149:18
171:15 175:18
185:8 186:12,15
203:8 212:2
214:17 227:3
228:14 240:2,4
243:11,14 245:15
261:12 264:10
291:15 292:19
293:14 302:9
311:8,10 315:12
341:15 342:11,13
346:9 364:4 368:1
384:10,12 385:1,8
393:6,20 396:15
398:15,16 403:8
415:9
**questionable**
320:12
**questioning** 384:15
384:20 396:14
**questionnaire** 5:4
92:3,21 102:11
**questions** 7:7,16,18
10:14 23:1 44:1
44:12 54:12 55:5
55:11,14 64:5
68:8 80:20 82:8
92:13,17 115:18
116:3,8 132:6
178:9 188:7
395:18 396:1,3
403:4 410:3
412:19
**quick** 118:8
**quickly** 94:13
**quid** 90:12,12
175:3
**quiddity** 1:8 5:3
92:2 143:16
147:12
**quidditys** 106:4,8
**quips** 385:20,21
**quit** 17:18
**quite** 30:20 47:9

80:18 131:11
156:12 206:14
247:5 266:20
270:18 316:20
330:4,21 399:21
408:15
**quo** 175:3
**quote** 109:6 371:13
371:18 372:7
**quoting** 371:20

**R**

**r** 3:1 6:1 27:6
**raise** 116:8
**raising** 93:4
**ran** 195:18 238:10
322:22 348:16
408:14,15,21
**random** 60:6,10
62:7,11,12 137:22
192:4,15
**randomly** 60:14
191:16,19
**range** 294:21
**ranged** 34:17
**rate** 11:19,20,21,22
12:7,9 14:11
134:4 199:5
386:19
**rates** 233:15
**ratio** 126:22 133:19
160:13 187:14
191:5 373:22
**ratios** 351:13
**raw** 413:9,11
**read** 27:22 28:1
39:22 88:12 89:6
91:7 93:8 102:16
123:17 154:3
158:14,15 178:18
183:14 208:2
213:4 233:17,18
237:14,15 248:16
249:7 260:6,8
291:12 303:17
326:15 348:2
349:4 355:5

425:20 427:4
**readable** 15:12
**readily** 231:19,20
**reading** 19:20
88:17 91:9 93:11
95:2 102:12,19
103:2 104:4 159:6
189:19 191:22
279:7 283:6
326:11
**readings** 341:5
**real** 45:13,14,19
81:2,10 82:8,13
83:3,5 104:15
131:19,20
**reality** 210:21
**realize** 124:6 410:1
422:11
**realized** 117:8
178:22
**really** 53:22 116:5
130:17 148:7
157:17 177:10
225:10 268:14
299:3 303:3
315:14 353:7
365:19 370:20
**reason** 94:18
120:10 123:22
150:13 173:7,10
195:20 212:12
213:9 249:17,21
264:15 326:5
420:5
**reasonable** 395:16
**reasoned** 173:17
**reasons** 56:20 61:3
81:2,10 82:9,13
83:3,5,9,12
159:16 195:5
249:10,14,16
250:1,12 252:11
396:22
**reassess** 257:8
**rebalance** 251:4
**rebalanced** 387:14
**rebalancing** 249:11

249:16,22 252:10
252:14 387:18,20
**rebounds** 382:4
**rebuild** 357:8
**recall** 11:7 43:14
43:15,22 44:4
73:20,22 74:10
80:8,11 88:8 91:8
91:12,21 92:21
99:2,4,6 102:9,12
111:2,3 130:21
131:3 148:21
170:10,17,19,22
171:1 226:8 271:1
356:1 375:13
403:7 407:16
410:2 424:17
**received** 85:9
106:10 111:2,4
143:14 189:1
**receiver** 88:14
**recess** 71:17 137:9
200:11 272:3
307:21 335:7
354:20 380:17
396:6 409:10
**recited** 180:18
**reclassified** 232:13
**recognize** 21:18
48:22 50:11
110:12 113:7,16
119:16 124:21
183:6 200:16
321:7 355:1
**recognized** 27:12
75:17
**recollection** 53:13
80:11 81:6 226:10
291:13
**recommend** 39:21
**reconstruct** 147:11
149:17
**reconstructing**
148:20
**record** 6:9,21 7:21
21:21 49:2 109:21
149:16 158:2

165:15,18 183:14
193:1,6 200:10,18
201:8,17 202:11
204:1 219:19
226:14 228:11,13
249:8 254:12,13
286:8 287:18
289:6 307:20,22
321:4,9 335:6
354:17,18 371:8
380:16 384:1,19
396:5,10,22 409:7
409:9 415:16,19
415:22 417:17
421:17 422:4
424:2,19 425:7,16
428:9
**recorded** 50:21
**records** 11:9 86:11
95:9 101:22
108:14,17,19
109:1,7 121:8
124:16 144:11
145:21,21 149:1,6
149:12,13 154:7
164:14,15 167:10
231:21 270:14
272:11 282:6
304:9 336:6,7,10
346:2 356:3
359:21 361:21
393:6 398:10
400:4 403:16
409:14 412:22
413:8 414:3
415:12 416:8
**recruited** 22:12
**redefining** 208:13
208:14
**reduce** 46:4 253:3
253:21 255:18
369:19 370:5
372:8
**reduced** 428:7
**reducing** 235:1
**reduction** 254:9
**refer** 7:5 24:1

86:12 87:22 209:8
252:1 291:6 306:5
388:4
**reference** 104:17
139:6 228:3 229:7
229:13 305:11
312:6,11 318:6,15
**referenced** 49:20
112:16 113:20
180:11 181:19
228:18 308:21
316:1 334:16
350:22 385:4
**references** 336:22
411:9
**referencing** 208:22
228:9 310:10
328:5 386:2
**referred** 149:6
179:18 253:7
326:16 355:13
388:5
**referring** 35:12
86:17 90:16 138:8
149:9 165:1,6,19
220:14 223:5
233:22 262:15
263:20 265:6,20
373:2 391:14
**reflect** 6:9 7:21
164:9 192:19
338:6 416:1
**reflected** 17:12
22:16 124:19
125:2 167:10,12
167:16 216:20
286:4 287:2 293:4
293:9,13 319:14
372:21 413:8
**reflecting** 209:10
**reflective** 193:6
236:3 237:8 256:3
**reflects** 346:18
372:5
**refreshing** 291:13
**regard** 27:3 57:13
73:21 99:20 164:2

177:9 342:4
**regarding** 22:14
25:2 29:17 30:11
44:12 50:14 51:11
80:9 92:13 162:12
163:11 276:8
284:4 287:17
346:12 375:22
396:13 423:22
**regardless** 289:14
393:22
**regards** 11:9 15:4
17:7 24:11 26:13
30:5,15 31:4,13
36:4 39:14 44:1,5
44:11 50:18,21
51:4,7 52:18 53:9
53:15 71:21 75:9
82:2 101:15,21
102:6,16 103:21
106:3,4,7 114:2
115:2,18 116:3
126:13 134:13
152:5 153:5 181:4
181:10 187:4
255:14 260:10
275:4 293:20
294:2 309:11
327:18 341:10
368:11 384:10
404:19 409:17
**register** 71:10
**registered** 71:7
**registrations** 70:22
**regression** 56:8
57:15 68:13,17,19
69:3,11 70:5
**regressions** 55:20
69:5 70:12
**regular** 88:21 89:2
368:4
**regulates** 164:22
165:4
**regulation** 38:19
165:7 203:16
204:2 227:14
**regulations** 25:16

26:7,13,17 27:10
29:16 30:17 31:4
165:1 168:18
169:15 174:5,16
**reiterate** 9:14
**relate** 235:14
368:17
**related** 20:11 25:15
39:15 40:10 69:6
79:14 142:13
147:19 151:16,19
152:13 155:6
165:2 198:12
220:17 233:15
242:14 271:16
299:5 328:20
331:5 349:17
350:17 373:8
406:22 428:10
**relates** 368:17
**relating** 89:15
177:18
**relationship** 69:8
160:13
**relative** 120:9
220:17 303:15
329:16 363:22
428:13
**relatively** 234:14
330:12 363:19
**releasing** 425:8
**relevant** 60:11
116:18 117:10
125:8 126:1
143:16 150:8,19
151:1,6 153:9
154:22 197:10,11
236:4 357:7 397:6
398:17
**reliable** 51:16
57:11 58:9 61:12
**relied** 384:14,19
**relies** 166:7,9 222:2
**rely** 221:2 223:1
225:16
**remainder** 178:12
**remaining** 113:19

**remember** 78:1
88:11 396:12
407:7
**reminded** 178:10
**remove** 362:2
**removed** 194:19
**remunerate** 36:22
**remuneration**
18:14
**repeat** 7:18 28:13
146:22 159:1
171:14 218:19
237:12
**rephrase** 396:15
**replaced** 42:18
**replicates** 367:15
**replies** 168:4
**report** 4:10,11,18
5:2 9:6,8,18 17:6
19:20,21 21:11
22:1,2,9 48:1,6,10
48:18 49:5,7,20
51:2,19,21 52:6
52:11,12,19 53:19
58:21 62:20 63:3
74:22 78:15,19,21
81:12,15 93:9
108:19 112:17
113:20 126:13
146:8 154:17
158:22 160:3
162:19 166:6
168:4 175:6
177:14 178:8,12
186:7 187:19,21
188:2,10,13,19,22
189:2,17 191:12
203:13 207:9,10
207:12,14 211:2
212:8 213:6 216:6
249:7 262:12
288:19 294:20
315:4 320:12
322:12 325:12
327:7 341:21
354:12 355:3,6,9
355:13 369:15,16

371:11,14,16
372:11,20 373:1
384:17,18 385:5,7
385:9 386:3
387:11 388:20
389:7 399:21
411:17 415:6
418:17 424:14
**reported** 1:22
63:12 96:4 137:21
166:8 203:22
224:1 225:5 273:8
321:13 323:3
335:14 411:19
**reporter** 7:13 28:1
158:15 233:18
237:15 260:8
395:18 424:20
425:20
**reports** 23:10,12
24:15 52:2,7,17
85:10,15 106:6
188:22 348:7,14
355:14
**represent** 6:18
164:22 170:15
272:8 401:2
**representative**
139:2 197:9
241:19 242:2,20
**represents** 226:1
333:20 369:18
**requested** 28:1
158:15 233:18
237:15 260:8
**requests** 384:12
**require** 7:8 57:16
143:1 204:14,21
205:2 287:6
307:13 372:17
**required** 390:17
**requires** 257:12
287:3,16 375:21
**research** 18:15
25:13 41:17,22
54:10 66:19
327:11

**resemble** 117:22
118:1
**residual** 299:19,21
**resigned** 18:5
**resource** 28:18
334:13
**resources** 23:4
47:21 108:10
359:21
**respective** 308:2
381:2
**respectively** 179:3
**response** 7:8,9,13
79:10,14 80:9
103:10 110:2
117:18,21 384:17
**responses** 9:18
64:10
**responsibilities**
25:20
**responsibility**
29:21 169:6
**responsible** 34:2
**responsive** 385:8
**rest** 218:17 311:13
**restate** 7:18 97:12
247:15 365:8
**restating** 208:4
**restrictions** 143:2
**restrictive** 47:9
298:18
**result** 83:18 167:2
167:3 195:21
196:4 207:22
227:5,6 237:1
238:5 242:17
373:4
**resulting** 224:18
**results** 69:16,16
126:1,12 130:4
133:17 195:4
205:18 239:15,20
248:14 252:1
258:12 259:3
262:5 294:18
323:6 326:12
348:8

resume 72:20
retained 12:11
  13:22 54:5,20
  73:13
retention 11:12
retirement 42:22
  43:2,5,11,13,15
  43:17
retrieve 63:15
  409:1
return 22:2 93:21
  93:22 375:8
reversal 180:6,6
  277:13,19,21
  279:15,20
reversals 180:9,12
  286:13
reversed 313:2,4
review 9:16 21:16
  40:14 48:16 50:7
  50:9 89:12,19,22
  91:2,5 92:15
  95:16 96:20 97:8
  97:14 98:19 99:22
  100:7,8,11 113:4
  113:5 119:14
  127:13,19 164:13
  188:6 201:13
  247:1 270:13
  271:2 290:9
  324:20 354:15
  355:17 383:17
  409:14
  reviewed 9:5 10:2,5
  11:7,8 31:13
  34:19 48:5 102:7
  128:14 162:17
  163:8 170:18
  179:12 187:20
  189:1 214:6
  272:14 300:12
  305:5 347:22
  352:13 384:14
  reviewing 9:4
  34:21 88:9 90:19
  94:2 124:15
  329:15

reviews 92:14
ride 365:18
right 12:18,21 13:1
  13:5 38:9 39:11
  51:12 53:17 56:13
  56:13 57:6 66:18
  67:18 78:4 86:4
  88:7,12 92:6
  94:14 104:3 105:9
  110:14,17,20
  112:12 113:15
  115:16 121:16
  123:4 125:17,18
  126:7,21 127:1
  128:16,17 131:15
  135:14 136:12
  138:6 144:10
  146:9 147:7,18
  149:8,15 150:2
  153:16 162:22
  166:2 172:11
  174:20,22 176:14
  177:6,8,9,17
  182:20 185:5
  186:6,13 190:14
  190:16,20 192:22
  196:3 198:11
  205:21 208:9
  209:16,18 210:15
  212:21 217:7
  218:12,14 221:11
  222:11,12 227:2,7
  229:17,21 238:2,9
  240:20 241:1,20
  242:11,13 243:1,2
  244:19 246:2
  250:20 251:20
  255:3 261:16
  263:9 264:3,11
  265:15 267:8,10
  270:6 271:15
  275:5 276:1,15
  277:8,9,17,19
  280:9,19 281:11
  281:13 283:11
  284:1 285:10
  286:20 288:4

289:13 291:19
293:17 294:7
295:7,20 298:1,21
299:5 300:6
301:19 302:5
304:2 306:11
308:9 309:6,10,14
309:20 311:16
312:13 313:16
314:9 316:2,3
318:9 320:5
321:19 322:5
333:2 334:12
336:6,7,8,11
337:1,11,15
338:16 340:17
341:14 345:3
346:20 348:10
350:7 351:19
352:2 353:20
362:9 363:17
364:17 366:17
368:19 370:8
374:11 376:9
378:1,6,14 379:6
380:2,3,13,14
381:17,18 382:1
386:18 387:7
390:9,13 391:13
392:12 395:15
397:18 401:16
404:17 405:7
407:12 408:5
410:14 412:13
415:8 416:18
417:9,10 418:11
418:21 419:11,18
421:16 422:8
423:17,18 424:3
rise 362:18
risk 23:15 44:11,12
  93:21,22 94:3,15
  94:20 134:12
  152:5,7,12,17
  153:5,9,12,15,19
  153:22 154:5
  161:6 253:3,21

254:9 269:15
287:7 307:12
365:16,22 366:1
366:15,19 369:19
370:4,5,9 372:8
372:20 373:4,10
373:18 374:1,7,12
374:20 375:6,8
376:11,17,20
377:10 378:12
risked 132:1
risking 377:5,6
risks 366:7,18
  376:5
rmr 1:22 2:19
robust 23:13,17
  59:10
role 14:19,20 22:15
  22:17 25:7 84:4
roman 22:9 48:2
room 46:9,15
rotate 316:2
rough 315:2
roughly 47:17
round 179:17
  181:18,21 182:6,7
  182:13,17 183:11
  183:15,18 184:2,7
  184:19 185:9
  221:15 222:9
  277:18 286:3,10
  287:22 289:15,20
  290:16 294:13
  298:19 299:8,18
  300:10,16 301:1,5
  301:11 307:7
  308:8 311:12
  319:22 320:2
  325:3 326:8
  342:18 345:2
  375:17 400:20
  401:2,5,12 403:14
  405:18 406:1
  412:3,7,10 417:5
  421:5,7
rounds 222:11
  405:21

roundtrip 97:21
roundturn 178:20
routed 203:11
rule 165:7 227:18
rules 7:5 25:20,21
  25:22 26:1,12,17
  30:1 41:18 305:15
  305:16 378:2,9,12
run 31:18 32:13
  45:8 52:10,17
  53:14,21 54:2
  55:16,21,22 56:8
  56:18 68:10 69:11
  70:12 123:11
  125:16 194:7
  220:16 246:13
  296:6 322:3 323:8
  324:15 341:17
  running 55:20
  57:13 61:10
  201:16 349:13

_____

S

s 1:4 2:14 3:1,7 4:7
  6:1 134:19 230:3
  230:5 270:17
  273:3 316:4 330:2
  330:17,17 331:8
  377:16,18 378:22
  379:11 381:2
  400:18
sachs 18:9
sale 132:18 183:16
  183:17 281:6
  364:10
sales 108:13,17,19
  109:1,4 132:18
  405:16
sample 4:20 56:12
  56:22 57:3,10
  58:1,20 61:20,22
  62:5,6,6,10,16,19
  63:9,20 64:9
  68:11 87:6,10,11
  129:2,6,10 139:18
  197:9 200:8,21
  201:1,22 214:5

232:20 237:8
239:5,9,13 241:10
242:2,9,12 244:2
244:4,8,9,9,14,19
245:18 297:9
311:6,7,8 323:21
332:6,9,12,13
**sampled** 195:7
**samples** 57:18 58:4
59:22 60:5,6 64:1
122:17 195:14
246:21
**sampling** 242:6,13
242:13
**sas** 5:1,6 9:20,20,21
10:2,3,22 14:22
15:3 55:20 88:12
107:13,16 201:8
201:11 321:2,11
322:22 324:3,10
324:14,15,21
325:5,6 334:16
335:10 337:17
348:16 349:18
398:17
**sat** 35:1 107:11
**saturday** 231:9
**saw** 76:20 79:3
94:13 95:9 96:21
96:22 166:15
167:1,2 169:2
358:9 360:2
391:10 392:14
393:10 406:22
**saying** 70:11 91:12
99:18 104:12,19
119:22 120:2
125:4 144:19
150:22 167:14,21
168:3 170:21
171:1 192:13
198:1 213:7
214:13,14,15,16
215:7 223:22
236:8 311:17
340:20 392:13
394:20,21 402:21

416:18 418:21
**says** 22:11 25:1,13
31:2 59:10 81:7
137:14 147:20
157:18 165:9
166:3 172:15,16
172:18,19 173:9
173:11,13 175:17
193:1 200:19
201:22 249:9
250:21 251:17
267:18 268:17
303:12 304:19
308:10 310:16
373:3 385:5 389:7
389:17 411:1
414:20
**scalpers** 361:7
**scalping** 360:22
361:3,6,9,13,19
**scan** 11:2
**scanned** 15:19
**schafer** 14:2,3,4,13
15:21 16:3 52:21
53:9,20 87:7,16
101:15 107:6,8
110:8 321:16
398:19 406:21
410:6,8 411:8
**schafers** 14:19
101:20
**schedule** 335:12
**scholes** 37:19
**school** 18:1,15
**scope** 174:14 326:8
342:18
**screen** 414:10
**screens** 42:14
**se** 132:2 368:2
**search** 393:6 394:1
**sec** 305:16
**second** 4:16 9:5
49:22 55:4 68:16
79:16 90:10
112:22 113:9
138:12,17 158:13
158:13 164:12

175:21 183:11
200:21 201:11
204:15,20 206:16
207:12,17 210:17
222:21 254:12
272:13 281:6,10
282:17 285:13
289:9 304:20
321:19 361:14
371:17 372:2
382:19 414:14
415:17
**seconds** 279:3
284:10,10 285:21
339:14 383:8
**section** 49:11
**sections** 38:12
**sectors** 316:3
**securities** 70:19
**see** 22:10 48:3
49:16 79:5 81:8
85:4 96:19 97:6
97:18 98:14
119:16 120:1,22
121:6,9 125:4,6
139:21 142:10
151:1 154:7 162:3
166:20 167:14
168:6 170:5
171:21 183:12
187:14 194:7
195:4 198:5 202:7
206:20 213:13
228:1 229:14
236:2 238:17
249:5 258:11,15
258:18 259:19
268:11 279:4
282:10 284:6
294:14 315:1,6
323:4 326:2
357:15 358:21
359:20 360:16
371:17 390:22
392:22 393:7,20
394:3 405:11
410:12 413:5

416:18
**seeing** 99:6 170:17
170:20 189:16
**seen** 39:3 78:22
79:2 92:22 109:18
113:10 141:8
161:17 163:7
178:14 179:11
181:4,8 189:2
206:10 260:15
261:7 272:15
**select** 60:9,13
**selected** 60:6 156:6
246:17
**selecting** 60:11
128:16 152:16
193:16
**selection** 61:14,22
62:15,16,17,19
63:9,14 128:13
129:10,19 328:7
**selections** 322:2
**selects** 59:22
**selfreporting** 60:21
**sell** 83:21 84:1 94:6
107:1 114:16
176:17,22 177:2
184:6 185:6,8,11
185:13 222:8,18
223:15,15,15
273:19,21 274:4
274:18 275:9
276:15 278:20
280:13,13,22
283:1,2,2,13,14
284:9,17,22 285:4
285:5,5,19 369:4
401:2,6 420:2,20
421:2,6 422:5,7,9
**selling** 19:9 29:12
176:7,7,8,8 263:5
265:16 268:10
283:5 361:14,15
**sells** 223:14 291:21
379:18,21 400:19
401:10 404:6
**semantics** 394:4

**semester** 17:13,22
**send** 183:10 285:22
285:22
**sending** 29:1,15
**sends** 28:21
**sense** 23:20 31:7
65:16 68:9 81:9
91:13 95:2 130:8
133:16 134:7,8,9
149:4,9 152:8
195:16 248:6
257:12 306:2,7
323:19 326:12
328:17 352:17
364:13
**sensitive** 362:22
367:7
**sent** 9:22 27:21
276:21 410:3
**sentence** 22:16
137:17 138:8
139:22 140:4
175:15 176:13
304:20 373:3
**separate** 26:15
45:18 65:9 109:17
165:11 223:19
224:14 299:15
370:3 401:3 406:9
**separates** 65:6
**separating** 112:9
**september** 134:14
189:7
**sequence** 148:20
275:6 286:9 377:2
401:7
**series** 7:7 15:9 59:8
71:3 97:21 114:5
217:7 223:13
224:17 261:8
301:2 305:16
313:22 377:2
389:10 401:9,13
421:15
**service** 36:22
**session** 315:18
316:13 318:12

398:6
**sessions** 315:20
316:2,6
**set** 4:16 9:5 10:6
39:22 40:15 59:5
67:1,18,21 68:11
93:5 98:1 108:3
108:21 112:22
113:9 117:22
138:21 146:17
201:18 202:3
233:13 235:12,12
236:2,8,14 237:18
257:7,8 281:21
305:19 315:20
322:5 323:4
337:14 386:22
**sets** 62:7 68:13
82:10 111:11
130:16 152:18
159:8 226:6 236:3
321:20 322:4
323:1,7
**setting** 68:6 271:17
387:16
**settings** 371:7
**settle** 230:21
**settled** 111:19,22
116:2,4
**settlement** 35:20
230:22
**settles** 31:1
**seven** 164:11
176:10,17 177:1
217:7,13 218:16
219:4,10 274:1
338:7,13 360:15
378:22 379:12,17
381:12 382:3
393:11,12 394:5,6
394:7
**sevenhour** 340:8
**seventh** 19:2
**severe** 357:10
**shaking** 417:3
**share** 263:12
306:14

**shares** 263:14
271:12,16 328:12
**sheet** 347:4 427:8
**sheets** 146:14
**shift** 338:16
**short** 71:17 84:2
118:2,3,4,9 119:4
120:9,19 121:8,14
122:8 125:1
178:21 182:8
200:11 272:3
275:7 277:10,22
278:6,21,22 284:9
284:13,20 285:9
286:11,16,16
293:2 307:21
335:7 354:20
358:15 359:9
361:4,18 363:2
367:14 380:17
396:6 402:22
404:3,6 405:13
409:10
**shortcomings**
224:10 326:22
**shorter** 102:10,21
103:21 140:5
373:5
**shortterm** 361:4,16
**shoulders** 7:12
**shouldnt** 141:20
342:20 417:6
**show** 27:8 90:11,15
109:9 110:21
159:15 184:4
189:13 190:21
271:19 302:22
320:19,22 337:16
343:9 348:17
351:14 413:11
414:3 416:7
**showed** 51:13
76:19 167:4
216:16 283:20
291:7
**showing** 92:8 141:9
183:4 200:14

228:4 321:6
349:17
**shown** 162:20
**shows** 416:1
**shredder** 409:2,4
**shrinks** 331:6
**shrug** 7:11
**shuffle** 383:15
**shut** 119:4
**sias** 350:5,5
**side** 84:19 111:12
126:13 127:2
234:6,21 258:6
276:19 280:3,4
328:12 329:1
351:8
**sides** 128:11 192:8
340:14
**sign** 46:1 425:20
**signature** 22:4 49:6
425:22 427:12
**signed** 17:4 78:10
427:8
**significance** 140:11
140:11,14,19
**significant** 57:10
357:7 386:2,4,7
388:2,6,10,12,16
**significantly** 332:2
**signify** 249:19
**similar** 19:11 28:18
49:10 62:16
109:16 119:17
121:1,9,14 124:8
124:22 125:9,22
126:9 129:18
131:14 325:9
**similarly** 126:9
192:11
**simple** 57:18 68:10
219:14 349:15
**simply** 313:21
**simultaneous**
364:10 387:19
**simultaneously**
55:7
**single** 114:16

226:17,21 358:9
400:16 410:1
**singular** 222:15
**sir** 50:11 85:22
92:22 100:6
109:19 155:5
200:16 204:3
214:17 321:7
344:19 347:4
404:18 408:11,21
414:16 419:8
**sit** 100:12 111:13
344:8 376:16
424:13
**sits** 307:18 337:11
**situation** 173:5
181:15 192:15
197:3 212:5 332:7
373:13 374:15
**six** 12:10,13 13:4
13:20 35:1,3 36:4
77:6 240:10,10,13
241:13,16,18,22
242:3 273:7
279:11 286:10
296:8,9 322:8,8
360:14 371:10,15
376:19 416:12
418:18
**sixandahalf** 309:16
311:22 312:2,19
317:16 318:1,4,15
**sixmonth** 123:5
186:18 187:2
**sixth** 34:20
**size** 56:4,12,15,17
57:2,3,10 58:1,20
84:3 110:18 134:5
139:18 140:2
141:2,12 151:17
152:21 153:3
155:16,19 159:16
160:11 162:20
164:9 178:19
201:1 202:10
206:1 234:3 235:1
238:4 239:13,14

241:7 244:16
258:18,20 262:10
262:13 263:2,10
265:9,14 267:20
271:9,11 290:21
291:1,16,19 292:1
293:20 295:12
297:10,11 300:9
300:15 301:22,22
309:13 323:21
325:2 327:18
328:10 329:17
332:6,6,9 333:5
334:5 342:22
348:8 374:5,8,21
375:12 380:5
389:13 390:22
391:4 406:16
**sized** 391:18
**sizes** 56:22 205:22
245:19,19 263:3
266:10,17 288:16
288:17,21 295:18
296:10 301:12
321:12 332:15,17
333:10 373:5
**skewed** 138:19
314:11
**skewness** 314:19,21
**skill** 138:1,19
192:18,19 195:20
196:19
**skype** 53:11
**slew** 26:3
**slice** 322:20
**slightly** 68:1 110:17
**slot** 240:9,22 414:4
**slots** 322:14
**small** 43:10 56:22
58:7 132:8 146:17
155:18 164:8
181:2 234:14
329:16 330:10,13
389:8 394:18
**smaller** 253:10,13
256:12 267:20
268:2,3 300:22

301:1 302:15
373:4 389:10
390:22 391:3,18
392:3,6,6,8,14,15
392:22 393:2
**smallest** 393:7
**snapshot** 90:7
**soat** 1:8
**society** 327:4
**soes** 179:21 180:22
180:22 181:1
309:5
**software** 55:19
**sold** 46:16 127:5,7
132:7 176:9 182:8
210:20 271:17
274:1 289:21
291:2,21 292:12
292:13 393:11,11
393:12 417:11,14
423:19
**solid** 80:13
**solinsky** 3:6 148:6
289:9 354:16
395:4,11,15,21
396:4 409:3
415:22 423:12
**solution** 56:10
**somebody** 43:12
202:21 250:21
328:8 383:7
**someplace** 203:11
**somewhat** 136:7
208:10
**sorry** 28:13 37:3
66:4 92:5 146:22
164:12,13 171:14
191:14 237:13
239:12 244:22
260:6 266:7
273:14 275:22
282:14 283:6
285:19 290:7
313:5 319:7
321:18 343:14
346:9 400:6
408:18 414:5

415:1,9,14 418:3
418:8 419:2,22
422:5
**sort** 37:14,16 38:22
41:21 56:1,3
57:16 59:10 84:3
84:13 91:10
103:15 111:17
144:9 175:3,4
185:6 201:8 223:2
240:18 249:18
250:18 261:16
266:21 307:17
329:4 334:18
350:15 397:11
**sorts** 56:1 83:17
255:8
**sound** 163:3
**sounds** 10:21
**source** 29:11 51:16
95:4 110:10 201:7
305:11,11
**sources** 4:19 48:2
49:11 63:10,14
145:22 149:19
200:7,19
**speak** 8:10 10:9,11
20:13 35:7 372:2
**speaking** 10:19
17:15 59:4 61:19
114:15 135:7
136:17 137:6
209:3 244:2 247:4
376:10
**speaks** 279:7 372:7
**specialization**
304:3
**specific** 9:3 60:14
64:17 69:8 81:6
99:13,13 116:6
136:4 151:13,14
226:10 231:6
242:19 270:1
303:13 332:7,8
401:11 416:8
**specifically** 38:17
90:18 93:15 169:5

181:19 265:6,7
301:11 360:11
**specified** 115:15
278:13
**spectrum** 59:8
**speculating** 260:17
361:10
**speculation** 26:11
114:14 125:14
136:22 142:19
147:5 151:4 152:6
156:11 164:1
169:18 171:7
172:6 185:15
193:10 196:22
197:19 198:9
204:17 205:20
206:9 207:1 217:3
217:16 221:9,20
226:20 238:7
239:22 245:8
246:9 248:5 249:1
250:8,15 251:7
252:5,13 253:12
254:21 255:6
256:6,18 257:17
258:14 259:7
260:1 261:10
262:7 264:22
270:4 274:6 275:2
275:12 276:9
277:7,16 279:18
286:7 290:3 293:7
298:12 300:20
301:9 302:3 317:7
329:20 337:7
353:4 357:20
361:2 362:4
363:11 365:3,14
366:10 367:3
371:4 373:20
375:1 376:22
378:16 379:16
383:5 388:14
390:20 391:7
399:6 402:19
404:1

**speculative** 353:5,8
353:10 358:9,11
**speculator** 353:1,6
**speculators** 21:5
353:20
**spellings** 350:5
**spend** 13:7 98:3
154:20 189:14
**spent** 13:13,18
15:22 40:17
107:15
**spikes** 135:12
**split** 226:6
**spoke** 157:15
**spoken** 73:16
**spot** 28:8 178:11
**spread** 263:18,19
323:19
**spreadsheet** 86:11
86:13,17 90:5,6
90:16,17 325:10
344:19 356:21
357:1 414:18
**spreadsheets** 87:1
90:19 104:22
106:12 145:21
**spring** 17:1 311:9
**stable** 261:17
**stack** 200:2
**staff** 22:14,16 24:1
24:2 25:3,8 34:13
34:19 136:16
183:8
**staffing** 40:12
**stage** 78:5
**stages** 222:7 225:8
225:9
**stambaugh** 350:4
**stamp** 90:11 146:1
146:7 202:19,20
203:2,10 204:7,8
204:11,15,22
206:7,18,20
274:14 278:8
307:1 314:2
338:22 345:12
410:4 413:15

418:12
**stamped** 203:6,15
203:22 210:19
277:9 289:7
313:15 317:19
390:8 416:20
**stamps** 107:2 108:4
202:1,4,18,22
203:3 205:2,8
206:15 209:3,6
211:3 212:12
229:4 230:6
324:19 398:3
407:2 413:14
**standard** 65:12,17
65:20 140:11
315:18 318:5
333:4,7 337:4,18
338:18 340:7
412:20 413:1
414:1
**standardized**
106:21
**standing** 276:7
278:8
**standpoint** 177:4,6
**stands** 181:2
**starks** 350:6
**start** 51:1 119:11
171:16 213:7
217:21 234:15
251:2 272:21
403:3 410:19
**started** 12:14,17
16:22 41:16
113:22 116:7
304:10 319:8
340:13 344:22,22
345:17 395:6
410:7 415:8
422:16
**starting** 82:15
159:4,5,9,11,12
235:18
**starts** 24:22 248:12
306:19 320:18
**startup** 40:10

state 6:20 10:10
72:12 73:12
137:18 144:16
160:5 234:11
235:21 236:13
330:11 385:1
stated 94:11 118:14
123:1 319:7 334:9
360:18
statement 34:17
59:12 61:14 63:22
64:8,12 66:12
88:5,7,15,19 89:6
147:20 159:8
165:13,14 167:16
167:16,21 168:10
170:5 213:18
214:4,6,19 216:11
225:15 255:1
268:15 280:9
293:9,13 309:19
310:18 311:20
312:20 319:15
356:4 369:22
372:6 386:3
387:10 388:4
389:6 390:21
392:22 394:16
statements 11:3
46:20 87:20 88:9
88:18 89:9,13,14
89:19 90:1,3 94:8
94:8,9 95:3,17,17
95:18 98:10,13,15
98:20 100:1,8,9
101:22 104:22
105:1 106:13
117:7 124:16,18
127:13,14,17,20
130:12,13 142:10
142:12 147:15,17
148:17,19 164:19
255:13 293:5
319:3 355:21,22
356:5 359:7
372:11 384:14
388:22

states 1:1 6:13
415:6
static 257:11
259:17
statistic 315:9
332:15 333:20
statistical 20:12
23:13 31:18 32:12
33:1 54:7 55:19
56:1,3,15 57:7,10
58:3,6 61:21
62:12 66:13 68:6
69:13 70:2 84:10
126:5 130:8
137:19 140:8,10
140:14 159:15
160:9,13 242:5,13
242:13 243:21
260:15,20 261:7
262:1 306:7 315:4
316:20,21 364:12
statistically 59:4,10
128:12 234:13
244:2
statistician 129:13
statistics 33:3
102:3 125:15
129:15 195:18
333:3
stats 104:14 129:14
148:3
status 133:12
214:18
stay 363:8,13
stemmed 111:9
stemming 222:19
stems 368:7
stenotype 428:7
step 37:3 55:1,4,13
194:18
steps 54:4,6 63:16
stick 408:11
sticker 354:10
stock 19:10 41:12
41:12,21 46:3,5
109:7 330:13
350:10

stocks 47:5,6,8,9
89:16
stop 8:6 31:19
158:13 374:18,18
381:6,7,13
stopped 382:9,10
382:19
stops 383:7
story 67:11
straight 369:12
strategies 37:6 40:9
91:19 93:13 104:5
131:8 191:21
355:15 362:20
384:16,21
strategy 36:11
79:15 80:14 95:10
105:4,14,19,22
131:6,7,12,20
132:2,5 150:20,21
151:2 355:18
356:6 357:17
358:3,6,12,17
359:12 360:5
365:5 366:6 385:3
385:6 387:12
388:3,7,9,11,17
street 2:15 3:9,16
279:20
strength 375:3
stretch 8:3
strike 43:14 51:5
70:4 101:5 118:7
131:18 154:11
180:5 203:4
224:12 230:3,5
286:22 315:16
352:8 357:14
364:4 374:6
409:18
structure 33:11
41:18 261:16
329:5,8
student 19:7 38:11
38:14,17,18 39:14
45:11 46:6
students 19:8 38:11

39:20 45:19 46:1
46:6,10,12,21,22
47:19 356:17
studied 305:1
studies 60:8 266:2
266:12,16 267:15
306:12 328:3
341:10 350:8,10
350:13,19,21
352:6,8,10,15,17
study 58:1 59:21
60:3,6,7 61:4
64:14,18 161:17
162:4 163:7 179:8
179:12,15,19
180:11,14,17
181:4 186:3
267:18,21 268:17
305:12 308:12
327:8 347:16
350:2 409:20
stuff 195:1 272:14
320:8 330:2
styled 6:12
sub 190:15
subgroups 140:9
subject 60:12 71:20
81:21 90:2 146:19
150:9 199:5 221:4
222:4 308:18,19
378:12
subjectively 58:17
submission 30:14
submit 269:12,13
submitted 27:18,19
188:16
subsample 140:20
196:12
subsequent 79:17
313:14
subsequently 77:14
274:20 393:8
subset 123:13
223:8 311:3
subsets 53:15
238:18
substance 6:19

substitute 63:5
subtle 156:12
subtlety 404:16,19
success 195:4 199:9
successful 155:22
suffered 382:7
suggest 352:18
suggested 140:10
suggesting 330:5
suite 3:17
sum 49:18 51:3,6
52:2 122:16
146:17
summaries 164:16
166:12,15 190:4
summarize 11:11
summary 8:22
85:15 88:1,4 90:6
137:15,18 207:16
324:18
sums 190:8
supplemental 4:11
9:8 48:17 49:4
51:21 52:19
187:19 188:22,22
207:9,14 355:6,9
384:17 385:5
387:11 388:20
supply 262:16
328:12
support 23:5,6,6
25:4 66:14 214:19
315:5 350:3
supports 66:14
supposed 31:2
197:13 203:4
supposedly 418:9
418:14,18
supposition 145:20
sure 8:1,9 9:13 10:2
10:5,18 16:2
30:20 46:1 52:12
59:17 63:3,11
64:16 71:16 88:14
90:3 93:21 99:2
102:21 103:1
107:14 108:2

110:13 112:19
122:15 123:12
148:15 150:15
152:11 161:4
169:10,19 189:12
193:22 201:20
203:16 204:1
208:11 243:11,16
243:16 259:8,10
291:13 296:11
306:11 314:17,18
314:22 316:17
317:8 321:19
326:16 345:8
348:1,16 349:3,15
377:4 384:11
385:22 389:12,21
394:20 399:1
400:1 408:10,13
408:15,20 415:18
**surest** 212:5
**surpassed** 132:9
**surveillance** 22:13
**susceptible** 56:22
207:21 208:21
210:8,22
**suspense** 401:10,17
402:12,15 403:1,4
403:7,16,18
404:20,21 405:3
405:12,17
**suspicion** 120:15
**suspicious** 115:8,11
115:12 116:11,12
116:13 119:7,9,10
119:11 120:9,11
120:19,21 196:18
197:9 245:5,20
**swaps** 19:16 36:15
37:5,9 38:15 39:7
72:3 73:1
**sway** 27:2
**switch** 269:1
**sworn** 6:5 428:5
**symmetric** 138:22
**synthetic** 367:10,12
367:14

**syracuse** 17:1,8,15
17:16,17,20 18:4
18:5 19:12,14
37:21 38:5,6 39:8
71:22 72:8
**system** 181:3
335:16 336:4,6,9
336:17,21 337:1
337:13,14 343:16
347:20 348:7,13
349:7,8,13 385:11
385:14
**systematic** 61:10
**systems** 40:15

---

**T**

**t** 4:7
**table** 295:2 322:11
322:12 323:3
326:17 331:22
341:21 376:17
**tables** 310:17
349:16 399:20
**tainted** 128:20
221:3 222:3
**take** 7:14 8:2 21:15
37:3 48:14 50:7
52:5 54:4 63:16
71:14 74:7 84:16
92:11 113:4
123:17 152:12,16
156:19 188:5,8
191:4 193:21
203:12 204:3
221:4 240:4,8
257:9 262:5 272:1
272:2,13 275:17
281:8 291:12
294:22 297:7,14
302:10,14 329:1
333:3 334:20
335:3 354:15,16
361:12 362:21
363:2,4,6,12,16
375:6 381:4
383:17
**taken** 6:11 71:17

110:4 129:9 137:9
160:20 185:9
200:11 216:4
226:5 227:8,8
272:3,8 307:21
335:7 354:20
357:10 360:21
380:17 396:6
409:10 428:3,6,12
**takes** 162:8 175:1
**talk** 47:21 68:16
85:5 86:3 104:18
163:5 164:21
181:17,21 186:8
192:17 255:11
262:11,12,13
265:5 267:15
306:17 309:15
328:3 342:15
353:7 368:4
425:17
**talked** 9:10 15:7
93:20 107:11
128:15 161:4,5,5
309:13 317:12
352:2 375:11
397:11 398:7
**talking** 26:16 34:12
66:7 74:22 81:16
86:19 88:5 89:16
96:17 105:11
123:5 131:21,22
148:10 164:13
165:22 166:16
220:9 222:9
223:17,19 240:13
255:12 261:13
263:8,18,22
265:11,19,20,22
267:2,11,15 269:1
308:4 309:1
312:17,18 328:2
329:13 332:7
365:21 372:13
383:2 389:15
**talks** 202:9 331:22
387:2

**tap** 69:18,20
**target** 36:8 257:11
**taught** 19:5,12,14
19:15,16,18,19
36:15 37:4,21
38:4,6,7 72:1,2,7
72:10,11 73:6
102:3
**tautology** 300:22
**teach** 19:4,5,6 37:4
37:9 38:1,3,8,10
72:17,22 131:7
356:12
**teaching** 18:12,19
37:7 131:10
**team** 22:12,18
**technically** 17:15
72:15 364:13
**techniques** 68:13
**tell** 22:15 31:12,17
32:11 35:3 37:3
45:20 67:11 74:1
76:12 85:8 106:10
111:21 121:20
148:12 157:13
163:12 175:21
178:18 185:3
204:5 214:15
216:21 217:12
223:4 225:4,4
253:19 266:17
272:18 275:9
281:3 282:8 288:5
313:18 325:17
326:21 334:14
347:8,12 367:21
408:19 411:1,4
**telling** 129:5
**ten** 49:6 113:14,19
141:1 178:16
182:8,8,8,9,12
184:6,6 209:9,22
210:18,19,20
211:18 212:16
227:6 234:20
237:20 239:17
248:11 251:22

262:12,14 281:19
281:19 333:14,18
333:19 369:15
371:14 379:11
395:3
**tend** 302:12 316:2
**term** 20:6 27:14
29:3 31:20,22
58:21 59:3 61:20
66:8 68:17 75:9
82:9 97:15 100:2
100:13 103:22
104:15 108:16
115:3 120:20
121:8,14 122:8
133:22 134:3
138:2 178:11
203:13 214:1
243:21 252:21
257:2 277:14
312:22 330:17
385:3,20 386:1
405:14 406:8,14
**termed** 120:11
**terms** 11:11,13,13
27:4 37:17 62:3
69:11 160:10
174:5 193:18
208:12 323:21
334:5 354:4 395:5
396:17 398:10
**test** 54:13 57:4,11
60:12 61:8 66:18
68:6,10 69:7,11
70:2,5,9,9 99:9,12
99:13 107:14
122:15 123:12
128:22 131:19
141:17 143:22
144:2 147:1 150:5
150:8 151:8,8,12
151:12 153:5,13
156:2 163:7,17
186:10 187:11
189:21 193:13,14
194:7 196:15,19
198:5 234:10

237:1 238:9,9,12
238:14 239:9
240:2,22 242:6
246:2 260:15,16
260:20 261:19
262:2,4 294:17
298:17,20 299:3,4
299:8 300:5 303:8
319:19 322:22
323:9 348:8 357:2
391:20 393:6
409:17 421:10,11
tested 53:2 59:22
138:5 147:1
153:12 161:12
163:21 238:16
380:9 411:22
tester 237:6
testified 6:6 16:13
21:3 24:13 397:13
398:11
testifying 20:5
testimony 8:15,17
18:18 19:22 20:10
24:10 26:10,16
30:13 101:17
118:11 218:3,5
332:11 346:7,12
369:9 370:13
392:18 394:14
409:19 410:20
413:21 424:15
427:5,6 428:4,6,9
testing 57:2 68:3,19
69:3,4 70:6 99:18
122:18 126:11
129:1 142:1 145:4
146:19 155:2
157:5 158:18
160:21 161:6
163:12 232:15
240:5 242:1,17
352:19 382:15
tests 23:9 52:10,18
53:14,21 54:2
55:16,21 56:1,3
56:21,21,21 57:13

57:16,17 58:4,19
61:9,12 67:13
70:12 84:10 130:8
131:17 133:20
139:13 140:8
159:15 162:17
195:14 201:16
246:14,20 295:4
334:9 341:17
348:9,16 349:14
text 181:19
textbook 39:1,4,8
39:10,13,16 51:13
73:7,8 163:8
181:12,16 305:10
308:18 367:20
textbooks 163:15
texts 53:6
thank 8:9 22:8
70:17 72:7 140:3
183:10 188:13
239:12 268:14
277:2 289:8
319:13 400:8
415:14 423:13
425:18,19
thats 6:22 13:9
17:12 20:14 27:10
27:13 31:2 34:16
36:2 39:4 43:11
43:12 45:14 56:11
58:6 61:3 63:6,12
66:2,6 68:9,20
69:22 72:5 74:7
75:15 76:11 81:12
82:15 85:13 90:11
94:13,18 95:13
96:1 99:21 105:16
105:17 109:3
112:13 120:1
121:16 122:5,13
122:16 129:14
132:19 134:15
136:11 138:19
144:17 147:6,18
152:20 153:7
154:2 156:8 172:4

172:19 173:13
174:3,9 175:3
177:4,13 178:1,9
182:12 184:6
185:10,16,19
189:8 191:7
192:15 194:3,18
195:8,17 198:10
198:13 201:18
203:10 210:3,21
211:14,20 215:9
218:15 219:12,17
220:19 223:21
224:22 225:19
226:15 227:3,11
231:8 235:9 236:9
237:18 241:3,5,11
242:2,12 243:1
259:8 261:20
262:2 267:4,22
268:13,14,22
269:2,5,15,19
275:22 276:2,3
281:18 284:17
285:3,10,13
288:12,17 289:2
290:13 292:2,4,17
293:12 295:3,21
296:6 297:22
299:3 300:6
302:13,15 306:1,5
306:21 308:22
311:15 312:8
317:2,4,17,19,20
318:6 319:22
321:15 324:17
326:22 328:10
334:3,16 336:5
337:14 338:11,18
340:16 342:2,3
343:5 344:13
346:1 349:2,6
350:16 353:3,11
353:19 354:3
357:10 358:2
359:2 361:7
362:16,22 363:2,4

363:13 366:3
369:11 373:11
374:11 378:4
385:8 386:12,18
387:1,7 390:13,15
391:8 393:10,18
397:7 402:5 403:3
404:14 405:2
407:5 408:5,15
413:20 419:18,18
421:12,12 422:18
422:19,21 423:3
423:17 424:8,18
theirs 410:11
theoretical 163:3
267:11
theoretically 98:17
126:6 147:9
theory 19:15,17
36:11 58:3,3,6
62:12 66:3 141:8
262:13,14,16
303:12 304:20
308:11 325:18
327:1,5,14 328:6
thereof 142:16
theres 46:17 58:8
58:13 59:4,8
61:10 62:19 65:5
65:10 68:12 69:6
75:19 82:18,20
83:15,16,17 94:20
113:14 114:19
129:2,15,17
140:13,19 142:10
144:9 148:8
153:14 158:2
159:6 160:18
161:1,11 171:16
172:9 180:6 185:5
190:22 198:6
199:19 203:21
205:10,22 209:15
211:7,11,12,15
212:12 213:18
214:14,16 215:18
219:8,13,16

222:14,22 238:17
242:6 243:11
249:20 250:22
256:21 260:20
262:1,22 264:10
264:12,14 265:1
266:9,11 269:2
270:6,7,14,18
276:7 279:9
283:12,14 285:3
299:14 303:1,5
305:15,16,19
306:12 312:13
316:3,4 317:18
319:5 323:13
325:12,17 327:1
327:11,13 328:6
331:2 334:2
336:20 338:5
340:20 341:15
342:12 351:4,6
362:5,13 366:1,15
366:16 370:9
374:13 377:15
389:9,9 392:9
393:16 395:22
405:11,21 410:13
413:15 417:8
418:17
thesis 65:5
theyve 39:22 103:5
178:2 278:20
thin 330:10
thing 10:7 57:3
81:6 102:10
106:22 128:8,10
144:17 146:15
148:1 151:15
170:4 173:12
194:3 211:14
219:18 241:6
243:9 259:12
262:3 342:4 353:3
things 20:7 21:3
41:19 53:18 56:2
83:2 103:16
150:11 153:9,17

159:19 209:3
212:22 277:12
315:12 316:16
320:5 335:5
349:15 370:3
406:9
**think** 8:12 12:14
17:10 20:10 23:22
24:4 36:10 41:11
42:1 44:3,13,16
44:16 46:8 47:1
52:13,15 53:17,18
55:8,9,10 56:20
57:12 58:17 64:16
65:7 66:21 67:9,9
67:17 72:20 73:3
73:22 74:7 76:8
76:20 77:19,19,20
77:20,21 79:1,7
79:12 80:22 81:12
82:9 83:7,8 84:18
84:18 85:2,13
86:2,7 92:5 94:5
95:13 102:1,20
103:3,12 104:3,16
110:9,9 111:8
114:19 118:20
122:4,22 124:1
125:15 126:4
128:16 135:6
136:11 137:1
139:18 143:21
144:9 145:9 147:6
147:15 150:12,19
151:7,15 152:2
158:1 160:4
161:15 163:14
169:3 172:9
178:15 180:16
182:2 185:4,10,22
186:13,13 202:2
205:12 209:2
210:16,20 212:20
213:11 214:20
217:4 219:12
223:9 227:3
228:11 235:11

238:8,21 239:7,9
248:9 249:15
250:2,9,16,16
253:6 256:12
267:22 276:17
277:17 284:15
288:3 294:20
296:6,15,15
300:14,21 301:20
302:20,21 306:3
314:6 317:16
322:12 323:9
325:12 327:17
330:2,9,16 331:7
332:12 336:5
340:16 341:14
351:16 353:11
357:11 358:2
359:7,11 365:22
367:17 372:13,18
374:11 375:10
382:21 387:15
390:7 393:10
394:21 397:13
399:8,18 401:5
402:8 406:11,17
406:22 408:11,18
409:5 410:10
413:4 414:8 422:3
422:19 423:12
**thinking** 210:22
**third** 92:6 113:13
139:4,8 224:8
231:10 248:13
323:4 420:11,13
420:15
**thought** 23:7 45:17
76:2 116:20 128:6
150:10 154:21
197:13 201:16
295:8 327:20
341:20 342:4
360:13 383:14
399:22
**thousand** 356:21
**thousands** 263:14
**three** 18:12,17 19:3

24:3 25:12 42:14
138:9 177:21
200:22 213:6
215:11 223:19
224:5,14 225:18
281:12,15 282:2,3
284:11 286:17
322:2,3 323:1
343:10 362:8
381:7 383:14
389:4
**threehour** 322:6,9
**threepage** 343:11
**threshold** 58:16
**threw** 108:7 422:20
**throw** 212:13,22
213:3 371:6 424:4
**thursday** 155:17
**ticket** 15:13,19
107:22 166:11
168:9 169:9 171:2
171:18 172:3
203:15 209:6,9,21
211:16 212:6
213:4,21 214:22
215:4 216:2,16,21
217:1 218:3,16
219:2,2 221:5
236:19 338:2,5
389:22 390:1,5,8
420:9
**tickets** 5:7,8,9 11:3
15:8,11,16 85:14
85:17 86:5,10
87:5,9,18 90:4
101:21 104:21
106:12 108:1,3
123:17 144:15
145:14,22 152:22
164:16 166:1,1
169:2,4,7 170:17
170:19,20 171:12
202:19 203:4,6
209:10,22 211:18
213:13,20 214:5
214:18 215:19
217:19,21 218:16

219:4 225:5,6
226:4,9 228:20
229:1,6,11 304:8
338:5 343:6,18
344:16 345:5
346:22
**ticks** 374:18,19
**tied** 386:17
**till** 14:15 288:7
**time** 8:2,10 9:12
11:15 13:6,11,18
14:9 15:5,21
16:15 29:2 40:16
42:13 59:19 69:19
73:10 74:21 76:14
77:1,2 82:14 83:6
84:2 90:8 92:11
96:11 98:3 99:6
104:7,9 107:2,16
108:2,4,13,17,18
109:1,4 111:12
115:15,16,19
116:18 117:10
118:3,5,9 119:5
119:17 122:1
123:5,16,21 125:1
125:8 126:1,4,5
134:5,13,16,19
135:7,14,17 136:1
136:6,18 137:7
139:20 141:2,4
143:16 145:10
146:1,7 147:3,21
151:8 152:21
153:3,8 154:20
155:20 160:12,12
162:19 165:16
166:5 168:6,19
169:1,12,13,15,20
170:1 171:4
172:17 173:8
174:21 189:6,11
189:15 193:12,19
195:1,3,6,7,9,11
196:16 197:11
199:5,9,10 201:14
202:1,4,5,9,18,20

202:22 203:2,3,6
203:10,15,22
204:7,8,11,15,21
205:2,8 206:6,7
206:14,18,20
209:3,6 210:19
211:3 212:12
217:13,14 229:4
230:6 231:6,12
234:3 236:4,10,15
237:9 238:4 240:9
240:9,22 241:7
248:12 249:9
250:13 256:22
257:9,14 258:1
274:14 276:6,6
277:9 278:8 279:8
280:16 281:6,6,9
281:9 287:1,12,22
288:6,7 289:7
290:18 291:12
294:22 307:1,19
308:2,6 309:4
313:14,19 314:2,5
315:1,3 316:4,4,5
316:9,9,18 317:19
320:5 321:14
322:4,14,16,20
323:2,14,15
324:19 327:7,9,11
327:12 328:14
330:18,21 332:8
332:14,22 334:19
335:12,13 337:5
337:13,18,19
338:1,7,9,10,11
338:19,22 339:6,8
339:9 340:1,7
341:2,4,10 342:22
343:3 345:12
348:9,12,13
351:11,15 354:16
356:13 357:9
358:5 360:8
361:18 364:16,18
366:14 370:14
375:19 376:6,20

377:6 378:2
379:21 380:5,6,9
380:10 381:4
382:18,20 383:1
386:10 390:8,12
391:21 395:5,12
395:16 397:6
398:11,13,21,22
399:3,4,8,14,19
400:1,12 401:21
405:5 406:18
407:1,20 408:17
409:13,15,17
410:4,10 411:21
412:4,20,20 413:1
413:2,14,15,22
414:1 416:7,19
417:14 418:12
419:9,10 421:16
422:22 423:9,12
423:18,20,22
424:3,4 425:2,18
**timeline** 44:5,7
**times** 8:14 10:8
13:16 31:12,17
32:11 73:3,3
82:17,18 141:11
159:17 169:14
187:15 192:2,9
202:13 222:14
240:5,10,12
242:19 254:19
316:14 321:21
324:11 325:14
364:13 383:9
387:13 398:17,17
398:20 408:19
**timing** 93:18 212:3
218:13 219:17
220:17
**today** 6:9 51:19,22
100:12 111:13
113:11 164:15
277:14 289:8,11
300:13 334:14
371:2 392:11
397:14 425:13,19

**todays** 6:19 9:1,3
11:4,8 13:19
395:14
**told** 25:7 74:8 76:5
80:2 111:6 115:7
115:10 121:19
236:14 245:1
247:22
**tolerance** 44:11,12
365:16 374:7,20
**tolerances** 372:21
373:4,10,18
374:12
**tolerant** 374:1
**tool** 33:2
**top** 27:7 223:6
234:20 248:12
251:21
**topics** 37:20 38:15
**total** 47:18 49:18
51:3,6 87:13
122:16 123:14
190:8,9,22 271:11
286:21 287:1
291:20,21 295:4
295:21 311:4
314:5 377:5 380:1
383:3
**totality** 103:9
**touch** 75:6
**touched** 213:11
**tracing** 144:3
**track** 284:12 404:8
**trade** 4:22 11:3
15:8,11,13,15,19
30:19,21 31:5
32:9 74:22 75:4
83:20 85:14,16
86:5,10,14 87:4,5
87:8,17 91:15
94:7,19 95:16
99:14 101:21
103:13 104:21
107:22 108:1,3
109:6 114:12,16
114:22 123:17
124:16 132:11

133:15 138:12
139:8,18 140:2
141:2 142:8,17
143:4,8 144:1,4
144:11 145:14,15
145:20,21,22
146:11 150:17
151:17 152:4,21
152:22 153:3
155:18 159:16
160:11 161:9
162:20 163:1
164:9 165:17,20
165:22 166:11,12
167:12 168:8,13
168:20 169:2,4,7
169:9,13 170:1
171:12 175:1
176:6,12,14,19
177:3,5 178:2,8
178:11,15,20
179:5,16,18 180:8
181:6,17 182:7
184:9,14,19 186:5
202:14,15,19
206:1,16 207:9
209:4,6,8,9,21,22
210:11,12,17
213:13,20,21
214:18 215:3,12
216:1,16,21 217:1
217:20 221:5
222:15 226:4,5,9
227:15,20 228:20
229:1,6,11,12,12
229:17 232:5,13
236:15,18 241:7,8
242:4 243:8
247:10 249:10,13
251:11 258:20
262:10,13 263:3
263:12 264:1,19
265:8,14 266:10
266:17 269:8
271:9,10,21
272:12 281:4
288:11,13,16,17

288:21 289:3
290:13,16,21,22
291:4,16 293:20
295:12,18 296:10
297:10 298:18
299:15 300:9,18
301:12,21 302:13
302:14 304:8,8,9
304:13,17 309:17
311:18 313:9,11
317:3,11,12 318:2
319:8,14,21
320:17 321:12,13
324:13,18 325:3
327:4 328:8,13
329:2 332:15,17
333:4,10 338:9
340:12 342:17
343:16,20 344:4
345:5,17 346:4,18
346:21 347:6,15
348:9 349:19
351:5,8 360:19
362:6 373:4,16
374:8,17 375:12
375:13 378:4,5,7
379:5 380:4,4
381:2 389:13,18
389:18,21,22
390:5,18 392:10
394:8,10 398:4
400:5,7,8,20
401:2,5 402:5
403:12 405:12
406:16 408:18,19
412:8 413:13,19
413:20 414:5,7,17
414:19,21 416:4
416:19 417:10
418:12,13,15,21
419:4,6,12,14,21
420:7,9 423:1,2,3
424:5
**traded** 44:17,19,21
45:5 178:20 206:5
210:13 240:11
247:2,17 331:13

331:16 363:18
378:5
**tradeoff** 93:22
250:5 361:20
375:9
**tradeoffs** 93:21
**trader** 20:17 24:12
34:1,2,5,6 35:13
36:8 41:19 60:13
134:8 138:18
144:4 150:13
154:2 169:16
172:15,18,19
173:6,8,13,21
219:17 222:8
264:4 267:7,16
269:6,8,11 350:18
351:21 358:5
373:13,14 377:16
377:18,19 378:12
378:13,13,22
379:2,11 380:22
381:1,6,7,16,19
381:21,22 382:7
382:11,12,18,20
390:10,16 400:14
400:15,17
**traders** 25:22 26:21
27:1,20 28:4,17
29:3,11 42:12
60:8 150:14 175:1
267:14,18 316:7
374:16 378:5,7
380:12 381:11,14
382:2,17
**trades** 4:14,14,21
45:1 62:8 74:16
74:19 76:13,20,20
84:21 86:11 94:12
94:16 97:21 98:1
99:15,19 100:14
101:8,13 103:22
104:10 109:12,12
110:15,15,18,21
111:11,14,19
112:1,4,8,16
113:14,17,19,20

114:1,2 115:2,5,8
115:13 116:11,14
116:17 117:15,20
117:22 120:8,19
121:1,8,13,18
123:13,15 124:12
125:7,9 126:17
128:13 132:15
133:13,20 137:21
139:17,20,21
140:5,6,9 141:3,4
141:12 142:13
145:5 146:19
147:2,3,8 151:1
159:13 160:14
161:20 163:18
165:11 166:4,5,7
166:14,16,17,21
167:17 168:1,6,21
168:22 175:7,10
175:19,22 176:2,3
176:20 177:9,10
177:11,14 179:2
185:19 186:1,11
186:14 187:5
189:5,10,17 190:9
190:10,22 191:1
191:16,19 192:2
192:12,20 193:7
193:16 194:1,10
194:20,22 195:2
195:10 196:4,16
197:3,8,15,22
198:1,3,4 199:21
202:5 207:19
208:1,5 212:16
215:13,21 217:8
219:16 220:1,17
221:13 223:4,5,10
223:12,14 228:5,9
229:2,4,6,9,14,15
232:12 233:6,7,10
233:15,20,22
234:2 235:6,8,14
235:14,22,22
236:2 237:1,20,22
238:3,11,18

240:17,17,20,21
241:4,13,14 242:7
243:7 244:16
245:5,11,20 246:6
246:17 247:20
248:2 258:9,10,19
260:12 263:8,16
263:17 265:18
266:8,12 267:20
268:15,19 287:2
288:21,22 294:14
294:16 295:4,12
295:19,19 296:3,5
296:5,9,9,17
297:2,3,9,12,18
297:19 298:2
299:7 300:15
301:2,6,7,16,16
301:17,22 302:1
302:10,16,17,18
303:13,15 304:10
304:22 309:13
310:19 311:4,4,5
311:12 313:22
323:17,19 324:11
327:19 328:16
329:14 330:6,10
332:1,3,14,18,22
334:7,8,10,14,15
334:17 335:11,12
336:2 337:12
338:6 339:3,21
340:21 343:22
344:2 346:19
347:17 355:16
358:22 360:9
372:3 377:2
385:12 389:5,17
391:21 392:3,6,15
397:9,22 398:8,9
398:18,21 400:13
401:12,13 402:15
403:6,17 404:13
405:9,9 408:12
411:18 414:4,11
414:17 415:3,6,12
416:8,9 418:18

419:7 420:6
**trading** 1:5 2:14
  3:7 20:17 25:20
  26:21,22 31:13,21
  32:6,16,19,20,21
  33:18 36:6,10
  41:5,7,18 42:16
  42:16,19 60:9
  76:22 77:1 79:14
  82:19,19,20 86:8
  86:9 89:6 91:19
  93:12,13,20 95:8
  95:10,19 97:19
  100:18 101:22
  103:16,20,21
  104:5,22 105:3,15
  105:19,22 116:21
  118:1,4 119:17
  120:5,6 121:8
  123:8 124:22
  131:6,11,12,20
  132:2,4 135:21
  136:18 137:3
  138:1 142:9
  147:11 148:13,16
  149:1,6,12,13
  150:9,20,21 151:2
  151:11,13,16
  154:6,11 155:1,10
  155:13,16,22
  156:8,19 157:7,8
  159:17,18 162:11
  164:7,8,14,16,22
  165:16 166:12
  167:9 179:15,20
  179:20 180:1,21
  181:3 185:4,4,17
  187:12 190:5
  192:18 193:4
  196:19 197:1,10
  204:4 207:18,19
  208:5,16 210:6,10
  217:22 219:19
  230:21 231:21
  236:10,15 237:8
  240:10,10 241:19
  249:18 258:11

263:1,7 271:12
  272:11 286:4
  298:7,14 308:21
  309:16,19,20
  310:7,9,11,14
  312:1,6,18 314:2
  315:18,19,21
  316:5 317:17
  318:11 322:18
  323:20 328:9
  329:6,18 335:19
  340:4 356:5,10
  358:11,17 359:4,5
  359:5,6,12,17
  360:4,12 361:21
  365:5 370:22
  373:14,15 385:3,6
  387:17 397:12
  398:1,6,10 399:20
  400:4,6,14,16
  407:8 411:9 414:3
  415:12 416:16
**training** 195:20
**transaction** 75:10
  75:11,15 82:16
  105:11 108:22
  114:17 132:3,9
  141:10 144:1,6
  162:21 174:17
  183:15 194:17
  216:17,20 222:16
  263:1,2 265:5,10
  266:21 276:13
  278:17,19 279:4
  281:22 284:16
  285:1,16 294:5,9
  305:22 316:15
  327:12 328:3,4,7
  329:9,11 344:22
  345:22 347:3
  351:16,17 352:3
  402:17,17 403:14
  405:11
**transactions** 89:20
  96:5 113:16 117:9
  117:14 119:16
  121:21 122:9

124:7,17,22
  125:21 126:10
  127:11,18 128:20
  129:4,17,18,20
  150:9,11 177:19
  196:16 209:10
  212:4 214:6 230:1
  230:1,9 232:16,17
  232:21 233:6
  239:17 255:12
  261:8 264:5 271:4
  312:3 319:4
  357:16 358:10
  359:22 360:17
  369:18 372:8
  393:21 403:15,20
  403:21 421:15
**transcript** 10:12
**transcription** 427:6
**transferred** 109:5
  338:2
**transition** 412:19
**translation** 174:13
**transmission**
  266:22
**transmitting** 42:17
**transparency**
  306:1
**treasurer** 46:13
**treat** 299:15 328:18
**treatise** 30:14
  162:8 163:7 181:8
  306:6 308:17
**treatises** 162:17
  305:1
**trial** 8:15
**tried** 46:17,21
  128:6 141:21
  144:10 162:18
  163:1 178:13
  199:9 203:1
  207:11 243:1
  294:14 312:14
  315:3 322:19
  360:6 424:17
**tries** 162:9 329:10
  362:17

trigger 205:1
trim 239:1,3,8
trip 277:19 287:22
  307:7 311:12
true 27:13 59:13
  67:11,21 193:13
  235:9 236:9 277:9
  296:18,21 341:22
  343:5 370:13
  372:16 391:8
  427:5 428:8
trust 27:13
trusted 122:11
trusting 122:10
try 10:9 35:21
  54:11 59:5 63:18
  63:20 64:11 67:10
  67:19 81:4 93:16
  93:19,21 94:20
  108:11 144:18
  145:11 146:15
  149:20 159:19
  161:19 163:9
  199:10 224:22
  300:5 305:20
  356:5 357:8,11
  361:7 366:19
  380:14,21 425:10
trying 17:10,22
  26:15 27:2 28:14
  64:16 66:12,16
  67:2,14 69:7
  83:10,20,21,22
  84:1 88:11 94:3,5
  95:8 96:15 103:4
  103:8,12 106:14
  108:6 146:3 156:2
  158:17 159:4
  160:8 195:19
  196:11 205:10
  219:9 233:10
  257:21 292:21
  298:21 310:6
  312:11 323:18
  358:3 366:12
  367:17 374:12
  390:11 424:16

turn 22:8 24:21
  48:12 49:9 51:1
  137:13 175:5
  181:18,21 182:6,7
  182:13,17 183:12
  183:15,19 184:2,7
  184:19 185:9
  222:9 249:6
  287:22 289:20
  290:16 294:13
  299:18 300:10,16
  301:1,5 306:17
  308:8 325:3 326:8
  327:7 345:2 355:8
  375:18 384:8
  400:20 401:2,5,12
  403:14 405:19,21
  406:1 417:5 421:5
turned 307:8
turning 251:21
turns 198:2 221:15
  222:11 286:3,10
  289:15 298:19
  299:8 301:11
  320:1,2 342:18
  412:3,7,10 421:7
twice 378:12,13
two 9:10 12:21,22
  18:6,17 19:6 22:9
  22:11 25:1 30:22
  32:3 34:10 38:6
  38:12 50:7,11
  52:2 56:7 65:6,9
  65:11,19 69:1
  72:1 82:10 84:12
  96:16 111:4,6,11
  112:6,9,10 116:17
  116:17,21 117:22
  130:16,16 138:4
  142:14 151:21
  152:17 153:3,9
  155:4,7,9 156:19
  157:9 159:7
  162:10 163:18,20
  164:10 176:7,8,8
  176:8,9 183:5
  185:9,19 186:1

  187:12 192:7
  195:14,17 197:4
  197:14 202:22
  203:17 206:5,7,16
  206:20 207:16
  213:7 219:15
  220:2 226:6 227:5
  228:8,12,15,17
  236:3 238:18
  243:4 248:8,20
  252:19 258:12
  260:19 263:16
  266:2 273:22
  274:20,21 276:16
  277:10,18 282:3
  282:15 283:7,14
  283:20 284:21
  285:19 297:7
  302:5,21 303:2,6
  305:14 309:2
  323:7 324:11
  326:13 327:2
  331:2 333:21
  335:5 341:4,18
  350:3 352:6,16
  354:3,7 359:16
  360:2 362:5
  369:21,22 370:3
  371:13,14 372:11
  374:16,18 377:15
  380:12 381:6
  382:2,8,17 383:8
  389:3,10 394:8,8
  394:18 397:2
  398:2 401:3
  403:14 407:1
  413:14
twolot 176:9
twopage 50:6
  200:15 228:8
type 12:19 24:11
  34:1,2,6 43:15
  45:8 58:9 63:17
  64:15 91:19 93:11
  93:12 102:7 118:8
  122:14 123:11
  131:5 154:7 194:7

  217:10 265:12
  270:6 307:14,14
  315:17 327:1
  329:9 358:21
  359:16 411:7
types 21:6 23:18
  37:15 56:14 60:14
  70:6 83:18,18
  103:16 267:19
  305:22
typewriting 428:7
typical 90:9 309:15
  309:19,20 310:7
  312:1 362:10
typically 261:18
  317:17 354:7
  367:8

         **U**
u 1:4 2:14 3:7 316:4
uhhuh 7:12
uhuh 7:12
ultimately 63:13
  104:3 403:6
  404:13
uncertainty 134:12
  360:8
unclear 177:8
uncovered 292:10
  353:5,8
undefined 408:4
undergrad 73:4
underlie 355:15
underlining 97:6
underlying 27:10
  29:11 65:5 95:10
  98:22 119:14
  253:3,6,10 256:1
  256:3,13,14 257:7
  257:22 258:5
  259:20 260:4
  362:1 363:18
  365:11 367:14
  385:17
undermines 388:2
understand 7:14,17
  10:19 12:6 15:18

  21:1 27:9 31:20
  31:22 61:18,20
  62:3 63:19,20
  66:8 93:2,6 97:11
  101:16 116:22
  120:17 122:13
  133:22 174:6
  180:5 203:3
  229:22 233:5
  243:14 252:20
  257:2 308:5
  335:18 386:15
  396:14 407:3,12
  421:8 422:18
  425:9,13
understanding
  27:16 28:16,17,20
  75:14 98:21
  103:13 108:16
  116:16 118:6
  134:3 162:15
  168:17 169:15,22
  179:4 182:5
  183:18 186:16
  192:3 199:19
  203:5,14 204:19
  204:20 257:6
  288:11 336:1
  362:11 367:21
  370:22 385:2,10
  386:4 396:17,19
  411:12,14
understandings
  362:14
understood 7:21
  9:13 74:15 94:2
  208:19
undertake 7:20
  54:6 74:2 77:18
  78:7 79:20 105:21
  133:10 171:17
undertaking
  357:10
unfilled 265:2
  267:9 269:14
  298:4 302:11
  412:15

**unique** 208:10
**unit** 265:16
**united** 1:1 6:13
**universe** 85:11
  119:15 232:20
**universities** 18:20
**university** 13:10
  16:20,22 17:2,5
  17:21 19:8 45:16
  46:13 72:11,13,18
  73:2
**unprofitable**
  113:17 122:5
  126:17 127:1
  159:13 160:14
  194:1 232:13
  245:11 349:20,21
**unrelated** 157:11
  157:12 401:13
**unstable** 261:3
**untoward** 175:2
**unusual** 137:22
  138:2
**update** 17:9
**updating** 183:9
**upheld** 23:18
**uphold** 107:13
**upside** 353:12
**urgency** 84:3
**usable** 106:19
  111:18
**use** 7:10 39:4,5,10
  39:13 48:9 54:8
  54:10,14 57:9,11
  62:12 64:9,15
  69:3 73:7 108:10
  129:22 141:21
  142:2 143:7,7
  144:10 150:7
  162:9 178:7,11
  193:5,13 199:10
  201:6 207:8 209:5
  245:10 249:9
  251:16 271:2
  288:15 305:11
  316:13 318:5
  319:18 322:14

354:3 366:6,22
369:10,13 370:22
377:22 381:8
398:3 406:14
409:16 411:20
412:2
**useful** 56:15 103:6
**uses** 162:4 163:8
  177:14 181:13
  381:6,7
**usually** 37:6 51:1
  55:18 57:17 59:7
  60:3,6 66:2,11
  67:19 69:5 108:18
  109:5 179:18
  253:9 261:18
  360:6 361:7
**utilized** 26:8 36:7
  93:13 102:16
  114:20 128:19
  384:15,20

---
**V**

**v** 17:7,9,12 19:21
**vaglica** 1:22 2:19
  428:2
**vague** 67:5 82:6
  97:9,17 104:1
  118:18 124:10
  136:10,21 147:4
  155:11 157:2
  160:22 169:17
  182:18 185:15
  187:6 194:11
  243:19 244:5
  245:8 246:12,19
  264:9,22 270:16
  275:2,11 280:7
  298:11 299:10
  331:1 367:18
  368:12 383:5
  392:1
**valid** 47:3 128:9
  212:13 323:11
**validate** 130:1
**value** 131:2 133:2
  151:20 231:1,17

256:22 366:14,16
369:6
**values** 96:9 364:6
**variable** 13:9 65:6
  68:21,21,22 69:8
  151:18 241:7
  242:14 366:13,18
**variables** 62:13
  68:15 84:14,15
  196:3,7 255:8
  366:16 372:22
  373:1,6 374:13
  380:7 396:22
**variance** 351:13
**variation** 316:21
  334:3
**varied** 24:3
**variety** 15:1 41:16
**various** 19:22
  37:15 87:20
  106:16 137:22
  138:7 154:22
  175:7 393:9
**vary** 265:14
**vast** 319:20
**vegas** 376:16
**vehicle** 95:5
**venues** 42:2 64:19
**verbal** 7:13
**verification** 348:1
**verified** 168:8
  348:17
**verifies** 46:9
**verify** 52:14 108:11
  122:7 129:5
  132:14 133:11
  171:10,16,18
  186:10 187:11
  237:7 247:7
  347:19 349:12
  399:10
**verifying** 46:14
  348:19 349:3
**vernacular** 57:10
**versa** 354:9
**versus** 6:12 14:19
  18:19 69:4 115:14

116:15 127:1
130:19 131:2
133:12 156:8
163:10 166:18,19
186:9 190:9 194:1
195:22 209:9
219:3,10 232:17
233:11 236:19
238:13,17 240:6,6
260:17 262:7
267:20 294:18
298:8 303:20
306:8 322:18
333:14 339:8
340:10 373:18
397:3
**vetted** 31:8 46:10
**vetting** 24:15
**vice** 354:9
**view** 81:2 193:2
  356:8
**viewed** 84:14
  191:22
**violated** 389:2
  391:15
**virtually** 192:3,5,9
**visited** 41:20
**visiting** 41:14
**vita** 180:21
**volatile** 135:17
  136:6 331:3
  360:14
**volatility** 134:1,11
  135:2,3,7,12,12
  136:2,8,13,20
  137:2,6 145:4
  147:19,22 152:8
  161:4 193:19
  194:22 195:8,16
  196:8,11 253:3
  255:18 331:5,6
  351:14 357:9
  362:11,14,15,17
  362:18,22 363:2,3
  363:4,6,8,13,16
  363:19,20 364:12
  366:13 367:5,7

368:2,5,7,9,10,13
368:22 369:3,5,5
369:8,17 372:5
**volume** 151:11,13
  151:16,19 152:2
  161:5 264:14
**voted** 46:11
**vs** 1:7

---
**W**

**w** 2:15 3:6,9
**wager** 353:16
**wait** 10:16 14:15
  158:13 167:5
**waived** 426:1
**walk** 276:9
**walked** 375:14
**want** 23:21 47:21
  51:19 54:12 60:21
  61:4 65:11 69:19
  71:14,20 90:13
  99:17 112:19
  119:6 121:6
  172:15 175:5
  188:8 193:21
  198:5 204:4,5
  208:11 212:22
  224:6,6,7,8 229:7
  229:14 250:5
  251:17 268:4,8,9
  268:9,10 269:8
  276:9 280:13
  288:19 335:10
  353:15 363:8
  367:20 371:10
  375:6 377:13
  384:11 390:15
  395:17,21 404:7
  405:14 408:10,13
  409:6 415:11
  418:16 419:8
  424:1 425:7,17
**wanted** 53:2 70:18
  122:11,13 259:18
  315:1 318:5 326:2
  356:22 376:8
**wants** 264:12 291:9

390:16
washington 1:13
2:16 3:10
wasnt 21:4 77:4,6
80:12 84:16
118:20 122:4
123:11 128:21
129:4 142:6 143:1
144:20,21 157:1
158:3 170:21
186:21 199:8
214:11 216:6
224:16 231:21
247:12 292:6
293:2 296:8
337:13 345:18
389:12 405:12
406:6 408:3 417:9
watch 269:18
wave 7:9
way 66:22 67:9,22
85:19 101:15
106:21 128:18
129:2,5,7 143:4
156:4 160:4
171:21 173:12
189:22 194:6
211:7 212:5 220:5
221:11 227:11
235:21 236:13
239:7 263:21
268:7 275:8
301:13 303:4
304:5 307:16
316:19 331:5
335:4 404:20
412:14 416:10
419:8 422:1
ways 161:5 366:1
weaker 239:10
website 5:5 182:20
183:1,6
wed 9:12 107:18
week 13:14,15
17:16 18:6 46:1
82:20 98:16,16
139:20 141:3,12

153:8 155:19
159:18 160:12
162:19 325:20,22
326:7,14 350:2
352:19 378:3
380:5,10 425:11
425:17
weekend 327:15,16
350:17 351:4,6
weekends 155:15
350:18 351:1,3,13
351:15
weekly 13:7
weeks 16:12 18:6
37:6,20 100:4
weight 46:20
went 9:6,7 17:14,20
25:11 60:8 107:12
190:20 197:10
201:10 232:11
287:15,21 292:7
300:10 347:22
404:10 405:15
410:9
weve 32:14 59:14
60:8 70:8 92:19
102:8 109:4,5
113:22 115:3
132:2 133:4
147:16 164:15
183:4 199:13
255:12 317:12
321:6 392:10
395:2,4,15,16
whats 7:6 18:7 21:7
27:16 42:2 46:16
47:16 49:11 51:9
61:6 65:3 86:6
92:8 108:16 109:9
109:17 114:1,12
134:3 140:6
165:13 174:2
182:5 200:14
228:4 262:21
264:6 267:9
271:19 278:17
279:4 280:21

281:22 284:15
285:7,16 287:1,8
295:10 309:18
310:18 311:19
317:13 324:6
354:5 362:11
369:21 383:17,18
387:10 400:4
423:1,22
whens 419:21
whos 63:7 169:9
193:16 267:17
400:14
willing 153:20,22
395:7
winloss 187:14
winners 195:22
winning 189:17
wish 51:22
witness 6:4 33:9
35:8 48:20 59:17
64:4 65:15 67:6
67:17 69:21 75:3
75:14 76:1,18
92:14 95:13,21
97:3,18 101:11
103:12 104:3
109:14 114:15
118:19 124:11
125:15 126:4,16
129:22 130:7
131:14 135:6
136:11 137:1
144:9 145:9,19
147:6 148:7 151:5
152:7 155:12
156:12 157:3
158:1,11 159:1
160:4 161:1,14
162:18 163:14
164:2 167:19
168:3 169:19
170:4 171:8 173:3
173:17 174:9
182:2,19 184:22
185:16,22 186:21
187:8 188:10

191:7 193:11
194:3,12 196:2,10
197:1 198:10,19
199:16 200:5
205:21 206:10
207:2 208:19
209:15 210:2
211:11,20 212:11
212:20 213:16
214:9,21 215:7
216:9 217:4,17
218:19 219:12
220:5 221:10,21
224:16 225:22
226:14,21 227:11
228:14 236:8
237:12,16 238:8
239:7 240:1
241:18 243:20
244:7 245:14
246:13,20 248:6
249:2 250:9,16
251:8,14 252:6,14
253:13 255:7,17
256:19 257:18
258:4,15 259:8
260:2 261:13
264:10 265:1
268:22 270:5,17
277:8,17 278:2
279:9,19 280:8,19
284:5 286:9,16
290:4 291:10,15
293:8,16 295:2
296:21 297:22
298:13 299:11
300:3,21 301:10
302:4,20 304:1
306:11 312:5
313:4,13 314:17
317:8,16 318:21
320:4,15 326:17
330:9 331:2,12,18
332:12 333:17
338:21 339:18
340:3,16 341:7,13
342:2 343:5 344:3

345:9 349:2,10
352:2 353:19
358:14 359:2
361:3 362:5
363:12 364:9
365:4,15 366:11
367:4 368:13
371:5 373:21
374:11 375:2
376:1,13 377:1
378:17 379:17
383:6 388:15
390:21 391:8
392:2 394:15
396:2 399:7,18
401:5,16 402:2,20
404:2 405:21
412:6 414:13
415:3,20 424:3
425:8 428:4,6,9
women 64:9,12
wont 264:13,19
word 63:5 191:4
271:3
worded 70:17
words 118:7 408:1
work 12:4 13:16
14:21 19:1 23:14
24:16 25:13 26:14
34:12,19 35:2
41:5,7 43:18 53:9
54:9,21 58:14
65:17,18 87:17
89:3 107:4,7
109:4 123:18
174:14,14 179:7
186:14 198:17
357:8
worked 12:5 15:7
26:19 83:1 102:2
143:16 337:4
385:12
working 22:19,21
24:8 25:8 26:5,18
40:17 52:21
208:11 306:12
387:8 395:19

397:20
**works** 32:6 45:20
  336:17 337:2,2,10
**worldwide** 331:13
  331:20
**worried** 194:22
  212:3
**worry** 212:15
  264:19 387:20
**worse** 327:6
**worth** 373:22
**worthless** 231:2,3,8
  323:18
**wouldnt** 26:5 27:12
  35:6 64:4 150:19
  150:22 151:5
  172:12 193:4
  196:18 199:7
  201:13 202:6
  225:10 238:16
  248:8 250:12
  255:22 256:14
  259:19 270:18
  275:21 292:8
  293:4,12 296:4
  313:2 314:21
  329:15 330:2
  338:18 374:5
  413:17 416:12
  417:1,1,22
**wow** 406:11
**write** 78:19,21
  107:13 163:15,15
  169:7 377:14
**writing** 66:19
  214:22
**written** 9:7,14 16:4
  22:1 23:11 30:13
  42:14 49:5 50:17
  51:4,6,14 53:1
  58:4 106:22 158:2
  173:8 261:9
  345:19
**wrong** 94:22 214:7
  317:22 341:8
  342:7 365:19
  392:20 415:1

**wrote** 81:15 321:11
  386:18

---

### X

**x** 1:4,10 4:7 68:22
  127:7 132:7 173:9
**xfa** 4:21 87:1 202:4
  202:6 228:3,5,8
  229:4,14

---

### Y

**y** 68:21 127:7 132:8
**yeah** 10:4 14:2
  18:22 24:7 31:21
  35:8 39:4 43:12
  43:17 45:14 49:21
  60:16 61:3,19
  65:1,16 68:20
  70:8 73:18 79:12
  80:7,7,22,22 83:7
  87:14 88:11 90:22
  93:1 94:5 95:22
  96:16 97:3 98:11
  99:2 104:13,16
  105:16 109:3
  113:17 114:4
  115:1 120:18
  123:7 127:16
  129:12,14,22
  130:7 131:3
  132:13 134:11
  135:6,11 137:6
  139:11 140:1
  142:11 145:9
  153:9,15 155:21
  160:4 161:15
  164:2 167:19
  169:5,19 171:1
  175:16 182:2,15
  187:16 191:7
  194:3 196:2,10
  202:2 204:20
  205:21 207:4,15
  210:2 212:11
  218:19 219:6
  221:10 223:9
  225:6 227:3,11

230:14,20 231:5,9
  237:16 244:7,17
  246:13,20 249:2
  252:6 255:17
  258:4,20,22 266:6
  271:6 272:22
  278:2,12 279:9
  280:8,9 281:8
  283:14 284:5
  285:14 288:4,12
  288:17 290:12
  291:15 293:8
  299:3 304:1,12
  307:11,17 312:13
  312:21 313:13
  315:20 316:10
  317:8 318:9 319:5
  322:5 329:10
  330:16 331:12
  334:18 337:14
  338:8 345:9,16,19
  346:1 347:10,17
  349:2 353:3 354:3
  358:14 359:8
  362:5 363:16
  364:9 365:4 366:3
  372:13,18 373:7
  375:2 376:13
  377:1 378:9,17
  379:18 386:22
  388:15 390:1,6
  392:21 395:4
  398:14 399:7
  402:20 405:22
  411:6 413:4
  420:11 424:10
**year** 19:19 22:1
  144:6
**years** 18:17 19:18
  38:6,7 40:11
  42:13 72:1,3,18
  73:11
**yen** 135:21,22
  136:2 176:17
  177:1 204:5,6
  221:14 251:18
  330:4,7,20 331:7

**yep** 277:3
**yesterday** 10:1
**york** 41:12,20
  64:18 109:7
**youd** 66:20 145:15
  193:20 194:4
  223:12 258:15
  277:10 297:22
  359:3 379:8
  386:13
**youll** 55:11 69:16
  131:10 218:7
  295:17 339:8
**youre** 7:11 16:14
  26:5 40:4 41:22
  42:3 55:8,10,16
  57:6 58:19 59:11
  60:5 61:4,9 64:5,8
  64:14 66:7,19
  67:14 69:7 74:22
  81:15,20 83:20
  84:1 86:17 88:17
  90:16 93:4 94:22
  96:17 103:8 114:3
  122:17 128:7
  140:15,16 143:10
  144:19 150:22
  156:13 158:17
  159:6 162:4
  164:13 165:1,6
  167:14,21,22
  191:15 192:13
  193:22 194:22
  195:19 208:14
  212:3 213:20
  214:13,14,15,16
  215:2,4 218:16
  219:14,15 220:9
  220:13 223:5,17
  223:18 229:10
  233:5,10,21 234:6
  234:20 235:1,3,6
  235:17 239:2
  240:5,12 241:2,12
  242:18 243:17
  253:5 257:21
  258:1,4,6 263:4,5

263:8,20 264:6,18
  265:10 267:2
  269:1 271:14
  274:10,11 275:22
  277:21,22 281:9
  283:4,5 285:9
  292:15 295:18
  296:3 308:7
  311:17 312:11,22
  317:22 318:10,14
  318:18 320:1
  325:17,19 326:1
  328:2,9,16,17
  330:5 332:7
  333:14,15 337:18
  339:2,6 340:1,6,6
  340:7,20 351:2
  353:12 359:21
  360:7 364:5,17,18
  366:12 367:4
  371:20 373:8
  377:5,6 387:16
  390:11 392:13,14
  394:5,6,7,8,9,12
  394:20 408:10
  409:18 416:18
  417:2 424:15
**youve** 8:14 16:8
  20:4 21:16 36:14
  48:15 49:19 54:19
  54:19 68:17 73:16
  89:2 113:5 114:1
  118:13 120:11
  125:11 174:15
  178:14 179:9
  181:12 188:5
  204:3 212:7 213:5
  241:11 242:20
  272:15 273:5
  327:19 330:16
  346:16 409:13

---

### Z

**zero** 13:15 192:3,5
  192:9 225:8 231:4
  274:10 284:12,15
  322:7 323:5,17

344:21 387:3,5,8
**zone** 339:9 423:22
**zones** 341:4

**0**

**0** 103:15
**000** 16:10 47:18
373:14,15 374:16
377:10 383:9
**0000340** 90:12
**0016** 170:13
**01** 380:18
**02** 409:11
**05** 275:22 280:5
281:12 377:19
**06** 137:10 347:13
**08** 134:15 272:4
281:2,12 347:13
**09** 273:1 274:16
336:17 339:13,14

**1**

**1** 1:9 4:10,22 21:8
21:11 24:22 27:6
33:4 48:2 49:11
49:15 85:20
137:10,13 178:15
178:18 184:4
191:5 193:5
227:22 248:11
271:21 272:12
345:18 400:5,7,8
422:6 423:15,20
**10** 1:14 2:8 5:12
6:10 71:18,18
140:16 185:13,13
224:6,7,8 225:7
225:19 233:9
263:16 269:17
273:1 274:16,17
275:17 284:10,10
305:15 332:1
336:17,18,21
339:13,14 377:18
377:19 379:21
381:2,12 382:3
384:16 389:7,15

389:17,18,19
390:15,16 391:4
391:20 393:21
416:20 417:16,16
417:19 423:5
**100** 83:20 197:15
198:1,3 241:4
243:5,15,16 244:3
244:7,15,17
263:12 379:10
380:1
**107** 295:21
**109** 4:14
**10lot** 224:5
**10th** 289:8,12
319:10
**11** 5:12 49:10 85:20
85:21 284:8
288:20 295:3
319:8 320:18
343:16,20 344:4
384:16 417:16,19
**112** 4:15
**112cv06763** 1:5
**1155** 2:15 3:9
**12** 4:22 34:18 49:9
49:10 137:10
164:13 185:8
271:20,21 272:7
273:6 274:17
278:9 314:4 322:7
322:7,9 323:5,5
332:2 336:9
339:12 347:13,13
372:20 375:10
391:10 400:3
**120** 112:14
**12cv6763** 6:13
**13** 5:12 164:11,21
275:19 276:3,16
277:2 304:19
346:21 347:6
385:4 409:11
422:6
**130** 112:16 113:20
115:2 121:21
129:20 147:2

150:9 151:1 175:9
177:18 194:10,21
195:11 197:7
232:20 234:15
235:22 237:20
271:4
**14** 5:12 19:2 165:9
303:11 420:14,18
420:19 421:2
423:10,15 428:22
**1400** 3:17
**15** 5:12 19:18 24:4
37:6,20 166:3
175:18 182:10
273:6 306:19
323:5,5 356:20
387:11 417:17
**150** 42:12
**16** 5:1 47:20 175:6
306:17 317:19
321:1,2,6 419:22
420:1,14 421:1
**17** 5:2 27:6 179:1
230:14 274:17
275:17,18,21,22
336:18,21 339:14
341:4 354:10,11
355:2 414:4
419:22
**18** 5:3 87:12,15
92:1,2,9,20 94:11
95:3 102:8 103:2
143:14 169:4,5
175:18 179:3
187:5 191:15
192:1 202:6
229:13,19 273:6
323:5,5 325:16
354:21 419:15,15
419:19 420:1,13
420:15 421:2,12
422:15 423:10,19
424:4
**183** 5:5
**188** 4:18
**19** 182:22 183:4
189:18 276:16

277:2 278:12
324:7 388:20
**1925** 274:1
**1948** 352:6
**1984** 352:10
**1993** 41:20
**1995** 352:7,13
**1998** 179:21
**19a** 5:5 183:1
**19b** 5:6 324:3

**2**

**2** 4:11 48:13,17
49:10 175:19,22
177:1,3,16 192:13
200:12,12 207:13
228:1,9,18 229:3
232:5 345:22
**20** 5:7 13:11 16:10
16:14 22:3 87:12
87:15 137:10
169:5 191:12
199:14 223:20
249:6 263:16
269:9,13,18 280:5
281:2,12,12,20
301:18 303:4
327:7 343:6
354:21 356:20
373:16 374:17
377:16 378:5,22
379:6 381:17
**200** 4:19 42:12
**2001** 72:16
**2008** 92:21 175:18
179:2 419:12,13
**2009** 134:15 175:18
179:2 187:5 189:7
189:18 199:21
**2011** 72:16
**2013** 17:5 22:6 49:5
73:22
**2014** 1:14 2:8 6:10
384:7
**2016** 428:22
**202** 3:11
**20581** 2:16 3:10

**20th** 416:20
**21** 4:10 5:8 179:2
200:12 230:16
284:8 285:14
323:5,5 331:22
334:6,8,9,14,17
339:21 340:21
344:15,16 345:4
346:17 347:11
415:6,8,9 416:9
418:1,7,14,15,16
418:18,22 419:2,7
419:12
**21st** 2:15 3:9
**22** 5:9 22:2,4
275:21 346:22
**224** 175:19,22
177:16
**228** 4:21
**22page** 92:10
**23** 5:10 275:18,22
383:11,18 396:7
**236** 190:22
**24** 299:6 310:1,5
311:4,10,11 323:5
**2446** 1:21
**24hour** 316:5 337:2
337:15 352:9,12
407:21 408:4
412:7
**25** 192:12,12 204:6
245:11,22 262:12
273:2,6,14,15,16
273:19,19 274:2
274:19,19 275:7,8
275:9 277:10
278:5,9,20 279:9
279:22 280:1,1,3
280:3,10,10,14,17
280:22 281:5,5,6
281:10,10,16
282:2,13,16 283:1
283:22 284:1,2,6
284:9,20,20,22
289:21,22 290:1
291:2,3,22,22
292:2,9,12 293:19

294:1,5 297:18
299:14,16,18
307:2,7,10 391:11
393:11,18 394:5,7
**2511144** 3:19
**26** 271:8 281:20
288:20 295:8,10
295:11,18 296:12
297:9,11 301:15
302:13
**27** 347:10
**271** 4:22
**28** 2:9 48:1 295:3
295:10,14 296:12
299:6 311:1,2,3,7
311:15 343:21
347:13
**28th** 416:22
**29** 22:6 275:21
297:17 389:18
423:10
**291** 190:22

---

**3**

**3** 4:13 50:1,3 272:4
332:2
**30** 224:4,6 225:7,18
269:14 284:9
309:21 381:19
395:6,12 396:13
**300** 288:11 375:13
376:5,7,10 377:5
377:10 422:6
**31** 200:12 413:20
414:7,10,19
423:19,20
**312** 3:19
**321** 5:1
**324** 5:6
**33** 3:16 423:19
**34** 274:19 304:19
**343** 5:7
**344** 5:8
**346** 5:9
**35** 27:6 420:19
**350** 11:18
**354** 5:2

**36** 279:3 280:5
**375** 47:18
**38** 274:17 303:12
415:8 416:19
417:13 418:19
**383** 5:10
**39** 276:16 277:2
**396** 4:5 179:3

---

**4**

**4** 4:14 109:10,11,16
109:17 110:13
112:11 114:2
115:4 117:11,14
121:9,15 122:9
124:9,19 125:2,10
202:5 229:12,17
272:4 309:21
326:17 383:9
384:10 419:13
420:4
**40** 230:4 278:9,12
335:8 424:21
**402** 4:4
**41** 415:8 423:2
426:2
**4186623** 3:11
**428** 1:9
**43** 71:18
**44** 309:12,15
311:17
**45** 185:12 396:7
416:20 417:16,19
**46** 311:4,11 325:11
417:19
**48** 4:11
**49** 232:6 244:22
273:1 288:21
289:1 295:19
301:16 309:12
339:13
**4th** 419:17 420:16

---

**5**

**5** 4:14 47:9 109:10
109:11,16 110:11
110:12,14 112:13
114:2 115:4

117:11,14 121:9
121:15 122:9
124:9,19 125:2,10
140:14,18 192:13
229:8,13 322:12
323:3 331:22
335:8,8 373:14
385:1 410:14,19
410:19 411:11,12
411:15,20,21
412:12,15 414:20
416:17 419:12
420:1,6,14 421:1
**50** 4:13 112:4
138:11,11 198:3
246:6 269:9,10,22
273:8 278:9,13
280:6,10 282:6,7
282:8 283:3,10
285:8,9,11,12
286:1 287:10
289:21 291:2,21
292:11,16 325:16
330:6 375:19
376:4,17,17,19
377:6,8 379:20,22
381:22 417:10,15
417:16,16
**500** 134:19 230:3
373:15 374:16
**52** 380:18
**53** 326:11 335:8
**54** 326:11 417:16
417:19
**55** 192:2,5,8 233:6
245:6,21 273:8,8
296:5 326:12
377:20
**56** 112:11 273:19
**57** 272:4 285:14
**58** 71:18 281:2
288:21 289:1
295:19 301:16
309:12
**59** 331:22 344:9
345:5

---

**6**

**6** 4:4,15 112:20,21
113:7 114:3 115:4
117:11,14 121:9
121:15 122:9
124:9,19 125:2,10
199:12 273:6
334:7,10 339:21
340:21,22 347:11
354:21,21 380:18
381:13 382:4
414:4 415:7
416:10,11,12
417:18 418:9
419:7,19 420:1,13
420:14,15,18,19
421:2,2,12 422:13
422:15,17 424:4
**60** 103:15 112:4
378:8
**60001** 403:17
**60006** 170:15
216:22
**60602** 3:18
**63s** 71:5
**64** 112:10 192:13
233:2,7 246:7,11
296:5
**650** 12:10
**66** 192:2,5,8 233:1
**680** 379:1,22
**69** 288:2 314:6
**690** 379:21

---

**7**

**7** 4:18 71:3 188:1,2
200:3 249:7,9
380:18 386:1
395:6,12 396:7,7
**70** 16:1 295:4 311:4
**700** 230:4
**710** 379:13,18
382:5
**75** 14:12 273:8
382:4
**7month** 199:12

---

**8**

**8** 4:19 17:5 200:1,4
200:6,7,15 377:17
377:19,19,20
379:1,12 409:11
409:11 417:16
424:21 426:2
**80** 16:2 199:4 245:5
245:20 382:12
**81** 191:5 193:5

---

**9**

**9** 2:9 4:21 49:5
228:4,5 273:6,8,8
273:19 274:19
309:21 319:10,11
319:13 320:19
334:7,10 339:22
340:21,22 377:17
377:21 379:1,22
384:7 396:13
414:4 415:7
416:10,11 418:10
419:8 422:13
**90** 123:18 140:16
**90259** 276:19
**907** 285:20
**92** 5:3
**920** 284:20
**931** 281:1
**933** 278:9,13
**934** 279:3
**936** 278:20
**940** 283:2,18,21
**941** 283:1,17 284:7
**95** 140:12,15
381:13
**956** 273:3,9 274:2
**96329** 283:9
**9th** 319:8

**EXHIBIT 1**

# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| U.S. Commodity Futures Trading Commission, <br><br> v. Donald A. Newell and <br><br> Quiddity, LLC, | Civil Action |

## EXPERT REPORT OF JEFFREY H. HARRIS, Ph.D.

August 29, 2013



DEPOSITION EXHIBIT

Harris 1

1/10/14  KV

## EXPERT REPORT OF JEFFREY H. HARRIS, Ph.D.

### I.    Qualifications

1.    I, Jeffrey H. Harris, am Dean's Chair in Finance at the Whitman School of Management at Syracuse University. Prior to joining the faculty at Syracuse, I taught at Southern Methodist University, the University of Delaware (tenured), the University of Notre Dame and the Ohio State University. I have also served as Chief Economist at the U.S. Commodity Futures Trading Commission (CFTC) in Washington, DC. As the CFTC Chief Economist, I directed the economic analysis to support the Division of Enforcement in a wide variety of cases. I was in charge of directing economic research studies and providing economic guidance to the Commission.

2.    In my capacity as Chief Economist at the CFTC, I recruited, hired and directed a team of economists who interfaced with market surveillance and Enforcement staff regarding economic issues. I also interfaced with the Division of Market Oversight, offering expert economic perspective on issues regarding regulatory jurisdiction and product oversight. Among other projects, I directed and presented to the Commission economic analyses of natural gas markets, which were subsequently written into law, designating CFTC jurisdiction over "significant price discovery contracts"[1] and gave economic input into various contracts considered for CFTC jurisdiction, including one-day forward electricity contracts, hurricane contracts and various event-outcome contracts, among others. Additionally, I coordinated efforts with

---

[1] See Jeffrey H. Harris, "Price Discovery in Natural Gas Markets" testimony before the United States Commodity Futures Trading Commission Hearing to Examine Trading on Regulated Exchanges and Exempt Commercial Markets, September 18, 2007.

Enforcement attorneys regarding the potential for market abuses and directed staff to apply economic analysis to support Enforcement cases efficiently and effectively. Through this work and my own research, I have become intimately familiar with the interface between the Commodity Exchange Act (and related regulations) and financial market economics.

3.    My primary teaching responsibilities have spanned the areas of investments, derivative securities (options and futures), financial markets and institutions, and corporate finance. I received my doctorate in Business Administration (Finance) from the Ohio State University in 1995 and a Masters of Business Administration from the University of Iowa in 1987.

4.    Earlier in my career I served a one-year term as Visiting Academic Fellow at the NASDAQ Stock Market and a one-year term as a Visiting Academic Scholar in the Office of Economic Analysis at the United States Securities and Exchange Commission (SEC) in Washington, DC. My academic work has been in the field of market microstructure, studying how trading behavior, market regulations and market structure interact. I have published numerous articles in refereed finance journals, including the *Journal of Finance*, the *Journal of Financial Economics*, the *Journal of Futures Markets*, the *Journal of Investment Management*, and the *Review of Financial Studies*. In addition, I have served as a referee for a wide range of academic journals including *The Accounting Review, Journal of Banking and Finance, Journal of Business, Journal of Finance, Journal of Financial and Quantitative Analysis, Journal of Financial Markets*, and *Review of Financial Studies*, among others.

3

5.     I have testified on four separate occasions to various Committees and Subcommittees of the United States Congress, including "The Role of Speculative Investments in Energy Markets" before the United States Senate Subcommittee on Energy and Natural Resources on September 16, 2008; "Financial Speculation in Commodity Markets: Are Institutional Investors and Hedge Funds Contributing to Food and Energy Price Inflation?" before the United States Senate Committee on Homeland Security and Governmental Affairs on May 20, 2008; "The Influence of Speculative Traders in Commodity Markets" before the United States House of Representatives Agriculture Committee on May 15, 2008; and "The Influence of Non-commercial Institutional Investors on Oil Prices" before the United States Senate Committee on Energy and Natural Resources on April 3, 2008.

6.     Additionally, I have testified on three separate occasions at the CFTC, including "Price Discovery in Natural Gas Markets" at the Hearing to Examine Trading on Regulated Exchanges and Exempt Commercial Markets, September 18, 2007; "Price Convergence in Agricultural Markets" before the Agricultural Markets Roundtable, April 22, 2008; and "On Position Limits" at the Open Meeting Regarding Proposed Position Limits Rule, January 14, 2010.  Exhibit B contains my curriculum vitae.

## II.     Assignment and Summary of Opinions

### a.  Assignment and Compensation

7.     I have been retained by the U.S. Commodity Futures Trading Commission (CFTC) in the matter of CFTC v. Donald A. Newell and Quiddity, LLC to prepare this expert report to independently assess whether the Defendants fraudulently allocated commodity futures contracts trades and options on commodity futures contracts trades

(collectively, "commodity interest trades") to benefit a corporate proprietary account at the expense of customer trading accounts managed by the Defendants.

8.      For the time spent working on this matter I am being compensated at the rate of $350 per hour. My compensation is in no way contingent upon the professional conclusions that I reach or the final results of this litigation.

### b. Summary of Opinions

9.      The summary of my opinions is as follows: First, I find, on an objective statistical basis, that the difference in profitability between the reported client and proprietary trades is highly unusual, under various assumptions about random outcomes or trading skill. Second, I find that there is no evidence that the difference in profitability between client and proprietary trades during the sample period is driven by trade size, executing broker, the day of the week trades were executed or the time of day that trades were executed. In fact, most statistically significant differences between the size of client and proprietary trades run in the opposite direction, suggesting that client trades should be more profitable than proprietary trades. Third, I find there is limited evidence that client trades are held for a shorter period than are proprietary trades. However, within the data I analyzed, there is no significant correlation between trade profitability and holding period, either among client trades or among all trades, suggesting that the profitability difference between client and proprietary accounts is not related to the time positions are held.

10.      In sum, I conclude that the profitability differences between client and proprietary trades cannot be explained by characteristics of trade size, executing broker, the time a position is held, the day of week that trades are executed or by the time of day

that trades are executed. The profitability differences are almost surely the result of *ex post* assignment to different trading accounts.

11.    For this expert opinion I have relied on the information contained in the documents listed in Exhibit A below.  These documents include .pdf files of trade tickets from office orders, spreadsheet records of trades executed via Mizuho, MF Global and XFA, and electronic statements of various accounts generated by the Defendants. Accordingly, if additional materials or any new facts are brought to my attention, I reserve the right to modify or update my opinions.

### c. Organization of Report

12. The remainder of my report is organized into the following sections. In Section III, I briefly discuss regulations applicable to the trading in question along with some perspective on the profitability of trades made by the Defendants. In Section IV, I review the characteristics of the trading records, including the time positions are held, the time of day and day of week that trades are executed, and the lot sizes of executed trades for further perspective on any differences between trades made for client accounts and those made for the proprietary account. In Section V, I state my conclusions.

## III. Applicable Regulation and Defendants' Trading Records

13. The CFTC regulates trading by agents who represent clients. In particular, brokers are required to identify and keep separate trades for their clients and trades for their own proprietary account.

14. To the best of my knowledge, the Defendants did not consistently keep separate trades executed on behalf of clients from those executed for the Defendants' proprietary account.

15. Given the fact that trades were not identified as customer or proprietary trades at the time of execution, the analysis that I apply in this report relies greatly on the *ex post* assignment of trades to different accounts as reported by the Defendants. In this light, the CFTC alleges that the *ex post* allocation of trades was done in a manner to the detriment of the customer account and to the benefit of the proprietary account. Observed objectively, I apply some basic statistical tests to the trading data to assess whether this allegation has merit.

16. First, I simply assess the profitability of various trades that are assigned *ex post* to the proprietary and customer accounts. During the period under question (October 15, 2008 through March 18, 2009), I examined data for 2224 trades executed in the eMini S&P 500 and S&P futures contracts (1262 trades), the Japanese Yen futures contract (607 trades), the Euro futures contract (355 trades) and related options on these futures. Of these trades, 1627 have been assigned as client trades and 597 assigned as proprietary trades. While the bulk of trading took place in the eMini S&P 500 futures contracts, the Defendants actively traded in each of these markets.

17. My statistical analysis examines 130 trades executed during the sample period which were identified by the CFTC as suspicious.[2] Among these trades, 55 of 66 trades assigned to the proprietary account were profitable for the Defendants. Conversely, just 25 of 64 trades assigned to the client account were profitable for clients. I assess the objective probability of this dichotomous outcome with a number of statistical tests.[3]

18. One way to objectively assign probabilities to these outcomes is to simply assume that a random trade would be profitable 50 percent of the time. Viewed in this light, the probability of making profitable trades 55 out of 66 times in the proprietary account is virtually zero. Under the same assumption, the probability of having as few as 25 profitable trades (of 64) in the proprietary account is just 5.2 percent. In either case, it appears highly unlikely that the outcomes between the two types of accounts would be so different.

---

[2] Trades through XFA have no timestamps so are excluded in this analysis. In addition, I could not locate trade tickets for a few of the trades, so these were also excluded. Lastly, trade number 49 for the proprietary account was not profitable, so was also excluded.

[3] Since some trade characteristics are missing in the data, some statistical tests are performed on subsets of the full data as necessary.

19. Of course, the Defendants are finance professionals, likely with some skill in trading these assets. Viewed in this light, the probability of making profitable trades is likely larger than 50 percent. As a second alternative, I use the Defendants' record of profitability to assess an alternative view of the differences between outcomes in the proprietary and client trading accounts. For the second alternative, I consider that, in total, 80 Defendant trades were profitable (25 for clients and 55 for the proprietary account) out of a total of 130 trades (64 for clients and 66 for the proprietary account). Thus, the Defendant trades are profitable 61.5 percent of the time, (larger than 50 percent, presumably reflecting some degree of skill).

20. Based on the 61.5 percent probability in my second alternative, the probability of making profitable trades 55 out of 66 times in the proprietary account remains virtually zero. Under the same assumption, the probability of having as few as 25 profitable trades (of 64) in the proprietary account is also virtually zero. Under this second alternative, the assumption that the Defendants have skill does not increase the probability that proprietary trades are always profitable, and in fact, this assumption reduces the probability of finding so few profitable client trades.

21. A third alternative, tilted toward assessing the skill applied to trades in the client account, is to consider the probability of making profitable trades based on client trades alone. Under this assumption, the probability of making profitable trades would be just 39.1 percent (25 out of 64 trades). For this third alternative, and as might be expected, the probability of having as few as 25 profitable trades (of 64) in the proprietary account rises to 84.0 percent. However, the probability of making profitable trades 55 out of 66 times in the proprietary account remains virtually zero. This third

alternative also fails to explain the dichotomous results between profitability in the client and proprietary accounts.

22. I have assessed the differential results between profitable trades in the client and proprietary accounts under three assumptions--using random probabilities, assuming a degree of skill, and using probabilities from client trades alone. In each of these three cases, it remains virtually impossible, on an independent statistical basis, to support the contention that client trades and proprietary trades were not assigned on an *ex post* basis, with fewer profitable trades assigned to client accounts.

**IV.    Trade Characteristics and Differences between Proprietary and Client Trades**

23. The analysis above implies that there is virtually zero probability of having such dichotomous rates of profitability between client and proprietary trades. Of course, the possibility remains that the types of trades made for clients differ in some dimension from the types of trades made for the proprietary account. In this section, I apply independent statistical tests to the data to assess whether trade sizes, holding periods, executing brokers, contract types, time of day, or day of the week differs across client and proprietary trades.

24. Statistical tests comparing trade characteristics across client and proprietary accounts can be done with a parametric approach (assuming the data is normally distributed) or a non-parametric approach (making no such assumption). In an effort to be comprehensive, I present results from both parametric and non-parametric tests below.

**A. Trade size analysis**

25. The first characteristic I examine is the trade size. Economic theory and empirical evidence have shown that transaction costs (and, by extension, profitability)

10

can depend on the sizes of trades executed.[4] Generally, larger trades are more expensive and therefore are likely to be less profitable. Given the disparity between the profitability of client and proprietary trades examined above, a natural question is whether these trades differ by size.

26. Based on the trade information I assessed, I am able to identify trade sizes for 58 client trades and 49 proprietary trades. The average trade size for client trades was 76.9 contracts while the average trade size for proprietary trades was 64.0 contracts. Based on a statistical test for differences, however, we can be only 60 percent confident that these trade sizes differ (far from the standard 95 percent confidence level typically applied to assess important statistical differences).

27. The median trade size for client trades is 35 contracts while the median trade size for proprietary trades is 25 contracts. Based on a non-parametric test of these differences, we can only be 62 percent confident that these medians are different. Both parametric and non-parametric tests fail to show that the trade sizes across accounts differ in any statistical sense.

28. As an alternative, I consider tests for the subset of 70 total trades (24 client trades and 46 proprietary trades) that were completely filled during the sample period. For example, if 20 contracts were purchased and 18 contracts were sold during the sample period, I consider only the trade sizes of the 18 contracts which were both bought and sold during the period and ignore the remaining contracts. I refer to these 18 contracts and "round turn" trades.

29. The average trade size for round turn client trades was 41.3 contracts while the average trade size for round turn proprietary trades was 65.8 contracts, a larger

---

[4] See Pedersen and Fialkowski (1994) and Frino, Bjursell, Wang and Lepone (2008).

11

difference than for all trades. Based on a statistical test for differences, we can be 94 percent confident that these round turn trade sizes differ (marginally statistically different, from a statistical standpoint). This evidence suggests that round turn proprietary trades are somewhat larger than round turn client trades, suggesting that proprietary trades might be more expensive, and therefore less profitable. If so, this result that runs contrary to the finding that the Defendants' proprietary trades are more likely to be profitable (as compared to client trades).

30. The median trade size for round turn client trades is 25 contracts while the median trade size for round turn proprietary trades is 32.5 contracts. Based on a non-parametric test of these differences, we can only be 59 percent confident that these medians are different. These non-parametric tests fail to show that the trade sizes for round turn trades differ across accounts in any statistical sense.

31. While trade size statistics generally fail to distinguish between client and proprietary trades, I also compare trade sizes conditional on which contract is traded for each account. Table 1 presents point estimates of trade sizes across contracts and shows that trade sizes do appear to differ across markets. In the Euro market, the average client trade was 80 contracts while the average proprietary trade was 39.1 contracts. In the Yen market, the average client trade was 35.8 contracts and proprietary trade was 52.8 contracts. More similar, client and proprietary trades in the S&P market were 90.2 and 88.3, respectively.

32. Based on parametric t-tests, we can only be 67 percent confident that the Euro client trades are larger than proprietary trades. As might be expected, we can only be 7 percent confident that client and proprietary trade sizes differ in the S&P market. While

larger trades may be more expensive to execute (and therefore less profitable), I find no evidence that client trades are significantly larger than proprietary trades.

33. This marginal evidence is supported by the fact that non-parametric tests show we can only be 87 percent confident that the Euro client trades are larger than proprietary trades (again, below the standard 95 percent confidence typically required for statistically significant differences). Likewise, we can only be 34 and 38 percent confident that median Yen and S&P client trades are larger than proprietary trades, respectively.

34. I further examine trade sizes by broker and by day of the week. While there is limited theory to guide an examination of profitability by broker, some empirical evidence suggests transaction costs (and therefore profitability) may differ across the trading week.[5] Generally, transaction costs are higher on Mondays than other days of the week. These higher transaction costs may theoretically make trades executed on Mondays less profitable. I therefore explore whether the difference in profitability between client and proprietary trades documented above might stem from a disproportionate share of client trades executed on Mondays.

35. Table 2 displays the number of trades on each day of the week, categorized by client and proprietary account. As shown, 13 client trades and 11 proprietary trades are executed on Mondays, suggesting there is not a significant difference in the fraction of total trades executed on Mondays. Among trades executed on Mondays, the average trade size for client trades was 64.2 contracts while the average trade size for proprietary trades was 37.7 contracts. Based on a statistical test for differences, however, we can be only 80 percent confident that these trade sizes differ (below the standard 95 percent confidence level typically applied to assess statistical differences).

36. In the interest of a complete analysis of potential day of the week effects, I also test (both parametrically and non-parametrically) for differences in mean and median trade sizes across other days of the week. As shown in Table 2, average trade sizes in the customer accounts are 86.9, 80.4, 92.5 and 69.3 contracts for Tuesday through Friday, respectively. While proprietary account trade sizes differ in magnitude (43.2, 126.6, 42.4, and 51.7 contracts, respectively), none of these differences are statistically significant beyond the 80 percent confidence level. There is no evidence that the average client and proprietary trades differ in the day of week that they are executed.

37. As shown in Table 2, median trade sizes in the customer accounts are 35, 50, 25 and 50 contracts for Tuesday through Friday, respectively. While proprietary account trade sizes sometimes differ in magnitude (at 50, 90, 25, and 45 contracts, respectively), non-parametric tests show that none of these differences are statistically significant beyond the 56 percent confidence level. In sum, I find no evidence that day of the week effects have significant influence over the differences in profitability found between client and proprietary accounts.

38. For completeness, I also examine trade sizes across executing broker. While no theory guides a look at specific executing brokers, if client trades are disproportionately executed via different brokers (relative to proprietary trades), we might expect differences in the profitability as well. In this analysis, I examine the trade size of 38 client trades and 7 proprietary trades executed through MF Global and 9 client trades and 40 proprietary trades executed through Mizuho. Mizuho executed a greater fraction of proprietary trades while MF Global executed a greater fraction of client trades during the sample period.

---

[5] See Keim and Stambaugh (1984) and Sias and Starks (1995).

39. An examination of MF Global trades shows that the average client trade size was 78.9 contracts while the average trade size for proprietary trades was 137.9 contracts. Based on a statistical test for differences in means, however, we can be only 87 percent confident that these trade sizes differ (insignificant at the standard 95 percent confidence level). Median MF Global trade sizes are 45 and 65 contracts for client and proprietary trades, respectively. Non-parametric statistical tests show that these medians are not significantly different either.

40. Examining Mizuho trades, I find that the average client trade size was just 22.2 contracts while the average proprietary trade size was 53.1 contracts. This mean difference is statistically significant at the 99 percent confidence level. However, a larger proprietary trade size suggests that the profitability of proprietary trades should be lower, not higher. The median Mizuho trade size is the same (25 contracts) for both client and proprietary trades. Non-parametric statistical tests confirm that these medians are not statistically different.

41. Overall, I find only marginal differences between the size of trades assigned to client and proprietary accounts. Client trades executed through the various brokers are, on average, unprofitable across each broker. The profitability of trades appears to be unrelated to the executing broker.

**B. Holding period analysis**

42. The analysis above implies that there is little evidence linking trade sizes with profitability across client and proprietary trades. Where statistical significance was found, this significance worked against finding greater profitability within the proprietary account. However, the possibility remains that the characteristics of trades made for

15

clients differs from those made for the proprietary account on other dimensions. In this section, I examine a second general trade characteristic--the holding period for each trade. I apply similar statistical tests to the data to assess whether the holding period generally, and holding period conditional on executing broker, contract type, time of day, or day of the week differs across client and proprietary trades.

43. While little economic theory guides the examination of holding periods, there remains some uncertainty as to whether this dimension may contribute to the disparity in profitability of trades in the client and proprietary accounts. In the interest of exploiting more information in the data I have been provided, I test some of these possibilities below.

44. Based on the trading data I analyzed, I am able to identify the holding period for 58 client trades and 49 proprietary trades. The average client trade was held for 345.5 minutes, just under 6 hours, while the average proprietary trade was held for 524.5 minutes, or just under 9 hours. Given that the typical trading day lasts 6.5 hours, the average proprietary trade was held for at least one overnight period. Based on a statistical test for differences, we are 95 percent confident that the proprietary trades are held longer than client trades.

45. The median client position is held for 217 minutes, while the median proprietary position is held for 385 minutes. Based on a non-parametric test of these differences, we are also 97 percent confident that these medians are different. Both parametric and non-parametric tests show that the holding periods across accounts are statistically different, with client trades held for a shorter duration than proprietary trades.

46. I further examine whether the difference in holding periods between client and proprietary trades is related to the profitability differences between the two groups. I find that the correlation between holding period and profits is an insignificant 12% among client trades and an insignificant 14% among all trades. The lack of correlation suggests that the profitability difference between client and proprietary accounts is not related to the time positions are held.

47. I further compare holding periods conditional on which contract is traded for each account. Table 3 presents point estimates of the mean and median holding periods across contracts and shows that the general differences between holding periods are found only in the Yen and S&P markets. In the Euro market, the average client trade was held for 505.5 minutes while the average proprietary trade was held for just 342.3 minutes. In the Yen market, the average client trade was held for 389 minutes and proprietary trade was held for 596.8 minutes. Similarly, S&P client trades were held for a shorter period (306.4 minutes) than proprietary trades (530.8 minutes).

48. Formal statistical tests show no significant differences between the length of time client positions are held and the length of time proprietary trades are held in either the Euro or Yen markets. For parametric t-tests, our degree of confidence is 52 and 76 percent in these two markets, while the corresponding degrees of confidence for non-parametric median tests are 18 and 91 percent. In these markets there is no statistical evidence that the length of time that positions are held contributes to the difference in profitability between client and proprietary trades.

49. For the S&P market we can be 87 percent confident that the mean S&P proprietary trade is held longer than the mean client trade (306.3 vs. 530.8 minutes).

Similarly, non-parametric tests suggest only an 81 percent level of confidence that the median times held differ (median client trades are held for 254 minutes vs. 341 minutes for proprietary trades). Tests for differences in medians in the Euro and Yen markets also fail to find differences between the time held for client and proprietary trades.

50. I further examine holding periods by broker and by day of the week. Keeping in mind that there is limited theory to link holding periods to profitability, I extend my analysis to the broker and day of week to better characterize any possible dimensions that might support the dichotomous results in profitability. The relatively weak evidence that proprietary trades are held longer in the Yen or S&P markets merits further investigation along these dimensions.

51. Table 4 displays the number of trades on each day of the week, categorized by client and proprietary account. As shown, 12 client trades and 11 proprietary trades are closed out on Mondays. Among these trades, however, the average client trade was held for 244.5 minutes while the average proprietary trade was held for 459.6 minutes. Based on a statistical t-test for differences, however, we can be only 55 percent confident that these holding periods differ (far below the standard 95 percent confidence level typically applied to assess statistical differences). Tests for differences between medians, however, suggest that client trades closed on Mondays are held for significantly shorter duration (244.5 minutes vs. 459.5 minutes) with 97 percent confidence.

52. I also test (both parametrically and non-parametrically) for differences in mean and median holding periods across other days of the week. As shown in Table 4, average holding periods in the client accounts are 402.8, 470.7, and 372.8 minutes for Tuesday through Thursday, respectively. While the average proprietary account holding

periods differ in magnitude (302.7, 489.3, and 519.2 minutes, respectively), none of these differences are statistically significant beyond the 92 percent confidence level (a marginal difference for positions closed on Tuesdays).

53. As shown in Table 4, median holding times in the customer accounts are 206, 254, and 288.5 minutes for Tuesday through Thursday, respectively. While proprietary account holding periods sometimes differ in magnitude (at 270, 292, and 439 minutes, respectively), non-parametric tests show that none of these differences are statistically significant beyond the 68 percent confidence level.

54. For positions closed on Friday, however, the average client trade is held just 256.8 minutes compared to 1074 minutes for proprietary trades. The median client trade is held for 256.8 minutes compared to 788 minutes for the median proprietary trade closed on Fridays. Both mean and median differences are significant at the 99 and 98 percent levels, respectively. In sum, I find some evidence that client trades are held for a shorter period of time than proprietary trades, primarily for trades executed to close positions on Fridays.

55. As with trade size above, I also examine holding periods across executing broker. MF Global trades shows that the average client trade was held for 184.2 minutes while the average proprietary trade was held for 217.6 minutes. Based on a statistical test for differences in means, however, we can be only 18 percent confident that these holding times differ (far from the standard 95 percent confidence level). Median MF Global trades are held for 179 and 270 minutes for client and proprietary trades, respectively. Non-parametric statistical tests show that these medians are not significantly different, however (at only the 46 percent level of confidence).

56. Examining Mizuho trades, I find that the average client trade was held just 347.6 minutes while the average proprietary trade was held for 549 minutes. This mean difference is not statistically different, however, with only a 77 percent level of confidence. Similarly, we can only be 72 percent confident that the median Mizuho trades differ by account (medians are 169 and 470 minutes, but with a small number of observations and large variances, these are not statistically different).

57. The analysis of holding times suggests that the reported client and proprietary trades may differ along at least this one dimension for the 12 client trades which are closed on Fridays (relative to 7 proprietary trades). However, we do not know whether these differences are causal in any sense. Differences may stem from either client trades being held for a shorter time horizon than proprietary trades or from unprofitable trades being sold earlier and assigned *ex post* to client accounts.

**C. Time of day analysis**

58. Given the limited evidence that trade sizes differ between client and proprietary accounts and the few differences uncovered for the time that positions are held between accounts, I further look to potential differences in the execution times for these.[6] Table 5 shows the average and median sizes for client and proprietary trades, grouped by time of day that the position was closed.[7] As shown, statistical differences between client and proprietary trades cannot be determined in trades reported before 12 noon since there was no variation in trade sizes for the 4 client trades in this category.

---

[6] Ekman (1992), McInish and Wood (1992) and Chan, Christie and Schultz (1995) show transaction costs differ across the trading day, and therefore profitability of trades executed at different times may also differ.
[7] I use the time of the closing trade assuming that exogenous reasons for closing a client position (e.g. for rebalancing purposes, hedging, etc.) gives the Defendants less control over this trade characteristic.

59. Table 5 reports only a few statistically significant results. For instance, the 10 proprietary trades reported to be executed between 12 and 3 p.m. are significantly larger (with 99 percent confidence) than are the 5 client trades executed during the same interval. Likewise, the 3 proprietary trades reported to be executed between 6 and 9 p.m. are also significantly larger than the 21 client trades executed during that interval (with 95 percent confidence). As noted above, however, larger trades are likely to be more expensive, and therefore less profitable than smaller trades. In this light, this evidence suggests that these comparable client trades should be more profitable than the proprietary trades, a result contrary to those documented above.

60. Given the small number of observations examined above, I also test whether the median trade sizes differ across groups within the various time bins. While the median trade size varies from 25 to 75 contracts in various time intervals, I find only one marginal statistical difference in this data. For trades reported after 9 p.m. the median client trade is 40 contracts while the median proprietary trade is for just 25 contracts. This difference is marginally statistically different at the 10 percent level (or 90 percent confidence level). Note that during this interval, however, the differences in means are not significant.

61. I further examine whether the time of day at which client and proprietary trades are executed is related to the profitability differences between the two groups. I find that the correlation between the time of day executed and profits is -24%, indicating that trades executed later in the day are less profitable. This result likely stems from the fact that (mostly unprofitable) client trades are more likely executed later in the day. Indeed, within client trades alone, the correlation between the time of day traded and

21

profits is an insignificant 3% and within proprietary trades, the correlation is an insignificant -7%. The lack of correlations here also suggests that the profitability difference between client and proprietary accounts is not related to the time of day that trades are executed.

**V.      Conclusions**

62. For the foregoing reasons, I conclude that the profitability differences between client and proprietary trades cannot be explained by characteristics of trade size, executing broker, the time a position is held, the day of week that trades are executed or by the time of day that trades are executed. The profitability differences are almost surely the result of *ex post* assignment to different trading accounts.


_____
Jeffrey H. Harris

Dated:  August 29, 2013

**Table 1 Trade Size by Contract Type**

Average and median trade sizes for 49 trades assigned to the proprietary account and 58 trades assigned to the client account from October 15, 2008 through March 18, 2009 in the eMini S&P 500 and S&P futures contracts, the Japanese Yen futures contract, and the Euro futures contract. ***, **, and * denote differences between client and proprietary trades at the 99, 95 and 90 percent confidence levels, respectively.

| Contract | | # trades | Average Trade Size | Median Trade Size |
|---|---|---|---|---|
| Euro | Client | 6 | 80.0 | 35 |
| | Proprietary | 9 | 39.1 | 25 |
| Yen | Client | 13 | 35.8 | 30 |
| | Proprietary | 21 | 52.8 | 25 |
| S&P | Client | 39 | 90.2 | 50 |
| | Proprietary | 19 | 88.3 | 60 |

**Table 2 Trade Size by Day of Week**
Average and median trade sizes, by day of the week, for 57 trades assigned to the client
account and 44 trades assigned to the proprietary account from October 15, 2008 through
March 18, 2009 in the eMini S&P 500 and S&P futures contracts, the Japanese Yen
futures contract, and the Euro futures contract. ***, **, and * denote differences between
client and proprietary trades at the 99, 95 and 90 percent confidence levels, respectively.

| Day | | # trades | Average Trade Size | Median Trade Size |
|---|---|---|---|---|
| Monday | Client | 13 | 64.2 | 35 |
| | Proprietary | 11 | 37.7 | 25 |
| Tuesday | Client | 8 | 86.9 | 35 |
| | Proprietary | 11 | 43.2 | 50 |
| Wednesday | Client | 12 | 80.4 | 50 |
| | Proprietary | 14 | 126.6 | 90 |
| Thursday | Client | 12 | 92.5 | 25 |
| | Proprietary | 5 | 42.4 | 25 |
| Friday | Client | 12 | 69.3 | 50 |
| | Proprietary | 3 | 51.7 | 45 |

24

**Table 3 Holding Time by Contract Type**

Average and median minutes held for 49 trades assigned to the proprietary account and 58 trades assigned to the client account from October 15, 2008 through March 18, 2009 in the eMini S&P 500 and S&P futures contracts, the Japanese Yen futures contract, and the Euro futures contract. ***, **, and * denote differences between client and proprietary trades at the 99, 95 and 90 percent confidence levels, respectively.

| Contract | | # trades | Average Minutes Held | Median Minutes Held |
|---|---|---|---|---|
| Euro | Client | 6 | 505.5 | 221.5 |
| | Proprietary | 9 | 342.3 | 227.0 |
| Yen | Client | 13 | 389.0 | 186.0 |
| | Proprietary | 21 | 596.8 | 498.0* |
| S&P | Client | 39 | 306.4 | 254.0 |
| | Proprietary | 19 | 530.8 | 341.0 |

25

**Table 4 Holding Time by Day of Week**

Average and median minutes held, by day of the week, for 48 trades assigned to the proprietary account and 57 trades assigned to the client account from October 15, 2008 through March 18, 2009 in the eMini S&P 500 and S&P futures contracts, the Japanese Yen futures contract, and the Euro futures contract. ***, **, and * denote differences between client and proprietary trades at the 99, 95 and 90 percent confidence levels, respectively.

| Day | | # trades | Average Minutes Held | Median Minutes Held |
|---|---|---|---|---|
| Monday | Client | 12 | 244.5 | 166.0 |
| | Proprietary | 11 | 459.6 | 393.0** |
| Tuesday | Client | 9 | 402.8 | 206.0 |
| | Proprietary | 11 | 302.7* | 270.0 |
| Wednesday | Client | 11 | 470.7 | 254.0 |
| | Proprietary | 9 | 489.3 | 292.0 |
| Thursday | Client | 13 | 372.8 | 208.5 |
| | Proprietary | 10 | 519.2 | 430.0 |
| Friday | Client | 12 | 256.8 | 262.0 |
| | Proprietary | 7 | 1074.0*** | 788.0** |

**Table 5  Trade Size by Time of Day Reported**
Average and median trade size, by time of day that the position was closed, for 58 trades
assigned to the proprietary account and 49 trades assigned to the client account from
October 15, 2008 through March 18, 2009 in the eMini S&P 500 and S&P futures
contracts, the Japanese Yen futures contract, and the Euro futures contract. ***, **, and *
denote differences between client and proprietary trades at the 99, 95 and 90 percent
confidence levels, respectively.

| Time of Day Reported | | # trades | Average Trade Size | Median Trade Size |
|---|---|---|---|---|
| Before 12 noon | Client | 4 | 25.0 | 25.0 |
| | Proprietary | 25 | 43.1 | 25.0 |
| 12 p.m. to 3 p.m. | Client | 5 | 34.0 | 35.0 |
| | Proprietary | 10 | 88.5*** | 72.5 |
| 3 p.m. to 6 p.m. | Client | 15 | 72.0 | 25.0 |
| | Proprietary | 2 | 42.5 | 42.5 |
| 6 p.m. to 9 p.m. | Client | 21 | 69.5 | 40.0 |
| | Proprietary | 3 | 134.3** | 25.0 |
| After 9 p.m. | Client | 13 | 127.1 | 75.0 |
| | Proprietary | 9 | 76.3 | 40.0* |

**Exhibit A--Facts and Data Considered in Forming Opinion**

**I.        Publications**

Chan, K.C., William G. Christie and Paul H. Schultz, 1995, Market structure and
    the intraday pattern of bid-ask spreads for Nasdaq securities, *Journal of
    Business* 68, 35-60.

Ekman, Peter D., 1992, Intraday patterns in the S&P 500 index futures market,
    *Journal of Futures Markets* 12, 365-381.

Frino, Alex, Johan Bjursell, George H. K. Wang and Andrew Lepone, 2008,
    Large trades and intraday futures price behavior, *Journal of Futures
    Markets* 28, 1147-1181.

Keim, Donald B. and Robert F. Stambaugh, 1984, A further investigation of the
    weekend effect in stock returns, *Journal of Finance* 39, 819-835.

McInish, Thomas H. and Robert A. Wood, 1992, An analysis of intraday patterns
    in bid/ask spreads for NYSE stocks, *Journal of Finance* 47, 753-64.

Pedersen, Mitchell A. and David Fialkowski, 1994, Posted versus effective
    spreads: Good prices or bad quotes?, *Journal of Financial Economics* 35,
    269-292.

Sias, Richard and Laura Starks, 1995, The day of the week anomaly: The role of
    institutional investors, *Financial Analysts Journal* 51, 58-67.


**II.        Sources Used to Construct the Datasets**

- CFTC complaint as filed PDF

- Defendants' Answer and Affirmative Defense to Complaint PDF

- Plaintiff's Answers and Objections to Defendants' First Set of Interrogatories
   PDF

- Plaintiff's Responses and Objections to Defendants' Second Set of
   Interrogatories to Plaintiff (Revised) PDF

- Devon trade ticket files, various PDF

- Mizuho trade ticket files, various PDF

- MF Global electronic trading records (60629001 - Suspense Account.txt)

- MF Global electronic trading records (29060006 - Proprietary Account.txt)

- Master Allocation spreadsheet files (XLS)

Exhibit B—Curriculum Vitae of Jeffrey H. Harris

# JEFFREY H. HARRIS

624 Whitman
Syracuse University
Syracuse, NY 13244
(315) 443-4843
jhharr03@syr.edu

## Education

Ph.D., Business Administration, Finance. The Ohio State University, 1995

M.B.A., Finance. The University of Iowa, 1987

B.A., Physics. Economics Minor. The University of Iowa, 1986
                    Attended Luther College, 1982-84

## Employment History

Syracuse University, Dean's Chair in Finance, 2011-Present

University of Delaware, Professor, 2006-11
                    Associate Professor, 2003-06
                    Assistant Professor, 2001-03

Southern Methodist University, James M. Collins Chair (Visiting), 2010-11

U.S. Commodity Futures Trading Commission, Chief Economist, 2007-10
                    Visiting Academic/Consultant, 2006-07

University of Notre Dame, Assistant Professor, 1995-2001

Nasdaq Department of Economic Research, Visiting Academic Fellow, 2000-01

U.S. Securities and Exchange Commission, Visiting Academic Scholar, 1999-2000

The Ohio State University, Visiting Assistant Professor, 1995-97

## Professional Activities

Testimony before Congress
        "The Role of Speculative Investments in Energy Markets" before the United States
        Senate Subcommittee on Energy and Natural Resources, September 16, 2008.

30

"Financial Speculation in Commodity Markets: Are Institutional Investors and Hedge Funds Contributing to Food and Energy Price Inflation?" before the United States Senate Committee on Homeland Security and Governmental Affairs, May 20, 2008.

"The Influence of Speculative Traders in Commodity Markets" before the United States House of Representatives Agriculture Committee, May 15, 2008.

"The Influence of Non-commercial Institutional Investors on Oil Prices" before the United States Senate Committee on Energy and Natural Resources, April 3, 2008.

Testimony before the Commission
"Price Discovery in Natural Gas Markets" before the United States Commodity Futures Trading Commission Hearing to Examine Trading on Regulated Exchanges and Exempt Commercial Markets, September 18, 2007.

"Price Convergence in Agricultural Markets" before the United States Commodity Futures Trading Commission Agricultural Markets Roundtable, April 22, 2008.

"On Position Limits" before the United States Commodity Futures Trading Commission Open Meeting Regarding Proposed Position Limits Rule, January 14, 2010.

Expert Reports
In re: United States Securities and Exchange Commission v. Moises Saba Masri and Albert Meyer Sutton
In re: Sycamore Networks, Inc. Initial Public Offering Securities Litigation
In re: United States v. Sergey Aleynikov
In re: United States v. George Holley
In re: Qimonda Richmond, LLC, et al. Debtors, Chapter 11

## Publications

"Herding and Speculation in the Crude Oil Market" with Celso Brunetti and Bahattin Büyükşahin, *The Energy Journal*, forthcoming.

"Informed Trading and Market Structure" with Charlie X. Cai, Robert S. Hudson and Kevin Keasey, *European Financial Management*, forthcoming.

"Who Drove and Burst the Tech Bubble" with John M. Griffin, Tao Shu and Selim Topaloglu, 2011, *Journal of Finance* 66, 1251-1290.

"Clearing House, Margin Requirements, and Systemic Risk" with Jorge A. Cruz Lopez and Christophe Pérignon, 2011, *Review of Futures Markets* 19, 39-54.

"The Role of Speculators during Periods of Financial Distress" with Naomi Boyd and Arkadiusz Nowak, 2011, *Journal of Alternative Investments* 14, 10-25.

"Effects of Central Bank Intervention on the Interbank Market during the Subprime Crisis" with Celso Brunetti and Mario di Filippo, 2011, *Review of Financial Studies* 24, 2053-2083.

"The Role of Speculators in the Crude Oil Futures Markets" with Bahattin Büyükşahin, 2011, *The Energy Journal* 32, 167-202.

"Why to Maturing Futures and Cash Prices Diverge for Agricultural Commodities?" with Nicole Aulerich and Raymond P.H. Fishe, 2011, *Journal of Futures Markets* 31, 503-533.

"Why are IPO Investors Net Buyers through Lead Underwriters?" with John M. Griffin and Selim Topaloglu, 2007, *Journal of Financial Economics* 85, 518-551.

"How New Entry in Options Markets affected Market Making and Trading Costs" with Patrick DeFontnouvelle and Raymond P.H. Fishe, 2005, *Journal of Investment Management* 3, 24-40.

"The Development of Secondary Market Liquidity for NYSE-Listed IPOs" with Shane A. Corwin and Marc L. Lipson, 2004, *Journal of Finance* 59, 2339-2374, Awarded Outstanding Paper in Financial Institutions at the 2002 Southern Finance Association Meeting.

"The Dynamics of Institutional and Individual Trading" with John M. Griffin and Selim Topaloglu, 2003, *Journal of Finance* 58, 2285-2320. Nominated for the Smith-Breeden Prize.

"The Behavior of Bid-Ask Spreads and Volume in Options Markets During the Competition for Listings in 1999" with Patrick DeFontnouvelle and Raymond P.H. Fishe, 2003, *Journal of Finance* 58, 2437-2463. Nominated for the Smith-Breeden Prize.

"Nasdaq Trading Halts: The Impact of Market Mechanisms on Prices, Trading Activity and Execution Costs" with William G. Christie and Shane A. Corwin, 2002, *Journal of Finance* 57, 1443-1478.

"The Initial Listing Decisions of Firms that Go Public" with Shane A. Corwin, 2001, *Financial Management* 30, 35-55.

"The Effect of Nasdaq Market Reform on Trading Costs and Depths" with Michael J. Barclay, William G. Christie, Eugene Kandel, and Paul H. Schultz, 1999, *Journal of Finance* 54, 1-34. Nominated for the Smith-Breeden Prize.

"The Trading Profits of SOES Bandits" with Paul H. Schultz, 1998, *Journal of Financial Economics* 50, 39-62.

"The Importance of Firm Quotes and Rapid Executions: Evidence from the January 1994 SOES Rules Change" with Paul H. Schultz, 1997, *Journal of Financial Economics* 45, 135-166.

"Why Did NASDAQ Market Makers Stop Avoiding Odd-Eighth Quotes?" with Paul H. Schultz and William G. Christie, 1994, *Journal of Finance* 49, 1841-1860.

## Book Chapters/Articles in Books
"The Changing Structure of Energy Futures Markets" with Bahattin Büyükşahin, James A. Overdahl and Michel A. Robe, 2009, in *Finance et Valeurs*, A. Corhay, G. Hubner and A. Miller, editors, ULg Press, Belgium.

"Equity Market Derivatives" with L. Mick Swartz, 2009, in *Financial Derivatives* (Robert W. Kolb Series in Finance), Bob Kolb and Jim Overdahl, editors, John Wiley and Sons, Inc.

"Tick Size, Market Structure and Trading Costs" with William G. Christie and Eugene Kandel, 2008, in *Stock Market Liquidity: Implications for Market Microstructure and Asset Pricing*, Francois-Serge L'habitant and Greg N. Gregoriou, editors, John Wiley and Sons, Inc., 173-197.

## Working Papers
"CoMargin: A System to Enhance Financial Stability" with Jorge A. Cruz Lopez, Christophe Hurlin and Christophe Perignon.

"Speculation, Prices and Market Volatility" with Celso Brunetti and Bahattin Büyükşahin.

"The Impact of Herding on Futures Market Prices" with Naomi Boyd, Bahattin Büyükşahin and Michael S. Haigh.

"Funding Constraints and Liquidity Contagion in U.S. Equity and Treasury Markets" with Christof W. Stahel.

"Do Institutional Traders Predict Bull and Bear Markets?" with Celso Brunetti and Bahattin Büyükşahin.

"Fundamentals, Trader Activity and Derivative Pricing" with Bahattin Büyükşahin, Michael S. Haigh, James A. Overdahl and Michel A. Robe.

"Trading Networks" with Lada Adamic, Celso Brunetti and Andrei Kirilenko.

"Off but Not Gone: A Study of Nasdaq Delistings" (formerly titled "From Pink Slips to Pink Sheets: Market Quality around Nasdaq Delisting") with Venkatesh Panchapagesan and Ingrid M. Werner.

"Stepping Ahead of the Book" with Amy K. Edwards.

"Liquidity Risk, Investor Flux and Post-Earnings Announcement Drift" with Kirsten L. Anderson and Eric So.

"The Sound of Silence" with Mohsen Saad.

## Work-In-Progress
"Price Discovery in Crude Oil Futures Markets" with Bahattin Büyükşahin.

"The Long and Short of Dealer Profits" with Jay F. Coughenour.

## Teaching Experience
Seminar, Empirical Finance (PhD), 2012
Financial Management (MSF), 2013
Investment Analysis (MBA), 2001-04, 2006.
Portfolio Theory (MBA), 2010, 2012.
Derivative Investments (MBA), 1996-97, 2005, 2010, 2012-13.
Management of Financial Institutions (MBA), 1995-97.
Investments, 2001-06, 2010.
Options, Futures and Other Derivatives, 1994-97, 2005, 2012-13.
Speculative Markets, 2010.
Financial Institutions Management, 1997.
Introductory Managerial Finance, 1997-99.

## Presentations
"Financial Trading, Energy Markets and Dodd-Frank"
Keynote Address to the 2012 Oklahoma State MSQFE Alumni Weekend.

"Gasoline Prices and the Changing U.S. Oil Market"
Presented to the Congressional Research Service.

"Funding Constraints and Liquidity Contagion in U.S. Equity and Treasury Markets"
Presented at Syracuse University.

"Energy Markets and Dodd-Frank: Where are we now?"
Presented at the 2012 Fulbright Jaworski/Cornerstone Research conference on Dodd-Frank's Impact on the Energy Markets and at Resources for the Future.

"Do Institutional Traders Predict Bull and Bear Markets?"
Presented at the New York Accounting and Finance Forum and Syracuse University.

"Speculation, Prices and Market Volatility"
Presented at the University of Mississippi and the University of Delaware Economics
Seminar.

"The Evolving Landscape for Derivative Regulation"
Presented at Fulbright Jaworski Oil and Gas Compliance Seminar, HEC Paris,
NasdaqOMX, the Universita Politecnica delle Marche, Ancona, Italy, the Vanderbilt
University Conference on Regulatory Change in the Global Financial System, Cornerstone
Research and the Platts Oil Trading and Risk Management Forum.

"Effects of Central Bank Intervention on the Interbank Market during the Sub-Prime
Crisis"
Presented at the Universita Politecnica delle Marche, Ancona, Italy.

"Trading Networks"
Presented at Rutgers University, Southern Methodist University, Syracuse University,
Temple University, the University of Central Florida, the University of Missouri-
Columbia, the University of Tennessee and Villanova University.

"Improving Market Transparency"
Presented at the 2009 CFTC Symposium for International Market Authorities.

"Abusive Conduct from an Economist's Perspective"
Presented at the 2009 CFTC Division of Enforcement International Regulators
Conference.

"The Role of Speculators in the Crude Oil Futures Markets"
Presented at the NYSE/Euronext Amsterdam & Tinbergen Institute Workshop on
Liquidity and Volatility in Today's Markets and the 2009 International Association of
Energy Economists International Conference.

"Index Trading and Speculation in Commodity Futures Markets"
Presented at the CFTC Agricultural Forum, the American Agricultural Economics
Association Meeting, the Mid-Atlantic Farm Credit Board of Directors annual meeting,
the Council on Food, Agriculture and Resource Economics, Keynote Address to the
Washington Area Finance Association, the U.S.-India Financial and Economic Forum,
the U.S. Department of State Bureau of Economic and Business Affairs, the 2008 CFTC
Symposium for International Market Authorities, the USDA/World Bank Food Panel, the
2008 IOSCO Conference on Speculation and Volatility in Commodity Markets, the
Canadian Securities Administration, the Energy Information Administration (Department
of Energy), the 2009 NCCC-134 Meeting on Applied Commodity Price Analysis,
Forecasting and Market Risk Management, the Kansas City Federal Reserve Panel on
Agricultural Finance, the 2009 EIA Energy Conference, the American Petroleum
Institute, the 2009 FIA Legal and Compliance Conference, HEC Paris, the 2009
Canadian Economics Association meeting, Terrapinn 2011 World Commodities Week
and the 2011 InVivo Paris Conference on Speculation in Agriculture Markets.

"Increasing Internationalization of the Financial Markets"
Presented at the Chatham House, London.

"Index Funds and Data Dissemination in Crude Oil Markets"
Presented at the 2008 International Energy Agency Expert Roundtable on Oil Price
Formation and to the U. S. CFTC Energy Markets Advisory Committee.

"The Impact of Herding on Futures Market Prices"
Presented at the 2007 CFTC Symposium for International Market Authorities.

"Price Discovery in U.S. Natural Gas Futures Markets"
Presented to the U.S. CFTC.

"Market Growth, Trader Participation and Pricing in Energy Futures Markets"
Presented at the Arizona State University, the 2007 MIT Center for Energy and
Environmental Policy Research Conference and Johns Hopkins University.

"Liquidity Risk, Investor Flux and Post-Earnings Announcement Drift"
Presented at the University of Toronto and the University of Arizona.

"The Sound of Silence"
Presented at the U.S. CFTC and University of Delaware Brown Bag seminar series.

"Off but Not Gone: A Study of Nasdaq Delistings" (formerly titled "From Pink Slips to
Pink Sheets: Market Quality around Nasdaq Delisting")
Presented at the University of Delaware, George Mason University and George
Washington University.

"Why are IPO Investors Net Buyers through Lead Underwriters?"
Presented at American University, Case Western Reserve University, Drexel University,
the University of Missouri—Columbia, Morgan State University and Temple University.

"Investor Behavior Surrounding Earnings Announcements"
Presented at the University of Delaware Brown Bag seminar series.

"Trading Behavior around the Rise and Fall of Nasdaq"
Presented at the University of Maryland and the University of Connecticut.

"The Effect of Decimals on Nasdaq Retail Trading"
Presented at the University of Delaware and 2002 Eastern Finance Association Meeting.

"The Development of Secondary Market Liquidity for NYSE-Listed IPOs"
Presented at Nasdaq, 2001 Financial Management Association Annual Meeting, 2002
Southern Finance Association Meeting, the University of Miami and the University of
Delaware.

"Competition for Market Making in NYSE IPOs"
Presented at Nasdaq.

"Nasdaq Trading Halts: The Impact of Market Mechanisms on Prices, Trading Activity and Execution"
Presented at the 2000 Western Finance Association Annual Meeting, 2000 NBER Microstructure Conference, 2000 Financial Management Association Annual Meeting, Penn State University, the Nasdaq Stock Market, George Washington University and American University.

"The Initial Listing Decisions of Firms that Go Public"
Presented at the 1998 Financial Management Association Annual Meeting, the Nasdaq Stock Market, Syracuse University and Arizona State University.

"The Trading Profits of SOES Bandits"
Presented at the University of Georgia and the 1997 Financial Management Association Annual Meeting.

"The Importance of Firm Quotes and Rapid Executions: Evidence from the January 1994 SOES Rules Change"
Presented at The Ohio State University, University of Notre Dame and the 1997 American Finance Association Annual Meeting.

"Cost Components of the Bid-Ask Spread: An Intraday Analysis"
Presented at the 1994 Financial Management Association Annual Meeting, University of Arizona, University of Houston, University of Iowa, University of Miami, Michigan State University and University of Notre Dame.

## Professional Activities

Panelist,
> "Dodd-Frank and Commodity Markets" panel at the Terrapinn World Commodities Week, London 2011.
> "Speculation and Regulation in Energy Markets" panel at the Standard Chartered Bank Earth's Resources Conference, Hong Kong 2011.
> "The Regulatory World of Market Manipulation" panel at the American Bar Association Antitrust and Consumer Law Issues in the Energy Industry Conference, 2011.
> "Commodity Super-cycles" panel at Standard Chartered Bank New York Symposium, 2011.
> "World Oil Markets" panel moderator at the IEA/IEF/OPEC London Symposium on World Oil Markets, 2010.
> "Assessing Dodd-Frank" panel on current financial regulation, National Association of Business Economists, 2010.
> "What's Next?" panel on post-crisis regulation, Georgetown University, 2010.

"Sovereign CDS Markets" discussion panel at Georgetown University, 2010.

Referee,
  *The Accounting Review, Eastern Economic Journal, Financial Management, Financial Review, International Review of Financial Analysis, Journal of Accounting and Public Policy, Journal of Banking and Finance, Journal of Business, Journal of Corporate Finance, The Journal of Economics and Business, Journal of Finance, Journal of Financial Economics, Journal of Financial and Quantitative Analysis, Journal of Financial Markets, Journal of Money, Credit and Banking, The Quarterly Review of Economics and Finance* and *Review of Financial Studies.*

Director,
  Eris Exchange, 2011-Present
  Southern Finance Association 2010-Present

Track Chair,
  Markets and Microstructure, Financial Management Association 2002
  Markets and Microstructure, Midwest Financial Management Association 2003

Program Committee,
  European Finance Association 2006-11
  Financial Management Association 2002-10
  Southern Finance Association 2008
  Western Finance Association 2003-11, 2013

Session Chair,
  Financial Management Association 2002, 2004-05
  Southern Finance Association 2000, 2002, 2008
  Eastern Finance Association 2002

Discussant,
  Allied Social Sciences Association 2007
  Financial Management Association 1996-97, 1999-2002, 2004-06
  Ohio State Conference on Dealer Markets 1996
  Notre Dame/Nasdaq Dealer Market Conferences 1999-2000
  Southern Finance Association 2000, 2002, 2008
  Western Finance Association 2001, 2004
  Washington Area Finance Association 2000, 2002, 2004

Member,
  American Finance Association
  Financial Management Association
  Southern Finance Association
  Western Finance Association

38

Advisor,
>Lerner Finance Club (MBA) 2005-07
>Whitman Financial Management Association 2011-Present

## Other Work Experience

Copy Editor, *Journal of Finance*, 1992-93
MBA Advisor/Graduate Admissions Coordinator, University of Iowa College of
Business Administration, 1988-1991
Executive Trainee/Distributor, MAY Corporation Venture Stores Division, 1988

## Honors and Awards

Lerner College Outstanding Scholar Award, University of Delaware, 2008
Research Grants,
>Institute for Financial Markets, 2010
>Lerner College of Business and Economics, 2004, 2007
>University of Delaware General University Research Grant, 2006
>University of Delaware Department of Finance, 2005
>University of Notre Dame Mendoza College of Business, 1996, 1998-99

Nominated for University of Delaware Lerner College Teaching Award, 2004, 2006
Nominated for University of Delaware Lerner College Advising Award, 2004
Cited as "Prominent Faculty" in 2008-10, 2012 Business Week Rankings of
>Undergraduate Business Schools
Member, Beta Gamma Sigma

**EXHIBIT 2**

# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| U.S. Commodity Futures Trading Commission, v. Donald A. Newell and Quiddity, LLC, | Civil Action 12-CV-6763 |

## SUPPLEMENTAL EXPERT REPORT OF JEFFREY H. HARRIS, Ph.D.

**(Incorporates by Reference Previous Expert Report)**

December 9, 2013



DEPOSITION EXHIBIT
Harris 2
1/10/14   RV
PENGAD 800-631-6989

**SUPPLEMENTAL EXPERT REPORT OF JEFFREY H. HARRIS, Ph.D.**

**I.     Overview**

1.     In this report, I clarify and discuss the use of the term "trades," offer my opinions on statements made in Defendants' Expert Reports (see list in Appendix A), and present some further analysis of the trades which the Defendants assigned to both proprietary and customer trading accounts.

**II.     Summary of Opinion**

2.     First, upon reviewing the Defendants' expert reports, I maintain that there exists little evidence of material differences (other than profitability) between trades assigned to client and proprietary trading accounts. Second, I find that the Defendants' criticism of the Commodity Futures Trading Commission (CFTC) definition of "trades" as all trading activity over a particular day is not problematic, and in fact, is less susceptible to data errors that may result from any *ex post* assignment of trades to customer or proprietary accounts. Third, having further analyzed days in which trades in the same contract are assigned to either the customer or proprietary account, I continue to find that profitability of trades differs across accounts.

**III.     Clarification of the Term "Trades"**

3.     My Expert Report adopted the the same terminology for the term "trade" as employed by the CFTC in the complaint. I adopted this definition for an important reason: Given no evidence that individual executions were assigned *a priori* to the client

or proprietary accounts, an analysis of the profitability or trade characteristics of trades defined as "the initiation and liquidation of a position" would be inherently flawed since an objective observer would have no factual basis for determining whether the position was initiated in the client or proprietary account. In fact, an *ex post* allocation of executions to different accounts would necessarily rely on a definition of "initiations and liquidations" tainted by the alleged behavior that was the subject of the original complaint.

4.      Indeed, on a number of days (at least fifteen) during the complaint period, Defendants allocated positions in the same underlying contract to both customer and proprietary accounts positions. If allocations were done on an *ex post* basis, it would be impossible for an independent observer to know when any initiated position might have been liquidated. Without the facts to support the contention that these executions were assigned to an account at initiation, any type of analysis using this "bad" data would be flawed. If the account designation for initiated positions are not accurate, any subsequent analysis based on the erroneous account designation would be inaccurate as well.

5. Whether trades are defined as "initiation and liquidation" or by trading day, on the various days during the period under question the trades assigned to customer accounts fared significantly worse than those assigned to the proprietary account. In fact, on eight of these days, trades assigned to the customer accounts suffered aggregate daily losses while trades assigned to the proprietary account enjoyed aggregate daily profits.

6. The CFTC's definition of "trades" attempts to overcome this inherent flaw in the Defendants' definition by examining executions over an entire trading day, since the overnight period affords the opportunity for *ex post* assignment. By examining the full

set of executions each day as a "trade," my original analysis focused on the statistical

differences between observable characteristics of the executions assigned to each account

each day rather than on the potentially faulty premise that executions were appropriately

assigned beforehand to the customer or proprietary accounts. In this light, any attempt to

apply an "initiation and liquidation" approach introduces potentially flawed data into the

analysis of profitability.

7. In short, any critique of the CFTC's definition of a "trade" in this case lacks

merit. To avoid the bias inherent in analyzing trades defined as "the initiation and

liquidation of a position" my analysis focuses on substantiated facts in the data and not

on data potentially tainted by the precise bad behavior alleged in the CFTC's complaint.


## IV. Discussion of the Defendants' Trading Strategies

8. Defendants' expert reports posit a number of differences that should be evident

if the trading strategies applied to customer and proprietary accounts differ. Indeed, my

original Expert Report utilized as many facts within the trade data—including trade size,

executing broker, length of time a trade is held, day of the week that trades are executed

and time of day that trades are executed—that could be exploited in an attempt to discern

any differences between accounts. I found little to no differences along these dimensions.

9. Subsequently (see p. 5, Final Expert Report of John Burnside) the Defendants'

expert asserts that the overwhelming number of customer trades placed by the Defendants

during the period covered by the CFTC complaint are in options contracts and are not

futures day trades. This does not diminish the fact that the futures day trades assigned to

the customer account closely resemble the futures day trades assigned to the proprietary account (sometimes on the same day and in the same underlying asset).

10. Defendants' expert reports mention on many occasions that delta hedging strategies underlie trades assigned to the customer account. I find these statements to be unconvincing. First of all, one of the Defendants' experts asserts that the Defendants' customer trades are generated by a computer executing "a probability dependent approach to option volatility arbitrage" but also represent "hedge transactions ... motivated by the desire to reduce risk ... and not motivated by the quest for profits" (see p. 6, Final Expert Report of John Burnside). These two motivations are contradictory. Arbitrage trades (including statistical based option volatility arbitrage), by definition, are meant to generate profits.

11. Notwithstanding the contradictory nature of these statements, I have no reason to believe that this strategy was actually implemented in trades assigned to customer accounts. Volatility arbitrage as a strategy

> "generally implemented through a delta neutral portfolio consisting of an option and its underlying asset. A long position in an option combined with a short position in the underlying asset is equivalent to a long volatility position. This strategy will be profitable if the realized volatility on the underlying asset eventually proves to be higher than the implied volatility on the option when the trade was initiated. Conversely, a short position in an option combined with a long position in the underlying asset is equivalent to a short volatility position, which will be profitable if the realized volatility on the underlying asset is ultimately lower than the option's implied volatility." (see Investopedia.com at http://www/investopedia.com/terms/v/volatility-arbitrage.asp accessed on December 6, 2013)

Despite the assertion that this strategy underlies trades assigned to customer accounts, the Defendants' expert reports provide only a few anecdotal details as to the combined option and underlying assets that might comprise this strategy. Only a few

5

option or portfolio deltas have been provided in defense of this strategy, a fact I find surprising, given the assertions that this strategy prevailed during the entire period under question. Moreover, the Defendants provide only scant evidence about market volatility that these strategies were purported to mitigate.

12. Defendants' experts also claim that different risk tolerances could possibly lead to "material differences" between the profitability of trades assigned to the customer accounts and trades assigned to the proprietary account (see Section V.B. pp. 7-8, Final Expert Report of John Burnside). However, different risk tolerances are also likely to be reflected in material differences in the variables I analyzed in my first expert report. For instance, lower risk tolerances should also result in smaller trade sizes and/or shorter holding periods. The fact that no material differences are found between trade sizes or holding periods in my earlier analysis suggests that different risk tolerances also do not underlie the profitability differences found between the trades assigned to the customer and proprietary accounts.

13. Defendants' experts also claim that proprietary trading systems are "at least partially, if not wholly, in the heads of the traders who employ them" and it is "virtually impossible to ascertain … the system used by … Mr. Newell" (p. 8, Final Expert Report of John Burnside). I find this argument to be unconvincing in light of my prior analysis. Just because an independent observer might not be able to correctly ascertain a particular proprietary trading strategy does not mean that a comparison of trade characteristics between trades assigned to customer accounts and trades assigned to proprietary accounts is not informative. The fact remains that the computer assisted trading strategy which the Defendants allegedly used for customer accounts generates trades indistinguishable from

proprietary trades across the five variables that I analyzed in my first report, but significantly different in profitability. These expert claims do not temper my concerns that these trades were executed and then allocated after the fact to different accounts based on profitability.

14. In the few instances when the Defendants' trades are discussed in any detail by the experts (see Section XI in Preliminary Expert Report of John Burnside) I find the explanations of customer trading strategies to be incomplete or even contradictory. In one instance, during the discussion of February 24, 2009 trades, the Defendants' expert himself notes that the espoused "delta neutral strategy" was not followed. A delta neutral strategy will have a delta close to zero. At the top of the last page of this report, he documents a net (portfolio) delta of -32.5, a bearish position, and notes that the lack of a long futures (which would move the portfolio delta closer to zero) "seems a bit out of place." These findings undermine assertions that strategies executed for customer accounts were part of delta neutral strategies.

15. In another instance, the Defendants' expert Burnside discusses the trades executed on October 16, 2008 with details about the gamma of the portfolio in the customer account (see Section XI in Preliminary Expert Report of John Burnside). He documents that the customer account had a significant gamma. Optimally, a delta neutral strategy will have a low gamma so as to minimize the number of times a portfolio must be rebalanced. The fact that this gamma was significant also undermines claims that a delta neutral strategy was applied to customer accounts.

16. Expert Burnside's discussion of the trades on October 16, 2008 also contains inconsistencies (see Section XI in Preliminary Expert Report of John Burnside). Burnside

7

acknowledges "I cannot ... even begin to explain the logic ... of each action." Nevertheless he concludes allocations to customer accounts were "done with the purpose of either hedging an existing ... position or ... an anticipated or executed option order." Since even the Defendants' expert himself fails to understand the logic of each action, I am not convinced of anything that he might opine on related to the purposes of these trades. At the end of the day, as Burnside notes, in the customer account "open positions made $1,230,339" but day trades allocated to "the customer accounts lost $720,200." Meantime, day trades assigned to the proprietary account were profitable.

17. To the best of my knowledge, the Defendants did not consistently keep separate trades executed on behalf of clients from those executed for the Defendants' proprietary account. My previous report examined five possible trade characteristics that might generate the profitability differences noted in the CFTC complaint. Having reviewed the Defendants' expert reports, I find Defendants' *ex post* explanations based on differences in trading strategies (like those cited above) often contradict trading records, lend support to the CFTC's complaint or simply are asserted with little empirical support.

18. For instance, the Defendants' expert's report makes statements about trading strategies that are contradicted by the trading records. When discussing Trade 4, Burnside notes "Quiddity's express strategy is to establish long term positions and not to engage in short-term options trading" (Preliminary Expert Report of John Burnside). However, the trading records of Customer Trades 1 (on October 15, 2008) and 8 (on October 23, 2008) both involve short-term options trades assigned to the customer account.

8

19. The Defendants' expert's report makes other claims which are directly contradicted by trading data. For instance, Burnside notes, when discussing Trade 17, "the 10-lot trades, are too few in quantity to be properly allocated to the customer accounts" and when discussing Trade 29, that "(a 10-lot) is ... too small to be allocated among customer accounts" (Preliminary Expert Report of John Burnside). Notwithstanding that these statements leave an impression that the allocation process took place after execution, they are clearly violated by the fact that hundreds of other executions of lesser quantity (including 1-, 2-, and 3-lot executions) have been allocated to customer accounts in other trades cited in the complaint.

20. The Defendants' expert's report also concedes that some trade tickets clearly lacked proper account numbers. For instance, when discussing Trade 8, Burnside notes "the order tickets bear 'Q0000,' the suspense account number with nothing to indicate the trades were for the proprietary account" (Preliminary Report of John Burnside). Notably, these order tickets also do not indicate the trades were for the customer account where they were put in an "erroneous allocation" and subsequently moved to the proprietary account.

## V. Further Analysis of Profitability Differences between Customer and Proprietary Trading Accounts

21. Defendants' expert reports raise questions about the CFTC selectively choosing data for the complaint. In an effort to account for differences that cannot be directly measured (like trading strategies and the like), I subsequently analyzed trades (using the CFTC definition for reasons cited above) for customer and proprietary

accounts executed on exactly the same days. In this analysis, I found 15 days where trades were executed in the same contract for both accounts.

22. Within these 15 days, the profitability of trades differed substantially whether the trade was assigned to the customer or proprietary account. In fact, I identified eight days where the trades assigned to the customer account experienced aggregate daily losses while those assigned to the proprietary account experienced profits. Additionally, the profits of trades assigned to the proprietary account far exceeded any profits attained by trades assigned to the customer account.

23. This concurrent-day analysis adds further evidence to the CFTC's complaint. We see a pattern similar to that described in my original expert report—customer trades are more likely to experience losses than proprietary trades, even when trades are assigned to both accounts on the same day in the same contract.

### VI. Conclusions

24. For the foregoing reasons, I conclude that the profitability differences between client and proprietary trades cannot be explained by characteristics of trade size, executing broker, the time a position is held, the day of week that trades are executed or by the time of day that trades are executed. The profitability differences are almost surely the result of *ex post* assignment to different trading accounts.

Jeffrey H. Harris
Dated: December 9, 2013

10

**Exhibit A--Facts and Data Considered in Forming Opinion**

### I.    Publications

Chan, K.C., William G. Christie and Paul H. Schultz, 1995, Market structure and the intraday pattern of bid-ask spreads for Nasdaq securities, *Journal of Business* 68, 35-60.

Ekman, Peter D., 1992, Intraday patterns in the S&P 500 index futures market, *Journal of Futures Markets* 12, 365-381.

Frino, Alex, Johan Bjursell, George H. K. Wang and Andrew Lepone, 2008, Large trades and intraday futures price behavior, *Journal of Futures Markets* 28, 1147-1181.

Keim, Donald B. and Robert F. Stambaugh, 1984, A further investigation of the weekend effect in stock returns, *Journal of Finance* 39, 819-835.

McInish, Thomas H. and Robert A. Wood, 1992, An analysis of intraday patterns in bid/ask spreads for NYSE stocks, *Journal of Finance* 47, 753-64.

Pedersen, Mitchell A. and David Fialkowski, 1994, Posted versus effective spreads: Good prices or bad quotes?, *Journal of Financial Economics* 35, 269-292.

Sias, Richard and Laura Starks, 1995, The day of the week anomaly: The role of institutional investors, *Financial Analysts Journal* 51, 58-67.

### II.   Sources Used to Construct the Datasets

- CFTC complaint as filed PDF

- Defendants' Answer and Affirmative Defense to Complaint PDF

- Plaintiff's Answers and Objections to Defendants' First Set of Interrogatories PDF

- Plaintiff's Responses and Objections to Defendants' Second Set of Interrogatories to Plaintiff (Revised) PDF

- Devon trade ticket files, various PDF

- Mizuho trade ticket files, various PDF

- MF Global electronic trading records (60629001 - Suspense Account.txt)

- MF Global electronic trading records (29060006 - Proprietary Account.txt)

- Master Allocation spreadsheet files (XLS)

- Expert Report of John Burnside

- Final Expert Report of John Burnside

- Expert Report of John E. Parkes, Jr.

- Expert Report of Margaret Wiermanski

- Expert Report of Jeffrey H. Harris

EXHIBIT 3

Newell/Quiddity Timeline

Rept due Aug 12
Review Def Rept Oct 2
Depositions ? Oct Nov 4
Def. expert Rept Dec 2

+Testimony?

Conf Call w/BOAZ + MIKE 6-6-13
① 2 Acdts 60001 customer
           60006 Prop

② Complaint lists trades P 34 thru MF Global
       Time entered → CST
       other times → GMT

③ Link trade tickets (have order info)

[ 2. Depositions ] Trading Strategy ① L-T (3-6 mo) duration
                                    ② Scalping

Next Depositions in July (10,11) + software names worked on systems
       17, 18 desk people

— Delay in defendant responses → {may delay report date }

DEPOSITION
EXHIBIT
Harris 3
1/10/14        KV
PENGAD 800-631-6989

Conf Call 6-6-13' CFTC-Newell ~

① 130 + day trades during period.
   - break down between accts.

② Arguments related to strategies?
   - trade characteristics (size, time, holding period, etc)

Conf call 6-11-13'                    → text files
Allocation schedule - XFA, MFGlobal, Devonshire, Mizuho
                      ↳ order tickets              ↳ order tickets

example: Oct 15  1-50 emini BUY Mizuho
                 ↳ 10 page pdf
                 Daily statements pdf

Reconstruct 6000 ? acct

**EXHIBIT 4**

## Attachment A: Customer Trades

| Trade Number | Date | Contract | | | |
|---|---|---|---|---|---|
| 1 | 10/15/2008 | IMM S&P 500 | October | 2008 | Put |
| 2 | 10/16/2008 | E-MINI S&P 500 | December | 2008 | |
| 3 | 10/17/2008 | E-MINI S&P 500 | December | 2008 | |
| 4 | 10/20/2008 | E-MINI S&P 500 | December | 2008 | |
| 5 | 10/21/2008 | E-MINI S&P 500 | December | 2008 | |
| 6 | 10/22/2008 | E-MINI S&P 500 | December | 2008 | |
| 7 | 10/22/2008 | IMM JYEN | December | 2008 | |
| 8 | 10/23/2008 | IMM EOM S&P | October | 2008 | Put |
| 9 | 10/24/2008 | E-MINI S&P 500 | December | 2008 | |
| 10 | 10/27/2008 | IMM JYEN | December | 2008 | |
| 11 | 10/28/2008 | IMM EURO FX | December | 2008 | |
| 12 | 10/28/2008 | E-MINI S&P 500 | December | 2008 | |
| 13 | 10/28/2008 | IMM JYEN | December | 2008 | |
| 14 | 10/29/2008 | E-MINI S&P 500 | December | 2008 | |
| 15 | 10/30/2008 | E-MINI S&P 500 | December | 2008 | |
| 16 | 10/30/2008 | IMM EURO FX | December | 2008 | |
| 17 | 10/31/2008 | E-MINI S&P 500 | December | 2008 | |
| 18 | 11/3/2008 | E-MINI S&P 500 | December | 2008 | |
| 19 | 11/4/2008 | IMM EURO FX | December | 2008 | |
| 20 | 11/4/2008 | E-MINI S&P 500 | December | 2008 | |
| 21 | 11/5/2008 | IMM EURO FX | December | 2008 | |
| 22 | 11/6/2008 | E-MINI S&P 500 | December | 2008 | |
| 23 | 11/7/2008 | E-MINI S&P 500 | December | 2008 | |
| 24 | 11/10/2008 | IMM EURO FX | December | 2008 | |
| 25 | 11/10/2008 | E-MINI S&P 500 | December | 2008 | |
| 26 | 11/13/2008 | IMM EURO FX | December | 2008 | |
| 27 | 11/13/2008 | E-MINI S&P 500 | December | 2008 | |
| 28 | 11/13/2008 | IMM JYEN | December | 2008 | |
| 29 | 11/14/2008 | IMM EURO FX | December | 2008 | |
| 30 | 11/14/2008 | E-MINI S&P 500 | December | 2008 | |
| 31 | 11/14/2008 | IMM JYEN | December | 2008 | |
| 32 | 11/17/2008 | E-MINI S&P 500 | December | 2008 | |
| 33 | 11/18/2008 | E-MINI S&P 500 | December | 2008 | |
| 34 | 11/20/2008 | IMM JYEN | December | 2008 | |
| 35 | 11/24/2008 | E-MINI S&P 500 | December | 2008 | |
| 36 | 11/25/2008 | E-MINI S&P 500 | December | 2008 | |
| 37 | 11/26/2008 | E-MINI S&P 500 | December | 2008 | |



DEPOSITION EXHIBIT
Harris 4
1/10/14    KV

| | | | | | |
|---|---|---|---|---|---|
| 38 | 11/28/2008 | E-MINI S&P 500 | December | 2008 | |
| 39 | 12/2/2008 | E-MINI S&P 500 | December | 2008 | |
| 40 | 12/8/2008 | E-MINI S&P 500 | December | 2008 | |
| 41 | 12/10/2008 | E-MINI S&P 500 | December | 2008 | |
| 42 | 12/17/2008 | E-MINI S&P 500 | March | 2009 | |
| 43 | 1/8/2009 | E-MINI S&P 500 | March | 2009 | |
| 44 | 1/8/2009 | IMM JYEN | March | 2009 | |
| 45 | 1/9/2009 | IMM JYEN | March | 2009 | |
| 46 | 1/12/2009 | IMM JYEN | March | 2009 | |
| 47 | 1/12/2009 | IMM JYEN | March | 2009 | |
| 48 | 1/12/2009 | IMM JYEN | March | 2009 | |
| 49 | 1/14/2009 | E-MINI S&P 500 | March | 2009 | |
| 50 | 1/15/2009 | E-MINI S&P 500 | March | 2009 | |
| 51 | 1/16/2009 | E-MINI S&P 500 | March | 2009 | |
| 52 | 1/21/2009 | E-MINI S&P 500 | March | 2009 | |
| 53 | 1/21/2009 | IMM JYEN | March | 2009 | |
| 54 | 1/22/2009 | E-MINI S&P 500 | March | 2009 | |
| 55 | 1/22/2009 | IMM JYEN | March | 2009 | |
| 56 | 1/23/2009 | IMM JYEN | March | 2009 | |
| 57 | 1/27/2009 | E-MINI S&P 500 | March | 2009 | |
| 58 | 1/27/2009 | IMM JYEN | March | 2009 | |
| 59 | 2/2/2009 | IMM JYEN | March | 2009 | |
| 60 | 2/12/2009 | E-MINI S&P 500 | March | 2009 | |
| 61 | 3/2/2009 | E-MINI S&P 500 | March | 2009 | |
| 62 | 3/6/2009 | E-MINI S&P 500 | March | 2009 | |
| 63 | 3/12/2009 | E-MINI S&P 500 | March | 2009 | |
| 64 | 3/18/2009 | E-MINI S&P 500 | March | 2009 | |

**EXHIBIT 5**

**Attachment B: Proprietary Trades**

| Trade Number | Date | Size | Contract | Broker |
|---|---|---|---|---|
| 1 | 10/15/2008 | 300 | December 08 E-mini S&P 500 | MF Global |
| 2 | 10/15/2008 | 250 | October 08 E-mini S&P 500 | Mizuho |
| 3 | 10/16/2008 | 100 | December 08 E-mini S&P 500 | Mizuho |
| 4 | 10/17/2008 | 396 | October IMM S&P 500 | XFA |
| 5 | 10/21/2008 | 10 | November 08 E-mini S&P 500 | Mizuho |
| 6 | 10/23/2008 | 75 | December 08 E-mini S&P 500 | Mizuho |
| 7 | 10/24/2008 | 100 | December 08 IMM JPY/USD | Mizuho |
| 8 | 10/24/2008 | 30 | December 08 E-mini S&P 500 | Mizuho |
| 9 | 10/27/2008 | 70 | December 08 IMM JPY/USD | Mizuho |
| 10 | 11/4/2008 | 50 | November 08 IMM EUR/USD | Mizuho |
| 11 | 11/7/2008 | 50 | December 08 E-mini S&P 500 | Mizuho |
| 12 | 11/11/2008 | 25 | December 08 E-mini S&P 500 | Mizuho |
| 13 | 11/12/2008 | 353 | December 08 IMM JPY/USD | MF Global |
| 14 | 11/14/2008 | 85 | December 08 E-mini S&P 500 | Mizuho |
| 15 | 11/18/2008 | 10 | December 08 E-mini S&P | Mizuho |
| 16 | 11/20/2008 | 205 | December 08 E-mini S&P 500 | Mizuho |
| 17 | 11/21/2008 | 45 | December 08 E-mini S&P 500 | Mizuho |
| 18 | 11/21/2008 | 18 | November 08 IMM S&P 500 | XFA |
| 19 | 11/24/2008 | 65 | December 08 E-mini S&P 500 | MF Global |
| 20 | 11/25/2008 | 50 | December 08 E-mini S&P 500 | Mizuho |
| 21 | 11/28/2008 | 150 | December 08 E-mini S&P 500 | Mizuho |
| 22 | 11/28/2008 | 80 | December 08 IMM JPY/USD | Mizuho |
| 23 | 12/1/2008 | 60 | December 08 E-mini S&P | MF Global |
| 24 | 12/2/2008 | 40 | December 08 IMM JPY/USD | MF Global |
| 25 | 12/4/2008 | 2 | December 08 E-mini S&P 500 | MF Global |
| 26 | 12/17/2008 | 50 | March 09 E-mini S&P 500 | Mizuho |
| 27 | 1/12/2009 | 25 | March 09 IMM JPY/USD | Mizuho |
| 28 | 1/15/2009 | 60 | March 09 IMM JPY/USD | Mizuho |
| 29 | 1/16/2009 | 60 | March 09 IMM JPY/USD | Mizuho |
| 30 | 1/27/2009 | 20 | March 09 IMM JPY/USD | Mizuho |
| 31 | 1/28/2009 | 25 | March 09 IMM JPY/USD | Mizuho/MF Global |
| 32 | 2/2/2009 | 20 | March 09 IMM JPY/USD | Mizuho |
| 33 | 2/3/2009 | 25 | March 09 IMM EUR/USD | Mizuho |
| 34 | 2/3/2009 | 25 | March 09 IMM JPY/USD | Mizuho |
| 35 | 2/4/2009 | 50 | March 09 IMM JPY/USD | Mizuho |
| 36 | 2/6/2009 | 25 | March 09 IMM JPY/USD | Mizuho |



DEPOSITION EXHIBIT
Harris 5
PENGAD 800-631-6989
1/10/14
RV

**Attachment B: Proprietary Trades**

| Trade Number | Date | Size | Contract | Broker |
|---|---|---|---|---|
| 1 | 10/15/2008 | 300 | December 08 E-mini S&P 500 | MF Global |
| 2 | 10/15/2008 | 250 | October 08 E-mini S&P 500 | Mizuho |
| 3 | 10/16/2008 | 100 | December 08 E-mini S&P 500 | Mizuho |
| 4 | 10/17/2008 | 396 | October IMM S&P 500 | XFA |
| 5 | 10/21/2008 | 10 | November 08 E-mini S&P 500 | Mizuho |
| 6 | 10/23/2008 | 75 | December 08 E-mini S&P 500 | Mizuho |
| 7 | 10/24/2008 | 100 | December 08 IMM JPY/USD | Mizuho |
| 8 | 10/24/2008 | 30 | December 08 E-mini S&P 500 | Mizuho |
| 9 | 10/27/2008 | 70 | December 08 IMM JPY/USD | Mizuho |
| 10 | 11/4/2008 | 50 | November 08 IMM EUR/USD | Mizuho |
| 11 | 11/7/2008 | 50 | December 08 E-mini S&P 500 | Mizuho |
| 12 | 11/11/2008 | 25 | December 08 E-mini S&P 500 | Mizuho |
| 13 | 11/12/2008 | 353 | December 08 IMM JPY/USD | MF Global |
| 14 | 11/14/2008 | 85 | December 08 E-mini S&P 500 | Mizuho |
| 15 | 11/18/2008 | 10 | December 08 E-mini S&P | Mizuho |
| 16 | 11/20/2008 | 205 | December 08 E-mini S&P 500 | Mizuho |
| 17 | 11/21/2008 | 45 | December 08 E-mini S&P 500 | Mizuho |
| 18 | 11/21/2008 | 18 | November 08 IMM S&P 500 | XFA |
| 19 | 11/24/2008 | 65 | December 08 E-mini S&P 500 | MF Global |
| 20 | 11/25/2008 | 50 | December 08 E-mini S&P 500 | Mizuho |
| 21 | 11/28/2008 | 150 | December 08 E-mini S&P 500 | Mizuho |
| 22 | 11/28/2008 | 80 | December 08 IMM JPY/USD | Mizuho |
| 23 | 12/1/2008 | 60 | December 08 E-mini S&P | MF Global |
| 24 | 12/2/2008 | 40 | December 08 IMM JPY/USD | MF Global |
| 25 | 12/4/2008 | 2 | December 08 E-mini S&P 500 | MF Global |
| 26 | 12/17/2008 | 50 | March 09 E-mini S&P 500 | Mizuho |
| 27 | 1/12/2009 | 25 | March 09 IMM JPY/USD | Mizuho |
| 28 | 1/15/2009 | 60 | March 09 IMM JPY/USD | Mizuho |
| 29 | 1/16/2009 | 60 | March 09 IMM JPY/USD | Mizuho |
| 30 | 1/27/2009 | 20 | March 09 IMM JPY/USD | Mizuho |
| 31 | 1/28/2009 | 25 | March 09 IMM JPY/USD | Mizuho/MF Global |
| 32 | 2/2/2009 | 20 | March 09 IMM JPY/USD | Mizuho |
| 33 | 2/3/2009 | 25 | March 09 IMM EUR/USD | Mizuho |
| 34 | 2/3/2009 | 25 | March 09 IMM JPY/USD | Mizuho |
| 35 | 2/4/2009 | 50 | March 09 IMM JPY/USD | Mizuho |
| 36 | 2/6/2009 | 25 | March 09 IMM JPY/USD | Mizuho |

| 37 | 2/9/2009 | 25 | March 09 IMM EUR/USD | Mizuho |
|----|----------|-----|-----------------------|--------|
| 38 | 2/9/2009 | 25 | March 09 S&P 500 | Mizuho |
| 39 | 2/11/2009 | 25 | March 09 IMM JPY/USD | Mizuho |
| 40 | 2/12/2009 | 25 | March 09 E-mini S&P 500 | Mizuho |
| 41 | 2/12/2009 | 25 | March 09 IMM EUR/USD | Mizuho |
| 42 | 2/12/2009 | 25 | March 09 IMM JPY/USD | Mizuho |
| 43 | 2/13/2009 | 25 | March 09 IMM EUR/USD | Mizuho |
| 44 | 2/17/2009 | 50 | March 09 IMM JPY/USD | Mizuho |
| 45 | 2/18/2009 | 25 | March 09 IMM JPY/USD | Mizuho |
| 46 | 2/19/2009 | 25 | March 09 IMM EUR/USD | Mizuho |
| 47 | 2/20/2009 | 25 | March 09 IMM EUR/USD | Mizuho |
| 48 | 2/23/2009 | 7 | March 09 IMM EUR/USD | Mizuho |
| 49 | 2/23/2009 | 25 | March 09 IMM JPY/USD | Mizuho |
| 50 | 2/24/2009 | 25 | March 09 IMM JPY/USD | Mizuho |
| 51 | 3/2/2009 | 25 | March 09 IMM JPY/USD | Mizuho |
| 52 | 3/3/2009 | 25 | March 09 IMM JPY/USD | Mizuho |
| 53 | 3/3/2009 | 25 | March 09 E-mini S&P 500 | Mizuho |
| 54 | 3/9/2009 | 25 | March 09 IMM JPY/USD | Mizuho/MF Global |
| 55 | 3/12/2009 | 15 | June 09 IMM JPY/USD | Mizuho |
| 56 | 3/18/2009 | 145 | June 09 IMM EUR/USD | MF Global |

**EXHIBIT 6**

## IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

U.S. COMMODITY FUTURES TRADING   :
COMMISSION,   :
        :   Civil Action No.: 1:12-cv-06763
      Plaintiff,   :
        :
      v.   :
        :
DONALD A. NEWELL AND   :
QUIDDITY, LLC,   :
        :
      Defendants.  

## PLAINTIFF'S ANSWERS AND OBJECTIONS TO
## DEFENDANTS' SECOND SET OF INTERROGATORIES TO PLAINTIFF (REVISED)

Pursuant to Rule 33 of the Federal Rules of Civil Procedure and in response to "Defendants Second Set of Interrogatories to Plaintiff (Revised)", Plaintiff U.S. Commodity Futures Trading Commission ("Plaintiff" or "CFTC") answers and objects as follows.

### General Objection and Qualifications

The CFTC asserts and incorporates by reference the following general objections to "Defendants Second Set of Interrogatories to Plaintiff (Revised)" as though they were set forth in full in each answer.

1. Plaintiff objects to Defendants' First Request to the extent Defendants' definitions and instructions exceed the requirements of the Federal Rules of Civil Procedure.

2. Plaintiff objects to Defendants' First Request to the extent that they seek information or documents protected by the attorney-client privilege, or any other evidentiary privilege, including the Privacy Act of 1974, 5 U.S.C. § 552a, or are conditionally protected under the work product privilege.



DEPOSITION
EXHIBIT
Harris 6
1/10/14
FENGAD 800-631-6989

3. Plaintiff objects to Defendants' First Request upon the grounds and to the extent that they seek information prepared or developed in anticipation of litigation or for trial.

4. Plaintiff objects to Defendants' First Request upon the grounds and to the extent that they seek the discovery of information which is irrelevant and immaterial and not reasonably calculated to lead to the discovery of admissible evidence.

5. Plaintiff objects to Defendants' First Request upon the grounds that the general instructions are so vague, broad, general, and all inclusive that they do not permit a proper or reasonable response and are, therefore, unduly burdensome and oppressive.

6. Plaintiff objects to Defendants' First Request to the extent that they would seek the production of materials already in defendant's possession, or materials equally available to plaintiff and defendant, on the grounds that they are burdensome. To the extent requested documents have already been produced to defendants by Plaintiff or a third party, Plaintiff will not produce such documents again.

**Answers**

1. State the name and position of the individuals answering these interrogatories. For purposes of this interrogatory you can omit anyone who's role was merely ministerial.

**Answer:**

The person answering the interrogatories is Brandon Tasco, Futures Trading Investigator. Objections prepared by Boaz I. Green, Trial Attorney.

2. State each of the unprofitable trades where the "average loss" "was approximately $6,700" as alleged in ¶ 30, of the Complaint, providing the date of the trade,

commodity traded, price, Bates-number of the manual or electronic order ticket sufficient to identify the trade.

Answer:

| Date | Contract | Month | Year | Price or Average Price Buy/Sell | Profitable | Bates # |
|------|----------|-------|------|---------------------------------|------------|---------|
| 10/21/2008 | E-MINI S&P 500 | December | 2008 | 982.00 / 966.50 | No | Quid-Mizuho-0000290 Quid-Mizuho-0000284 |
| 11/10/2008 | E-MINI S&P 500 | December | 2008 | 919.75 / 913.25 | No | Quid-Mfg-0050354 |
| 11/12/2008 | E-MINI S&P 500 | December | 2008 | 870.50 / 868.00 | No | Quid-Mfg-0050354 |
| 11/19/2008 | E-MINI S&P 500 | December | 2008 | 808.50 / 807.00 | No | Quid-Mizuho-0000426 Quid-Mizuho-0000427 |
| 11/26/2008 | E-MINI S&P 500 | December | 2008 | 856.375 / 849.25 | No | Quid-Mizuho-0000359 Quid-Mizuho-0000360 Quid-Mizuho-0000361 Quid-Mizuho-0000362 |
| 12/2/2008 | E-MINI S&P 500 | December | 2008 | 837.50 / 833.00 | No | Quid-Mfg-0050354 |
| 12/3/2008 | E-MINI S&P 500 | December | 2008 | 843.25 / 842.50 | No | Quid-Mfg-0050354 |
| 2/9/2009 | IMM JYEN | March | 2009 | 109.168 / 108.960 | No | Quid-Mizuho-0000912 Quid-Mizuho-0000913 |
| 2/11/2009 | IMM EURO | March | 2009 | 1.2920 / 1.2913 | No | Quid-Mizuho-0000891 Quid-Mizuho-0000892 Quid-Mizuho-0000897 Quid-Mizuho-0000898 Quid-Mizuho-0000899 |
| 3/19/2009 | E-MINI S&P 500 | March | 2009 | 789.75 / 788.00 | No | Quid-Mfg-0050354 |

3.      State each trade which Defendants improperly allocated to the Proprietary Account other than those listed in ¶ 34 of the Complaint improperly, providing the date of the trade, commodity traded, price(s), Bates-number of the manual or electronic order ticket sufficient to identify the trade.

Answer:

Plaintiff objects to Interrogatory 3 with respect to any trades outside of the Relevant Period as defined in the Complaint, as irrelevant to any claim or defense. In Paragraph 30 of the Complaint, Plaintiff alleged that "[D]uring the Relevant Period, Quiddity, through Newell, allocated *at least* 66 trades to the Proprietary Account post-execution, after it was apparent whether the trades were profitable or if the market had moved favorably to an open position" (emphasis added). To date, Plaintiff is not alleging any additional trades that Defendants "improperly allocated" to the Proprietary Account other than those listed in Paragraphs 30 and 34 of the Complaint. Plaintiff will amend its response to this interrogatory to add additional trades that were unlawfully allocated as necessary. To the extent that Plaintiff's expert will rely in his analysis on any additional trades, the details of such trade(s) will be disclosed at the time that the experts' report is due. Plaintiff further objects to Interrogatory 3 because it seeks to obtain disclosure of materials subject to attorney work-product protection because they were prepared in anticipation of litigation, including but not limited to, disclosure of the contents of draft reports and communications between and among Commission staff concerning the progress of the investigation, planning, organizing and managing the investigation, evaluating possible allegations of violative conduct, and/or assisting Plaintiff's attorneys in preparing recommendations for litigation.

4.    State with specificity each of the 64 trades allocated "to the Pool post-execution" as alleged in ¶ 31 of the Complaint, including identification of any unprofitable trades allocated, and providing the date of each trade, commodity traded, price(s), Bates-number of the manual or electronic order ticket sufficient to identify the trade.

Answer:

| Date | Contract | Month | Year | Call/Put | Strike | Price or Average Price Buy/Sell | Profitable | Bates # |
|------|----------|-------|------|----------|--------|--------------------------------|------------|---------|
| 10/15/2008 | IMM S&P 500 | October | 2008 | Put | 900 | 10 / 10.5 | Yes | Quid-Devon-0000170<br>Quid-Devon-0000173 |
| 10/16/2008 | E-MINI S&P 500 | December | 2008 | | | 899.25/ 890.25 | No | Quid-Mfg-0050354 |
| 10/17/2008 | E-MINI S&P 500 | December | 2008 | | | 955.75 / 923.00 | No | Quid-Mfg-0050354 |
| 10/20/2008 | E-MINI S&P 500 | December | 2008 | | | 965.00 / 965.50 | Yes | Quid-Mfg-0050354 |
| 10/21/2008 | E-MINI S&P 500 | December | 2008 | | | 975.50 / 965.25 | No | Quid-Mfg-0050354 |
| 10/22/2008 | E-MINI S&P 500 | December | 2008 | | | 907.50 / 908.25 | Yes | Quid-Mfg-0050354 |
| 10/22/2008 | IMM JYEN | December | 2008 | | | 100.775 / 102.180 | Yes | Quid-Mfg-0050354<br>Quid-Mizuho-0000300<br>Quid-Miuzho-0000301<br>Quid-Mizuho-0000302 |
| 10/23/2008 | IMM EOM S&P | October | 2008 | Put | 800 | 18.40 / 13.00 | No | Quid-Devon-0000102<br>Quid-Devon-0000104<br>Quid-Devon-0000107<br>Quid-Devon-0000109<br>Quid-Devon-0000111<br>Quid-Devon-0000113 |
| 10/24/2008 | E-MINI S&P 500 | December | 2008 | | | 880.25 / 862.00 | No | Quid-Mfg-0050354 |
| 10/27/2008 | IMM JYEN | December | 2008 | | | 107.225 / 107.350 | Yes | Quid-Mfg-0050354 |
| 10/28/2008 | IMM EURO FX | December | 2008 | | | 1.2655 / 1.23550 | No | Quid-Mizuho-0000327<br>Quid-Mizuho-0000330<br>Quid-Mizuho-0000331 |
| 10/28/2008 | E-MINI S&P 500 | December | 2008 | | | 859.75 / 858.75 | No | Quid-Mfg-0050354 |
| 10/28/2008 | IMM JYEN | December | 2008 | | | 108.000 / 103.850 | No | Quid-Mizuho-0000328<br>Quid-Mizuho-0000329 |
| 10/29/2008 | E-MINI S&P 500 | December | 2008 | | | 947.62 / 949.00 | Yes | Quid-Mizuho-0000334<br>Quid-Mfg-0050354 |
| 10/30/2008 | E-MINI S&P 500 | December | 2008 | | | 940.50 / 943.75 | Yes | Quid-Mfg-0050354 |
| 10/30/2008 | IMM Euro FX | December | 2008 | | | 1.30865 / 1.30150 | No | Quid-Mfg-0050354<br>Quid-Mizuho-0000338<br>Quid-Mizuho-0000339 |
| 10/31/2008 | E-MINI S&P 500 | December | 2008 | | | 945.75 / 947.25 | Yes | Quid-Mfg-0050354 |

| Date | Contract | Month | Year | Call/Put | Strike | Price or Average Price Buy/Sell | Profitable | Bates # |
|------|----------|-------|------|----------|--------|--------------------------------|------------|---------|
| 11/3/2008 | E-MINI S&P 500 | December | 2008 | | | 963.00 / 966.00 | Yes | Quid-Mfg-0050354 |
| 11/4/2008 | IMM EURO FX | December | 2008 | | | 1.29583 / 1.29364 | No | Quid-Mfg-0050354 Quid-Mizuho-0000553 Quid-Mizuho-0000554 Quid-Mizuho-0000555 Quid-Mizuho-0000556 |
| 11/4/2008 | E-MINI S&P 500 | December | 2008 | | | 987.00 / 985.00 | No | Quid-Mfg-0050354 |
| 11/5/20008 | IMM EURO FX | December | 2008 | | | 1.29560 / 1.29120 | No | Quid-Mizuho-0000537 Quid-Mizuho-0000540 Quid-Mizuho-0000541 |
| 11/6/2008 | E-MINI S&P 500 | December | 2008 | | | 908.25 / 917.75 | Yes | Quid-Mfg-0050354 |
| 11/7/2008 | E-MINI S&P 500 | December | 2008 | | | 916.25 / 912.50 | No | Quid-Mfg-0050354 |
| 11/10/2008 | IMM EURO FX | December | 2008 | | | 1.28055 / 1.27860 | No | Quid-Mfg-0050354 |
| 11/10/2008 | E-MINI S&P 500 | December | 2008 | | | 936.75 / 918.25 | No | Quid-Mfg-0050354 |
| 11/13/2008 | IMM EURO FX | December | 2008 | | | 1.26790 / 1.28135 | Yes | Quid-Mizuho-0000480 Quid-Mizuho-0000481 |
| 11/13/2008 | E-MINI S&P 500 | December | 2008 | | | 864.41 / 867.75 | Yes | Quid-Mfg-0050354 Quid-Mizuho-0000491 Quid-Mizuho-0000492 |
| 11/13/2008 | IMM JYEN | December | 2008 | | | 103.9775 / 103.9350 | No | Quid-Mizuho-0000484 Quid-Mizuho-0000485 Quid-Mizuho-0000486 Quid-Mizuho-0000487 Quid-Mizuho-0000488 Quid-Mizuho-0000489 Quid-Mizuho-0000490 Quid-Mfg-0050354 |
| 11/14/2008 | IMM EURO FX | December | 2008 | | | 1.26790 / 1.26695 | No | Quid-Mizuho-0000462 Quid-Mizuho-0000463 Quid-Mizuho-0000464 Quid-Mizuho-0000465 |
| 11/14/2008 | E-MINI S&P 500 | December | 2008 | | | 903.50 / 906.50 | Yes | Quid-Mfg-0050354 |
| 11/14/2008 | IMM JYEN | December | 2008 | | | 102.840 / 102.720 | No | Quid-Mfg-0050354 |
| 11/17/2008 | E-MINI S&P 500 | December | 2008 | | | 871.00 / 856.75 | No | Quid-Mfg-0050354 |
| 11/18/2008 | E-MINI S&P 500 | December | 2008 | | | 840.75 / 842.00 | Yes | Quid-Mizuho-0000450 Quid-Mizuho-0000452 |
| 11/20/2008 | IMM JYEN | December | 2008 | | | 105.735 / 105.250 | No | Quid-Mfg-0050354 |

| Date | Contract | Month | Year | Call/Put | Strike | Price or Average Price Buy/Sell | Profitable | Bates # |
|---|---|---|---|---|---|---|---|---|
| 11/24/2008 | E-MINI S&P 500 | December | 2008 | | | 833.25 / 832.00 | No | Quid-Mizuho-0000378 Quid-Mizuho-0000379 Quid-Mizuho-0000380 |
| 11/25/2008 | E-MINI S&P 500 | December | 2008 | | | 860.75 / 849.75 | No | Quid-Mfg-0050354 |
| 11/26/2008 | E-MINI S&P 500 | December | 2008 | | | 864.25 / 863.00 | No | Quid-Mfg-0050354 |
| 11/28/2008 | E-MINI S&P 500 | December | 2008 | | | 892.05 / 893 | Yes | Quid-Mizuho-0000357 Quid-Mizuho-0000358 Quid-Mfg-0050354 |
| 12/2/2008 | E-MINI S&P 500 | December | 2008 | | | 892.30 / 893.00 | Yes | Quid-Mizuho-0000357 Quid-Mizuho-0000358 Quid-Mfg-0050354 |
| 12/8/2008 | E-MINI S&P 500 | December | 2008 | | | 909.50 / 913.5 | Yes | Quid-Mizuho-0000600 Quid-Mizuho-0000601 Quid-Mizuho-0000602 |
| 12/10/2008 | E-MINI S&P 500 | December | 2008 | | | 908.00 / 898.50 | No | Quid-Mfg-0050354 |
| 12/17/2008 | E-MINI S&P 500 | March | 2009 | | | 909.31 / 913.23 | Yes | Quid-Mfg-0050354 Quid-Mizuho-0000612 Quid-Mizuho-0000614 |
| 1/8/2009 | E-MINI S&P 500 | March | 2009 | | | 903.50 / 895.50 | No | Quid-Mfg-0050354 |
| 1/8/2009 | IMM JYEN | March | 2009 | | | 109.950 / 109.610 | No | Quid-Mfg-0050354 |
| 1/9/2009 | IMM JYEN | March | 2009 | | | 110.035 / 110.595 | Yes | Quid-Mfg-0050354 |
| 1/12/2009 | IMM JYEN | March | 2009 | | | 109.950 / 109.610 | No | Quid-Mfg-0050354 |
| 1/12/2009 | IMM JYEN | March | 2009 | | | 110.035 / 110.595 | Yes | Quid-Mfg-0050354 |
| 1/12/2009 | IMM JYEN | March | 2009 | | | 112.140 / 112.355 | Yes | Quid-Mfg-0050354 |
| 1/14/2009 | E-MINI S&P 500 | March | 2009 | | | 839.50 / 838.50 | No | Quid-Mfg-0050354 |
| 1/15/2009 | IMM S&P 500 | March | 2009 | | | 836.00 / 834.30 | No | Quid-Xfa-0000003 |
| 1/16/2009 | E-MINI S&P 500 | March | 2009 | | | 844.00 / 838.75 | No | Quid-Mfg-0050354 |
| 1/21/2009 | E-MINI S&P 500 | March | 2009 | | | 818.06 / 813.50 | No | Quid-Mizuho-0000680 Quid-Mizuho-0000682 Quid-Mizuho-0000683 Quid-Mizuho-0000684 Quid-Mfg-0050354 |
| 1/21/2009 | IMM JYEN | March | 2009 | | | 114.860 / 112.790 | No | Quid-Mfg-0050354 |
| 1/22/2009 | E-MINI S&P 500 | March | 2009 | | | 828.00 / 830.00 | Yes | Quid-Mfg-0050354 |

| Date | Contract | Month | Year | Call/Put | Strike | Price or Average Price Buy/Sell | Profitable | Bates # |
|---|---|---|---|---|---|---|---|---|
| 1/22/2009 | IMM JYEN | March | 2009 | | | 113.105 / 112.365 | No | Quid-Mfg-0050354 |
| 1/23/2009 | IMM JYEN | March | 2009 | | | 113.640 / 111.855 | No | Quid-Mizuho-0000697 Quid-Mfg-0050354 |
| 1/27/2009 | E-MINI S&P 500 | March | 2009 | | | 846.50 / 839.25 | No | Quid-Mizuho-0000705 Quid-Mizuho-0000706 Quid-Mizuho-0000707 |
| 1/27/2009 | IMM JYEN | March | 2009 | | | 112.32 / 111.62 | No | Quid-Mfg-0050354 |
| 2/2/2009 | IMM JYEN | March | 2009 | | | 111.390 / 111.510 | Yes | Quid-Mizuho-0000967 Quid-Mizuho-0000973 |
| 2/12/2009 | E-MINI S&P 500 | March | 2009 | | | 835.50 / 823.00 | No | Quid-Mfg-0050354 |
| 3/2/2009 | E-MINI S&P 500 | March | 2009 | | | 708.25 / 710.00 | Yes | Quid-Mfg-0050354 |
| 3/6/2009 | E-MINI S&P 500 | March | 2009 | | | 682.75 / 675.25 | No | Quid-Mfg-0050354 |
| 3/12/2009 | E-MINI S&P 500 | March | 2009 | | | 737.75 / 715.50 | No | Quid-Mfg-0050354 |
| 3/18/2009 | E-MINI S&P 500 | March | 2009 | | | 778.00 / 798.00 | Yes | Quid-Mfg-0050354 |

5.    State the name, position, and address of each of the current or former employees and/or agents of the following entities interviewed, relating to matters alleged in the Complaint, by employees and/or agents of the CFTC, including the dates and places of said interview(s) and whether any record (verbatim, summary, or notes) exist:

     a. MF Global;
     b. Mizuho;
     c. XFA;
     d. The National Futures Association; and/or
     e. Quiddity.

<u>Answer:</u>

    Plaintiff objects to Interrogatory 5 on the grounds that it is irrelevant to any claim or defense. Plaintiff has already disclosed to Defendants the names and contact information, if known, of all individuals who may possess discoverable information, as well as subjects of information those individuals may possess. Plaintiff further objects to Interrogatory 5 because

it seeks to obtain disclosure of materials subject to attorney work-product protection because they were prepared in anticipation of litigation, including, but not limited to, investigative plans and investigation notes and memoranda.

Without waiving any objections, Plaintiff conducted a telephonic interview of former MF Global employees Talha Chaudhry and Steve Hood on December 15, 2011. Notes of that interview exist and are attorney work-product. The address of Talha Chaudhry and Steve Hood has already been disclosed in Plaintiffs' initial disclosures.

Plaintiff has produced to Defendants transcripts of all the investigatory testimony taken in this matter.

6.    State whether Plaintiff conducted any analysis of the trading by Defendants on behalf of the proprietary account for trades entered between April of 2009 through December 31, 2012? If so, state the nature of the analysis and, with specificity, the findings of that analysis.

Answer:

Plaintiff objects to Interrogatory 6 on the grounds that it is irrelevant to any claim or defense, because Defendants were not charged with any conduct taking place between April of 2009 and December 31, 2012. To the extent that Plaintiff's expert will rely in his analysis on any additional trades, the details of such trade(s) will be disclosed at the time that the experts' report is due. Plaintiff further objects to Interrogatory 6 because it seeks to obtain disclosure of materials subject to attorney work-product protection because they were prepared in anticipation of litigation, including, but not limited to, disclosure of the contents of draft reports and communications between and among Commission staff concerning the progress of the investigation, planning, organizing and managing the investigation, evaluating possible

allegations of violative conduct, assisting Plaintiff's attorneys in preparing recommendations for litigation.

7.      State, with specificity, Plaintiff's understanding of the trading system used by the Defendants for the pool and managed accounts and the respective roles that commodity futures and options on commodity futures played in that system.

Answer:

Plaintiff objects to the term "trading system" as vague. Plaintiff objects to Interrogatory 7 on the grounds that it is irrelevant to any claim or defense, because Defendants have made no allegations concerning Defendants "trading system." To the extent that Plaintiff's expert will rely in his analysis on any analysis of Defendants' trading strategy the details of such analysis will be disclosed at the time that the experts' report is due. Plaintiff further objects to Interrogatory 7 because it seeks to obtain disclosure of material subject to attorney work-product protection because they were prepared in anticipation of litigation, including, but not limited to, disclosure of the contents of draft reports and communications between and among Commission staff concerning the progress of the investigation, planning, organizing and managing the investigation, evaluating possible allegations of violative conduct, assisting Plaintiff's attorneys in preparing recommendations for litigation. Plaintiff further objects to Interrogatory 7 because Plaintiff has already produced to Defendants all documents and testimony in its possession containing descriptions of a "trading system" of Defendants.

8.    Identify all witnesses Plaintiff intends to call at the trial of this action and the anticipated subject matter of each witness's testimony.

Answer:

Plaintiff objects to Interrogatory 8 on the grounds that it is premature. Plaintiff has already disclosed to Defendants the names and contact information, if known, of all individuals who may possess discoverable information, as well as subjects of information those individuals may possess. The Court has not set a date for trial and has not set a date for pretrial disclosures. Plaintiff is not required to provide the names of witnesses it intends to call at trial or the anticipated subject matter of each witness's testimony until such pre-trial disclosures are due, pursuant to Fed. R. of Civ. P. 26(a)(3). Because fact discovery in this matter is ongoing, Plaintiff has not yet determined what witnesses it may call at trial. Plaintiff reserves the right to call any individual listed in Plaintiff's Rule 26(a)(1) initial disclosures and any subsequent supplement thereto.

I certify under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge and information.

Dated: 5/17/13

Signed: _____
Brandon Tasco

Dated: 5/17/13

Objections prepared by Counsel for the Plaintiff:

/s/ Boaz Green
Boaz Israel Green (*pro hac vice*)
D.C. Bar No. 977520
Trial Attorney
Michael W. Solinsky (*pro hac vice*)
D.C. Bar No. 433754
Chief Trial Attorney
Gretchen L. Lowe
D.C. Bar No. 421995
Associate Director
U.S. Commodity Futures Trading Commission
Division of Enforcement
1155 21st Street, NW
Washington, D.C. 20581
bgreen@cftc.gov
msolinsky@cftc.gov
Telephone: (202) 418-6623 (Green)
Fax: (202) 418-5523

Susan Padove
IL Bar No. 6196293
Senior Trial Attorney
U.S. Commodity Futures Trading Commission
Division of Enforcement
525 West Monroe Street, Suite 1100
Chicago, IL 60661
spadove@cftc.gov
Telephone: (312) 596-0544
Fax: (312) 596-0714
Local Counsel

Counsel for Plaintiff U.S. Commodity
Futures Trading Commission

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | |
|---|---|
| U.S. COMMODITY FUTURES TRADING COMMISSION, | : |
| Plaintiff, | : |
| | :   Civil Action No.: 1:12-cv-06763 |
| v. | : |
| | : |
| DONALD A. NEWELL AND | : |
| QUIDDITY, LLC, | : |
| Defendants. | : |

**Certificate of Service**

I, Boaz Green, certify that on May 17, 2013 I caused the foregoing Plaintiff's Answers and Objections to Defendants' Second Set of Interrogatories to Plaintiff (Revised) to be delivered to the attorneys listed below via email.

                                                 /s/ Boaz Green

Alan F. Block
Block & Landsman
33 N. LaSalle, Suite 1400
Chicago, IL 60602
(312) 251-1144
alan@block-landsman.com

Nicholas P. Iavarone
The Iavarone Firm
33 N. LaSalle Street
Suite 1400
Chicago, IL 60602
Tel: (312) 637-9466
niavarone@iavaronefirm.com

EXHIBIT 7

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

U.S. COMMODITY FUTURES TRADING
COMMISSION,                                      :
                                                 :
                                                 :
                          Plaintiff,             :
                                                 :
         v.                                      :        CASE NO. 12-cv-06763
                                                 :
DONALD A. NEWELL AND                             :
QUIDDITY, LLC,                                   :
                                                 :
                          Defendants.            :

# EXPERT REPORT OF JOHN E. PARKES JR.
## (Preliminary: Without Having Examined the Documents used by the CFTC's Expert)

## Dated: October 10, 2013



My background and qualifications are contained on Schedule "A" to this report.

I have reviewed the following: The Complaint and the Answer;

1. The discovery requests of the respective parties and the responses to those requests;
2. All the OTRs taken by the CFTC and the embedded exhibits;
3. The Depositions and embedded exhibits of:
   a. Brandon Tasco;
   b. Brent Rowley;
   c. Janet McCormick;
   d. Don Newell;
   e. Alberto Moreno;
   f. Shane O'Mara;
   g. Albert Whortenberry;
   h. Anthony Bria;
   i. John Gaimari; and
   j. Andrew Buenaventura.
4. Letters provided to the court stating the theories of the respective parties and their supporting contentions;
5. The compliance manuals produced by Mizuho and MF Global;
6. The reports of:
   a. Jeffery D. Harris;
   b. John Burnside; and
   c. Margaret Wiermanski.
7. Trading documentation QUID-MIZUHO-0000001-10512; QUID-MFG-B-000001-127; QUID-MFG-B-000001-127; QUID-DEVON-0000001-315;
8. Certain electronic data obtained from the native files produced to the CFTC by MF Global for the transactions specified in the Complaint;
9. The ClearVision Manual produced by Mizuho USA, Inc.;
10. The daily commodity statements for the proprietary ("60006") for each of the dates alleged in the Complaint;

11.     The following analyses:[1]
   a. 10/16/08 analysis constructed by Newell of the trading for the client accounts;
   b. Time & sales for 10/16/08;
   c. Price graphs for 10/16/08 with orders annotated on the graph;
   d. Closing positions for the client accounts for each date specified in the Complaint;
   e. An Excel spreadsheet with various information regarding the activity for each of the "trades" listed in the Compliant;
   f. An Excel spreadsheet with various information regarding the activity for "trades" not listed in the Compliant;
   g. An Excel spreadsheet that listed the number of trades and contracts traded for the proprietary account from 10/08 thru 09/09;
   h. Excel spreadsheets detailing the trading by date in the proprietary account for twelve different months;

12.     The documents produced by Mizuho USA, Inc. in response to the Defendant's subpoena.

13.     Various MF Global "surveillance" emails;

14.     QUID-MIZUHO-000006424, 6436, 6944, 7174, 7175 and 7255;

15.     A series of 52 documents related to the subject of "give-ups" as provided by Defendants;

16.     A series of 54 trade tickets, blotters, reposts and emails related to "give-up" provided by the Defendants;

17.     A "give-up" summary provided by the Defendants;

18.     Definitions of various options trading strategies;

19.     Various private placement memoranda for Quiddity;

20.     Sixty documents produced in discovery and provided by Defendants regarding Quiddity's performance and strategies;

---

[1] For each of these spreadsheets, I conducted a random comparison of underlying documents to the data on the spreadsheets to verify the trustworthiness of the data contained in the Excel spreadsheets.

21.  Presentations used by Quiddity in 2008, 2009, 2010, and 2011 as well as QFX presentations;
22.  Forty-three documents relating to the risk of the Quiddity strategy;
23.  Forty-two due diligence documents relating to QED;
24.  Seven due diligence documents relating to QFX; and
25.  CFTC Regulations, CME notices re: bunched orders; FIA suspense account explanation; and CFTC advisories.

I was also given access to the database constructed Project Leadership (subsequently changed to D4) for the Defendants containing all of the documents produced by the CFTC to the Defendants; this gave me the opportunity to review various documents such as actual Excel allocations by the Defendants; Give-up Agreements; email communications from the Defendants' agents to various brokers, internal communications among personnel at Mizuho USA, Inc. and MF Global, Inc.

## I.

## SCOPE OF ENGAGEMENT

I have been retained at the rate of $350 per hour to: a) conduct an investigation as to whether, in my opinion, the Defendants engaged in a fraudulent post-trade allocation scheme as alleged by the Commodity Futures Trading Commission ("CFTC"); b) evaluate, against financial industry standards, the quality of the investigation conducted by the CFTC; and c) evaluate the report of the CFTC's expert, Jeffery D. Harris ("Harris").

## II.

## SUMMARY OF OPINION

Based on my review of the documents, on-the-record ("OTR") and deposition testimony, the Reports of John Burnside and Margaret Wiermanski, and my interview of Don Newell, it is my opinion that the Defendants did not engage in a post-trade allocation

scheme, fraudulent or otherwise. It is also my opinion that the CFTC assigned an inexperienced investigator to the task and failed to conduct an investigation consistent with the prevailing standards in the financial industry and, instead, selected various trades, out of context, to support the allegations. I am also of the opinion that, by allowing the CME to promulgate procedures during the time-period alleged in the CFTC's Complaint ("the relevant time period") the CFTC permitted CME members to disregard specific account identifiers given by customers at the time of placing an order and, instead, to use a suspense account number, the integrity of the audit trail was materially compromised.

III.

## THE IMPORTANCE OF THE FCM'S ORDER TICKET IN COMMODITY FUTURES AND OPTIONS REGULATION

The fundamental document in futures and options on futures (together jointly referred to as "futures trading" for this portion of my report) is the order ticket generated either manually or electronically by a futures commission merchant ("FCM") upon receipt of a customer order. The FCM must record the contract, the contract month, the price, whether the commodity futures or options contract so specified is being purchased or sold, together with required data such as the initials of the person taking the order, all as specified by CFTC Reg. 1.35(a-1): "the account identification, except as provided in paragraph (a-1)(5) of this section, and order number... shall be recorded thereon, by timestamp or other timing device, the date and time, to the nearest minute, the order is received, and in addition, for option customers' orders, the time, to the nearest minute, the order is transmitted for execution."

If an FCM is a member of a contract market such as the Chicago Mercantile Exchange ("CME") and receives a verbal order at the FCM's order desk on the floor of the exchange, the FCM, pursuant to CFTC Req. 1.35 (a-1)(2), must prepare a written record that

5

includes "the account identification, order number, and the date and time, to the nearest minute, the order was transmitted or received on the floor of such contract market.... The FCM shall immediately upon receipt thereof prepare a written record of the order in non-erasable ink, including the account identification, except as provided in paragraph (a-1)(5) of this section or appendix C to this part, and order number and shall record thereon, by timestamp or other timing device, the date and time, to the nearest minute, the order is received." This written order is known as an "office order" if received from the customer by an order taker not located on the exchange floor and a "floor order" if received by the FCM's personnel on the FCM's order desk located on an exchange's floor either transmitted directly from the customer or relayed by personnel not located on the exchange floor who took the original order from the customer that had generated an "office order."

Additionally, Reg. 1.35 permits the exchange on which the order is being executed to require time stamping of the order ticket when the order is transmitted for execution and executed.

The above requirement of Reg. 1.35 that a unique account identifier be recorded on each written record (*i.e.* order ticket) in conjunction with the time stamping requirements of both Reg. 1.35 and rules adopted by exchanges, such as the CME, provides an audit trail of the order from the initial receipt of the order from the customer through transmittal for execution and subsequently execution time-stamped. This audit trail prevents customer orders from being improperly misallocated by either the person initially placing them or by a person entering the order on behalf of the customer and to record whether an order was timely executed and reported to the customer.

The ability of an FCM to use a suspense account regardless of whether the account manager has provided a specific account identifier effectively destroys the audit trail since any document created by the account manager placing the trade on behalf of a customer can be originated or completed after there is an

6

indication that the trade is profitable or unprofitable; thus, there is no document that can effectively refute the FCM's order ticket.[2] CFTC Reg. 135(a-1)(5)(iv)(B) requires eligible account managers to maintain records for bunched orders sufficient "to permit the reconstruction of the handling of the order from the time of placement by the account manager to the allocation to individual accounts."

The use of a suspense account raises a presumption that an order is a "bunched" order. If the FCM, without informing the account manager, uses the suspense account designation despite receiving a specific account identifier, the account manager would be presumed to have violated this regulation when the account manager was never required to keep such records since he or she had given a specific account identifier when placing the order and would have no reason to create the records required by CFTC Reg. 135(a-1)(5)(iv)(B). Since the relevant time-period, the CME has changed its procedures.

The CFTC investigator Brandon Tasco ("Tasco") was clearly unqualified to conduct the investigation involving Quiddity and Mr. Newell. Mr. Tasco lacked basic knowledge of the industry, possessing no working knowledge of options, options strategy, order entry procedures, back office operations, and of one of the most fundamental investigative tools available in the industry, time and sales reports. It is apparent that Mr. Tasco was unaware of the issue involving the CFTC rule regarding use of bunched orders and the CME procedure. Moreover, since it was clear from all of the marketing material related to Quiddity that it was engaged in a long-term (4-6 month) options strategy in which the purchase or sale of futures were relegated to less that 5% of the trades, appointing an investigator with no experience with options or options trading strategy is inexplicable. I do not see

---

[2] As Ms. Wiermanski noted in her report, QUID-MIZUHO-0000665 and QUID-MIZUHO-0000668 (tickets written during normal trading hours by different persons within a minute of each other) reflect the complete freedom that Mizuho granted order takers in recording information on order tickets.

how it is possible to conduct an adequate investigation into an allegation of fraudulent post-trade allocations without knowing the disclosed strategy and what type of trading was permitted by the strategy.

As explained in more detail below, I have been unable to discern any appreciable differences in the order tickets for the trading activity referenced in Par. 34 of the CFTC's Complaint and the trading tickets for proprietary account trades that were not included in the CFTC's Complaint, especially the losing trades. Mr. Tasco either overlooked this extremely important fact or he failed to appreciate its importance. Nor did the investigator review proprietary account trades and trading success or failure outside of the relevant time-period.

It is my opinion that there were two other deficiencies in the CFTC's investigation. *First,* the CFTC failed to properly investigate the reallocation of the profits from a quarter of a million dollar Yen trade from customer accounts to the proprietary account after the trade had been confirmed. Someone in Mizuho USA, Inc.'s ("Mizuho") compliance department had to have reviewed the request. No attempt seems to have been made to determine what Mizuho did to investigate the reallocation request. The request would have raised a major red-flag at Mizuho and, in my experience, would have been referred to compliance. FCMs are required by CFTC Req. 1.35 to investigate allocation red flags. Also, a wrongful misallocation would open Mizuho to customer claims. *Second,* Mr. Newell testified that, prior to obtaining access to trade the proprietary account on the PATS terminal installed in Quiddity's office by MF Global, that when placing those trades he was engaged in contemporaneous telephone conversations with the MF Global's back office desk informing them of the fact that the order was for the proprietary account. Mr. Moreno, the salesperson for the account testified that he was not involved with either the order process or answering telephones on the order desk or back-office

responsibilities.[3] Yet, no interviews occurred of any MF Global back office personnel. When one looks at the total number of trades admittedly allocated from the MF Global suspense account to the proprietary account, if Mr. Newell was not contacting MF Global back office personnel contemporaneously with the trades to inform them that the trades were for the proprietary account, why did not MF Global compliance raise an issue with the allocations?[4]

Another concern is the misuse by Mr. Tasco and the CFTC of the term 'trade" in its Complaint. The CME, in its Glossary, defines the term "trade' as follows:

> The term "trade" shall mean any purchase or sale of any commodity futures or options contract made on the Exchange.

While the CFTC glossary does not define the term "trade" in its glossary, the CFTC appears to have the same definition. *See* CFTC Reg. 135 (a)(2)(ii)B)(3).[5] The Complaint speaks in terms of the "56 profitable trades" in Par. 30 and uses the same term for "trades" allocated to the "Pool" in Par. 31 and in Par. 34. In fact, the number of actual "trades" the CFTC alleges were improperly allocated number in the hundreds, as do the proprietary account trades that are not alleged to have been improperly allocated. The

---

[3] As discussed below, Mr. Klen was the only other MF Global employee interviewed but his experience was solely in technology and other back-office, extraneous back-office matters.

[4] Attached as Schedule "B" is a spreadsheet reflecting the P&L of all trades by the proprietary account during the relevant time-period, the "trades" in the Complaint are identified with numbers corresponding to those in the table in Par. 34 of the Complaint. Except for Trade 49 in the complaint, the P&L for the trades in the complaint are those computed by the CFTC in the table in Par. 34 of the Complaint.

[5] The member receiving and executing the order shall return such trading card or other record to the member placing the order. The member placing the order then must submit together both of the trading cards or other records documenting such *trade* to contract market personnel or the clearing member, in accordance with contract market rules adopted pursuant to paragraph (j)(1) of this section.

CFTC Glossary does, however, define the term "round turn" as follows:

> A completed transaction involving both a purchase and a liquidating sale, or a sale followed by a covering purchase.

The CFTC uses that definition in footnote 1 of Par. 34 of the Complaint to define the term "lot size" in the table contained within that paragraph:

> Lot size indicates the number of contracts traded in a round-turn trade, i.e., long and short positions in the same contract that offset each other for a realized profit or loss, with the exception of the October 17, 2009 and November 21, 2008 options trades, which consisted of 396 and 18 lots, respectively, of options that expired that day.

However, that is not how "lot size" is used in the table in Par. 34 of the Complaint. For example, Trade 1, which indicates a "lot size" of 300, actually consists of 8 round turn trades with lot sizes of 25 or 50 contracts. This miscounting of "lot size" is replicated repeatedly throughout the table contained in Par. 34 of the Complaint. I find it inexplicable that the federal agency charged with administering the Commodity Exchange Act would inadvertently make such a glaring and material error.

In my opinion, for these reasons and the more detail reasons discussed in the remainder of this report, I am of the opinion that the CFTC's investigation fails to comport to the minimum requirements for an audit or investigation of commodity futures, securities or options trading.

## IV.

## POST-TRADE ALLOCATION OF BUNCHED ORDERS UNDER REG. 1.35

The exception to paragraph (a-1)(5) to Reg. 1.35 states that: "Specific customer account identifiers for accounts included in bunched orders need not be recorded at the time of order

placement or upon report of execution if the requirements of paragraphs (a-1)(5)(i)-(iv) of this section are met." The requirements are that: (i) the order placer is an eligible account manager (which Quiddity was); (ii) that the eligible account manager make certain information required by the regulation available to its customers (which Quiddity did); (iii) that post-execution allocations be made as soon as practicable under a demonstrably fair and equitable manner (which Quiddity did); and (iv) appropriate records be maintained by the eligible account manager to demonstrate the fairness of the allocation and to reconstruct the trade from the time of placement to the time the order is allocated (which Quiddity did).

CFTC Reg. 4.34(l) requires that a CTA (or any principal thereof) who intends to trade for its own account disclose that fact to its customers and to inform them that they may inspect the records of such trades and the CTA's policy regarding such trading. Quiddity made the disclosures to its customers as required by Reg. 4.34.

Paragraph (a-1)(5)(iv)(C) of Reg. 1.35 does *not* require the FCM to maintain the same records as the eligible account manager. FCMs are to merely maintain records that "identify each order subject to post-execution allocation and the accounts to which contracts executed for such order are allocated." CME Advisory RA-01-05 (Feb. 2, 2005) created a situation that permitted CME members that were executing trades for give-up to another firm to place a suspense account identifier on an order ticket regardless of whether the person placing the order gave the order taker a specific account number even when it was impossible for the order to be part of a "bunched order," *i.e.* a one lot trade. As a result of this CME procedure, a FCM could have used the suspense account number at its discretion for give-up transactions without notifying the account manager. As a result, the integrity of the "bunched" order audit trail was lost.

For example, by definition, an account manager placing an order solely for one account is not placing a "bunched order" since it will not be subject to "allocation." Therefore, the account manager is

not required to maintain the records mandated by CFTC Reg. 1.35 135(a-1)(5)(iv) for such a trade. However, since, without the account manager's knowledge, the executing FCM could assign the FCM's suspense account number to the order ticket, the trade becomes one that appears to be subject to the "bunched order" rule and the account manager could be accused of being in violation of that regulation without ever having intended to, or having actually, violated the regulation.

## V.

## THE QUIDDITY TRADING STRATEGY

Quiddity's system was marketed as a long-term (4-6 months) non-directional option premium strategy, *i.e.* a strategy that was not dependent on price movement in any direction but, instead, profited from the time decay of the options sold by the strategy. Quiddity attempted to identify and sell over-priced options and, when applicable, identify and buy underpriced options. This type of strategy, for all intents and purposes, obtains the maximum "profit" for a given overall position at the time the position is initiated in the form of the premiums collected. Quiddity then attempted to manage the position in the most cost effective method in order to retain as much of the premiums as possible until the time came to either unwind the overall position, or the time at which the options expired. In the Quiddity strategy, time worked in favor of the strategy while price volatility worked to the disadvantage of the strategy. Depending on the intensity of the volatility being experienced, active risk management actions would be implemented. The specific risk management necessary to manage the position became more proactive as the volatility of a particular market increased.

Quiddity used a proprietary software system known as QUIPS that was used to identify options for possible inclusion in a new portfolio or for managing an existing portfolio position. As an option strategy, Quiddity preferred, when possible, to manage risk through the use of options. Specifically, Quiddity was most

concerned with the delta of the overall strategy, *i.e. the position's* equivalent exposure to the underlying future; for example, the S&P 500.[6] However, the use of options to manage delta has some inherent complications:

1. Futures trade more frequently, are therefore more liquid, and can provide an almost instantaneous electronic fill; while options must be traded manually, and in volatile markets can take much longer, sometimes up to half an hour, for confirmation of a fill;

2. The price of a futures contract is a reflection of a multitude of bids and offers reflecting the true "market" for the futures contract in a liquid supply and demand system and cannot be "too expensive" at any moment in time.[7]

3. An options price, however, is very dependent on the market-maker who can, for example, increase the price of a call or put because he or she believes it is being offered too cheaply, by merely increasing the implied volatility of the option. Additionally, the market-makers can raise prices simply to discourage customers from buying an option. In this type of scenario (*i.e.* implied volatility increases, reflecting the expectation of future price volatility of the underlying futures contract), the use of options for risk management purposes can become too expensive for Quiddity.

Therefore, according to Newell, Quiddity at times used the purchase or sale of futures as "place holders" until a suitable options contract could be found to adjust the overall option

---

[6]While generically referred to as a delta neutral strategy, *i.e.* one that was neither long nor short, the Quiddity strategy was short-biased. In other words, at any given time, an overall position may be long or short a given number of underlying contracts as reflected in the position's total delta and Quiddity then attempted to keep the delta near to the most advantageous total delta in its risk management.

[7]That is not to say that the general market for a futures contract cannot be viewed as "oversold" or "overbought" by a trader. However, since the current price of a futures contract has neither implied volatility nor a time component, it cannot mathematically, be "too expensive."

position's cumulative delta. Futures contracts used to hedge, either in the traditional sense (a farmer selling corn futures to protect the price of the current crop) or a futures trade instituted to reduce the risk of an existing futures or options position, is considered a non-directional trade. The purpose of the futures contract used as a hedge is accomplished as soon as the futures contracts are bought or sold. Subsequent price movement of the futures contract is largely irrelevant because the futures hedge is now simply part of a larger overall position.

According to Newell, and verified by the Quiddity statements, when Quiddity used futures contracts to hedge an overall position, it sought to hedge only part of an options position. Therefore, given the fact that the hedge covered only a part of the total position, a "gain" from the new futures positions hedge would be "bad" since the loss experienced by the overall position would be much greater than the gain from the hedge. Conversely, a "loss" on the futures hedge would be "good" relative to the overall profitability of the total position.

Option prices fluctuate based on factors other than the simple daily movement of the underlying future contract (volatility, time). Therefore, the daily profit and loss of a long-term options trading strategy is not indicative of the long-term success or failure of the strategy. Such success or failure can only be assessed when the options in question have either expired or been closed out. It is my opinion that the CFTC investigator did not appreciate this reality nor understand why it is impossible to compare the results of the day trading for the proprietary account with the profit and losses for a long term options strategy. The trading style, risk parameters, and time horizon (the proprietary account generally being measured in minutes and the strategy for the customers' accounts being measured in months) are radically different for the two strategies. Furthermore, the absence of implied volatility as a factor in the price of futures contract as well as the absence of the opportunity to profit from the passage of time renders, in my opinion, the attempt to compare the two

strategies as the CFTC has done in Par. 31 thru 33 of the Complaint, an exercise in futility.

## VI.

## A TRADE VERSUS A POSITION

A trade, as previously noted, is any order placed with an exchange that is filled or partially filled. A position is an open number of option or futures contracts in an account. A position can be added to or reduced by the entry of one or more trades. The term "lot" is, in accordance with industry custom and practice, a synonym for "quantity." Therefore a "ten-lot trade" is a trade of ten contracts of a specific commodity or option. As previously stated, the CFTC repeatedly mislabels most of the transactions in Par.34 of the Complaint as a "so many lot trade" when, in fact, the transactions are almost always the sum of various "trades." There is a material difference from the standpoint of risk, margin, and credit approval, between entering into, for example, a series of 25 lot trades in which a commodity is either bought or sold and then liquidated by an offsetting transaction before a new contract is executed to establish a new position, and a one-time trade buying or selling 300 futures contracts. The trade initiating the 300-lot contract position has twelve times the risk and twelve times the margin requirement of a 25-lot trade opening position.

## VII.

## DAY-TRADING

What may be perceived as day trading in the Quiddity strategy can occur because: 1) the trader intends to liquidate a position initiated during the trading day before the end of the trading day and does so; or 2) because a position established during the day that is intended to be carried for days or weeks until a specific profit is reached or, in the situation where the positions being used to manage delta of an options position, the need for such management no longer exists (*i.e.* the options expire or the

position is liquidated); however, adverse price movement during the day causes the position to be liquidated. Actual day trades, (those in which a position is intended to be established during a trading day and liquidated before the end of the same trading day) are inconsistent with Quiddity's declared long-term options strategy.

Scalping is a form of day trading in which the intention of a trader is to take advantage of relatively small price movement.

Given the extreme price volatility in the latter part of October 2008 when the S&P not only moved more than 85 points in a day but had intraday swings of 30 or 40 points, a futures position initiated as a hedge as the market moved in one direction (a long position as the price rose), may need to be liquidated as the market retraced its movement and began moving in the opposite direction (retracing not only to where the long position was initiated but declining further).

Day trading can also be a commission intensive undertaking and is a directional trading strategy that has completely different margin requirements and risk profiles than a long term options strategy.[8]

Day trades also have a different risk profile from spread trades or hedges. While day trading can be very profitable, it can also incur large losses. A trade initiated as a hedge trade has a "no risk" profile since it is the existence of the underlying position that motivates the hedge and not whether the hedge position makes or loses money. Whatever "loss" that the hedge position might sustain is being offset by the price movement of the underlying

---

[8] Generally day-trading does not require margin since margin is calculated at the end of the trading session and the day trader is "flat" at that time. Therefore, the number of contracts a trader may day trade is a function of the credit function of the FCM (how much is the trader "good for" if he or she suffers a loss) as opposed to application of the exchange initial and maintenance margins for overnight positions.

position, which in Quiddity's case would be a multiple of approximately four since only 25% or less of the underlying options positions was being hedged.

# VIII.

## FRAUDULENT ALLOCATION SCHEMES

Fraudulent allocation schemes are those in which a person who has trading authority over one or more accounts, waits until a trade is either closed out for a profit or a loss (or has an open profit or open loss) before allocating winning trades to the account manager account and allocating some number of simultaneously executed losing trades to customer accounts. No losing trades are alleged to have been misallocated to the customer accounts.

With the use of a suspense account, it is possible for an eligible account manager to allocate trades:
1. When the order is given;
2. When a price or quantity change is made to an unexecuted order;
3. Contemporaneous with the report of the fill for the order;
4. After the fill has been reported, and the price is the same as that for the order;
5. After the fill, and the price has moved so that there is a loss for the trade; and
6. After the fill, and the price has moved so that there is an open profit for the trade or the position has been closed out for a profit.

Only the last type of allocation would support a false allocation scheme.[9] I have not observed any testimony or document relating

---

[9]Also, it is not uncommon during times when an order desk is busy for the trader to take all the pertinent order information (commodity, contract month, price, quantity), place the order and then place the account number on the order ticket later or instruct a colleague to do so. Here, when a dedicated phone line is used, it would not be unusual for an order taker to place an account number associated with that phone on the order ticket at the time the phone was answered. At Mizuho, the one account number that

to the trades specified in the Complaint that eliminates any of the situations described in examples 1 thru 5 above. In fact, for the reasons stated in the following sections of this report, I am of the opinion that, taken as a whole, the testimony and documents that I have reviewed establish the fact that no such fraudulent allocation scheme existed.

## IX.

## THE PROCEDURE FOR CONDUCTING A FRAUDULENT ALLOCATION INVESTIGATION FOR THE QUIDDITY TRANSACTIONS IN QUESTION

### A.
### What Was the Nature of The Trading Strategy Employed For The Customers' Accounts?

The two factors most determinative of difference in trading results for two accounts are, *first*, differences in trading strategy and, *second*, the availability of margin for the accounts in conjunction with the risk profile for the respective accounts. Any analysis of the differences between the results enjoyed by one account as compared to another that does not attempt to determine the effect these two factors have had on the respective accounts is fatally flawed. For that reason, my opinion is that the CFTC's expert report submitted in this matter is fatally flawed and that the conclusions are both untenable and unwarranted.

> I conclude that the profitability differences between client and proprietary trades cannot be explained by characteristics of trade size, executing broker, the time a position is held, the day of week that trades are executed or by the time of day that trades are executed. The profitability differences are almost surely the result of ex post assignment to different trading

---

could always be traced to Quiddity for any order was "Q0000". This is the type of consideration that a proper investigation would need to take into account.

accounts.

Mr. Harris Report at Par. 62.[10] In fact, I take issue with Mr. Harris' using as a baseline assumption (Par. 18) the fact that in a sufficiently large random sampling any orders to buy or sell futures contracts would result in a 50% probability of success. *No one enters futures orders at random.* Every order has a methodology or reason, valid or invalid, behind it. Here the accounts had defined methodology: long term-option selling strategy for the customer accounts and day-trading or "scalping" for the proprietary account. Therefore, using a random sampling baseline is facially incorrect and misleading. The question should instead be, how much deviation, if any, was there from Mr. Newell's success at day-trading than that realized by other market professionals engaged in a similar strategy.[11]

The first step in any investigation of whether a trade was part of a fraudulent allocation scheme is to determine whether the trades in question were compatible with Quiddity's declared long-term options trading strategy. The fact that the CFTC investigator and the previous NFA investigator were completely unfamiliar with

---

[10]Mr. Harris uses the terms "trade" and "round-turn trade," and while the term round-term trade is a term with a precise definition and, therefore, I assume that Mr. Harris was using that definition, Mr. Harris does not define how he is using the term "trade." Is it being used pursuant to the definition in the CME glossary and the portion of CFTC Reg. 1.35 previously discussed or does he use the term with the same meaning as that used in the CFTC's Complaint? Without having access to the "trades" being referred to in the report, it is impossible to determine whether any of the conclusions related to "trades" in Mr. Harris' report have or lack validity. For example, Mr. Harris states that he reviewed 130 "trades" that were identified by the CFTC as "suspicious". That number is more than twice the number of "trades" alleged in the Complaint and only a fraction of the round-turn trades that comprise those 56 "trades." Again, without knowing to which specific transactions Mr. Harris is referring, it is impossible to determine whether even his methodology is proper.

[11]For the period of 2003 through 2010, the Quiddity trading strategy made a 10.54% average annual profit (Schedule "C" attached). This record clearly demonstrates Mr. Newell's high degree of trading acumen.

the fundamentals of options trading, not to mention Quiddity's trading program, calls into question their entire investigation. The purpose of an investigation is to examine all of the facts to determine the truth, not to look for selective facts to support a pre-determined conclusion. The failure to take into account the fact that trades in paragraph 34 of the Complaint are almost all day trades using futures contracts and that the Fund's declared trading program or strategy was a long-term options strategy in which futures trades comprise less than 5% of the overall trades, also discredits the report of Mr. Harris, the CFTC's expert.

Attempting to determine why the trading results for one account differ from the results realized by another account without taking into consideration whether the two accounts engaged in different trading strategies is not an appropriate approach. *Two accounts, each using a different trading strategy would be expected to have different results attributable to the two differing methodologies.* This is especially true here where, instead of the customer and proprietary accounts both employing a directional strategy or both employing a hedging strategy, the customer accounts were engaged in non-directional futures trading to hedge risk while the proprietary account was engaged in directional trading that attempted to make profits from an increase or decrease in the price of the futures contract. Indeed, *if a statistical analysis found no differences in the result between accounts using two such disparate strategies, then a suspicion certainly would arise since the results over a six-month period would have to differ.* The lack of such a difference would raise a suspicion while the existence of a difference in results would not. The fact that Mr. Harris found differences that cannot be, in his opinion, justified by differences in trade size, time of day, day of the week, etc. are entirely consistent with the differing results of the "trades" for the accounts being attributable to the contrasting trading strategies that were employed.

A second omission by Mr. Harris skewers the results of his "study." Mr. Harris does not account for futures positions that were initiated and rolled into the overall customer positions

because no appropriate options contract could be found as a suitable hedge. Including such futures "trades" into his analysis, and matching their duration to the underlying options positions would materially lengthen the holding period for the futures "trades" executed for the customer accounts.

Mr. Harris ignores the most important factor in his conclusion–the reason for the trades.[12] The trades for the "client" accounts are part of non-directional hedges while the trades for the proprietary account are directional day-trades. Most importantly, the "trade" for the client accounts was the overall position (the combination of the profit and loss of the *existing* futures *and* options positions *plus* any future hedges executed. Mr. Harris makes no comparison on the profitability of the overall options strategy and trades made for the proprietary account. Comparing a single hedging component of an options strategy with trades that are overwhelmingly futures day trades simply is not a valid comparison, and is completely inconclusive in determining whether a fraudulent allocation scheme existed.

Regarding some aspects of Mr. Harris' report, as explained by Mr. Burnside, the smaller or less frequently commodity futures hedges were established by Quiddity, the better the long-term result for the client accounts, since the larger, overall options and futures position is making money in any given time period. Large profits for the hedge trades would mean that the overall position was suffering even greater losses. Other factors, ignored by Mr. Harris, such as margin availability, could have a direct impact on the profitability of one set of trades as opposed to another set of trades; For example, the margin available. Different margin

---

[12]Mr. Newell's testimony in his OTR and in his deposition was that the purpose of initiating the futures position for the customer accounts is to establish a placeholder for a hedge while a suitable options trade is identified and then executed. According to Mr. Burnside's report this is a normal practice for managing an open options position. Therefore, using a flip of the coin randomness does not seem appropriate.

constraints impact the profitability of trades executed by the two accounts even when both accounts used the same trading strategy.

I agree with Mr. Burnside's criticisms and conclusions regarding the time of day and size of trades as factors accounting for the differences between the performance of the customers' accounts futures trades and the trades for the proprietary account. However, the most glaring deficiency in Mr. Harris' report is his statement in Par. 20 that the probability of having 55 of 66 trades (83.3% successful) for the proprietary account being profitable is "virtually zero." This is a statement that is, in my opinion, disingenuous at best.[13]

What really exposes the fact that a statistical analysis, such as that engaged in by Mr. Harris, cannot replace hard facts in the investigative process, is Mr. Harris's conclusions concerning the success of trading for the proprietary account during the relevant time period. There is no need for a statistical analysis to determine if this degree of trading success was possible or characteristic of Mr. Newell's proprietary trading.

Professional traders have been able to sustain remarkable track records over a given period of time. Mr. Harris provides neither an empirical study nor baseline for professional day traders with similar expertise as that possessed by Mr. Newell. Instead, Mr. Harris' conclusion rests on an artificial baseline of 61.5% that is obtained by combining the results of 130 undisclosed trades' that amalgamate the results of two trading different strategies -- directional day-trading and non-directional hedging -- to reach the conclusion that the possibility of Mr. Newell achieving the rate of success, using Mr. Harris' statistical model, was "virtually zero." What Mr. Harris did not attempt, however, was to look at all the

---

[13] Successful traders, in fact, can sustain remarkable success ratios. In May of 2011, for example, Goldman Sachs publically noted that while it had experienced previous quarters where it's traders had only experienced one or two losing days in a quarter, it had completed trading for the previous quarter without a losing day of trading.

proprietary trades during the relevant time-period encompassed by the Complaint and then compare those results to another time period where there is no allegation that any trades were allocated after the trades proved profitable. Since, whether Mr. Newell could repeat this *"virtually impossible"* performance at a time when it was clear no trades were allocated post-trade could be determinative, it is puzzling why Mr. Harris did not conduct such an analysis.

A proper inquiry would have considered all the proprietary trades actually cleared through that account during the relevant time-period. While I do not claim to be a statistician, the results seem to directly contradict Mr. Harris' analysis and conclusions concerning the proprietary trading. Below is a table of the percentages of profitable trades by the proprietary account during the October 2008 to the March 2009 period alleged in the CFTC's Complaint as reported on the account statements, including all transactions identified in the Complaint:

|        | Percent Of Profitable Round Turns | Percent of Profitable Contracts |
|--------|-----------------------------------|--------------------------------|
| Oct-09 | 80.77% | 75.71% |
| Nov-09 | 69.01% | 73.55% |
| Dec-09 | 59.70% | 58.90% |
| Jan-09 | 62.22% | 67.89% |
| Feb-09 | 76.67% | 88.09% |
| Mar-09 | 92.31% | 91.67% |

Clearly, the profitability of the round turn trades in December and January of 2009 are near what Mr. Harris considers his baseline number of 61.5%. The 69% for November is not appreciably higher.

For the period of April to September of 2009 (when it is agreed that the trading for the proprietary account was executed through MFG account 290-60006 via the PATS terminal in Quiddity's office and telephone orders to MFG's 24-hour desk) Mr. Newell

traded 7,628 total contracts in 3,814 round turn day trades in the proprietary account. The following shows the rate of success for both round turn trades and number of contracts traded:[14]

|        | Percent Of Profitable Round Turns | Percent of Profitable Contracts |
|--------|-----------------------------------|---------------------------------|
| Apr-09 | 84.00%                            | 84.50%                          |
| May-09 | 79.01%                            | 84.10%                          |
| Jun-09 | 72.20%                            | 88.20%                          |
| Jul-09 | 86.22%                            | 87.70%                          |
| Aug-09 | 83.30%                            | 92.40%                          |
| Sep-09 | 78.70%                            | 85.20%                          |

Clearly, the success of Mr. Newell's trading exceeded the profitability per trade and per round turn trade that occurred in the relevant time-period in the CFTC's Complaint. Point of fact, Mr. Harris' assumption concerning the possibility of achieving such success levels is completely repudiated by this trading success.

## B.

### Were The Alleged Wrongfully Allocated Trades Compatible With The Strategy For The Customer Accounts?

For a specific trade to be considered as eligible for a fraudulent allocation scheme, the trade must be one that is compatible to the declared trading strategy for the clients' accounts. Futures trades that are intended as directional day trades or as directional scalps cannot be part of a fraudulent allocation scheme since they cannot be properly allocated to the customer accounts given Quiddity's declare strategy, regardless of when they were allocated to the proprietary account. For example, in my opinion it is very clear that the transactions in Trade 1 in

---

[14] The specific break-down is on Schedule "D" attached to this report.

Par. 34 were executed as day trades (many of them scalps) and, therefore, are not be part of a fraudulent allocation scheme.

Next, when considering an order that is questionable, were there a sufficient number of contracts to permit allocation to the customer accounts pursuant to the trading program's allocation requirements?[15] For example, if there are seven customer accounts and an order to buy two S&P mini contracts is placed, the presumption has to be that the trade is not intended for customer accounts. A subsequent sale of the two lot position would be a further indication that the original trade was not intended for the customers' accounts[16] since it could not be used to even out positions across all of the customer accounts.[17] The only possibility for an allocation of these two contracts would be if two of the customer accounts were missing an S&P futures mini contract because of partial fills. I am unaware of any CFTC factual inquiry when the number of contracts for a day-trade position could not conceivably be allocated to the Quiddity customer accounts. For example, trade 25 in paragraph 34 of the Complaint consists of a series of two one-lot in and out trades of the December S&P mini-contracts which could not possibly have been allocated to the customer accounts and could not seriously be considered as a trade to manage the delta of an overall options position consisting of thousands of options contracts.

From the documents and testimony that I reviewed, neither the CFTC investigator, the NFA investigator, nor Mr. Harris made any effort to determine what the minimum number of futures contracts or options would need to be purchased or sold on an

---

[15] The number of contracts executed is not a reliable factor since only part of an order was filled. The question is what was the intent for the order.

[16]For this report, the Quiddity funds are included as "customers."

[17] When price or limit orders are used, the result can be a partial fill; an order to buy seven contracts at X price may result in only 5 contracts being filled leaving two of the theoretical customer accounts short one futures contract.

order to be allocated to the customer accounts pursuant to Quiddity's allocation requirements.

## C.
## Reconstruction Of The Trading Day

Assuming that a questioned trade was for a sufficient number of contracts to be properly allocated to the customer accounts, the next question is whether the trade could have legitimately been part of the trading strategy for the overall position of the customer accounts. Since the only use of futures trading by Quiddity for the customer accounts was to manage the delta of the overall position or to act as a place holder while an option order was executed, the questions to be asked are: 1) would this trade be placed to possibly manage delta of the overall position; 2) was there an options trade executed near the time the futures trade was liquidated so that it was possible for the futures trade to have been a place holder for the customers' account that was "taken" by the proprietary account after the fact; or 3) was the futures trade made as part of a "delta-neutral" options trade. *e.g.* when some number of put contracts are purchased for their ability to reduce vega (an options characteristic), and a number of futures contracts are purchased to "hedge" the delta of the options to zero.

Determining whether a futures position may have been a placeholder requires a review of the manual or electronic option order tickets for the day. There is no indication that the CFTC did made this rudimentary effort for the trades in Par. 34 of the Complaint. Determining if the futures trade could be reasonably entered to manage the delta of the overall position is much more difficult and would require the services of an experienced options trader. If I were conducting the investigation for the CFTC, I would have assigned this review to either an experienced, in-house options trader or would have retained such a trader for the purpose. The CFTC neither utilized an investigator experienced with options trading to conduct such a review nor did it hire an expert to accomplish that task. This omission is inexcusable if the purpose of the investigation was to uncover facts.

While theoretically even small price movements could affect the delta of an options position, in practice such a reconstruction would start with trades having significant price movements between the institution of the position and its liquidation. A move, for example, of two, three, four, five, six "ticks" is insufficient to materially affect the delta of a large option position containing hundreds of options in different contract months and would not warrant the rapid liquidation of a previously executed futures trade.

Another factor mitigating against the trades at issue in the Complaint having been used as legitimate hedges for the overall position for the customer accounts is the in and out nature of numerous trades at prices lower (in the case of a long position) or higher (in the case of a short position) than the original position was closed. Lifting a "long" hedge while the market is rising makes no sense. For example, if the original order was for the clients' accounts and was a hedge, Quiddity would have no justification to take off the hedge as the market continued to move adversely and as the hedge was fulfilling its purpose. Reinstating the hedge at a more disadvantageous price just a few minutes later makes even less sense. Yet, as discussed more thoroughly by Mr. Burnside, this is characteristic of a number of the round turn trades comprising the "trades" listed in Paragraph 34 of the Complaint. Any investigation would necessarily have to take into account these types of trading considerations.

Then, as Mr. Burnside explains, if there was a determination that a specific trade or series of futures trades allocated to the proprietary account could have acted as legitimate hedge trades for the overall position of the customer accounts, an investigator (or trading expert under his or her direction) would need to calculate the position, the delta, the gamma, and the changes in delta and gamma at the time the position or positions initiated by the particular order ticket were executed to determine if the trades could have been for the customer accounts. Time and sales

reports from the exchange, with which Mr. Tasco was unfamiliar, are a necessary tool for such an investigation.

## X.

## EXECUTING FCM RESPONSIBILITIES

The NFA places the following responsibilities on executing FCMs such as MF Global and Mizuho:

> . . . if the FCM has actual or constructive notice that allocations for its customers may be fraudulent, the FCM must take appropriate action. For example, if an FCM has notice of unusual allocation activity, the FCM must make a reasonable inquiry into the matter and, if appropriate, refer the matter to the proper regulatory authorities (e.g., the CFTC or NFA or its DSRO). Whether an FCM has such notice depends upon the particular facts involved.

9029 - NFA Compliance Rule 2-10: The Allocation Of Bunched Orders For Multiple Accounts (Board of Directors, June 9, 1997; revised September 15, 2003). Therefore, at all times relevant to the Complaint, both FCMs had a duty to investigate any suspicious allocation activity for the trades they each executed for Quiddity.[18]

---

[18]Defendant's Ex. 15, a January 2009 email in which Moreno is being told that apparent activity in Quiddity's MF Global account was 'improper" for a suspense account, indicates that MF Global's compliance department was monitoring the suspense account. Therefore, given this type of surveillance, the fact that MF Global permitted the allocations from the suspense account to the proprietary account mitigates against MF Global suspecting that any fraudulent allocation scheme was taking place. Using the suspense account to place trades for the proprietary account is a red-flag. The fact that MF Global permitted the practice of using the suspense account for Newell's proprietary trades until Mr. Newell requested that the proprietary account be given access on the PATS terminal in Quiddity's office, rather than MF Global imposing that requirement on Quiddity, certainly corroborates Mr. Newell's testimony on his making contemporaneous calls to the MF Global trading desk to inform MF Global that trades just placed were for the proprietary account.

The cancel and rebill of the October 24, 2008 Japanese Yen trade identified in Par. 34 of the Complaint occurred at the beginning of the period when the CFTC alleges the fraudulent allocation scheme began. The request by Quiddity to reallocate trades that had generated profits of almost a quarter of a million dollars that had been already confirmed to customers, by taking the trades out of the customers' accounts, and to place the profit in its proprietary account, is an obvious example of a suspicious reallocation. This request would have raised a major red-flag to the FCMs.

In his OTR, Mr. Hanson of MF Global testified that such a reallocation for a trade executed by MF Global, would have required, given the time period that had elapsed from the time of the allocation until the request to reallocate, at a minimum the approval of MF Global's compliance department and perhaps the Exchange. Since this reallocation was a "give-in" from Mizuho, Mr. Hanson's department did not process this reallocation and he was unaware of what procedures were followed by the responsible MF Global department. However, to fulfill the supervisory requirements discussed above, Mizuho would need a comparable procedure for handling such reallocation requests. The fact that Mizuho processed this reallocation request leads me to conclude that the Mizuho compliance department must have reviewed the orders, telephone tapes, and other documents related to the trades and determined that the trades were identified as made for the proprietary account.

Finally, if the alleged fraudulent allocation scheme was as open and pervasive as the Complaint makes it seem, how could either MF Global or Mizuho not have at least "constructive notice" from the very order tickets and emails that the CFTC cites as proof of a fraudulent allocation scheme? A conclusion that an investigator could draw is that the FCM was sufficiently convinced that the orders were not "bunched", meaning that at the time of placing the

order or before execution or upon reporting the fill, Quiddity provided the respective FCMs with a sufficient account identifier to remove the trades from the operation of CFTC Reg. 1.35(a-1).

A second event mitigating against the conclusion that the Defendants' engaged in a fraudulent allocation scheme is the fact that the Defendants requested that MF Global provide them with authorization to place orders directly for the proprietary account though the PATS terminal in Quiddity's office. If the Defendants were engaged in a fraudulent scheme by using the MF Global suspense account to allocate profitable trades to the proprietary account, it makes no sense for them to request PATS access that would prevent that scheme from operating since PATS order entry requires the identification of the intended account.

## XI.

## MF GLOBAL

Initially, when Quiddity used the PATS terminal installed in its office by MF Global, it had to place the order in the suspense account. [19]   Mr. Newell, who requested that the proprietary account be added to the PATS terminal drop-down menu in late November of 2008, testified that he would place contemporaneous calls when trading for the proprietary account informing the MF Global back office that the trades were being made for the proprietary account.

The only persons to testify from MF Global were Bert Moreno, the salesperson assigned to the Quiddity account and back-office employees, John Klen, and Neal A. Hanson.  Mr. Moreno did not

---

[19]The initial account opening documents from 2007, provided by MFG, show that Quiddity's proprietary account was approved to execute trades via the suspense account. Furthermore, emails from MFG's back office personnel shows that Quiddity was instructed to directly call or email the back office for allocation purposes. For example, see QUID-MFG-B-0000001, QUID-MFG-B-0015573, and QUID-MFG-B-0021345

take orders and had no knowledge of when, or if, Quiddity personnel (prior to Quiddity having direct access for the proprietary account on the PATS terminal in its office) called immediately after placing an electronic order for the proprietary account to inform MF Global personnel that the order was for the proprietary account as opposed to a customer account. Mr. Klen played no role with the Mizuho order desk and no questions on this issue were directed to Mr. Hanson.

Without the existence of contrary testimony or documents to Mr. Newell's testimony that he was placing contemporaneous phone calls there could not be any investigative basis for sustaining the allegations of a fraudulent allocation scheme involving the MF Global trades identified in the Complaint unless the trading activity conclusively established that the trades should have been allocated to the customer accounts as part of Quiddity's trading strategy. As discussed below, the trading effected through Mizuho from October 16, 2008 through early-December of 2008 are indicative of directional day trading, frequently as "scalps" and were not consistent with hedging the long-term option strategy employed for the customers' accounts.

John Burnside's analysis of the MF Global trades in his report is thorough and, in my opinion, clearly show that the trades (Nos. 1, 13, 19, 23, 24 and 25) were not compatible with Quiddity's option strategy and bear the characteristics of directional day trades. Also, I do not detect a discernible difference between the trades executed by MF Global that were included in Par. 34 of the Complaint and the trading executed by MF Global from April to September of 2009 when no fraudulent allocation scheme is alleged to have existed.

The 5-lot quantities of trading in Trades 23 and 24 and the 1-lot trading related to Trade 25, together with the timing of the trades, would lead anyone with a basic knowledge of futures trading to conclude that these were directional day trades. While Trade 1 is in quantities sufficient to allocate to the customers' account for the

purposes of my investigation,[20] the in-and-out nature of the trades and their timing are also clearly indicative of directional day trading.

Regarding Trade 56, Mr. Newell stated that he had forgotten to change the account number populated on the PATS terminal from the suspense account number to the proprietary account number when entering these trades. I agree with Mr. Burnside's opinion regarding this "trade." An important point discussed by Mr. Burnside is that whomever concluded that these trades were meant for the customer accounts and misallocated to the proprietary account did not even check to see whether the customers' open futures and option positions had been "rolled" forward. There would be no reason to establish a placeholder trade in a contract month when, if no suitable option hedge was found, it would have to be rolled forward. Moreover, the trades were executed as only six to thirty second scalps in a number of instances. The fact that this type of error only occurred once in the approximately four months after the proprietary account number was added to the PATS terminal dropdown menu is consistent with Mr. Newell's explanation. Also, the CFTC failed to adduce any testimony from anyon in the MF Global back office contradicting Mr. Newell's explanation. For these reasons, it is not possible to reasonably conclude that the trades comprising the CFTC's Trade 56 were part of a fraudulent post-execution scheme.

Finally, for all the reasons stated above, it is my opinion that no such scheme existed regarding the trades executed through MF Global that are listed in the table in Par. 34 of the Complaint.

---

[20]I assumed for my investigation that any trade of a 25-lot or more size could, presumably be equitably allocated to the customer accounts.

# XII.

## MIZUHO

### A.
### The Mizuho Back Office and Trade Entry Systems

The Mizuho practice of permitting its order desk to use a suspense account for any order that would eventually be a give-up to another firm raises issues regarding the integrity of the audit trail for orders entered through Mizuho. From the documents that I reviewed, it appears that no specific give-up agreement existed for the 60006 proprietary account. As Mr. Buenaventura testified the give-up agreement is the document used to enter an account number in Mizuho's front-end (order entry)) system. I have not located any other input documents adding the proprietary account to the Mizuho back office system. If 60006 was not an authorized account on the PATS or GL terminals used to enter trades at Mizuho, then the entire system of audit trails for any orders entered becomes deficient and suspect.[21]

Even if account 60006 was available in the PATS or GL order entry screen account drop-down box, the fact that Mizuho permitted its personnel to enter the suspense account number (Q0000) even when the account manager specified a specific account number, undermines the integrity of the audit trail for the entire order entry system. I have observed exhibits to Mr. Buenaventura's deposition where, while 60006 is written on the order ticket, the electronic log shows only Q0000 for the order account number. I have observed other instances where Q0000 is used for one-lot orders that cannot possibly be allocated to multiple accounts. This leads to the conclusion that, from an auditing or compliance perspective, Mizuho did not have a standard practice for when suspense account numbers could be used and apparently left the order entry personnel with

---

[21] Also, I have not found any PATS or TT screen shot showing that 60006 appeared in the account number drop-down menu for order entry at Mizuho during the relevant time-period.

unrestricted discretion as to when to use the suspense account number, Q0000, on an order ticket, even when a specific account was identified.

This is a serious omission, not only from custom and practice in the industry, but appears to violate Mizuho's responsibility to provide an accurate audit trail for the transactions executed for give-ups, as more fully described in the expert report of Margaret Wiermanski. In any compliance audit conducted by qualified personnel, the failure to limit the use of suspense account numbers when a specific account identifier has been given by the account manager, and the absence of a procedure to inform the account manager at the time the order is entered that a suspense account number is given or, alternatively, the use of a log wherein the order desks specifies the time frame during a trading session when suspense account numbers were being used even though specific account numbers were given, is a serious compliance and operational deficit. As an auditor or compliance examiner, this lax procedure employed by Mizuho would mean that one could not rely on any general practice, usage, or custom, but would have to know the actual conversation involving each order ticket to determine whether any post-trade allocation occurred. In the absence of the order entry personnel recalling the specific conversations related to a trade, I believe that no one could make a determination that a post-trade allocation existed on the trades listed in the CFTC's Complaint.

## B.
## Mizuho Order Ticket Analysis

Other factors further complicate the determination of whether the Defendants engaged in a fraudulent allocation scheme at Mizuho. *First*, since there are two scenarios in which a specific proprietary account number could legitimately appear on an order ticket after the order was placed (either when a change to an unfilled order was made or when the fill was reported), different handwriting on the order ticket notating the proprietary account number (60006) cannot be a determinative factor from an investigative

standpole. [22]    *Second,* as previously discussed, Mizuho desk personnel could use a suspense account number even when a specific account identification was given at the time the order was placed.

The tickets for Trade 49 in the Complaint (which actually resulted in a loss of $16,262.50) contains the same account information ("60006 being written in different ink near the bottom of the ticket) as on trades in which the CFTC apparently concluded that the same information established that the trade was allocated fraudulently.

The September 2008 Mizuho Compliance Manual states that the Compliance Department was charged with reviewing taped conversations on an on-going basis to attempt to uncover policy or regulatory violations.    Therefore, while it is possible that an appropriate daily sampling of conversations could have missed the telephone calls involving Quiddity, given the number of suspected trades and the length of time the alleged allocation scheme existed, it is unlikely that every conversation would have escaped compliance's attention.

Further complicating matters, it appears Mizuho personnel placed Q0000 on order tickets even when the order desk personnel were told that the trade was for the proprietary account. Mizuho's written order tickets, their computer trade logs from the order entry platform, and handwritten trade sheets completed by Mr. Bria and Mr. Gaimari contain references to Q0000 even when order tickets contain the 60006 account number. Additionally, the lack of a specific give-up agreement between MFG and Mizuho for

---

[22]A further complication is that the proprietary number could have been given at the end of the order taking process.  For example, the person at the desk picks up the dedicated telephone for Quiddity, is given an order, writes "Q0000" on the ticket and then the person placing the order says "this is for the prop account", "60006" or otherwise identifies the trade as one for the 60006 account.  In that instance both account numbers (Q0000 and 60006) would appear on the order ticket.

account 60006 and the ubiquitous use of the Q0000 number on trade logs and trade sheets, indicates that the PATS and TT front-end platforms only permitted the order desk to enter trades for the Q0000 account regardless of the account number provided by the person placing the order.

Finally, the practice of the Mizuho 24-hour trading desk to remove the "pink" (or 3rd copy of the tri-part order ticket used to take orders) prior to many orders being filled, and subsequently placed on the desk of the "day-shift", compromised the integrity of the three-part ticket since each of the two lower carbons are intended to be identical "carbon copies" of the top (white) part of the ticket.[23]

As the deposition testimony of both Mizuho personnel and Mr. Rowley indicated, the use of an incorrect account number does not result in a trade error, i.e. a mistake that could cause the executing broker to lose money. This fact, in conjunction with the fact that Mizuho permitted the order desk personnel to use the suspense account number even when an account identifier was provided, minimizes the importance of placing the actual account number on the order ticket for give-up trades since the desk personnel know that the back office will obtain the proper allocations.

These facts, together with the inability of Mizuho personnel to remember the actual conversations or even identify handwriting, raises a serious question as to whether the CFTC personnel who conducted the investigation were conducting an actual investigation, as opposed to simply seeking only facts to support a prior conclusion. Even more importantly, as discussed below, the trade tickets for losing trades for the proprietary account and on which Mizuho order takers placed "Q0000" and which are not included in the CFTC's Complaint, contain the same type of

---

[23] According to the testimony of Janet McCormick, Mizuho's compliance department was unaware that this practice was occurring, which indicated that Mizuho's compliance department did not have a complete grasp of how its 24-hour desk was actually operating.

36

account order information as on the order tickets included in the CFTC's Complaint (whether completed by Mizuho's order desk during the normal trading day or by the 24-hour trading desk).[24]

A comparison of the losing trades in the proprietary account during the relevant time-period that are not alleged to have been part of the allocation "scheme" is very instructive.

Order ticket QUID-MIZUHO-0000290 establishing a 25-lot position was taken and executed by the 24-hour desk on October 21, 2008 with "Acct=290-60006 Man" written in the "sell" portion of the order ticket. This position was offset the next morning during regular trading hours by the order reflected on QUID-MIZUHO-0000284 where the information next to Account No. is: "Q0000/290-60006 Man." This round-turn trade resulted in a $19,370 loss. The "290-60006" appearing on these two tickets is not significantly different than the "290-60006" on QUID-MIZUHO-0000509, 510 and 512 for Trade 12 in Par. 34 of the Complaint (completed by the Mizuho regular hours trade desk). Nor, does the information differ materially from the information on QUID-MIZUHO-0000637 and 640 completed by the 24-hr desk as part of Trade 27 in Par. 34 of the CFTC's Complaint. *See also:* QUID-MIZUHO-0000850 that is part of Trade 44.

The trade tickets (QUID-MIZUHO-0000427 and 426) for a trade of 25-lot DEC S&P EMINI contract entered on November 29, 2008 that resulted in an $1,875 loss to the proprietary account, like a number of the trade tickets for trades the CFTC alleges were fraudulently allocated, bears only the suspense account number. Likewise, QUID-MIZUHO-0000708, an order to cover a 5-lot Mar S&P EMINI position for a $2,625 loss only bears the suspense account number.

Three trade tickets (QUID-MIZUHO-0000359, 360, and 361) completed by Mizuho personnel during regular trading hours on November 26, 2008 for two round turn DEC S&P EMINI trades

---

[24]*See* Schedule "B."

that lost $3,562 contain "Q0000 - 60006" and "60006" underlined and slanted above and to the left of "Q0000." And, the "Q0000 60006" notation is similar to many of the trade tickets for transactions the CFTC alleges were fraudulently allocated.

On February 9, 2009, the proprietary account (through Mizuho) entered into a round turn JYH trade that lost $6,500. The initiating order ticket completed by the Mizuho 24-hour trading desk (QUID-MIZUHO-0000912) has "60006" at the bottom of the ticket in what appears to be different ink similar to many of the order tickets the CFTC alleges were the product of a fraudulent allocation scheme. The order ticket completed the next morning (QUID-MIZUHO-0000913) has only "Q0000" as an account number like many of the transactions included in the CFTC's complaint. However, this round turn trade lost $6,500.

Also, on February 29, 2009 the proprietary account engaged in two round-turn 25-lot MAR S&P EMINI trades. The opening transaction for the second round turn trade was initiated through an order placed with Mizuho's 24-hour desk (QUID-MIZUHO-0000899) that bears only the suspense account number. The position is then partially liquidated (12 contracts) on an order ticket placed with the 24-hour desk (QUID-MIZUHO-0000892) that only bears "Q0000", the suspense account number. This partial offset resulted in a $150 loss. The remaining 13 contracts were offset by the regular Mizuho trading desk through order ticket (QUID-MIZUHO-0000891) that also *only* bears the suspense account number "Q0000." This partial offset resulted in an $8,125 loss. This more than offset the $3,175 profit on the first round turn trade in the series. The trading sequence actually netted a loss of $5,100.[25]

---

[25]The trade tickets for the initial trade (QUID-MIZUHO-0000897 and 898) completed by the Mizuho 24-hr desk also bear only the suspense account number "Q0000."

38

According to the CFTC, Defendants engaged in a fraudulent allocation scheme for as little as $50 (Trade 5), $250 (Trade 24), and $375 (Trade 25).

The loss of $5,100 on the February 9, 2009 ECH round turn-trade and the $5,625 loss on the February 24, 2009 ESH round-turn trade are both larger than the profit on Trades 18, 23, 26, 32, 34, 37, 39, 42, 43, 46, 47, 51, 52, and 55).

The $6,500 loss incurred on February 9, 2009 on the JHY round-turn trade is also larger than the profit realized on Trade 15, only $62.50 less than the profit made on Trade 20, and only $375 less than the profit made Trade 12.

The $8,275 loss on the second February 9, 2009 ECH trade is not only larger than all of profits on these trades but is also larger than the profits made on Trades 14, 22, 35, and 44.

The loss of $16,262.50 on Trade 49 is larger than all of those trades as well as Trades 9, 17, 19, 21, 30, 33, 41, 45, and 48.

And finally, the $19,375 loss on the October 21, 2008 trade is larger than the profit on those trades as well as Trades 28 and 36 or, put another way, larger than the profits on 35 of the "trades" alleged in the CFTC's Complaint.

That a person who is, according to the CFTC, so greedy as to engage in fraud for as little as $50, $250, and $375, would post-trade allocate these losses to his own account, is illogical. What these losing trades are indicative of is the complete lack of any uniform procedure on the use of the suspense account number for Mizuho's order desk personnel and the mischief that resulted from the CME procedure that permitted employees of FCMs to use a suspense account number whenever they pleased.

Given the similarities noted on all of the order tickets for the trades described above, it is impossible to use what is or is not on

the Mizuho order tickets to establish that the trades were subject to a fraudulent post-trade allocation scheme.

The same can be said for the trades done for the proprietary account at MF Global during the October 15, 2008 to December 4, 2008 when Quiddity was executing its proprietary trades in the suspense account using the MF Global PATS machine. Even though trades on October 29, 2008 (JYZ), November 10,12, 19 and 26, 2008 (EZH), and the December 2 and 3, 2008 resulted in losses ranging from $562.50 to $10,937.50, those trades were allocated to the proprietary account, an action completely inconsistent with someone engaging in a fraudulent allocation scheme.

## XIII.

## XFA

The testimony of Mr. Rowley, concerning his procedures in completing order tickets, in which he states that the order number is, essentially, a low priority item of information and that, when busy, he may ignore that information, is consistent with my findings and opinion regarding the Mizuho order tickets. I am, therefore, of the opinion, that the CFTC, from an investigative standpoint, has failed to establish that the two XFA trades listed in the table in Par. 34 of the Complaint, as Trades 4 and 18, were part of a fraudulent post-trade allocation scheme.

No one from Devonshire was interviewed on-the-record or deposed concerning this matter. Therefore, there is no basis for any determination that trades executed through Devonshire were improperly allocated.

## XIV

## CONCLUSIONS

For the reasons stated above, it is my opinion that:

1. There is insufficient evidence that the Defendants engaged in a fraudulent allocation scheme as alleged in the Compliant; to the contrary, it is my opinion that the Defendants did not engage in such a scheme;

2. The CFTC (as well as the NFA) failed to conduct an adequate investigation into the matter and that their investigations were fatally flawed for the reasons stated in this report;

3. Moreover, Mr. Tasco and Mr. O'Meara both lacked the qualifications and experience to conduct an investigation into whether a fraudulent allocation scheme occurred in which trades supposedly made for a long-term options strategy, or to hedge that strategy, were actually fraudulently allocated to Quiddity's proprietary account;

4. Mr. Harris' conclusions are patently erroneous because he used a non-industry standard definition of the term "trade" and he failed to take into account the fact that the proprietary account used a directional day-trading strategy for futures transactions, while the customer accounts used futures as hedges for a non-directional options trading strategy.

5. Mr. Harris' conclusions are further erroneous because he did not consider trades outside the period alleged in the Complaint and based his report on the assumption that the trades at issue were allocated post execution

**A**

# JOHN E. PARKES, JR.

3512 Hillside Road    Evanston, Illinois 60201
Telephone (312) 876-6363   Facsimile (847) 492-8615
email: jparkes6@comcast.net

## CURRICULUM VITAE

**Compliance Associates (1988 - Present)**
**PRESIDENT/FOUNDER**

Founded consulting firm providing compliance consulting services, including expert witness and litigation support services. Services are offered to regulatory authorities, the securities industry, and to both the securities and plaintiffs' bar.

**Expert engagements for the Enforcement Division of the Securities and Exchange Commission:**

### In The Matter of J. W. Barclay
The SEC brought charges against the firm, two principals and six brokers for a wide variety of violations, seeking permanent bars against all the parties. Prepared a full profit and loss analysis with exhibits for ten to fifteen customer accounts to support expert opinions.. The firm, two principals and five brokers did not contest the claims against them, including failure to supervise, unauthorized discretion, churning, and unsuitable trading, among other violations. One broker, Edgar Alacan, contested the SEC changes **In The Matter of Edgar B. Alacan**, and a hearing was held before an ALJ in New York City. Expert testimony was offered before the ALJ with a finding supporting the expert opinions resulting in a permanent bar.

### In The Matter of George J. Kolar
Mr. Kolar was the Regional Vice President in charge of four branch offices for Dean Witter in the Detroit metropolitan area, while also the Resident Branch Manager of one of the offices. The SEC charged him with failure to supervise a broker in an office other than his resident office. At that time Dean Witter had a cooperative arrangement with a unaffiliated insurance company to share certain high net worth customer accounts for their investment and insurance needs. One of the insurance brokers called Mr. Kolar to warn him of potential selling away by a Dean Witter broker. The securities broker was prominent in the community as a former Red Wings hockey star, and his mother was a local television personality, giving him added local clout. The telephone call from the insurance broker to Mr. Kolar was specific in identifying three of the potential customers for the selling away activity and the product involved. Mr. Kolar directed the resident branch manager of the broker to interview him about the allegations, later accepting the broker's defense without instituting additional supervision. Expert testimony was offered before an ALJ that, due to the specificity of the notice he received, Mr. Kolar should have taken one of several steps of ongoing additional supervision, such as contacting one or more of the customers, to prevent what became a $10 million dollar fraud after several years. Noting the expert opinions, the ALJ sustained the claim against Mr. Kolar.

### In The Matter of H. Beck, Inc., and Gary Hurwitz
The firm of H.Beck had multiple one-man branch or satellite locations in various locations outside of the main office. At one of these one-man remote locations a principal of the firm created a phony limited partnership, selling interests in the partnership to his customers. The SEC charged the managing partner and the firm with failure to supervise following discovery of the fraud. Following the preparation of written expert opinions for submission to the parties the matter was settled without oral testimony.

**Expert engagement for The Chicago Stock Exchange:**
Prepared expert opinions in a matter involving rule violations on the part of a member firm.

**Expert Engagements for The State of Indiana's Securities Division**
Conducted compliance examinations of branch offices in Indiana annually, reporting to the Securities

Division. These examinations continued for over twenty years, involving as many as eight branches in one year. **Recent notable Expert Witness engagements**:

    \* The Trustee of the Sentinel Bankruptcy, a $600 million money market firm failure, offering expert opinions that a broker dealer failed to supervise one of its brokers who sold high-risk, unsuitable investments to Sentinel by co-opting Sentinel's traders with excessive and costly entertainment in violation of industry standards;

    \* The Northern Trust Company, to rebut claims made by a terminated Financial Planner claiming whistle blower status;

    \* StoneMor Operating, Inc., a publicly-traded cemetery owner; for claims against two major broker dealers in a multi-state fraud to steal over $65 million from cemetery trust funds; and

    \* For Scottie and Larsa Pippen, to prepare damages in malpractice claims against two law firms and an accounting firm..

Expert testimony and opinions have been offered in federal and state courts, in civil, regulatory and enforcement proceedings, in all recognized arbitration forums, in administrative proceedings and mediation. Testimony and opinions have been offered on a broad range of issues involved in institutional and retail disputes, such as supervision, due diligence, suitability, concentration, diversification, leveraged transactions, principal and market maker transactions, proprietary products, lost opportunity and well-managed account damages, and introducing vis-a-vis clearing broker dealers.

The founder has been engaged in over four hundred matters, in which over two hundred matters expert opinions have been offered in court, arbitration, or in deposition. Parties represented have included regulators, major and regional broker-dealers, investment advisors, banks and other concerns involved in disputes requiring securities expertise, such as insurance companies, accounting firms and a wide array of plaintiffs.

Litigation support applications routinely include the analysis of investment account activity with resulting compilations for profit/loss, contribution, commissions, damages, churning, suitability, leverage and other relevant measures of activity and investment conduct.

**William Blair & Company (1976-1988)**
**MANAGER, COMPLIANCE & LEGAL DEPARTMENT**
**SECRETARY, GROWTH INDUSTRY SHARES, INC.**

Compliance Officer, charged with overall responsibility for management of the Compliance & Legal Department, reporting to the Chief Financial Partner. Responsible for assuring that the firm observed the rules, regulations, and laws governing its business activities as an investment bank, investment advisor and broker/dealer.

Supervised a compliance staff of seven employees, responsible for the review of all departments and employees. Prepared evaluation of and recommendations on business policy for the firm, as well as development of improved surveillance and review techniques to assure a high level of quality in the firm's business activities
Joined the firm as a registered representative, with additional responsibility for the supervision of the firm's options business. Drafted the compliance policies and supervisory procedures for option sales,.implementing the procedures on a daily basis reporting to the General Counsel and the Senior Registered Options Principal.

**E. F. Hutton & Company, Inc. (1969-1976)**
**ACCOUNT EXECUTIVE**

Initial entry into the securities industry as an Account Executive with responsibility for developing and servicing a wide range of personal, trust and business accounts. Assisted the Branch Manager as Syndicate Manager, the Director of Options Sales and as supervisor of probationary brokers. Became the Director of Options Sales for the Midwest Region.

## REGISTRATIONS

| | |
|---|---|
| Branch Officer Manager | Series 12 |
| Registered Options Principal | Series 4 |
| General Securities Sales Representative | Series 7 |
| Associated Person - Commodities | Series 3 |
| Interest Rate Options | Series 5 |
| Insurance Registration: Life, Annuity, Accident/Health | |

## PROFESSIONAL ASSOCIATIONS

**Arbitrator**
    FINRA (NASD Regulation, Inc.)    New York Stock Exchange
**Mediator**
    FINRA (NASD Regulation, Inc.)
**Compliance Auditor**
    Securities Division    State of Indiana
**Past Member**
    Business Conduct Committee    Chicago Board Options Exchange
**Past Chairman**
    Compliance & Legal Roundtable    SIFMA (Securities Industry Association)
**Past Member**
    Compliance & Legal Division    SIFMA (Securities Industry Association)
**Past Member**
    State Regulation Committee    SIFMA (Securities Industry Association)

### EDUCATION
University of Chicago
MBA Program 1966-1967
Hope College
Bachelor of Arts, Sociology 1961

### MILITARY SERVICE
U.S. Army Security Agency
Top Secret/Cryptographic Security Clearance
Honorable Discharge 1964
Military Advisor/Royal Thai Army Security Agency - Udon, Thailand

3

B

| Complt. No | Date | Document No. | B/S | QTY | CONTRACT | Price | Time | P&L |
|---|---|---|---|---|---|---|---|---|
| 1 | 10/15/08 | QUID-MFG-0050345 | b | 25 | esz | 955.500 | 17:10:09 | |
| | | QUID-MFG-0050345 | s | 25 | esz | 956.250 | 17:23:01 | |
| | | QUID-MFG-0050345 | s | 25 | esz | 934.250 | 19:39:13 | |
| | | QUID-MFG-0050345 | b | 25 | esz | 933.500 | 19:40:35 | |
| | | QUID-MFG-0050345 | s | 25 | esz | 936.000 | 19:43:25 | |
| | | QUID-MFG-0050345 | b | 25 | esz | 934.000 | 19:44:01 | |
| | | QUID-MFG-0050345 | b | 25 | esz | 930.000 | 20:05:33 | |
| | | QUID-MFG-0050345 | b | 25 | esz | 930.000 | 20:05:36 | |
| | | QUID-MFG-0050345 | s | 25 | esz | 932.500 | 20:07:07 | |
| | | QUID-MFG-0050345 | s | 25 | esz | 931.000 | 20:08:58 | |
| | | QUID-MFG-0050345 | b | 25 | esz | 936.750 | 20:26:20 | |
| | | QUID-MFG-0050345 | b | 25 | esz | 937.250 | 20:29:48 | |
| | | QUID-MFG-0050345 | s | 25 | esz | 940.000 | 20:59:09 | |
| | | QUID-MFG-0050345 | s | 25 | esz | 944.250 | 21:11:41 | |
| | | QUID-MFG-0050345 | s | 25 | esz | 920.250 | 21:52:55 | |
| | | QUID-MFG-0050345 | b | 25 | esz | 920.000 | 21:54:36 | |
| | | QUID-MFG-0050345 | s | 50 | esz | 912.500 | 21:57:36 | |
| | | QUID-MFG-0050345 | b | 50 | esz | 908.750 | 21:58:38 | |
| | | QUID-MFG-0050345 | s | 50 | esz | 907.750 | 22:00:04 | |
| | | QUID-MFG-0050345 | b | 50 | esz | 909.500 | 22:02:12 | $22,500.00 |
| 2 | 10/15/08 | QUID-MIZUHO-0000253 | S | 250 | ESV 850p | 5.000 | 01:08 p.m. | |
| | | QUID-MIZUHO-0000252 | B | 250 | ESV 850p | 3.000 | 02:12 p.m. | $25,000.00 |
| 3 | 10/16/08 | QUID-MIZUHO-0000276 | s | 22 | esz | 897.000 | 04:00 p.m. | |
| | | QUID-MIZUHO-0000276 | s | 47 | esz | 896.500 | 04:00 p.m. | |
| | | QUID-MIZUHO-0000276 | s | 14 | esz | 896.250 | 04:00 p.m. | |
| | | QUID-MIZUHO-0000276 | s | 17 | esz | 896.000 | 04:00 p.m. | |
| | | QUID-MIZUHO-0000272 | b | 25 | esz | 871.000 | 10:16 a.m. | |
| | | QUID-MIZUHO-0000273 | b | 25 | esz | 873.250 | 10:18 a.m. | |
| | | QUID-MIZUHO-0000274 | b | 25 | esz | 877.500 | 10:22 a.m. | |
| | | QUID-MIZUHO-0000275 | b | 25 | esz | 877.000 | 10:23 a.m. | $107,500.00 |
| 4 | 10/17/08 | QUID-XFA-0000001 | s | 396 | spv 1100c | 0.500 | 1019am | $47,500.00 |

| Complt. No | Date | Document No. | B/S | QTY | CONTRACT | Price | Time | P&L |
|---|---|---|---|---|---|---|---|---|
| | 10/21/08 | QUID-MIZUHO-0000290 | b | 25 | esz | 982.000 | 02:13 a.m. | -$19,375.00 |
| | | QUID-MIZUHO-0000284 | s | 25 | esz | 966.500 | 10:54 a.m. | -$19,375.00 |
| 5 | 10/21/2008 | QUID-MIZUHO-0000282 | b | 10 | ESX 1150c | 2.000 | 01:50 p.m. | |
| | 10/21/2008 | QUID-MIZUHO-0000283 | s | 10 | ESX 1150c | 2.100 | 02:07 p.m. | $50.00 |
| 6 | 10/23/2008 | QUID-MIZUHO-0000314 | s | 25 | esz | 910.250 | 05:46 p.m. | |
| | | QUID-MIZUHO-0000312 | s | 25 | esz | 909.000 | 07:05 p.m. | |
| | | QUID-MIZUHO-0000313 | s | 25 | esz | 909.750 | ??? | |
| | | QUID-MIZUHO-0000310 | b | 25 | esz | 885.500 | 12:11 p.m. | |
| | | QUID-MIZUHO-0000306 | b | 25 | esz | 876.250 | 12:53 p.m. | |
| | | QUID-MIZUHO-0000305 | b | 25 | esz | 877.000 | 01:39 p.m. | $112,812.50 |
| 7 | 10/24/08 | QUID-MIZUHO-0000267 | b | 5 | jyz | 104.550 | 10:07 p.m. | |
| | | QUID-MIZUHO-0000267 | b | 45 | jyz | 104.560 | 10:07 p.m. | |
| | | QUID-MIZUHO-0000266 | b | 50 | jyz | 104.680 | 10:24 p.m. | |
| | | QUID-MIZUHO-0000265 | s | 2 | jyz | 104.260 | 10:54 p.m. | |
| | | QUID-MIZUHO-0000265 | s | 8 | jyz | 104.250 | | |
| | | QUID-MIZUHO-0000265 | s | 4 | jyz | 104.240 | | |
| | | QUID-MIZUHO-0000265 | s | 11 | jyz | 104.230 | | |
| | | QUID-MIZUHO-0000265 | s | 3 | jyz | 104.220 | | |
| | | QUID-MIZUHO-0000265 | s | 15 | jyz | 104.210 | | |
| | | QUID-MIZUHO-0000265 | s | 7 | jyz | 104.200 | | |
| | | QUID-MIZUHO-0000264 | s | 10 | jyz | 109.160 | 06:25 a.m. | |
| | | QUID-MIZUHO-0000264 | s | 40 | jyz | 109.130 | 06:25 a.m. | $257,500.00 |
| 8 | 10/24/08 | QUID-MIZUHO-0000270 | s | 5 | esz | 908.500 | 8:??p.m. | |
| | | QUID-MIZUHO-0000269 | s | 13 | esz | 899.000 | 10:45 p.m. | |
| | | QUID-MIZUHO-0000269 | s | 12 | esz | 898.250 | 10:45 p.m. | |
| | | QUID-MIZUHO-0000268 | b | 30 | esz | 884.000 | 11:00 a.m. | $24,375.00 |
| 9 | 10/27/08 | QUID-MIZUHO-0000322 | B | 7 | jyz | 107.900 | 03:01 a.m. | |
| | | QUID-MIZUHO-0000322 | B | 8 | jyz | 107.910 | | |
| | | QUID-MIZUHO-0000322 | B | 10 | jyz | 107.920 | | |

| Complt. No | Date | Document No. | B/S | QTY | CONTRACT | Price | Time | P&L |
|---|---|---|---|---|---|---|---|---|
| | | QUID-MIZUHO-0000321 | S | 25 | jyz | 108.900 | 04:14 a.m. | |
| | | QUID-MIZUHO-0000323 | B | 25 | jyz | 108.000 | 04:43 a.m. | |
| | | QUID-MIZUHO-0000320 | S | 17 | jyz | 107.520 | 07:13 a.m. | |
| | | QUID-MIZUHO-0000320 | S | 4 | jyz | 107.530 | | |
| | | QUID-MIZUHO-0000320 | S | 3 | jyz | 107.540 | | |
| | | QUID-MIZUHO-0000320 | S | 1 | jyz | 107.550 | | |
| | | QUID-MIZUHO-0000324 | B | 4 | jyz | 107.010 | 12:58 p.m. | |
| | | QUID-MIZUHO-0000324 | B | 12 | jyz | 107.000 | | |
| | | QUID-MIZUHO-0000324 | B | 9 | jyz | 106.990 | | |
| | | QUID-MIZUHO-0000325 | S | 1 | jyz | 106.930 | 1:42 p.m. | |
| | | QUID-MIZUHO-0000325 | S | 4 | jyz | 106.920 | | |
| | | QUID-MIZUHO-0000325 | S | 3 | jyz | 106.870 | | |
| | | QUID-MIZUHO-0000325 | S | 2 | jyz | 106.870 | | |
| | | QUID-MIZUHO-0000325 | S | 5 | jyz | 106.820 | | |
| | | QUID-MIZUHO-0000325 | S | 5 | jyz | 106.800 | | $15,750.00 |
| | 10/28/08 | MFG | s | 4 | JYZ | 107.410 | | -$2,950.00 closed from 10/27 |
| | | MFG | s | 1 | JYZ | 107.430 | | -$712.50 |
| | | | | | | | | -$3,662.50 |
| | 10/31/08 | DEV or XFA | b | 2 | spx 700p | 4.000 | | |
| | | DEV or XFA | s | 2 | spx 700p | 4.500 | | $250.00 |
| | 10/31/08 | QUID-MIZUHO-0000341 | s | 5 | JYZ 118c | 0.700 | 2:00pm | |
| 10 | 11/04/08 | QUID-MIZUHO-0000544 | s | 50 | ecx 132p | 3.900 | 09:16 a.m. | |
| | | QUID-MIZUHO-0000543 | b | 50 | ecx 132p | 2.980 | 11:05 a.m. | $57,500.00 |
| 11 | 11/07/08 | QUID-MIZUHO-0000527 | b | 25 | esz | 910.000 | 07:32 a.m. | |
| | | QUID-MIZUHO-0000526 | b | 25 | esz | 906.000 | 07:43 a.m. | |
| | | QUID-MIZUHO-0000528 | s | 50 | esz | 917.000 | 11:13 p.m. | $22,500.00 |
| | 11/10/08 | QUID-MFG-0050345 | s | 25 | esz | 913.250 | 18:52:50 | |
| | | QUID-MFG-0050345 | b | 25 | esz | 919.750 | 19:30:18 | -$8,125.00 |

| Complt. No | Date | Document No. | B/S | QTY | CONTRACT | Price | Time | P&L |
|---|---|---|---|---|---|---|---|---|
| 12 | 11/11/08 | QUID-MIZUHO-0000513 | b | 25 | esz | 906.000 | 621a.m. | |
| | | QUID-MIZUHO-0000509 | s | 25 | esz | 916.000 | 1023a.m. | |
| | | QUID-MIZUHO-0000510 | s | 13 | esz | 911.250 | 133p.m. | |
| | | QUID-MIZUHO-0000510 | s | 12 | esz | 911.500 | 133p.m. | |
| | | QUID-MIZUHO-0000512 | b | 22 | esz | 910.750 | 139p.m. | |
| | | QUID-MIZUHO-0000512 | b | 3 | esz | 910.500 | | |
| | | QUID-MIZUHO-0000511 | b | 25 | esz | 897.000 | 149p.m. | |
| | | QUID-MIZUHO-0000508 | s | 25 | esz | 898.500 | 152p.m. | |
| | | QUID-MIZUHO-0000507 | b | 10 | esz | 897.000 | 215p.m. | |
| | | QUID-MIZUHO-0000506 | b | 10 | esz | 891.000 | 235p.m. | |
| | | QUID-MIZUHO-0000505 | s | 10 | esz | 893.000 | 245p.m. | |
| | | QUID-MIZUHO-0000504 | s | 10 | esz | 899.000 | 246p.m. | $6,875.00 |

| Complt. No | Date | Document No. | B/S | QTY | CONTRACT | Price | Time | P&L |
|---|---|---|---|---|---|---|---|---|
| | 11/12/08 | QUID-MFG-0050345 | s | 25 | esz | 876.000 | 15:33:53 | |
| | | QUID-MFG-0050345 | s | 25 | esz | 868.000 | 16:41:03 | |
| | | QUID-MFG-0050345 | s | 25 | esz | 868.500 | 16:42:28 | |
| | | QUID-MFG-0050345 | b | 25 | esz | 872.250 | 16:53:33 | $4,687.50 |
| | | QUID-MFG-0050345 | s | 25 | esz | 866.500 | 17:11:08 | |
| | | QUID-MFG-0050345 | s | 25 | esz | 864.750 | 17:12:24 | |
| | | QUID-MFG-0050345 | b | 25 | esz | 869.500 | 17:58:48 | -$1,875.00 |
| | | QUID-MFG-0050345 | b | 25 | esz | 870.000 | 17:58:48 | -$1,875.00 |
| | | QUID-MFG-0050345 | b | 25 | esz | 866.250 | 18:12:33 | $312.50 |
| | | QUID-MFG-0050345 | b | 25 | esz | 874.500 | 18:38:47 | -$12,187.50 |
| | | | | | | | | -$10,937.50 |
| | | | | | | | | |
| 13 | 11/12/08 | QUID-MFG-0050345 | b | 25 | jyz | 103.800 | 15:42:42 | |
| | | QUID-MFG-0050345 | b | 25 | jyz | 103.880 | 15:46:46 | |
| | | QUID-MFG-0050345 | s | 25 | jyz | 103.750 | 15:52:11 | |
| | | QUID-MFG-0050345 | b | 25 | jyz | 103.920 | 16:19:14 | |
| | | QUID-MFG-0050345 | b | 25 | jyz | 104.040 | 16:29:10 | |
| | | QUID-MFG-0050345 | b | 25 | jyz | 104.380 | 16:37:22 | |
| | | QUID-MFG-0050345 | s | 25 | jyz | 104.870 | 16:40:53 | |
| | | QUID-MFG-0050345 | b | 25 | jyz | 104.850 | 16:41:31 | |
| | | QUID-MFG-0050345 | s | 25 | jyz | 104.810 | 16:44:32 | |
| | | QUID-MFG-0050345 | s | 25 | jyz | 104.710 | 16:45:52 | |
| | | QUID-MFG-0050345 | b | 25 | jyz | 104.740 | 16:47:43 | |
| | | QUID-MFG-0050345 | s | 1 | jyz | 104.750 | 16:48:53 | |
| | | QUID-MFG-0050345 | b | 1 | jyz | 104.800 | 16:51:30 | |
| | | QUID-MFG-0050345 | b | 25 | jyz | 104.730 | 16:52:52 | |
| | | QUID-MFG-0050345 | b | 2 | jyz | 104.700 | 16:55:33 | |
| | | QUID-MFG-0050345 | s | 2 | jyz | 104.750 | 16:58:05 | |
| | | QUID-MFG-0050345 | b | 25 | jyz | 104.700 | 16:58:21 | |
| | | QUID-MFG-0050345 | s | 25 | jyz | 104.750 | 17:00:21 | |
| | | QUID-MFG-0050345 | b | 25 | jyz | 104.950 | 17:03:38 | |
| | | QUID-MFG-0050345 | s | 25 | jyz | 105.190 | 17:10:34 | |
| | | QUID-MFG-0050345 | s | 50 | jyz | 105.560 | 17:15:53 | |
| | | QUID-MFG-0050345 | b | 25 | jyz | 105.410 | 17:17:07 | |
| | | QUID-MFG-0050345 | b | 25 | jyz | 105.390 | 17:22:11 | |

| Complt. No | Date | Document No. | B/S | QTY | CONTRACT | Price | Time | P&L |
|---|---|---|---|---|---|---|---|---|
| | | QUID-MFG-0050345 | s | 50 | jyz | 105.120 | 17:25:15 | |
| | | QUID-MFG-0050345 | b | 50 | jyz | 105.300 | 17:33:58 | |
| | | QUID-MFG-0050345 | s | 25 | jyz | 104.890 | 17:56:28 | |
| | | QUID-MFG-0050345 | s | 25 | jyz | 104.760 | 17:56:45 | |
| | | QUID-MFG-0050345 | b | 25 | jyz | 104.450 | 18:58:44 | |
| | | QUID-MFG-0050345 | s | 25 | jyz | 104.420 | 19:02:30 | $99,281.25 |
| | | | | | | | | |
| | 11/13/08 | DEV or XFA | b | 1 | esx 700p | 1.000 | | |
| | | DEV or XFA | s | 1 | esx 700p | 1.100 | | $5.00 |
| | | | | | | | | |
| 14 | 11/14/08 | QUID-MIZUHO-0000477 | b | 25 | esz | 892.500 | 07:40a.m. | |
| | | QUID-MIZUHO-0000471 | s | 25 | esz | 899.000 | 08:49a.m. | |
| | | QUID-MIZUHO-0000470 | s | 20 | esz | 883.000 | 09:55a.m. | |
| | | QUID-MIZUHO-0000475 | b | 10 | esz | 877.250 | 10:07 a.m. | |
| | | QUID-MIZUHO-0000476 | b | 10 | esz | 882.000 | 10:13 a.m. | |
| | | QUID-MIZUHO-0000469 | s | 10 | esz | 880.000 | 11:39a.m. | |
| | | QUID-MIZUHO-0000467 | s | 10 | esz | 890.000 | 11:40 a.m. | |
| | | QUID-MIZUHO-0000474 | s | 10 | esz | 876.000 | 12:06 p.m. | |
| | | QUID-MIZUHO-0000468 | s | 10 | esz | 880.000 | 12:07 p.m. | |
| | | QUID-MIZUHO-0000473 | b | 10 | esz | 888.750 | 01:12 p.m. | |
| | | QUID-MIZUHO-0000472 | b | 10 | esz | 895.000 | 01:19 p.m. | |
| | | QUID-MIZUHO-0000472 | b | 10 | esz | 896.500 | | |
| | | QUID-MIZUHO-0000466 | s | 10 | esz | 898.250 | 01:21 p.m. | $7,500.00 |
| | | | | | | | | |
| | 11/18/08 | QUID-MIZUHO-0000444 | s | 25 | esz | 840.750 | 02:13 p.m. | $2,375.00 |
| | | QUID-MIZUHO-0000448 | b | 10 | esz | 836.000 | 02:17p.m. | -$4,687.50 |
| | | QUID-MIZUHO-0000447 | b | 25 | esz | 847.000 | 02:23 p.m. | |
| | | QUID-MIZUHO-0000446 | b | 15 | esz | 835.500 | 02:29 p.m. | |
| | | QUID-MIZUHO-0000443 | b | 10 | esz | 842.500 | 02:32 p.m. | -$2,250.00 |
| | | QUID-MIZUHO-0000442 | s | 15 of 25 | esz | 865.750 | 03:09 p.m. | $22,687.50 |
| | | | | | | | | $18,125.00 |
| | | | | | | | | |
| 15 | 11/18/08 | QUID-MIZUHO-0000445 | b | 10 | esz | 853.500 | 02:50 p.m. | |
| | | QUID-MIZUHO-0000442 | s | 10 of 25 | esz | 865.750 | 03:09 p.m. | $6,125.00 |
| | | | | | | | | |
| | 11/19/08 | QUID-MIZUHO-0000427 | b | 25 | esz | 808.500 | 2:46pm | |

| Compl. No | Date | Document No. | B/S | QTY | CONTRACT | Price | Time | P&L |
|---|---|---|---|---|---|---|---|---|
| 16 | 11/20/08 | QUID-MIZUHO-0000426 | s | 25 | esz | 807.000 | 2:47pm | $1,875.00 |
| | | QUID-MIZUHO-0000410 | s | 100 | ESZ | 803.000 | 11:17 p.m. | |
| | | QUID-MIZUHO-0000411 | s | 100 | ESZ | 801.000 | 11:47 p.m. | |
| | | QUID-MIZUHO-0010291 | b | 25 | ESZ | 791.500 | 07:54 a.m. | |
| | | QUID-MIZUHO-0010293 | b | 25 | ESZ | 791.500 | 08:06 a.m. | |
| | | QUID-MIZUHO-0010295 | b | 50 | ESZ | 797.500 | 08:31 a.m. | |
| | | QUID-MIZUHO-0010297 | b | 50 | ESZ | 800.000 | 08:33 a.m. | |
| | | QUID-MIZUHO-0010299 | b | 5 | ESZ | 787.250 | 08:46 a.m. | |
| | | QUID-MIZUHO-0010301 | b | 5 | ESZ | 789.250 | 08:47 a.m. | |
| | | QUID-MIZUHO-0010303 | b | 10 | ESZ | 791.250 | 08:51 a.m. | |
| | | QUID-MIZUHO-0010305 | b | 5 | ESZ | 784.000 | 09:28 a.m. | |
| | | QUID-MIZUHO-0010307 | b | 5 | ESZ | 799.000 | 09:45 a.m. | |
| | | QUID-MIZUHO-0010309 | b | 5 | ESZ | 795.000 | 09:55 a.m. | |
| | | QUID-MIZUHO-0010311 | b | 5 | ESZ | 804.250 | 10:03 a.m. | |
| | | QUID-MIZUHO-0010311 | b | 5 | ESZ | 805.250 | | |
| | | QUID-MIZUHO-0010311 | b | 5 | ESZ | 805.500 | | |
| | | QUID-MIZUHO-0010313 | s | 5 | ESZ | 791.500 | 12:38 p.m | |
| | | QUID-MIZUHO-0010315 | b | 5 | ESZ | 781.500 | 01:48 p.m. | $58,937.50 |
| 17 | 11/21/08 | QUID-MIZUHO-0000387 | b | 25 | ESZ | 766.000 | 01:05 a.m. | |
| | | QUID-MIZUHO-0000386 | s | 25 | ESZ | 776.000 | 01:07 a.m. | |
| | | QUID-MIZUHO-0000388 | s | 10 | ESZ | 765.500 | 08:31 a.m. | |
| | | QUID-MIZUHO-0000389 | b | 10 | ESZ | 746.000 | 10:11 a.m. | |
| | | QUID-MIZUHO-0000390 | b | 10 | ESZ | 751.000 | 12:35 p.m. | |
| | | QUID-MIZUHO-0000391 | b | 5 | ESZ | 771.250 | 02:13 p.m. | |
| | | QUID-MIZUHO-0000392 | b | 5 | ESZ | 761.000 | 02:08 p.m. | $14,062.50 |
| 18 | 11/21/08 | QUID-XFA-02.04 | s | 18 | SPX 700p | 0.400 | 12:13:21 | $1,800.00 |
| | 11/24/08 | DEV or XFA | b | 100 | spz 950c | 13.500 | | |
| | | DEV or XFA | s | 100 | spz 950c | 14.800 | | $32,500.00 |
| 19 | 11/24/08 | QUID-MFG-0050345 | b | 50 | esz | 811.500 | 15:49:47 | |
| | | QUID-MFG-0050345 | s | 25 | esz | 818.250 | 16:01:02 | |

| Complt. No | Date | Document No. | B/S | QTY | CONTRACT | Price | Time | P&L |
|---|---|---|---|---|---|---|---|---|
| | | QUID-MFG-0050345 | s | 25 | esz | 819.000 | 16:05:16 | |
| | | QUID-MFG-0050345 | s | 5 | esz | 831.500 | 17:10:09 | |
| | | QUID-MFG-0050345 | b | 5 | esz | 841.000 | 17:53:44 | |
| | | QUID-MFG-0050345 | s | 5 | esz | 833.250 | 18:18:09 | |
| | | QUID-MFG-0050345 | b | 5 | esz | 830.500 | 18:33:57 | |
| | | QUID-MFG-0050345 | b | 5 | esz | 855.000 | 21:33:14 | |
| | | QUID-MFG-0050345 | s | 5 | esz | 855.500 | 21:34:23 | $15,437.00 |
| 20 | 11/25/08 | QUID-MIZUHO-0000366 | b | 50 | esz | 864.000 | 07:20 a.m. | |
| | | QUID-MIZUHO-0000365 | s | 25 | esz | 870.250 | 08:24 a.m. | |
| | | QUID-MIZUHO-0000364 | s | 25 | esz | 863.000 | 09:14 a.m. | $6,562.50 |

| Complt. No | Date | Document No. | B/S | QTY | CONTRACT | Price | Time | P&L |
|---|---|---|---|---|---|---|---|---|
| | 11/26/08 | QUID-MIZUHO-0000359 | s | 5 | esz | 844.000 | 8:42am | |
| | | QUID-MIZUHO-0000361 | b | 5 | esz | 850.000 | 9:40am | -$1,500.00 |
| | | QUID-MIZUHO-0000360 | s | 5 | esz | 854.500 | 9:27am | |
| | | QUID-MIZUHO-0000362 | b | 5 | esz | 862.750 | 10:20am | -$2,062.50 |
| | | | | | | | | -$3,562.50 |
| 21 | 11/28/08 | QUID-MIZUHO-0000351 | s | 50 | esz | 882.500 | 05:08 p.m. | |
| | | QUID-MIZUHO-0000353 | b | 50 | esz | 882.250 | 05:27 p.m. | |
| | | QUID-MIZUHO-0000354 | b | 45 | esz | 884.750 | 05:45 p.m. | |
| | | QUID-MIZUHO-0000354 | b | 5 | esz | 882.500 | | |
| | | QUID-MIZUHO-0000350 | s | 50 | esz | 888.000 | 06:43 p.m. | |
| | | QUID-MIZUHO-0000355 | b | 50 | esz | 885.250 | 03:58 a.m. | |
| | | QUID-MIZUHO-0000346 | s | 50 | esz | 887.250 | 08:53 a.m. | $14,312.50 |
| 22 | 11/28/08 | QUID-MIZUHO-0000352 | b | 50 | jyz | 104.840 | 05:07 p.m. | |
| | | QUID-MIZUHO-0000346 | s | 50 | jyz | 104.850 | 06:41 p.m. | |
| | | QUID-MIZUHO-0000346 | s | 30 | jyz | 104.930 | 12:03 a.m. | |
| | | QUID-MIZUHO-0000347 | b | 10 | jyz | 104.720 | 09:11 a.m. | |
| | | QUID-MIZUHO-0000347 | b | 20 | jyz | 104.750 | | $7,750.00 |
| 23 | 12/01/08 | QUID-MFG-0050345 | s | 25 | esh | 849.500 | 16:32:59 | |
| | | QUID-MFG-0050345 | b | 15 | esh | 847.250 | 18:01:05 | |
| | | QUID-MFG-0050345 | b | 10 | esh | 847.250 | 18:01:05 | |
| | | QUID-MFG-0050345 | s | 5 | esh | 849.000 | 18:08:36 | |
| | | QUID-MFG-0050345 | b | 5 | esh | 846.000 | 18:19:24 | |
| | | QUID-MFG-0050345 | s | 5 | esh | 840.000 | 18:54:59 | |
| | | QUID-MFG-0050345 | s | 5 | esh | 844.000 | 19:12:28 | |
| | | QUID-MFG-0050345 | b | 5 | esh | 847.250 | 19:35:18 | |
| | | QUID-MFG-0050345 | b | 5 | esh | 847.000 | 19:36:21 | |
| | | QUID-MFG-0050345 | s | 5 | esh | 844.750 | 20:33:32 | |
| | | QUID-MFG-0050345 | b | 5 | esh | 841.000 | 20:39:39 | |
| | | QUID-MFG-0050345 | s | 5 | esh | 846.000 | 20:47:03 | |
| | | QUID-MFG-0050345 | b | 5 | esh | 844.750 | 20:49:33 | |
| | | QUID-MFG-0050345 | s | 5 | esh | 839.000 | 21:08:50 | |

| Complt. No | Date | Document No. | B/S | QTY | CONTRACT | Price | Time | P&L |
|---|---|---|---|---|---|---|---|---|
| | | QUID-MFG-0050345 | b | 5 | esh | 835.000 | 21:30:19 | |
| | | QUID-MFG-0050345 | s | 5 | esh | 822.500 | 21:52:49 | |
| | | QUID-MFG-0050345 | b | 5 | esh | 819.000 | 21:56:34 | $3,000.00 |
| | 12/02/08 | QUID-MFG-0050345 | s | 5 | esz | 820.000 | 15:47:16 | |
| | | QUID-MFG-0050345 | b | 5 | esz | 827.000 | 16:05:08 | -$1,750.00 |
| | | QUID-MFG-0050345 | s | 5 | esz | 845.500 | 18:39:27 | |
| | | QUID-MFG-0050345 | b | 5 | esz | 843.000 | 18:50:50 | $625.00 |
| | | QUID-MFG-0050345 | s | 5 | esz | 841.500 | 18:54:53 | |
| | | QUID-MFG-0050345 | b | 5 | esz | 846.500 | 19:17:25 | -$1,250.00 |
| | | QUID-MFG-0050345 | b | 5 | esz | 839.250 | 19:32:24 | |
| | | QUID-MFG-0050345 | s | 5 | esz | 835.500 | 19:40:24 | -$937.50 |
| | | QUID-MFG-0050345 | s | 5 | esz | 823.500 | 20:33:26 | |
| | | QUID-MFG-0050345 | b | 5 | esz | 831.000 | 20:56:25 | -$1,875.00 |
| | | | | | | | | -$5,187.50 |
| 24 | 12/02/08 | QUID-MFG-0050345 | s | 25 | jyz | 106.890 | 16:33:55 | |
| | | QUID-MFG-0050345 | b | 5 | jyz | 106.800 | 17:57:44 | |
| | | QUID-MFG-0050345 | b | 5 | jyz | 106.800 | 18:10:14 | |
| | | QUID-MFG-0050345 | b | 5 | jyz | 106.800 | 18:26:57 | |
| | | QUID-MFG-0050345 | s | 5 | jyz | 107.000 | 18:52:24 | |
| | | QUID-MFG-0050345 | b | 10 | jyz | 106.900 | 19:00:14 | |
| | | QUID-MFG-0050345 | s | 5 | jyz | 107.000 | 19:32:45 | |
| | | QUID-MFG-0050345 | b | 5 | jyz | 106.950 | 19:36:52 | |
| | | QUID-MFG-0050345 | b | 5 | jyz | 107.360 | 20:04:58 | |
| | | QUID-MFG-0050345 | s | 5 | jyz | 107.400 | 20:39:44 | |
| | | QUID-MFG-0050345 | b | 5 | jyz | 107.380 | 21:03:22 | $250.00 |
| | 12/03/08 | QUID-MFG-0050345 | s | 5 | esz | 832.750 | 15:38:10 | |
| | | QUID-MFG-0050345 | b | 5 | esz | 832.000 | 15:52:27 | $187.50 |
| | | QUID-MFG-0050345 | s | 5 | esz | 838.000 | 16:15:55 | |
| | | QUID-MFG-0050345 | b | 5 | esz | 837.000 | 16:20:03 | $250.00 |
| | | QUID-MFG-0050345 | s | 5 | esz | 839.750 | 16:27:16 | |
| | | QUID-MFG-0050345 | b | 5 | esz | 846.750 | 16:36:16 | -$1,750.00 |
| | | QUID-MFG-0050345 | s | 5 | esz | 860.000 | 17:23:43 | |

| Complt. No | Date | Document No. | B/S | QTY | CONTRACT | Price | Time | P&L |
|---|---|---|---|---|---|---|---|---|
| | | QUID-MFG-0050345 | b | 5 | esz | 857.000 | 17:33:01 | $750.00 |
| | | | | | | | | $562.50 |

| Complt. No | Date | Document No. DEV or XFA | B/S | QTY | CONTRACT | Price | Time | P&L | |
|---|---|---|---|---|---|---|---|---|---|
| | 12/03/08 | DEV or XFA | b | 10 | spz 950c | 6.500 | | | |
| | | DEV or XFA | b | 30 | spz 950c | 7.500 | | | |
| | | DEV or XFA | s | 50 | spz 950c | 9.000 | | $17,500.00 | 40 of 50 sold |
| 25 | 12/04/08 | QUID-MFG-0050345 | b | 1 | esz | 843.750 | 2:47:46PM | | |
| | | QUID-MFG-0050345 | s | 1 | esz | 835.000 | 2:54:16PM | | |
| | | QUID-MFG-0050345 | b | 1 | esz | 845.000 | 2:57:03PM | | |
| | | QUID-MFG-0050345 | s | 1 | esz | 845.750 | 3:05:01PM | $375.00 | |
| | 12/08/08 | QUID-MFG-0050339 | b | 25 | esz | 903.250 | 15:41:52 | | |
| | | QUID-MFG-0050339 | s | 5 | esz | 907.000 | 15:46:24 | $937.50 | |
| | | QUID-MFG-0050339 | s | 5 | esz | 905.250 | 15:47:44 | $500.00 | |
| | | QUID-MFG-0050339 | s | 10 | esz | 904.000 | 15:48:27 | $375.00 | |
| | | QUID-MFG-0050339 | s | 5 | esz | 900.000 | 15:56:28 | -$812.50 | |
| | | QUID-MFG-0050339 | b | 5 | esz | 905.750 | 16:34:34 | | |
| | | QUID-MFG-0050339 | s | 5 | esz | 908.250 | 16:55:59 | $500.00 | |
| | | QUID-MFG-0050339 | s | 4 | esz | 910.250 | 16:55:59 | $225.00 | $1,725.00 |
| | 12/09/08 | QUID-MFG-0050339 | s | 5 | esz | 904.750 | 17:32:25 | | |
| | | QUID-MFG-0050339 | b | 5 | esz | 908.750 | 18:07:55 | -$1,000.00 | |
| | | QUID-MFG-0050339 | b | 5 | esz | 888.250 | 20:37:26 | | |
| | | QUID-MFG-0050339 | s | 5 | esz | 886.250 | 20:38:48 | -$500.00 | |
| | | QUID-MFG-0050339 | s | 5 | esz | 891.000 | 20:49:33 | | |
| | | QUID-MFG-0050339 | s | 5 | esz | 897.500 | 21:00:53 | | |
| | | QUID-MFG-0050339 | b | 5 | esz | 895.000 | 21:07:22 | -$1,000.00 | |
| | | QUID-MFG-0050339 | b | 5 | esz | 886.750 | 21:31:06 | $2,687.50 | $187.50 |
| | 12/10/08 | QUID-MFG-0050339 | s | 10 | | 898.500 | 18:31:56 | | |
| | | QUID-MFG-0050339 | b | 1 | | 897.000 | 18:32:48 | $775.00 | |
| | | QUID-MFG-0050339 | b | 1 | | 896.500 | 18:34:00 | $100.00 | |
| | | QUID-MFG-0050339 | b | 5 | | 898.000 | 18:36:31 | $125.00 | |
| | | QUID-MFG-0050339 | s | 3 | | 898.000 | 18:56:11 | | |
| | | QUID-MFG-0050339 | b | 5 | | 896.000 | 18:58:39 | $575.00 | |

| Compl. No | Date | Document No. | B/S | QTY | CONTRACT | Price | Time | P&L |
|---|---|---|---|---|---|---|---|---|
| | | QUID-MFG-0050339 | b | 1 | | 895.500 | 19:00:57 | $125.00 |
| | | QUID-MFG-0050339 | s | 1 | | 902.000 | 19:15:49 | |
| | | QUID-MFG-0050339 | b | 1 | | 899.000 | 19:29:49 | $150.00 |
| | | QUID-MFG-0050339 | b | 1 | | 893.500 | 20:45:40 | |
| | | QUID-MFG-0050339 | s | 5 | | 893.500 | 20:45:40 | $0.00 |
| | | QUID-MFG-0050339 | b | 1 | | 891.000 | 20:49:45 | $125.00 |
| | | QUID-MFG-0050339 | b | 4 | | 890.500 | 21:08:27 | $450.00 |
| | | QUID-MFG-0050339 | s | 5 | | 894.000 | 21:08:27 | $175.00 |
| | | QUID-MFG-0050339 | b | 2 | | 893.750 | 21:27:07 | $25.00 |
| | | QUID-MFG-0050339 | b | 1 | | 897.750 | 21:31:02 | -$187.50 |
| | | QUID-MFG-0050339 | b | 1 | | 894.750 | 21:37:42 | -$37.50 |
| | | | | | | | | $1,700.00 |
| | 12/11/08 | QUID-MFG-0050339 | b | 3 | | 902.750 | 19:05:17 | |
| | | QUID-MFG-0050339 | b | 1 | | 897.500 | 19:14:39 | |
| | | QUID-MFG-0050339 | s | 1 | esz | 897.750 | 19:14:39 | -$250.00 |
| | | QUID-MFG-0050339 | s | 1 | | 898.000 | 19:48:20 | -$237.50 |
| | | QUID-MFG-0050339 | s | 2 | | 881.750 | 20:55:03 | -$1,837.50 |
| | | | | | | | | -$2,325.00 |
| | 12/15/08 | QUID-MFG-0050339 | b | 1 | | 864.000 | 18:40:40 | |
| | | QUID-MFG-0050339 | s | 1 | esz | 869.250 | 20:45:47 | $262.50 |
| | 12/15/08 | QUID-MFG-0050339 | b | 2 | esh | 866.000 | 21:53:53 | |
| | | QUID-MFG-0050339 | s | 5 | | 866.250 | 21:37:22 | $25.00 |
| | | QUID-MFG-0050339 | b | 1 | | 866.500 | 21:55:07 | -$12.50 |
| | | QUID-MFG-0050339 | b | 1 | | 867.250 | 21:53:43 | -$50.00 |
| | | QUID-MFG-0050339 | b | 1 | | 869.000 | 21:52:19 | -$137.50 |

| Complt. No | Date | Document No. | B/S | QTY | CONTRACT | Price | Time | P&L |
|---|---|---|---|---|---|---|---|---|
| | | QUID-MFG-0050339 | b | 5 | | 869.750 | 21:45:35 | |
| | | QUID-MFG-0050339 | b | 5 | | 871.750 | 21:47:02 | |
| | | QUID-MFG-0050339 | s | 5 | | 873.000 | 21:43:01 | $812.50 |
| | | QUID-MFG-0050339 | s | 5 | | 874.000 | 21:46:52 | $562.50 |
| | | | | | | | | $1,462.50 |
| | 12/16/08 | QUID-MFG-0050339 | s | 1 | esh | 879.250 | 16:21:11 | |
| | | QUID-MFG-0050339 | b | 25 | esh | 895.000 | 20:59:04 | -$787.50 |
| | | QUID-MFG-0050339 | s | 24 | esh | 893.000 | 21:02:27 | -$2,400.00 |
| | | | | | | | | -$3,187.50 |
| | | DEV or XFA | b | 10 | spz 900c | 14.000 | | |
| | | DEV or XFA | s | 10 | spz 900c | 16.000 | | $5,000.00 |
| 26 | 12/17/08 | QUID-MIZUHO-0000616 | b | 25 | esh | 903.500 | 11:34 p.m. | |
| | | QUID-MIZUHO-0000615 | b | 25 | esh | 893.500 | 02:45 a.m. | |
| | | QUID-MIZUHO-0000617 | s | 25 | esh | 899.250 | 07:16 a.m. | |
| | | QUID-MIZUHO-0000618 | s | 25 | esh | 900.000 | 08:06 a.m. | $2,812.00 |
| | 12/22/08 | QUID-MFG-0050339 | s | 5 | esh | 858.250 | 21:40:33 | |
| | | QUID-MFG-0050339 | s | 5 | esh | 863.750 | 21:57:35 | |
| | | QUID-MFG-0050339 | b | 2 | esh | 868.000 | 22:03:39 | -$975.00 |
| | | QUID-MFG-0050339 | b | 7 | esh | 868.500 | 22:05:40 | -$2,487.50 |
| | | QUID-MFG-0050339 | b | 1 | esh | 869.000 | 22:05:54 | -$262.50 |
| | | | | | | | | -$3,725.00 |
| | 01/05/09 | QUID-MFG-0050339 | b | 5 | esh | 929.500 | 20:19:31 | |
| | | QUID-MFG-0050339 | s | 5 | esh | 923.000 | 20:48:12 | -$325.00 |
| | 01/07/09 | QUID-MFG-0050339 | s | 1 | esh | 919.000 | 16:01:24 | |
| | | QUID-MFG-0050339 | s | 1 | esh | 910.750 | 16:51:47 | |
| | | QUID-MFG-0050339 | b | 1 | esh | 916.500 | 17:46:13 | $125.00 |
| | | QUID-MFG-0050339 | s | 1 | esh | 906.250 | 20:00:09 | |
| | | QUID-MFG-0050339 | s | 1 | esh | 901.250 | 21:06:24 | |
| | | QUID-MFG-0050339 | b | 1 | esh | 900.000 | 21:18:58 | $537.50 |

| Complt. No | Date | Document No. | B/S | QTY | CONTRACT | Price | Time | P&L |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | $662.50 |

| Complt. No | Date | Document No. | B/S | QTY | CONTRACT | Price | Time | P&L |
|---|---|---|---|---|---|---|---|---|
| 27 | 01/08/09 | QUID-MFG-0050339 | s | 2 | esh | 897.000 | 19:46:06 | $375.00 |
| | | QUID-MFG-0050339 | b | 2 | esh | 900.750 | 10:26 a.m. | |
| | 01/12/09 | QUID-MIZUHO-0000640 | b | 25 | jyh | 110.050 | 10:59 p.m. | |
| | | QUID-MIZUHO-0000637 | s | 12 | jyh | 111.460 | 05:57 a.m. | |
| | | QUID-MIZUHO-0000639 | s | 13 | jyh | 111.260 | 07:17 a.m. | $9,437.50 |
| | 01/14/09 | QUID-MFG-0050339 | b | 15 | jyh | 112.620 | 16:41:33 | |
| | | QUID-MFG-0050339 | s | 10 | jyh | 112.800 | 16:48:00 | $2,250.00 |
| | | QUID-MFG-0050339 | s | 5 | jyh | 112.740 | 17:22:03 | $750.00 |
| | | QUID-MFG-0050339 | b | 5 | jyh | 112.400 | 17:40:21 | |
| | | QUID-MFG-0050339 | s | 2 | jyh | 112.330 | 17:51:44 | -$175.00 |
| | | QUID-MFG-0050339 | s | 3 | jyh | 112.340 | 17:51:44 | -$225.00 |
| | | QUID-MFG-0050339 | b | 5 | jyh | 112.340 | 19:29:42 | |
| | | QUID-MFG-0050339 | s | 5 | jyh | 112.450 | 20:10:06 | $687.50 |
| | | | | | | | | $3,287.50 |
| 28 | 01/15/09 | QUID-MIZUHO-0000653 | b | 25 | jyh | 112.300 | 06:54 p.m. | |
| | | QUID-MIZUHO-0000655 | s | 3 | jyh | 113.030 | 02:57 a.m. | |
| | | | | 7 | jyh | 113.020 | | |
| | | QUID-MIZUHO-0000657 | b | 25 | jyh | 112.300 | 03:00 a.m. | |
| | | QUID-MIZUHO-0000654 | b | 2 | jyh | 113.030 | 03:00 a.m. | |
| | | | b | 8 | jyh | 113.040 | | |
| | | QUID-MIZUHO-0000656 | s | 25 | jyh | 113.100 | 03:03 a.m. | |
| | | QUID-MIZUHO-0000658 | s | 10 | jyh | 112.100 | 07:10 a.m. | |
| | | QUID-MIZUHO-0000659 | s | 15 | jyh | 112.000 | 07:15 a.m. | $16,687.50 |
| | 01/16/09 | QUID-MFG-0050339 | b | 20 | jyh | 110.810 | 4:08:05 | |
| | | QUID-MFG-0050339 | s | 20 | jyh | 110.880 | 4:27:57 | $1,750.00 |
| | 01/16/09 | QUID-MFG-0050339 | b | 2 | esh | 844.000 | 17:22:10 | |
| | | QUID-MFG-0050339 | s | 2 | esh | 846.000 | 17:27:01 | $200.00 |
| 29 | 01/16/09 | QUID-MIZUHO-0000669 | s | 25 | jyh | 111.300 | 06:02 p.m. | |

| Complt. No | Date | Document No. | B/S | QTY | CONTRACT | Price | Time | P&L |
|---|---|---|---|---|---|---|---|---|
| | | QUID-MIZUHO-0000666 | b | 25 | jyh | 111.150 | 07:14 p.m. | |
| | | QUID-MIZUHO-0000671 | s | 25 | jyh | 111.150 | 07:15 p.m. | |
| | | QUID-MIZUHO-0000655 | b | 10 | jyh | 110.310 | 08:48 a.m. | |
| | | QUID-MIZUHO-0000666 | b | 9 | jyh | 110.560 | 08:48 a.m. | |
| | | | b | 6 | jyh | 110.550 | | |
| | | QUID-MIZUHO-0000672 | s | 10 | jyh | 110.410 | 09:31 a.m. | |
| | | QUID-MIZUHO-0000668 | b | 10 | jyh | 110.800 | 10:37 a.m. | $21,450.00 |
| | 01/20/09 | QUID-MFG-0050339 | b | 10 | jyh | 111.200 | 19:18:44 | |
| | | QUID-MFG-0050339 | s | 1 | jyh | 111.310 | 20:29:43 | $137.50 |
| | | QUID-MFG-0050339 | s | 9 | jyh | 111.300 | 20:30:47 | $1,125.00 |
| | | QUID-MFG-0050339 | b | 10 | jyh | 111.400 | 20:45:38 | |
| | | QUID-MFG-0050339 | s | 5 | jyh | 111.500 | 21:17:19 | $625.00 |
| | | QUID-MFG-0050339 | s | 5 | jyh | 111.430 | 21:28:21 | $187.50 |
| | | QUID-MFG-0050339 | b | 5 | jyh | 111.500 | 22:00:53 | $2,075.00 |
| | 01/21/09 | QUID-MFG-0050339 | b | 2 | jyh | 111.460 | 8:07:32 | |
| | | QUID-MFG-0050339 | b | 13 | jyh | 111.470 | 8:07:32 | |
| | | QUID-MFG-0050339 | s | 15 | jyh | 111.200 | 15:48:03 | -$5,037.50 |
| | | QUID-MFG-0050339 | s | 10 | jyh | 111.180 | 15:56:00 | |
| | | QUID-MFG-0050339 | b | 10 | jyh | 111.080 | 16:00:37 | $1,250.00 |

| Complt. No | Date | Document No. | B/S | QTY | CONTRACT | Price | Time | P&L |
|---|---|---|---|---|---|---|---|---|
| | | QUID-MFG-0050339 | s | 5 | jyh | 111.350 | 16:01:57 | |
| | | QUID-MFG-0050339 | s | 5 | jyh | 111.360 | 16:01:57 | |
| | | QUID-MFG-0050339 | b | 5 | jyh | 111.840 | 16:12:55 | -$3,062.50 |
| | | QUID-MFG-0050339 | b | 5 | jyh | 111.920 | 16:13:33 | -$3,500.00 |
| | | QUID-MFG-0050339 | s | 5 | jyh | 111.970 | 16:21:04 | |
| | | QUID-MFG-0050339 | b | 5 | jyh | 111.890 | 16:22:53 | $500.00 |
| | | QUID-MFG-0050339 | b | 5 | jyh | 112.050 | 16:26:50 | |
| | | QUID-MFG-0050339 | s | 5 | jyh | 112.080 | 16:27:47 | $187.50 |
| | | QUID-MFG-0050339 | b | 5 | jyh | 112.270 | 16:30:03 | |
| | | QUID-MFG-0050339 | s | 5 | jyh | 112.400 | 16:31:29 | $1,187.50 |
| | | QUID-MFG-0050339 | b | 2 | jyh | 112.340 | 16:34:25 | |
| | | QUID-MFG-0050339 | b | 3 | jyh | 112.350 | 16:34:25 | |
| | | QUID-MFG-0050339 | s | 5 | jyh | 112.480 | 16:35:33 | $837.50 |
| | | QUID-MFG-0050339 | b | 5 | jyh | 112.540 | 16:37:43 | |
| | | QUID-MFG-0050339 | s | 5 | jyh | 112.660 | 16:39:27 | $750.00 |
| | | QUID-MFG-0050345 | s | 25 | jyh | 113.505 | 16:44:53 | |
| | | QUID-MFG-0050345 | b | 25 | jyh | 113.380 | 16:45:23 | $3,906.25 |
| | | QUID-MFG-0050339 | b | 5 | jyh | 113.430 | 16:49:40 | |
| | | QUID-MFG-0050339 | s | 5 | jyh | 113.520 | 16:51:10 | $562.50 |
| | | QUID-MFG-0050339 | b | 5 | jyh | 113.450 | 16:53:02 | |
| | | QUID-MFG-0050339 | s | 5 | jyh | 113.760 | 16:59:48 | $1,937.50 |
| | | QUID-MFG-0050339 | b | 3 | jyh | 114.110 | 18:03:35 | |
| | | QUID-MFG-0050339 | s | 3 | jyh | 113.860 | 18:09:40 | -$937.50 |
| | | QUID-MIZUHO-680 | s | 5 | jyh | 111.500 | 6:24pm | $0.00 covered 5 long from 1/20 |
| | | QUID-MIZUHO-679 | s | 25 | jyh | 111.420 | 1:06am | $7,062.50 |
| | | QUID-MIZUHO-681 | b | 25 | jyh | 111.210 | 8:46am | $5,643.75 |
| | 01/22/09 | QUID-MFG-0050339 | b | 25 | esh | 829.250 | 20:04:43 | |
| | | QUID-MFG-0050339 | s | 5 | esh | 831.000 | 20:10:49 | $437.50 |
| | | QUID-MFG-0050339 | s | 5 | esh | 831.250 | 20:10:50 | $500.00 |
| | | QUID-MFG-0050339 | s | 5 | esh | 831.750 | 20:09:56 | $625.00 |
| | | QUID-MFG-0050339 | s | 5 | esh | 832.250 | 20:10:03 | $750.00 |
| | | QUID-MFG-0050339 | s | 5 | esh | 832.500 | 20:09:24 | $812.50 |
| | | | | | | | | $3,125.00 |

| Complt. No | Date | Document No. | B/S | QTY | CONTRACT | Price | Time | P&L |
|---|---|---|---|---|---|---|---|---|
| | 01/22/09 | QUID-MFG-0050339 | s | 10 | jyh | 113.010 | 15:56:29 | $750.00 |
| | | QUID-MFG-0050339 | b | 5 | jyh | 112.890 | 16:01:45 | $1,312.50 |
| | | QUID-MFG-0050339 | b | 5 | jyh | 112.800 | 16:02:44 | |
| | | QUID-MFG-0050339 | b | 2 | jyh | 112.680 | 16:04:48 | |
| | | QUID-MFG-0050339 | b | 3 | jyh | 112.690 | 16:04:48 | |
| | | QUID-MFG-0050339 | s | 5 | jyh | 112.780 | 16:05:27 | $587.50 |
| | | QUID-MFG-0050339 | b | 5 | jyh | 112.790 | 16:24:48 | |
| | | QUID-MFG-0050339 | s | 5 | jyh | 112.850 | 16:30:12 | $375.00 |
| | | QUID-MFG-0050339 | b | 5 | jyh | 112.900 | 16:32:05 | |
| | | QUID-MFG-0050339 | s | 5 | jyh | 112.850 | 16:57:49 | $937.50 |
| | | QUID-MFG-0050339 | s | 10 | jyh | 112.950 | 17:01:34 | |
| | | QUID-MFG-0050339 | b | 5 | jyh | 113.110 | 17:10:40 | -$1,312.50 |
| | | QUID-MFG-0050339 | s | 5 | jyh | 112.900 | 17:16:35 | |
| | | QUID-MFG-0050339 | b | 5 | jyh | 112.830 | 17:58:17 | -$125.00 |
| | | QUID-MFG-0050339 | s | 5 | jyh | 112.810 | 18:09:46 | $2,525.00 |
| | 01/22/09 | DEV or XFA | b | 10 | jyh 121c | 1.300 | | |
| | | DEV or XFA | s | 10 | jyh121c | 1.400 | | $1,250.00 |
| | 01/23/09 | QUID-MFG-0050339 | s | 5 | esh | 811.500 | 15:58:50 | |
| | | QUID-MFG-0050339 | b | 5 | esh | 823.500 | 17:18:20 | $3,000.00 |
| | 01/23/09 | QUID-MFG-0050339 | b | 5 | jyh | 112.040 | 16:35:10 | |
| | | QUID-MFG-0050339 | s | 5 | jyh | 112.020 | 17:02:55 | $125.00 |
| | 01/26/09 | QUID-MFG-0050339 | s | 5 | esh | 824.000 | 16:36:39 | |
| | | QUID-MFG-0050345 | s | 5 | esh | 826.500 | 20:14:00 | |
| | | QUID-MFG-0050345 | s | 5 | esh | 826.500 | 20:14:07 | |
| | | QUID-MFG-0050345 | b | 5 | esh | 826.250 | 20:14:19 | -$562.50 |
| | | QUID-MFG-0050339 | b | 5 | esh | 834.000 | 21:41:10 | -$1,875.00 |
| | | QUID-MFG-0050339 | s | 5 | esh | 835.000 | 21:41:29 | $2,437.50 |

| Complt. No | Date | Document No. | B/S | QTY | CONTRACT | Price | Time | P&L |
|---|---|---|---|---|---|---|---|---|
| | 01/26/09 | DEV or XFA | s | 20 | spf eom 750p | 1.300 | | |
| | | DEV or XFA | b | 20 | spf eom 750p | 1.400 | | |
| | | DEV or XFA | s | 20 | spf eom 750p | 1.500 | | $500.00 |
| | 01/26/09 | QUID-MFG-0050339 | s | 25 | jyh | 111.930 | 16:25:29 | |
| | | QUID-MFG-0050339 | b | 25 | jyh | 111.740 | 16:30:30 | $5,937.50 |
| | | QUID-MFG-0050345 | s | 25 | jyh | 111.620 | 16:36:00 | |
| | | QUID-MFG-0050339 | s | 5 | jyh | 111.910 | 16:51:18 | |
| | | QUID-MFG-0050339 | b | 5 | jyh | 111.700 | 17:01:06 | -$500.00 |
| | | QUID-MFG-0050339 | s | 5 | jyh | 111.810 | 17:03:32 | |
| | | QUID-MFG-0050339 | b | 5 | jyh | 111.850 | 17:08:49 | -$1,437.50 |
| | | QUID-MFG-0050345 | b | 25 | jyh | 112.320 | 17:51:08 | -$18,875.00 |
| | | QUID-MFG-0050339 | b | 10 | jyh | 112.450 | 19:51:20 | |
| | | QUID-MFG-0050339 | s | 5 | jyh | 112.600 | 20:09:18 | $937.50 |
| | | QUID-MFG-0050339 | s | 5 | jyh | 112.550 | 20:11:40 | $625.00 |
| | | QUID-MFG-0050339 | s | 5 | jyh | 112.480 | 21:01:47 | |
| | | QUID-MFG-0050339 | b | 5 | jyh | 112.300 | 21:14:26 | $1,125.00 |
| | | QUID-MFG-0050339 | s | 5 | jyh | 112.360 | 21:29:50 | -$12,187.50 |
| 30 | 01/27/09 | QUID-MIZUHO-0000710 | s | 20 | jyh | 112.500 | 05:34 a.m. | |
| | | QUID-MIZUHO-0000709 | b | 20 | jyh | 112.000 | 07:02 a.m. | $12,500.00 |

| Complt. No | Date | Document No. | B/S | QTY | CONTRACT | Price | Time | P&L | |
|---|---|---|---|---|---|---|---|---|---|
| | 01/27/09 | QUID-MIZUHO-0000708 | b | 5 | esh | 837.000 | 07:06 a.m. | -$2,625.00 | covered 5/10 short from · |
| | 01/27/09 | Quid-MFG-0050339 | b | 5 | jyh | 112.000 | | $2,250.00 | covered 5/5 short from 1/ |
| | 01/28/09 | QUID-MFG-0050345 | b | 6 | esh | 864.750 | 16:36:24 | $0.00 | |
| | | QUID-MFG-0050345 | s | 6 | esh | 864.750 | 16:36:35 | | |
| | | QUID-MFG-0050339 | b | 5 | esh | 864.000 | 16:36:39 | -$7,250.00 | covered 5/5 short from 1/ |
| | | QUID-MFG-0050339 | s | 1 | esh | 869.750 | 20:24:46 | | |
| | | QUID-MFG-0050339 | s | 1 | esh | 864.500 | 21:09:44 | $7,250.00 | |
| 31 | 01/28/09 | QUID-MIZUHO-0000720 | s | 25 | jyh | 111.970 | 06:37 p.m. | | |
| | | QUID-MIZUHO-0000719 | b | 5 | jyh | 111.750 | 07:05 a.m. | | |
| | | QUID-MFG-0050339 | b | 5 | jyh | 111.870 | 16:20:53 | | |
| | | QUID-MFG-0050339 | b | 5 | jyh | 111.770 | 16:21:10 | | |
| | | QUID-MFG-0050339 | s | 5 | jyh | 111.770 | 16:22:34 | | |
| | | QUID-MFG-0050339 | b | 5 | jyh | 111.570 | 16:31:19 | | |
| | | QUID-MFG-0050339 | b | 5 | jyh | 111.450 | 16:54:23 | | |
| | | QUID-MFG-0050339 | b | 5 | jyh | 111.500 | 16:55:50 | | |
| | | QUID-MFG-0050339 | b | 5 | jyh | 111.010 | 20:20:06 | | |
| | | QUID-MFG-0050339 | s | 5 | jyh | 110.860 | 20:20:56 | $8,750.00 | |
| | 01/29/09 | QUID-MIZUHO-0000727 | s | 25 | jyh | 111.500 | 06:?? p.m. | | |
| | | QUID-MIZUHO-0000728 | b | 25 | jyh | 111.330 | 11:16 p.m. | $5,312.50 | |
| | | QUID-MIZUHO-0000729 | b | 25 | jyh | 111.010 | 2:01 a.m. | | |
| | | QUID-MIZUHO-0000730 | s | 25 | jyh | 111.300 | 06:53a.m. | $9,062.50 | |
| | | | | | | | | $14,375.00 | |
| | 01/29/09 | QUID-MIZUHO-0000730 | b | 2 | esh | 855.250 | 09:19 a.m. | $1,187.50 | covered 2 short from 1/2£ |
| | 01/30/09 | QUID-MFG-0050339 | s | 5 | esh | 820.750 | 21:31:25 | $162.50 | |
| | | QUID-MFG-0050339 | b | 1 | esh | 824.000 | 22:07:25 | -$162.50 | |
| | | QUID-MFG-0050339 | b | 2 | esh | 825.750 | 22:12:44 | -$500.00 | |
| | | QUID-MFG-0050339 | b | 1 | esh | 825.250 | 22:13:18 | -$225.00 | |
| | | | | | | | | -$887.50 | |

| Complt. No | Date | Document No. | B/S | QTY | CONTRACT | Price | Time | P&L | |
|---|---|---|---|---|---|---|---|---|---|
| | 02/02/09 | QUID-MIZUHO-0000976 | b | 1 | esh | 809.000 | 12:00 a.m. | $587.50 | covered 1 short from 1/3( |
| 32 | 02/02/09 | QUID-MIZUHO-0000977 | s | 20 | jyh | 112.000 | 02:02 a.m. | | |
| | | QUID-MIZUHO-0000975 | b | 20 | jyh | 111.900 | 06:55 a.m. | $2,500.00 | |
| | 02/03/09 | QUID-MFG-0050339 | b | 25 | jyh | 112.110 | 19:28:30 | | |
| | | QUID-MFG-0050339 | s | 25 | jyh | 112.210 | 19:52:04 | $3,125.00 | |
| | | QUID-MFG-0050339 | s | 30 | jyh | 112.190 | 20:15:22 | | |
| | | QUID-MFG-0050339 | b | 20 | jyh | 112.260 | 20:26:22 | -$1,750.00 | |
| | | QUID-MFG-0050339 | b | 10 | jyh | 112.100 | 21:02:40 | -$1,125.00 | |
| | | | | | | | | $2,500.00 | |
| 34 | 02/03/09 | QUID-MIZUHO-0000959 | b | 25 | jyh | 111.500 | 08:26 p.m. | | |
| | | QUID-MIZUHO-0000953 | s | 25 | jyh | 111.650 | 11:58 p.m. | $4,687.50 | |
| 35 | 02/04/09 | QUID-MIZUHO-0000937 | s | 25 | jyh | 111.950 | 05:35 p.m. | | |
| | | QUID-MIZUHO-0000936 | b | 25 | jyh | 111.720 | 06:41 p.m. | | |
| | | QUID-MIZUHO-0000935 | s | 25 | jyh | 112.100 | 01:05 a.m. | | |
| | | QUID-MIZUHO-0000934 | b | 25 | jyh | 112.080 | 07:46 a.m. | $7,812.50 | |
| 36 | 02/06/09 | QUID-MIZUHO-0000927 | s | 25 | jyh | 110.200 | 08:50 p.m. | | |
| | | QUID-MIZUHO-0000923 | b | 5 | jyh | 110.000 | 09:16 p.m.? | | |
| | | QUID-MIZUHO-0000924 | b | 6 | jyh | 109.490 | 04:?? a.m. | | |
| | | QUID-MIZUHO-0000924 | b | 14 | jyh | 109.500 | | $18,825.00 | |
| 37 | 02/09/09 | QUID-MIZUHO-0000918 | b | 25 | ech | 129.700 | 05:27 p.m. | | |
| | | QUID-MIZUHO-0000915 | s | 25 | ech | 130.250 | 07:27 a.m. | $4,062.50 | |
| 38 | 02/09/09 | QUID-MIZUHO-0000919 | s | 25 | esh | 862.250 | 05:18 p.m. | | |
| | | QUID-MIZUHO-0000920 | b | 25 | esh | 859.000 | 06:57 a.m. | $17,187.50 | |

| Complt. No | Date | Document No. | B/S | QTY | CONTRACT | Price | Time | P&L |
|---|---|---|---|---|---|---|---|---|
| | 02/09/09 | QUID-MIZUHO-0000912 | s | 25 | jyh | 108.960 | 635pm | |
| | | QUID-MIZUHO-0000913 | b | 10 | jyh | 109.200 | 814am | -$3,000.00 |
| | | QUID-MIZUHO-0000913 | b | 5 | jyh | 109.180 | | -$1,375.00 |
| | | QUID-MIZUHO-0000913 | b | 5 | jyh | 109.170 | | -$1,312.50 |
| | | QUID-MIZUHO-0000913 | b | 5 | jyh | 109.080 | | -$812.50 |
| | | | | | | | | -$6,500.00 |
| | 02/09/09 | QUID-MIZUHO-0000898 | s | 25 | ech | 129.150 | 11:47 p.m. | |
| | | QUID-MIZUHO-0000897 | b | 4 | ech | 129.040 | 11:57p.m. | $550.00 |
| | | QUID-MIZUHO-0000897 | b | 21 | ech | 129.050 | 12:33 a.m. | $2,625.00 |
| | | QUID-MIZUHO-0000899 | s | 25 | ech | 129.100 | | |
| | | QUID-MIZUHO-0000892 | b | 12 | ech | 129.090 | 07:05 a.m. | -$150.00 |
| | | QUID-MIZUHO-0000891 | b | 13 | ech | 129.600 | 07:52 a.m. | -$8,125.00 |
| | | | | | | | | -$5,100.00 |
| 39 | 02/11/09 | QUID-MIZUHO-0000895 | s | 25 | jyh | 111.250 | 05:08 p.m. | |
| | | QUID-MIZUHO-0000893 | s | 25 | jyh | 111.150 | 11:44 p.m. | |
| | | QUID-MIZUHO-0000896 | s | 25 | jyh | 111.400 | 03:43 a.m. | |
| | | QUID-MIZUHO-0000894 | b | 25 | jyh | 111.150 | 05:30 a.m.? | $3,125.00 |
| 40 | 02/12/09 | QUID-MIZUHO-0000874 | s | 25 | esh | 829.500 | 10:51 p.m. | |
| | | QUID-MIZUHO-0000872 | b | 25 | esh | 822.000 | 04:20 a.m. | $9,375.00 |
| 41 | 02/12/09 | QUID-MIZUHO-0000873 | s | 25 | ech | 129.080 | 11:00 p.m. | |
| | | QUID-MIZUHO-0000880 | b | 25 | ech | 128.600 | 02:42 a.m. | $15,000.00 |
| 42 | 02/12/09 | QUID-MIZUHO-0000875 | s | 5 | jyh | 111.130 | 10:54 p.m. | |
| | | QUID-MIZUHO-0000875 | s | 20 | jyh | 111.050 | | |
| | | QUID-MIZUHO-0000876 | b | 9 | jyh | 111.040 | 04:54 a.m. | |
| | | QUID-MIZUHO-0000876 | b | 6 | jyh | 111.100 | | |
| | | QUID-MIZUHO-0000877 | b | 2 | jyh | 110.910 | | |
| | | QUID-MIZUHO-0000877 | b | 8 | jyh | 110.900 | 07:55 a.m. | $2,093.00 |

| Complt. No | Date | Document No. | B/S | QTY | CONTRACT | Price | Time | P&L |
|---|---|---|---|---|---|---|---|---|
| | 02/12/09 | QUID-MFG-0050339 | b | 4 | jyh | 110.600 | 20:39:36 | |
| | | QUID-MFG-0050339 | b | 1 | jyh | 110.610 | 20:39:36 | |
| | | QUID-MFG-0050339 | s | 5 | jyh | 110.640 | 20:57:18 | $237.50 |
| | | QUID-MFG-0050339 | b | 5 | jyh | 110.500 | 21:02:30 | |
| | | QUID-MFG-0050339 | s | 5 | jyh | 110.530 | 21:04:06 | $187.50 |
| | | | | | | | | $425.00 |
| | 02/12/09 | QUID-MFG-0050339 | s | 5 | esh | 821.000 | 17:52:07 | |
| | | QUID-MFG-0050339 | b | 25 | esh | 817.000 | 19:20:31 | $1,000.00 |
| | | QUID-MFG-0050339 | s | 20 | esh | 817.000 | 19:20:46 | |
| | | QUID-MFG-0050339 | s | 5 | esh | 811.000 | 21:13:39 | $0.00 |
| | | QUID-MFG-0050339 | s | 5 | esh | 812.750 | 21:15:10 | |
| | | QUID-MFG-0050339 | b | 5 | esh | 828.500 | 21:44:18 | -$4,375.00 |
| | | QUID-MFG-0050339 | b | 5 | esh | 830.500 | 21:45:07 | -$4,437.50 |
| | | | | | | | | $7,812.50 |
| 43 | 02/13/09 | QUID-MIZUHO-0000862 | s | 25 | ech | 128.970 | 11:23 a.m. | |
| | | QUID-MIZUHO-0000863 | b | 25 | ech | 128.850 | 01:06 p.m. | $3,750.00 |
| 44 | 02/17/09 | QUID-MIZUHO-0000850 | s | 25 | jyh | 108.350 | 08:17 p.m. | |
| | | QUID-MIZUHO-0000848 | b | 25 | jyh | 108.250 | 08:19 p.m. | |
| | | QUID-MIZUHO-0000848 | b | 25 | jyh | 108.980 | 03:22 a.m. | |
| | | QUID-MIZUHO-0000847 | b | 25 | jyh | 108.850 | 06:51 a.m. | $7,187.50 |

| Complt. No | Date | Document No. | B/S | QTY | CONTRACT | Price | Time | P&L |
|---|---|---|---|---|---|---|---|---|
| | 02/17/09 | QUID-MIZUHO-0000845 | s | 25 | esh | 806.500 | 07:57 p.m. | |
| | | QUID-MFG-0050339 | s | 5 | esh | 797.250 | 15:31:26 | |
| | | QUID-MFG-0050339 | b | 5 | esh | 790.000 | 15:55:48 | $4,125.00 |
| | | QUID-MFG-0050339 | s | 5 | esh | 793.250 | 16:18:14 | |
| | | QUID-MFG-0050339 | b | 5 | esh | 799.500 | 21:36:28 | $1,750.00 |
| | | QUID-MFG-0050339 | s | 5 | esh | 788.000 | 22:01:35 | |
| | | QUID-MFG-0050339 | b | 5 | esh | 787.000 | 22:05:12 | $4,875.00 |
| | | | | | | | | $10,750.00 |
| | 02/18/09 | QUID-MFG-0050339 | b | 5 | esh | 791.500 | 15:46:04 | $3,750.00 covered from 2/12 |
| | | QUID-MFG-0050339 | b | 5 | esh | 782.250 | 16:23:24 | $6,062.50 covered from 2/12 |
| | | QUID-MFG-0050339 | b | 5 | esh | 785.000 | 16:32:21 | $3,062.50 covered from 2/12 |
| | | QUID-MFG-0050339 | b | 5 | esh | 785.750 | 16:34:27 | $1,875.00 covered from 2/12 |
| | | QUID-MFG-0050339 | s | 5 | esh | 790.000 | 17:27:18 | |
| | | QUID-MFG-0050339 | b | 10 | esh | 789.000 | 17:35:19 | $0.00 covered from 2/12 |
| | | | | | | | | $14,750.00 |
| 45 | 02/18/09 | QUID-MIZUHO-0000834 | s | 25 | jyh | 108.210 | 05:19 p.m. | |
| | | QUID-MIZUHO-0000833 | b | 25 | jyh | 107.800 | 06:21 a.m. | $12,812.50 |
| 46 | 02/19/09 | QUID-MIZUHO-0000821 | s | 25 | ech | 126.650 | 03:28 a.m. | |
| | | QUID-MIZUHO-0000820 | b | 12 | ech | 126.560 | 02:21 p.m. | |
| | | QUID-MIZUHO-0000820 | b | 8 | | 126.550 | | |
| | | QUID-MIZUHO-0000820 | b | 5 | | 126.540 | | $3,037.50 |
| 47 | 02/20/09 | QUID-MIZUHO-0000808 | b | 25 | ech | 125.750 | 11:03 p.m. | $3,125.00 |
| | 02/20/09 | QUID-MIZUHO-0000803 | b | 25 | esh | 753.250 | 12:16 p.m. | |
| | | QUID-MFG-0050339 | s | 10 | esh | 766.500 | 15:47:23 | $6,625.00 |
| | | QUID-MFG-0050339 | s | 5 | esh | 762.250 | 17:14:24 | $2,250.00 |
| | | QUID-MFG-0050339 | s | 5 | esh | 759.000 | 18:51:18 | $1,437.50 |
| | | QUID-MFG-0050339 | s | 5 | esh | 757.750 | 18:55:54 | $1,125.00 |
| | | QUID-MFG-0050339 | s | 5 | esh | 755.750 | 19:10:30 | |
| | | QUID-MFG-0050339 | s | 5 | esh | 754.750 | 19:16:48 | |

| Compit. No | Date | Document No. | B/S | QTY | CONTRACT | Price | Time | P&L |
|---|---|---|---|---|---|---|---|---|
| | | QUID-MFG-0050339 | s | 5 | esh | 756.250 | 19:35:19 | -$7,375.00 |
| | | QUID-MFG-0050339 | b | 10 | esh | 770.000 | 20:25:34 | $4,062.50 |
| | 02/23/09 | QUID-MFG-0050339 | s | 10 | jyh | 106.050 | 16:26:56 | |
| | | QUID-MFG-0050339 | b | 10 | jyh | 106.040 | 16:36:08 | $125.00 |
| | | QUID-MFG-0050339 | b | 3 | jyh | 105.940 | 17:01:04 | |
| | | QUID-MFG-0050339 | b | 7 | jyh | 105.950 | 17:01:04 | $1,287.50 |
| | | QUID-MFG-0050339 | s | 10 | jyh | 106.050 | 21:51:29 | $1,412.50 |

| Complt. No | Date | Document No. | B/S | QTY | CONTRACT | Price | Time | P&L |
|---|---|---|---|---|---|---|---|---|
| 48 | 02/23/09 | QUID-MIZUHO-0000784 | b | 7 | ech | 128.660 | 03:21 a.m. | |
| | | QUID-MIZUHO-0000783 | s | 7 | ech | 129.890 | 08:48 p.m. | $10,762.50 |
| 49 | 02/23/09 | QUID-MIZUHO-0000785 | b | 25 | jyh | 106.250 | 08:48 p.m. | |
| | | QUID-MIZUHO-0000786 | s | 10 | jyh | 106.100 | 03:48 a.m. | |
| | | QUID-MIZUHO-0000787 | s | 9 | jyh | 105.520 | 03:?? a.m. | |
| | | QUID-MIZUHO-0000787 | s | 6 | jyh | 105.510 | | -$16,262.50 |
| | 02/23/09 | QUID-MIZUHO-0000788 | b | 5 | esh | 748.750 | 02:07 p.m. | $1,875.00 covered from 2/20 |
| | | QUID-MFG-0050339 | b | 5 | esh | 762.750 | 16:49:21 | |
| | | QUID-MFG-0050339 | s | 5 | esh | 763.250 | 16:55:23 | $125.00 |
| | | QUID-MFG-0050339 | s | 5 | esh | 758.250 | 17:32:50 | |
| | | QUID-MFG-0050339 | s | 5 | esh | 756.500 | 18:05:08 | |
| | | QUID-MFG-0050339 | s | 5 | esh | 752.500 | 18:51:52 | |
| | | QUID-MFG-0050339 | s | 5 | esh | 749.500 | 18:58:01 | |
| | | QUID-MFG-0050339 | s | 5 | esh | 746.000 | 21:11:57 | $3,062.50 |
| | | QUID-MFG-0050339 | b | 5 | esh | 746.000 | 21:30:50 | $5,062.50 |
| 50 | 02/24/09 | QUID-MIZUHO-0000766 | s | 25 | jyh | 105.250 | 10:34 p.m. | |
| | | QUID-MIZUHO-0000767 | b | 25 | jyh | 104.500 | 04:59 a.m. | $23,437.50 |
| | 02/24/09 | QUID-MIZUHO-0000768 | b | 5 | esh | 748.000 | 08:41 a.m. | $2,562.50 cover 5/20 from 2/23 |
| | | QUID-MIZUHO-0000768 | b | 5 | esh | 752.000 | 09:39 a.m. | $1,125.00 cover 10/20 from 2/23 |
| | | | | | | | | $3,687.50 |
| | 02/24/09 | QUID-MFG-0050339 | b | 5 | esh | 761.000 | 19:28:34 | -$2,125.00 cover 15/20 from 2/23 |
| | | QUID-MFG-0050339 | b | 5 | esh | 763.500 | 19:41:04 | -$3,500.00 cover 20/20 from 2/23 |
| | | | | | | | | -$5,625.00 |
| | 02/27/09 | DEV or XFA | b | 50 | spg eom 700p | 0.050 | | $5,625.00 50 of 100 expired worthle |
| | | DEV or XFA | s | 100 | spg eom 700p | 0.500 | | |

| Cmplt. No | Date | Document No. | B/S | QTY | CONTRACT | Price | Time | P&L |
|---|---|---|---|---|---|---|---|---|
| | 03/02/09 | QUID-MIZUHO-0001034 | b | 4 | jyh | 102.73aps | | |
| 51 | 03/02/09 | QUID-MIZUHO-0001038 | b | 25 | jyh | 102.500 | 06:38 p.m. | |
| | | QUID-MIZUHO-0001036 | s | 25 | jyh | 102.650 | 11:16 p.m. | $4,687.50 |
| 52 | 03/03/09 | QUID-MIZUHO-00001028 | s | 25 | jyh | 102.600 | 08:28p.m. | |
| | | QUID-MIZUHO-00001027 | b | 25 | jyh | 102.500 | ??? | $3,125.00 |
| 53 | 03/03/09 | QUID-MIZUHO-00001024 | b | 25 | esh | 705.500 | 10:46 p.m.? | |
| | | QUID-MIZUHO-00001026 | s | 25 | esh | 714.250 | 10:46p.m. | $10,937.50 |
| 54 | 03/09/09 | QUID-MIZUHO-1014 | b | 25 | jyh | 101.100 | 05:20 a.m. | |
| | | QUID-MFG-0050339 | s | 25 | jyh | 101.150 | 17:01:45 | $1,562.50 |
| | 03/11/09 | QUID-MIZUHO-00000997 | s | 25 | esh | 729.000 | 05:09 a.m. | $500.00 |
| | | QUID-MIZUHO-00000998 | b | 5 | esh | 727.000 | 05:30 a.m. | $1,000.00 |
| | | QUID-MIZUHO-00000999 | b | 5 | esh | 725.000 | 05:45 a.m. | $1,000.00 |
| | | QUID-MIZUHO-00001000 | b | 15 | esh | 725.000 | 05:50 a.m. | $2,500.00 |

| Compl't. No | Date | Document No. | B/S | QTY | CONTRACT | Price | Time | P&L | |
|---|---|---|---|---|---|---|---|---|---|
| | 03/11/09 | QUID-MFG-0050339 | s | 4 | jyh | 102.750 | 20:52:13 | $50.00 | covering from 3/02 |
| | 03/11/09 | QUID-MIZUHO-000010001 | b | 25 | jym | 102.890 | 11:44 a.m. | | |
| | | QUID-MFG-0050339 | s | 15 | jym | 102.990 | 21:43:55 | $1,875.00 | |
| 55 | 03/12/09 | QUID-MIZUHO-00000992 | b | 25 | jym | 103.030 | 07:47 p.m. | | |
| | | QUID-MIZUHO-00000990 | s | 10 | jym | 103.350 | 08:27 p.m. | | |
| | | QUID-MIZUHO-00000991 | s | 4 | jym | 104.100 | 12:11am | | |
| | | QUID-MIZUHO-00000991 | s | 1 | jym | 104.110 | | | |
| | | QUID-MFG-0050339 | S | 5 | jym | 103.130 | 15:02:31 | | |
| | | QUID-MFG-0050339 | S | 5 | jym | 102.900 | 15:22:17 | | |
| | | QUID-MFG-0050339 | s | 5 | jym | 102.010 | 16:18:15 | $5,012.50 | |
| | 03/12/09 | DEV or XFA | b | 100 | sph eom 600p | 1.500 | | $25,000.00 | |
| | | DEV or XFA | s | 100 | sph eom 600p | 2.500 | | | |
| | 03/17/09 | QUID-MFG-0050339 | b | 25 | eum | 129.880 | 18:37:48 | | |
| | | QUID-MFG-0050339 | s | 5 | eum | 129.980 | 18:47:33 | $625.00 | |
| | | QUID-MFG-0050339 | s | 4 | eum | 130.000 | 18:48:14 | $600.00 | |
| | | QUID-MFG-0050339 | s | 1 | eum | 129.990 | 18:48:40 | $137.50 | |
| | | QUID-MFG-0050339 | s | 5 | eum | 129.960 | 18:49:29 | $500.00 | |
| | | QUID-MFG-0050339 | s | 5 | eum | 129.970 | 18:49:30 | $562.50 | |
| | | QUID-MFG-0050339 | s | 5 | eum | 130.010 | 18:57:47 | $812.50 | |
| | | | | | | | | $3,237.50 | |

C

| Month | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|-------|------|------|------|------|------|------|
| Jan | 1.04% | 1.74% | 2.38% | 0.15% | 2.02% | 1.23% |
| Feb | 3.35% | 5.67% | 1.02% | 0.85% | -3.84% | -0.68% |
| Mar | 0.83% | 0.01% | 0.83% | 1.03% | -6.06% | 0.25% |
| Apr | 7.11% | -4.03% | -0.50% | -0.14% | 7.09% | 1.68% |
| May | -2.35% | -0.25% | 1.18% | -9.83% | 3.05% | 1.32% |
| Jun | 0.97% | 3.67% | 1.57% | 4.36% | -1.06% | 2.66% |
| Jul | 3.62% | -0.17% | 0.71% | 2.90% | 3.25% | 0.64% |
| Aug | 0.17% | 0.72% | -0.56% | 2.83% | 1.08% | 1.11% |
| Sep | 3.22% | 4.15% | 3.14% | 2.28% | 3.45% | -5.65% |
| Oct | -2.05% | -0.07% | 0.12% | 1.57% | 1.17% | -12.49% |
| Nov | 1.38% | 0.65% | 2.19% | 2.88% | 3.47% | 5.65% |
| Dec | 4.48% | 0.90% | 1.29% | 3.26% | 0.39% | 6.41% |
| Total | 14.96% | 13.40% | 14.14% | 5.71% | 14.17% | 0.58% |
| Performance compounded monthly | | | | | | |
| Audited fund performance available through 2009 | | | | | | |
| Prior to 2008 QED Program earned less than .75% of income f | | | | | | |

| 2009 | 2010 |
|---|---|
| 0.74% | 1.39% |
| 3.58% | -1.90% |
| 0.50% | 1.64% |
| 3.22% | -1.75% |
| 0.15% | -0.61% |
| 0.59% | 1.98% |
| 0.17% | 0.51% |
| 1.17% | 0.43% |
| 1.40% | 1.67% |
| 0.31% | 1.50% |
| 1.62% | -0.31% |
| 1.04% | 1.31% |
| 15.41% | 5.97% |

rom interest

D

04/09 thru 09/09 for Proprietary Account
7628 total contracts (3814 round turns) in pure day trades (opened and closed same session).

| Date | Trades | Contracts |
|------|--------|-----------|
| 2-Apr | 4 of 4 | 50 of 50 |
| 3-Apr | 4 of 4 | 100 of 100 |
| 6-Apr | 2 of 2 | 26 of 26 |
| 8-Apr | 4 of 4 | 50 of 50 |
| 9-Apr | 1 of 1 | 25 of 25 |
| 13-Apr | 0 of 3 | 0 of 3 |
| 14-Apr | 11 of 11 | 73 of 73 |
| 15-Apr | 6 of 6 | 59 of 59 |
| 16-Apr | 2 of 2 | 10 of 10 |
| 20-Apr | 2 of 2 | 9 of 9 |
| 21-Apr | 4 of 7 | 45 of 120 |
| 22-Apr | 3 of 8 | 57 of 107 |
| 23-Apr | 9 of 9 | 75 of 75 |
| 25-Apr | 5 of 5 | 50 of 50 |
| 28-Apr | 2 of 2 | 25 of 25 |
| 30-Apr | 4 of 5 | 52 of 53 |
| **Totals** | **63 of 75** | **706 of 835** |
| | **84.00%** | **84.50%** |

| Date | Trades | Contracts |
|------|--------|-----------|
| 1-May | 7 of 7 | 75 of 75 |
| 4-May | 5 of 5 | 35 of 35 |
| 5-May | 1 of 1 | 25 of 25 |
| 6-May | 3 of 4 | 75 of 100 |
| 7-May | 4 of 4 | 50 of 50 |
| 8-May | 0 of 1 | 0 of 25 |
| 11-May | 4 of 4 | 30 of 30 |
| 12-May | 5 of 6 | 45 of 50 |
| 13-May | 1 of 1 | 25 of 25 |
| 15-May | 1 of 1 | 25 of 25 |
| 19-May | 1 of 1 | 22 of 22 |
| 20-May | 6 of 16 | 122 of 201 |
| 21-May | 9 of 10 | 115 of 125 |
| 26-May | 2 of 2 | 25 of 25 |
| 27-May | 2 of 2 | 25 of 25 |
| 28-May | 3 of 3 | 72 of 72 |
| **Totals** | **54 of 68** | **766 of 910** |
| | **79.40%** | **84.10%** |

| Date | Trades | Contracts |
|------|--------|-----------|
| 1-Jun | 2 of 2 | 25 of 25 |
| 2-Jun | 2 of 2 | 50 of 50 |
| 3-Jun | 2 of 2 | 50 of 50 |
| 4-Jun | 2 of 2 | 25 of 25 |
| 8-Jun | 1 of 1 | 25 of 25 |
| 10-Jun | 3 of 4 | 15 of 25 |
| 12-Jun | 1 of 1 | 25 of 25 |

| Date | Trades | Contracts |
|---|---|---|
| 16-Jun | 1 of 3 | 25 of 25 |
| 17-Jun | 1 of 1 | 25 of 25 |
| 18-Jun | 0 of 2 | 0 of 25 |
| 22-Jun | 4 of 5 | 20 of 25 |
| 23-Jun | 3 of 6 | 37 of 50 |
| 24-Jun | 3 of 3 | 25 of 25 |
| 25-Jun | 1 of 1 | 25 of 25 |
| 30-Jun | 1 of 1 | 25 of 25 |
| **Totals** | **26 of 36** | **397 of 450** |
| | **72.20%** | **88.20%** |

| Date | Trades | Contracts |
|---|---|---|
| 2-Jul | 0 OF 2 | 0 OF 25 |
| 6-Jul | 12 of 12 | 102 of 102 |
| 7-Jul | 5 of 5 | 70 of 70 |
| 20-Jul | 3 of 3 | 30 of 30 |
| 21-Jul | 3 of 4 | 90 of 100 |
| 23-Jul | 0 of 2 | 0 of 20 |
| 27-Jul | 4 of 4 | 50 of 50 |
| 28-Jul | 4 of 4 | 6 1of 61 |
| 30-Jul | 3 of 3 | 25 of 25 |
| 31-Jul | 3 of 4 | 71 of 86 |
| **Totals** | **37 of 43** | **499 of 569** |
| | **86.00%** | **87.70%** |

| Date | Trades | Contracts |
|---|---|---|
| 3-Aug | 2 of 4 | 35 of 41 |
| 4-Aug | 1 of 1 | 50 of 50 |
| 7-Aug | 3 of 7 | 15 of 50 |
| 12-Aug | 4 of 4 | 70 of 70 |
| 17-Aug | 5 of 5 | 35 of 35 |
| 18-Aug | 1 of 1 | 35 of 35 |
| 19-Aug | 7 of 7 | 50 of 50 |
| 21-Aug | 4 of 4 | 111 of 111 |
| 27-Aug | 1 of 1 | 50 of 50 |
| 31-Aug | 2 of 2 | 50 of 50 |
| **Totals** | **30 of 36** | **501 of 542** |
| | **83.30%** | **92.40%** |

| Date | Trades | Contracts |
|---|---|---|
| 1-Sep | 2 of 2 | 34 of 34 |
| 2-Sep | 2 of 2 | 50 of 50 |
| 3-Sep | 2 of 2 | 50 of 50 |
| 9-Sep | 1 of 2 | 25 of 27 |
| 10-Sep | 0 of 5 | 0 of 75 |
| 14-Sep | 0 of 1 | 0 of 1 |
| 15-Sep | 3 of 3 | 29 of 29 |
| 17-Sep | 3 of 3 | 30 of 30 |
| 18-Sep | 3 of 3 | 30 of 30 |

| Date | Trades | Contracts |
|---|---|---|
| 24-Sep | 4 of 4 | 35 of 35 |
| 25-Sep | 2 of 2 | 50 of 50 |
| 28-Sep | 1 of 1 | 25 of 25 |
| 29-Sep | 1 of 1 | 25 of 25 |
| | | |
| **Totals** | **26 of 33** | **433 of 508** |
| | **78.70%** | **85.20%** |

**EXHIBIT 8**

**Sources Used to Construct the Datasets**

| Dataset | Source |
|---|---|
| Client_list | Plaintiff's Responses and Objections to Defendants' Second Set of Interrogatories to Plaintiff (Revised).PDF |
| Prop_list | Complaint as filed.PDF |
| All_client_trades | Trade ticket PDF files (Devon and Mizuho trades)<br>60629001 - Suspense Account.txt (MF Global's electronic trading records)<br>Trade prices and lot sizes were also checked against the Master Allocation Spreadsheet files. |
| All_prop_trades | Trade ticket PDF files (Devon and Mizuho trades)<br>29060006 - Proprietary Account.txt (MF Global's electronic trading records) |
| **All_trades** | **This is the dataset that was used to perform all of the analysis.**<br>The dataset combines all_client_trades and all_prop_trades into one final dataset. Thus, the sources are:<br>Trade ticket PDF files (Devon and Mizuho trades)<br>60629001 - Suspense Account.txt (MF Global's electronic trading records)<br>29060006 - Proprietary Account.txt (MF Global's electronic trading records) |



DEPOSITION
EXHIBIT
Harris 8
1/10/14

**Sample Description**

The prop_list and client_list SAS files contain all trades identified in the compliant (prop_list) and the file titled "Plaintiff's Responses and Objections to Defendants' Second Set of Interrogatories to Plaintiff (Revised)" (client_list). For the analysis, I used these lists of trades and added information from each trade ticket associated with that trade. Sample sizes in the analysis are different from the client_list and prop_list files because the final dataset I constructed required legible timestamps on the physical trade tickets. Trades with illegible timestamps are therefore not in the all_prop_trades or all_client_trades datasets and are not included in the analysis. Note that trades through XFA have no timestamps so these are not in the analysis. In addition, trades 4 and 18 for the proprietary account are through XFA and are also options that expired on the same day. These trades do not represent a same day purchase and sale and are not included in the analysis. I could not locate trade tickets for a few of the trades, so these were excluded from the final sample as well. Finally, trade number 49 for the proprietary account was not profitable so this was excluded from the analysis.

Two main categories of results are presented: Holding Time and Lot Size. Holding times are computed as the minutes or hours between the first and last trade of a given contract on a given day. If there are multiple timestamps on the physical trade tickets, the latest timestamp is used. If the trades are through MF Global, the time that is listed when the action variable equals "Fill" is used. Lot sizes are computed as the minimum of the total number of buys and the total number of sales of a given contract in a given day. Within the holding time and lot size categories, several types of analysis are performed. The sample sizes differ for each type of analysis. The reasons are listed in the table below.

| Type of Analysis | Why Sample Size is Different from Pooled Analysis |
|---|---|
| Contract type | N/A (not different) |
| By day of the week | The proprietary account only has one trade that began on a Sunday so tests cannot be performed. |
| By broker | Some trades are through multiple brokers and are therefore excluded; there are no proprietary account trades through Devon so the customer account trades have no comparison. |
| Round turn trades | Not all trades are round turn. |

EXHIBIT 9



.3     **821**     **XFA**     **821**     82

Acct. No.  408-     Firm No. _____     Sub Acct. No.  Q 0000

| BUY | | | | | SELL | | | |
|---|---|---|---|---|---|---|---|---|
| CALL | | | | | CALL | | 588 | 71 00 | 50 |
| | QUANTITY | CONTRACT/MONTH | STRIKE | PREMIUM | | QUANTITY | CONTRACT/MONTH | STRIKE | PREMIUM |
| PUT | | | | | PUT | 396 | | | |
| CON CXL | | | | | CON CXL | | | | |

CME 16 OCT 08 10:19:20

INITIAL     CLOSING          INITIAL     CLOSING     XF

QUID-XFA-0000001.0037

EXHIBIT 12

DEPOSITION EXHIBIT
[PENGAD 800-631-6989]

**Trade 1**

| Acct | Date | Time | Exch | Source | | Order # | Action | B/S | Qty | | | Price | Price2 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 70313 | 15-Oct-08 | 10:09:49 | CME | From Client | OK | 8645971 | Enter | B | 25 | MINI | S&P | 956.00 | | Limit | DNEWELL | 60629001 |
| 70313 | 15-Oct-08 | 17:10:09 | CME | From TxServer | OK | 8645971 | Enter | B | 25 | MINI | S&P | 956.00 | | Limit | DNEWELL | 60629001 |
| 70313 | 15-Oct-08 | 17:10:09 | CME | To Exchange | OK | 8645971 | Enter | B | 25 | MINI | S&P | 956.00 | | Limit | DNEWELL | 60629001 |
| 70313 | 15-Oct-08 | 17:10:09 | CME | From Exch | OK | 8645971 | Enter | B | 25 | MINI | S&P | 956.00 | | Limit | DNEWELL | 60629001 |
| 70313 | 15-Oct-08 | 17:10:09 | CME | To Client | OK | 8645971 | Enter | B | 25 | MINI | S&P | 956.00 | | Limit | DNEWELL | 60629001 |
| 70314 | 15-Oct-08 | 17:10:09 | CME | From Exch | OK | 8645971 | Fill | B | 6 | MINI | S&P | | 955.50 | | DNEWELL | 60629001 |
| 70315 | 15-Oct-08 | 17:10:09 | CME | From Exch | OK | 8645971 | Fill | B | 3 | MINI | S&P | | 955.50 | | DNEWELL | 60629001 |
| 70316 | 15-Oct-08 | 17:10:09 | CME | From Exch | OK | 8645971 | Fill | B | 3 | MINI | S&P | | 955.50 | | DNEWELL | 60629001 |
| 70317 | 15-Oct-08 | 17:10:09 | CME | From Exch | OK | 8645971 | Fill | B | 3 | MINI | S&P | | 955.50 | | DNEWELL | 60629001 |
| 70318 | 15-Oct-08 | 17:10:10 | CME | From Exch | OK | 8645971 | Fill | B | 3 | MINI | S&P | | 955.50 | | DNEWELL | 60629001 |
| 70322 | 15-Oct-08 | 17:10:10 | CME | From Exch | OK | 8645971 | Fill | B | 7 | MINI | S&P | | 955.75 | | DNEWELL | 60629001 |
| 72357 | 15-Oct-08 | 10:22:10 | CME | From Client | OK | 8645972 | Enter | S | 25 | MINI | S&P | 956.25 | | Limit | DNEWELL | 60629001 |
| 72357 | 15-Oct-08 | 17:22:29 | CME | From TxServer | OK | 8645972 | Enter | S | 25 | MINI | S&P | 956.25 | | Limit | DNEWELL | 60629001 |
| 72357 | 15-Oct-08 | 17:22:29 | CME | To Exchange | OK | 8645972 | Enter | S | 25 | MINI | S&P | 956.25 | | Limit | DNEWELL | 60629001 |
| 72357 | 15-Oct-08 | 17:22:29 | CME | From Exch | OK | 8645972 | Enter | S | 25 | MINI | S&P | 956.25 | | Limit | DNEWELL | 60629001 |
| 72357 | 15-Oct-08 | 17:22:29 | CME | To Client | OK | 8645972 | Enter | S | 25 | MINI | S&P | 956.25 | | Limit | DNEWELL | 60629001 |
| 72402 | 15-Oct-08 | 17:23:01 | CME | From Exch | OK | 8645972 | Fill | S | 2 | MINI | S&P | | 956.25 | | DNEWELL | 60629001 |
| 72403 | 15-Oct-08 | 17:23:01 | CME | From Exch | OK | 8645972 | Fill | S | 5 | MINI | S&P | | 956.25 | | DNEWELL | 60629001 |
| 72405 | 15-Oct-08 | 17:23:01 | CME | From Exch | OK | 8645972 | Fill | S | 5 | MINI | S&P | | 956.25 | | DNEWELL | 60629001 |
| 72406 | 15-Oct-08 | 17:23:02 | CME | From Exch | OK | 8645972 | Fill | S | 10 | MINI | S&P | | 956.25 | | DNEWELL | 60629001 |
| 72407 | 15-Oct-08 | 17:23:02 | CME | From Exch | OK | 8645972 | Fill | S | 1 | MINI | S&P | | 956.25 | | DNEWELL | 60629001 |
| 72409 | 15-Oct-08 | 17:23:04 | CME | From Exch | OK | 8645972 | Fill | S | 1 | MINI | S&P | | 956.25 | | DNEWELL | 60629001 |
| 72413 | 15-Oct-08 | 17:23:05 | CME | From Exch | OK | 8645972 | Fill | S | 1 | MINI | S&P | | 956.25 | | DNEWELL | 60629001 |
| 90259 | 15-Oct-08 | 12:38:51 | CME | From Client | OK | 8645973 | Enter | S | 25 | MINI | S&P | 934.25 | | Limit | DNEWELL | 60629001 |
| 90259 | 15-Oct-08 | 19:39:11 | CME | From TxServer | OK | 8645973 | Enter | S | 25 | MINI | S&P | 934.25 | | Limit | DNEWELL | 60629001 |
| 90259 | 15-Oct-08 | 19:39:11 | CME | To Exchange | OK | 8645973 | Enter | S | 25 | MINI | S&P | 934.25 | | Limit | DNEWELL | 60629001 |
| 90259 | 15-Oct-08 | 19:39:11 | CME | From Exch | OK | 8645973 | Enter | S | 25 | MINI | S&P | 934.25 | | Limit | DNEWELL | 60629001 |
| 90259 | 15-Oct-08 | 19:39:11 | CME | To Client | OK | 8645973 | Enter | S | 25 | MINI | S&P | 934.25 | | Limit | DNEWELL | 60629001 |
| 90266 | 15-Oct-08 | 19:39:13 | CME | From Exch | OK | 8645973 | Fill | S | 19 | MINI | S&P | | 934.25 | | DNEWELL | 60629001 |
| 90267 | 15-Oct-08 | 19:39:13 | CME | From Exch | OK | 8645973 | Fill | S | 6 | MINI | S&P | | 934.25 | | DNEWELL | 60629001 |
| 90440 | 15-Oct-08 | 12:40:14 | CME | From Client | OK | 8645974 | Enter | B | 25 | MINI | S&P | 933.50 | | Limit | DNEWELL | 60629001 |
| 90440 | 15-Oct-08 | 19:40:34 | CME | From TxServer | OK | 8645974 | Enter | B | 25 | MINI | S&P | 933.50 | | Limit | DNEWELL | 60629001 |

**Trade 1**

| Account | Date | Time | Exch | Routing | Status | Order | Action | B/S | Qty | | | Price | Fill | Limit | User | ID |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 90440 | 15-Oct-08 | 19:40:34 | CME | To Exchange | OK | 8645974 | Enter | B | 25 | MINI | S&P | 933.50 | | Limit | DNEWELL | 60629001 |
| 90440 | 15-Oct-08 | 19:40:34 | CME | From Exch | OK | 8645974 | Enter | B | 25 | MINI | S&P | 933.50 | | Limit | DNEWELL | 60629001 |
| 90440 | 15-Oct-08 | 19:40:34 | CME | To Client | OK | 8645974 | Enter | B | 25 | MINI | S&P | 933.50 | | Limit | DNEWELL | 60629001 |
| 90448 | 15-Oct-08 | 19:40:35 | CME | From Exch | OK | 8645974 | Fill | B | 14 | MINI | S&P | | 933.50 | | DNEWELL | 60629001 |
| 90449 | 15-Oct-08 | 19:40:35 | CME | From Exch | OK | 8645974 | Fill | B | 11 | MINI | S&P | | 933.50 | | DNEWELL | 60629001 |
| 90797 | 15-Oct-08 | 12:42:21 | CME | From Client | OK | 8645975 | Enter | S | 25 | MINI | S&P | 936.00 | | Limit | DNEWELL | 60629001 |
| 90797 | 15-Oct-08 | 19:42:41 | CME | From TxServer | OK | 8645975 | Enter | S | 25 | MINI | S&P | 936.00 | | Limit | DNEWELL | 60629001 |
| 90797 | 15-Oct-08 | 19:42:41 | CME | To Exchange | OK | 8645975 | Enter | S | 25 | MINI | S&P | 936.00 | | Limit | DNEWELL | 60629001 |
| 90797 | 15-Oct-08 | 19:42:41 | CME | From Exch | OK | 8645975 | Enter | S | 25 | MINI | S&P | 936.00 | | Limit | DNEWELL | 60629001 |
| 90797 | 15-Oct-08 | 19:42:41 | CME | To Client | OK | 8645975 | Enter | S | 25 | MINI | S&P | 936.00 | | Limit | DNEWELL | 60629001 |
| 90899 | 15-Oct-08 | 19:43:25 | CME | From Exch | OK | 8645975 | Fill | S | 25 | MINI | S&P | | 936.00 | | DNEWELL | 60629001 |
| 90992 | 15-Oct-08 | 12:43:32 | CME | From Client | OK | 8645976 | Enter | B | 25 | MINI | S&P | 934.00 | | Limit | DNEWELL | 60629001 |
| 90992 | 15-Oct-08 | 19:43:51 | CME | From TxServer | OK | 8645976 | Enter | B | 25 | MINI | S&P | 934.00 | | Limit | DNEWELL | 60629001 |
| 90992 | 15-Oct-08 | 19:43:51 | CME | To Exchange | OK | 8645976 | Enter | B | 25 | MINI | S&P | 934.00 | | Limit | DNEWELL | 60629001 |
| 90992 | 15-Oct-08 | 19:43:51 | CME | From Exch | OK | 8645976 | Enter | B | 25 | MINI | S&P | 934.00 | | Limit | DNEWELL | 60629001 |
| 90992 | 15-Oct-08 | 19:43:51 | CME | To Client | OK | 8645976 | Enter | B | 25 | MINI | S&P | 934.00 | | Limit | DNEWELL | 60629001 |
| 90998 | 15-Oct-08 | 19:44:01 | CME | From Exch | OK | 8645976 | Fill | B | 25 | MINI | S&P | | 934.00 | | DNEWELL | 60629001 |
| 92885 | 15-Oct-08 | 13:05:13 | CME | From Client | OK | 8645977 | Enter | B | 25 | MINI | S&P | 930.25 | | Limit | DNEWELL | 60629001 |
| 92885 | 15-Oct-08 | 20:05:33 | CME | From TxServer | OK | 8645977 | Enter | B | 25 | MINI | S&P | 930.25 | | Limit | DNEWELL | 60629001 |
| 92885 | 15-Oct-08 | 20:05:33 | CME | To Exchange | OK | 8645977 | Enter | B | 25 | MINI | S&P | 930.25 | | Limit | DNEWELL | 60629001 |
| 92885 | 15-Oct-08 | 20:05:33 | CME | From Exch | OK | 8645977 | Enter | B | 25 | MINI | S&P | 930.25 | | Limit | DNEWELL | 60629001 |
| 92885 | 15-Oct-08 | 20:05:33 | CME | To Client | OK | 8645977 | Enter | B | 25 | MINI | S&P | 930.25 | | Limit | DNEWELL | 60629001 |
| 92886 | 15-Oct-08 | 20:05:33 | CME | From Exch | OK | 8645977 | Fill | B | 1 | MINI | S&P | | 930.00 | | DNEWELL | 60629001 |
| 92887 | 15-Oct-08 | 20:05:33 | CME | From Exch | OK | 8645977 | Fill | B | 2 | MINI | S&P | | 930.00 | | DNEWELL | 60629001 |
| 92888 | 15-Oct-08 | 20:05:33 | CME | From Exch | OK | 8645977 | Fill | B | 10 | MINI | S&P | | 930.00 | | DNEWELL | 60629001 |
| 92889 | 15-Oct-08 | 20:05:33 | CME | From Exch | OK | 8645977 | Fill | B | 1 | MINI | S&P | | 930.00 | | DNEWELL | 60629001 |
| 92890 | 15-Oct-08 | 20:05:33 | CME | From Exch | OK | 8645977 | Fill | B | 1 | MINI | S&P | | 930.00 | | DNEWELL | 60629001 |
| 92891 | 15-Oct-08 | 20:05:33 | CME | From Exch | OK | 8645977 | Fill | B | 10 | MINI | S&P | | 930.25 | | DNEWELL | 60629001 |
| 92906 | 15-Oct-08 | 13:05:16 | CME | From Client | OK | 8645978 | Enter | B | 25 | MINI | S&P | 930.00 | | Limit | DNEWELL | 60629001 |
| 92906 | 15-Oct-08 | 20:05:36 | CME | From TxServer | OK | 8645978 | Enter | B | 25 | MINI | S&P | 930.00 | | Limit | DNEWELL | 60629001 |
| 92906 | 15-Oct-08 | 20:05:36 | CME | To Exchange | OK | 8645978 | Enter | B | 25 | MINI | S&P | 930.00 | | Limit | DNEWELL | 60629001 |
| 92906 | 15-Oct-08 | 20:05:36 | CME | From Exch | OK | 8645978 | Enter | B | 25 | MINI | S&P | 930.00 | | Limit | DNEWELL | 60629001 |

**Trade 1**

| ID | Date | Time | Exch | Route | Status | Order# | Type | B/S | Qty | | | Price | Price | Limit | User | Account |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 92906 | 15-Oct-08 | 20:05:36 | CME | To Client | OK | 8645978 | Enter | B | 25 | MINI | S&P | 930.00 | | | DNEWELL | 60629001 |
| 92907 | 15-Oct-08 | 20:05:36 | CME | From Exch | OK | 8645978 | Fill | B | 21 | MINI | S&P | | 930.00 | | DNEWELL | 60629001 |
| 92908 | 15-Oct-08 | 20:05:36 | CME | From Exch | OK | 8645978 | Fill | B | 3 | MINI | S&P | | 930.00 | | DNEWELL | 60629001 |
| 92909 | 15-Oct-08 | 20:05:36 | CME | From Exch | OK | 8645978 | Fill | B | 1 | MINI | S&P | | 930.00 | | DNEWELL | 60629001 |
| 93157 | 15-Oct-08 | 13:06:47 | CME | From Client | OK | 8645979 | Enter | S | 25 | MINI | S&P | 932.25 | | Limit | DNEWELL | 60629001 |
| 93157 | 15-Oct-08 | 20:07:07 | CME | From TxServer | OK | 8645979 | Enter | S | 25 | MINI | S&P | 932.25 | | Limit | DNEWELL | 60629001 |
| 93157 | 15-Oct-08 | 20:07:07 | CME | To Exchange | OK | 8645979 | Enter | S | 25 | MINI | S&P | 932.25 | | Limit | DNEWELL | 60629001 |
| 93157 | 15-Oct-08 | 20:07:07 | CME | From Exch | OK | 8645979 | Enter | S | 25 | MINI | S&P | 932.25 | | Limit | DNEWELL | 60629001 |
| 93157 | 15-Oct-08 | 20:07:07 | CME | To Client | OK | 8645979 | Enter | S | 25 | MINI | S&P | 932.25 | | Limit | DNEWELL | 60629001 |
| 93158 | 15-Oct-08 | 20:07:07 | CME | From Exch | OK | 8645979 | Fill | S | 17 | MINI | S&P | | 932.50 | | DNEWELL | 60629001 |
| 93159 | 15-Oct-08 | 20:07:07 | CME | From Exch | OK | 8645979 | Fill | S | 3 | MINI | S&P | | 932.50 | | DNEWELL | 60629001 |
| 93160 | 15-Oct-08 | 20:07:07 | CME | From Exch | OK | 8645979 | Fill | S | 3 | MINI | S&P | | 932.50 | | DNEWELL | 60629001 |
| 93161 | 15-Oct-08 | 20:07:07 | CME | From Exch | OK | 8645979 | Fill | S | 2 | MINI | S&P | | 932.50 | | DNEWELL | 60629001 |
| 93292 | 15-Oct-08 | 13:08:38 | CME | From Client | OK | 8645980 | Enter | S | 25 | MINI | S&P | 931.00 | | Limit | DNEWELL | 60629001 |
| 93292 | 15-Oct-08 | 20:08:58 | CME | From TxServer | OK | 8645980 | Enter | S | 25 | MINI | S&P | 931.00 | | Limit | DNEWELL | 60629001 |
| 93292 | 15-Oct-08 | 20:08:58 | CME | To Exchange | OK | 8645980 | Enter | S | 25 | MINI | S&P | 931.00 | | Limit | DNEWELL | 60629001 |
| 93292 | 15-Oct-08 | 20:08:58 | CME | From Exch | OK | 8645980 | Enter | S | 25 | MINI | S&P | 931.00 | | Limit | DNEWELL | 60629001 |
| 93292 | 15-Oct-08 | 20:08:58 | CME | To Client | OK | 8645980 | Enter | S | 25 | MINI | S&P | 931.00 | | Limit | DNEWELL | 60629001 |
| 93293 | 15-Oct-08 | 20:08:58 | CME | From Exch | OK | 8645980 | Fill | S | 25 | MINI | S&P | | 931.00 | | DNEWELL | 60629001 |
| 95886 | 15-Oct-08 | 13:26:00 | CME | From Client | OK | 8647691 | Enter | B | 25 | MINI | S&P | 936.75 | | Limit | DNEWELL | 60629001 |
| 95886 | 15-Oct-08 | 20:26:20 | CME | From TxServer | OK | 8647691 | Enter | B | 25 | MINI | S&P | 936.75 | | Limit | DNEWELL | 60629001 |
| 95886 | 15-Oct-08 | 20:26:20 | CME | To Exchange | OK | 8647691 | Enter | B | 25 | MINI | S&P | 936.75 | | Limit | DNEWELL | 60629001 |
| 95886 | 15-Oct-08 | 20:26:20 | CME | From Exch | OK | 8647691 | Enter | B | 25 | MINI | S&P | 936.75 | | Limit | DNEWELL | 60629001 |
| 95886 | 15-Oct-08 | 20:26:20 | CME | To Client | OK | 8647691 | Enter | B | 25 | MINI | S&P | 936.75 | | Limit | DNEWELL | 60629001 |
| 95888 | 15-Oct-08 | 20:26:20 | CME | From Exch | OK | 8647691 | Fill | B | 2 | MINI | S&P | | 936.75 | | DNEWELL | 60629001 |
| 95889 | 15-Oct-08 | 20:26:20 | CME | From Exch | OK | 8647691 | Fill | B | 1 | MINI | S&P | | 936.75 | | DNEWELL | 60629001 |
| 95890 | 15-Oct-08 | 20:26:20 | CME | From Exch | OK | 8647691 | Fill | B | 4 | MINI | S&P | | 936.75 | | DNEWELL | 60629001 |
| 95891 | 15-Oct-08 | 20:26:20 | CME | From Exch | OK | 8647691 | Fill | B | 1 | MINI | S&P | | 936.75 | | DNEWELL | 60629001 |
| 95892 | 15-Oct-08 | 20:26:21 | CME | From Exch | OK | 8647691 | Fill | B | 2 | MINI | S&P | | 936.75 | | DNEWELL | 60629001 |
| 95893 | 15-Oct-08 | 20:26:21 | CME | From Exch | OK | 8647691 | Fill | B | 2 | MINI | S&P | | 936.75 | | DNEWELL | 60629001 |
| 95896 | 15-Oct-08 | 20:26:21 | CME | From Exch | OK | 8647691 | Fill | B | 2 | MINI | S&P | | 936.75 | | DNEWELL | 60629001 |
| 95898 | 15-Oct-08 | 20:26:21 | CME | From Exch | OK | 8647691 | Fill | B | 1 | MINI | S&P | | 936.75 | | DNEWELL | 60629001 |

**Trade 1**

| 95899 | 15-Oct-08 | 20:26:21 | CME | From Exch | OK | 8647691 | Fill | B | 5 | MINI | S&P | | 936.75 | | DNEWELL | 60629001 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 95900 | 15-Oct-08 | 20:26:21 | CME | From Exch | OK | 8647691 | Fill | B | 1 | MINI | S&P | | 936.75 | | DNEWELL | 60629001 |
| 95901 | 15-Oct-08 | 20:26:21 | CME | From Client | OK | 8647691 | Fill | B | 4 | MINI | S&P | | 936.75 | | DNEWELL | 60629001 |
| 96321 | 15-Oct-08 | 13:29:22 | CME | From Client | OK | 8647692 | Enter | B | 25 | MINI | S&P | 936.00 | | Limit | DNEWELL | 60629001 |
| 96321 | 15-Oct-08 | 20:29:42 | CME | From TxServer | OK | 8647692 | Enter | B | 25 | MINI | S&P | 936.00 | | Limit | DNEWELL | 60629001 |
| 96321 | 15-Oct-08 | 20:29:42 | CME | To Exchange | OK | 8647692 | Enter | B | 25 | MINI | S&P | 936.00 | | Limit | DNEWELL | 60629001 |
| 96321 | 15-Oct-08 | 20:29:42 | CME | From Exch | OK | 8647692 | Enter | B | 25 | MINI | S&P | 936.00 | | Limit | DNEWELL | 60629001 |
| 96321 | 15-Oct-08 | 20:29:42 | CME | To Client | OK | 8647692 | Enter | B | 25 | MINI | S&P | 936.00 | | Limit | DNEWELL | 60629001 |
| 96327 | 15-Oct-08 | 13:29:28 | CME | From Client | OK | 8647693 | Enter | B | 25 | MINI | S&P | 937.25 | | Limit | DNEWELL | 60629001 |
| 96327 | 15-Oct-08 | 20:29:48 | CME | From TxServer | OK | 8647693 | Enter | B | 25 | MINI | S&P | 937.25 | | Limit | DNEWELL | 60629001 |
| 96327 | 15-Oct-08 | 20:29:48 | CME | To Exchange | OK | 8647693 | Enter | B | 25 | MINI | S&P | 937.25 | | Limit | DNEWELL | 60629001 |
| 96327 | 15-Oct-08 | 20:29:48 | CME | From Exch | OK | 8647693 | Enter | B | 25 | MINI | S&P | 937.25 | | Limit | DNEWELL | 60629001 |
| 96327 | 15-Oct-08 | 20:29:48 | CME | To Client | OK | 8647693 | Enter | B | 25 | MINI | S&P | 937.25 | | Limit | DNEWELL | 60629001 |
| 96328 | 15-Oct-08 | 20:29:48 | CME | From Exch | OK | 8647693 | Fill | B | 2 | MINI | S&P | | 937.25 | | DNEWELL | 60629001 |
| 96329 | 15-Oct-08 | 20:29:48 | CME | From Exch | OK | 8647693 | Fill | B | 23 | MINI | S&P | | 937.25 | | DNEWELL | 60629001 |
| 96335 | 15-Oct-08 | 13:29:30 | CME | From Client | OK | 8647692 | Cancel | B | 0 | MINI | S&P | 936.00 | | | DNEWELL | 60629001 |
| 96335 | 15-Oct-08 | 20:29:50 | CME | From TxServer | OK | 8647692 | Cancel | B | 0 | MINI | S&P | 936.00 | | | DNEWELL | 60629001 |
| 96335 | 15-Oct-08 | 20:29:50 | CME | To Exchange | OK | 8647692 | Cancel | B | 0 | MINI | S&P | 936.00 | | | DNEWELL | 60629001 |
| 96335 | 15-Oct-08 | 20:29:50 | CME | From Exch | OK | 8647692 | Cancel | B | 0 | MINI | S&P | 936.00 | | | DNEWELL | 60629001 |
| 96335 | 15-Oct-08 | 20:29:50 | CME | To Client | OK | 8647692 | Cancel | B | 0 | MINI | S&P | 936.00 | | | DNEWELL | 60629001 |
| 99258 | 15-Oct-08 | 13:58:37 | CME | From Client | OK | 8647694 | Enter | S | 25 | MINI | S&P | 941.00 | | Limit | DNEWELL | 60629001 |
| 99258 | 15-Oct-08 | 20:58:57 | CME | From TxServer | OK | 8647694 | Enter | S | 25 | MINI | S&P | 941.00 | | Limit | DNEWELL | 60629001 |
| 99258 | 15-Oct-08 | 20:58:57 | CME | To Exchange | OK | 8647694 | Enter | S | 25 | MINI | S&P | 941.00 | | Limit | DNEWELL | 60629001 |
| 99258 | 15-Oct-08 | 20:58:57 | CME | From Exch | OK | 8647694 | Enter | S | 25 | MINI | S&P | 941.00 | | Limit | DNEWELL | 60629001 |
| 99258 | 15-Oct-08 | 20:58:57 | CME | To Client | OK | 8647694 | Enter | S | 25 | MINI | S&P | 941.00 | | Limit | DNEWELL | 60629001 |
| 99276 | 15-Oct-08 | 13:58:49 | CME | From Client | OK | 8647695 | Enter | S | 25 | MINI | S&P | 940.00 | | Limit | DNEWELL | 60629001 |
| 99276 | 15-Oct-08 | 20:59:08 | CME | From TxServer | OK | 8647695 | Enter | S | 25 | MINI | S&P | 940.00 | | Limit | DNEWELL | 60629001 |
| 99276 | 15-Oct-08 | 20:59:08 | CME | To Exchange | OK | 8647695 | Enter | S | 25 | MINI | S&P | 940.00 | | Limit | DNEWELL | 60629001 |
| 99276 | 15-Oct-08 | 20:59:08 | CME | From Exch | OK | 8647695 | Enter | S | 25 | MINI | S&P | 940.00 | | Limit | DNEWELL | 60629001 |
| 99276 | 15-Oct-08 | 20:59:08 | CME | To Client | OK | 8647695 | Enter | S | 25 | MINI | S&P | 940.00 | | Limit | DNEWELL | 60629001 |
| 99279 | 15-Oct-08 | 20:59:09 | CME | From Exch | OK | 8647695 | Fill | S | 21 | MINI | S&P | | 940.00 | | DNEWELL | 60629001 |
| 99280 | 15-Oct-08 | 20:59:09 | CME | From Exch | OK | 8647695 | Fill | S | 4 | MINI | S&P | | 940.00 | | DNEWELL | 60629001 |

**Trade 1**

| ID | Date | Time | | Route | | Order | Action | S/B | Qty | | | Price | Price 2 | | | Account |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 99338 | 15-Oct-08 | 13:59:14 | CME | From Client | OK | 8647694 | Cancel | S | 0 | MINI | S&P | 941.00 | | Limit | DNEWELL | 60629001 |
| 99338 | 15-Oct-08 | 20:59:34 | CME | From TxServer | OK | 8647694 | Cancel | S | 0 | MINI | S&P | 941.00 | | Limit | DNEWELL | 60629001 |
| 99338 | 15-Oct-08 | 20:59:34 | CME | To Exchange | OK | 8647694 | Cancel | S | 0 | MINI | S&P | 941.00 | | Limit | DNEWELL | 60629001 |
| 99338 | 15-Oct-08 | 20:59:34 | CME | From Exch | OK | 8647694 | Cancel | S | 0 | MINI | S&P | 941.00 | | Limit | DNEWELL | 60629001 |
| 99338 | 15-Oct-08 | 20:59:34 | CME | To Client | OK | 8647694 | Cancel | S | 0 | MINI | S&P | 941.00 | | Limit | DNEWELL | 60629001 |
| 100962 | 15-Oct-08 | 14:11:13 | CME | From Client | OK | 8647696 | Enter | S | 25 | MINI | S&P | 944.25 | | Limit | DNEWELL | 60629001 |
| 100962 | 15-Oct-08 | 21:11:33 | CME | From TxServer | OK | 8647696 | Enter | S | 25 | MINI | S&P | 944.25 | | Limit | DNEWELL | 60629001 |
| 100962 | 15-Oct-08 | 21:11:33 | CME | To Exchange | OK | 8647696 | Enter | S | 25 | MINI | S&P | 944.25 | | Limit | DNEWELL | 60629001 |
| 100962 | 15-Oct-08 | 21:11:33 | CME | From Exch | OK | 8647696 | Enter | S | 25 | MINI | S&P | 944.25 | | Limit | DNEWELL | 60629001 |
| 100962 | 15-Oct-08 | 21:11:33 | CME | To Client | OK | 8647696 | Enter | S | 25 | MINI | S&P | 944.25 | | Limit | DNEWELL | 60629001 |
| 100969 | 15-Oct-08 | 21:11:41 | CME | From Exch | OK | 8647696 | Fill | S | 19 | MINI | S&P | | 944.25 | | DNEWELL | 60629001 |
| 100970 | 15-Oct-08 | 21:11:42 | CME | From Exch | OK | 8647696 | Fill | S | 4 | MINI | S&P | | 944.25 | | DNEWELL | 60629001 |
| 100971 | 15-Oct-08 | 21:11:42 | CME | From Exch | OK | 8647696 | Fill | S | 2 | MINI | S&P | | 944.25 | | DNEWELL | 60629001 |
| 104713 | 15-Oct-08 | 14:52:20 | CME | From Client | OK | 8647697 | Enter | S | 25 | MINI | S&P | 922.50 | | Limit | DNEWELL | 60629001 |
| 104713 | 15-Oct-08 | 21:52:40 | CME | From TxServer | OK | 8647697 | Enter | S | 25 | MINI | S&P | 922.50 | | Limit | DNEWELL | 60629001 |
| 104713 | 15-Oct-08 | 21:52:40 | CME | To Exchange | OK | 8647697 | Enter | S | 25 | MINI | S&P | 922.50 | | Limit | DNEWELL | 60629001 |
| 104713 | 15-Oct-08 | 21:52:40 | CME | From Exch | OK | 8647697 | Enter | S | 25 | MINI | S&P | 922.50 | | Limit | DNEWELL | 60629001 |
| 104713 | 15-Oct-08 | 21:52:40 | CME | To Client | OK | 8647697 | Enter | S | 25 | MINI | S&P | 922.50 | | Limit | DNEWELL | 60629001 |
| 104762 | 15-Oct-08 | 14:52:30 | CME | From Client | OK | 8647697 | Cancel | S | 0 | MINI | S&P | 922.50 | | Limit | DNEWELL | 60629001 |
| 104762 | 15-Oct-08 | 21:52:49 | CME | From TxServer | OK | 8647697 | Cancel | S | 0 | MINI | S&P | 922.50 | | Limit | DNEWELL | 60629001 |
| 104762 | 15-Oct-08 | 21:52:49 | CME | To Exchange | OK | 8647697 | Cancel | S | 0 | MINI | S&P | 922.50 | | Limit | DNEWELL | 60629001 |
| 104762 | 15-Oct-08 | 21:52:50 | CME | From Exch | OK | 8647697 | Cancel | S | 0 | MINI | S&P | 922.50 | | Limit | DNEWELL | 60629001 |
| 104762 | 15-Oct-08 | 21:52:50 | CME | To Client | OK | 8647697 | Cancel | S | 0 | MINI | S&P | 922.50 | | Limit | DNEWELL | 60629001 |
| 104794 | 15-Oct-08 | 14:52:35 | CME | From Client | OK | 8647698 | Enter | S | 25 | MINI | S&P | 920.00 | | Limit | DNEWELL | 60629001 |
| 104794 | 15-Oct-08 | 21:52:55 | CME | From TxServer | OK | 8647698 | Enter | S | 25 | MINI | S&P | 920.00 | | Limit | DNEWELL | 60629001 |
| 104794 | 15-Oct-08 | 21:52:55 | CME | To Exchange | OK | 8647698 | Enter | S | 25 | MINI | S&P | 920.00 | | Limit | DNEWELL | 60629001 |
| 104794 | 15-Oct-08 | 21:52:55 | CME | From Exch | OK | 8647698 | Enter | S | 25 | MINI | S&P | 920.00 | | Limit | DNEWELL | 60629001 |
| 104794 | 15-Oct-08 | 21:52:55 | CME | To Client | OK | 8647698 | Enter | S | 25 | MINI | S&P | 920.00 | | Limit | DNEWELL | 60629001 |
| 104795 | 15-Oct-08 | 21:52:55 | CME | From Exch | OK | 8647698 | Fill | S | 25 | MINI | S&P | | 920.25 | | DNEWELL | 60629001 |
| 104941 | 15-Oct-08 | 14:54:06 | CME | From Client | OK | 8647699 | Enter | B | 25 | MINI | S&P | 920.00 | | Limit | DNEWELL | 60629001 |
| 104941 | 15-Oct-08 | 21:54:26 | CME | From TxServer | OK | 8647699 | Enter | B | 25 | MINI | S&P | 920.00 | | Limit | DNEWELL | 60629001 |
| 104941 | 15-Oct-08 | 21:54:26 | CME | To Exchange | OK | 8647699 | Enter | B | 25 | MINI | S&P | 920.00 | | Limit | DNEWELL | 60629001 |

**Trade 1**

| ID | Date | Time | Exch | Route | Status | Order | Action | B/S | Qty | Type | Product | Price | Fill Price | TIF | Trader | Account |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 104941 | 15-Oct-08 | 21:54:26 | CME | From Exch | OK | 8647699 | Enter | B | 25 | MINI | S&P | 920.00 | | Limit | DNEWELL | 60629001 |
| 104941 | 15-Oct-08 | 21:54:26 | CME | To Client | OK | 8647699 | Enter | B | 25 | MINI | S&P | 920.00 | | Limit | DNEWELL | 60629001 |
| 104959 | 15-Oct-08 | 21:54:36 | CME | From Exch | OK | 8647699 | Fill | B | 25 | MINI | S&P | | 920.00 | | DNEWELL | 60629001 |
| 105144 | 15-Oct-08 | 14:55:09 | CME | From Client | OK | 8647700 | Enter | S | 25 | MINI | S&P | 919.00 | | Limit | DNEWELL | 60629001 |
| 105144 | 15-Oct-08 | 21:55:29 | CME | From TxServer | OK | 8647700 | Enter | S | 25 | MINI | S&P | 919.00 | | Limit | DNEWELL | 60629001 |
| 105144 | 15-Oct-08 | 21:55:29 | CME | To Exchange | OK | 8647700 | Enter | S | 25 | MINI | S&P | 919.00 | | Limit | DNEWELL | 60629001 |
| 105144 | 15-Oct-08 | 21:55:29 | CME | From Exch | OK | 8647700 | Enter | S | 25 | MINI | S&P | 919.00 | | Limit | DNEWELL | 60629001 |
| 105144 | 15-Oct-08 | 21:55:29 | CME | To Client | OK | 8647700 | Enter | S | 25 | MINI | S&P | 919.00 | | Limit | DNEWELL | 60629001 |
| 105279 | 15-Oct-08 | 14:55:42 | CME | From Client | OK | 8647700 | Cancel | S | 0 | MINI | S&P | 919.00 | | Limit | DNEWELL | 60629001 |
| 105279 | 15-Oct-08 | 21:56:01 | CME | From TxServer | OK | 8647700 | Cancel | S | 0 | MINI | S&P | 919.00 | | Limit | DNEWELL | 60629001 |
| 105279 | 15-Oct-08 | 21:56:01 | CME | To Exchange | OK | 8647700 | Cancel | S | 0 | MINI | S&P | 919.00 | | Limit | DNEWELL | 60629001 |
| 105279 | 15-Oct-08 | 21:56:01 | CME | From Exch | OK | 8647700 | Cancel | S | 0 | MINI | S&P | 919.00 | | Limit | DNEWELL | 60629001 |
| 105279 | 15-Oct-08 | 21:56:02 | CME | From Exch | OK | 8647700 | Cancel | S | 0 | MINI | S&P | 919.00 | | Limit | DNEWELL | 60629001 |
| 105279 | 15-Oct-08 | 21:56:02 | CME | To Client | OK | 8647700 | Cancel | S | 0 | MINI | S&P | 919.00 | | Limit | DNEWELL | 60629001 |
| 105479 | 15-Oct-08 | 14:56:58 | CME | From Client | OK | 8648391 | Enter | S | 50 | MINI | S&P | 914.75 | | Limit | DNEWELL | 60629001 |
| 105479 | 15-Oct-08 | 21:57:18 | CME | From TxServer | OK | 8648391 | Enter | S | 50 | MINI | S&P | 914.75 | | Limit | DNEWELL | 60629001 |
| 105479 | 15-Oct-08 | 21:57:18 | CME | To Exchange | OK | 8648391 | Enter | S | 50 | MINI | S&P | 914.75 | | Limit | DNEWELL | 60629001 |
| 105479 | 15-Oct-08 | 21:57:18 | CME | From Exch | OK | 8648391 | Enter | S | 50 | MINI | S&P | 914.75 | | Limit | DNEWELL | 60629001 |
| 105479 | 15-Oct-08 | 21:57:18 | CME | To Client | OK | 8648391 | Enter | S | 50 | MINI | S&P | 914.75 | | Limit | DNEWELL | 60629001 |
| 105559 | 15-Oct-08 | 14:57:11 | CME | From Client | OK | 8648391 | Cancel | S | 0 | MINI | S&P | 914.75 | | Limit | DNEWELL | 60629001 |
| 105559 | 15-Oct-08 | 21:57:31 | CME | From TxServer | OK | 8648391 | Cancel | S | 0 | MINI | S&P | 914.75 | | Limit | DNEWELL | 60629001 |
| 105559 | 15-Oct-08 | 21:57:31 | CME | To Exchange | OK | 8648391 | Cancel | S | 0 | MINI | S&P | 914.75 | | Limit | DNEWELL | 60629001 |
| 105559 | 15-Oct-08 | 21:57:31 | CME | From Exch | OK | 8648391 | Cancel | S | 0 | MINI | S&P | 914.75 | | Limit | DNEWELL | 60629001 |
| 105559 | 15-Oct-08 | 21:57:31 | CME | To Client | OK | 8648391 | Cancel | S | 0 | MINI | S&P | 914.75 | | Limit | DNEWELL | 60629001 |
| 105593 | 15-Oct-08 | 14:57:16 | CME | From Client | OK | 8648392 | Enter | S | 50 | MINI | S&P | 912.25 | | Limit | DNEWELL | 60629001 |
| 105593 | 15-Oct-08 | 21:57:35 | CME | From TxServer | OK | 8648392 | Enter | S | 50 | MINI | S&P | 912.25 | | Limit | DNEWELL | 60629001 |
| 105593 | 15-Oct-08 | 21:57:35 | CME | To Exchange | OK | 8648392 | Enter | S | 50 | MINI | S&P | 912.25 | | Limit | DNEWELL | 60629001 |
| 105593 | 15-Oct-08 | 21:57:36 | CME | From Exch | OK | 8648392 | Enter | S | 50 | MINI | S&P | 912.25 | | Limit | DNEWELL | 60629001 |
| 105593 | 15-Oct-08 | 21:57:36 | CME | To Client | OK | 8648392 | Enter | S | 50 | MINI | S&P | 912.25 | | Limit | DNEWELL | 60629001 |
| 105594 | 15-Oct-08 | 21:57:36 | CME | From Exch | OK | 8648392 | Fill | S | 50 | MINI | S&P | | 912.50 | | DNEWELL | 60629001 |
| 105894 | 15-Oct-08 | 14:58:17 | CME | From Client | OK | 8648393 | Enter | B | 50 | MINI | S&P | 908.75 | | Limit | DNEWELL | 60629001 |
| 105894 | 15-Oct-08 | 21:58:37 | CME | From TxServer | OK | 8648393 | Enter | B | 50 | MINI | S&P | 908.75 | | Limit | DNEWELL | 60629001 |
| 105894 | 15-Oct-08 | 21:58:37 | CME | To Exchange | OK | 8648393 | Enter | B | 50 | MINI | S&P | 908.75 | | Limit | DNEWELL | 60629001 |

**Trade 1**

| | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 105894 | 15-Oct-08 | 21:58:37 | CME | From Exch | OK | 8648393 | Enter | B | 50 | MINI | S&P | 908.75 | | Limit | DNEWELL | 60629001 |
| 105894 | 15-Oct-08 | 21:58:37 | CME | To Client | OK | 8648393 | Enter | B | 50 | MINI | S&P | 908.75 | | Limit | DNEWELL | 60629001 |
| 105907 | 15-Oct-08 | 21:58:38 | CME | From Exch | OK | 8648393 | Fill | B | 1 | MINI | S&P | | 908.75 | | DNEWELL | 60629001 |
| 105909 | 15-Oct-08 | 21:58:38 | CME | From Exch | OK | 8648393 | Fill | B | 3 | MINI | S&P | | 908.75 | | DNEWELL | 60629001 |
| 105914 | 15-Oct-08 | 21:58:38 | CME | From Exch | OK | 8648393 | Fill | B | 5 | MINI | S&P | | 908.75 | | DNEWELL | 60629001 |
| 105915 | 15-Oct-08 | 21:58:39 | CME | From Exch | OK | 8648393 | Fill | B | 41 | MINI | S&P | | 908.75 | | DNEWELL | 60629001 |
| 106244 | 15-Oct-08 | 14:59:44 | CME | From Client | OK | 8648394 | Enter | S | 50 | MINI | S&P | 907.50 | | Limit | DNEWELL | 60629001 |
| 106244 | 15-Oct-08 | 22:00:04 | CME | From TxServer | OK | 8648394 | Enter | S | 50 | MINI | S&P | 907.50 | | Limit | DNEWELL | 60629001 |
| 106244 | 15-Oct-08 | 22:00:04 | CME | To Exchange | OK | 8648394 | Enter | S | 50 | MINI | S&P | 907.50 | | Limit | DNEWELL | 60629001 |
| 106244 | 15-Oct-08 | 22:00:04 | CME | From Exch | OK | 8648394 | Enter | S | 50 | MINI | S&P | 907.50 | | Limit | DNEWELL | 60629001 |
| 106244 | 15-Oct-08 | 22:00:04 | CME | To Client | OK | 8648394 | Enter | S | 50 | MINI | S&P | 907.50 | | Limit | DNEWELL | 60629001 |
| 106247 | 15-Oct-08 | 22:00:04 | CME | From Exch | OK | 8648394 | Fill | S | 50 | MINI | S&P | | 907.75 | | DNEWELL | 60629001 |
| 106591 | 15-Oct-08 | 15:01:21 | CME | From Client | OK | 8648395 | Enter | B | 50 | MINI | S&P | 906.75 | | Limit | DNEWELL | 60629001 |
| 106591 | 15-Oct-08 | 22:01:41 | CME | From TxServer | OK | 8648395 | Enter | B | 50 | MINI | S&P | 906.75 | | Limit | DNEWELL | 60629001 |
| 106591 | 15-Oct-08 | 22:01:41 | CME | To Exchange | OK | 8648395 | Enter | B | 50 | MINI | S&P | 906.75 | | Limit | DNEWELL | 60629001 |
| 106591 | 15-Oct-08 | 22:01:41 | CME | From Exch | OK | 8648395 | Enter | B | 50 | MINI | S&P | 906.75 | | Limit | DNEWELL | 60629001 |
| 106591 | 15-Oct-08 | 22:01:41 | CME | To Client | OK | 8648395 | Enter | B | 50 | MINI | S&P | 906.75 | | Limit | DNEWELL | 60629001 |
| 106616 | 15-Oct-08 | 15:01:31 | CME | From Client | OK | 8648395 | Cancel | B | 0 | MINI | S&P | 906.75 | | Limit | DNEWELL | 60629001 |
| 106616 | 15-Oct-08 | 22:01:51 | CME | From TxServer | OK | 8648395 | Cancel | B | 0 | MINI | S&P | 906.75 | | Limit | DNEWELL | 60629001 |
| 106616 | 15-Oct-08 | 22:01:51 | CME | To Exchange | OK | 8648395 | Cancel | B | 0 | MINI | S&P | 906.75 | | Limit | DNEWELL | 60629001 |
| 106616 | 15-Oct-08 | 22:01:51 | CME | From Exch | OK | 8648395 | Cancel | B | 0 | MINI | S&P | 906.75 | | Limit | DNEWELL | 60629001 |
| 106616 | 15-Oct-08 | 22:01:51 | CME | To Client | OK | 8648395 | Cancel | B | 0 | MINI | S&P | 906.75 | | Limit | DNEWELL | 60629001 |
| 106650 | 15-Oct-08 | 15:01:52 | CME | From Client | OK | 8648396 | Enter | B | 50 | MINI | S&P | 909.50 | | Limit | DNEWELL | 60629001 |
| 106650 | 15-Oct-08 | 22:02:12 | CME | From TxServer | OK | 8648396 | Enter | B | 50 | MINI | S&P | 909.50 | | Limit | DNEWELL | 60629001 |
| 106650 | 15-Oct-08 | 22:02:12 | CME | To Exchange | OK | 8648396 | Enter | B | 50 | MINI | S&P | 909.50 | | Limit | DNEWELL | 60629001 |
| 106650 | 15-Oct-08 | 22:02:12 | CME | From Exch | OK | 8648396 | Enter | B | 50 | MINI | S&P | 909.50 | | Limit | DNEWELL | 60629001 |
| 106650 | 15-Oct-08 | 22:02:12 | CME | To Client | OK | 8648396 | Enter | B | 50 | MINI | S&P | 909.50 | | Limit | DNEWELL | 60629001 |
| 106651 | 15-Oct-08 | 22:02:12 | CME | From Exch | OK | 8648396 | Fill | B | 30 | MINI | S&P | | 909.50 | | DNEWELL | 60629001 |
| 106652 | 15-Oct-08 | 22:02:12 | CME | From Exch | OK | 8648396 | Fill | B | 1 | MINI | S&P | | 909.50 | | DNEWELL | 60629001 |
| 106653 | 15-Oct-08 | 22:02:12 | CME | From Exch | OK | 8648396 | Fill | B | 1 | MINI | S&P | | 909.50 | | DNEWELL | 60629001 |
| 106654 | 15-Oct-08 | 22:02:12 | CME | From Exch | OK | 8648396 | Fill | B | 5 | MINI | S&P | | 909.50 | | DNEWELL | 60629001 |
| 106655 | 15-Oct-08 | 22:02:12 | CME | From Exch | OK | 8648396 | Fill | B | 13 | MINI | S&P | | 909.50 | | DNEWELL | 60629001 |

**EXHIBIT 16**

```
                              1_time_test_last
\ **************************************************************************
 * Mike Shafer                                                            *
 * School of Business                                                     *
 * Providence College                                                     *
 * CFTC v. Newell, et al., 12-cv-6763                                     *
 **************************************************************************;

 **************************************************************************
 * Analyze by time of last trade.                                         *
 **************************************************************************;

 * Clear out the work library;
 proc datasets lib=work kill nolist;
 quit;

 * Clear log and output from previous program;
 DM 'ODSRESULTS' CLEAR EDITOR;
 DM 'CLEAR LOG; CLEAR OUTPUT;' ;
 run;

 * Turn off date and page numbers for output;
 options nodate
                nonumber;


 **************************************************************************
 * Analyze trades by time of last trade.                                  *
 **************************************************************************;

 * Get hour of last trade;
 data time;
        set cftc.all_trades_summary;
        hour=hour(timepart(trd_last));
 run;

 * Set up categories;
 data time;
        set time;
        /*
        if 00<=hour<03  then interval='[00:00,03:00)';
        if 03<=hour<06  then interval='[04:00,06:00)';
        if 06<=hour<09  then interval='[06:00,09:00)';
        if 09<=hour<12  then interval='[09:00,12:00)';
        if 12<=hour<15  then interval='[12:00,15:00)';
        if 15<=hour<18  then interval='[15:00,18:00)';
        if 18<=hour<21  then interval='[18:00,21:00)';
        if 21<=hour<24  then interval='[21:00,00:00)';
        */
        /*
        if 00<=hour<12  then interval='[00:00,12:00)';
        if 12<=hour<18  then interval='[12:00,18:00)';
        if 18<=hour<24  then interval='[18:00,24:00)';
        */
        if 00<=hour<12  then interval='[00:00,12:00)';
        if 12<=hour<15  then interval='[12:00,15:00)';
        if 15<=hour<18  then interval='[15:00,18:00)';
        if 18<=hour<21  then interval='[18:00,21:00)';
        if 21<=hour<24  then interval='[21:00,00:00)';
 run;

 * Sort;
 proc sort data=time;
        by prop interval;
```

Page 1



DEPOSITION
EXHIBIT

Harris 16

1/10/14          KV

PENGAD 800-831-6989

```
                              1_time_test_last
run;


*******************************************************************************
* Perform t-test and Wilcoxon median test for differences in lot sizes.      *

*******************************************************************************;

* Sort;
proc sort data=time;
        by interval prop hour;
run;

* Get summary stats;
proc means data=time noprint;
        by      interval prop;
        var     lot_size;
        output  out=stats(drop=_:)
                        n=n
                        mean=mean
                        median=median;
run;

* Print;
proc print data=stats noobs;
run;

* Get ttest for different holding times;
title 'Lot Size by Time: t-Test';
proc ttest data=time;
        class   prop;
        by              interval;
        where   interval ne '[00:00,12:00)';
        var     lot_size;
run;
title;

* Get Wilcoxon Rank-Sum test and Kruskal-Wallis Test;
title 'Lot Size by Time: Wilcoxon Rank-Sum Test';
proc npar1way data=time wilcoxon;
        class   prop;
        by              interval;
        where   interval ne '[00:00,12:00)';
        var             lot_size;
run;
title;


*******************************************************************************
* Perform t-test and Wilcoxon median test for differences in holding times.  *

*******************************************************************************;

* Sort;
proc sort data=time;
        by interval prop hour;
run;

* Get summary stats;
proc means data=time noprint;
        by      interval prop;
        var     mins;
        output  out=stats(drop=_:)
                              Page 2
```

```
                              1_time_test_last
                    n=n
                    mean=mean
                    median=median;
run;

* Print;
proc print data=stats noobs;
run;

* Get ttest for different holding times;
title 'Holding Time by Time: t-Test';
proc ttest data=time;
        class   prop;
        by              interval;
        var     mins;
run;
title;

* Get Wilcoxon Rank-Sum test and Kruskal-Wallis Test;
title 'Holding Time by Time: Wilcoxon Rank-Sum Test';
proc npar1way data=time wilcoxon;
        class   prop;
        by              interval;
        var             mins;
run;
title;
```

**EXHIBIT 17**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

U.S. COMMODITY FUTURES TRADING
COMMISSION,                                    :
                                               :
                        Plaintiff,             :
                                               :
        v.                                     :        CASE NO. 12-cv-06763
                                               :
DONALD A. NEWELL AND                           :
QUIDDITY, LLC,                                 :
                                               :
                        Defendants.            :


# FINAL EXPERT REPORT OF JOHN BURNSIDE
## (Incorporates By Reference Previous Preliminary Report)


Dated: November 11, 2013



## I. QUALIFICATIONS ADDENDUM

Expanding on my qualifications as stated in my preliminary report, over the past twenty years, I have evaluated, developed and used numerous trading systems for use in trading commodity futures and option markets. I have actual experience day-trading and using trading systems based on moving averages, oscillators, momentum, and other mathematical formulas. During this time-period, I have also analyzed market fundamentals to trade both on a fundamental basis and as part of trading systems that use a combination of technical and fundamental factors. During this time-period, I have also been required to both construct and/or evaluate trading systems. I have also worked with hedgers and have, myself, actively engaged in hedging.

As a material part of my professional experience over the past twenty years I have been required to read and evaluate scores of studies that rely heavily on statistical analysis to evaluate whether technical trading systems can be used to trade profitably in various futures markets and whether specific types of technical systems can profitably forecast price movements in commodity futures and options markets.

## II. SUMMARY OF OPINION.

As I stated in my preliminary report,[1] Dr. Harris' statistical analysis is fatally flawed. I now have had the opportunity to review the underlying data and methodology utilized by Dr. Harris' and it is my opinion that Dr. Harris' report uses a severely flawed methodology.

## III. THE UNKNOWNS IN DR. HARRIS REPORT
### A. What Is A "Trade"?

As stated in my preliminary report, Dr. Harris never defines the term "trade" as used in his report. Dr. Harris apparently adopts, at least for part of his report, the same terminology as employed by the CFTC in the Compliant, *i.e.* that a "trade" is all the activity in an account in a specific commodity futures or options contract during a specific trading day.

A trade actually is the institution of a position and its subsequent liquidation by an offsetting transaction or series of transactions. For example, buying 10 futures contracts and then selling those contracts five minutes later is a trade according to futures industry custom and practice.[2] Similarly, executing an order or a series of orders to buy X contracts and then entering a single order or a series of orders for Y quantity to liquidate the position of X contracts, is a trade. And, conversely, an order to sell all 10 contracts, a day later is also a "trade." Utilizing the definition of a "trade" used by the CFTC in the Complaint as opposed to the

---

[1] I incorporate by reference my previous report in this final report.

[2] This example and the following examples assume that there is no pre-existing position in the account when the trade is executed.

futures industry's accepted definition of a trade as the initiation and liquidation of a position has a profound impact on the holding period for a "trade."

For example, Dr. Harris considers the purchase and sale of 300 futures contracts on October 15, 2008, listed as Trade 1 in paragraph 34 of the Complaint, as a single "trade" when, in actuality it is a series of 8 trades. *See* Exhibit "A" to my preliminary report. The first order in this series of trades occurs at 17:10:09 and the last order is executed at 22:02:12. Dr. Harris' methodology of considering this trading activity as a single trade would result in a holding period of over 4 hours. However, the initial position of long 25 DEC E-MINI S&P contracts was completely offset less than 13 minutes later at 17:23:01. The next position of short 25 DEC E-MINI S&P contracts was established at 19:39:13 and was offset a minute and a half later at 19:40:45. None of the positions established during this series of 8 trades was held for more than 45 minutes. Thus, the average holding period for the eight trades would be somewhere between ninety seconds and 45 minutes. Yet, using the CFTC's definition of a "trade" would establish a holding period over 5 times longer.

**B. Why Exclude Trade 49?**
Dr. Harris states that he was analyzing 66 trades allocated to Quiddity's proprietary account that the CFTC identified as "suspicious." Dr. Harris' report at paragraph 17. Dr. Harris states that he discarded Trade 49 in the CFTC's Complaint from his probability of profitability analysis of the proprietary account because, contrary to the calculation in the Complaint, the trade was unprofitable. Footnote 2 of Dr. Harris' Report. Excluding an unprofitable "trade" from the set of "suspicious" trades skews his data sample in favor of profitability.

**C. How Many Trades Did Dr. Harris Analyze?**
Dr. Harris states that he was provided with data regarding 130 "trades" considered by the CFTC as "suspicious." Dr. Harris's Report at paragraph 17. From the 130 "suspicious trades", Dr. Harris eliminated all of the "trades" executed by XFA because the trade tickets lacked time-stamps. Id. at footnote 2. Dr. Harris also states that he could not find trade tickets for an unknown number of trades, which he also excluded from his analysis. In footnote 2 of his report, Dr. Harris states that he also excluded Trade 49 in his analysis, presumably referring to Trade 49 in the table contained in par. 34 of the Complaint. However, the results detailed in paragraphs 18-21 of Dr. Harris' report are based on the analysis of 130 trades, which would include Trade 49, the XFA trades, and the unknown number of trades for which he could not locate trade tickets.

**D. What Criteria Did The CFTC Use To Identify the 130 Suspicious Trades?**
Dr. Harris states that he examined data for 2,224 "trades" and analyzed 130 (or only 5.85% of the "trades") designated by the CFTC as "suspicious." Dr. Harris' Report at paragraph 16.

Dr. Harris does not disclose the criteria the CFTC used to designate the 130 trades he analyzed as "suspicious." Nothing in the documents produced by Dr. Harris discloses the CFTC's criteria. Therefore, it is impossible to determine whether the profitability difference between the customer accounts as reflected in the 64 customer account trades and the 66 proprietary account trades analyzed is actually a function of the CFTC's selection criteria as opposed to a post-execution allocation scheme. For example, selecting one set of trades from a larger universe of trades made for an account merely to arrive at a set of trades that are 75% profitable and then selecting a subset from another account to arrive at a 50% profitability rate would result in a profitability differential solely based on the selection process. Suppose trades for two accounts, the orders for which were placed through a suspense account, are executed by flipping a coin 200 times. If a coin-flip results in "heads," five contracts of the DEC EMINI S&P contract are sold for Account A and five contracts are purchased for Account B. If a coin-flip results in "tails," five contracts are bought for Account A and five contracts are sold for Account B. The resulting positions from each of the individual trades are held for three minutes and then liquidated. The trades are then accurately allocated out of the suspense account to the respective Traders' account after the positions are liquidated and the profitability of the trades has been established. Whatever success or failure the two accounts experience is a result of chance and not a post-execution allocation scheme.

Later, 55 profitable trades and 11 unprofitable trades are selected from the 200 trades in Account A and 25 profitable trades and 39 unprofitable trades from the 200 trades in Account B. All the trades for Account A and Account B are the same size, all were held for the same period of time, all executed on the same day by the same broker, and each pair of trades was initiated at the same time.[3] The results of the analysis would be the same as that reported in paragraph 18 of Dr. Harris' Report but that result would be a function of the selection process and not the result of a post-execution allocation scheme. Any methodology that fails to test whether the CFTC's trade selection process might bias any possible results is invalid.

## IV. DR. HARRIS CALCULATION OF THE PROBABILITIES OF SUCCESS FOR THE TWO ACCOUNTS LACKS ANY JUSTIFIABLE BASIS

Dr. Harris states in paragraph 18 of his Report: "One way to objectively assign probabilities to these outcomes is to simply assume that a random trade would be profitable 50 percent of the time." As already discussed, if the trades were not randomly selected but, instead, were selected by the CFTC pursuant to some undisclosed criteria, the results of a "random" analysis of the trades would be invalid. Even if the selection criteria was without fault or bias, employing an

---

[3] These are the five variables that Dr. Harris used to analyze the 130 "suspicious" trades in his report and which he summarized in paragraph 62 of his Report ("the Dr. Harris variables").

analysis based on the results of reoccurring random phenomena cannot provide a valid measurement of the likelihood of the profitability experienced in an account or accounts in which the trading was not based on random chance.

Compounding this flawed methodology, Dr. Harris states that, because 80 of the *selected* "130 suspicious trades" were profitable and that this "presumably reflects some degree of skill" which he calculates as 61.5%. Dr. Harris' Report at paragraph 19. Once again, this 61.5% profitability level is a reflection of the subset of "suspicious" trades selected by the CFTC and not Mr. Newell's skill level, which would be reflected in the entirety of his trading over a given period of time. Moreover, the trades analyzed by Dr. Harris are overwhelmingly futures day-trades while the overwhelming number of trades placed by Mr. Newell for the customers' accounts are in options contracts and were not day-trades.

A methodology that sought to eliminate the possible "suspicious" nature of any of the trades during the relevant time-period would have used a control period to test Mr. Newell's skill level. One such control period was included in the account statements provided to Dr. Harris in the form of the futures trades cleared through MF Global. From April through September of 2009, a time-period when there is no allegation of any post-execution allocations,[4] the proprietary account engaged in 291 trades, over twice the number of "trades" analyzed by Dr. Harris. The trading during that time-period resulted in 236 profitable trades or a success rate of 81.1%. In other words, in the six months following the six-month period in the CFTC's Compliant, Mr. Newell essentially replicated the "virtually zero" probability of 83.33% profitability for his proprietary account trading that was reflected in the 66 "trades" selected by the CFTC. *See* Exhibit "A" attached.[5]


# V. A METHODOLOGY THAT BASES AN OPINION OF PROFITBILITY DIFFERENTIAL BETWEEN ACCOUNTS USING ONLY THE FIVE DR. HARRIS VARIABLES IS FUNDAMENTALLY FLAWED.

---

[4] The futures trades for the proprietary during the April to September 2009 were exclusively entered through the PATS terminal in Quiddity's office with the proprietary account designated at the time of order entry.

[5] The monthly percentage of profitability during the April through September of 2009 period based on the number of profitable trades out of trades made was:

| | |
|-----|--------|
| Apr | 84.00% |
| May | 79.40% |
| Jun | 72.20% |
| Jul | 86.00% |
| Aug | 83.30% |
| Sep | 78.70% |

As previously stated Dr. Harris tested 130 "suspicious trades" against only the five Dr. Harris variables: 1) trade size; 2) executing brokers; 3) the length of time a position was held; 4) the day of the week the trade was executed; and 5) the time of day the trade was executed. Dr. Harris' Report at paragraph 62. Dr. Harris then states that, "the profitability differences between client and proprietary trades cannot be explained by characteristics of trade size, executing broker, the time a position is held, the day of week that trades are executed or by the time of day that trades are executed" and therefore "the profitability differences between client and proprietary trades" analyzed "are almost surely the result of *ex post* assignment to different trading accounts." Dr. Harris' Report at paragraph 62. In other words, no factors other than the five Dr. Harris variables or a possible improper post-execution allocation of trades can account for the difference in profitability between *two accounts*. Dr. Harris' methodology accounts for no other variables and contains no statements regarding variables assumed to be constant for the two accounts he examined. The entirety of the "variable universe" is then contained in the five Dr. Harris variables and the possibility of improper post-execution allocation of trades between the accounts.

## A. Directional Versus Non-Directional Trading.

As I have stated previously in my preliminary report, Dr. Harris' failure to account for the possible difference in trading methodology between the customer and proprietary accounts (directional day-trading and non-directional hedging) completely invalidates his methodology.[6] As discussed below, hedge transactions are not motivated by the quest for profits; instead, hedge transactions are motivated by the desire to reduce the risk in either a cash contract position (for example grain in storage) or obligation (for example, a commitment to deliver grain) or an established futures and/or options position. Analyzing the two accounts as though both intended to profit would lead to an invalid result because the methodology of assuming identical profit motives for the trading is flawed.

Mr. Newell used a computer-based system that generated the trades made for the customer accounts. The system is a probability dependent approach to option volatility arbitrage that is systematically implemented using a specific software program with a well-defined set of rules. Mr. Newell has achieved an average annual return of approximately 10% from 2003 through 2012 for the

---

[6] Trades entered for the purpose of making a profit are directional since the market must appreciate or decline in the direction favorable to the position established for the trader to profit (or lose). Hedging transaction are non-directional trades since the initiation of the hedge accomplishes the risk adjusting purpose of the trade. The resulting profitability or loss of the hedge merely reflects whether the hedge reduced the risk (the market continued to move adversely and the hedge profit offset a portion of the loss in the primary position) or was the price of insurance (the transaction cost and any loss on the hedge position) that ultimately was not needed.

QED Customer Accounts because of the program's ability to select the initial option positions and Mr. Newell's ability to manage the risk of those positions. A table of the audited track record results for 2003 through 2010 is attached as Exhibit "B."[7]

The controlling feature of the program employed for the customer accounts was the risk management techniques employed, which, as volatility increases, requires that substantial hedging trades be made to keep risk exposure within defined limits. I have reviewed the documents produced by Dr. Harris to the Defendants' attorneys and I have been unable to discern any attempt by Dr. Harris to test, or even account for the possibility that the difference in profitability between the Quiddity customer and proprietary accounts for the trades analyzed could have resulted from different reasons for entering the respective trades, *i.e.* non-directional hedge trades in the customer and directional trades in the proprietary account.

**B. Risk Tolerance.**
Even if both accounts being analyzed were directional trading accounts, any material difference in the risk tolerance between the two accounts would result in a material difference in the profitability of the accounts.

For example, if two futures accounts were traded using difference risk tolerances any resulting difference in profitability would, according to Dr. Harris, be attributable to a measureable difference in one of more of the Dr. Harris variables or because the trades were improperly allocated post-execution.[8] None of the research papers produced by Dr. Harris provide any support for the five Dr. Harris variables being *determinative* of differences of account profitability in the

---

[7] Most of the revenue received from initiating the strategy for the customer accounts was in the form of premium received when the options positions were initiated, which occurred *prior to* October 15, 2008. The trades made after the original positions were first initiated were made to manage the risk of the overall options position in the customer accounts. Therefore, any measurement of trading in the customer accounts during the relevant time-period is a measurement of Mr. Newell's hedging "skill" and not his trading for profits "skill."

[8] Assume that Trader A and Trader B have identical risk tolerance (both would exit a losing position after the trade loses x points) and profit objectives (both would cover a profitable position after a trade gained y points). As I interpret Dr. Harris' report, if Trader A, who uses a moving average to determine his trades and Trader B, who merely flips a coin (going long when the flip resulted in "heads" and short when the flip resulted in "tails"), were to trade the same futures markets, with the same size orders, on the same day, at the same time, and with the same executing broker, there would not be a statistically significant difference in the profitability of their trading.

absence of post-execution allocation.

Assume that two accounts with the same funding execute orders to purchase or sell futures contracts at the same time and that both accounts have the same profit objective (10 points in the EMINI S&P) and risk tolerances of 3 points for Trader A and 5 points for trader B. Both traders go short one futures contract at 800. If the price rises to 803.25, Trader A is out with a loss of 3 points. If the price continues to rise to 804, Trader A has still only lost 3 points. If the price reaches 804.75 and then turns downward, never having traded above 805.00,and at some point in the market's downward progression Trader B chooses to cover the position, depending on the price that Trader B exits the position, she will have either a different or smaller loss than Trader A, experience no loss, or will experience a profit. The difference in profitability would not be "explained by 'trade size, executing broker, the time a position is held, the day of week that trades are executed" or "the time of day that the 'trades' were executed."

Even if Trader A and B have the same risk tolerance (3 points) but have different profit objectives, 10 points and 13 points, respectively, the profitability of the accounts can also differ markedly. If the price drops to 790, Trader A exits the position with a 10-point profit. If the price continues to drop to 787, Trader B exits with a 13-point profit. However, if after trading slightly below 790, the market rises, should Trader B cover the trade, she would now realize less of a profit, no profit, or even a loss depending on the price paid. Again, none of the 5 Dr. Harris variables could explain the difference in profitability between the two accounts.

## C. Trading Systems.
There are scores upon scores of different trading systems each with their own variables. While it is possible to compare trading systems that are completely computer-based and use a defined methodology expressed in formulas and algorithms, it is virtually impossible to ascertain, much less compare, the system used by professional day-traders and scalpers (such as Mr. Newell) for their proprietary accounts. Those "trading systems" are, at least partially if not wholly, in the heads of the traders who employ them. One study relied upon in the futures industry is *Foundations of Technical Analysis: Computational Algorithms, Statistical Inference, and Empirical Implementation*, Andrew W. Lo, Harry Mamaysky, and Jiang Wang, The Journal of Finance Vol. LV. No. 4, August 2000. As stated on the very first page of this study:

> Technical analysis, also known as "charting," has been a part of financial practice for many decades, but this discipline has not received the same level of academic scrutiny and acceptance as more traditional approaches such as fundamental analysis. One of the main obstacles is the highly subjective nature of technical analysis-the presence of geometric shapes in historical price charts is often in the eyes of the beholder.

Page. 1705. And, they also state:

> One of the greatest gulfs between academic finance and industry practice is the separation that exists between technical analysts and their academic critics. In contrast to fundamental analysis, which was quick to be adopted by the scholars of modern quantitative finance, technical analysis has been an orphan from the very start. It has been argued that the difference between fundamental analysis and technical analysis is not unlike the difference between astronomy and astrology. Among some circles, technical analysis is known as "voodoo finance." And in his influential book A Random Walk down Wall Street, Burton Malkiel (1996) concludes that "[u]nder scientific scrutiny, chart-reading must share a pedestal with alchemy."

Page. 1705. Mr. Newell's technical day-trading "system" was a mixture of "art" and analysis that incorporated, as with almost all professional traders, a degree of fundamental analysis and was derived from (and reflected in) his years as a successful market maker on the Chicago Board of Options Exchange.[9]

In addition to the risk and profit factors previously discussed, a commodity futures or options trader (whether trading for himself or others and whether using a computer-based system of merely one contained in his "head") must determine when to trade, at what price to enter the market, and whether to go long or short. Such a determination of when, what, and how much to trade is not dictated by the Dr. Harris variables unless that trading system is based *solely* on either the day of the week or time of day or both. For example, Trader A may use the intersection of two different moving averages based on 5 minute time intervals to determine his entry and exit prices. Trader B, who may choose to use the same moving average system, but one based 10, 15, or 30 minute pricing intervals, will have significantly different entry and exit points. Additionally, Trader A and B could use identical time-intervals but Trader A uses an exponentially weighted moving average, while Trader B uses a simple moving average. Again, the two traders will have different price entry and exit points. And, of course, traders who use other indicators (such as price and volume or momentum or oscillators, etc.) will each have different market entry points. Different market entry points will produce different results that are not attributable to either the Dr. Harris variables

---

[9]Technical traders (sometimes referred to as "chartists") and fundamentalists (sometimes referred to as arbitrageurs") view the market differently:

> Fundamentalists observe the same freely available fundamental value. Technical traders pay no attention to this value, instead relying on a variety of trading rules commonly investigated in the empirical literature.

*Market Ecologies: The Interaction and Profitability of Technical Trading Strategies*, Jackson and Ladley, working Paper No. 13/02 January 2013 at. p 2, University of Leicester, UK, Department of Economics. As this study indicates, different technical factors or systems can result in different levels of profitability

or to an improper post-execution allocation

An illustration of two simple strategies demonstrates that even strategies possessing the same risk tolerance and profit objects, as well as identical price entry points for initiating a trade, might realize wildly different trading results for reasons wholly independent of the five Dr. Harris variables or of an improper post-execution allocation scheme. First, assume, that two traders with a profit object of 8 points have correctly determined that 800 is a valid support/resistance point in an EMINI S&P contract. Trader A views 800 as resistance and a price at which to initiate a short position with a 3-point stop-loss. However, Trader B views 800 as a price that, if exceeded, signals a breakout and intends to initiate a long position at 801, also with a 3-point stop loss. The price of the EMINI S&P contract rises to 800 and Trader A sells one contract. The price continues to rise to 801 and Trader B initiates a long position. If the price rises to 809, Trader A loses 3-points (having covered his sale at 803) and Trader B makes an 8-point profit (if she sold at 809). This disparity in profitability is a result of the traders' differing perceptions regarding the importance of the EMINI S&P contract price reaching 800 and not any of the five Harris factors.

Next, assume that Trader A and Trader B have identical risk tolerances of 3-points and profit objectives 8-points. Both traders again believe that 800 is a resistance point at which to sell one EMINI S&P contract. Trader A's system calls for the sale of one contract when the price reaches 800. However, Trader B requires "confirmation" (after reaching 800 the price does not break that price level and must decline X points and then once again rise to 800) before initiating a short position. Now, assume that the price reaches 800 and Trader A sells one contract short. Whether the accounts will have identical or even similar results is dependent on whether the price subsequently drops below 800 by X points and then reaches 800 again. If the price initially reaches 800 and continues to advance past 803, Trader A will have gone short and will have realized a loss while Trader B does not. If the price reaches 800 and then immediately drops 15 points, Trader A will realize a 15 point profit while trader B will not even have an open position. The differing results are not dependent on Dr. Harris' five variables or whether the trades are allocated post-execution.

## CONCLUSION

Dr. Harris' methodology for calculating the profitability probability for the Quiddity customer and proprietary accounts and his analysis of the reason for the differing profitability are both fatally flawed.

7628 total contracts (3814 round turns) in pure day trades (opened and closed same session).

| Date | Trades | Contracts |
|------|--------|-----------|
| 2-Apr | 4 of 4 | 50 of 50 |
| 3-Apr | 4 of 4 | 100 of 100 |
| 6-Apr | 2 of 2 | 26 of 26 |
| 8-Apr | 4 of 4 | 50 of 50 |
| 9-Apr | 1 of 1 | 25 of 25 |
| 13-Apr | 0 of 3 | 0 of 3 |
| 14-Apr | 11 of 11 | 73 of 73 |
| 15-Apr | 6 of 6 | 59 of 59 |
| 16-Apr | 2 of 2 | 10 of 10 |
| 20-Apr | 2 of 2 | 9 of 9 |
| 21-Apr | 4 of 7 | 45 of 120 |
| 22-Apr | 3 of 8 | 57 of 107 |
| 23-Apr | 9 of 9 | 75 of 75 |
| 25-Apr | 5 of 5 | 50 of 50 |
| 28-Apr | 2 of 2 | 25 of 25 |
| 30-Apr | 4 of 5 | 52 of 53 |
| **Totals** | **63 of 75**<br>**84.00%** | **706 of 835**<br>**84.50%** |

| Date | Trades | Contracts |
|------|--------|-----------|
| 1-May | 7 of 7 | 75 of 75 |
| 4-May | 5 of 5 | 35 of 35 |
| 5-May | 1 of 1 | 25 of 25 |
| 6-May | 3 of 4 | 75 of 100 |
| 7-May | 4 of 4 | 50 of 50 |
| 8-May | 0 of 1 | 0 of 25 |
| 11-May | 4 of 4 | 30 of 30 |
| 12-May | 5 of 6 | 45 of 50 |
| 13-May | 1 of 1 | 25 of 25 |
| 15-May | 1 of 1 | 25 of 25 |
| 19-May | 1 of 1 | 22 of 22 |
| 20-May | 6 of 16 | 122 of 201 |
| 21-May | 9 of 10 | 115 of 125 |
| 26-May | 2 of 2 | 25 of 25 |
| 27-May | 2 of 2 | 25 of 25 |
| 28-May | 3 of 3 | 72 of 72 |
| **Totals** | 54 of 68<br>79.40% | 766 of 910<br>84.10% |

| Date | Trades | Contracts |
|------|--------|-----------|
| 1-Jun | 2 of 2 | 25 of 25 |
| 2-Jun | 2 of 2 | 50 of 50 |
| 3-Jun | 2 of 2 | 50 of 50 |
| 4-Jun | 2 of 2 | 25 of 25 |
| 8-Jun | 1 of 1 | 25 of 25 |
| 10-Jun | 3 of 4 | 15 of 25 |
| 12-Jun | 1 of 1 | 25 of 25 |
| 16-Jun | 1 of 3 | 25 of 25 |

Exhibit "A"

| Date | Trades | Contracts |
|------|--------|-----------|
| 17-Jun | 1 of 1 | 25 of 25 |
| 18-Jun | 0 of 2 | 0 of 25 |
| 22-Jun | 4 of 5 | 20 of 25 |
| 23-Jun | 3 of 6 | 37 of 50 |
| 24-Jun | 3 of 3 | 25 of 25 |
| 25-Jun | 1 of 1 | 25 of 25 |
| 30-Jun | 1 of 1 | 25 of 25 |
| **Totals** | **26 of 36** | **397 of 450** |
| | **72.20%** | **88.20%** |

| Date | Trades | Contracts |
|------|--------|-----------|
| 2-Jul | 0 OF 2 | 0 OF 25 |
| 6-Jul | 12 of 12 | 102 of 102 |
| 7-Jul | 5 of 5 | 70 of 70 |
| 20-Jul | 3 of 3 | 30 of 30 |
| 21-Jul | 3 of 4 | 90 of 100 |
| 23-Jul | 0 of 2 | 0 of 20 |
| 27-Jul | 4 of 4 | 50 of 50 |
| 28-Jul | 4 of 4 | 6 1of 61 |
| 30-Jul | 3 of 3 | 25 of 25 |
| 31-Jul | 3 of 4 | 71 of 86 |
| **Totals** | **37 of 43** | **499 of 569** |
| | **86.00%** | **87.70%** |

| Date | Trades | Contracts |
|------|--------|-----------|
| 3-Aug | 2 of 4 | 35 of 41 |
| 4-Aug | 1 of 1 | 50 of 50 |
| 7-Aug | 3 of 7 | 15 of 50 |
| 12-Aug | 4 of 4 | 70 of 70 |
| 17-Aug | 5 of 5 | 35 of 35 |
| 18-Aug | 1 of 1 | 35 of 35 |
| 19-Aug | 7 of 7 | 50 of 50 |
| 21-Aug | 4 of 4 | 111 of 111 |
| 27-Aug | 1 of 1 | 50 of 50 |
| 31-Aug | 2 of 2 | 50 of 50 |
| **Totals** | **30 of 36** | **501 of 542** |
| | **83.30%** | **92.40%** |

| Date | Trades | Contracts |
|------|--------|-----------|
| 1-Sep | 2 of 2 | 34 of 34 |
| 2-Sep | 2 of 2 | 50 of 50 |
| 3-Sep | 2 of 2 | 50 of 50 |
| 9-Sep | 1 of 2 | 25 of 27 |
| 10-Sep | 0 of 5 | 0 of 75 |
| 14-Sep | 0 of 1 | 0 of 1 |
| 15-Sep | 3 of 3 | 29 of 29 |
| 17-Sep | 3 of 3 | 30 of 30 |
| 18-Sep | 3 of 3 | 30 of 30 |
| 24-Sep | 4 of 4 | 35 of 35 |
| 25-Sep | 2 of 2 | 50 of 50 |

| | | |
|---|---|---|
| 28-Sep | 1 of 1 | 25 of 25 |
| 29-Sep | 1 of 1 | 25 of 25 |
| **Totals** | **26 of 33** | **433 of 508** |
| | **78.70%** | **85.20%** |

| Month | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|-------|------|------|------|------|------|------|------|------|
| Jan | 1.04% | 1.74% | 2.38% | 0.15% | 2.02% | 1.23% | 0.74% | 1.39% |
| Feb | 3.35% | 5.67% | 1.02% | 0.85% | -3.84% | -0.68% | 3.58% | -1.90% |
| Mar | 0.83% | 0.01% | 0.83% | 1.03% | -6.06% | 0.25% | 0.50% | 1.64% |
| Apr | 7.11% | -4.03% | -0.50% | -0.14% | 7.09% | 1.68% | 3.22% | -1.75% |
| May | -2.35% | -0.25% | 1.18% | -9.83% | 3.05% | 1.32% | 0.15% | -0.61% |
| Jun | 0.97% | 3.67% | 1.57% | 4.36% | -1.06% | 2.66% | 0.59% | 1.98% |
| Jul | 3.62% | -0.17% | 0.71% | 2.90% | 3.25% | 0.64% | 0.17% | 0.51% |
| Aug | 0.17% | 0.72% | -0.56% | 2.83% | 1.08% | 1.11% | 1.17% | 0.43% |
| Sep | 3.22% | 4.15% | 3.14% | 2.28% | 3.45% | -5.65% | 1.40% | 1.67% |
| Oct | -2.05% | -0.07% | 0.12% | 1.57% | 1.17% | -12.49% | 0.31% | 1.50% |
| Nov | 1.38% | 0.65% | 2.19% | 2.88% | 3.47% | 5.65% | 1.62% | -0.31% |
| Dec | 4.48% | 0.90% | 1.29% | 3.26% | 0.39% | 6.41% | 1.04% | 1.31% |
| Total | 14.96% | 13.40% | 14.14% | 5.71% | 14.17% | 0.58% | 15.41% | 5.97% |

Performance compounded monthly
Audited fund performance available through 2009
Prior to 2008 QED Program earned less than .75% of income from interest

Exhibit "B"

**EXHIBIT 18**

# Quiddity LLC
## Diversified Program
Quiddity Earnings Diversification Fund
Quiddity Managed Accounts



Exhibit No. 1
DEFT'S

# Due Diligence Questionnaire
## August 2008

**General Information, Key Personnel & Organization Structure**    2

**Program/Fund Information & Fund Structure**    6

**Investment Strategy**    7

**Investment & Research Process**    12

**Risk Management & Portfolio Construction**    13

**Operations & Administration**    18

**Competitive Summary**    20

**Recent Enhancements**    21



DEPOSITION EXHIBIT
Harris 18
1/10/14    RV

Quiddity LLC structures probability based strategies that reflect our macroeconomic views on liquid market sectors. Probability based strategies have non-linear performance profiles that enhance profit potential and facilitate advanced risk management. Such strategies profit both above and below our entry points, and profit even if our biases are wrong, while adding significant profit when we are correct. Our traders are experienced options market makers, with specific expertise in probability based trading. They are assisted by powerful proprietary analytic tools that reflect over one hundred man-years of development effort.

# Quiddity LLC
## Diversified Program



## General Information, Key Personnel & Organization Structure

1.  **Name of Management Company:**
    Quiddity LLC

2.  **Name of Fund:**
    QED Fund II LLC

3.  **Address of Principal Office:**
    141 W Jackson Suite 3100
    Chicago, IL 60604

4.  **Telephone:**
    (312) 583-0300

5.  **Facsimile:**
    (312) 583-1271

6.  **Investment Manager; Known Since:**
    Donald A. Newell, since inception, January 2003

7.  **Investor Relationship Officers:**
    Andy Davis, US Director of Marketing and Patrick Grosrenaud, European Director

8.  **Address of Sub-Office, if any:**
    There is no Sub-Office. Secure data and systems backup at 3525 N. Paulina, Chicago, IL, and Dalkim Technologies, Batavia, IL.

9.  **Telephone of Sub-Office, if any:**
    N/A

10. **Facsimile of Sub-Office, if any:**
    N/A

11. **Date of Formation:**
    December 2001

12. **Form of Organization:**
    Limited Liability Company

13. **Jurisdiction of Organization:**
    State of Illinois, USA

14. **Regulatory Registrations:**
    National Futures Association (NFA), Commodities Futures Trading Commission (CFTC)

15. **Date of Last Inspection(s):**
    NFA routine audit completed March 2006, annual outside CPA audit March 2008

2

# Quiddity LLC
## Diversified Program



**16. Organization Chart:**



**17. Ownership Structure:**
Donald A. Newell 99% ownership, Kristina Newell (spouse) 1% ownership

## Department Head Contact Information

**18. IT:** Dalkim Computer Technologies
   **Name:** Dale Schwer          **Email:** dschwer@dalkim.com
**19. Operations:**
   **Name:** Bernard F. Doyle III   **Email:** brennie@quiddityllc.net
**20. HR:**
   **Name:** Donald A. Newell        **Email:** danewell@quiddityllc.net
**21. Client Services:**
   **Name:** Jan Kodatt              **Email:** jkodatt@quiddityllc.net
**22. Legal:**
   **Name:** Bernard F. Doyle, Jr.   **Email:** bdoyle@d-b-law.com
**23. Compliance:**
   **Name:** Bernard F. Doyle, III   **Email:** brennie@quiddityllc.net
**24. Trading Desk:**
   **Name:** Jason Knupp             **Email:** jknupp@quiddityllc.net
**25. Accounting:**
   **Name:** Dave Staszak, CPA       **Email:** dave111@quiddityllc.net
**26. Capital Allocation:**
   **Name:** Donald A. Newell        **Email:** danewell@quiddityllc.net
**27. Risk Management:**
   **Name:** Kathy Winski            **Email:** kathy@quiddityllc.net

# Quiddity LLC
## Diversified Program



### 28. Backgrounds of Principals & Senior Employees:

#### Donald A. Newell, *Managing Member and President*

Mr. Newell brings extensive knowledge and success in options trading to Quiddity LLC, as well as practical entrepreneurial experience. His eight years as a market maker at the Chicago Board Options Exchange were marked by consistent financial success and the implementation of new ideas. In 1998, Mr. Newell, with two partners, founded Second City Trading LLC, a proprietary options trading firm specializing in both on and off-floor market making. As the firm's head trader, Mr. Newell was responsible for creating and implementing the firm's risk management policy; developing and running the trading desk; and overseeing the firm's 30 traders.

Mr. Newell left the CBOE trading floor in the summer of 2002 to join the family business, Sheridan Invesments, Inc.(SII), a CTA with a single strategy of yield enhancement in the U.S. Treasury market. In 2001, Mr. Newell realized that the developing inverted yield curve would render the strategy inefficient, given its lack of diversification, and chose to close the program. After a year of analysis, Mr. Newell directed a team of programmers in an overhaul of the SII software. The software was enhanced to allow it to manage trading in multiple markets and to allow biased probability trading. Risk management constraints were also expanded. The addition of market diversification and probability biases were such significant enhancements to the program's capabilities, Mr. Newell determined to launch a new program and Quiddity LLC commenced trading in January 2003.

Whether trading on or off of the floor, Mr. Newell has successfully coupled an instinctual understanding of markets with implementation of precise systems. Mr. Newell holds a BA in Finance from the University of Illinois where he graduated in 1994 with Departmental Distinction.

#### Bernard F. Doyle, III, *Senior Trader and Compliance*

Mr. Doyle brings a wide range of trading experience and analytical knowledge to Quiddity LLC. He started his career in trading in 1998 as an intern for Morgan Stanley Dean Witter, where he was eventually awarded autonomous, but supervised, operational control of the OTC retail precious metals desk. Following two summers of trading at Morgan Stanley, he joined Second City Trading LLC as a summer intern in 2000, where he began to learn the skills necessary to be a floor market maker. During the following school year at Tulane University, Mr. Doyle participated in the highly selective Burkenroad Program, which is a nationally recognized securities research program. Mr. Doyle was an analyst on the research team that modeled and consequently issued a research report on the cash flow, earnings, and stock price of Gulf Island Fabrication Inc. After graduation in 2001, Mr. Doyle rejoined Second City Trading LLC as a full time market maker apprentice and upstairs trader. In addition to learning the skills to trade options, Mr. Doyle also participated in the development of several technical trading and dynamic index trading programs. In May 2002 he joined Morningstar Inc., an independent mutual fund rating company,

4

# Quiddity LLC
## Diversified Program



as an Assistant Data Analyst. As a member of the special projects team Mr. Doyle specialized in 12b-1 fee structures and accounting issues. In January 2003, Mr. Doyle joined Quiddity LLC where he has continuously applied both his technical and fundamental backgrounds to contribute to the successful returns of the firm. In January of 2006, Mr. Doyle was made a principal of Quiddity LLC.

**Jason Knupp, *Senior Trader*** Jason brings a diverse knowledge of products and extensive options trading experience to Quiddity LLC. Jason entered the trading business in 1996 a month after graduating from Iowa State University with a Bachelor of Science in Finance. Jason joined Tague Securities and after the obligatory training program he became a market maker on the Chicago Board Options Exchange (CBOE). After Van der Moolen purchased Tague Securities, Jason became the Designated Primary Market Maker (DPM) for his pit. The role of the DPM at the CBOE is similar to a specialist on the New York Stock Exchange. Consequently, Jason was responsible for ensuring an orderly options market in several stocks including Eastman Kodak and Phillip Morris. In 2004 Jason left Van der Moolen to move to the futures business trading Chicago Mercantile Exchange products. Jason became a sole proprietor trading Eurodollars, currencies, energies, and index arbitrage. Jason joined Quiddity LLC in 2007. Jason will utilize his knowledge base in options and diverse futures products, along with the risk management learned as a DPM and a sole proprietor trader, to augment the capabilities of Quiddity LLC.

**Kathryn M. Winski, *Risk Manager*** Kathryn joined the Quiddity LLC team when trading commenced in early 2003. Her main responsibilities include portfolio analysis and risk management for all current Quiddity LLC trading programs. For the past 13 years, her responsibilities have encompassed trading room operations: trade execution, daily trade room routines, and system management. Kathy is an active participant in the ongoing evolution of Quiddity's proprietary software (QUIPS), with user interface and systems integration as primary responsibilities. From 1992 – 2001, Kathryn worked at Sheridan Investments and had an important role in the development and implementation of the earlier generation of the risk management software. Kathryn attended the University of Indiana in Bloomington.

## 29. Employee Turnover:
R. Wallace replaced as Marketing Director by A. Davis in April 2007.
K. Oldford pursuit of graduate degree February 2008.

## 30. Percentage of Time Principals & Senior Employees Devote to Manager:
100% devoted to manager.

## 31. Principals & Senior Employees Investment in Fund:
Depending on the particular individual there are those with 100% of liquid net worth to those with no investment at all.

# Quiddity LLC
## Diversified Program



**32. Compensation of Senior Employees:**
Salary and discretionary performance based bonus.

**33. Strategic Relationships, Affiliates, Sponsors and/or Partnerships:** None

**34. Restrictions on Employees' Personal Trading:**
No personal trading allowed in markets traded by the company.

**35. Code of Ethics:** Modeled on "Best Practice" and meets all NFA requirements

**36. Anticipated Organization Growth:**
A research assistant and an addition risk management staff member will be the next hires. Back office automation allows trading levels to increase without more staff.

**37. Pending, Settled or Threatened Criminal, Civil or Administrative Proceedings:** None

## Product/Fund Information & Fund Structure

**38. Assets Under Management for Fund(s) w/Historical Data:**
As of August 1, 2008, assets under management totaled $67,000,000. Initial start up funds totaled $450,000 in January 2003.

**39. Status & Capacity:** Initial fund capacity is $500 million, strategy capacity $1 Billion.

**40. Single or Multiple Manager(s):**
Quiddity programs and funds will always be a single manager.

**41. Fund(s) Open for New Investment:** All are open

**42. Number of Qualified Eligible Participant Investors:** 29

**43. Number of Non-QEP Investors:** None, as all investors must be QEP.

**44. Classes of Investors:** Only one class of investors in fund.

**45. Exchange Listings:** Not listed.

**46. Minimum Investment:** Managed accounts $1,000,000. Fund investor $50,000.

**47. Subscription Periods:**
Monthly subscription for the pool and daily subscription for managed accounts.

**48. Lock-up Period & Redemption Rights:**
No Lock-up Period. Redemption Rights, daily for managed accounts, monthly for pool.

**49. Gate & Suspension of Redemptions:**
No suspension of redemptions is possible. Unrestricted redemption at any month end is allowed in our Funds. Managed accounts have no restrictions at all.

# Quiddity LLC
## Diversified Program



**50. Fees, Hurdle, & High Water Mark:**
Standard terms are a 2% annual management fee and a 20% incentive fee. Variations have been negotiated. New high water mark is basis for incentive fee.

**51. Managed Accounts & Minimum:**
Managed accounts are accepted with a minimum investment of $1,000,000. Fees are negotiable, but have historically been the equivalent of a 2%/20% structure.

**52. Currency:**
Historically all but one account have been denominated in US dollars. The single exception to date is a Swiss Franc (CHF) account. Quiddity is indifferent to the denomination, or home currency, of any account.

## Investment Strategy

**53. Detailed Description of Investment Strategy:**
Quiddity LLC structures probability based strategies that reflect our macroeconomic views on liquid market sectors. Probability based strategies have non-linear, or curved, performance profiles keyed to underlying probability distributions. Such profiles enhance profit potential and facilitate advanced risk management. Options are required to produce such positions. A combination of long and short positions captures the benefit of probability based trading and maintains the full hierarchy of risk management constraints (see point 64). Such strategies profit both above and below our entry points, and profit even if our biases are wrong, while adding significant profit when we are correct.

The graph below illustrates the probability based trading advantage when the bias is EURUSD will trade in a 132 to 144 range with a 55% probability of ending above 136 in 30 days. It will significantly out-perform a simple "buy" strategy.



7

# Quiddity LLC
## Diversified Program



Unbiased market determined probability distributions are analyzed and used as the starting point in strategy development. Macroeconomic biases are developed using internal data analysis integrated with independent analysis from extensive public and private sources. Our proprietary software evaluates both biased and unbiased probability distributions, applying them to create nonlinear strategies that are profitable over a range of market prices, both up and down from initiation levels. Our experienced market maker traders find this software is a powerful tool that allows them to maximize risk-adjusted returns.

Quiddity strategies are planned and managed over 3 to 6 month expiration cycles, and performance is best evaluated over the full cycle, as we do internally. Daily and monthly returns volatilities are always higher than full cycle returns volatility. During each cycle, positions are evaluated continually and re-optimized to maximize risk-adjusted returns. This dynamic process generates roughly 40% of total trading returns, with the balance coming from the initial static projections. The other 60% comes from the initial strategy position (see discussion at point 65.)

Risk management is our first priority and is fully integrated into the strategy management process. A detailed description of our risk management hierarchy of constraints is provided at point 64 below. Probability based risk management is anticipatory, not reactionary, a significant advantage.

54.     **Portfolio Investments:**

The Diversified Program investment is limited to highly liquid and fully transparent exchange traded futures and options contracts. Expiration dates rarely exceed six months, and average eighty days.

| Strategy Component Positions: | Average | Range |
|---|---|---|
| Long Options | 40% | 30-50% |
| Short Options | 55% | 40-60% |
| Long Futures/Cash | 3% | 0-5% |
| Short Futures/Cash | 2% | 0-5% |



# Quiddity LLC
## Diversified Program

### 55. Distinguishing Features of Strategy & Strategy "Edge":

Quiddity strategies are probability based. Market expectations of future price movements are always best expressed in probabilistic terms. Strategies keyed to underlying probabilities, either market determined or reflecting our macro bias, have nonlinear "payoff profiles" and will always outperform linear strategies on a risk adjusted basis. This unique approach provides a significant portion of Quiddity's overall "edge."

Our traders are experienced options market makers, with specific expertise in probability based trading. As "price makers" instead of "price takers" they establish positions advantageously and continually rebalance them to maintain optimality. As is frequently the case at successful money management firms, the experience of the traders is the most important single contributor to "edge."

Our traders are assisted by powerful proprietary analytic tools that reflect well over one hundred man-years of ongoing development effort. These tools are critical to market established probability distributions analysis and the application of our macroeconomic biases. They establish positions that are initially optimal in terms of risk adjusted expected returns (probability weighted), and facilitate the continuous re-optimization.

Research is a relatively minor source of "edge." Research results are extremely "broad brush," making precision forecasts is not an element in Quiddity's success. Strategies will profit when the research bias is wrong, but provide strong incremental profitability when the bias is correct.

The relative importance of these four sources of "edge," or value added by Quiddity is illustrated in the graph to the right. The element labeled "macro bias" represents the contribution from our macro research.



Value Added Contributors

### 56. Effects on Strategy of Asset Growth & Capacity Constraints:

Given the highly liquid markets in which the strategy may invest, there is no anticipated capacity constraint. An initial limitation of $500 million will be self-imposed to verify market liquidity remains adequate before additional assets are accepted. When this level is reached a hold for three to six months will be done for assessment.

### 57. Most Favorable Types of Market Conditions:

Normal markets that conform to expected probability distributions. This includes range bound markets as well as markets that are trending moderately.

9



# Quiddity LLC
## Diversified Program

**58. Least Favorable Types of Market Conditions:**

Periods of extreme expansion in implied volatility, and exceptionally strong short-term price trends that were not anticipated are the two potential adverse conditions. A volatility expansion of over 35% in one day, or 65% in one to two weeks, creates severe distortions in spread relations between individual options. Such episodes have been rare historically, and have only occurred in the equity index sector in the period covered by our track record. Quiddity's experience in these equity market shocks, historically large expansions in 2006 and thrice in 2007, established that even in the worst case mark-to-market performance is only temporarily impacted. A return to long-term trend profitability is achieved within one to two months, well before expiration of the strategy impacted. Exceptionally strong price trends in any market can also have had temporary adverse impacts.

**59. Detailed Description of the Most Volatile Period Since Inception:**

As noted in point 58, extreme expansion in implied volatility, the basis of pricing options, creates severe distortions in option price relations. Because Quiddity strategies typically employ a variety of option spreads, such distortions can result in temporary mark-to-market losses. However, the spread relations must return to normal by option expiration. The four most volatile periods in the modern option era (post 1987) have occurred in the last eighteen months. The July/August 2007 period was by far the most volatile.



We learned a great deal from the events of May and June 2006, and made significant enhancements to our risk management systems in the second half of 2006. The equity market crash of February provided additional insight that lead to further improvements. The July and August 2007 stock market melt down provided an extreme stress test and validated the merits of these modifications, as performance was positive in every week during two months of market chaos. The event in November confirmed the improvements, as illustrated in the chart above. (More comment at point 96).

10

# Quiddity LLC
## Diversified Program



### 60. Historical Performance:

| Composite | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | Related Statistics | |
|---|---|---|---|---|---|---|---|---|
| January | 1.04% | 1.74% | 2.38% | 0.15% | 2.02% | 1.23% | Average annual return | 12.6% |
| February | 3.35% | 5.67% | 1.02% | 0.85% | -3.84% | -0.68% | Annualized standard deviation | |
| March | 0.83% | 0.01% | 0.83% | 1.03% | -6.06% | 0.25% | From inception | 9.4% |
| April | 7.11% | -4.03% | -0.50% | -0.14% | 7.09% | 1.68% | Currently | 4.9% |
| May | -2.35% | -0.25% | 1.18% | -9.83% | 3.05% | 1.32% | Maximum drawdown - m.o.m. | -10.0% |
| June | 0.97% | 3.67% | 1.57% | 4.36% | -1.06% | 2.66% | Recovery (trading days) | 38.00 |
| July | -3.62% | -0.17% | 0.71% | 2.90% | 3.25% | 0.64% | % Quarters with gain | 81.8% |
| August | 0.17% | 0.72% | -0.56% | 2.83% | 1.08% | | Average profitable quarter | 4.3% |
| September | 3.22% | 4.15% | 3.14% | 2.28% | 3.45% | | Average loss quarter | -3.5% |
| October | -2.05% | -0.07% | 0.12% | 1.57% | 1.17% | | Largest quarterly gain | 9.2% |
| November | 1.38% | 0.65% | 2.19% | -2.88% | 3.47% | | Largest quarterly loss | -7.4% |
| December | 4.48% | 0.90% | 1.29% | 3.26% | 0.39% | | Sharpe ratio w/o interest | 1.33 |
| Year | 14.96% | 13.40% | 14.14% | 5.71% | 14.17% | 7.28% | Correlations: | |
| | | (Compounded Monthly) | | | | | CTA Index | 0.05 |
| | July 2008 return is a preliminary estimate | | | | | | Hedge Fund Index | 0.14 |
| | Returns include less than .75% interest income per year | | | | | | S&P 500 | 0.17 |

### Description of Calculations for Performance Figures:

The performance documented in the accompanying track record is a composite of all accounts prepared in conformance to all prescribed NFA standards, and was reviewed in a routine NFA audit in March 2006. All figures are actual results. Fee structure varies between accounts, but all approximate our standard 2% management fee and 20% incentive fee. Managed accounts reflect no interest income, and the composite performance table shown above, interest income is less than 0.75% annually. Quiddity LLC has two funds through December 2007 in the composite that were audited annually by an outside CPA firm.

# Quiddity LLC
## Diversified Program

## Investment & Research Process

### 61. Detailed Description of Investment & Research Process:

As noted at point 55, research is a relatively minor source of "edge." Research results are extremely "broad brush," making precision forecasts is not an element in Quiddity's success. Strategies will profit when the research bias is wrong, but provide strong incremental profitability when the bias is correct. Fundamental macro-economic views define expected probability distributions for periods of 30 to 180 days. Data and independent analysis from extensive public and private sources is distilled into market sector forecasts, and then translated into specific "biased" price probability distribution forecasts.

In each market sector traded, four price range scenarios are possible:

> Market will remain largely unchanged
>
> Upward price bias (probability of higher price is over 50%)
>
> Downward price bias (probability of lower prices is over 50%)
>
> Market will be either sharply higher or lower (special situations)

The research process graphically:









**Start: Strategic Macro Economic view**

**Establish Probability Biases**

**Prioritize Opportunities**

**Adjust Macro View as necessary**

**Market Data & Trading Feedback**

**Strategic Trading Recommendations**

**Monitor Performance**



# Quiddity LLC
## Diversified Program

**62. Sources of Investment Ideas:**
As discussed in detail at points 53, 54 and 65, Quiddity uses a probability based approach that is the principal ongoing investment idea, and a significant source of our "edge". The structure demanded by this probability based approach provides for conceptual input in several areas. First is the development of biases to apply to market determined probability distributions. As noted in the previous point and at point 64, this is a "broad brush" element that adds only modestly to the Quiddity "edge." Second is the identification of pricing anomalies that may be profit generators. Viable examples tend to be time dependent and are identified by our software. Traders with market making experience can identify similar opportunity from the flow of live quotes. Option trading is still predominately done through open outcry, and large multiple leg orders can provide real opportunities.

## Risk Management & Portfolio Construction

**63. Detailed Description of Risk Management Policies:**
Probability analysis is the foundation of risk management, and is used to manage expected volatility through time by limiting expected (probability weighted) losses. Effectively this is a probabilistic approach to Sharpe ratio optimization.

A hierarchy of probability based risk constraints is maintained, determined by market established (unbiased) probability density functions. Examples of target constraints:

- Maximum acceptable losses at various probabilities;
  (e.g. breakeven at $\pm\, 2\, \sigma$, no loss over 2% at $\pm\, 3\, \sigma$)

- Minimum time passage for full loss recovery, without position changes; and
  (e.g. today's $3\, \sigma$ losses to be recovered in less than 30 days)

- Constraints on probability weighted losses at all times.
  (e.g. worst tail weighted losses must be under 1%)

Conditional expected losses (CEL), or "tail risk," are explicitly controlled to insure that loss exposure never exceeds that of a linear payoff profile with a comparable $3\, \sigma$ downside.

Shock analysis based constraints are also maintained against "event risk" and correlation breakdown losses.

Value at Risk (VaR) provides an industry recognized portfolio constraint that supplements our proprietary risk metrics, but is not of practical use.

Probability based risk management is proactive, not reactive. Risk constraints are maintained at all times by internal elements of the positions, making stop-loss orders unnecessary.

13

# Quiddity LLC
## Diversified Program



Risk management is the top priority at all times at Quiddity LLC, and efforts to improve it are ongoing. As noted in point 59, we benefit from our experience. Risk exposure by any metric has been radically reduced over the last eighteen months, while ongoing performance potential has improved. Because all of the QED strategies are executed with liquid and transparent exchange traded contracts, exchange established margin requirements provide an objective arm's length indication of position risk. In 2007 average margin required was under 15% of trading level in the unleveraged program, as compared to well over 30% in prior years. During the second half of 2007 the QED program was profitable every month, and average margin was only 9%. Future improvements are not likely to achieve as dramatic reduction.



A brief review of performance (point 60) shows that it has improved even as position risk has been reduced sharply. Note that annualized volatility is only 9.9%, and correlation with all assets groups is low.

Five years of learning from our experience and modifying our strategies accordingly has made the QED program an increasingly attractive investment. Fundamental market behavior has changed at an unprecedented pace in the last two years, and we expect this transformative process to continue, even to accelerate. We view this as opportunity, not problematic.



# Quiddity LLC
## Diversified Program

### 64. Targeted Risk/Return Profile:

As discussed at points 54, 55, and 59, Quiddity strategies are probability based. This means that the Risk/Return profile reflects the underlying market established probability distribution of future prices for the security at issue. Defined probability expectations lead to strategies that profit over a range of prices, with returns that are proportionate to their probabilities of occurring. Profit potential is greatest at price levels with a high probability of occurring, while loss exposure is limited to price levels with very low associated probabilities. The expected value of the biggest potential loss tail (potential total losses weighted by their associated probability of occurring) is constrained to be less than 1% at all times, while maximizing expected profits.

The graph below illustrates a typical Risk/Return Profile as it evolves from inception to expiration. Key characteristics:

Rate at which profit at highly probable price levels grows

Rate at which range of profitable prices expands

Minimizing potential losses to keep their probability weighted total value under 1%.

Recover of short term mark-to-market losses within specific time frame



15



# Quiddity LLC
## Diversified Program

**65. Number of Positions Long & Short:**
Specific positions are structured to best generate the desired probability based Risk/Return Profile, both initially and as it evolves over the strategy's life. Risk constraints always limit the degree to which a strategy can be both net long or short options and net long or short the market. In options terminology there are constraints and all of the "Greeks", especially Gamma, Vega, and Delta. There is no other explicit effort to determine the number of long and short positions. Longer-term average positions are detailed at point 54, and are fairly stable over time. Risk constraints are the primary determinate of allocation between market sectors. Position size, as measured by risk metrics, is increased in the sector with the best risk adjusted return until at the margin another sector becomes superior. Each sector must stand on its own risk metrics, although the diversified portfolio is constantly evaluated to verify that in total its risk metrics are less than the sum of the individual sectors.

**66. Trading, Cash Management, Holding Period for Positions & Portfolio Turnover:**
Trading consists of three activities: initiating strategies, ongoing optimization of strategies, and closing of any remaining positions at strategies expiration.

Margin utilization is the primary form of cash management. Average utilization is targeted below 15%, while peak utilization is not to not exceed 40%. Funds in excess of margin are invested in minimum risk securities.

Holding periods for strategies are tied to final expiration, typically 30 to 90 days, and at most 150 days. Individual components of any single sector strategy are subject to ongoing rebalancing to maintain optimum risk and return characteristics, as discussed at 65.

Four to six strategies are typically open at any one time, each in an individual macroeconomic sector, and have an average life of two months. Portfolio turnover on a strategy basis is therefore six times a year. Individual positions turn more frequently, with individual contract turn over of between eight and ten times annually.

**67. Position Sizes:**
Position sizes are determined primarily by the hierarchy of risk constraints (point 64), and secondarily by margin requirement management.

**68. Leverage Policies:**
External leverage in the form of borrowing is not used. Leveraging in terms of margin utilization as a percent of equity is actually deleveraging at only 0.1 to 1 on average, and 0.4 to 1 with extreme margin utilization.

**69. Portfolio Exposure Limitations:**
Our risk constraint hierarchy (see point 64) strictly limits exposure. Strategies are constructed with internal hedges to meet risk limits over all possible prices. These probability based constraints maintain a theoretical limit of a 20% of loss given a six standard deviation event (1 in 100,000). The practical exposure in the Diversified Program is less than half this level. With current methodology the draw down in the worst period of volatility ever (point 59) was under 10%.



# Quiddity LLC
## Diversified Program

**70. Spread Risk Limitations:**
Spreads are a significant component of our positions, and the risk constraints and exposure limits (points 64 and 80) expressly factor in spread behavior on a probabilistic basis.

**71. Geographic Exposure Limitations:**
Other than FX, exposure is limited to US and European exchange traded contracts on major equity indices, government fixed income securities, and industrial commodities. To the extent that FX exposure exists, it is limited to the G8 countries presently, and will expand to include China in the event the Renimbi floats.

**72. Liquidity Limitations:**
Investment and trading is restricted to only the most liquid and transparent markets. Liquidity in the Chicago Mercantile Exchange FX complex is adequate, but is the least liquid market traded in the Program. A self-imposed ceiling on assets of $500,000,000 will be maintained until it is established that addition funds will not pose a problem.

**73. Stop-Loss Levels:**
Probability based risk management is proactive, not reactive. Risk constraints are maintained at all times by internal elements of the positions, making stop-loss orders unnecessary. Refer to discussion at point 64 and 65.

**74. General Risks of the Strategy:**
The low margin utilization (points 63 and 66) and use of only highly liquid and transparent securities (point 54) make the program's general risk exposure

**75. Most Prominent Risk of the Strategy:**
Reference points 59 and 60. Note that the impact of extreme expansions in volatility or of extreme short-term price changes is transitory. By expiration any mark-to-market losses will usually be more than fully recovered. The graph below illustrates that as a group all strategies expiring in any given quarter were profitable over their full term.



17

# Quiddity LLC
## Diversified Program



**76. Analysis of Largest Historical Peak to Trough Draw downs as of Month-end:**
In May 2006 the emerging markets melt down triggered the then largest spike in options implied volatility in modern (post 1987) option market history (reference point 59). This caused a temporary mark-to-market loss of 9.86%. Adding the unrelated April loss of 0.14% brought the total draw down to 9.97%. This loss was fully recovered by mid August without material adjustment to the positions, because the distortions in option spread relations returned to normal as the September expiration approached.

**The Program's sensitivity to market volatility has been greatly reduced as was illustrated in July and August 2007.** As illustrated in the chart at point 59, the market volatility spike was double that occurring in 2006, but the series of enhancement made in 2006 and early 2007 resulted in profitable performance throughout the market crisis.

### Operations & Administration

**77. Process for Investing New Capital:**
It is fully invested to match existing open position as soon as market conditions permit. Typically from one to three weeks are required to reach full commitment.

**78. Process of Allocating Trades Among Accounts:**
1) All trades are done as block orders, with each account (fund or managed account) receiving positions in proportion to their relative equity.
2) Allocate trades in the proper ratio of account size if a full trade is executed.
3) Allocate contracts to bring accounts into line.
4) Allocate contracts to adjust deltas if account is out of line because of partial fills or adjustment in size of the account.
5) In the rare event that there is a split fill the average price of the trade will be utilized when available.
6) In the event that an average price cannot be utilized the High/Low Prices will be allocated starting with largest account in dollar terms down to smallest.
7) Trade allocation will be provided promptly to the FCM.

**79. Tracking of Individual Positions & Portfolio Allocations:**
Multiple redundant approaches are used and crossed checked. A daily trade log is maintained and confirmed with brokers by 3:30p.m. daily. Proprietary system management software tracks plans as they are executed both by market sector and account and then is crossed checked against the trade log by 4:00p.m. daily. Brokerage statements are reviewed each morning independently by risk management, accounting, and trade operations, and reconciled to the systems count each morning before 7:00 a.m.

**80. Quality of Trade Execution:**
As former market makers, our traders are extremely sensitive to the quality of execution. In the majority of trades they are "price makers" not "price takers," insuring that quality is excellent. Multiple quotes are always received to insure prices are competitive. Slippage is not a concern.



# Quiddity LLC
## Diversified Program

### 81. Policy/Procedures for Marking of Positions:
All positions are exchange traded and therefore marked by the exchange daily. Quiddity has no role in marking prices, which insures for full transparency.

### 82. Calculation of Net Asset Value:
A precise calculation of NAV is made at calendar month-end, when actual interest income, operating expenses, and fees are determinable. A month to date estimated change in NAV is done daily with actual settlement prices and estimates of other income, expense and fees.

### 83. Cash & Position Movements out of Funds:
Positions are never moved out of funds. If an investor were to transfer, then positions would be closed in the existing fund and opened in the new fund with two individual trades. Cash movement out is limited to payment of direct obligations of the fund, primarily trading manger fees, audit fees and bank charges, and to investor redemptions.

### 84. Use of Computer Technology & Automation:
Given that our proprietary software, reflecting over 100 man-years of development time accounts for 40% of our "edge", the use of computers is extensive. The ratio of computers to employees is approaching 3:1.

### 85. Types and Timing of Reports/Information to Investors:
Fund investors receive un-audited financial statements monthly and a month narrative report. Audited financial statements are received along with form K-1 annually. Any reasonable investor question is answered promptly.

### 86. Details of all Soft Dollar Arrangements:
None.

### 87. Backup/Disaster Contingency Plans:
Full back-up of all data is maintained at two separate external locations, updated daily. Operational capabilities are also maintained at two separate locations outside of the Chicago loop to allow trading to continue without interruption.

### 88. Third-Party Representatives:
No contractual relations exist with third party representatives. Quiddity will accept "walk in" introductions and negotiate appropriate compensatory agreements with third party agents.

### 90. Client Base:
Limited to Qualified Eligible Person (QEP) in both fund and managed accounts.

### 91. Compliance:
The firm has a compliance officer and follows all NFA guidelines and regulations. One NFA audit has been completed without material incident.

# Quiddity LLC
## Diversified Program



**92. Commissions and annualized trading volume:**

Both trading volume and commission costs per contract traded have been reduced steadily since inception. Further reductions in costs per contract may occur, but annualized trading volumes will remain near 4,000 per $1,000,000 of equity per year.



**Commissions Paid - Diversified Program**

**93. List of Service Providers:**

ABN (FX research)
Bloomberg (data and analysis)
CQG (data and analysis)
Credit Suisse (Macro research)
Stress Free Business Solutions (IT and disaster backup)
Doyle and Bolotin LTD (Legal and Compliance)
Newedge (execution and clearing)
Goldman Sachs (Macro research)
Humana (Health insurance)
J-Trader / Patsystems (electronic trading platform)
MF Global (execution, clearing, and fixed income research)
Masters Capital (Macro and equity research)
Mizuho (execution and clearing)
Northern Trust (Corporate and Fund Banking)
Paylocity (Payroll services)
Probability Analytic Research (Macro research)
Ryan & Juraska (Auditing, accounting consultation)
Speakeasy (Commutations and Disaster redundancy)
UBS (FX research)
XFA (execution)

20

# Quiddity LLC
## Diversified Program



### 94. Competitive Summary

Five years of learning from our experience and modifying our strategies accordingly has made the QED program an increasingly attractive investment. Fundamental market behavior has changed at an unprecedented pace in the last two years, and we expect this transformative process to continue. We view this as opportunity, not problematic.

The Quiddity Earnings Diversification program now has a five-year track record, which has shown the benefits of experience. Volatility has dropped to 9.9% from an initial level of 15%. Absolute performance has improved concurrently: the last twelve months return of 14.5% compare to a five year average of 12.7% per year. As discussed at point 63, risk as measured by exchange established margin utilization has dropped dramatically in the last 18 months.

Risk exposure by any metric has been radically reduced, as noted in point 63. Because all of the QED strategies are executed with liquid and transparent exchange traded contracts, exchange established margin requirements provide an objective arm's length indication of position risk. Average margin utilization has ranged between 5% and 15% for most of 2007 and should average less than 15% on an ongoing basis. This is a dramatic reduction from the average of 37% that prevailed from 2003 through 2006, as illustrated in the chart on page 14. Future improvements are not likely to achieve as dramatic reduction.

On an absolute basis, performance versus major benchmarks is clearly competitive. On a risk adjusted basis, it becomes compelling.



21



# Quiddity LLC
## Diversified Program

## 96. Recent Enhancements

While efforts to improve our programs are continuous, the enhancements made in response to the equity market volatility spikes in May-June 2006 and February-March 2007 were especially important. Volatility shocks can cause a myriad of distortions in option prices and price spread relationships. Over time these return to normal, by expiration at the very latest. However, the mark-to-market P&L impact in the short term can be serious. In the 2006 event, distortions arose that were more extreme than ever witnessed before. We at Quiddity studied these and made a series of strategy changes to adjust for them. The shock in early 2007 was more serious than the 2006 event, but because of the 2006 enhancements the short term P&L impact on the QED program was less than half as large, and the recovery of mark-to-market losses faster. Further lessons were also learned from this shock, and additional program refinements resulted in late March. The benefit of these strategy improvements was clearly demonstrated over the last ten months, beginning in April 2007. (Reference point 59).



Daily Performance in the "Crisis"
Quiddity Earnings Diversification Program Versus Indices

QED results are trading profits before any fees and without interest.

July-August market chaos provided a definitive stress test. It was significantly worse than either of the earlier events and caused wide spread havoc for many investment programs. The QED program was profitable every week during July and August 2007. November provided another "event" almost as severe as the summer one, while QED performance was well above its five year average, confirming that the strategy enhancements have tamed the short term risks inherent in volatility spikes. January 2008 QED performance demonstrates continuing stable uncorrelated portable Alpha.

**EXHIBIT 19**

A



**U.S. COMMODITY FUTURES TRADING COMMISSION**

CFTC GLOSSARY

**A GUIDE TO THE LANGUAGE OF THE FUTURES INDUSTRY**

The CFTC Glossary is intended to assist the public in understanding some of the specialized words and phrases used in the futures industry since many of these terms are not found in standard reference works. The CFTC Glossary is not inclusive, and if you cannot find the term you are looking for or have any other comments, please let us know.

Definitions are not intended to state or suggest the views of the Commission concerning the legal significance or meaning of any word or term and no definition is intended to state or suggest the Commission's views concerning any trading strategy or economic theory.

# A B C D E F G H I J K L M N O P Q R S T U V W X Y Z

## Abandon
To elect not to exercise or offset a long option position.

## Accommodation Trading
Non-competitive trading entered into by a trader, usually to assist another with illegal trades, such as a sale at a below market price intended to create a short-term trading loss for tax purposes that is later reversed.

## Accumulator
A contract in which the seller agrees to deliver a specified quantity of a commodity or other asset to the buyer at a pre-determined price on a series of specified accumulation dates over a specified period of time. The contract typically has a "knock-out" price, which, if reached, will trigger the cancellation of all remaining accumulations. Moreover, the amount of the commodity to be delivered may be doubled or otherwise adjusted on those accumulation dates when the price of the asset reaches a specified price different from the knockout price.

## Active Fund
A private fund as defined in section 202(a) of the Investment Advisers Act of 1940, that is not a third-party subaccount and that executes 200 or more swaps per month.

## Actuals
The physical or cash commodity, as distinguished from a futures contract. See Cash and Spot Commodity.

## Aggregation
The principle under which all futures positions owned or controlled by one trader (or group of traders acting in concert) are combined to determine reporting status and compliance with speculative position limits.

## Agricultural Commodity
An agricultural commodity is defined in Commission regulation 1.3(zz) as a commodity in one of four categories: (1) the enumerated commodities listed in section 1a of the Commodity Exchange Act, including such things as wheat, cotton, corn, the soybean complex, livestock, etc.; (2) a general operational definition that covers: "All other commodities that are, or once were, or are derived from, living organisms, including plant, animal and aquatic life, which are generally fungible, within their respective classes, and are used primarily for human food, shelter, animal feed, or natural fiber;" (3) a catch-all category for commodities that would generally be recognized as agricultural in nature, but which don't fit within the general operational definition: "Tobacco, products of horticulture, and such other commodities used or consumed by animals or humans as the Commission may by rule, regulation, or order designate after notice and opportunity for hearing;" and (4) "Commodity-based indexes based wholly or principally on underlying agricultural commodities."

## Agricultural Trade Option
Off-exchange options on agricultural commodities that are transacted directly between commercial market participants for hedging or risk management purposes.

## Agricultural Trade Option Merchant
Any person that is in the business of soliciting or entering option transactions involving an enumerated agricultural commodity that are not conducted or executed on or subject to the rules of an exchange.

## Allowances



DEPOSITION EXHIBIT
Harris 19A
1/10/14    KV
PENGAD 800-631-6989

risk, would be considered a retail customer.

## Retender
In specific circumstances, some exchanges permit holders of futures contracts who have received a delivery notice through the **clearing organization** to sell a futures contract and return the notice to the clearing organization to be reissued to another long; others permit transfer of notices to another buyer. In either case, the trader is said to have retendered the notice.

## Retracement
A reversal within a major price trend.

## Reversal
A change of direction in prices. See Reverse Conversion.

## Reverse Conversion or Reversal
With regard to options, a position created by buying a call option, selling a put option, and selling the underlying instrument (for example, a futures contract). See Conversion. Reverse Crush Spread: The sale of soybean futures and the simultaneous purchase of soybean oil and meal futures. See **Crush Spread**.

## Reverse Crush Spread
The sale of soybean futures and the simultaneous purchase of soybean oil and meal futures. See Crush Spread.

## Riding the Yield Curve
Trading in an interest rate futures contract according to the expectations of change in the yield curve.

## Ring
See pit.

## Risk Factor
See Delta.

## Risk Mitigation Service
Similar to Portfolio Compression Services, Risk Mitigation Service providers evaluate the portfolio of a swaps market participant and enter into new trades with counterparties in the service providers' network based on the overall risk profile of their client's portfolio. However, unlike **Portfolio Compression Services**, Risk Mitigation Services are not restricted to netting out redundant positions. Risk Mitigation Services may result in new positions that modify the overall risk profile of the client.

## Risk/Reward Ratio
The relationship between the probability of loss and profit. This ratio is often used as a basis for trade selection or comparison.

## Risked-Based Margining
See Portfolio Margining.

## Roll-Over
A trading procedure involving the shift of one month of a **straddle** into another future month while holding the other contract month. The shift can take place in either the long or short straddle month. The term also applies to lifting a near futures position and re-establishing it in a more deferred delivery month.

## Round Lot
A quantity of a commodity equal in size to the corresponding futures contract for the commodity. See Even Lot.

## Round Trip Trading
See Wash Trading.

## Round Turn
A completed transaction involving both a purchase and a liquidating sale, or a sale followed by a covering purchase.

## Rules
The principles for governing an exchange. In some exchanges, rules are adopted by a vote of the membership, while in others, they can be imposed by the governing board.

## Runners
Messengers or clerks on a trading floor who deliver orders received by phone clerks to brokers for execution in the pit.

B

```
                                    O_TIME~1
**********************************************************************
* Mike Shafer                                                       *
* School of Business                                                *
* Providence College                                               *
* CFTC v. Newell, et al., 12-cv-6763                                *
**********************************************************************;


**********************************************************************
* Analyze by time of fist trade.                                    *
**********************************************************************;

* Clear out the work library;
proc datasets lib=work kill nolist;
quit;

* Clear log and output from previous program;
DM 'ODSRESULTS' CLEAR EDITOR;
DM 'CLEAR LOG; CLEAR OUTPUT;' ;
run;

* Turn off date and page numbers for output;
options nodate
                nonumber;


**********************************************************************
* Analyze trades by time of first trade.                            *
**********************************************************************;

* Get hour of last trade;
data time;
        set cftc.all_trades_summary;
        hour=hour(timepart(trd_first));
run;

* Set up categories;
data time;
        set time;
        /*
        if 00<=hour<03  then interval='[00:00,03:00)';
        if 03<=hour<06  then interval='[04:00,06:00)';
        if 06<=hour<09  then interval='[06:00,09:00)';
        if 09<=hour<12  then interval='[09:00,12:00)';
        if 12<=hour<15  then interval='[12:00,15:00)';
        if 15<=hour<18  then interval='[15:00,18:00)';
        if 18<=hour<21  then interval='[18:00,21:00)';
        if 21<=hour<24  then interval='[21:00,00:00)';
        */
        /*
        if 00<=hour<12  then interval='[00:00,12:00)';
        if 12<=hour<18  then interval='[12:00,18:00)';
        if 18<=hour<24  then interval='[18:00,24:00)';
        */

        if 00<=hour<12  then interval='[00:00,12:00)';
        if 12<=hour<15  then interval='[12:00,15:00)';
        if 15<=hour<18  then interval='[15:00,18:00)';
        if 18<=hour<21  then interval='[18:00,21:00)';
        if 21<=hour<24  then interval='[21:00,00:00)';

run;

* Sort;
```

Page 1

DEPOSITION
EXHIBIT
Harris 19B
1/10/14   RV
PENGAD 800-631-6989

```
                                    0_TIME~1
proc sort data=time;
        by prop interval;
run;


****************************************************************************
* Perform t-test and Wilcoxon median test for differences in lot sizes.   *
****************************************************************************;


* Sort;
proc sort data=time;
        by interval prop hour;
run;

* Get summary stats;
proc means data=time noprint;
        by      interval prop;
        var     lot_size;
        output  out=stats(drop=_:)
                        n=n
                        mean=mean
                        median=median;
run;

* Print;
proc print data=stats noobs;
run;

* Get ttest for different holding times;
title 'Lot Size by Time: t-Test';
proc ttest data=time;
        class   prop;
        by              interval;
        var     lot_size;
run;
title;

* Get Wilcoxon Rank-Sum test and Kruskal-Wallis Test;
title 'Lot Size by Time: Wilcoxon Rank-Sum Test';
proc nparlway data=time wilcoxon;
        class   prop;
        by              interval;
        var             lot_size;
run;
title;


****************************************************************************
* Perform t-test and Wilcoxon median test for differences in holding times. *
****************************************************************************;


* Get summary stats;
proc means data=time noprint;
        by      interval prop;
        var     mins;
        output  out=stats(drop=_:)
                        n=n
                        mean=mean
                        median=median;
run;
```

Page 2

```
                                O_TIME~1
* Print;
title 'Holding Time Stats';
proc print data=stats noobs;
run;
title;

* Get ttest for different holding times;
title 'Holding Time by Time: t-Test';
proc ttest data=time;
        class   prop;
        by              interval;
        var     mins;
run;
title;

* Get Wilcoxon Rank-Sum test and Kruskal-Wallis Test;
title 'Holding Time by Time: Wilcoxon Rank-Sum Test';
proc npar1way data=time wilcoxon;
        class   prop;
        by              interval;
        var     mins;
run;
title;
```

EXHIBIT 20

№ 48960

# MIZUHO

MIZUHO SECURITIES USA INC.
Futures Division

SALES# FC

ACCOUNT NO.

| BUY | SELL |
|---|---|
| 35  EC2 | 35-12655 |

2008 OCT 28 PM 2:21

2008 OCT 28 PM 2:19

2008 OCT 28 PM 2:22

2008 OCT 28 PM 2:22

2008 OCT 28 PM 2:19

Source4 (773) 247-4141

MUZ-U



DEPOSITION
EXHIBIT
Harris 20
1/10/14   RV

QUID-MIZUHO-0000327

**AGENT:** 104

**MIZUHO** MIZUHO SECURITIES USA INC.
Futures Division

**24/HOUR DESK**

FC

FLOOR # _____ TICKET # 236695

BLOTTER # _____

☐ EFP
☐ EFP UNTIL IMM         737
☐ EFP THRU IMM

| C | D | L | M | S | Q | X |
|---|---|---|---|---|---|---|

☐ SYDNEY ONLY
☐ SYDNEY/SYCOM

☐ PROJECT A

☐ ACCESS

☐ GLOBEX ONLY
☐ SIMEX ONLY
☐ GLOBEX/SIMEX/GLOBEX

☐ TIFFE
☐ TSE
☐ OPEN CLOSE
☐ DAY SESSION ONLY

☐ LIFFE ONLY
☐ LIFFE/APT

☐ MATIF

☐ EUREX

OTHER EXCHANGE
NAME _____

☐ CALL BACK
☐ DO NOT CALL BACK
☐ CUSTOMER WILL
☐ CALL & CFM IN AM

**BUY**

−35 / 123⁶⁰ ✓

**SELL**

35 123⁶⁰

Form-MIZ-09

| ORDER PLACED BY | ACCOUNT NUMBER | TELEPHONE NUMBER | ORDER TAKEN BY | WAS ORDER CALLED BACK | ORDER WORKING WITH |
|---|---|---|---|---|---|
| Dn | ID | | | ☐ YES ☐ NO INITIALS | NAME |

Source4 773-247-4141

QUID-MIZUHO-0000330

**MIZUHO** MIZUHO SECURITIES USA INC.
Futures Division

AGENT: **104**

24/HOUR DESK
TICKET # 236694
BLOTTER # _____

☐ EFP
☐ EFP UNTIL IMM **737**
☐ EFP THRU IMM

FLOOR # _____

| C | D | L | M | S | Q | X |
|---|---|---|---|---|---|---|

☐ SYDNEY ONLY
☐ SYDNEY/SYCOM

☐ PROJECT A

☐ ACCESS

☐ GLOBEX ONLY
☐ SIMEX ONLY
☐ GLOBEX/SIMEX/GLOBEX

☐ TIFFE
☐ TSE
☐ OPEN CLOSE
☐ DAY SESSION ONLY

☐ LIFFE ONLY
☐ LIFFE/APT

☐ MATIF

☐ EUREX

OTHER EXCHANGE
NAME _____

☑ CALL BACK
☐ DO NOT CALL BACK
☐ CUSTOMER WILL
☐ CALL & CFM IN AM

**BUY** 7:00

7 / 123⁵³ ✓

4 / 123⁵² ✓

4 / 123⁵¹ ✓

20 / 123⁵⁰ ✓

**SELL**

35 .. 3C2⁵

~~125 00~~

123 ⁵⁰

| ORDER PLACED BY | ACCOUNT NUMBER | TELEPHONE NUMBER | ORDER TAKEN BY | WAS ORDER CALLED BACK | ORDER WORKING WITH |
|---|---|---|---|---|---|
| Don | 0000 ID | 773-868 9625 | MS | ☐ YES ☐ NO INITIALS_____ | NAME_____ |

Form-MIZ-09

Source4 773-247-4141

QUID-MIZUHO-0000331

**EXHIBIT 21**



N⁰ 48327

EMAILED

# MIZUHO

### MIZUHO SECURITIES USA INC.
### Futures Division

SALES#
FC

ACCOUNT NO. 010000

| BUY | SELL |
|-----|------|
| 1138-39 | Gml |

25 - JYH

11142
OB

25 - 111.39

2009 FEB -2 AM 11:09

Source6 (773) 247-4141

M12-11

EXHIBIT 22

№ 49165

# MIZUHO

### MIZUHO SECURITIES USA INC.

Brennie JG

SALES# FC

ACCOUNT NO. 0000

2008 OCT 28 Futures Division

2008 OCT 28 PM12:06  PM12:06

| BUY | SELL |
|---|---|
| | Gm |
| | 35 - JYZ |
| | 104.00 |
| | 10395 |
| | 10380 |
| | |
| | 7 - 104.00 |
| | 3 - 10383 |
| | 10 - 10382 |
| | 8 - 10381 |
| | 7 - 10380 |

2008 OCT 28 PM12:08  2008 OCT 28 PM12:08

2008 OCT 28 PM12:08

2008 OCT 28 PM12:08

Source (773) 247-4141

MIZ-11



DEPOSITION
EXHIBIT

Harris 22
11/01/17  KV

PENGAD 800-631-6989

Case: 1:11-cv-06763 Document #: 191-1 Filed: 04/01/14 Page 317 of 329 PageID #:1439

# MIZUHO SECURITIES USA INC.
## Futures Division

**AGENT:** 737

24/HOUR DESK

TICKET # 236115

TII  7:00AU  | C | D | L | M | S | Q | X | VAN

FLOOR # _____  BLOTTER # _____ Gml

**BUY**   GBX

2008 OCT 27 PM 0:21

35 JYZ8
10750

**SELL**

+1
10799

+34
10800

| ORDER PLACED BY | ACCOUNT NUMBER | TELEPHONE NUMBER | ORDER TAKEN BY | WAS ORDER CALLED BACK | ORDER WORKING WITH |
|---|---|---|---|---|---|
| Don | 80000 / ID | Call & Email | JK | ☑ YES ☐ NO / INITIALS | NAME _____ |

- ☐ EFP
- ☐ EFP UNTIL IMM
- ☐ EFP THRU IMM
- ☐ SYDNEY ONLY
- ☐ SYDNEY/SYCOM
- ☐ PROJECT A
- ☐ ACCESS
- ☐ GLOBEX ONLY
- ☐ SIMEX ONLY
- ☐ GLOBEX/SIMEX/GLOBEX
- ☐ TIFFE
- ☐ TSE
- ☐ OPEN CLOSE
- ☐ DAY SESSION ONLY
- ☐ LIFFE ONLY
- ☐ LIFFE/APT
- ☐ MATIF
- ☐ EUREX
- OTHER EXCHANGE NAME _____
- ☑ CALL BACK
- ☐ DO NOT CALL BACK
- ☐ CUSTOMER WILL
- ☐ CALL & CFM IN AM

Form-MIZ-09

Source4 773-247-4141

QUID-MIZUHO-0000329

**EXHIBIT 23**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| U.S. COMMODITY FUTURES TRADING COMMISSION, | : : : | |
| Plaintiff, | : : | Civil Action No.: 1:12-cv-06763 |
| v. | : : | |
| DONALD A. NEWELL AND QUIDDITY, LLC, | : : : | |
| Defendants. | : | |

## PLAINTIFF'S PRELIMINARY ANSWERS AND OBJECTIONS TO DEFENDANTS' INTERROGATORIES TO PLAINTIFF

Pursuant to Rule 34 of the Federal Rules of Civil Procedure ("FRCP") and in response to "Defendants Interrogatories to Plaintiff" ("Defendants' Interrogatories"), Plaintiff U.S. Commodity Futures Trading Commission ("Plaintiff" or "CFTC") answers and objects as follows.

### GENERAL OBJECTION AND QUALIFICATIONS

The CFTC asserts and incorporates by reference the following general objections to Defendants' Interrogatories as though they were set forth in full in each answer.

1. Plaintiff objects to Defendants' Interrogatories to the extent Defendants' definitions and instructions exceed the requirements of the FRCP.

2. Plaintiff objects to Defendants' Interrogatories to the extent that they seek information or documents protected by the attorney-client privilege, or any other evidentiary privilege, including the Privacy Act of 1974, 5 U.S.C. § 552a, or are conditionally protected under the work product privilege.



3. Plaintiff objects to Defendants' Interrogatories upon the grounds and to the extent that they seek information prepared or developed in anticipation of litigation or for trial.

4. Plaintiff objects to Defendants' Interrogatories upon the grounds and to the extent that they seek the discovery of information which is irrelevant and immaterial and not reasonably calculated to lead to the discovery of admissible evidence.

5. Plaintiff objects to Defendants' Interrogatories upon the grounds that the general instructions are so vague, broad, general, and all inclusive that they do not permit a proper or reasonable response and are, therefore, unduly burdensome and oppressive.

6. Plaintiff objects to Defendants' Interrogatories to the extent that they would seek the production of materials already in Defendants' possession, or materials equally available to Plaintiff and Defendants, on the grounds that they are burdensome. To the extent requested documents have already been produced to defendants by Plaintiff or a third party, Plaintiff will not produce such documents again.

7. Plaintiff objects to Defendants' Interrogatories to the extent that they attempt to use a request for production to require Plaintiff to authenticate documents provided by third parties.

### ANSWERS

1. Identify which days and transactions are referred to by the statement "days (at least fifteen) during the complaint period" which is referenced in paragraph 4 of the Harris Supplemental Report.

**ANSWER:**

| Date | Customer Trade | Proprietary Trade |
|------|----------------|-------------------|
| October 15, 2008 | 1 | 2 |
| October 16, 2008 | 2 | 3 |
| October 21, 2008 | 5 | 5 |

| | | |
|---|---|---|
| October 27, 2008 | 10 | 9 |
| November 4, 2008 | 19 | 10 |
| November 7, 2008 | 23 | 11 |
| November 14, 2008 | 30 | 14 |
| November 18, 2008 | 33 | 15 |
| November 24, 2008 | 35 | 19 |
| November 25, 2008 | 36 | 20 |
| November 28, 2008 | 38 | 21 |
| December 17, 2008 | 42 | 26 |
| January 12, 2009 | 48 | 27 |
| February 2, 2009 | 59 | 32 |
| February 12, 2009 | 60 | 40 |

2. Identify which days and transactions are referred to by the statement "on eight of these days, trades assigned to the customer accounts… daily profits" which is referenced in paragraph 5 of the Harris Supplemental Report.

**ANSWER:**

| Date | Customer Trade | Proprietary Trade |
|---|---|---|
| October 16, 2008 | 2 | 3 |
| October 21, 2008 | 5 | 5 |
| November 4, 2008 | 19 | 10 |
| November 14, 2008 | 30 | 14 |
| November 24, 2008 | 35 | 19 |
| November 25, 2008 | 36 | 20 |

| November 28, 2008 | 38 | 21 |
| February 12, 2009 | 60 | 40 |

3. Identify any CFTC rule or regulation upon which the Report is premised or relies upon for the conclusions set forth in paragraph 6 of the Harris Supplemental Report.

**ANSWER:**

None

4. Identify all documents and other materials upon which Harris reviewed and relies upon for his statements questioning whether Defendants utilized "delta hedging strategies" in paragraphs 10 and 11 of the Harris Supplemental Report.

**ANSWER:**

The Final Expert Report of John Burnside.

5. State Harris' understanding of the parameters and function of the "computer assisted trading strategy" as that term is referenced in paragraph 13 of the Harris Supplemental Report

**ANSWER:**

The discussion of the trading strategy as described in the Final Expert Report of John Burnside.

6. Identify all documents, records, or other information upon which Harris relies for his response to interrogatory 5 above.

**ANSWER:**

The Final Expert Report of John Burnside.

7. Define what is meant by the term "significant gamma" as referenced in paragraph 15 of the Harris Supplemental Report.

**ANSWER:**

The Final Expert Report of John Burnside uses the term "significant gamma." Gamma is the rate of change of delta in an option, or portfolio of options and is often calculated as the second derivative (with respect to the underlying security price) of an option pricing formula.

8. Identify the "trading records" referenced in paragraph 17 of the Harris Supplemental Report.

**ANSWER:**

"Trading records" include the Mizuho trade tickets, Devonshire trade tickets, XFA trade tickets, and MFG electronic trade records. Copies of these records, as well as an Excel spreadsheet identifying the Bates numbers of trade tickets were provided to Defendants on September 3, 2013.

9. Identify the trading records referenced in the third sentence of paragraph 18 of the Harris Supplemental Report.

**ANSWER:**

The records for Trade 1 (October 15, 2008) are Quid-Devon-0000170, Quid-Devon-0000173. The records for Trade 8 (October 23, 2008) are Quid-Devon-0000102, Quid-Devon-0000104, Quid-Devon-0000107, Quid-Devon-0000109, Quid-Devon-0000111, Quid-Devon-0000113.

10. Identify each and every transaction in which "executions of lesser quantity (including 1-, 2- and 3-lot executions) have been allocated to customer accounts" as that phrase is referenced in paragraph 19 of the Harris Supplemental Report.

**ANSWER:**

Plaintiff objects to this request because it is unduly burdensome. Defendants have all trade records reviewed by Dr. Harris. Notwithstanding and without waiving these objections, Plaintiff states that examples of such executions can be found in the MFG electronic trading records, to be found at Quid-MFG-0050354.

11. Identify the trades analyzed as referenced in paragraph 21 of the Harris Supplemental Report, including the "15 days of trades referenced therein.

**ANSWER:**

See details in response to Interrogatory No. 1 above.

12. Identify the "eight days" and any trades within those "eight days" analyzed by Harris as referenced in paragraph 22 of the Harris Supplemental Report, including any profit analysis of the referenced trades.

**ANSWER**:

See details in response to Interrogatory No. 2 above.

I calculated the profits and losses for each trade listed in response to Interrogatory 11 above,

calculated the overall profit and loss for the Customer Trades and the Proprietary Trades and

then compared the two sums.

13. Identify the MF Global electronic trading records referenced on page 12 of the Harris Supplemental Report.

**ANSWER**:

Quid-MFG-0050354, Quid-MFG-0050343

**VERIFICATION**

I HEREBY CERTIFY that the foregoing is true and correct to the best of my knowledge and information.

DATED: January 9, 2014                    _____
                                                      Jeffrey Harris, Ph.D

Dated: January 9, 2014

/s/ Boaz Green
Boaz Israel Green (*pro hac vice*)
D.C. Bar No. 977520
Trial Attorney
Bernard Kim (*pro hac vice*)
D.C. Bar No. 492412
Trial Attorney
Michael Solinsky (*pro hac vice*)
D.C. Bar No. 433754
Chief Trial Attorney
Gretchen L. Lowe
D.C. Bar No. 421995
Acting Director
U.S. Commodity Futures Trading
Commission
Division of Enforcement
1155 21st Street, NW
Washington, D.C. 20581
bgreen@cftc.gov
msolinsky@cftc.gov
Telephone:  (202) 418-6623 (Green)
Fax:  (202) 418-5523

Susan Padove
IL Bar No. 6196293
Senior Trial Attorney
U.S. Commodity Futures Trading
Commission
Division of Enforcement
525 West Monroe Street, Suite 1100
Chicago, IL 60661
spadove@cftc.gov
Telephone: (312) 596-0544
Fax: (312) 596-0714
Local Counsel

Counsel for Plaintiff U.S. Commodity
Futures Trading Commission

**Attachment A: Customer Trades**

| Trade Number | Date | Contract | | | |
|---|---|---|---|---|---|
| 1 | 10/15/2008 | IMM S&P 500 | October | 2008 | Put |
| 2 | 10/16/2008 | E-MINI S&P 500 | December | 2008 | |
| 3 | 10/17/2008 | E-MINI S&P 500 | December | 2008 | |
| 4 | 10/20/2008 | E-MINI S&P 500 | December | 2008 | |
| 5 | 10/21/2008 | E-MINI S&P 500 | December | 2008 | |
| 6 | 10/22/2008 | E-MINI S&P 500 | December | 2008 | |
| 7 | 10/22/2008 | IMM JYEN | December | 2008 | |
| 8 | 10/23/2008 | IMM EOM S&P | October | 2008 | Put |
| 9 | 10/24/2008 | E-MINI S&P 500 | December | 2008 | |
| 10 | 10/27/2008 | IMM JYEN | December | 2008 | |
| 11 | 10/28/2008 | IMM EURO FX | December | 2008 | |
| 12 | 10/28/2008 | E-MINI S&P 500 | December | 2008 | |
| 13 | 10/28/2008 | IMM JYEN | December | 2008 | |
| 14 | 10/29/2008 | E-MINI S&P 500 | December | 2008 | |
| 15 | 10/30/2008 | E-MINI S&P 500 | December | 2008 | |
| 16 | 10/30/2008 | IMM EURO FX | December | 2008 | |
| 17 | 10/31/2008 | E-MINI S&P 500 | December | 2008 | |
| 18 | 11/3/2008 | E-MINI S&P 500 | December | 2008 | |
| 19 | 11/4/2008 | IMM EURO FX | December | 2008 | |
| 20 | 11/4/2008 | E-MINI S&P 500 | December | 2008 | |
| 21 | 11/5/2008 | IMM EURO FX | December | 2008 | |
| 22 | 11/6/2008 | E-MINI S&P 500 | December | 2008 | |
| 23 | 11/7/2008 | E-MINI S&P 500 | December | 2008 | |
| 24 | 11/10/2008 | IMM EURO FX | December | 2008 | |
| 25 | 11/10/2008 | E-MINI S&P 500 | December | 2008 | |
| 26 | 11/13/2008 | IMM EURO FX | December | 2008 | |
| 27 | 11/13/2008 | E-MINI S&P 500 | December | 2008 | |
| 28 | 11/13/2008 | IMM JYEN | December | 2008 | |
| 29 | 11/14/2008 | IMM EURO FX | December | 2008 | |
| 30 | 11/14/2008 | E-MINI S&P 500 | December | 2008 | |
| 31 | 11/14/2008 | IMM JYEN | December | 2008 | |
| 32 | 11/17/2008 | E-MINI S&P 500 | December | 2008 | |
| 33 | 11/18/2008 | E-MINI S&P 500 | December | 2008 | |
| 34 | 11/20/2008 | IMM JYEN | December | 2008 | |
| 35 | 11/24/2008 | E-MINI S&P 500 | December | 2008 | |
| 36 | 11/25/2008 | E-MINI S&P 500 | December | 2008 | |
| 37 | 11/26/2008 | E-MINI S&P 500 | December | 2008 | |

| 38 | 11/28/2008 | E-MINI S&P 500 | December | 2008 | |
| 39 | 12/2/2008 | E-MINI S&P 500 | December | 2008 | |
| 40 | 12/8/2008 | E-MINI S&P 500 | December | 2008 | |
| 41 | 12/10/2008 | E-MINI S&P 500 | December | 2008 | |
| 42 | 12/17/2008 | E-MINI S&P 500 | March | 2009 | |
| 43 | 1/8/2009 | E-MINI S&P 500 | March | 2009 | |
| 44 | 1/8/2009 | IMM JYEN | March | 2009 | |
| 45 | 1/9/2009 | IMM JYEN | March | 2009 | |
| 46 | 1/12/2009 | IMM JYEN | March | 2009 | |
| 47 | 1/12/2009 | IMM JYEN | March | 2009 | |
| 48 | 1/12/2009 | IMM JYEN | March | 2009 | |
| 49 | 1/14/2009 | E-MINI S&P 500 | March | 2009 | |
| 50 | 1/15/2009 | E-MINI S&P 500 | March | 2009 | |
| 51 | 1/16/2009 | E-MINI S&P 500 | March | 2009 | |
| 52 | 1/21/2009 | E-MINI S&P 500 | March | 2009 | |
| 53 | 1/21/2009 | IMM JYEN | March | 2009 | |
| 54 | 1/22/2009 | E-MINI S&P 500 | March | 2009 | |
| 55 | 1/22/2009 | IMM JYEN | March | 2009 | |
| 56 | 1/23/2009 | IMM JYEN | March | 2009 | |
| 57 | 1/27/2009 | E-MINI S&P 500 | March | 2009 | |
| 58 | 1/27/2009 | IMM JYEN | March | 2009 | |
| 59 | 2/2/2009 | IMM JYEN | March | 2009 | |
| 60 | 2/12/2009 | E-MINI S&P 500 | March | 2009 | |
| 61 | 3/2/2009 | E-MINI S&P 500 | March | 2009 | |
| 62 | 3/6/2009 | E-MINI S&P 500 | March | 2009 | |
| 63 | 3/12/2009 | E-MINI S&P 500 | March | 2009 | |
| 64 | 3/18/2009 | E-MINI S&P 500 | March | 2009 | |

### Attachment B: Proprietary Trades

| Trade Number | Date | Size | Contract | Broker |
|---|---|---|---|---|
| 1 | 10/15/2008 | 300 | December 08 E-mini S&P 500 | MF Global |
| 2 | 10/15/2008 | 250 | October 08 E-mini S&P 500 | Mizuho |
| 3 | 10/16/2008 | 100 | December 08 E-mini S&P 500 | Mizuho |
| 4 | 10/17/2008 | 396 | October IMM S&P 500 | XFA |
| 5 | 10/21/2008 | 10 | November 08 E-mini S&P 500 | Mizuho |
| 6 | 10/23/2008 | 75 | December 08 E-mini S&P 500 | Mizuho |
| 7 | 10/24/2008 | 100 | December 08 IMM JPY/USD | Mizuho |
| 8 | 10/24/2008 | 30 | December 08 E-mini S&P 500 | Mizuho |
| 9 | 10/27/2008 | 70 | December 08 IMM JPY/USD | Mizuho |
| 10 | 11/4/2008 | 50 | November 08 IMM EUR/USD | Mizuho |
| 11 | 11/7/2008 | 50 | December 08 E-mini S&P 500 | Mizuho |
| 12 | 11/11/2008 | 25 | December 08 E-mini S&P 500 | Mizuho |
| 13 | 11/12/2008 | 353 | December 08 IMM JPY/USD | MF Global |
| 14 | 11/14/2008 | 85 | December 08 E-mini S&P 500 | Mizuho |
| 15 | 11/18/2008 | 10 | December 08 E-mini S&P | Mizuho |
| 16 | 11/20/2008 | 205 | December 08 E-mini S&P 500 | Mizuho |
| 17 | 11/21/2008 | 45 | December 08 E-mini S&P 500 | Mizuho |
| 18 | 11/21/2008 | 18 | November 08 IMM S&P 500 | XFA |
| 19 | 11/24/2008 | 65 | December 08 E-mini S&P 500 | MF Global |
| 20 | 11/25/2008 | 50 | December 08 E-mini S&P 500 | Mizuho |
| 21 | 11/28/2008 | 150 | December 08 E-mini S&P 500 | Mizuho |
| 22 | 11/28/2008 | 80 | December 08 IMM JPY/USD | Mizuho |
| 23 | 12/1/2008 | 60 | December 08 E-mini S&P | MF Global |
| 24 | 12/2/2008 | 40 | December 08 IMM JPY/USD | MF Global |
| 25 | 12/4/2008 | 2 | December 08 E-mini S&P 500 | MF Global |
| 26 | 12/17/2008 | 50 | March 09 E-mini S&P 500 | Mizuho |
| 27 | 1/12/2009 | 25 | March 09 IMM JPY/USD | Mizuho |
| 28 | 1/15/2009 | 60 | March 09 IMM JPY/USD | Mizuho |
| 29 | 1/16/2009 | 60 | March 09 IMM JPY/USD | Mizuho |
| 30 | 1/27/2009 | 20 | March 09 IMM JPY/USD | Mizuho |
| 31 | 1/28/2009 | 25 | March 09 IMM JPY/USD | Mizuho/MF Global |
| 32 | 2/2/2009 | 20 | March 09 IMM JPY/USD | Mizuho |
| 33 | 2/3/2009 | 25 | March 09 IMM EUR/USD | Mizuho |
| 34 | 2/3/2009 | 25 | March 09 IMM JPY/USD | Mizuho |
| 35 | 2/4/2009 | 50 | March 09 IMM JPY/USD | Mizuho |
| 36 | 2/6/2009 | 25 | March 09 IMM JPY/USD | Mizuho |

| 37 | 2/9/2009 | 25 | March 09 IMM EUR/USD | Mizuho |
|----|----------|-----|----------------------|--------|
| 38 | 2/9/2009 | 25 | March 09 S&P 500 | Mizuho |
| 39 | 2/11/2009 | 25 | March 09 IMM JPY/USD | Mizuho |
| 40 | 2/12/2009 | 25 | March 09 E-mini S&P 500 | Mizuho |
| 41 | 2/12/2009 | 25 | March 09 IMM EUR/USD | Mizuho |
| 42 | 2/12/2009 | 25 | March 09 IMM JPY/USD | Mizuho |
| 43 | 2/13/2009 | 25 | March 09 IMM EUR/USD | Mizuho |
| 44 | 2/17/2009 | 50 | March 09 IMM JPY/USD | Mizuho |
| 45 | 2/18/2009 | 25 | March 09 IMM JPY/USD | Mizuho |
| 46 | 2/19/2009 | 25 | March 09 IMM EUR/USD | Mizuho |
| 47 | 2/20/2009 | 25 | March 09 IMM EUR/USD | Mizuho |
| 48 | 2/23/2009 | 7 | March 09 IMM EUR/USD | Mizuho |
| 49 | 2/23/2009 | 25 | March 09 IMM JPY/USD | Mizuho |
| 50 | 2/24/2009 | 25 | March 09 IMM JPY/USD | Mizuho |
| 51 | 3/2/2009 | 25 | March 09 IMM JPY/USD | Mizuho |
| 52 | 3/3/2009 | 25 | March 09 IMM JPY/USD | Mizuho |
| 53 | 3/3/2009 | 25 | March 09 E-mini S&P 500 | Mizuho |
| 54 | 3/9/2009 | 25 | March 09 IMM JPY/USD | Mizuho/MF Global |
| 55 | 3/12/2009 | 15 | June 09 IMM JPY/USD | Mizuho |
| 56 | 3/18/2009 | 145 | June 09 IMM EUR/USD | MF Global |