IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
Eastern Division

| | |
|---|---|
| UNITED STATES COMMODITY FUTURES TRADING COMMISSION, )))) | |
| *Plaintiff*, ) | Civil Action No. 1:12-cv-6763 |
| ) | |
| *v.* ) | District Judge Andrea R. Wood |
| ) | Magistrate Judge Geraldine S. Brown |
| DONALD A. NEWELL; ) QUIDDITY, LLC, ) | |
| ) | |
| *Defendants*. ) | |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFF'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS**

**INTRODUCTION**

In its motion to compel, the CFTC argued that defendants must turn over drafts of the Burnside and Parkes expert reports for two independent and alternative reasons. First, Rule 26(b)(3)(A)'s attorney work-product protection over drafts "simply did not apply" when a party could demonstrate that the final expert report was likely commandeered or drafted by opposing counsel. Second, the CFTC explained that a separate exception under Rule 26(b)(4)(C) rendered those drafts discoverable, where the drafts included facts, data, or assumptions that the party gave to its expert. *See* Dkt 97 (hereinafter "Pl. MTC") at 13-14.

In support of these legal arguments, the CFTC cited to numerous facts and testimony, including "Version 7" of Burnside's report which vividly demonstrates, in MS Word's "track changes" format, that defense counsel Iavarone had inserted vast swaths of facts, data, assumptions, and even actual opinions and analyses into Burnside's report. Moreover, the CFTC cited to Burnside's testimony, wherein he admitted, multiple times, that Iavarone had written

large portions of his report and that he was "sure" that additional portions of his final report—which he could not identify at his deposition and which were not indicated as counsel's handiwork in Version 7's track changes—were written by Iavarone.[1]

The CFTC similarly showed that Parkes' report was drafted in substantial measure by Iavarone. For instance, the CFTC demonstrated that Parkes' testimony that the entire "Materials Reviewed" section of his report was drafted by Parkes himself and "definitely" took him over an hour to draft was contradicted by documentary evidence, which indicates that the section is a near-verbatim replica of the same sections found in defendants' other two experts' reports, one of which contains metadata indicating that Iavarone was the original author. Indeed, after the CFTC filed this motion to compel, on April 3, 2014, defendants produced yet another new document in Parkes' possession with metadata again indicating that the section in question was authored by Iavarone. *See* Reply Exhs. ("REXs") 17-18; *see also* GEX 10; Pl. MTC at 9. Moreover, the CFTC demonstrated that many pages of key analyses and opinions in Parkes' report (such as pages 37-39 of his final report) that Parkes incorrectly attributed to Burnside came from neither Parkes nor Burnside but from some unidentified third party, most likely

---

[1] *See* Pl. MTC at 4-7 & GEX 1; *see, e.g.,* GEX 11 (Burnside Dep.) at 297:18-298:1 (Q: "Mr. Iavarone added to the draft in track changes, and you accepted the change?" A: "Yes." Q: "So besides accepting the change, did you actually do anything to put this string of words together?" A: "Not that I recall."); *id.* at 298:20-299:8 (Under questioning about the large sections of his report inserted by Iavarone quoted in Pl. MTC at 4-5, GEX 1 at 2-3, Burnside testified, A: "[Iavarone] edited these sections of the report." Q: "Edited or added?" A: "I don't recall at this time." Q: "Well, do you see anything that [Iavarone's] replacing, or is he just adding in terms of track changes?" A: "I don't see any edits."); *id.* at 300:8-302:16 (Burnside admitting that he did "no new independent analysis before [he] accepted the language that Mr. Iavarone inserted into the report"); *id.* at 308:11-22 (Burnside testifying that Iavarone "must have" drafted another key paragraph in Burnside's report); *id.* at 310:14-18 (Burnside admitting that when he "decided to accept the changes" inserted by Iavarone regarding a key witness's testimony, he "accepted Mr. Iavarone's characterization of [that] testimony without any independent analysis" to verify Iavarone's characterization was accurate); *id.* at 311:17-22 (admitting again that there was no difference between what Iavarone inserted in track changes and what was in his final report, Burnside testifying that he could not remember whether he wrote a lengthy footnote in his report); *id.* at 313:4-23 (Q: "[S]o, in the paragraph that made its way into the final report, are those the same [as the one inserted by Iavarone in track changes]"? A: "They are. . . ." Q: "Who drafted that?" A: "[Iavarone] did."); *id.* at 487:21-490:7 (Burnside admitting that he simply hit "accept changes" to all of Iavarone's insertions to his report); *id.* at 497:5-20 (Burnside responding, "I'm sure that there are," to the question whether there exist *other* portions of his report, besides those found in track-changes in Version 7, where Iavarone drafted the language and Burnside accepted it verbatim).

Iavarone, whom Parkes admitted drafted portions of the report regarding "substance" and was involved in "developing" the report's opinions.[2]

In their opposition to plaintiff's motion, defendants do not really dispute that it would be improper for an attorney to draft large swaths of an expert report. *See* Dkt 116 (hereinafter "Def. Opp.") at 1 (defendants implicitly acknowledge that an attorney commandeering or drafting parts of an expert report is a "discovery violation[]"). Instead, they attempt to deny that this happened, *i.e.*, they mostly attack the factual bases of the CFTC's motion. However, defendants' arguments in this regard lack merit, because they are based upon either distortions or misstatements of the record. Likewise, defendants' attempt to distinguish the legal authorities relied upon by the CFTC is unpersuasive, while the lone case they cite, when properly understood, supports plaintiff's position that the drafts must be produced.

## DISCUSSION

### I. DEFENDANTS HAVE FAILED TO REBUT THE RECORD EVIDENCE CITED BY PLAINTIFF DEMONSTRATING THAT COUNSEL LIKELY AUTHORED LARGE PORTIONS OF THE BURNSIDE AND PARKES REPORTS

Defendants' explanations for denying that counsel (or Newell) drafted much of the substance of portions of the Burnside and Parkes are based upon either misstatements of fact, implausible speculations, or both.

#### A. Defendants' Contention that Iavarone Was Merely a "Scriber" Lacks Evidentiary Support

Defendants' first explanation for the substantial evidence indicating Iavarone drafted large portions of the Burnside and Parkes reports is that "[b]oth experts testified that Iavarone

---

[2] *See* Pl. MTC at 8-11, 15; GEX 4 (Parkes Dep.) at 489:11-494:13 (Parkes testifying that "Mr. Iavarone was involved in the process of developing the *opinions*, the *whole report*"; *id.* at 531:1-6 (Parkes testifying that he had "intensive conversations with Mr. Iavarone about the *substance* of [his expert] report" and that after these discussions, *Iavarone* drafted what they discussed into *Parkes'* report); *see also id.* at 551:21-552:5 (Parkes testifying that Iavarone "conveyed" to him the expert opinions of Wiermanski and Burnside in their discussions about the "evolving status of [Parkes'] opinions").

was a scriber; the substance came from them." Def. Opp. at 1; *see also id.* at 5 ("Defense counsel was forced to take a more active role in the *ministerial* drafting of Burnside's initial report" (emphasis added)).  Tellingly, defendants fail to provide a citation to testimony where the experts actually "testified that Iavarone was a scriber."  This is because the opposite is true: Both experts testified that Iavarone provided the substance of portions of their reports, not that he was a mere "scriber."  *See, e.g., supra* notes 1 & 2 (collecting some of the testimony of Burnside and Parkes wherein they admitted that Iavarone drafted the substance of parts of their reports); *see generally* GEXs 1, 4, 11.  In short, there is a plethora of testimony from both Parkes and Burnside where they either admit or clearly indicate that Iavarone drafted substantive portions of the reports; meanwhile, defendants have cited no testimony supporting their bald allegation that Iavarone was a mere "scriber."

If Parkes' and Burnside's admissions were not enough, the few drafts plaintiff has obtained also indicate authorship by Iavarone.[3]  Version 7 of Burnside's report speaks for itself; the track changes clearly indicate pages of insertions by Iavarone that form some of the central and most critical opinions in Burnside's report.  *See* GEX 1.  Likewise, a comparison of the initial draft Parkes sent to Iavarone on September 30, 2013, with the final draft dated October 10, 2013, shows that the final draft contains around 15 pages (37%) of additional analysis.  *Compare* REX 17 ("Report1.docx") *with* GEX 3.  Contained within these 15 pages are analyses and opinions that Parkes testified were Burnside's, not his, even though Burnside, when shown the

---

[3] It is worth noting that *none* of the drafts currently in the CFTC's possession were obtained because defendants produced them in the proper course of discovery.  Defendants produced these documents only reluctantly, after plaintiff exposed that defendants were improperly withholding them, either just days before a deposition or after filing the motion to compel.  *See, e.g.,* REX 17.  Hence, defendants' assertion that on April 3, 2014 (after the motion to compel was filed), "in an effort to get past these distractions, Defendants provided Plaintiff a copy of a draft of Parke's report which was never shared with any other expert," Def. Opp. at 3 n.3, is both factually incorrect and disingenuous:  As defendants later admit, the draft *was* shared with another expert, Burnside, and this was the reason they turned it over to the CFTC, *see* Fed. R. Civ. P. 26(b)(4)(C), who had already expressly demanded that the this draft be produced.  *See* Def. Opp. at 6; REX 17; Pl. MTC at 8.  The belated production of this draft does not cure the prejudice to the CFTC, as it was unavailable to plaintiff when it deposed defendants' experts.

same analyses and opinions, testified they were not his either. *Compare* GEX 4 at 405:3-406:12 (Parkes testifying the detailed ticket analysis on pages 37-39 of his report was Burnside's) *with* GEX 11 at 500:21-502:10 (Burnside testifying that this analysis was not his). If these analyses and opinions were neither Burnside's nor Parkes' according to their own admissions, the only logical answer is that they belong to a third party—most likely Iavarone or Newell, in view of their prior history of drafting parts of Burnside's report. *See* Pl. MTC at 10-11.

### B. Defendants' Contention that the Government Shutdown "Forced" Counsel to Draft Portions of the Expert Reports is Meritless

Defendants next make the odd argument that a "time crunch" caused by the Government shutdown "forced" Iavarone to take a more "active role" in the drafting of the expert reports. Def. Opp. at 4-5. First, this argument fails on its own terms. The scheduling order set forth the October 10, 2013 due date for defendants' expert reports in June 2013, Dkt 39, giving defendants nearly four months to prepare their expert reports; there was no "time crunch" caused by the Government shutdown. Second, and more importantly, this argument is a true *non sequitur*. A "time crunch" in no way excuses or makes less improper an attorney drafting and inserting huge swaths of opinions and analysis in a report that is supposed to reflect the opinions and analyses of the party's experts. The fact that one is pressed for time and approaching a deadline may make it more *tempting* to engage in conduct that (all parties agree) is improper, but it is completely irrelevant to the inquiry whether it is appropriate for an attorney to draft, commandeer, and even form the substance of, a report that is passed off as the expert's own opinions. *See* Pl. MTC at 11-13 (explaining why this is prohibited by Rule 26(b)).

### C. Defendants' Other Explanations Specific to Burnside and Parkes Lack Merit

#### 1. Defendants' Speculation that Burnside "May" Have Typed Some of His Expert Report on Newell's Personal Computer Is Both Implausible and Beside the Point

Defendants attempt to explain Newell's insertions into Burnside's report in two contradictory ways: First, they implausibly speculate that Burnside "may" have used Newell's computer to type up some of his report at one of their meetings based on Burnside's remarkable inability to recall whether he used Newell's computer to draft some of his own report. Def. Opp. at 8-9. Next they argue that, contradictory to their first argument, there is no problem with Newell being involved in the drafting of the expert report because his insertions were "not substantive." *Id.* Neither of these arguments addresses or responds to the CFTC's point that, regardless of Newell's involvement, *counsel for Newell* drafted large portions of the substance in Burnside's report, including additional, unknown portions that are not indicated in the track-changes in Version 7 of the Burnside report. *See supra* note 1; GEX 1.

### 2. Defendants Fail to Explain the Appearance of the "Mr. Hughes" Error in the Burnside Report

Defendants attempt to explain away the mistaken reference to Dr. Harris as "Mr. Hughes" in Burnside's report by alleging that Burnside, not Iavarone, "perpetuated" this mistake based upon his review of Parkes' September 30 draft. Def. Opp. at 11 n.9. But defendants fail to comprehend that the "Hughes" mistake is found *only in sections of Burnside's report known to have been inserted by Iavarone*, which Burnside admitted he did not draft but simply hit "accept changes" to Iavarone's insertions. GEX 1 at 2, 4; GEX 11 at 313:4-23; *see also* Pl. MTC at 15; *supra* note 1. They also provide no factual support for their contention that the "Mr. Hughes" error was "introduced" by Parkes. Def. Opp. at 11 n.9. Accordingly, this error simply confirms what Version 7 already makes clear: Iavarone, not Burnside, was the primary author of many sections and opinions in Burnside's report.

### 3. Defendants' Contention that They Did Not "Knowingly" Withhold a Draft of the Parkes Report Given to Burnside Until After the Motion to Compel Was Filed Is Without Merit

-6-

Defendants accuse the CFTC of making two false statements to the court: (1) saying that a "newly discovered" draft of the Parkes report was produced on April 2, 2014; and (2) "giving the misimpression that [this draft was] knowingly withheld" by defendants. Def. Opp. at 5-6. But both of these statements are indisputably true. The draft *was* newly discovered just a few days earlier according to counsel's own email, GEX 16 (email indicating that the Parkes documents "came to light" on Monday, March 28, 2014); and defendants' implication that the CFTC gave a false statement because the draft itself was not "new," Def. Opp. at 5 n.5, is both bizarre and pointless.

As for the "misimpression" that defendants "knowingly withheld" the draft, it is indisputable that defendants *did* knowingly withhold the document. As defendants admit, Newell himself, *the main defendant and party to this case*, gave the Parkes draft to Burnside, and defendant Newell knew that this draft had been transmitted to Burnside for his review in preparing his own expert report. GEX 16. Yet defendants failed to produce this document, even though the CFTC's discovery requests explicitly demanded all documents related to his expert report communicated between Newell and Burnside, *see* GEX 2 (RFP #1). Defense counsel must take responsibility for their own client's actions, and cannot escape a clear and knowing discovery violation simply by passing the blame to their client who is also a party to this case.[4]

### 4. Defendants' Explanation for Parkes' References to Burnside's Report in the September 30 Draft Confirms that Someone Other than Parkes Drafted the Portions of His Report that Parkes (Mistakenly) Attributed to Burnside

Defendants next attempt to show that Parkes, not Iavarone, was the original author of the Parkes report's many opinions that explicitly rely upon the Burnside report. They thus allege

---

[4] Defendants' failure to timely produce this key document, due to Newell's actions, is another reason why the CFTC is troubled by the fact that defense counsel apparently allowed Newell to search his own emails without attorney supervision to find *zero* emails between him and Burnside or Parkes. *See* Pl. MTC at 4.

that the references to Burnside in Parkes' report were included in the original and first draft Parkes allegedly created on his own on September 30, 2013. Def. Opp. at 6. When the CFTC asked Parkes how he could have included those references before being given any documents concerning Burnside's opinions, Parkes testified he was "certain" some of the Burnside references were in the September 30 draft, because he had been given the Burnside information in telephone calls with Iavarone. GEX 4 at 551:2-552:6. Defendants have perpetuated this myth in their opposition to the CFTC's motion to compel, stating: "The reference to Burnside's report in Parke's [sic] initial September 30, 2013 draft report was based on a detailed summary provided to him during a telephone conversation with one of Defendants' attorneys."[5] Def. Opp. at 6.

But here, defendants have become entangled in their own web of unsupportable explanations and misstatements of the record. The September 30 draft has now been produced (albeit belatedly, after the motion to compel was filed) to reveal that *there are no references to Burnside's report in Parkes' September 30 initial draft. See* REX 17 ("Report1.docx"). The word "Burnside" does not appear once in that draft, although it appears a multitude of times, in many pages of analysis, in the final Parkes report. Accordingly, it is clear that, contrary to defendants' contentions and contrary to Parkes' unequivocal testimony, the references were added at some point after September 30 by an unknown person.

The CFTC is entitled to know who drafted and is responsible for these major portions of the Parkes report, and the court should compel defendants to produce the drafts of Parkes' report in order to ascertain this critical information, without which the CFTC will be unable to adequately cross-examine Parkes regarding many of the opinions in his report.

---

[5] The Burnside analyses allegedly (and implausibly) transmitted over the phone to Parkes included detailed mathematical calculations and dozens of specific tickets and descriptions thereof, identified by Bates-stamp. *See* Pl. MTC at 10-11; GEX 3 (Parkes' final report) at 37-39.

>    5.   **Parkes' Allegation that Counsel Did Not "Write the Words" of His Report Is Contradicted by His Own Testimony and Cannot Be Credited in View of the Other Unreliable and Inaccurate Statements Parkes Made Under Oath on the Same Issue**

Defendants, relying upon Parkes' testimony that counsel did not "write the words" of his report, argue that the court and the CFTC must accept at face value Parkes' testimony. Def. Opp. at 9. But this testimony is already inconsistent with other testimony Parkes gave:

> A.  I remember intensive conversations with Mr. Iavarone about the *substance* of the report [after September 30, 2013].
> Q.  Um-hmm. And so after your discussions, [Iavarone], did *he take what you guys had discussed and incorporate it into the report?*
> A.  *To a certain extent, yes.*
> Q.  Why did Nick incorporate the edits into your draft that you discussed?
> A.  Because I had sent him the report and *he sent it back after we discussed it.*
> Q.  I know, but when you discussed it, why didn't—why weren't you the one that was typing up the discussion notes?
> A.  I don't know. . . .

GEX 4 at 538:1-14. Thus, Parkes clearly testified that Iavarone incorporated edits into a draft of his report that were about "substance," not style, and sent this document containing substantive additions to Parkes. Moreover, Parkes never testified that Iavarone was a "scriber" for Parkes' thoughts which Iavarone typed up into the report. To the contrary, Parkes testified that "Iavarone was involved in the process of *developing* the opinions*, the whole report*." *Id.* at 494:9-13. Likewise, when asked whether Iavarone gave him "substantive assistance" with regard to another opinion in his report, Parkes answered, "You know, perhaps, you know. It's—it's—*[Iavarone] understood these issues much more clearly, you know, initially than I did when I came to these opinions*. It's just very difficult for me today to say exactly. I don't know." *Id.* at 492:1-5.

Even more convincing than Parkes' testimonial inconsistencies is the documentary evidence contradicting Parkes' testimony. As explained above, the newly discovered September 30 draft does not contain the Burnside references that Parkes was "certain" were included when

-9-

he testified at his deposition. *See supra* Part I.C.4. Similarly, as explained in the CFTC's opening memorandum, Parkes again gave inaccurate and unsupportable testimony about the central issue in this motion, *who* drafted an entire section of his report, when he testified unequivocally that *he* had drafted the Materials Reviewed section. *See* Pl. MTC at 9.

On this score, defendants' explanation for the Materials Reviewed section, which the CFTC contends was likely drafted by Iavarone, *id.*, is clearly evasive, because it persistently declines to admit or deny that Iavarone was the original author of this section. Def. Opp. at 11. Instead, defendants parse words to studiously avoid addressing the matter. For instance, defendants state that Burnside "apparently" generated the section from the document he received from Newell, without mentioning that the metadata for that document also indicates, like a similar document in Wiermanski's report, that the "Author" was "Nicholas P. Iavarone." GEX 10; REX 18; Pl. MTC at 9. Defendants then state awkwardly that "the *possibility* that 'Iavarone' might have copied the 'Materials Reviewed' section of the Word file he had received from Parkes four days earlier . . . never occurred to the CFTC," which they then follow with an "assuming *arguendo*" hypothetical.[6] Def. Opp. at 11 (emphasis added). But why speak of a factual issue—particularly a fact which defense counsel is in the best position to affirm—in such speculative and hypothetical terms? Why not directly certify on the record that "Iavarone did not draft or author the 'Materials Reviewed' section of Parkes' report, and Parkes testified truthfully when he declared he was the original author"? The answer is obvious. Parkes did not draft the

---

[6] Defendants' hypothetical argument that Iavarone authoring the Materials Reviewed sections for all three of their experts is "no big deal" is alarming. *See* Def. Opp. at 11. *Of course it is.* A basic purpose of an expert deposition is to test an expert's theories by inquiring what information he actually considered and what he failed to consider. Knowing exactly what materials the expert reviewed is the very foundation of this inquiry. If this information is pre-determined and made intentionally vague by an attorney, *without any indication that the expert actually reviewed the materials the attorney pre-determined*, the attorney has debilitated a party's ability to test the expert's theories. And this is precisely what happened here, especially in the case of the Parkes deposition, where Parkes testified that even though his report expressly stated he had "reviewed" the materials delineated by Iavarone, in truth, he had not reviewed them—the documents in the Materials Reviewed section were only "made available" to him, and thus the documents he *actually* reviewed were never specified. REX 20 (Parkes Dep.) at 45:2-48:22.

Materials Reviewed section of his report as he unequivocally testified, and accordingly the CFTC is entitled to review the drafts of his report to determine how this and the other 15 pages (37%) of his report not found in the September 30 draft were incorporated into his final report.[7]

## II. DEFENDANTS' LEGAL ARGUMENTS AND ATTEMPTS TO DISTINGUISH THE RELEVANT CASE LAW REQUIRING DISCOVERY OF THEIR EXPERTS' DRAFTS LACK MERIT

Defendants' attack of the CFTC's legal authorities is as unpersuasive as their attack of the factual bases for plaintiff's motion to compel. *See* Def. Opp. at 11-14.

Preliminarily, it is telling that defendants decline to attempt to distinguish the central case relied upon by the CFTC for its motion, *Gerke v. Travelers Cas. Ins. Co.*, 289 F.R.D. 316 (D. Or. 2013), despite the CFTC's contention in its opening brief that *Gerke* is on all fours with the instant case. Pl. MTC at 14. Presumably this is because such a task is impossible. Instead, defendants set up a straw man, attacking and distinguishing (and not persuasively) cases that *Gerke* relied upon, not the *Gerke* case that the CFTC relied upon. Def. Opp. at 12. Nor do defendants identify any case disagreeing with the holding in *Gerke*. Defendants thus have presented this court with no legal authority or distinguishing circumstances to challenge the central case relied upon by the CFTC in support of its motion to compel.

Defendants argue that *Gerke* was wrongly decided because its holding "would essentially repeal the 2009 [sic] amendments to Rule [26]" that granted attorney work-product protection over drafts of expert reports. *Id.* at 12. But it is defendants' position—*i.e.*, that the 2010

---

[7] Much of defendants' opposition is devoted to attacking a straw man regarding their experts' notes, as if the CFTC is interested in compelling production of Burnside's and Parkes' non-existent notes. Def. Opp. at 2-4, 6-8. As the CFTC explained, however, because defense counsel apparently supplied the relevant opinions and analysis to Burnside and Parkes, there was no need for them to take any notes on subjects that were foreign to them. *See* Pl. MTC at 7. Indeed, the lack of relevant notes is one major reason why the CFTC requires the drafts of the reports, to discover the sources and bases of the experts' opinions and analyses. As for defendants' charge that it was "disingenuous" for the CFTC to assert Parkes was not familiar with the relevant "bunched order" provisions of Rule 1.35 and is not an expert in CFTC regulations, Def. Opp. at 7-8, the record speaks for itself, and the court is respectfully referred to defendants' own exhibit, *id.* Exh. G at 146:9-11, 147:12-20, to determine which party is being "disingenuous."

amendments protect drafts that clearly were the handiwork of counsel such as Version 7 of the Burnside report—that would eviscerate Rule 26. Common sense dictates that Rule 26 does not protect such "drafts," because otherwise expert reports could be drafted *en toto* by a lawyer, rubber-stamped by a hired gun paid tens of thousands of dollars to do so, and then passed off as the hired gun's "expert" report. Depositions of experts would become a farcical exercise, in which the theories of a party's lawyer, not the opinions of the expert, would be tested through the cross-examination of a puppet serving as a "conduit" for the lawyer's theories. *See Gerke*, 289 F.R.D. at 328. And if Rule 26 were interpreted to protect drafts written by a lawyer, an expert would be able to bolster the lawyer's theories before a jury with a false veneer of objectivity and expertise, while being insulated from impeachment even though the theories were never his. *Id.*

To be sure, the 2010 amendments were intended to protect *legitimate* drafts of expert reports from discovery in most cases. But the *Gerke* court was fully aware of this, and canvassed the entire history of Rule 26 in this regard, focusing on the 2010 amendments and their underlying policies as well as the relevant case law. *Id.* at 325-28. The scholarly opinion in *Gerke* thus carefully weighed the policies underlying the 2010 amendments, which were intended to protect legitimate drafts *of the expert* from needless and fruitless litigation, against the intolerable circumstance of a lawyer "commandeering" the expert to serve as a "conduit" for his own theories. *Id.* Ultimately, the *Gerke* court arrived at a clear rule of law that appropriately balanced all the policies and drew a sensible line between these two countervailing considerations: "Rule 26(b)'s attorney work product protection has limits" and discovery of drafts will be permissible only where "the record reveals" that such commandeering may have taken place. *Id.* at 328. In other words, a party cannot base his demand for drafts on mere speculation or suggestion—he must present persuasive *evidence* justifying his claim that the opposing party commandeered the expert's report. As explained above and in its opening brief,

the CFTC has provided more than sufficient evidence for this purpose, far more than was available to the *Gerke* court. Pl. MTC at 14-15.

Properly understood, then, the *Gerke* rule was essentially followed by the court in *Medicines Co. v. Mylan, Inc.*, 2013 WL 2926944 (N.D. Ill. 2013), the sole case that defendants rely upon, but a case that actually supports the CFTC's position. In *Mylan*, the court declined to permit discovery of drafts based upon a party's suspicion that was "speculative at best" rather than record evidence as required by *Gerke*. *Id.* at *4. The movant there merely alleged that the expert had apparently copied language from a declaration that had been given to the expert by counsel, and the movant suspected that counsel had instructed the expert to include this language in his report—even though it was undisputed that the *counsel had not drafted the report or the declaration. Id.* This is the opposite of the situation here, where the CFTC has provided substantial evidence that the expert reports were actually drafted by, not just based on documents drafted by, defendants' counsel. Indeed, the *Mylan* court implied it would have ruled differently if there were any evidence that a substantive portion of the report was in fact drafted by counsel. *Id.* ("*Gerke* is inapplicable to the facts of this case [because], unlike the defendant's counsel in *Gerke*, [Mylan's counsel] did not write *any portion* of the document that the counsel gave to the expert" (emphasis added)).

Moreover, defendants fail to address the CFTC's alternative rationale for requiring production of the drafts: The clear evidence, discussed above, that the drafts transmitted facts, assumptions, and data (and even opinions and analysis) from defendants to their experts, and are hence expressly excepted from the privilege under Rule 26(b)(4)(C). *See Gerke*, 289 F.R.D. at 328-29; Pl. MTC at 13-14.

Finally, defendants misunderstand the nature of plaintiff's argument and Rule 26(b)(3)(A) itself when they suggest that the CFTC is required to make a "showing of substantial

-13-

need" and "undue hardship" to obtain the drafts. That showing is required only if the attorney work-product privilege applies to the drafts at issue. As the *Gerke* court explained, "Rule 26(b)'s attorney work-product protection has limits," and the privilege simply does not extend to drafts authored by attorneys, period. *Gerke*, 289 F.R.D. at 328. Nor does it apply to drafts containing facts, data, and assumptions, which are expressly excepted from Rule 26(b)(3)(A) under Rule 26(b)(4)(C). Rather, a movant must make a "substantial need" showing only when the attorney work-product privilege definitively applies to the expert drafts, which is consistent with Rule 26(b)(3)(A)'s application of the attorney work-product privilege in every context, not just expert reports.[8] *See, e.g., United States v. Farley*, 11 F.3d 1385, 1390 (7th Cir. 1993); *compare, e.g., Gerke*, 289 F.R.D. at 328-29 (not performing the "substantial need" analysis because the privilege did not apply to the drafts at issue) *with Mylan*, 2013 WL 2926944 at *5 (performing the "substantial need" analysis because the privilege did apply to the drafts at issue).

### III. THE COURT SHOULD GRANT PLAINTIFF'S MOTION AS UNOPPOSED WITH RESPECT TO DEFENDANTS' FAILURE TO CONDUCT AN ADEQUATE SEARCH FOR AND PRODUCE RESPONSIVE EMAILS

Defendants have submitted no opposition to plaintiff's motion to compel the production of the emails plaintiff specified and withheld in defendants' privilege log, *see* Pl. MTC at 16. Nor do they dispute that their privilege log is inadequate as a matter of law. *See id.* at 16-17. Also, as the CFTC pointed out, defendants failed to conduct a proper search of counsel's and Newell's email accounts, having provided virtually no emails from those accounts, even though there is definitive proof that responsive emails exist, *see, e.g., id.* at 17. Indeed, *last Monday*, on May 12, 2014, defendants produced yet another new email from one of their experts that was never produced, even though defendants' brief in opposition to this motion incorrectly states that

---

[8] In any event, even if such a showing were required, the CFTC has made that showing, since it remains in the dark as to the basis and source of many central opinions in the Parkes and Burnside reports, and will be unable to adequately cross-examine the experts at trial unless the information found only in the draft reports is produced.

the email "had been produced to the CFTC," Def. Opp. at 6. *See* REX 19. Moreover, although defendants accuse the CFTC of "refus[ing] to accept the fact that no emails exist between Burnside and Defendant Newell," Def. Opp. at 3, the production of yet another new email shows that the CFTC has substantial basis to believe that defendants never conducted an adequate search for emails in counsel's or Newell's emails, given defendants' history of withholding responsive emails and producing them at the last minute. *See, e.g.,* GEX 14 (new email from counsel's inbox produced on March 4, 2014, on the eve of a second expert deposition); *see also supra* note 4. Indeed, *twice* in defendants' opposition filed on May 2, 2014, they refer to specific emails that they incorrectly state have been produced to the CFTC. *See* REX 19. This drip-drip-drip of discovery must end—particularly since defendants have not opposed the CFTC's motion to compel in this regard—and the court should order defendants to produce the emails delineated in plaintiff's motion, conduct a proper search of their own and Newell's emails for responsive documents, and amend their privilege log to satisfy the basic requirements of the law, as explained in Parts II & III of the CFTC's motion to compel, *see* Pl. MTC at 16-17.[9]

## CONCLUSION

For the foregoing reasons, and for those stated in its opening brief in support of its motion to compel, the court should grant plaintiff's motion to compel production of documents.

Respectfully submitted,

---

[9] Footnote 3 of defendants' opposition brief is wrong in virtually every respect. The CFTC *did* produce discoverable, responsive emails between their expert and the CFTC, as specifically requested by defendants, as well as a lengthy privilege log that detailed the factual and legal basis for any redactions or withheld emails. Also, the CFTC *did* produce the native, raw data pursuant to expert discovery in a timely manner, long before Dr. Harris's deposition. *See* GEX 13 ("[W]e have given you all the data Dr. Harris compiled, the SAS codes used to analyze these data and run the statistical analysis, and the outcome of the statistical tests"). What defendants are referring to in their footnote are "interim files" that defendants could have created using the native data plaintiff produced, but which (since they were not competent in the use of SAS) Dr. Harris converted for them into Excel format, in order to provide them with "a format that more easily shows some of the variables" defendants were inquiring about. *Id.* Finally, plaintiff's counsel Boaz Green did respond by phone to defense counsel Block regarding the purported "coin flip" documents soon after they were first requested, informing him that no such documents exist.

<u>/s/ Bernard Kim</u>
Bernard G. Kim, Trial Attorney
Boaz Green, Trial Attorney
James H. Holl, III, Chief Trial Attorney
U.S. Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st Street, NW
Washington, D.C. 20581
(202) 418-5000
(202) 418-5531 (fax)
BGKim@CFTC.gov
BGreen@CFTC.gov
JHoll@CFTC.gov

*Attorneys for the Plaintiff*
*U.S. Commodity Futures Trading Commission*

DATED: May 16, 2014

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 16, 2014, I filed the foregoing using the CM/ECF system, which will send a notification of electronic filing to the following:

Alan F. Block, Esq. (alan@block-landsman.com)
Nicholas P. Iavarone, Esq. (niavarone@iavaronefirm.com)
*Attorneys for the Defendants*


/s/ Bernard Kim
Bernard Kim, Trial Attorney
U.S. Commodity Futures Trading Commission